04 CV 8141

JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

MICHAEL FEDER, On Behalf of Himself and :    Civil Action No.
All Others Similarly Situated,                  :

                                        :    CLASS ACTION

                 Plaintiff,          :

                                          :    COMPLAINT FOR VIOLATION OF THE
     vs.                              :    FEDERAL SECURITIES LAWS

AMERICAN INTERNATIONAL GROUP,       :
INC., MAURICE GREENBERG, HOWARD   :
SMITH and THOMAS TIZZIO,            :

                                          :

                Defendants.      :    DEMAND FOR JURY TRIAL

——————————————————————— x

## INTRODUCTION

1. This is a securities fraud class action on behalf of persons who purchased the publicly traded securities of American International Group, Inc. ("AIG" or the "Company") between October 28, 1999 and October 13, 2004 (the "Class Period"), against AIG and its top officers, for violations of the federal securities laws arising out of defendants' dissemination of false and misleading statements concerning the Company's results and operations.

2. AIG is a holding company that, through its subsidiaries, is engaged in a range of insurance and insurance-related activities in the United States and abroad.

3. The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a) That the Company was paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements;"

(b) That by concealing these "contingent commissions" and such "contingent commission agreements" the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars;

(c) That defendants had concealed the fact that it had engaged in illegal transactions using PNC-style structures with at least five additional insurers (in addition to PNC), contrary to defendants' claims on January 30, 2002; and

(d) That as a result of (a)-(c) above, defendants, as more fully described in ¶¶26 - 42, the Company's prior reported revenue and income was grossly overstated.

### Defendants' Scheme Unravels

4. On October 14, 2004, *CBS MarketWatch* issued an article entitled "Spitzer attacks insurance industry; NY Attorney General sues Marsh over commissions." The article stated in part:

In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.

Spitzer unveiled a law suit Thursday against the world's largest insurance broker, Marsh & McLennan for a common industry practice known as "contingent commissions."

Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies offering the highest commissions, rather than the ones most suited to their customers.

Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.

"The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

Shares of Marsh, AIG and other leading insurance companies and brokers slumped. Marsh dropped 14 percent to $39.70 and AIG lost nine percent to $60.70.

Ace Ltd., Chubb Corp., Hartford Financial, and Munich Re's Munich American Risk Partners were also involved in the scheme, Spitzer said.

Interestingly, AIG is headed by longtime CEO Hank Greenberg. His sons Evan Greenberg and Jeff Greenberg are the CEOs, respectively, of reinsurer Ace and broker Marsh & McLennan.

Ace spokesman John Herbkersman said the company has received subpoenas from Spitzer as part of the investigation and is cooperating.

"The Hartford is cooperating fully with the New York Attorney."

5.     On this news, AIG shares fell $6.80 to $60.19 on unusually heavy trading volume of

approximately 50 million shares.

### BACKGROUND AND SUMMARY OF THE ACTION

6.     There are basically three types of entities in the insurance market. First, there are

clients: companies and individuals seeking to purchase insurance for their businesses, employees or

themselves. Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage. Brokers represent the client, obtain price quotes, present the quotes to the client, and make recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance company's reputation for service or claims payment. Third, there are insurance companies. They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

7.      In this structure, the client makes two types of payments: (1) it pays its broker an advisory fee or a commission for locating the best insurer; and (2) it pays the chosen insurance company premiums for the coverage itself. When the client pays a commission it is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company. Sometimes clients – particularly large commercial clients – break out the broker's fee and pay it directly to the broker.

8.      In addition to the first commission payment described above, brokers sometimes receive another kind of payment, as well, but not one from the clients. These are called "contingent commissions" and come from insurance companies such as AIG pursuant to arrangements generally known as "contingent commission agreements." The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

9.      In the late 1990s, Marsh & McLennan ("Marsh"), AIG's key broker began to call these agreements "Placement Service Agreements" or "PSAs." After recent public scrutiny, it has

- 3 -

renamed them "Market Services Agreements" or "MSAs," contending that they do not reflect payment for "a specific transaction or placement" but relate instead to the "services we provide" to insurance companies. Unbeknownst to Marsh's clients, these "services" include steering business to complicit and profiting insurance companies by, among other things, rigging bids and fixing prices.

10. By way of brief background, during the 1980s and 1990s, the insurance brokerage industry underwent a period of consolidation.

11. AIG is a publicly traded company with approximately 86,000 employees and over $81 billion in annual revenues. Among its insurance lines is excess insurance which covers losses over and above the amounts covered by the insured's primary insurance policies. Marsh Global Broking's Excess Casualty Group and AIG's American Home Excess Casualty division (AIG's principal provider of commercial umbrella or excess liability and excess worker's compensations insurance) engaged in systematic bid manipulation.

12. When AIG was the incumbent carrier and a policy was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote. If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premium.

13. In situations where another carrier was the incumbent, Marsh asked AIG for what was variously referred to as a "backup quote," "protective quote" or "B Quote," telling AIG that it would not get the business. In many instances, Marsh provided AIG with a target premium and the policy terms for these quotes. In these cases, it was understood that the target premium set by Marsh was higher than the quote provided by the incumbent, and that AIG should not bid below the Marsh-supplied target.

14. In other instances, Marsh asked AIG to provide B Quotes where AIG was not supposed to get the business, but Marsh did not set a particular premium target. In these instances,

- 4 -

AIG looked at the expiring policy terms and premium and provided a quote high enough to ensure that (1) the quote would not be a winner, and (2) in the rare case where AIG did get the business, it would make a comfortable profit.

15.     In B Quote situations, AIG did not do a complete underwriting analysis. In those few situations when AIG inadvertently won B Quote business (because the incumbent was not able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work on the file -- that is, prepare the necessary analysis after the fact.

16.     Finally, Marsh came to AIG for a "C Quote" when there was no incumbent carrier to protect. Although Marsh often provided premium targets in these situations, it was understood that there was the possibility of real competition.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

18.     Venue is proper here pursuant to §27 of the 1934 Act. Acts and transactions giving rise to the violations of law complained of occurred here.

## THE PARTIES

19.     Plaintiff Michael Feder purchased AIG publicly traded securities as detailed in the attached Certification and was damaged thereby.

20.     Defendant AIG is a holding company that, through its subsidiaries, is engaged in a range of insurance and insurance-related activities in the United States and abroad.

21.     AIG operates in the United States. During the Class Period, AIG had approximately 2.61 billion shares of common stock outstanding, which shares traded in an efficient market on the New York Stock Exchange.

- 5 -

22.     Defendant Maurice Greenberg ("Greenberg") is the CEO and Chairman of the Board of the Company.

23.     Defendant Howard Smith ("Smith") is the CFO and CAO of the Company.

24.     Defendant Thomas Tizzio ("Tizzio") is the Senior Vice Chairman of General Insurance of the Company.

25.     Defendants are liable for the false statements pleaded herein, as those statements are each "group-published" information for which they are responsible. Defendants Greenberg, Smith and Tizzio (the "Individual Defendants"), by reason of their stock ownership and positions with and relations to AIG were controlling persons of AIG. AIG in turn controlled the Individual Defendants. The Individual Defendants and AIG are liable under §20(a) of the 1934 Act.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

26.     On October 28, 1999, the Company issued a press release entitled "AIG Reports Third Quarter 1999 Net Income Rose 17.8 Percent to $1.27 Billion." The press release stated in part:

American International Group, Inc. (AIG) today reported that its income for the third quarter of 1999 increased 17.8 percent to $1.27 billion, compared to $1.08 billion in the third quarter of 1998. For the first nine months of 1999, net income totaled $3.74 billion, an increase of 18.4 percent, compared to$3.16 billion in the same period of 1998.

*       *       *

Income before income taxes, minority interest for the third quarter of 1999 amounted to $1.87 billion, an increase of 15.0 percent over the $1.62 billion reported in 1998. For the first nine months of 1999, income before income taxes and minority interest increased 20.9 percent to $5.58 nillion from $4.62 billion reported last year. Included in these results were pretax realized capital gains of $54.1 million and $131.1 million for the third quarter and nine months of 1999, respectively, compared to$56.2 million and $140.4 million for the same periods in 1998.

- 6 -

Revenues in the third quarter of 1999 rose 6.6 percent to $9.65 billion from $9.04 billion in the year-earlier quarter. For the first nine months, revenues totaled $29.66 billion, an increase of 13.8 percent over $26.06 billion in 1998.

At September 30, 1999, AIG's consolidated assets and shareholders' equity approximated $259 billion and $32.3 billion, respectively.

***Commenting on the third quarter results, AIG Chairman M.R. Greenberg said, "AIG had a good quarter, in which most of our businesses did quite well. Catastrophe losses for AIG exceeded those of recent quarters, with the impact of Hurricane Floyd in the United States, earthquakes in Turkey, Greece and Taiwan and a typhoon in Japan. But the underlying strength of our basic businesses was demonstrated in a solid gain in operating results and net income. Once again, last year's third quarter has been restated to reflect the consolidation of SunAmerica, in accordance with pooling of interests accounting.***

27.     On February 10, 2000, the Company issued a press release entitled "AIG Reports

1999 Net Income Rose 18.1 Percent to Record $5.06 Billion." The press release stated in part:

American International Group, Inc. (AIG) today reported that its net income for 1999 increased 18.1 percent to $5.06 billion from $4.28 billion in 1998. For the fourth quarter of 1999, net income totaled $1.31 billion, an increase of 17.2 percent, compared to $1.12 billion in the same period of 1998.

\*          \*          \*

Income before income taxes and minority interest for the year 1999 increased 19.7 percent to $7.51 billion from $6.28 billion reported last year. For the fourth quarter of 1999, income before income taxes and minority interest amounted to $1.93 billion, an increase of 16.4 percent over the $1.66 billion reported in 1998. Included in these results were pretax realized capital gains of $122.0 million and losses of $9.1 million for the year and fourth quarter of 1999, respectively, compared to gains of $123.7 million and losses of $16.7 million for the same periods in 1998.

\*          \*          \*

Revenues for the year 1999 rose 13.8 percent to $40.66 billion from $35.72 billion in 1998. Fourth quarter revenues totaled $11.00 billion, an increase of 13.9 percent over $9.66 billion in the year earlier quarter.

At December 31, 1999, AIG's consolidated assets approximated $267 billion, an increase of 14 percent, compared to $234 billion at the prior year-end. In 1999, shareholders' equity increased to approximately $33 billion, a 10 percent increase over the $30 billion reported at December 31, 1998.

Commenting on the fourth quarter and full year results, AIG Chairman M.R. Greenberg said, "AIG had a good fourth quarter and a strong year overall. Our net

income for 1999 rose 18.1 percent to a record $5.06 billion. Catastrophe losses in the fourth quarter were a more significant factor for the industry and for AIG than in previous quarters. In particular, the European storms, which are expected to produce insured losses of approximately $6 billion for the industry, were especially severe. AIG's net catastrophe losses in the fourth quarter of $83.0 million impacted adjusted net income by $38 million or $0.03 a share, principally reflecting the net catastrophe . losses ($60 million) of AIG's majority-owned reinsurance subsidiary Transatlantic Holdings, Inc. Excluding these losses and realized capital losses, AIG's income as adjusted for the fourth quarter increased 17.4 percent to $1.36 billion, or $0.87 per share.

"*Worldwide general insurance net premiums written rose 4.7 percent in the fourth quarter and 11.2 percent for the full year 1999. All of these results include the consolidation of Transatlantic Holdings, Inc. and 21st Century Insurance Group in 1999 and in the third and fourth quarters of 1998. We achieved an underwriting profit of $122.2 million in the quarter, and a record $669.2 million for 1999.* Excluding catastrophe losses, our combined ratio for the fourth quarter was 96.96, compared to 95.97 in last year's quarter.

28.    On April 27, 2000, the Company issued a press release entitled "AIG's First Quarter

2000 Income Excluding Realized Capital Gains (Losses) Rose 15.5 Percent to $1.36 Billion." The

press release stated in part:

American International Group, Inc. (AIG) today reported that its net income for the first quarter of 2000 increased 12.3 percent to $1.35 billion, compared to $1.20 billion in the first quarter of 1999. Excluding net realized capital gains (losses), income increased 15.5 percent to $1.36 billion, compared to $1.18 billion in the first quarter of 1999.

\*        \*        \*

Income before income taxes, minority interest and realized capital gains (losses) for the first quarter of 2000 increased 14.9 percent to $2.01 billion from $1.75 billion reported in 1999.

Revenues in the first quarter of 2000 rose 10.8 percent to $10.89 billion from $9.82 billion in the year-earlier quarter. AIG's shareholders' equity rose over $500 million to approximately $33.8 billion at March 31, 2000, after open market purchases during the quarter of 10.4 million shares of AIG common stock. At that date, AIG's consolidated assets approximated $278 billion.

*Commenting on the first quarter's results, AIG Chairman M.R. Greenberg said, "Overall, it was a good quarter for AIG. Each of our principal business groups produced solid results.*

- 8 -

"Worldwide general insurance net premiums written rose 4.3 percent in the quarter, and we achieved an adjusted underwriting profit of $211.5 million. Our combined ratio was 95.78, compared to 95.28 in last year's first quarter. Excluding catastrophe losses of $25 million in the quarter versus zero in last year's first quarter, the combined ratio for first quarter 2000 was 95.17. We added $22 million to AIG's net loss and loss adjustment reserves in the quarter, bringing the total of such reserves to $24.6 billion at March 31. This reserve increase was reduced by $75 million of catastrophe losses paid in the first quarter from pre-2000 incurred losses.

*"Domestically, rates in the commercial property-casualty insurance market continue to firm. A growing number of classes are responding to the need for price increases. Workers' compensation rates are increasing in many states. Property is stronger, as are energy and some liability classes. AIG continues to monitor this part of our business carefully, canceling, non-renewing or losing business where we are unwilling to meet competitors' pricing*. For the quarter, this amounted to $110 million of reduced premiums written. Excluding the non-renewed business and also risk finance business, which is very transaction oriented, Domestic Brokerage Group net premiums written grew approximately 10 percent in the quarter. We continue to introduce many new products and services in the Brokerage Group, especially in the e-business area. The North American Division (NAD), a unit that serves U.S. corporations doing business overseas, was restructured to simplify access to our global network. The opportunity to provide seamless coverage and to serve U.S. businesses more efficiently in the global marketplace will contribute to stronger business growth in the future.

29.    On May 17, 2000, the Company issued a press release entitled "AIG Splits Common

Stock 3-for-2 and Raises Quarterly Common Stock Dividend 11.0 Percent." The press release stated

in part:

The Board of Directors of American International Group, Inc. (AIG) today declared a three-for-two split of the company's common stock in the form of a 50 percent common stock dividend. The dividend is payable on July 28, 2000 to shareholders of record on June 30, 2000.

The Board also declared a quarterly cash dividend on the new shares of 3.7 cents per share, payable on September 15, 2000 to shareholders of record on September 1, 2000. This represents an 11.0 percent increase in the quarterly cash dividend on AIG common stock.

30.    On July 27, 2000, the Company issued a press release entitled "AIG's Second Quarter

2000 Income Excluding Realized Capital Gains (Losses) Rose 13.1 Percent to $1.43 Billion." The

press release stated in part:

American International Group, Inc. (AIG) today reported that its income excluding net realized capital gains (losses) increased 13.1 percent to $1.43 billion in the second quarter and 14.2 percent to $2.79 billion for the first six months of 2000. Net income for the second quarter of 2000 increased 10.2 percent to $1.41 billion, compared to $1.28 billion in the second quarter of 1999. For the first six months of 2000, net income totaled $2.75 billion, an increase of 11.2 percent compared to $2.48. billion in the same period of 1999.

\*　　　\*　　　\*

Revenues in the second quarter of 2000 rose 12.1 percent to $11.43 billion from $10.20 billion in the year-earlier quarter. For the first six months, revenues totaled $22.32 billion, an increase of 11.5 percent over $20.02 billion in 1999.

At June 30, 2000, AIG's consolidated assets and shareholders' equity approximated $281 billion and $34.8 billion, respectively.

Commenting on the second quarter results, AIG Chairman M.R. Greenberg said, "It was a good quarter for AIG overall, with strong results from most of our major businesses and continued progress in terms of firming pricing in the U.S. property-casualty market.

*"Worldwide general insurance net premiums written rose 7.5 percent in the quarter, and we achieved an adjusted underwriting profit of $227.9 million. The combined ratio was 95.92, compared to 94.60 for the second quarter of 1999. During the quarter, we continued to pay claims, amounting to $57 million, related to last year's catastrophes, and also incurred new net catastrophe losses of $19 million.*

"Domestically, there is an increasingly better tone to the commercial property-casualty market as rates continue to firm. While the trend is in the right direction, it is important to remember that rates declined significantly over the past eight or nine years, and therefore further increases are necessary. Workers' compensation rates are also strengthening, but this remains a difficult class and we continue to be very selective in underwriting workers' compensation business. In this environment, we continue to exercise underwriting discipline throughout the AIG organization. During the second quarter, we canceled or non-renewed $114 million of business worldwide that did not meet our underwriting standards, continuing a strategy we have followed successfully for the past several years.

31.    On October 26, 2000, the Company issued a press release entitled "AIG's Third Quarter Income Excluding Realized Capital Gains (Losses) Rose 14.6 Percent to $1.41 Billion."

The press release stated in part:

American International Group, Inc. (AIG) today reported that its income excluding net realized capital gains (losses) increased 14.6 percent to $1.41 billion in the third quarter and 14.4 percent to $4.21 billion for the first nine months of 2000.

Net income for the third quarter of 2000, including net realized capital gains (losses), increased 9.3 percent to $1.39 billion, compared to $1.27 billion in the third quarter of 1999. For the first nine months of 2000, net income totaled $4.14 billion, an increase of 10.6 percent, compared to $3.74 billion in the same period of 1999.

\*     \*     \*

Income before income taxes, minority interest and realized capital gains (losses) for the third quarter of 2000 amounted to $2.10 billion, an increase of 15.8 percent over the $1.81 billion reported in 1999. For the first nine months of 2000, income before income taxes, minority interest and realized capital gains (losses) increased 14.5 percent to $6.24 billion from $5.45 billion reported last year.

Revenues in the third quarter of 2000 rose 15.6 percent to $11.14 billion from $9.64 billion in the year-earlier quarter. For the first nine months, revenues totaled $33.46 billion, an increase of 12.8 percent over $29.66 billion in 1999.

At September 30, 2000, AIG's consolidated assets and shareholders' equity approximated $295 billion and $36.5 billion, respectively.

*Commenting on the third quarter results, AIG Chairman M.R. Greenberg said, "AIG had a very good quarter, with increased momentum on the domestic commercial insurance pricing front, strong results from our overseas general insurance business, an excellent quarter for life insurance, and outstanding results in our financial services and asset management businesses.*

32.     On April 29, 2001, the Company issued a press release entitled "AIG's First Quarter

2001 Income Rose 15.2 Percent to $1.57 Billion" The press release stated in part:

American International Group, Inc. (AIG) today reported that its income excluding the cumulative effect of an accounting change and net realized capital gains (losses) for the first quarter of 2001 increased 15.2 percent to $1.57 billion, compared to $1.36 billion in the first quarter of 2000. Net income increased 13.8 percent to $1.53 billion, compared to $1.35 billion in the first quarter of 2000.

Revenues in the first quarter of 2001 rose 11.6 percent to $12.15 billion from $10.89 billion in the year-earlier quarter. At March 31, 2001, AIG's consolidated assets and shareholders' equity approximated $315 billion and $41.7 billion, respectively.

33.     On October 28, 2001, the Company issued a press release entitled "AIG's Third

Quarter 2001 Income Rose 14.1 Percent to $1.92 Billion" The press release stated in part:

- 11 -

American International Group, Inc. (AIG) today reported that its core income increased 14.1 percent to $1.92 billion in the third quarter and 13.9 percent to $5.69 billion for the first nine months of 2001. These results are in line with guidance furnished during AIG's October 9 investor conference call.

\*   \*   \*

Revenues in the third quarter of 2001 increased 12.9 percent to $15.73 billion from $13.93 billion in the year-earlier quarter. For the first nine months, revenues totaled $46.0 billion, an increase of 10.2 percent over $41.74 billion in 2000.

At September 30, 2001, AIG's consolidated assets and shareholders' equity are approximately $467 billion and $50.8 billion, respectively

34.     On July 25, 2002, the Company issued a press release entitled "AIG Reports Second

Quarter 2002 Net Income Rose 37.0 Percent to $1.80 Billion." The press release stated in part:

American International Group, Inc. (AIG) today reported that its net income for the second quarter of 2002 increased 37.0 percent to $1.80 billion, compared to $1.31 billion in the second quarter of 2001.

For the first six months of 2002, net income totaled $3.78 billion, an increase of 19.3 percent compared to $3.17 billion in the same period of 2001.

Second quarter 2002 adjusted income, excluding net realized capital gains (losses) and the cumulative effect of accounting changes and acquisition, restructuring and related charges in 2001, increased 9.8 percent to $2.21 billion, and 10.4 percent to $4.34 billion for the first six months of 2002.

35.     On October 24, 2002, the Company issued a press release entitled "AIG Reports

Third Quarter 2002 Net Income of $1.84 Billion vs. $326.8 Million in 2001." The press release

stated in part:

American International Group, Inc. (AIG) today reported that its net income for the third quarter of 2002 was $1.84 billion, compared to $326.8 million in the third quarter of 2001. For the first nine months of 2002, net income totaled $5.62 billion, an increase of 60.8 percent compared to $3.50 billion in the same period of 2001.

Income as adjusted-excluding net realized capital gains (losses) in both years and in 2001 the cumulative effect of accounting changes and acquisition, restructuring and related charges-increased 54.6 percent to $2.23 billion in the third quarter and 22.3 percent to $6.58 billion for the first nine months of 2002.

\*   \*   \*

- 12 -

Highlights of the third quarter 2002 include:

-       Record income as adjusted (excluding realized capital gains (losses)) of $2.23 billion, an increase of 54.6 percent over reported third quarter 2001 income as adjusted (excluding realized capital gains (losses) and acquisition-related charges) and an increase of 13.0 percent over third quarter 2001 income as adjusted (excluding realized capital gains (losses), World Trade Center losses and acquisition-related charges).

-       Return on equity of 16.4 percent on an annualized basis.

-       Record consolidated assets at September 30, 2002 of approximately $547 billion, an increase of $23 billion over June 30, 2002.

-       Record shareholders' equity at September 30, 2002 of approximately $58.7 billion, an increase of $3.7 billion over June 30, 2002.

-       Third quarter realized capital losses, primarily in the domestic fixed income portfolio, of $595.6 million.

-       Record quarter General Insurance net premiums written of $7.08 billion, an increase of 42.2 percent over third quarter 2001.

-       General Insurance pretax operating income before realized capital gains (losses) of $1.05 billion.

-       Third quarter 2002 pretax catastrophe losses of $40 million.

-       21st Century Insurance Group third quarter loss adjustment expense pretax provision of $43 million to resolve SB1899 Northridge earthquake claims and a $37 million pretax charge to write off capitalized costs associated with a software development project.

-       Record General Insurance cash flow of $4.76 billion during the first nine months of 2002.

-       General Insurance net loss and loss adjustment reserves totaling $27.04 billion as of September 30, 2002, an increase of $641.1 million and $1.15 billion in the third quarter and nine months of 2002, respectively.  Reserves previously established for the September 11, 2001 terrorist attacks continue to be adequate.

-       Life Insurance premium income, deposits and other considerations totaling $11.94 billion, an increase of 16.5 percent over third quarter 2001.

-       Life Insurance pretax operating income before realized capital gains (losses) of $1.52 billion.

-       Financial Services operating income of $552.5 million, an increase of 13.3 percent over third quarter 2001.

-       Retirement Savings & Asset Management operating income of $228.2 million, a decrease of 7.8 percent from third quarter 2001.

36.    On April 24, 2003, the Company issued a press release entitled "AIG Reports First

Quarter 2003 Net Income of $1.95 Billion vs. $1.98 Billion in the First Quarter of 2002; Income as

Adjusted to Exclude Realized Capital Losses Rose 11.1 Percent to $2.37 Billion." The press release

stated in part:

> American International Group, Inc. (AIG) today reported that its first quarter 2003 net income was $1.95 billion or $0.74 per share, compared to $1.98 billion or $0.75 per share in the first quarter of 2002. First quarter 2003 income as adjusted to exclude net realized capital gains (losses), increased 11.1 percent to $2.37 billion, compared to $2.13 billion in the first quarter of 2002. Per share income, as adjusted was $0.90, an increase of 11.1 percent over $0.81 in first quarter 2002.
>
> .    *         *         *
>
> Highlights of the first quarter of 2003 include:
>
> - Record capital funds (shareholders' equity) at March 31, 2003 of approximately $62 billion, an increase of approximately $3 billion over December 31, 2002.
>
> - Annualized return on equity of 16.9 percent. Return on equity is net income, before realized capital gains (losses), expressed as a percentage of average shareholders' equity, exclusive of unrealized appreciation (depreciation) of investments, net of taxes.
>
> - Record consolidated assets at March 31, 2003 of approximately $590 billion, an increase of approximately $29 billion over December 31, 2002.
>
> - Record General Insurance net premiums written of $8.24 billion, an increase of 30.1 percent over the first quarter of 2002.
>
> - Record General Insurance pretax operating income, excluding realized capital losses, of $1.32 billion.
>
> - Record General Insurance cash flow of $3.24 billion.
>
> - General Insurance net loss and loss adjustment reserves totaling $31.52 billion as of March 31, 2003, an increase of $1.17 billion for the first quarter of 2003.

- 14 -

- Record Life Insurance GAAP premium income of \$5.66 billion, up 18.3 percent over the first quarter of 2002. Life Insurance premium income, deposits and other considerations of \$13.01 billion, an increase of 1.5 percent over the first quarter of 2002 .... Excluding guaranteed investment contracts, life insurance premium income, deposits and other considerations increased 18.8 percent.

Income before income taxes and minority interest was \$2.92 billion in the first quarter of 2003, compared to \$2.96 billion in 2002.

37.    On July 24, 2003, the Company issued a press release entitled "AIG Reports Second

Quarter 2003 Net Income Rose 26.4 Percent to \$2.28 Billion; Announces Additional 25.0 Percent

Increase in Quarterly Common Stock Dividend." The press release stated in part:

American International Group, Inc. (AIG) today reported that its net income for the second quarter of 2003 increased 26.4 percent to \$2.28 billion, compared to \$1.80 billion in the second quarter of 2002. For the first six months of 2003, net income totaled \$4.23 billion, an increase of 11.9 percent compared to \$3.78 billion in the same period of 2002.

\*        \*        \*

Highlights of the second quarter of 2003 include:

- Record capital funds (shareholders' equity) at June 30, 2003 exceeding \$68 billion, an increase of approximately \$6 billion over March 31, 2003.

- Record consolidated assets at June 30, 2003 of approximately \$620 billion, an increase of approximately \$28 billion over March 31, 2003.

- Record General Insurance net premiums written of \$8.84 billion, an increase of 30.4 percent over the second quarter of 2002.

- Record General Insurance pretax operating income of \$1.21 billion, including \$83.5 million of realized capital losses.

- General Insurance combined ratio of 92.27 for the second quarter of 2003.

- Record General Insurance cash flow of \$5.91 billion in the first six months of 2003.

- General Insurance net loss and loss adjustment reserves totaling \$33.09 billion as of June 30, 2003, an increase of \$1.57 billion and \$2.74 billion for the second quarter and six months, respectively.

- Life Insurance GAAP premiums of \$5.47 billion, up 6.1 percent over the second quarter of 2002.

- 15 -

- Record Life Insurance pretax operating income of $1.56 billion, including $171.1 million of realized capital losses.

Income before income taxes and minority interest in the second quarter of 2003 increased 23.9 percent.

38.     On October 23, 2003, the Company issued a press release entitled "AIG Reports

Third Quarter 2003 Net Income Rose 26.9 Percent to $2.34 Billion." The press release stated in

part:

American International Group, Inc. (AIG) today reported that its net income for the third quarter of 2003 increased 26.9 percent to $2.34 billion, compared to $1.84 billion in the third quarter of 2002. For the first nine months of 2003, net income totaled $6.57 billion, an increase of 16.8 percent compared to $5.62 billion in the same period of 2002. Net income excluding realized capital losses increased 15.4 percent to $2.58 billion in the third quarter of 2003, and 13.5 percent to $7.46 billion for the first nine months of 2003.

39.     On February 11, 2004, the Company issued a press release entitled "AIG Reports

Record 2003 Net Income of $9.27 Billion, an Increase of 68.0 Percent over 2002." The press release

stated in part:

American International Group, Inc. (AIG) today reported that its net income for the full year 2003 increased 68.0 percent to a record $9.27 billion, compared to $5.52 billion in 2002. Net income excluding realized capital gains (losses) and cumulative effect of an accounting change increased 43.6 percent to a record $10.22 billion in the full year 2003.

Net income in the fourth quarter of 2003 totaled a record $2.71 billion compared to a loss of $103.8 million in the same period of 2002. Fourth quarter 2003 net income excluding realized capital gains (losses) and cumulative effect of an accounting change was a record $2.75 billion compared to $537.5 million in the same period of 2002. Results for fourth quarter and full year 2002 include the $1.8 billion net, after tax general insurance reserve charge.

Income before income taxes, minority interest, cumulative effect of an accounting change and pretax realized capital gains (losses) for the twelve months of 2003 increased 45.0 percent to $15.34 billion. Income before income taxes, minority interest, cumulative effect of an accounting change and pretax realized capital gains (losses) for the fourth quarter of 2003 was $4.14 billion, compared to $671.6 million in the fourth quarter of 2002.

- 16 -

40.     On April 22, 2004, the Company issued a press release entitled "AIG Reports First

Quarter 2004 Net Income of $2.66 Billion -- $1.01 Per Share – an Increase of 35.9 Percent Over

2003." The press release stated in part:

American International Group, Inc. (AIG) today reported that its first quarter 2004 net income rose 35.9 percent to $2.66 billion or $1.01 per share, compared to $1.95 billion or $0.74 per share in the first quarter of 2003. First quarter 2004 net income excluding realized capital gains (losses) and the cumulative effect of an accounting change, increased 19.9 percent to a record $2.84 billion or $1.08 per share, compared to $2.37 billion or $0.90 per share in the first quarter of 2003.

Income before income taxes, minority interest and the cumulative effect of an accounting change for the first quarter of 2004 was a record $4.29 billion, a 46.8 percent increase over $2.92 billion in the first quarter of 2003. These results include realized capital gains of $4.9 million in the first quarter of 2004, compared to realized capital losses of $631.5 million in the same period last year.

41.     On July 22, 2004, the Company issued a press release entitled "AIG Reports Second

Quarter 2004 Net Income of $2.86 Billion - $1.09 Per Share; an Increase of 25.7 Percent Over

2003." The press release stated in part:

American International Group, Inc. (AIG) today reported that its second quarter 2004 net income rose 25.7 percent to a record $2.86 billion or $1.09 per share, compared to $2.28 billion or $0.87 per share in the second quarter of 2003. Second quarter 2004 net income excluding realized capital gains (losses), increased 19.2 percent to a record $3.00 billion or $1.14 per share, compared to $2.52 billion or $0.96 per share in the same period of 2003.

Net income for the first six months of 2004 rose 30.4 percent to $5.52 billion or $2.10 per share, compared to $4.23 billion or $1.61 per share in the first six months of 2003. For the first six months of 2004 net income excluding realized capital gains (losses) and the cumulative effect of an accounting change, increased 19.5 percent to $5.84 billion or $2.22 per share, compared to $4.89 billion or $1.86 per share in the same period of 2003.

Income before income taxes and minority interest for the second quarter of 2004 was a record $4.39 billion, a 27.9 percent increase over $3.43 billion in the second quarter of 2003. Income before income taxes, minority interest and the cumulative effect of an accounting change for the first six months of 2004 was $8.68 billion, a 36.6 percent increase over $6.35 billion in the same period of 2003. These results include realized capital losses of $209.0 million and $204.1 million in the second quarter and six months of 2004, respectively, compared to realized capital losses of $356.9

million and $988.4 million in the second quarter and six months of 2003, respectively.

42. On October 14, 2004, *CBS MarketWatch* issued an article entitled "Spitzer attacks insurance industry; NY Attorney General sues Marsh over commissions." The article stated in part:

In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.

Spitzer unveiled a law suit Thursday against the world's largest insurance broker Marsh & McLennan for a common industry practice known as "contingent commissions."

Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies offering the highest commissions, rather than the ones most suited to their customers.

Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.

"The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

Shares of Marsh AIG and other leading insurance companies and brokers slumped. Marsh dropped 14 percent to $39.70 and AIG lost nine percent to $60.70.

Ace Ltd., Chubb Corp., Hartford Financial, and Munich Re's Munich American Risk Partners were also involved in the scheme, Spitzer said.

Interestingly, AIG is headed by longtime CEO Hank Greenberg. His sons Evan Greenberg and Jeff Greenberg are the CEOs, respectively, of reinsurer Ace and broker Marsh & McLennan.

Ace spokesman John Herbkersman said the company has received subpoenas from Spitzer as part of the investigation and is cooperating.

"The Hartford is cooperating fully with the New York Attorney."

43. The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

- 18 -

(a)     That the Company was paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements;"

(b)     That by concealing these "contingent commissions" and such " contingent commission agreements" the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars;

(c)     That defendants had concealed the fact that it had engaged in illegal transactions using PNC-style structures with at least five additional insurers (in addition to PNC), contrary to defendants' claims on January 30, 2002; and

(d)     That as a result of (a)-(b) above, defendants, as more fully described in ¶¶26 - 42, the Company's prior reported revenue and income was grossly overstated.

## MISLEADING FINANCIAL STATEMENTS

44.     In order to overstate its earnings during the Class Period, AIG violated Generally Accepted Accounting Principles ("GAAP") and SEC rules by failing to properly report and disclose the illegal nature of its revenue during the Class Period.

45.     These financial statements and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for and disclosure about its revenues, in violation of GAAP and SEC rules. AIG manipulated financial statements by allowing the Company to generate fees which it was not entitled to, which revenues may be forfeited (via fines, judgments and costs associated therewith) and which artificially inflated AIG's revenue and income and receivables.

46.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular

- 19 -

time.  Regulation S-X (17 C.F.R. §210.4-01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

47.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, 10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, 34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, 40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

- 20 -

accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, 50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, 42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, 58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, 79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

48.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

- 21 -

## DEFENDANTS' SCIENTER

49.     Defendants are AIG's top officers and directors. Each of the Individual Defendants, by virtue of their high-level positions with AIG, directly participated in the management of AIG, was directly involved in the day-to-day operations of AIG at the highest levels and was privy to confidential proprietary information concerning AIG and its business, operations, products, growth, financial statements and financial condition and was aware of or deliberately disregarded that the false and misleading statements were being made by and regarding the Company. Because of their managerial positions with AIG, each of the Individual Defendants had access to the adverse undisclosed information about AIG's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

50.     Defendants were personally familiar with the quality of the Company's revenues/receivables because they monitored AIG's revenue, closely monitoring the performance of AIG's operations via reports from AIG's Finance Department, which were generated and provided to Greenberg, Smith and Tizzio on a regular basis. The reports summarized the sales, amount billed, credit terms, and product type. As a result of their monitoring, defendants were aware that AIG would be unable to meet its projected results, unless they continued to engage in their illegal scheme. Defendants were also or should have been keenly aware that their "record" results were actually the result of illegal "contingent commission agreements." Further, defendants were able to consummate a multitude of note offerings at preferential rates – rates they would not have been entitled to if the truth were known.

## CLASS ACTION ALLEGATIONS

51.     This is a class action on behalf of purchasers of AIG publicly traded securities during the Class Period, excluding defendants (the "Class"). Excluded from the Class are officers and

- 22 -

directors of the Company, as well as their families and the families of the defendants. Class members are so numerous that joinder of them is impracticable.

52.    Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the prices of AIG's publicly traded securities and the extent of and appropriate measure of damages.

53.    Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) and the 1934 Act and Rule 10b-5 Against the Individual Defendants and AIG

54.    Plaintiff incorporates by reference ¶¶1-53 herein.

55.    Defendants violated §10(b) and Rule 10b-5 by:

(a)    Employing devices, schemes and artifices to defraud;

(b)    Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)    Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of AIG publicly traded securities.

56.    Class members were damaged as they paid artificially inflated prices for AIG's publicly traded securities in reliance on the integrity of the market.

- 23 -

## SECOND CLAIM FOR RELIEF

### For Violations of §20(a) of the 1934 Act
### Against the Individual Defendants and AIG

57.   Plaintiff incorporates by reference ¶¶1-56 herein.

58.   The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the 1934 Act, 15 U.S.C. §78t(a), as alleged herein. By virtue of their stock ownership, high-level positions, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. AIG controlled the Individual Defendants and all of its employees.

60.   By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of

the Federal Rules of Civil Procedure;

B.     Awarding plaintiff and other members of the Class damages together with interest

thereon;

C.     Awarding plaintiff and other members of the Class costs and expenses of this

litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs

and disbursements; and

D.     Awarding plaintiff and other members of the Class such equitable/injunctive or other

and further relief as may be just and proper under the circumstances.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 15, 2004                    LERACH COUGHLIN STOIA GELLER
                                                          RUDMAN & ROBBINS LLP
                                           SAMUEL H. RUDMAN (SR-7957)
                                           DAVID A. ROSENFELD (DR-7564)


                                           _____
                                                          SAMUEL H. RUDMAN

                                           200 Broadhollow Road, Suite 406
                                           Melville, NY 11747
                                           Telephone: 631/367-7100
                                           631/367-1173 (fax)

                                           ABRAHAM FRUCHTER & TWERSKY LLP
                                           JACK G. FRUCHTER
                                           One Penn Plaza
                                           Suite 2805
                                           New York, NY 10119
                                           Telephone: 212/279-5050
                                           212/279-3655 (fax)


                                           Attorneys for Plaintiff

- 25 -

## CERTIFICATION OF MICHAEL FEDER
## IN SUPPORT OF CLASS ACTION COMPLAINT

Michael Feder ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following trades of American International Group, Inc. common stock: See Attachment A

5.    In the past three years, plaintiff has sought to serve as a representative party on behalf of a class in the following actions filed under the federal securities laws: *Feder v. Electronic Data Systems Corporation* (E.D.Tx.)

6.    Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this  /4/th

day of October, 2004.

Michael Feder