**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————— x
                              :

IN RE AMERICAN INTERNATIONAL     :
GROUP, INC. SECURITIES LITIGATION    :    Master File No. 04 Civ. 8141 (JES) (AJP)
                              :

This Document Relates To:             :
All Actions                      :    Jury Trial Demanded
                              :
——————————————————————— x


## CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT



RECEIVED
DEC 15 2006
U.S.D.C. S.D. N.Y.
CASHIERS

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION AND KEY ADMISSIONS ................................................. 2

        A.      THE BID-RIGGING AND CONTINGENT COMMISSIONS
                SCHEME ............................................................................................................. 7

        B.      THE BRIGHTPOINT AND PNC DEALS ............................................................. 8

        C.      AIG FALSIFIED ITS FINANCIAL STATEMENTS ........................................... 8

        D.      GREENBERG'S REPEATED ATTEMPTS TO INFLATE  THE
                PRICE OF AIG STOCK BY MANIPULATING THE MARKET ...................... 11

II.     JURISDICTION AND VENUE ...................................................................................... 14

III.    PARTIES ....................................................................................................................... 15

        A.      LEAD PLAINTIFF ............................................................................................ 15

        B.      AMERICAN INTERNATIONAL GROUP DEFENDANTS .............................. 16

                1.      American International Group, Inc. .......................................................... 16

                2.      Maurice R. "Hank" Greenberg ................................................................ 16

                3.      Howard I. Smith ....................................................................................... 18

                4.      Martin J. Sullivan .................................................................................... 19

                5.      Thomas R. Tizzio .................................................................................... 20

                6.      Michael J. Castelli ................................................................................... 20

                7.      Christian M. Milton ................................................................................. 21

                8.      L. Michael Murphy .................................................................................. 21

                9.      John A. Graf ............................................................................................ 22

                10.     Frank J. Hoenemeyer ............................................................................... 23

                11.     Eli Broad ................................................................................................. 25

        C.      STARR INTERNATIONAL COMPANY, INC. .................................................. 26

        D.      C.V. STARR & CO., INC. ................................................................................. 29

E.     UNION EXCESS REINSURANCE COMPANY, LTD. ..................................... 32

F.     RICHMOND INSURANCE COMPANY LTD. ................................................... 32

G.    PRICEWATERHOUSECOOPERS ........................................................................ 33

H.    GENERAL REINSURANCE CORP. DEFENDANTS ...................................... 35

      1.     General Reinsurance Corp. ....................................................................... 35

      2.     Ronald E. Ferguson ..................................................................................... 35

      3.     John B. Houldsworth ................................................................................... 36

      4.     Richard Napier ............................................................................................ 37

I.      UNDERWRITER DEFENDANTS ...................................................................... 37

      1.     Wachovia Securities, Inc. ........................................................................... 37

      2.     Merrill Lynch & Co. .................................................................................... 38

IV.    CONTROL ALLEGATIONS/GROUP PLEADING ....................................... 38

V.     CLASS ACTION ALLEGATIONS ................................................................. 40

VI.    FACTUAL ALLEGATIONS .......................................................................... 43

A.    BACKGROUND ON AIG .................................................................................. 43

B.    GREENBERG'S 37-YEAR IRON-FISTED REIGN AT AIG ............................ 44

C.    RELEVANT ACQUISITIONS BY AIG DURING THE CLASS
      PERIOD ................................................................................................................ 49

      1.     HSB Group ................................................................................................... 50

      2.     American General ....................................................................................... 52

D.    AIG'S BOND OFFERINGS DURING THE CLASS PERIOD .......................... 55

      1.     Zero Coupon Convertible Senior Debentures ........................................... 55

      2.     0.5% Cash Exchangeable Equity-Linked Senior Notes ............................ 56

      3.     2.85% Medium-Term Notes, Series F ....................................................... 58

      4.     2.875% Notes ............................................................................................... 61

      5.     4.25% Notes ................................................................................................. 61

E.     AIG'S PAYMENT OF CONTINGENT COMMISSIONS AND PARTICIPATION IN ILLEGAL BID-RIGGING ............................................... 62

    1.    Background on the Insurance Industry ..................................................... 64

    2.    Contingent Commissions .......................................................................... 65

    3.    Bid-Rigging.................................................................................................. 68

        a.    How the Bid-Rigging Scheme Worked ........................................ 69

    4.    Insurance Brokers Respond to the Spitzer Complaint .............................. 75

    5.    To-Date, Four AIG Executives and Numerous Executives of Marsh and Other Companies Have Pleaded Guilty or Have Been Indicted In Connection with the Bid-Rigging Scheme ........................................................................................................ 76

    6.    AIG and Greenberg Respond to the Spitzer Complaint............................ 88

F.     AIG USED INCOME SMOOTHING PRODUCTS AND OTHER TECHNIQUES TO FALSELY INFLATE ITS EARNINGS................................ 92

    1.    AIG Improperly Used A $500 Million Finite Reinsurance Deal with General Re to Falsely Improve Its Financial Statements ................................................................................................. 94

        a.    Background on Claims Reserves, Reinsurance and Relevant Accounting Rules............................................................ 94

        b.    Background on the AIG-General Re Transaction......................... 96

        c.    The Government Begins Investigating AIG's Accounting for the General Re Transaction and Some Details of the Improper Deal Are Disclosed....................... 99

        d.    AIG Admits That It Misled Investors and Regulators ................................................................................... 101

        e.    AIG Admits Improperly Accounting for Its Transactions with General Re, Union Excess, Richmond and Others ................................................................ 103

        f.    Full Details of the AIG-General Re Deal Emerge ...................... 108

            i.    Greenberg Initiates the Improper AIG-General Re Deal............................................................ 109

ii.    Senior AIG and General Re Executives Negotiate and Structure the Transaction With Full Knowledge It Involved No Real Transfer of Risk ............................................................ 110

iii.   AIG And General Re Engage in Additional Transactions to Effectuate the Undisclosed Side Agreements That Concealed the True, Improper Nature of the AIG-General Re Deal ...................................................................... 122

g.    Effects of the Improper AIG-General Re Deal .......................... 123

h.    Regulatory Fallout From the AIG-General Re Deal.................. 126

2.    AIG Concealed Its True Relationship With Union Excess and Richmond to Allow the Company to Improperly Account for Its Reinsurance Transactions With Those Entities ................................................................................. 131

a.    AIG's History of Concealing from Regulators the Company's True Relationship with Its Off-Shore Reinsurers ................................................................ 135

b.    During the Government's Investigation Into AIG's Reinsurance Transactions, Defendants Removed and/or Destroyed Evidence at AIG's Bermuda Offices ........................................................................ 142

3.    Defendants Used "Top Side" Adjustments to Improperly Boost AIG's Claims Reserves and Other Accounts .............................. 144

4.    AIG Engaged in Multiple Transactions to Make Its Underwriting Results Appear More Favorable Than They Actually Were ...................................................................... 147

a.    AIG Disguised Its Underwriting Losses ..................................... 149

i.    Auto Warranty Losses...................................................... 149

ii.   Brazilian Life Insurance Losses...................................... 155

(a)   Nan Shan I........................................................ 156

(b)   Nan Shan II ...................................................... 157

b.    AIG Created False Underwriting Income By Improperly Accounting for Revenues From Its "Life Settlements" Business................................................................. 158

5.     The Government Investigates AIG's Loss Ratio ..................................... 161

6.     AIG's Massive Restatement of Earnings .................................... 163

     a.     AIG's Disclosures Leading up to the Restatement .................... 163

     b.     AIG'S 2004 Form 10-K ................................................................ 169

     c.     Greenberg's Response to the Restatement ................................. 194

G.     AIG MARKETED AND SOLD "INCOME SMOOTHING" INSURANCE PRODUCTS AND PARTICIPATED IN OFF-BALANCE-SHEET TRANSACTIONS THAT AIG KNEW, OR SHOULD HAVE KNOWN, VIOLATED GAAP ............................................... 196

1.     AIG Marketed and Sold Non-Traditional Insurance Products to Other Public Companies that AIG Knew, or Should Have Known, Violated GAAP and Had the Effect of Illegally "Smoothing" Those Companies' Earnings ......................... 197

     a.     GAAP and Insurance ................................................................. 198

     b.     Background on AIG's Development of "Income Statement Smoothing" Products Specifically Designed to Circumvent GAAP and SEC Rules ....................... 198

     c.     AIG's Deal with Brightpoint ...................................................... 201

     d.     The SEC Begins Investigating AIG's Dealings with Brightpoint .................................................................................. 203

     e.     The SEC's Administrative Proceedings Against AIG ............................................................................................. 204

     f.     The SEC's Civil Proceedings Against AIG ............................... 205

     g.     AIG's Misconduct During the SEC's Investigation .................. 205

2.     AIG Entered Into Off-Balance-Sheet Transactions With PNC and Other Public Companies that AIG Knew, or Should Have Known, Violated GAAP and Had the Effect of Illegally "Smoothing" Those Companies' Earnings ......................... 207

     a.     GAAP Standards for Non-Consolidation of SPEs ..................... 209

     b.     GAITS Product .......................................................................... 209

     c.     C-GAITS Product ...................................................................... 210

                       i.       AIG and PNC Enter into Two C-GAITS Transactions ................................................... 211

                       ii.      AIG Enters into a Third C-GAITS Transaction with PNC .................................... 214

                       iii.    AIG And PNC Unwind and Restructure the Three PAGIC Transactions ............................. 215

            d.      Criminal and Civil Proceedings Against AIG in Connection with Its Role in the GAITS and C-GAITS Transactions ................................................. 216

                       i.       SEC Proceedings Against AIG ...................................... 217

                       ii.      DOJ Proceedings Against AIG ...................................... 218

        3.      AIG Misled Investors About The Scope Of The Government's Investigations Into PNC and Brightpoint ....................... 220

H.      DEFENDANT GREENBERG INVESTIGATED FOR MANIPULATING AIG'S STOCK IN CONNECTION WITH THE COMPANY'S AUGUST 2001 ACQUISITION OF AMERICAN GENERAL AND AGAIN IN FEBRUARY 2005 ....................... 224

        1.      Defendant Greenberg Manipulated the Price of AIG Stock in Connection With the Company's August 2001 Acquisition of American General ........................................... 224

            a.      Background on Defendant Greenberg's Relationship with Grasso and the NYSE ................................... 226

        2.      Defendant Greenberg Manipulated the Price of AIG Stock in February 2005 ..................................................................... 228

I.      CONTINUED EFFECTS OF DEFENDANTS' MISCONDUCT .................... 234

        1.      Revelation of the Fraud Caused Massive Declines in AIG Stock ................................................................................. 234

        2.      Numerous Members of AIG's Senior Management and Other Senior Executives Have Been Fired, Forced to Resign or Placed "On Leave" ................................................ 236

        3.      Government Investigations ................................................... 237

        4.      Downgrades in AIG's Credit Rating ..................................... 239

J.      DEFENDANTS' OTHER BAD ACTS ............................................................ 242

1.      AIG Mischaracterized Premiums From Workers
        Compensation Policies ............................................................ 242

2.      Defendant Greenberg's Fraudulent Conveyance of Nearly
        42 Million Shares of AIG Stock ............................................. 248

3.      Other Regulatory Action Against AIG ................................... 250

4.      Other Litigation Relating to AIG's Reinsurance Business ..................... 251

5.      AIG's Role in Promoting Abusive Tax Shelters..................................... 251

VII.    FALSE AND MISLEADING STATEMENTS DURING THE CLASS
        PERIOD ........................................................................................... 253

A.      DEFENDANTS' FALSE AND MISLEADING FINANCIAL
        STATEMENTS............................................................................ 253

        1.      False and Misleading Statements Relating to Third Quarter
                1999............................................................................................ 253

        2.      False and Misleading Statements Relating to Fourth
                Quarter and Year-End 1999 .................................................... 257

        3.      False and Misleading Statements Relating to First Quarter
                2000............................................................................................ 263

        4.      False and Misleading Statements Relating to Second
                Quarter 2000 ............................................................................ 267

        5.      False and Misleading Statements Relating to Third Quarter
                2000............................................................................................ 272

        6.      False and Misleading Statements Relating to Fourth
                Quarter and Year End 2000 .................................................... 277

        7.      False and Misleading Statements Relating to First Quarter
                2001............................................................................................ 285

        8.      False and Misleading Statements Relating to Second
                Quarter 2001 ............................................................................ 290

        9.      False and Misleading Statements Relating to Third Quarter
                2001............................................................................................ 296

        10.     False and Misleading Statements Relating to Fourth
                Quarter and Year-End 2001 .................................................... 303

11.   False and Misleading Statements Relating to First Quarter 2002.................................................................................. 311

12.   False and Misleading Statements Relating to Second Quarter 2002 ............................................................... 317

13.   False and Misleading Statements Relating to Third Quarter 2002.................................................................................. 322

14.   False and Misleading Statements Relating to Fourth Quarter and Year-End 2002 .................................... 329

15.   False and Misleading Statements Relating to First Quarter 2003.................................................................................. 342

16.   False and Misleading Statements Relating to Second Quarter 2003 ............................................................... 349

17.   False and Misleading Statements Relating to Third Quarter 2003.................................................................................. 356

18.   False and Misleading Statements Relating to Fourth Quarter and Year-End 2003 .................................... 362

19.   False and Misleading Statements Relating to First Quarter 2004.................................................................................. 370

20.   False and Misleading Statements Relating to Second Quarter 2004 ............................................................... 377

21.   False and Misleading Statements Relating to Third Quarter 2004.................................................................................. 384

22.   False and Misleading Statements Relating to Fourth Quarter and Year-End 2004 .................................... 391

23.   GAAP Violations ................................................................... 395

B.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN CONNECTION WITH AIG'S ACQUISITIONS OF HSB GROUP AND AMERICAN GENERAL .......................................... 401

1.   Defendants' False and Misleading Statements in Connection With AIG's Acquisition of HSB Group ............................ 401

2.   Defendants' False and Misleading Statements in Connection With AIG's Acquisition of American General.................. 402

C.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN CONNECTION WITH AIG'S BOND OFFERINGS ................................... 404

    1.    Zero Coupon Convertible Senior Debentures......................................... 404

    2.    0.5% Cash Exchangeable Equity-Linked Senior Notes.......................... 405

    3.    2.85% Medium-Term Notes, Series F .................................................... 408

    4.    2.875% Notes ......................................................................................... 411

    5.    4.25% Notes ........................................................................................... 412

D.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ABOUT GOVERNMENT INVESTIGATIONS.................................................. 413

VIII.    DEFENDANT PwC's PARTICIPATION IN THE FRAUD AND FALSE AND MISLEADING AUDIT REPORTS ....................................................... 415

    A.    FORMS 10-K............................................................................................ 416

        1.    1999 10-K ............................................................................................. 416

        2.    2000 10-K ............................................................................................. 418

        3.    2001 10-K ............................................................................................. 420

        4.    2002 10-K ............................................................................................. 422

        5.    2003 10-K ............................................................................................. 424

    B.    PWC'S AUDITS OF AIG VIOLATED GAAS .................................................. 426

        1.    PwC Ignored Relevant GAAS Provisions in Conducting Its Audits of AIG ......................................................................................... 428

        2.    PwC's Audit Reports of AIG Violate Basic GAAS Provisions............................................................................................ 438

    C.    THE TRUTH BEGINS TO EMERGE ............................................................... 444

IX.    DEFENDANTS' ILLEGAL INSIDER SELLING...................................... 445

X.    OTHER EVIDENCE OF DEFENDANTS' SCIENTER ............................... 448

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE .......................................................... 459

XII.    NO SAFE HARBOR ................................................................... 459

XIII.   CAUSES OF ACTION ................................................................................ 460

XIV.   REQUEST FOR RELIEF ............................................................................ 485

XV.   JURY DEMAND .......................................................................................... 486

## <u>CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT</u>

The Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police and Fire Pension Fund (collectively, "Lead Plaintiff"), individually and on behalf of all other persons and entities who purchased or otherwise acquired securities issued by American International Group, Inc. ("AIG" or the "Company"), by its undersigned attorneys, for its Consolidated Third Amended Class Action Complaint ("Complaint"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief are based on, *inter alia,* its investigation made by and through its attorneys, which investigation includes, among other things: (1) a review of public documents; (2) a review and analysis of AIG's filings with the Securities and Exchange Commission ("SEC"); (3) pleadings and other documents relating to various criminal, civil and administrative investigations and proceedings involving AIG and its subsidiaries, as well as other defendants named herein, brought by, *inter alia*, the SEC, Department of Justice ("DOJ"), the New York Attorney General ("NYAG") and/or the New York State Department of Insurance ("NYDOI"); (4) analyst reports; (5) news releases and media reports of AIG and its subsidiaries; and (6) interviews with confidential witnesses.

Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control.  Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

I.     <u>**NATURE OF THE ACTION AND KEY ADMISSIONS**</u>

1.      This is a securities class action brought on behalf of all purchasers of AIG's publicly-traded securities between October 28, 1999 and April 1, 2005, inclusive (the "Class Period"), against AIG and its top officers, its outside auditors and various other defendants named herein, for violations of the federal securities laws arising out of Defendants' dissemination of false and misleading statements concerning the Company's financial results and operations, as well as Defendants' manipulation of the market in which AIG common stock trades.

2.      On March 28, 2005, ***AIG's outside counsel admitted to federal and state regulators that the Company had violated the federal securities laws.***  Indeed, according to the March 29, 2005 edition of *The Wall Street Journal*, "***lawyers for AIG yesterday told regulators that they had uncovered evidence suggesting that the company had misled investors and regulators in regulatory filings***."

3.      Likewise, a March 30, 2005 *Wall Street Journal* article reported:

> ***It was known that AIG's lawyers had told the regulators at a meeting Monday [March 28, 2005] that the company had uncovered evidence suggesting that it had misled investors and regulators in state and federal documents filed in past years***.
> Those filings mostly related to reinsurance deals AIG cut with offshore companies with [sic] that it was closely associated.

4.      That same March 30 article revealed that, on or about March 29, 2005, AIG's outside counsel disclosed to regulators that ***the Company had intentionally given false information to the NYDOI during a routine inspection of AIG's property-casualty business in early 2005***:

> The AIG lawyers told the authorities that AIG officials had exaggerated the degree to which risk was transferred to the reinsurer . . . In describing other findings from AIG's internal

probe, the lawyers said they had uncovered evidence suggesting that past filings were misleading. ***But in this case, the lawyers admitted that the information provided during the [NYDOI] examination earlier this year was intentionally false and not an honest mistake***.

5.        AIG's admissions did not stop there.  In an equally startling disclosure contained in AIG's 2004 Form 10-K, wherein the Company restated nearly five years of earnings, ***AIG admitted that members of its senior management had engaged in accounting fraud in an effort to falsely inflate the Company's earnings***:

> ***Certain of AIG's controls within its control environment were not effective to prevent certain members of senior management, including the former Chief Executive Officer and former Chief Financial Officer, from having the ability, which in certain instances was utilized, to override certain controls and effect certain transactions and accounting entries.  In certain of these instances, such transactions and accounting entries appear to have been largely motivated to achieve desired accounting results and were not properly accounted for in accordance with GAAP.***

6.        AIG's 2004 Form 10-K also admitted numerous other improprieties:

- ***"[T]hat certain [Top Level] entries appear to have been made at the direction of certain former members of senior management without appropriate documentation or support"; and***

- That AIG's $500 million reinsurance deal with Defendant General Reinsurance Corp. ("General Re") – which, as alleged in greater detail below, had been initiated by AIG's long-time Chairman and CEO, Defendant Maurice R. "Hank" Greenberg ("Greenberg") – was nothing more than a sham: ***"[T]he transaction was done to accomplish a desired accounting result and did not entail sufficient qualifying risk transfer***.  As a result, AIG has determined that the transaction should not have been recorded as insurance."

7.        All these revelations stand in stark contrast to the Company's representations that AIG and its senior management maintained the highest standards of integrity.  Indeed, in its

Letter to Shareholders at the beginning of its 2003 Annual Report and Form 10-K, AIG boldly stated:

> The whole country is paying a price for the gross misdeeds of relatively few executives who shirked their responsibility to create value for all of their corporate constituencies – shareholders, customers and employers – and abused the system to create wealth for themselves and their close associates. It is unfortunate that the misbehavior of a few companies and their executives could have a negative impact on so many . . . ***The focus on integrity and building long-term value must start at the top if it is to permeate throughout an organization***.

Unfortunately, the events of the last year have shown that AIG and certain of its current and former leaders are members of the group of companies and executives that AIG itself condemned.

8.      As alleged in greater detail below, in addition to the above admissions of securities fraud and accounting improprieties, the Company has also been implicated in, *inter alia*:

- market manipulation, wherein Defendant Greenberg repeatedly ordered AIG traders to purchase large quantities of AIG stock in an effort to artificially inflate the Company's stock price;

- paying insurance brokers hundreds of millions of dollars in improper "contingent commissions" and rigging bids to help facilitate that scheme; and

- selling "income smoothing" insurance products and off-balance sheet transactions that AIG knew would allow several publicly-traded companies to falsely inflate their financial statements.

9.      The breadth of Defendants' misdeeds are also reflected in the sheer number of civil and criminal investigations into the Company and its management (as well as investigations into other named defendants) that are currently pending, which includes probes brought by the (1) SEC, (2) DOJ, (3) U.S. Attorney's Office for the Southern District of New York, (4) NYAG,

(5) NYDOI, (6) California Department of Insurance, (7) Florida Insurance Commission, and (8) the insurance regulators of several other states.

      10.    As alleged in greater detail below, those investigations have caused numerous top executives to leave the Company, oftentimes after "pleading the Fifth":

- Defendant Maurice R. "Hank" Greenberg, AIG's CEO and Chairman: On March 14, 2005 AIG announced that its Board of Directors had forced Defendant Greenberg to resign from his post as CEO, a position he had held *since 1967*, though the Board allowed him to remain non-executive chairman. It was not until New York Attorney General Eliot Spitzer threatened to **indict** the Company that, on March 29, 2005, Defendant Greenberg resigned from that position as well. On April 12, 2005, ***Defendant Greenberg invoked his Fifth Amendment right against self incrimination while being questioned by government investigators***. Finally, on June 8, 2005 Defendant Greenberg resigned from the Board, ending his 45 years with AIG.

- Defendant Howard I. Smith, AIG's CFO: AIG announced on March 14, 2005 that Defendant Smith was placed "on leave." On March 21, 2005, Defendant Smith was terminated ***after invoking his Fifth Amendment right against self-incrimination while being questioned by government investigators***. Smith later resigned from AIG's Board on June 10, 2005.

- Defendant Christian M. Milton, AIG's Vice President of Reinsurance: Like Defendant Smith, Milton – who was a principal player in the AIG-General Re deal – was terminated on March 21, 2005 ***after he invoked his Fifth Amendment right against self-incrimination while being questioned by government regulators***.

- Defendant L. Michael Murphy, Legal Counsel/Senior AIG Executive: On March 27, 2005, AIG fired Defendant Murphy, a longtime confidant of Defendant Greenberg who ran the Company's Bermuda operations, after Murphy refused to cooperate with the Company's internal investigation. According to the NYAG, ***Defendant Murphy "ordered [the] destruction of documents relating to [AIG's] off-shore entities"*** and he, or employees under his control, removed more than 80 boxes of documents from AIG's Bermuda offices in March 2005.

- Defendant Michael J. Castelli, AIG's Vice President and Comptroller: On April 15, 2005, AIG placed Defendant Michael J. Castelli "on leave" and subsequently fired him.

- Vincent Cantwell, AIG Vice President:  On April 15, 2005, AIG placed Mr. Cantwell, who reported to Defendant Castelli, on leave.

11.     Several executives of Defendant General Re have also been fired and/or or face criminal and civil penalties from the government based on their involvement in AIG's fraud:

- Defendant Ronald E. Ferguson:  While he was Chairman and CEO of General Re, Defendant Ferguson helped structure and consummate the $500 million AIG-General Re sham reinsurance deal at Defendant Greenberg's request.  On or about May 20, 2005, Ferguson *invoked his Fifth Amendment right against self-incrimination while being questioned by government regulators.*

- Defendant John B. Houldsworth:  Houldsworth, who was CEO of a General Re subsidiary that was heavily involved in the AIG-General Re deal, was one of the principal architects of that deal.  On June 6, 2005, General Re fired Houldsworth after the SEC initiated and partially settled an enforcement action against him, alleging violations of, *inter alia*, Section 20(e) of the Exchange Act.  Three days later, on June 9, 2005, *Houldsworth pled guilty in federal court to one count of criminal conspiracy to violate the federal securities laws*.

- Defendant Richard Napier:  Napier, who was a Senior Vice President at General Re, was also heavily involved in structuring and consummating the AIG-General Re deal.  On June 10, 2005, the SEC initiated and partially settled an enforcement action against Napier, alleging violations of, *inter alia*, Section 20(e) of the Exchange Act.  That same day, Napier *pled guilty in federal court to one count of criminal conspiracy to violate the federal securities laws.*

- Joseph P. Brandon:  Brandon, who is currently CEO of General Re, *received a Wells Notice from the SEC on September 8, 2005* in connection with his involvement in the AIG-General Re deal.

- Elizabeth Monrad:  Monrad was, at all relevant times, CFO of General Re and helped to structure and consummate the AIG-General Re deal.  *Monrad received a Wells Notice from the SEC on or about May 10, 2005* in connection with her involvement in the AIG-General Re deal.

- Robert Graham:  Graham, currently General Re's Assistant General Counsel, *received a Wells Notice from the SEC on or about September 8, 2005* in connection with his role in the AIG-General Re deal.

- Christopher Garand:  Garand, a General Re executive who resigned from the company on August 31, 2005, also *received a Wells Notice from the SEC on*

*or about September 8, 2005* in connection with his role in the AIG-General Re deal.

### A.    THE BID-RIGGING AND CONTINGENT COMMISSIONS SCHEME

12.    In October 2004, the NYAG implicated AIG in a scheme to pay insurance brokers illegal "contingent commissions" that resulted in unsuspecting clients being "steered" by the brokers to purchase AIG insurance policies at inflated prices.

13.    To facilitate that scheme, AIG participated in illegal bid-rigging to deceive customers into thinking the bids for their business were competitive.  This illegal scheme virtually guaranteed that the duped customers would renew their AIG-written policies, as so-called "competitive" bids from other insurance companies were pre-arranged to be made at prices higher than AIG's.  In connection with this bid-rigging scheme, AIG also submitted fake, non-competitive bids in order to allow its co-conspirators to retain or obtain certain insurance business at inflated, non-competitive prices.

14.    Attorney General Spitzer likened the bid-rigging scheme to "***the same kind of cartel-like behavior carried out by organized crime*.**"  Similarly, Peter Pope, Deputy New York Attorney General in charge of the Criminal Division, said that the bid-rigging scheme is "***like the Mafia's Cement Club*,**" where construction projects rotated to cement companies based on the kickbacks the companies paid.

15.    In connection with these events, to-date, at least four AIG executives and employees have pleaded guilty in New York State Court to felony and misdemeanor charges of Scheme to Defraud.  Moreover, AIG has announced that it will no longer pay contingent commissions to insurance brokers.  The NYAG's investigation of the bid-rigging scheme continues.

B.      **THE BRIGHTPOINT AND PNC DEALS**

16.     In November 2004, one month after the contingent commission and bid-rigging schemes were disclosed, AIG paid ***$126 million in fines and restitution*** to settle charges brought by the SEC, DOJ and United States Attorneys' Offices in connection with AIG having actually participated in illegal schemes with several of its corporate clients – including Brightpoint Inc. ("Brightpoint") and PNC Financial Services Group, Inc. ("PNC") – to violate federal securities laws by manipulating those companies' earnings using so-called "non-traditional" or "finite" reinsurance policies, or off-balance-sheet transactions.  To settle an earlier probe by the SEC into AIG's illegal dealings with Brightpoint, AIG had agreed in September 2003 to pay a ***$10 million fine*** that was issued because – in the words of the SEC – "[i]n the course of the Commission's investigation, ***AIG did not come clean.  On the contrary, AIG withheld documents and committed other abuses***."

17.     To make matters worse, in connection with the government's investigations into AIG's Brightpoint and PNC transactions, ***the SEC and DOJ took the highly unusual step in October 2004 of accusing AIG of misleading investors by failing to disclose the full scope of those investigations***.

C.      **AIG FALSIFIED ITS FINANCIAL STATEMENTS**

18.     As discussed above, AIG has admitted to engaging in a massive accounting and securities fraud that resulted in the Company being forced to restate nearly five years of earnings. The government's investigation into these improprieties began on February 9, 2005, when the SEC and NYAG subpoenaed AIG to investigate whether it had manipulated *its own* earnings by purchasing and/or selling so-called "finite" reinsurance products from General Re and other reinsurance companies.  On March 4, 2005, the market learned that AIG's long-time Chief Executive, Defendant Greenberg, had also been subpoenaed by the NYAG because he had

***personally*** initiated a finite reinsurance transaction with General Re that fraudulently inflated AIG's claims reserves by $500 million.

19.     Although the government's inquiries initially focused on the General Re transaction, those investigations were gradually expanded to include a myriad of other accounting issues, including AIG's reinsurance deals with two off-shore reinsurers, Defendants Union Excess Reinsurance Company, Ltd. ("Union Excess") and Richmond Insurance Company Ltd. ("Richmond").

20.     On March 30, 2005, AIG issued a press release in which the Company admitted that the $500 million AIG-General Re deal was improper:

> ***AIG has concluded that the Gen Re transaction documentation was improper and, in light of the lack of evidence of risk transfer, these transactions should not have been recorded as insurance.*** Therefore, AIG's financial statements will be adjusted to recharacterize such transactions as deposits rather than as consolidated net premiums.

21.     In that same press release, AIG also disclosed that its "accounting treatment for certain additional items" was improper and needs to be "recharacterized or otherwise adjusted." The Company added that ***"[c]ertain but not all of the original characterizations resulted from transactions which appear to have been structured for the sole or primary purpose of accomplishing a desired accounting result."***

22.     In total, AIG estimated that, as a result of the General Re deal and other improper transactions, the Company would be forced to shave approximately ***$1.7 billion*** from consolidated shareholders' equity.

23.     One month later, on May 1, 2005, AIG issued a press release in which it announced that ***it planned to restate nearly five full years of earnings***, a move that would reduce consolidated  shareholders' equity ***by more than $2.7 billion***.

24.   AIG also announced on May 1, 2005 that:

> **[t]he restatement will correct errors in prior accounting for improper or inappropriate transactions or entries that appear to have had the purpose of achieving an accounting result that would enhance measures important to the financial community and that may have involved documentation that did not accurately reflect the nature of the arrangements.**

25.   On May 31, 2005, AIG filed its thrice-delayed 2004 Form 10-K, which restated the Company's earnings for the years ended December 31, 2003, 2002, 2001 and 2000, the quarters ended March 31, June 30 and September 30, 2004 and 2003 and the quarter ended December 31, 2003.  The restatement resulted in AIG slashing its net income from 2000 through 2004 **by $3.9 billion**, or 10 percent, and reducing the value of its shareholders' equity by **$2.26 billion** (rather than the $2.7 billion as previously announced).

26.   AIG's Form 10-K also made several remarkable additional admissions – namely **those that directly implicated members of AIG senior management, including Defendants Greenberg and Howard I. Smith ("Smith"), AIG's former CFO – in committing securities fraud**:

> **Certain accounting entries originated at the parent company level had the effect of reclassifying realized capital gains to net investment income, as well as adjusting other line item reclassifications and other segment financial information.**  In some cases, expense deferrals were increased or reserves decreased, **both having the effect of increasing reported earnings**. In other cases, the adjustments affected revenue and expense recognition between reporting periods or among business segments.  Certain of these entries were previously identified but considered not to be sufficiently material to require correction.  As part of its internal review, AIG analyzed and assessed "top level" adjustments since 2000 and **determined that certain entries appear to have been made at the direction of certain former members of senior management without appropriate documentation or support.**

> *        *        *

- 10 -

> *Certain of AIG's controls within its control environment were*
> *not effective to prevent certain members of senior management,*
> *including the former Chief Executive Officer and former Chief*
> *Financial Officer, from having the ability, which in certain*
> *instances was utilized, to override certain controls and effect*
> *certain transactions and accounting entries.  In certain of these*
> *instances, such transactions and accounting entries appear to*
> *have been largely motivated to achieve desired accounting results*
> *and were not properly accounted for in accordance with GAAP.*

27.     As alleged in greater detail below, the restatement involved improper transactions across seven major areas, including:  (1) the transfer of risk in connection with various reinsurance deals; (2) so-called "top side" adjustments to claims reserves and other accounts; (3) mischaracterizing certain income as underwriting income; and (4) converting underwriting losses into capital losses.

### D.     GREENBERG'S REPEATED ATTEMPTS TO INFLATE THE PRICE OF AIG STOCK BY MANIPULATING THE MARKET

28.     Defendant Greenberg's personal involvement in these related scandals was not limited to the reinsurance arena.  On November 24, 2004, the United States Attorney's Office for the Southern District of New York announced that it had opened a criminal investigation into whether Greenberg had violated federal securities laws by trying to inflate the price of AIG's stock in connection with the Company's August 2001 acquisition of American General Corporation ("American General").  The U.S. Attorney's Office's investigation followed several well-publicized instances where Defendant Greenberg contacted Richard "Dick" Grasso, who at the time was the head of the New York Stock Exchange ("NYSE"), in an effort to have Grasso prod the specialist firm responsible for trading AIG's stock on the floor of the NYSE to prop up AIG's stock price.

29.     The market would later learn that in February 2005, Defendant Greenberg had *again* manipulated, or attempted to manipulate, the price of AIG stock by ordering AIG traders

- 11 -

to purchase large quantities of its shares in an effort to – in Greenberg's own words – **"push it up a bit if we can."**  On one of those occasions, a trader told Defendant Greenberg that he could not purchase AIG shares in the last 10 minutes of trading because Kathy Shannon, AIG's deputy general counsel, had said it would be improper.  According to the trading tapes of that conversation, **Defendant Greenberg's response was, "I don't give a fuck what Kathy Shannon says!"**

30.     The U.S. Attorney's investigation into the market manipulation continues.

31.     In total, as a result of developments alleged herein, the price of AIG's stock plummeted, falling from $66.99 on October 13, 2004, to $50.95 as of April 1, 2005, a **24 percent decline** that represents a loss in market capitalization to investors of more than **$40 billion**.

32.     During the course of these events, and throughout the Class Period, AIG and its management repeatedly represented to investors and the public that the Company's financial condition was strong and that its revenues and profits were growing as a result of sound, honest business principles.  However, each of the Individual Defendants in this case knew, but concealed from the market, *inter alia*, the following facts:

(a)     That AIG falsely inflated its revenues and bolstered its claims reserves using improper "finite" reinsurance contracts where, in violation of GAAP and other rules, the AIG reinsurance companies were not taking on any risk;

(b)     That AIG falsely inflated its earnings by, *inter alia*:  (1) improperly accounting for more than $1 billion in reinsurance transactions with several off-shore reinsurance companies that AIG secretly controlled; (2) making unsupported "Top Side" adjustments that bolstered the Company's claims reserves and adjusted other accounts; (3) purposely mischaracterizing underwriting losses as investment losses; (4) failing to expense the long-term

compensation that Defendant SICO granted to current and former AIG employees; and (5) under-reserving for "asbestos and environmental exposures included within the reserve for net losses and loss expenses."

(c)      That AIG executives and employees had participated in an illegal bid-rigging scheme that served, *inter alia*, to: improperly inflate the amount of insurance premiums that AIG received, "protect" AIG from losing customers through fair competition, and defraud AIG's customers into believing that the insurance bids they received were honest and legitimate;

(d)      That AIG was paying hundreds of millions of dollars to insurance brokers, including Marsh & McLennan Companies, Inc. ("Marsh"), in illegal "contingent commissions" in return for the insurance brokers improperly "steering" clients to purchase AIG's insurance policies at artificially inflated prices;

(e)      That by concealing its contingent commission agreements from its clients and from the brokers' clients, AIG violated applicable principles of fiduciary law, subjecting the Company to potentially enormous fines and penalties;

(f)      That AIG improperly inflated its revenues by including fees earned in the illegal Brightpoint and PNC transactions;

(g)      That AIG failed to timely disclose the SEC's investigation into AIG's finite insurance deal with Brightpoint, namely that the Company had received a voluntary request for information in July 2000 and was subpoenaed in November 2001;

(h)      That AIG had failed to fully disclose the extent of the government's investigations into AIG's dealings with PNC by concealing the fact that AIG had engaged in illegal transactions using off-balance sheet entities with several companies other than PNC,

contrary to AIG press releases of January 30, 2002, September 21, 2004 and September 29, 2004; and

(i)     That as a result of (a) – (h) above, and as more fully described herein, AIG's prior reported profits and other key financial measures were grossly overstated.

33.     In addition, Defendant Greenberg manipulated the price of AIG stock prior to AIG's acquisition of American General in late 2001 and on several occasions in February 2005.

## II.     **JURISDICTION AND VENUE**

34.     This action arises under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, 77l(a)(2), and 77o, and Sections 10(b), 14(a), 20(a) and 20A of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a), 78t(a), and 78tA and Rules 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9.

35.     This Court has subject-matter jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1367.

36.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the false and misleading statements were made in or issued from this District.

37.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

III.     **PARTIES**

        A.      **LEAD PLAINTIFF**

38.     Ohio Public Employees Retirement System ("OPERS"), an instrumentality of the State of Ohio that operates pursuant to Chapter 145 of the Ohio Revised Code, currently serves more than 3,700 public employers, more than 620,000 members and 130,000 retirees and surviving beneficiaries.  OPERS has assets of $64.5 billion, making it the largest state pension fund in Ohio, the tenth largest state pension fund in the United States, and the seventeenth largest public pension fund in the world.  OPERS provides retirement, disability, and survivor benefit programs for public employees throughout the State of Ohio who are not covered by another state or local retirement system.  As demonstrated by its certifications attached hereto as Exhibit 1, OPERS purchased the publicly traded securities of AIG at artificially inflated prices during the Class Period.

39.     State Teachers Retirement System of Ohio ("STRS Ohio"), an instrumentality of the State of Ohio that operates pursuant to Chapter 3307 of the Ohio Revised Code, is a large public pension fund, with assets of $54.6 billion.  STRS Ohio serves more than 430,000 active, inactive and retired Ohio public educators.  As demonstrated by its certification attached hereto as Exhibit 2, STRS Ohio purchased the publicly traded securities of AIG at artificially inflated prices during the Class Period.

40.     Ohio Police & Fire Pension Fund ("OP&F"), an instrumentality of the State of Ohio, serves more than 52,000 active police officers and firefighters, retirees, and beneficiaries and survivors, and has assets of approximately $8.8 billion.  As demonstrated by its certification attached hereto as Exhibit 3, OP&F purchased the publicly traded securities of AIG at artificially inflated prices during the Class Period.

41.     OPERS, STRS Ohio and OP&F are, collectively, the Lead Plaintiff in this action.

42.      STRS Ohio also owned shares of HSB Group, Inc. ("HSB Group") and American General at the time AIG acquired those companies in November 2000 and August 2001, respectively.

43.      OPERS purchased the 4.25% Notes due on May 15, 2013, issued by AIG during the Class Period, as described in greater detail below.

### B.      AMERICAN INTERNATIONAL GROUP DEFENDANTS

#### 1.      American International Group, Inc.

44.      Defendant AIG is a Delaware corporation, with its principal place of business located in New York, New York.  AIG is a holding company that, through its subsidiaries, is engaged in a broad range of insurance and insurance-related activities in the United States and abroad.  AIG's securities are registered pursuant to Section 12(b) of the Exchange Act, and are listed on the New York Stock Exchange, as well as stock exchanges in London, Paris, Switzerland, Tokyo, Frankfurt, Australia, and Mexico.

#### 2.      Maurice R. "Hank" Greenberg

45.      Defendant Greenberg was, at all relevant times, AIG's Chairman and Chief Executive Officer.  Greenberg joined AIG in 1960 and became CEO in 1967.  In 1989, he also became Chairman.  On March 14, 2005, on the eve of a scheduled deposition before the NYAG and SEC, AIG's Board of Directors forced Greenberg to step down from his position as CEO. Although the AIG Board agreed to allow Greenberg to remain non-executive chairman of AIG, he later resigned from that position as well.  On June 8, 2005, Defendant Greenberg resigned from AIG's Board, thereby ending his nearly 45 years with the Company.

46.      Defendant Greenberg is President, CEO and Chairman of Defendant C.V. Starr & Co., Inc., a private entity of which he owns 16.4 percent.  Defendant C.V. Starr & Co., Inc. owns approximately 2 percent of AIG's outstanding stock, or 47.3 million shares.

47.     Defendant Greenberg is also a director of Defendant Starr International Co. Inc. ("SICO"), a private entity of which Defendant Greenberg owns approximately 8.33 percent. Defendant SICO owns approximately 12 percent of AIG's outstanding stock, or approximately 311.5 million shares.

48.     Defendant Greenberg has direct ownership of approximately 1.74 percent of AIG's outstanding stock, or approximately 45.3 million shares.  Thus, Defendant Greenberg, and entities he controls, own nearly 16 percent of AIG's outstanding stock.

49.     Defendant Greenberg personally made numerous false and misleading statements to the investing public during the Class Period, causing AIG stock to be artificially inflated, including the statements alleged, *inter alia*, in paragraphs 441, 812, 817, 828, 833, 837, 842, 853, 854, 859, 863, 864, 871, 880, 885, 890, 896, 897, 900, 928, 938, 945, 952 and 959 herein. Defendant Greenberg also participated in the issuance of, made statements in, signed, and/or certified as accurate, each of the Company's false and misleading press releases and SEC filings during the Class Period.

50.     As alleged herein, Defendant Greenberg directed, personally participated in, and/or knew about many of the improper transactions that artificially inflated the Company's financials, including, *inter alia*, the $500 million sham AIG-General Re transaction, the conversion of underwriting losses to investment losses, the mischaracterization of income from so-called "life settlement" policies as underwriting income, and AIG's improper booking of workers' compensation premiums.  Moreover, Defendant Greenberg engaged in schemes to directly inflate the price of AIG securities by manipulating the market for AIG stock.

51.     When questioned by federal and state regulators about these and other matters on April 12, 2005, Defendant Greenberg invoked his Fifth Amendment privilege against self-incrimination.

52.     As alleged in greater detail below, that same day, Defendant Greenberg filed a Form 4 "Statement of Changes in Beneficial Ownership" with the SEC, which revealed that he had "gifted" 41,399,802 shares of AIG common stock to his wife, Corinne P. Greenberg, on March 11, 2005.  The stock was worth approximately *$2.68 billion* on the date the conveyance was made.  On June 28, 2005, on the eve of a pre-motion conference before the Court regarding the conveyance, Mrs. Greenberg transferred the shares back into joint ownership status with Defendant Greenberg.

### 3.     Howard I. Smith

53.     Defendant Smith was, at all relevant times, AIG's Vice Chairman, CFO, Chief Administrative Officer and a director of the Company's board.  On March 14, 2005, AIG announced that Smith had been put on "leave" from his position as CFO.  On March 21, 2005, AIG fired Smith after he invoked his Fifth Amendment privilege against self-incrimination while being questioned by the SEC and the NYAG.  On June 10, 2005, Smith reportedly resigned from his position as a director of AIG.

54.     After joining AIG in 1984, Defendant Smith was named AIG's Senior Vice President and Comptroller, and Executive Vice President and Comptroller in 1995.  He became AIG's CFO in 1996, and at that time also assumed responsibility for AIG's Treasury, Investor Relations, and Credit and Market Risk functions.

55.     Defendant Smith was, at all relevant times, a director of Defendants Starr International Company, Inc. and C.V. Starr & Co., Inc., owning 8.33 percent and 7.61 percent those private companies' respective stocks.

56.     Prior to joining AIG, Smith was a partner in charge of Coopers & Lybrand's (the predecessor of Defendant PricewaterhouseCoopers LLP) New York office insurance practice.

57.     Defendant Smith prepared, participated in the issuance of, signed, and/or certified as accurate each of the Company's false and misleading press releases and SEC filings during the Class Period, as alleged herein.

58.     Like Defendant Greenberg, Smith directed, personally participated in and/or knew about many of the improper transactions that artificially inflated the Company's financials, including, *inter alia*, the $500 million sham AIG-General Re transaction, so-called "Top Side" or "top-level" adjustments to claims reserves and other accounts, the conversion of underwriting losses to investment losses, and the mischaracterization of income from "life settlement" policies as underwriting income.

### 4.     Martin J. Sullivan

59.     Defendant Martin J. Sullivan ("Sullivan") was, at all relevant times, AIG's Vice Chairman and Co-Chief Operating officer.  He is a director of AIG and has been since May 2002.  On March 14, 2005, Defendant Sullivan was elected CEO to replace Defendant Greenberg.

60.     In 1998, Defendant Sullivan had been elected Executive Vice President, Foreign General Insurance of AIG.  Prior to that, he had been Senior Vice President, Foreign General Insurance and President of American International Underwriters ("AIU"), AIG's international property-casualty organization.  Earlier he served as President of AIU's U.K./Ireland Division and Chief Operating Officer of AIG Europe Limited, and held a number of underwriting, marketing and management positions in the U.K. and Ireland.  He joined AIG in 1971 in the AIU Finance Department in London.

61.     Defendant Sullivan was a director of Defendants Starr International Company, Inc. and C.V. Starr & Co., Inc. until March 2005.

62.     Defendant Sullivan prepared and participated in the issuance of each of the Company's false and misleading press releases and SEC filings during the Class Period. Defendant Sullivan signed the Company's false and misleading annual reports filed on Forms 10-K with the SEC for the years 2002 and 2003.

63.     Defendant Sullivan also knew about and was involved in certain "Top Side" adjustments to AIG's claims reserves.

### 5.     Thomas R. Tizzio

64.     Defendant Thomas R. Tizzio ("Tizzio") was, at all relevant times, Senior Vice Chairman of AIG's General Insurance business segment and a director of AIG until May 2003. Defendant Tizzio was, at all relevant times, a director of Defendants Starr International and C.V. Starr & Co., Inc., owning 8.33 percent and 7.61 percent of those companies' respective shares.

65.     Defendant Tizzio signed the Company's false and misleading annual reports filed on Forms 10-K with the SEC for the years 1999, 2000, 2001, and 2002, as alleged below. Defendant Tizzio prepared, participated in the issuance of, signed, and/or certified as accurate each of the Company's false and misleading press releases and SEC filings during the Class Period.

66.     Defendant Tizzio also directed, personally participated in, and/or knew about many of the improper transactions that artificially inflated the Company's financials, including, *inter alia*, AIG's improper booking of workers' compensation premiums.

### 6.     Michael J. Castelli

67.     Defendant Michael J. Castelli ("Castelli") was, at all relevant times, Vice President and Comptroller of AIG.  He was previously AIG Vice President and Deputy

Comptroller, a position he held from 1998 until May 30, 2000, when he became Comptroller. Prior to that, Defendant Castelli served as Senior Vice President and CFO for AIG's Domestic General Insurance operations. Prior to joining AIG, Defendant Castelli was a partner at Defendant PwC.

68.    Defendant Castelli signed the Company's false and misleading annual reports filed on Forms 10-K with the SEC for the years 2000, 2001, 2002, and 2003, as alleged below.

69.    On April 15, 2005, AIG placed Defendant Castelli "on leave," the same day he was reportedly escorted from the Company's New York offices by several security guards. AIG fired Castelli sometime subsequent to that date – the Company's 2004 Form 10-K states that "certain other AIG executives, including its former comptroller, were terminated for [failure to cooperate with the Company's investigations]."

70.    Defendant Castelli directed, personally participated in, and/or knew about many of the improper transactions that artificially inflated the Company's financials, including, *inter alia*, the $500 million sham AIG-General Re transaction.

### 7.    Christian M. Milton

71.    Defendant Christian M. Milton ("Milton") was, at all relevant times, AIG's Vice President of Reinsurance. Milton played a pivotal role in structuring AIG's improper $500 million transaction with General Re, and he gave intentionally false information to state insurance regulators about the nature of other reinsurance arrangements. On March 21, 2005, AIG fired Milton after he invoked his Fifth Amendment privilege against self-incrimination while being questioned by the SEC and NYAG.

### 8.    L. Michael Murphy

72.    Defendant L. Michael Murphy ("Murphy") was, at all relevant times, Legal Counsel and a senior AIG executive at the Company's offices in Bermuda. Murphy is also Vice

President and Corporate Secretary of Defendant SICO and Corporate Secretary and an alternate director of Defendant Richmond Insurance Company Ltd.  Murphy also served as Vice President of Astral Reinsurance, a company that, until its dissolution in 2002, absorbed insurance risks underwritten by Defendants AIG and Union Excess.

73.    Defendant Murphy, who began working for AIG in 1972, was heavily involved in AIG's dealings with off-shore reinsurance companies that are currently being investigated by the government.  Moreover, he gave intentionally false information to the NYDOI in November 2000 in an effort to conceal the true nature of AIG's relationship with Defendant Richmond.

74.    On March 27, 2005, AIG fired Defendant Murphy – a close confidant of Defendant Greenberg – for refusing to cooperate with its internal investigation into its reinsurance transactions.  Murphy was fired after he, according to the NYAG, "ordered [the] destruction of documents relating to [AIG's] off-shore entities" and he, or employees under his control, removed more than 80 boxes of documents from AIG's Bermuda offices.

75.    Though based in Bermuda, Murphy made frequent trips to AIG's New York City headquarters to conduct business on behalf of Defendants AIG, C.V. Starr and/or SICO.

76.    Defendants Greenberg, Smith, Sullivan, Tizzio, Castelli, Milton, and Murphy are collectively referred to herein as the "Individual Defendants."

### 9.    John A. Graf

77.    Defendant John A. Graf ("Graf") was Executive Vice President of AIG from August 2001 until approximately September 2004.  Defendant Graf was Vice Chairman, Asset Accumulation at American General when that company was acquired by AIG in August 2001. After the acquisition, he was named Vice Chairman and a member of the board of AIG SunAmerica Inc. in 2001 and was elected AIG Executive Vice President, Retirement Savings in 2002, a position he served in until leaving the Company in September 2004.

78.     Because of Graf's position, he knew the adverse non-public information about the business of AIG, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.

79.     During the Class Period, Defendant Graf participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

80.     During the Class Period, Graf sold 785,342 shares of AIG stock for proceeds of $54,282,790.

### 10.     Frank J. Hoenemeyer

81.     Defendant Frank J. Hoenemeyer ("Hoenemeyer") was, at all relevant times, a director of AIG.  He was a member of the Board's Audit Committee for each year during the Class Period, and was chair of the Audit Committee in 2003.  He is also a financial consultant, serves as a director of Carey Fiduciary Advisors, Inc. and Cincinnati, Inc.  He was a career executive of Prudential Insurance Company of America, Inc. and retired as its Vice Chairman.

82.     Defendant Hoenemeyer signed the Company's false and misleading annual reports filed on Forms 10-K with the SEC for the years 1999, 2000, 2001, 2002, and 2003, as alleged below.  He also signed AIG's Forms S-3 or was a director when AIG filed the Forms with the SEC on February 24, 2000 and November 7, 2001.

83.     AIG's Audit Committee met sixteen times in 2004, nine times in 2003, eight times in 2002, four times in 2001, seven times in 2000 and four times in 1999. The audit committee was formed to assist the Board in its oversight of:  (i) the integrity of AIG's financial statements; (ii) AIG's compliance with legal and regulatory requirements; (iii) the qualifications,

independence and performance of AIG's independent auditor; and (iv) the performance of AIG's internal audit function.

84.     The members of the Audit Committee knew or should have known that the Company's financial statements were false and thereby permitted or condoned the unlawful practices described herein.  Accordingly, Defendant Hoenemeyer, as a member and the chair of the Audit Committee, knew of or recklessly disregarded the rampant unlawful practices at AIG described herein.

85.     Further, as a member and the chair of the Audit Committee and the AIG Board, Defendant Hoenemeyer received briefings and reports concerning the unlawful practices described herein.  However, he allowed AIG to continue those practices, and caused and/or permitted AIG to deny in filings with the SEC that AIG misled and/or deceived its shareholders.

86.     The members of the Audit Committee, including Defendant Hoenemeyer, submitted the following report for inclusion in the April 5, 2004 Proxy Statement, that stated in relevant part:

> In the performance of its oversight function, the Committee has considered and discussed both the audited financial statements as well as the unaudited quarterly financial statements with management and the independent accountants.  The Committee has also discussed with the independent accountants the matters required to be discussed by Statement on Auditing Standards No. 61, Communication with Audit Committees, as currently in effect.  Finally, the Committee has received the written disclosures and the letter from the independent accountants required by Independence Standards Board Standard No. 1, Independence Discussions with Audit Committees, as currently in effect, and has discussed with the accountants their independence.
>
> During 2003, the Audit Committee performed all of its duties and responsibilities under the then applicable Audit Committee Charter, holding nine meetings.  Based upon the reports and discussions described in this report and the role and responsibilities of the Audit Committee described above and in the Audit Committee Charter, the Audit Committee recommended to the

Board that the audited financial statements be included in AIG's Annual Report on Form 10-K for the year ended December 31, 2003 filed with the Securities and Exchange Commission.

87.     The Audit Committee, including Defendant Hoenemeyer, submitted similar reports in AIG's 2000, 2001, 2002 and 2003 Proxy Statements, and permitted AIG to deny in filings with the SEC that AIG misled and/or deceived its shareholders.

88.     As a member and chair of the Audit Committee, Defendant Hoenemeyer was obliged to discuss and review the Company's financial statements.  Upon the Audit Committee's recommendations, these financial statements were included in the Company's Annual Reports. Defendant Hoenemeyer and the other members of the Audit Committee knew these financial statements would be subsequently referred to and incorporated within the Company's press releases.  Consequently, Defendant Hoenemeyer had an obligation to ensure that those financial statements were not false and misleading.  Nevertheless, as detailed herein, as a result of Hoenemeyer's intentional or reckless disregard of his duties, AIG has been forced to restate its financial results and has admitted not only that its financial statements were false, but that the Company, through top management, had purposely inflated AIG's financial results.

### 11.     Eli Broad

89.     Defendant Eli Broad ("Broad") was, at all relevant times, a director of AIG until May 2003.  He served as a member of the AIG Finance Committee from 1999 to 2002, and is also Chairman of AIG SunAmerica Inc., a wholly-owned subsidiary of AIG.

90.     Because of Defendant Broad's position, he knew the adverse non-public information about the business of AIG, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.

91.     During the Class Period, Broad participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Broad signed the Company's false and misleading Annual Reports filed on Form 10-K with the SEC for the years 1999, 2000, 2001 and 2002, as alleged below.

92.     During the Class Period, Broad sold 4,605,417 shares of AIG stock for proceeds of more than $319 million.

### C.     STARR INTERNATIONAL COMPANY, INC.

93.     Defendant SICO is a Bermuda-based private holding company incorporated in Panama that, as of January 31, 2004, held 11.9 percent of AIG's common stock, making it AIG's single largest shareholder.  At one time, SICO controlled and operated a company called Astral Reinsurance that, until its dissolution in 2002, absorbed insurance risks underwritten by Defendant Union Excess.

94.     SICO was formed in the early 1970s by senior AIG executives, including Defendant Greenberg.  The primary purpose of SICO was to pay AIG executives incentive-based compensation that would encourage them to spend their careers with AIG.  In Defendant Greenberg's own words, SICO "marr[ies] people" to AIG.

95.     SICO is run by a 15-member board that is headed by Defendant Greenberg, who owns approximately 8.3 percent of SICO's stock.  The board was, at all relevant times, comprised of AIG executives, including Defendants Sullivan, Smith and Tizzio.  Defendant Murphy is currently SICO's Vice President and Secretary.

96.     As set forth in AIG's 2003 Form 10-K, at all relevant times, SICO provided a Deferred Compensation Profit Participation Plan ("SICO Plan") to approximately 700 AIG executives.  Participation in the SICO Plan by any person, and the amount of such participation, was at the sole discretion of SICO's Board of Directors.  AIG's Compensation Committee

played no part in this process, and it was merely informed of the results of the annual SICO board meetings.

97.     SICO's board decided which AIG executives received compensation under the SICO plan.  This compensation, in the form of AIG shares, is set aside in accounts that executives typically could not cash out until they retired.  At retirement, participating AIG executives received either cash or AIG shares, at SICO's discretion.

98.     However, if an executive left AIG for any reason before he or she retired, that executive forfeited the right to receive any of the compensation he or she accumulated under the SICO plan.  For example, on April 11, 2005, *The Wall Street Journal* reported that Defendant Greenberg's own son, Evan Greenberg – a former Director and COO of AIG – forfeited approximately $14 million in his SICO account when he left the Company in September 2000.  Likewise, Robert E. Omahne, another former AIG executive, lost his SICO set-asides when he was fired in late 1999.  Commenting on the issue of executives having to forfeit their SICO compensation upon prematurely departing from AIG, Defendant Greenberg reportedly asked, "If you're not going to ride the course, why should you have it?"

99.     The compensation that SICO paid often exceeded AIG executives' regular compensation.  Since 2001, the amount of long-term compensation that SICO allocated to AIG executives was approximately $270 million.  In 2003 alone, SICO set aside $129.6 million in AIG shares for AIG executives.  In 2004, AIG's top 11 executives were allocated $42.4 million in shares by SICO.

100.     For example, in 2004 alone, Defendant Sullivan was allocated $4.2 million under the SICO plan, which dwarfed the $1.6 million in annual compensation he received from AIG that year ($775,000 in salary and $830,000 in bonuses).  Likewise, in 2004, Defendant Smith

was allocated $4.2 million under the SICO plan (compared with his $1.36 million in annual AIG compensation), and Defendant Tizzio was allocated $5.0 million under SICO plan (compared with his $1.28 million in annual AIG compensation).  Over the years, Defendant Sullivan has accumulated a total of more than $10.6 million under the plan.

101.   The following table, which is comprised of information AIG disclosed in its June 27, 2005 Proxy statement, shows that the long-term compensation received by senior AIG executives from SICO (under the heading "SICO LTIP Payouts) far exceeded the regular compensation that AIG paid them:

| Name and Principal Position | Year | Annual Compensation | | | Long Term Compensation | | All Other Compensation |
| | | | | | Awards | Payouts | |
| | | Salary | Bonus | Other Annual Compensation | Stock Options | SICO LTIP Payouts | |
|---|---|---|---|---|---|---|---|
| Current Officers | | | | | | | |
| **Martin J. Sullivan** ..................... | 2004 | $ 774,963 | $ 830,000 | $ 28,075 | 50,000 | $ 4,202,880 | $ 14,350 |
| President and | 2003 | 792,347 | 730,000 | 235,062 | 80,000 | — | 14,000 |
| Chief Executive Officer | 2002 | 593,500 | 440,000 | — | 40,000 | 1,851,200 | 11,000 |
| **Donald P. Kanak** ....................... | 2004 | 743,000 | 960,000 | 365,474 | 50,000 | 3,152,160 | 14,350 |
| Executive Vice Chairman | 2003 | 718,538 | 860,000 | 1,164,528 | 65,000 | — | 13,999 |
| and Chief Operating Officer | 2002 | 554,710 | 553,917 | 1,684,589 | 75,000 | 1,851,200 | 11,000 |
| **Jay S. Wintrob** ......................... | 2004 | 716,000 | 900,000 | 20,948 | 50,000 | 2,626,800 | 1,510,707 |
| Executive Vice | 2003 | 731,038 | 625,000 | — | 80,000 | — | 1,424,499 |
| President—Retirement | 2002 | 716,000 | 490,000 | — | 40,000 | 1,851,200 | 6,469,372 |
| Services | | | | | | | |
| **Richard W. Scott** ...................... | 2004 | 550,000 | 1,139,905 | 32,405 | 15,000 | 709,236 | 13,341 |
| Senior Vice | 2003 | 559,616 | 1,061,250 | — | 30,000 | — | 9,000 |
| President—Investments | 2002 | 500,000 | 858,730 | — | 15,000 | 624,780 | 8,375 |
| **Thomas R. Tizzio** ..................... | 2004 | 654,700 | 630,000 | 27,905 | 25,000 | 5,043,456 | 14,350 |
| Senior Vice Chairman— | 2003 | 679,881 | 630,000 | — | 55,000 | 1,996,800 | 14,000 |
| General Insurance | 2002 | 654,700 | 655,000 | — | 30,000 | 3,702,400 | 10,500 |
| **Edmund S.W. Tse** ..................... | 2004 | 805,152 | 790,192 | 20,000 | 55,000 | 5,043,456 | — |
| Senior Vice Chairman— | 2003 | 815,156 | 746,859 | — | 100,000 | 1,784,880 | — |
| Life Insurance | 2002 | 765,154 | 781,859 | — | 50,000 | 3,702,400 | — |
| **Rodney O. Martin, Jr.** ............... | 2004 | 682,000 | 918,767 | 30,006 | 40,000 | 1,050,720 | 1,586,947 |
| Executive Vice President— | 2003 | 695,731 | 1,340,000 | 95,118 | 40,000 | — | 104,118 |
| Life Insurance | 2002 | 678,431 | 1,340,000 | 129,256 | 20,000 | 624,780 | 137,631 |
| **Kristian P. Moor** ....................... | 2004 | 628,298 | 635,000 | 14,245 | 40,000 | 3,152,160 | 12,692 |
| Executive Vice President— | 2003 | 651,479 | 585,000 | — | 65,000 | — | 12,342 |
| Domestic General Insurance | 2002 | 568,273 | 365,000 | — | 30,000 | 1,851,200 | 9,782 |

| Name and Principal Position | Year | Annual Compensation | | | Long Term Compensation | | All Other Compensation |
| | | Salary | Bonus | Other Annual Compensation | Awards Stock Options | Payouts SICO LTIP Payouts | |
|---|---|---|---|---|---|---|---|
| **Win J. Neuger ...........................** | 2004 | 902,154 | 560,000 | — | 50,000 | 3,152,160 | 9,225 |
| Executive Vice President | 2003 | 927,384 | 475,000 | — | 65,000 | — | 9,000 |
| and Chief Investment Officer | 2002 | 852,923 | 350,000 | — | 25,000 | 1,851,200 | 7,333 |
| <u>Former Officers</u> | | | | | | | |
| **M.R. Greenberg ........................** | 2004 | 1,000,000 | 8,000,000 | 292,716 | 375,000 | 10,086,912 | 14,350 |
| Former Chairman | 2003 | 1,000,000 | 6,500,000 | — | 750,000 | — | 14,000 |
| and Chief Executive Officer | 2002 | 1,000,000 | 5,000,000 | — | 375,000 | 11,107,200 | 11,000 |
| **Howard I. Smith........................** | 2004 | 631,154 | 730,000 | 29,700 | 60,000 | 4,202,880 | 14,350 |
| Former Vice Chairman and | 2003 | 654,231 | 680,000 | — | 100,000 | — | 14,000 |
| Chief Financial Officer | 2002 | 533,847 | 630,000 | — | 50,000 | 3,702,400 | 11,000 |

102.    On April 4, 2005, *The Wall Street Journal* reported that Defendants Greenberg and Murphy ousted seven of nine Board members from SICO's Board, all of whom were AIG executives, including Defendant Sullivan, AIG's new CEO.  That same article reported that the ousted directors will be replaced by former AIG executives still loyal to Defendant Greenberg. Defendant Greenberg's ability to remove nearly all of SICO's board members and replace them with his loyalists reflects his domination and control over that company.

103.    AIG's June 27, 2005 proxy statement confirmed that its executive officers no longer serve as officers or directors of SICO or its subsidiaries.

104.    By paying vast sums of money to AIG's officers and executives in the form of deferred compensation that did not vest until retirement (and could be cancelled at any time by Defendant Greenberg and/or SICO's Board), SICO controlled these officers and executives, and thus AIG.

### D.    C.V. STARR & CO., INC.

105.    Defendant C.V. Starr & Co., Inc. ("C.V. Starr") is a privately held Delaware corporation with its principal place of business located in New York, New York.  C.V. Starr is a commercial casualty insurance company whose largest source of business is AIG.  In fact, C.V.

Starr does nearly all of its business with AIG.  C.V. Starr owns approximately 2 percent of AIG's outstanding stock.

106.   Defendant Greenberg is C.V. Starr's President, CEO and Chairman, and he owns approximately 16.4 percent of its stock.  At all relevant times, C.V. Starr was run by a board of directors that historically was comprised of current and former officers and directors, including Defendants Smith, Sullivan and Tizzio.  However, in its June 27, 2005 proxy statement, AIG announced that its executive officers no longer serve as officers or directors of C.V. Starr or its subsidiaries.

107.   Like SICO, C.V. Starr also provides long-term compensation to top AIG executives.  "Membership" in C.V. Starr – known within the Company as the "Billionaire Club" – is by invitation only (from Defendant Greenberg himself) and is much more exclusive than participation in SICO.  In what *The Wall Street Journal* described as an "annual ritual," an elite group of approximately 80 top current and retired AIG executives fly to the Company's headquarters in New York to receive an envelope containing one piece of paper with a two-line entry on it – how many preferred shares the recipient received that year in C.V. Starr, and how much their previous stake's value had appreciated during the year.

108.   Like the compensation paid by SICO, the value of being a partner in C.V. Starr could be enormous.  For example, as of January 1, 2005: Defendant Greenberg held $121.4 million in C.V. Starr shares; Defendant Smith held $26.6 million in C.V. Starr shares; Defendant Sullivan held $10 million in C.V. Starr shares; and Defendant Tizzio held C.V. Starr shares valued at $32  million.  During the Class Period, AIG executives together held stakes in C.V. Starr valued at $176 million, while AIG's top nine current officers together held $104 million in C.V. Starr preferred stock as of January 1, 2005.

109.    The following table, which is comprised of information AIG disclosed in its June 27, 2005 Proxy statement, sets forth the value of the interest various AIG officers held in C.V. Starr preferred shares as of January 1, 2005. The table shows that the long-term compensation received by senior AIG executives from Defendant C.V. Starr far exceeded the regular compensation that AIG paid them:

| Name | Total Purchase Price | Liquidation Value of Preferred Shares | | Cash Dividends Paid in 2004 |
| --- | --- | --- | --- | --- |
| | | Increase in 2004 | Total | |
| **Current Officers** | | | | |
| Martin J. Sullivan .............................. | $   337,500 | $   2,475,000 | $ 10,062,500 | $   393,375 |
| Donald P. Kanak ................................ | 300,000 | 1,650,000 | 8,250,000 | 308,000 |
| Jay S. Wintrob .................................. | 225,000 | 1,650,000 | 7,275,000 | 288,750 |
| Richard W. Scott ............................... | 37,500 | 275,000 | 550,000 | 41,500 |
| Thomas R. Tizzio .............................. | 450,000 | 3,850,000 | 32,060,000 | 815,100 |
| Edmund S.W. Tse.............................. | 525,000 | 3,850,000 | 26,633,750 | 770,337 |
| Rodney O. Martin, Jr. ........................ | 75,000 | 550,000 | 1,600,000 | 88,000 |
| Kristian P. Moor ............................... | 262,500 | 1,925,000 | 9,237,500 | 344,375 |
| Win J. Neuger................................... | 225,000 | 1,650,000 | 8,000,000 | 296,000 |
| **Former Officers** | | | | |
| M.R. Greenberg ................................ | 1,200,000 | 8,800,000 | 121,375,000 | 2,775,250 |
| Howard I. Smith ................................ | 562,500 | 4,125,000 | 26,646,250 | 806,463 |
| All Executive Offices of AIG as a Group.......... | 3,975,000 | 29,150,000 | 175,923,750 | 4,427,282 |

110.    However, like the compensation paid by SICO, a member's interests in C.V. Starr were forfeited if he or she left AIG before retirement – in the words of Defendant Greenberg – on "unhappy terms."

111.    By paying vast sums of money to AIG's officers and executives in the form of deferred compensation that did not vest until retirement (and could be cancelled at any time by Defendant Greenberg and/or C.V. Starr's board), C.V. Starr controlled these officers and executives, and thus AIG.

E.    **UNION EXCESS REINSURANCE COMPANY, LTD.**

112.    Defendant Union Excess is a Barbados-domiciled reinsurance company.  Since the time AIG created it in 1991, Union Excess has reinsured risks emanating primarily or solely from AIG subsidiaries, both directly and indirectly.  In fact, Defendants Union Excess and Richmond, *infra*, together reinsured $1.2 billion of AIG's expected future claims, "known as recoverables," as of the end of 2003.

113.    Union Excess and AIG concealed the fact that AIG secretly controlled Union Excess, a fiction that allowed AIG to improperly remove hundreds of millions of dollars in liabilities from its books.  As part of its May 31, 2005 restatement, and the disclosures leading thereto, AIG admitted that its accounting for transactions with Union Excess was improper, resulting in a more than $951 million reduction to AIG's shareholders' equity.

F.    **RICHMOND INSURANCE COMPANY LTD.**

114.    Defendant Richmond is a Bermuda-based reinsurance holding company affiliated with Defendant AIG.  Defendant Richmond's predecessor, Inter-Hemispheric Insurance Co. ("Inter-Hemispheric"), was established by AIG as a $50 million joint venture with reinsurer Munich Re AG.  In 1986, Inter-Hemispheric was renamed Richmond Insurance Company Ltd., apparently deriving its name from AIG's Bermuda office, which is located on Richmond Road in Hamilton, Bermuda.  Defendant Murphy was Richmond's corporate secretary and an alternate director.

115.    AIG holds a 19.9 percent ownership interest in Richmond, and its original investors were Munich Re, with 49.9 percent; Western General Insurance, with approximately 10 percent, and three individuals, who owned the remaining interest.  Defendants Union Excess and Richmond together reinsured $1.2 billion of AIG's expected future claims, "known as recoverables," as of the end of 2003.

116.    Richmond and AIG concealed the fact that AIG secretly controlled Richmond, a fiction that allowed AIG to improperly remove hundreds of millions of dollars in liabilities from its books.  As part of its May 31, 2005 restatement, and the disclosures leading thereto, AIG admitted that its accounting for transactions with Richmond was improper.

117.    On July 27, 2005, *Reuters* reported that Richmond had surrendered its insurance license to Bermuda's financial services regulator, the Bermuda Monetary Authority, effectively putting it out of business.  The same article reported that AIG intended to shut down Richmond.

### G.    PRICEWATERHOUSECOOPERS

118.    Defendant PricewaterhouseCoopers LLP ("PwC") is a limited liability partnership, whose offices are located at 1177 Avenue of the Americas, New York, New York. PwC (and its predecessor Coopers & Lybrand) has maintained a client relationship with AIG for more than twenty years.  PwC served as AIG's outside auditor and principal accounting firm prior to and during the Class Period, and certified the accuracy and completeness of the materially false and misleading statements alleged below.

119.    By the start of the Class Period, PwC was acting as both auditor and business consultant to AIG – which is one of PwC's largest and most lucrative clients – and was providing a wide array of services to AIG through which PwC became involved in many aspects of AIG's business.  During the Class Period, PwC, among other things, audited AIG's financial statements for the fiscal years ended December 31, 1999, 2000, 2001, 2002, 2003 and 2004, performed quarterly financial reviews during each of those years and in 2004, provided a variety of tax and consulting services.

120.    According to AIG's Proxy Statements filed annually with the SEC, AIG paid PwC $44.8 million for services in 2003, $35.9 million of which was for audit and audit-related services; $39.5 million for services in 2002, $31 million of which was for audit and audit-related

services; $26.9 million for services in 2001, $15.5 million of which was for audit and audit-related services; and $25.4 million for services in 2000, $14.9 million of which was audit and audit related services.  Cumulatively, AIG paid PwC $136.6 million for services rendered between 2000 and 2003, $97.3 million of which was for audit and audit-related services.

121.    A large number of former auditors from PwC (or its predecessor, Coopers & Lybrand) now serve – or have served – as high-ranking AIG financial executives.  As alleged in greater detail below, this list includes: Defendant Smith, AIG's former CFO; Defendant Castelli, AIG's former Comptroller and Vice President; Steven J. Bensinger, AIG's current CFO (who, while at Coopers & Lybrand, served as the engagement partner for the AIG account); Saul Basch, Senior Vice President, Treasurer and CFO of HSB Group, an AIG subsidiary (who, while at Coopers & Lybrand, served as the engagement partner for the AIG account); David Herzog, AIG Comptroller and Vice President; Joseph Umansky, a former Senior Vice President of AIG and President of AIG Reinsurance Advisers;  Robert Conry, Managing Director of AIG Global Investment Group, an AIG subsidiary; and Robert P. Jacobson, AIG's Vice President, Strategic Planning.

122.    Throughout the Class Period PwC recklessly or intentionally certified the accuracy and completeness of AIG's financial statements that were not in compliance with GAAP and included, *inter alia*, billions of dollars in revenues derived from illegal contingent commissions and hundreds of millions in improper reinsurance revenues.

123.    Amazingly, PwC spent more than 50,000 person-hours in 2004 conducting an exhaustive, year-long analysis of AIG's internal controls without finding any problems.  In fact, in early January 2005, PwC announced the results of this effort, and "proudly reported" – as stated in *The New York Times* – that AIG "scored quite high."  Just two months later, after state

and federal regulators had begun investigating AIG's accounting, AIG announced during a

March 15, 2005 conference call that it could not rule out a finding by PwC that there was a

"material weakness" in AIG's internal controls.  On May 31, 2005, as part of AIG's massive

restatement, PwC suddenly "found" a litany of shortfalls in AIG's internal controls, all of which

had been in existence throughout the Class Period and before.

> **H.**   **GENERAL REINSURANCE CORP. DEFENDANTS**

> **1.**   **General Reinsurance Corp.**

124.    Defendant General Re is a wholly-owned subsidiary of Berkshire Hathaway that

provides global reinsurance and related risk assessment, risk transfer and risk management

operations.  General Re is one of the four largest reinsurers in the world.

125.    At Defendant Greenberg's request, General Re entered into a fraudulent finite

reinsurance contract with AIG in 2000 that both companies knew served no purpose other than to

allow AIG to improperly boost its financials by inflating its claims reserves.  The deal allowed

AIG to book $250 million in claims reserves and premiums revenues in the fourth quarter of

2000, and an additional $250 million in claims reserves and premiums revenues during the fourth

quarter of 2000 and first quarter of 2001.

> **2.**   **Ronald E. Ferguson**

126.    Defendant Ronald E. Ferguson ("Ferguson") was, at all relevant times, General

Re's Chairman and Chief Executive Officer.  He retired as the company's CEO in October 2001

and as Chairman in June 2002.  Ferguson acted as a consultant to General Re and certain of its

affiliates from October 2001 until mid-May 2005.  In response to Defendant Greenberg's

request, Ferguson helped arrange the $500 million AIG-General Re sham reinsurance deal.

127.    On May 20, 2005, *The Wall Street Journal* reported that General Re had

terminated its consulting agreement with Ferguson after he invoked his Fifth Amendment

privilege against self-incrimination while being questioned by SEC and DOJ regulators in connection with his role in the AIG-General Re reinsurance deal.

### 3.  John B. Houldsworth

128.    Defendant John B. Houldsworth ("Houldsworth") was, from approximately May 1990 until approximately June 2005, CEO of Cologne Re Dublin ("CRD"), a subsidiary of Cologne Re Germany, which is a subsidiary of General Re.  In 1998, he additionally became the Chief Underwriter for a General Re business unit called Alternate Solutions, and was located part of the time in General Re's Stamford, Connecticut headquarters.  At one point, Houldsworth headed General Re's Dublin office.  Houldsworth played an integral role in designing and carrying out the $500 million AIG-General Re sham reinsurance deal.

129.    On May 11, 2005, *The Wall Street Journal* reported that Defendant Houldsworth had received a Wells notice from the SEC in connection with his role in the AIG-General Re deal.

130.    On May 13, 2005, *The Wall Street Journal* reported that Defendant Houldsworth – who had also been notified by the Department of Justice that he was a target of an ongoing criminal investigation – was placed on unpaid leave.

131.    On June 6, 2005, the SEC initiated – and partially settled – an enforcement action against Defendant Houldsworth in connection with the AIG-General Re deal by filing a civil complaint against him in the U.S. District Court for the Southern District of New York.  That same day, General Re terminated Houldsworth.

132.    On June 9, 2005, Houldsworth pled guilty in the U.S. District Court for the Eastern District of Virginia to one count of criminal conspiracy to violate the federal securities laws.  As part of his plea arrangement, Houldsworth agreed to cooperate with the United States Attorney's Office in the Eastern District of Virginia and the Department of Justice's Fraud

Section in their ongoing investigations of AIG and General Re.  Sentencing is set for December 9, 2005, and Houldsworth could face up to five years in jail and fines of at least $250,000.

### 4.   **Richard Napier**

133.    Defendant Richard Napier ("Napier"), was a Senior Vice President at General Re's Stamford, Connecticut office from 1992 until he was terminated on June 8, 2005.  Since approximately 1990, his job responsibilities included managing relations with AIG, which is one of General Re's largest clients.  Like Defendant Houldsworth, Napier played an integral role in designing and carrying out the $500 million AIG-General Re sham reinsurance deal.

134.    On May 9, 2005, *The Wall Street Journal* reported that Defendant Napier had received a Wells notice from the SEC on May 2, 2005.

135.    On June 10, 2005 in the U.S. District Court for the Eastern District of Virginia, Defendant Napier also pled guilty to one count of criminal conspiracy to violate the federal securities laws.  He too could face up to five years in jail and fines of at least $250,000.

136.    On June 10, 2005, the SEC also initiated and partially settled an enforcement action against Defendant Napier by amending its earlier-filed complaint against Houldsworth to include Napier as a defendant.

137.    Defendants General Re, Ferguson, Houldsworth and Napier are referred to herein as the "General Re Defendants."

### I.   **UNDERWRITER DEFENDANTS**

### 1.   **Wachovia Securities, Inc.**

138.    Defendant Wachovia Securities, Inc.'s ("Wachovia") offices are located at Riverfront Plaza, 901 East Byrd Street, Richmond, Virginia.

139.    Wachovia was an underwriter with respect to $500 million in 2.85% Medium-Term Notes, Series F, issued by AIG on or about December 2, 2002 due on December 1, 2005.

140.    Wachovia failed in its duty to conduct appropriate due diligence in connection with the bond offering by negligently allowing false and misleading information to be included in the Registration Statements and Prospectuses filed in connection with that  offering.

### 2.    Merrill Lynch & Co.

141.    Defendant Merrill Lynch & Co.'s ("Merrill Lynch") offices are located at 4 World Financial Center, 250 Vesey Street, New York, New York.

142.    Merrill Lynch was an underwriter with respect to $500 million in 2.85% Medium-Term Notes, Series F, issued by AIG on or about December 2, 2002 due on December 1, 2005.

143.    Merrill Lynch failed in its duty to conduct appropriate due diligence in connection with the bond offering by negligently allowing false and misleading information to be included in the Registration Statements and Prospectuses filed in connection with that offering.

## IV.    CONTROL ALLEGATIONS/GROUP PLEADING

144.    The Individual Defendants controlled the content of AIG's press releases, corporate reports, SEC filings, and communications with analysts.  It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Individual Defendants identified above.

145.    Each of the Individual Defendants, by virtue of his high-level position, directly participated in the management of AIG, was directly involved in the day-to-day operations of AIG at the highest levels and was privy to confidential proprietary information concerning AIG's operations, business, growth, and financial prospects, as alleged herein.  As controlling persons of a publicly held company whose ordinary shares are traded on the NYSE, among others, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with

respect to the Company's business, markets, growth, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of AIG's ordinary shares would be based upon truthful and accurate information.

146.    The Individual Defendants were directly involved in, or responsible for, AIG's financial condition, business operations and the materially false and misleading public statements and released information related to AIG's financial condition as alleged herein.  At all times during the Class Period, the Individual Defendants were aware, or recklessly disregarded, that the materially false and misleading statements were being issued regarding AIG, and the Individual Defendants approved or ratified these statements, in violation of the federal securities laws.

147.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of or recklessly disregarded their materially false and misleading nature.  Because of their executive and managerial positions with AIG, each of the Individual Defendants had access to the undisclosed information about AIG's true financial condition, business operations and performance as particularized herein, and knew, or recklessly disregarded, that adverse facts rendered materially false and misleading the positive representations made by or about AIG and its business, as well as such statements that were adopted by AIG.

148.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of AIG shares by disseminating materially false and misleading statements.

## V.    CLASS ACTION ALLEGATIONS

149.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") of all persons who purchased or otherwise acquired AIG securities including equity, fixed income and all other securities during the Class Period, as alleged above, and who were damaged thereby.

150.    The Class Period is from October 28, 1999 through April 1, 2005.

151.    Lead Plaintiff also brings the claims alleged in paragraphs 1129 through 1148 below, on behalf of the following two subclasses:  All persons and entities who held the common stock of HSB Group at the time HSB Group was acquired by AIG in a stock for stock transaction (the "HSB Group Subclass"), and all persons and entities who held the common stock of American General at the time American General was acquired by AIG in a stock for stock transaction (the "American General Subclass") (both as the "Subclasses").

152.    Excluded from the Class are the Defendants herein, members of the immediate families of the Individual Defendants, any parent, subsidiary, affiliate, officer, or director of defendant AIG, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

153.    The members of the Class and the Subclasses are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class and Subclasses is unknown to Lead Plaintiff at the present time and can only be ascertained from books and records maintained by AIG and/or its agent(s), Lead Plaintiff believes that there are tens of thousands of members of the Class and the Subclasses located throughout the United States.  As

of September 30, 2004, AIG had issued and outstanding 2,604,570,819 shares of common stock. Throughout the Class Period, AIG common stock was actively traded on the NYSE, with more than 7.6 billion shares traded during the Class Period.  At the time it was acquired by AIG in November 2000, HSB Group had issued and outstanding more than 29.186 million shares of common stock.  At the time it was acquired by AIG in August 2001, American General had issued and outstanding 500.674 million shares of common stock.

154.    Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and the Subclasses.  Lead Plaintiff has retained extremely competent counsel experienced in class and securities litigation and intends to prosecute this action vigorously.  Lead Plaintiff is a member of the Class and the Subclasses and does not have interests antagonistic to, or in conflict with, the other members of the Class or the Subclasses.

155.    Lead Plaintiff's claims are typical of the claims of the members of the Class and the Subclasses.  Lead Plaintiff and all members of the Class purchased AIG securities at artificially inflated prices and have sustained damages arising out of the same wrongful course of conduct.  Lead Plaintiff and all members of the Subclasses received, in exchange for their shares of HSB Group and/or American General, shares of AIG stock that were artificially inflated and have suffered damages arising out of the same wrongful course of conduct.

156.    Common questions of law and fact exist as to all members of the Class and the Subclasses and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class and the Subclasses are:

(a)    Whether the federal securities laws were violated by the Defendants' acts and omissions as alleged herein;

(b)     Whether the Defendants participated in and pursued the common course of conduct and fraudulent schemes complained of herein;

(c)     Whether the Defendants had knowledge of (or were reckless with respect to) the illegal activities described herein;

(d)     Whether the statements disseminated to the investing public, including investors in AIG, during the Class Period omitted and/or misrepresented material facts about AIG's true financial condition, business operations and future business prospects;

(e)     Whether Defendants acted knowingly or recklessly in omitting to state and/or misrepresenting material facts;

(f)     Whether the market price of AIG's securities during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

(g)     Whether Lead Plaintiff and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

157.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all members of the Class and the Subclasses is impracticable.  Furthermore, as the damages suffered by many individual Class and Subclass members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class and Subclass members individually to seek redress for the wrongful conduct alleged.  Lead Plaintiff does not foresee any difficulty in the management of this litigation that would preclude its maintenance as a class action.

158.     The names and addresses of the record owners of the shares of AIG common stock and other securities purchased during the Class Period are available from AIG and/or its

transfer agent(s).  Notice can be provided to persons who purchased or otherwise acquired AIG

common stock by a combination of published notice and first class mail, using techniques and

forms of notice similar to those customarily used in other class actions arising under the federal

securities laws.

## VI.    FACTUAL ALLEGATIONS

### A.    BACKGROUND ON AIG

159.    As set forth in AIG's annual reports and other SEC filings, AIG has more than

90,000 employees and operations in more than 130 countries and jurisdictions, and is "the

world's leading international insurance and financial services organization."  In 2003 alone, AIG

reported more than $81.30 billion in revenues, net income of $9.27 billion and assets of $678.34

billion.

160.    AIG, through its subsidiaries, is engaged in a broad range of insurance and

insurance-related activities in the United States and abroad.  AIG's operations are conducted

through four business segments:  General Insurance, Life Insurance Retirement Services,

Financial Services and Asset Management.

161.    AIG's primary domestic division is the Domestic Brokerage Group ("DBG"),

which is part of AIG's General Insurance segment.  DBG's business is derived from brokers in

the United States and Canada and is conducted through its General Insurance subsidiaries.

162.    DBG writes substantially all classes of business insurance, accepting business

mainly from insurance brokers.  During 2003, DBG accounted for 57 percent of AIG's General

Insurance net premiums written.

163.    DBG's principal General Insurance company subsidiaries include American

Home Assurance Company ("American Home") and National Union Fire Insurance Company of

Pittsburgh, Pa. ("National Union).

(a)     American Home is a provider of commercial umbrella liability insurance and primary workers' compensation insurance.  It is also one of the leading providers of extended service coverages for consumer electronics, appliance, and computer retailers.

(b)     National Union is one of AIG's principal General Insurance subsidiaries, and is a leading provider of directors and officers, fiduciary, employment practices and e-commerce liability insurance, and a premier underwriter of professional liability and fidelity coverages.

164.    It is believed that the improper bid-rigging activities, alleged in greater detail below, occurred at American Home and other operations within DBG.  Moreover, National Union was the AIG subsidiary that entered into the improper $500 million AIG-General Re transaction, also alleged in greater detail below.

165.    The operations of AIG's Financial Services segment are conducted primarily through AIG Financial Products Corp. and its subsidiaries (collectively referred to as "AIG-FP"), and American General Finance, Inc. and its subsidiaries (collectively referred to as "AGF").

166.    It is believed that AIG's improper off-balance-sheet transactions with PNC, alleged in greater detail below, were entered into by AIG-FP.

**B.     <ins>GREENBERG'S 37-YEAR IRON-FISTED REIGN AT AIG</ins>**

167.    During the Class Period, it was common knowledge throughout the Company – and indeed, throughout the market – that Defendant Greenberg was a demanding, iron-fisted micromanager like no other.  A September 22, 2005 *Financial Times* article accurately summed up Defendant Greenberg's management style:

> Mr[.] Greenberg ruled the insurer with an iron fist, terrorising
> underlings at all hours of the day, intimidating a compliant board,
> and delivering stunningly impressive earnings quarter by quarter.

168.     A July 23, 2000 *New York Times* article states that "Mr. Greenberg is totally hands-on." That article quotes Warren Buffett, who has known Defendant Greenberg for decades, as saying, "[Greenberg] knows when the sparrow falls, and he even knows when the sparrow is thinking of falling." The article also described how, "[o]nce a month, Mr. Greenberg assembles his division presidents around a rectangular table" at AIG headquarters, and "[t]o start the 'chairman's meeting,' as it is known, he swings his eyes around the room and, like a stern law professor putting students to a test, finally lets his gaze rest on one executive. That person has a minute or so to rattle off current sales, expenses, profits and any unusual developments. Then, moving clockwise, each of the other subordinates reports."

169.     The February 21, 2005 edition of *Fortune* reported that, while Defendant Greenberg "kept the company shrouded in secrecy," he had "persuaded everybody at AIG that nothing happened without his knowledge. 'If a twig snaps in a Chinese forest, Hank Greenberg hears it,' says one of his former executives." The article emphasized that Defendant Greenberg insisted on being directly involved in company matters and "refused to let information filter up to him through his top executives. He would call the janitor if he thought that would get him the answer to an important question." The article also stated that Defendant Greenberg "has always held himself out to his employees as the CEO who knows everything that goes on at his company."

170.     Likewise, the May 2, 2005 edition of *Forbes* contained the following piece, entitled, "Greenberg Knew It All," which read, in relevant part:

> More than a decade ago, during a brief interregnum in my career as a journalist, I was summoned to the office of Maurice "Hank" Greenberg at American International Group to talk about the company's annual report. The communications firm where I worked at the time believed that providing some help in the preparation of this somewhat turgid document might be a wedge

into more work for the nation's fastest-growing financial conglomerate.

"Do you think you can improve our annual report?" Greenberg growled at me. "Well, here's last year's. See if you can make it better."

Several weeks and many sleepless nights later, we turned in the document. The director of communications for AIG received it and smiled thinly. *"You know, of course, who wrote every word of the original you were improving on?" he asked. "Hank Greenberg."*

*To suggest today that Greenberg had no real knowledge or understanding of any insurance product on his watch at this company that he ran with an iron fist for 35 years seems, at least to someone who has witnessed how he works closeup, a trifle naïve*. Indeed, if the numbers of various prosecutors circling AIG and the Fifth Amendment pleadings by its top executives are any indication, perhaps criminally naïve. We'll see.

But it seems doubtful that the annual report was the only item Greenberg micromanaged. *At AIG, he had a hand in virtually every new and innovative insurance product that launched from the moment he took control of the small property-casualty operation with its roots in Shanghai.* There were even taxi vouchers for his executives that he scrutinized to the finest detail.

171. In short, Defendant Greenberg completely dominated and controlled AIG and its Board of Directors. He exercised this control in large part through his control of the various Starr entities. Numerous members of the Board also served on the boards of those entities, each member receiving significant compensation up to tens of millions of dollars.

172. Indeed, because of these conflicts created by Defendant Greenberg's control and domination of the Board, AIG has consistently been given low marks on its corporate governance rating and has been rated among the weakest Boards in the country in terms of corporate governance. In fact, in its most recent Board Analyst report for AIG, the Corporate Library awarded the Board an "F" for its board effectiveness rating, and awarded it a "high" for its board risk assessment.

- 46 -

173.    An October 7, 2002 article in *Business Week*, in commenting on the conflicts

created by Defendant Greenberg's domination and control of the Board, stated in relevant part:

> Perhaps more troubling, ***seven of the inside directors, including Chairman and CEO Maurice R. "Hank" Greenberg, control and run two private companies that have substantial business dealings with AIG, leaving the execs open to charges of self dealing and conflicts of interest.  One of these companies is a veritable bank vault, paying out tens of millions in cash and stock to AIG executives outside the purview of the board's compensation committee.***  No wonder many governance experts consider the board among the weakest in Corporate America.

> \*        \*        \*

> ***"It's an old style board dominated by a charismatic and highly successful CEO,"*** *says Charles M. Elson, director of the Center for Corporate Governance at the University of Delaware.* ***"Investors are basically jumping out of an airplane with him without a parachute.  The standard governance protections aren't there."***

> \*        \*        \*

> Rather than taking the full value of their holdings when AIG went public, he and several other insiders took only the book value of the stock.  The difference – roughly $110 million in AIG stock – was ultimately stashed away in Starr International Co. (SICO), a Bermuda company.  The value of those shares has grown to more than $20 billion, representing some 12% of AIG's outstanding shares.  SICO has little business purpose other than to reward current and future AIG executives – above and beyond what they receive directly from AIG.

> Some 600 of AIG's top executives get "units'' that represent AIG shares or cash from a compensation plan that is not administered by the compensation committee of AIG's board.  The rewards also function as golden handcuffs, because they cannot be collected until an employee retires after reaching age 65.  In 2000, Starr dished out bonuses worth more than $55 million to the company's top five officers, including $23.7 million to Greenberg alone.

> "It's a unique arrangement in a company of that size,'" says Kenneth A. Bertsch, director of corporate governance at TIAA-CREF, the teachers' pension fund.  One result, he says, is that AIG's stock options represent just 3.5% of outstanding shares – far

below the 15% threshold the fund has set for companies in its portfolio.

Greenberg makes the same point, arguing that shareholders benefit greatly from this highly unusual plan because AIG doesn't have to pay out as much compensation. "If we didn't have that, the options outstanding at AIG might be 5 or 10 times as great,'' he says. "What we've done is so misunderstood. There has never been a more generous act on the part of a group of people in Corporate America."

But governance critics note that a separate compensation scheme controlled by Greenberg and a handful of insiders can have a perverse effect. ***"Since the top officers control it, the compensation program could stifle any dissent that could legitimately come before the board,''*** says Delaware's Elson. "It creates a company within a company that is at odds with the transparency we expect from a public corporation."

174.    Defendant Greenberg's own actions demonstrate that he dominated and controlled the Board. On March 24, 2005, *CBS MarketWatch* issued an article detailing a request by the AFL-CIO that concerned AIG's Board. The article stated in part:

> ***Greenberg assured the AFL-CIO that he could get AIG's board to approve the new policy, Rees said.***
>
> \*        \*        \*
>
> "That's the only time I've spoken with a CEO directly about an issue like board nominations," Rees said.
>
> While the AFL-CIO was grateful for Greenberg's personal involvement, it also left lingering concerns.
>
> ***The whole process suggested that Greenberg still retained too much control over the board . . . .***

175.    On April 1, 2005, *The Wall Street Journal* reported that:

> Over the years, AIG employees and directors rarely challenged Mr. Greenberg because of his highly successful track record running the company, current and former AIG executives say. ***At board meetings, directors often refrained from asking questions because they didn't want to appear ignorant or to challenge Mr. Greenberg's authority, people familiar with meetings say.***

176.    Likewise, an April 29, 2005, *Wall Street Journal* article reported that "[i]n a deposition filed last year in a lawsuit against AIG by the Teachers' Retirement System of Louisiana, Mr. Hoenemeyer said ***he couldn't recall a time in the previous five years when AIG's board voted against a proposal made by Mr. Greenberg***."

177.    Based on his extensive investigations of Defendants AIG and Greenberg, New York Attorney General Eliot Spitzer also concluded that Defendant Greenberg dominated and controlled AIG and its Board.  Appearing on ABC's "This Week with George Stephanopoulos" on April 10, 2005, Spitzer described AIG as "***a black box run with an iron fist by a CEO who did not tell the public the truth***. That is the problem."

178.    Defendant Greenberg and his CFO, Defendant Smith, enjoyed this virtually unlimited power at AIG for years.  On April 27, 2005, *The Wall Street Journal* issued an article entitled "Top AIG Lawyer in 1992 Warned on Accounting."  The article stated in relevant part:

> Meantime, attorneys representing the company have largely finished a report on their internal investigation, people familiar with the matter said.  The 150-page-plus document questions the integrity of AIG's financial-reporting system but doesn't quantify the size of any potential accounting adjustment, the people said.
>
> ***The report concludes that Mr. Greenberg and Howard I. Smith, the company's ousted chief financial officer, had few checks and balances in place regarding their accounting moves, the people said***.  The report was prepared by lawyers at Simpson Thacher & Bartlett and Paul, Weiss, Rifkind, Wharton & Garrison.

### C.    RELEVANT ACQUISITIONS BY AIG DURING THE CLASS PERIOD

179.    During the Class Period, AIG acquired HSB Group and American General in stock for stock transactions wherein HSB Group and American General shareholders received shares of AIG in exchange for their shares in the two respective companies.  As alleged in greater detail below, because the price and value of AIG stock was inflated at the time of these

two acquisitions, HSB Group and American General shareholders received materially fewer shares of AIG than they would have received had the truth been known.

### 1. **HSB Group**

180. On or about November 22, 2000, AIG completed its acquisition of HSB Group, a deal worth more than $1.43 billion. Pursuant to the deal, shareholders of HSB Group received 0.4178 shares of AIG common stock in exchange for each share of HSB Group common stock. This exchange ratio represented $41.00 in value of AIG common stock based on an average of AIG's then-recent stock prices, pursuant to the August 17, 2000 "Agreement and Plan of Merger Among American International Group, Inc., Engine Corporation and HSB Group, Inc."

181. Prior to the acquisition, approximately 29.1 million shares of HSB common stock were outstanding, and AIG issued approximately 12.2 million shares of common stock to HSB shareholders to consummate the deal.

182. In connection with the HSB Group acquisition, on or about September 29, 2000, AIG filed with the SEC a Form S-4 Registration Statement, which included a Joint Proxy Statement/Prospectus ("HSB Group Registration Statement"). The HSB Group Registration Statement states, in relevant part:

> The selected financial data of AIG as of and for the years dated December 31, 1999, 1998, and 1997 … has been derived from consolidated financial statements of AIG, which have been audited by PricewaterhouseCoopers LLP, independent auditors, and incorporated by reference in this proxy statement/prospectus.
>
> *       *       *
>
> The selected consolidated financial data of AIG as of and for the six months ended June 30, 2000 and June 30, 1999 has been derived from unaudited, consolidated financial statements filed with the Commission and incorporated by reference in this proxy statement/prospectus . . . .
>
> *       *       *

The consolidated financial statements and schedules of American International Group, Inc. at December 31, 1999 and 1998 and for the three year period ended December 31, 1999 incorporated by reference in this proxy statement/prospectus have been audited by PricewaterhouseCoopers LLP, independent auditors as stated in their reports, which are incorporated by reference.  Those consolidated financial statements and schedules are incorporated herein by reference in reliance upon their report given upon their authority as experts in accounting and auditing.

183.    Moreover, Goldman, Sachs & Co. issued a fairness opinion, dated August 17, 2000, to the HSB Group Board of Directors.  The fairness opinion relied on, and was premised on, AIG's false and misleading financial statements.  The fairness opinion stated, in relevant part:

You have asked our opinion as to the fairness from a financial point of view to the holders (other than American International Group, Inc. ("AIG") or any of its subsidiaries) of the outstanding shares of Common Stock, no par value (the "Shares"), of HSB Group, Inc. (the "Company") of the consideration to be received in exchange for each Share (the "Consideration"), pursuant to the Agreement and Plan of Merger (the "Agreement"), dated as of August 17, 2000, among AIG, Engine Acquisition Corporation, a wholly-owned subsidiary of AIG, and the Company.

\*        \*        \*

In connection with this opinion, we reviewed, among other things: the Agreement; Annual Reports to Shareholders and Annual Reports on Form 10-K of the Company and AIG for the five years ended December 31, 1999; the budget of AIG for the year ending December 31, 2000 (the "2000 Budget"); certain interim reports to shareholders of AIG and certain interim reports to shareholders of the Company; Quarterly Reports on Form 10-Q of the Company and AIG . . . .

\*        \*        \*

We have relied upon the accuracy and completeness of all of the financial and other information discussed with or reviewed by us and have assumed such accuracy and completeness for purposes of rendering this opinion.

\*        \*        \*

In addition, we have not made an independent evaluation or appraisal of the assets and liability (including the loss and loss adjustment expense reserves) of each of the Company and AIG or any of their respective subsidiaries and we have not been furnished with any such evaluation or appraisal.  In that regard, we have made no analysis of, and express no opinion as to, the adequacy of the loss and loss adjustment expense reserve of AIG.

\*        \*        \*

Based upon and subject to the foregoing and based upon such other matters as we consider relevant, it is our opinion that as of the date hereof the Consideration to be received by holders of Shares pursuant to the Agreement is fair from a financial point of view to the holders of Shares (other than AIG or any of its subsidiaries).

### 2.    American General

184.    On August 29, 2001, AIG acquired American General in a deal worth more than $23.39 billion.  In connection with the acquisition, AIG issued approximately 290 million shares of common stock, in an exchange for all the outstanding common stock of American General based on an exchange ratio of 0.5790 shares of AIG common stock for each share of American General common stock.

185.    Pursuant to the May 11, 2001 merger agreement, the terms of the deal were that American General shareholders were to receive AIG common stock according to an exchange ratio that was to be determined based on the 10-day average price of AIG's common stock ending three days prior to the August 29, 2001 closing.  The exchange ratio was that American General shareholders would receive AIG stock valued at $46 per share so long as AIG's average stock price during the 10-day pricing period was between $76.20 and $84.22.  If AIG's price was equal to or less than $76.20, or equal to or more than $84.22, American General shareholders were to receive 0.6037 or 0.5462 AIG shares, respectively.

186.    In connection with the American General acquisition, on or about June 20, 2001, AIG filed with the SEC a Form S-4 Registration Statement, which included a Joint Proxy Statement/Prospectus ("American General Registration Statement").  The American General Registration Statement states:

> The selected consolidated financial data of AIG as of and for the years ended December 31, 2000, 1999 and 1998 have been derived from consolidated financial statements of AIG, which have been audited by PricewaterhouseCoopers LLP, independent accountants, and are incorporated by reference in this proxy statement/prospectus.
>
> *       *       *
>
> The selected consolidated financial data of AIG as of and for the three months ended March 31, 2001 and March 31, 2000 have been derived from unaudited consolidated financial statements filed by AIG with the SEC and are incorporated by reference in this proxy statement/prospectus . . . .
>
> *       *       *
>
> The consolidated financial statements and financial statement schedules of American International Group, Inc. at December 31, 2000 and 1999 and for the three year period ended December 31, 2000 incorporated by reference in this proxy statement/prospectus have been audited by PricewaterhouseCoopers LLP, independent accountants as stated in their report, which is incorporated by reference.  Those consolidated financial statements and financial statement schedules are incorporated herein by reference in reliance upon their report given the authority of that firm as experts in accounting and auditing.

187.    Moreover, Morgan Stanley Dean Witter issued a fairness opinion, dated May 10, 2001, to the American General Board of Directors.  The fairness opinion relied on, and was premised on, AIG's false and misleading financial statements.  The fairness opinion stated, in relevant part:

> You have asked for our opinion as to whether the Consideration to be received by the holders of shares of American General Common

Stock pursuant to the Merger Agreement is fair from a financial point of view to such holders.

For purposes of the opinion set forth herein, we have:

(i)  reviewed certain publicly available financial statements and other business and financial information of American General and AIG, respectively;

(ii)  reviewed certain internal financial statements and other financial and operating data concerning American General and AIG prepared by the managements of American General and AIG, respectively;

(iii)  reviewed certain earnings estimates of American General and AIG published by certain financial analysts who report on American General and AIG;

*       *       *

(viii)  compared the financial performance of American General and AIG and the prices and the trading activity of American General Common Stock and AIG Common Stock with that of certain other comparable publicly-traded companies and their securities;

*       *       *

We have assumed and relied upon without independent verification the accuracy and completeness of the information reviewed by us for the purposes of this opinion.

*       *       *

Our opinion is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof.

*       *       *

Based on and subject to the foregoing, we are of the opinion on the date hereof that the Consideration to be received by the holders of shares of American General Common Stock pursuant to the Merger Agreement is fair from a financial point of view to such holders.

D.    **AIG'S BOND OFFERINGS DURING THE CLASS PERIOD**

188.    During the Class Period, AIG issued several bonds.  Each of the Registration

Statements and Prospectuses pursuant to which those bonds were issued contained false and

misleading statements – including AIG's earnings and shareholders' equity reported in the

financial statements incorporated by reference – as alleged herein.

1.    **Zero Coupon Convertible Senior Debentures**

189.    On or about November 9, 2001, AIG issued $1.5 billion worth of Zero Coupon

Convertible Senior Debentures due November 9, 2031.  AIG issued these bonds pursuant to a

Registration Statement and Prospectus that was filed with the SEC on November 7, 2001 and

became effective on November 7, 2001.

190.    The Registration Statement and Prospectus incorporates by reference the

following:  AIG's Annual Report on Form 10-K for the year ended December 31, 2000; AIG's

Quarterly Reports on Form 10-Q for the quarters ended March 31, 2001 and June 30, 2001; and

AIG's Current Reports on Form 8-K, dated August 29, 2001, September 18, 2001, October 9,

2001 and November 6, 2001.

191.    The Registration Statement and Prospectus also stated:

> The consolidated financial statements and financial statement
> schedules of American International Group, Inc. at December 31,
> 2000 and 1999 for the three-year period ended December 31, 2000
> included in AIG's Annual Report on Form 10-K for the fiscal year
> December 31, 2000 and incorporated by reference in this
> prospectus have been audited by PricewaterhouseCoopers LLP,
> independent accountants, as stated in their report, which is
> incorporated herein by reference.  Those consolidated financial
> statements and financial statement schedules are incorporated
> herein by reference in reliance upon their report given upon the
> authority of that firm as experts in accounting and auditing.
>
> The supplemental consolidated financial statements and financial
> statement schedules of American International Group, Inc. at
> December 31, 2000 and 1999 and for the three-year period ended

> December 31, 2000 included in AIG's Current Report on Form 8-K, dated October 9, 2001, and incorporated by reference in this prospectus have been audited by PricewaterhouseCoopers LLP, independent accountants, as stated in their report, which is incorporated herein by reference in reliance upon their report given upon the authority of that firm as experts in accounting and auditing.

192. The Registration Statement and Prospectus was signed by Defendants Greenberg, Smith, Castelli, Broad, Hoenemeyer, and Tizzio.

### 2.    0.5% Cash Exchangeable Equity-Linked Senior Notes

193. On or about May 11, 2000, AIG issued $210 million worth of 0.5% Cash Exchangeable Equity-Linked Senior Notes due May 15, 2007.  AIG issued these bonds pursuant to:  (1) a Shelf Registration Statement that was filed with the SEC on or about February 24, 2000; (2) a Prospectus dated March 3, 2000; and (3) a Prospectus Supplement that was filed with the SEC on May 10, 2000 and had become effective on May 8, 2000.

194. The Shelf Registration Statement incorporates by reference certain of AIG's already-filed SEC filings, as well as the Company's subsequent SEC filings made until the bonds are sold:

> The SEC allows AIG to "incorporate by reference" the information AIG files with the SEC, which means that AIG can disclose important information to you by referring to those documents.  The information incorporated by reference is considered to be part of this prospectus, and later information that AIG files with the SEC will automatically update and supersede that information as well as the information included in this prospectus.  AIG incorporates by reference the documents listed in the accompanying box and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until all the debt securities are sold.  This prospectus is part of a registration statement AIG filed with the SEC.

195. The SEC filings listed in the "accompanying box" that are specifically incorporated by reference are AIG's:  Annual Report on Form 10-K for the year ended

December 31, 1998; Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999,

June 30, 1999 and September 30, 1999; and Current Report on Form 8-K dated June 3, 1999, as

amended.

196.   The Shelf Registration Statement also stated:

> The consolidated financial statements and financial statement
> schedules of AIG and its subsidiaries incorporated in this
> prospectus by reference to AIG's Annual Report on Form 10-K for
> the year ended December 31, 1998 and AIG's Current Report on
> Form 8-K dated June 3, 1999, as amended, have been so
> incorporated in reliance on the report of PricewaterhouseCoopers
> LLP, independent accountants, given on the authority of that firm
> as experts in auditing and accounting.

197.   Like the Shelf Registration Statement, AIG's March 3, 2000 Prospectus

incorporates by reference certain of AIG's already-filed SEC filings, as well as the Company's

subsequent SEC filings made until the bonds are sold:

> The SEC allows AIG to "incorporate by reference" the information
> AIG files with the SEC, which means that AIG can disclose
> important information to you by referring to those documents.  The
> information incorporated by reference is considered to be part of
> this prospectus, and later information that AIG files with the SEC
> will automatically update and supersede that information as well as
> the information included in this prospectus.  AIG incorporates by
> reference the documents listed in the accompanying box and any
> future filings made with the SEC under Sections 13(a), 13(c), 14 or
> 15(d) of the Securities Exchange Act of 1934 until all the debt
> securities are sold.  This prospectus is part of a registration
> statement AIG filed with the SEC.

198.   The SEC filings listed in the "accompanying box" that are specifically

incorporated by reference are AIG's:  Annual Report on Form 10-K for the year ended

December 31, 1998; Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999,

June 30, 1999 and September 30, 1999; and Current Report on Form 8-K dated June 3, 1999, as

amended.

199.    The March 3, 2000 Prospectus also stated:

The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 1998 and AIG's Current Report on Form 8-K dated June 3, 1999, as amended, have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

200.    The May 8, 2000 Prospectus Supplement stated:

The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated into the prospectus accompanying this prospectus supplement by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 1999 have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

201.    Pursuant to the Shelf Registration Statement and March 3, 2000 Prospectus, also incorporated by reference in this offering was AIG's Annual Report on Form 10-K for the year ended December 31, 1999.

202.    The Shelf Registration Statement was signed by Defendants Greenberg, Smith, Broad and Tizzio.

### 3.       2.85% Medium-Term Notes, Series F

203.    On or about December 2, 2002, AIG issued $500 million worth of 2.85% Medium-Term Notes, Series F due December 1, 2005.  AIG issued these bonds pursuant to, *inter alia*, (1) a Shelf Registration Statement that was filed with the SEC on or about February 24, 2000; (2) a Prospectus dated March 3, 2000; (3) a Prospectus Supplement that was filed with the SEC on January 30, 2001 and had become effective on January 26, 2001; (4) a Prospectus Supplement filed with the SEC on August 7, 2001; and (4) two Pricing Supplements and a Prospectus Supplement that were filed with the SEC on November 27, 2002.

204.    The Shelf Registration Statement incorporates by reference certain of AIG's already-filed SEC filings, as well as the Company's subsequent SEC filings made until the bonds are sold:

> The SEC allows AIG to "incorporate by reference" the information AIG files with the SEC, which means that AIG can disclose important information to you by referring to those documents.  The information incorporated by reference is considered to be part of this prospectus, and later information that AIG files with the SEC will automatically update and supersede that information as well as the information included in this prospectus.  AIG incorporates by reference the documents listed in the accompanying box and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until all the debt securities are sold.  This prospectus is part of a registration statement AIG filed with the SEC.

205.    The SEC filings listed in the "accompanying box" that are specifically incorporated by reference are AIG's:  Annual Report on Form 10-K for the year ended December 31, 1998; Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999, June 30, 1999 and September 30, 1999; and Current Report on Form 8-K dated June 3, 1999, as amended.

206.    The Shelf Registration Statement also stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 1998 and AIG's Current Report on Form 8-K dated June 3, 1999, as amended, have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

207.    Like the Shelf Registration Statement, AIG's March 3, 2000 Prospectus incorporates by reference certain of AIG's already-filed SEC filings, as well as the Company's subsequent SEC filings made until the bonds are sold:

>The SEC allows AIG to "incorporate by reference" the information AIG files with the SEC, which means that AIG can disclose important information to you by referring to those documents.  The information incorporated by reference is considered to be part of this prospectus, and later information that AIG files with the SEC will automatically update and supersede that information as well as the information included in this prospectus.  AIG incorporates by reference the documents listed in the accompanying box and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until all the debt securities are sold.  This prospectus is part of a registration statement AIG filed with the SEC.

208.    The SEC filings listed in the "accompanying box" that are specifically incorporated by reference are AIG's:  Annual Report on Form 10-K for the year ended December 31, 1998; Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999, June 30, 1999 and September 30, 1999; and Current Report on Form 8-K dated June 3, 1999, as amended.

209.    The March 3, 2000 Prospectus also stated:

>The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 1998 and AIG's Current Report on Form 8-K dated June 3, 1999, as amended, have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

210.    Pursuant to the Shelf Registration Statement and March 3, 2000 Prospectus, also incorporated by reference in this offering were AIG's Annual Reports on Form 10-K for the years ended December 31, 1999, December 31, 2000 and December 31, 2001.

211.    The Shelf Registration Statement was signed by Defendants Greenberg, Smith, Broad and Tizzio.

### 4.    2.875% Notes

212.    On or about March 23, 2004, AIG announced an offer to exchange $500 million worth of 2.875% Notes 144A securities for an equal amount of registered, like coupon bonds, with a maturity date of May 15,  2008.  AIG issued these bonds pursuant to a Registration Statement and Prospectus that was filed with the SEC on March 22, 2004 and became effective on April 20, 2004.

213.    The Registration Statement and Prospectus incorporates by reference AIG's Annual Report on Form 10-K for the year ended December 31, 2003.

214.    Moreover, the Registration Statement and Prospectus presented selected financial data from the fiscal years 2000 through 2003 that "should be read in conjunction with the financial statements and accompanying notes included in AIG's Annual Report on Form 10-K for the year ended December 31, 2003, which is incorporated by reference herein."  The selected financial data presented for fiscal years 2000 through 2003 include, *inter alia*, AIG's revenue, net income and shareholders' equity.

215.    The Registration Statement and Prospectus also stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 2003 have been incorporated in reliance on the report by PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

216.    The Registration Statement and Prospectus was signed by Defendants Greenberg, Smith, Castelli, Hoenemeyer and Sullivan.

### 5.    4.25% Notes

217.    On or about March 23, 2004, AIG announced an offer to exchange $1.0 billion worth of 4.25% Notes 144A securities for an equal amount of registered, like coupon bonds, with

a maturity date of May 15, 2013. AIG issued these bonds pursuant to a Registration Statement and Prospectus that was filed with the SEC on March 22, 2004 and became effective on April 20, 2004.

218.   The Registration Statement and Prospectus incorporates by reference AIG's Annual Report on Form 10-K for the year ended December 31, 2003.

219.   Moreover, the Registration Statement and Prospectus presented selected financial data from the fiscal years 2000 through 2003 that "should be read in conjunction with the financial statements and accompanying notes included in AIG's Annual Report on Form 10-K for the year ended December 31, 2003, which is incorporated by reference herein." The selected financial data presented for fiscal years 2000 through 2003 include, *inter alia*, AIG's revenue, net income and shareholders' equity.

220.   The Registration Statement and Prospectus also stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 2003 have been incorporated in reliance on the report by PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

221.   The Registration Statement and Prospectus was signed by Defendants Greenberg, Smith, Castelli, Hoenemeyer and Sullivan.

**E.    AIG'S PAYMENT OF CONTINGENT COMMISSIONS AND PARTICIPATION IN ILLEGAL BID-RIGGING**

222.   On October 14, 2004, after approximately six months of investigating improprieties within the insurance industry, New York Attorney General Eliot Spitzer filed a civil complaint (the "Spitzer Complaint") in Supreme Court, New York County against Marsh, the world's largest insurance broker.

223.    The Spitzer Complaint revealed that, since at least the late 1990s, AIG, along with several other insurance companies, paid Marsh hundreds of millions of dollars each year in so-called "contingent commissions," *i.e.*, commissions above and beyond those normally understood to be paid to brokers, based on the volume or profitability of the business the broker directed to them.  In return, Marsh agreed to "steer" unsuspecting clients to purchase policies from AIG and the other insurance companies that paid the largest contingent commissions.

224.    In announcing the filing of the Spitzer Complaint on October 14, 2004, the NYAG's press release noted that it "has uncovered extensive evidence showing that [the paying of contingent commissions] distorts and corrupts the insurance marketplace and cheats insurance customers."

225.    The Spitzer Complaint also alleges that, to facilitate the contingent commission scheme, AIG and others participated in illegal bid-rigging.  In fact, on October 14, two AIG executives – Karen Radke and Jean-Baptist Tateossian – pleaded guilty to participating in rigging bids for insurance contracts.

226.    Attorney General Spitzer likened the bid-rigging scheme to "***the same kind of cartel-like behavior carried out by organized crime***."  Similarly, Peter Pope, Deputy New York Attorney General in charge of the Criminal Division, said that the bid-rigging scheme is "***like the Mafia's Cement Club***," where construction projects rotated to cement companies based on the kickbacks the companies paid.

227.    In response to Attorney General Spitzer's October 14, 2004 announcement implicating AIG in the illegal contingent commission and bid-rigging schemes, shares of AIG fell by more than 10 percent, or $6.80, from $66.99 to $60.00.  The sell-off of AIG shares was the steepest drop in the stock since the stock market crash in October 1987.  Further, on October

- 63 -

15, 2004, AIG's stock price fell another 3.6 percent, to close at $57.85, representing **a $24 billion loss** in AIG's market capitalization over the two days.

228.     To date, four AIG executives and numerous executives from Marsh and other companies embroiled in the scandal have pleaded guilty in connection with the bid-rigging scheme.

### 1.     Background on the Insurance Industry

229.     There are essentially three kinds of entities in the insurance industry.  First, there are the clients, *i.e.*, individuals and businesses that seek to purchase insurance for their businesses, employees or themselves.  Second, there are brokers and independent agents (collectively "brokers"), who are hired by clients to advise them about coverage and to find insurance companies that offer suitable coverage at fair prices.  Brokers represent the clients, obtain price quotes from insurance companies, present the quotes to the clients, and make recommendations to the clients.  Third, there are the insurance companies, who submit quotes to the brokers, and, if ultimately selected by the clients, enter into contracts that provide insurance for the clients.

230.     A client makes two types of payments.  First, a client pays its broker an advisory fee or commission for finding the best insurance company for its needs.  Second, a client pays the insurance company premiums for the insurance policy itself.

231.     As Attorney General Spitzer's investigation revealed, brokers sometimes also receive another kind of payment, called "contingent commissions," from insurance companies pursuant to arrangements generally known as "contingent commission agreements."  These agreements typically require the insurance company to pay the broker this extra commission based on one or more of the following factors: (i) how much business the broker's clients place with the insurance company; (ii) how many of the broker's clients renew policies with the

insurance company; and (iii) the profitability of the business the broker places with the insurance company.

### 2.  Contingent Commissions

232.    The Spitzer Complaint alleges that, since at least the 1990s, AIG – along with several other insurance companies – paid Marsh *billions* of dollars in contingent commissions in order to shield these insurance companies from competition and to induce Marsh to steer business to them.  Styled as payments for various non-existent "services," the agreements to pay the contingent commissions were called "placement service agreements" ("PSAs") or "market services agreements" ("MSAs").

233.    In 2003 alone, AIG and other insurance companies paid Marsh nearly $800 million in contingent commission payments.

234.    During the Class Period, AIG paid Marsh (and other insurance brokers) hundreds of millions of dollars, if not more, in contingent commissions so that they would improperly steer business to AIG, in violation of their fiduciary duties to their clients.  Thus, by means of these illegal payments, AIG aided and abetted the brokers' breach of their fiduciary duties.

235.    AIG's misconduct was directly harmful to its clients because AIG passed on the costs of the contingent commission directly to its clients in the form of higher premiums.

236.    Assuming *arguendo* that *some* contingent commissions may not be inappropriate, the contingent commissions at issue here were illegal for several reasons, including (1) Marsh did no work for the contingent commissions it received, other than steering business to those insurance companies that paid it the highest commissions, and (2) neither Marsh nor AIG (and the other insurance companies that paid contingent commissions) adequately informed their clients of the size or true purpose of these payments.

237.    As set forth in documents attached as exhibits to the Spitzer Complaint, one such contingent commission agreement between AIG and Marsh is the "Placement Service Agreement," executed by AIG through the Commercial Risk Division of AIG Risk Management, Inc., that became effective on January 1, 2003.  The agreement provided that "placement service payments" made pursuant to the parties' agreement "shall be in addition to, and not in lieu of[,] customary commission payments to Marsh by" AIG.

238.    The agreement set forth the following schedule for calculating payments.  For "Renewals," *i.e.*, where clients had AIG-written policies that were set to expire, AIG agreed to pay Marsh: (a) "1% if the renewal growth rate is over 85%, but less than 89% on an annual basis[;]" (b) 2% if the renewal growth rate is over 90%, but less than 95% on an annual basis[;]" and (c) "3% if the renewal growth rate is over 95% on an annual basis."  For "New Business," AIG agreed to pay Marsh: (a) "2% of gross written premium for guaranteed cost new business"; and (b) "3% of gross written premium for loss sensitive new business."

239.    Marsh created lists of those insurance companies whose products Marsh's employees were to treat as a priority in selling to its clients.  The lists were not based on the insurance companies' price, value or quality of service, but rather on the amount of money the insurance companies paid Marsh in contingent commissions.

240.    Along these lines, Marsh internally rated the insurance companies based on how much they paid Marsh pursuant to their contingent commission agreements.  For example, in February 2002, a Marsh executive provided nine of his colleagues with a list of insurance companies that had contracted to pay Marsh contingent commissions.  The Marsh executive warned, however, that "[s]ome [contingent commission agreements] are better than others," and

that Marsh would formally "tier" the insurance companies to give the employees "clear direction on ***who [we] are steering business to and who we are steering business from***."

241.   A September 2003 e-mail from a Marsh executive was even more straightforward, writing that, "We need to place our business in 2004 with those [insurance companies] that have superior financials, broad coverage and ***pay us the most***."

242.   AIG was one of the companies to which Marsh was "steering business."  A Marsh "tiering report" which was circulated to various Marsh executives, ranked AIG and other insurance companies according to how profitable the companies' contingent commission agreements were to Marsh.  The report lists at least four AIG subsidiaries and related parties: C.V. Starr, National Accounts, Lexington Primary and Lexington Excess.

243.   The benefits of the steering system to AIG and the other participating insurance companies were significant.  For example, in July 2000, a Marsh executive wrote to four of her colleagues to discuss "Business Development Strategies" with a certain "preferred" insurance company that had signed a contingent commission agreement with Marsh.  In describing what Marsh had done for that insurance company, she wrote, "They have gotten the 'lions [sic] share' of our Environmental business PLUS they get an unfair 'competitive advantage['] as our preferred [sic] [insurance company]."

244.   AIG fully understood that its contingent payments to Marsh were not for any "services rendered."  For example, the handwritten notes of an AIG executive indicate that Marsh – in particular, William Gilman, at the time a managing director of Marsh – threatened to "kill" AIG if AIG did not "get to [the] right number" in its contingent commission agreements with Marsh.  Those notes read, "Per W. Gilman, Get to the right number or 'we'll kill you.'"

245.   During the Class Period, AIG obtained billions of dollars in premiums revenues as a result of its payments of illegal contingent commissions to Marsh and other brokers.  AIG's reported revenues throughout the Class Period were materially inflated by including premiums revenues derived from these "bribes."

246.   In addition, all statements in AIG's SEC filings during the Class Period related to so-called competition in the insurance industry and related to AIG's premiums revenue, were false and materially misleading.

### 3.   <u>Bid-Rigging</u>

247.   To facilitate the "steering" discussed above, AIG was a principal player in an illegal scheme with Marsh and a handful of other insurance companies to rig bids for quotes that Marsh presented to its clients.

248.   Beginning in or around November 1998, and continuing until at least the summer of 2004, AIG, through (at least) the Excess Casualty Division of American Home – AIG's principal provider of commercial umbrella or excess liability and excess worker's compensation insurance – engaged in a systematic scheme with Marsh to rig bids.

249.   The bid-rigging was done to ensure that, when AIG was selected by Marsh to win a bid, AIG's policy would be selected by the client.  Thus, the rigged bids helped ensure AIG billions of dollars in premiums by virtually guaranteeing that customers would choose AIG's policies.  The bid-rigging also ensured that AIG's customers would pay higher premiums than they otherwise would have paid had there actually been competition for their business.

250.   As with the payment of illegal contingent commissions described above, the bid-rigging made false and misleading all of AIG's statements during the Class Period related to competition in the insurance industry and related to AIG's premiums revenue.

## a.   How the Bid-Rigging Scheme Worked

251.     When AIG was the "incumbent" insurance carrier for a client whose policy came up for renewal, Marsh solicited from AIG a so-called "A Quote," whereby Marsh provided AIG with the policy terms and a "target premium" for the quote.  If AIG agreed to quote the target Marsh provided, AIG kept the business, regardless of whether it, or a competitor, could have quoted more favorable terms or a lower premium.

252.     When insurance companies other than AIG were the "incumbent" carriers, AIG submitted to Marsh so-called "B Quotes" (also referred to as, *inter alia*, "B bids," "fake quotes," "bogus quotes," "bullshit quotes," "backup quotes," or "protective quotes").  In submitting the "B Quotes," AIG knew that it would not receive the business.  This was so because AIG understood that the target premium Marsh had set for the "B Quote" was higher than the incumbent carrier's quote, and AIG was not to bid below the incumbent.

253.     AIG went along with this scheme – *i.e.*, provided fictitious "B Quotes" when it knew it was not going to get the business – because AIG's business was "protected" in situations when AIG was the incumbent carrier.  Indeed, William Gilman, at the time a managing director of Marsh, said that because that company "protected AIG's ass" when it was the incumbent carrier, Marsh expected AIG to help Marsh "protect" other incumbents.

254.     In other situations, AIG submitted "B Quotes" where Marsh had not set a premium target, but where it was still understood that AIG was not supposed to receive the business.  In such instances, AIG examined the terms and premiums of the incumbent carrier's expiring policy and then submitted a quote that was sufficiently high to ensure that AIG's quote would not be the most favorable.

255.     In B quote situations, AIG did not perform a complete underwriting analysis, as is typically done.  In those rare instances when AIG inadvertently won business based on a B quote

(because the incumbent was not able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work on the file – in other words, prepare the requisite analysis after the fact.

256.    The benefits to AIG resulting from its participation in the bid-rigging scheme were significant.  AIG received millions of dollars each year in premiums as a result of the illegal bid-rigging, thereby artificially inflating, *inter alia*, its revenues, premiums revenues and net income during the Class Period.

257.    For example, on December 17, 2002, Patricia Abrams, an assistant vice president of another insurance company, faxed Greg Doherty, a Marsh executive, quoting an annual premium of $990,000 for a particular policy for Marsh's client, Fortune Brands, Inc.  Later that same day, the insurer increased its bid by $110,000, to $1,100,000.  The fax cover sheet to Doherty that accompanied the revised bid stated, "Per our conversation attached is revised confirmation.  All terms & conditions remain unchanged."  The next day, Abrams explained in an email to a colleague that ***the upward revision in the insurer's  bid was done to protect AIG*** – the incumbent carrier on the policy – who had submitted a bid ***higher*** than the insurer's original $990,000:  "Original quote $990,000 Premium . . . ***We were more competitive than AIG in price and terms. [Marsh] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business*** . . . ."  Fortune Brands Inc. ultimately renewed its policy with AIG.

258.    As alleged in the NYAG's September 12, 2005 indictment of eight Marsh executives, discussed in greater detail *infra* at paragraphs 296 through 300, Fortune Brands Inc. had stolen from it more than $1 million "in or around January 2003."

259.    The indictment also charges that:  Dyson-Kissner-Moran Corporation had stolen from it $1million or more "during a period from on or about May 16, 2003 to on or about January 23, 2004"; Vivendi Universal, S.A. had stolen from it $1 million or more "in or about July 2003"; and Cisco Systems, Inc. has stolen from it $50,000 or more "in or about April 2003."

260.    Lead Plaintiff's investigation reveals that all three of these companies were AIG clients.  Thus, the premiums these companies paid to AIG artificially inflated AIG's revenues and earnings.

261.    A similar instance was documented in a complaint filed by the Attorney General of the State of Connecticut against Marsh in September 2005.  In 1999, Bridgeport Hospital, whose umbrella insurance policy with AIG was set to expire, hired Marsh to procure a new policy.  On September 14, 1999, Nicole Michaels – a broker in the Excess Casualty Division of Marsh Global Broking, Inc. who, as alleged below, would later plead guilty in August 2005 to Attempting to Act in Combination of Restraint of Trade and Competition – wrote Mark Manzi and Joshua Bewlay of Marsh – who also later pled guilty in connection with the bid-rigging – and asked, "tell me what to do with the pricing" on Bridgeport Hospital's insurance policy. Michaels indicated that she intended to have Zurich American Insurance Co. ("Zurich") submit a non-competitive quote in order to support the bid of AIG, Marsh's preferred insurer.

262.    The Marsh executives recommended to Bridgeport Hospital that it accept an increase in premium.  After the client questioned why its premium should increase when the risk being insured had not increased, Bewlay wrote to Michaels that he was going to make a phone call "to protect AIG" and that he would find out whether Bridgeport Hospital's opposition to a higher premium "is real or b.s."

263.   The next day, on September 15, 1999, Zurich submitted a quote that was purposely higher than that offered by AIG.  Bridgeport Hospital eventually renewed its policy with AIG at the increased premium that Marsh had suggested.

264.   AIG's business was protected even in instances where its clients were unhappy with the Company's services.  For example, in June 2003, an insurer learned that Brambles, USA, a manufacturer of commercial pallets and containers, was unhappy with its AIG-written policy that was set to expire.  However, Marsh asked the insurer *not* to submit a competitive bid because Marsh wanted AIG – whose quote was $850,000 – to retain the business with Brambles.  The e-mail reads, in relevant part:

> **This is another AIG protection job by NY**. [redacted] just called to ask if we can beat $850,000 for Lead $25m.  I've advised him to go direct [sic] to you, as I cannot make this call.
>
> Our rating has risk at $890,000 and I advised [Marsh] NY that we could get to $850,000 if needed.  **Doherty [at Marsh] gave me [sic] song & dance that [the] game plan is for AIG at $850,000 and to not commit our ability in writing!**
>
> Apparently both Marsh Atlanta and [Brambles] are extremely unhappy with AIG and if we can put [sic] offer on table at $800,000 we'll get it.

265.   Similarly, correspondence between Marsh and Munich-American Risk Partners ("MARP") also reflect AIG's involvement in the bid-rigging scheme and the benefits the Company received by having its business "protected."  A December 6, 2001 e-mail from a Marsh executive to a MARP employee notes that MARP had submitted a competitive bid but "[Marsh] called [MARP] off when incumbent AIG came in with an acceptable deal. (**We [Marsh] owed them [AIG], as they cheaped [sic] it the previous year in competition to help us get the business in broker competition.**)"

266.     In an e-mail exchange between two AIG employees in October 2003, one

underwriter – in commenting on a particular bid the company had submitted to Marsh on an

excess liability policy for Hubbell Incorporated, whose policy with Zurich was set to expire –

stated that, **"[t]his was not a real opportunity**.  [The incumbent carrier] Zurich did what they

needed to do at renewal.  We were just there in case [Zurich] defaulted.  **Broker . . . said Zurich**

**came in around $750K & wanted us to quote around $900K.**"  After all the "bids" had been

submitted, Hubbell ended up renewing its policy with Zurich for $782,000, as recommended by

Marsh.

267.     The felony complaints filed against AIG executives Karen Radke and Jean-

Baptist Tateossian filed in New York State court provide further details of AIG's wrongdoing.

On September 18, 2003, Alex Bynum ("Bynum"), an underwriter in AIG's Excess Casualty unit,

emailed Samantha Gilman at Marsh to provide details about an insurance premium for a

prospective client.  A printed version of the email includes the handwritten words, **"[T]his is a B**

**submission, just protecting Marsh's market . . .**"

268.     Likewise, the felony complaint against Robert Stearns, a former Marsh executive,

alleges as follows:

> [I]n a March 5, 2003 e-mail, Josh Bewlay, head of Marsh's Global
> Broking Unit, directed [Stearns]: "Bob, could you get  the quote
> from Pete.  AIG was to hit 25 percent increase.  Then we need B
> quotes at the expiring attachments."  Further e-mails reflect that
> Zurich, ACE and St. Paul subsequently offered losing quotes on
> this account.  In one, **Greg Doherty, a Marsh broker, sent ACE**
> **underwriter James Williams a March 17, 2003 e-mail instructing**
> **him as follows:  "need a 'B' for shits and giggles." The client**
> **renewed the insurance policy with AIG**.

269.     The felony complaint against Joshua M. Bewlay, a former Marsh executive,

alleges the following:

On September 28, 2001, [Bewlay] disseminated a "broking plan" for a particular piece of business to certain Marsh brokers in the Excess Casualty department, informing them that "if AIG does all the coverage, we will do a Type B on this." ***On October 3, 2001, [Bewlay] sent an e-mail to Peter Andersen, a broker on Marsh's AIG-dedicated team, informing Mr. Andersen that if he provided AIG's quote before Friday, [Bewlay] "c[ould] do a Type B on it and protect [him]." In subsequent emails, [Bewlay] provided the brokers with AIG's quote of $79,750, thereby ensuring that no alternate quote would be more competitive. Indeed, Zurich American Insurance Company ("Zurich") and Munich American Risk Managers ("MARP" or "Amre") complied by submitting quotes for $110,000 and $135,000 respectively, and the client ultimately bound with AIG***.

Similarly, on March 4, 2002, [Bewlay] disseminated a broking plan to certain Marsh brokers in the Excess Casualty department for another piece of business, in which ***he instructed them to get "B quotes from MARP and Zurich," in order to protect the incumbent, AIG***. In subsequent e-mails, [Bewlay] reiterated his request for a B quote from Zurich and MARP, requested one from Kemper as well, and provided AIG's quote of $825,000 to ensure that the B quotes were less competitive. Indeed, MARP complied with the request by indicating that they would be "well north of $1M" for the placement. Zurich complied as well by submitting a quote of $1,045,000. [Bewlay] provided this information to the client through the Marsh Client Advisor, and the client ultimately bound the business with AIG.

270.    The felony complaint against Kathryn Winter, a former Marsh executive, alleges, in relevant part:

[I]n a November 25, 2002 email to RoseAnn Zakovic, [Winter] instructed Zakovic to, "[p]lease just get an indication, email is fine on the captioned. ***AIG is quoting $1 mil for 25 mil xs 2/4/4 and 2 mil auto. Can you have ZGE come in with a "B" quote- 1.4 mil??" The next day, Zakovic received a quote from a Zurich underwriter for $1,400,000, which she then forwarded to [Winter]. The client renewed the policy with AIG***.

271.    On March 5, 2004, Jason Monteforte, a Marsh employee, forwarded an email to AIG's Bynum which stated that Zurich American Insurance Co. "has released a quote of $173,720 . . . Please have AIG provide an email indication for $50mm x P." Monteforte added

that "The incumbent hit the target . . . need an indication for $50mm at $200,000," meaning that AIG was to submit a bid of $200,000 – *i.e.,* a bid higher than the one submitted by the incumbent, Zurich.  AIG's Bynum replied that he would forward the bid under separate cover, and ***one minute later, he sent Monteforte an email containing the inflated bid that Marsh had requested***.  Bynum later emailed Monteforte seeking confirmation that AIG did not win the account.

272.    As indicated below, AIG reported substantial premium revenue growth during the Class Period.  AIG and the Individual Defendants failed to disclose that this growth was attributable to AIG's participation in the illegal bid-rigging scheme.

### 4.    <u>Insurance Brokers Respond to the Spitzer Complaint</u>

273.    On October 15, 2004, just one day after the Spitzer Complaint was filed, Marsh announced that it was suspending its practice of accepting contingent commissions.

274.    On October 21, 2004, Willis Group Holdings, the third-largest insurance broker, also announced that it would no longer accept contingent commissions, despite the commissions' having provided Willis with between $80 million and $160 million in annual revenue.

275.    On October 22, 2004, Aon Corporation, the world's number two insurance broker, announced that it, too, would stop taking contingent commissions.  Aon had received approximately $200 million in such payments in 2003.

276.    On October 25, 2004, Jeffrey W. Greenberg, Defendant Greenberg's son, resigned as CEO and chairman of Marsh.

277.    On January 31, 2005, Marsh reached a settlement with Attorney General Spitzer's office, pursuant to which Marsh agreed to pay $850 million in restitution to its policyholders.  Among other things, the settlement also prohibits Marsh from accepting any form of contingent commissions and prohibits Marsh from participating in bid-rigging.

278.   In announcing the settlement, Marsh also released the findings of an internal investigation conducted by the company's outside counsel, Davis Polk & Wardell.  Those findings explained that contingent commissions paid to Marsh "may have generated MSA revenues for Marsh, Inc. *in excess of ten or fifteen per cent of the client's overall premium."*

### 5.   To-Date, Four AIG Executives and Numerous Executives of Marsh and Other Companies Have Pleaded Guilty or Have Been Indicted In Connection with the Bid-Rigging Scheme

279.   To date, more than 15 insurance executives from several companies have pleaded guilty to criminal charges in connection with bid-rigging.

280.   On October 14, 2004, Karen Radke and Jean-Baptist Tateossian, two AIG executives, pleaded guilty to counts of Scheme to Defraud in the First Degree, a Class E felony, in connection with the bid-rigging scheme.  Each defendant faces a maximum of four years in prison.

281.   Radke was an AIG senior vice president of the Excess Casualty Unit of American Home Assurance Company, one of AIG's principal subsidiaries in AIG's General Insurance business segment.

282.   According to the transcript of her guilty plea, Radke participated in the bid-rigging scheme from July 2001 through 2004, wherein various Marsh employees instructed her "and others at AIG" to submit specific quotes for insurance rates that Radke knew were higher than those of the so-called "incumbent" carrier.  The transcript of Radke's sworn testimony reads, in relevant part:

> MR. KNAPP [Assistant Attorney General Whitman Knapp]:  Ms. Radke, in July of 2001, did you become a manager of American Home, a division of AIG, an insurance company in Manhattan?
>
> THE DEFENDANT [Karen Radke]:  Yes.

MR. KNAPP:  From July of 2001 through 2004, you and others at AIG participated in a scheme with individuals at Marsh & McLennan, an insurance brokerage also based in Manhattan?

THE DEFENDANT:  Yes.

MR. KNAPP:  Did the goals of this scheme include allowing Marsh to control the market and to protect incumbent insurance carriers when their business was up for renewal?

THE DEFENDANT:   Yes.

MR. KNAPP:  During this time period, Bill Gilman, Ed McNenny, and others at Marsh periodically instructed you and others at AIG to submit specific quotes for insurance rates that you believed were higher than those of the incumbent carriers, were designed to ensure that the incumbent carriers would win certain business, and resulted in clients being tricked and deceived by a deceptive bidding process; is that true?

THE DEFENDANT:  Yes.

**MR. KNAPP:  On numerous occasions did you and others at AIG comply with those requests by submitting such quotes?**

**THE DEFENDANT: Yes.**

MR. KNAPP:  By doing so, did you and others assist Gilman, McNenny and others at Marsh to obtain property with a value in excess of a thousand dollars from more than one insurance client?

THE DEFENDANT:  Yes.

**MR. KNAPP:  In turn, did AIG periodically benefit from the scheme when AIG was the incumbent carrier?**

**THE DEFENDANT:   Yes.**

MR. KNAPP:  In those cases, did you believe that other carriers were also submitting noncompetitive quotes specified by Marsh, thereby allowing AIG to obtain property with a value in excess of a thousand dollars for more than one insurance client?

THE DEFENDANT:  Yes.

> MR. KNAPP:  Pursuant to this scheme, did you intentionally engage in deception, and intentionally convey quotes to Marsh under false and fraudulent pretenses?
>
> THE DEFENDANT:  Yes.

283.   Radke faces a maximum sentence of four years imprisonment, and is cooperating with the Attorney General's ongoing investigation.

284.   Tateossian, the head of AIG's National Accounts unit within American Home, testified at his plea hearing that he had learned of AIG's participation in the bid-rigging scheme based on "numerous conversations with employees of Marsh and from *[his] supervisors* at American Home."  Tateossian also stated that he participated in the scheme from 2002 to 2004. The transcript of Tateossian's sworn testimony reads, in relevant part:

> MR. KNAPP [Assistant District Attorney Whitman Knapp]:  Sir, during approximately 13 months in 2002 and 2003, were you the head of the Marsh Unit at American Home?
>
> THE DEFENDANT [Jean-Baptist Tateossian]:  Yes.
>
> MR. KNAPP:  Is American Home a division of AIG, an insurance company in Manhattan?
>
> THE DEFENDANT:  Yes.
>
> MR. KNAPP:  And did the American Unit deal exclusively with Marsh Global Broking, a subsidiary of Marsh & McLennan Companies, an insurance brokerage based in Manhattan?
>
> THE DEFENDANT:  Yes.
>
> ***MR. KNAPP:  During this time period, on many occasions, did you and others at AIG participate in a scheme with individuals at Marsh to protect incumbent insurance companies from competition when their business was up for renewal, and to allow Marsh to control the market?***
>
> ***THE DEFENDANT:  Yes.***
>
> MR. KNAPP:  Did you learn of the existence and methodology of this scheme from numerous conversations with

employees of Marsh and from your supervisors at American Home?

THE DEFENDANT: Yes.

MR. KNAPP:  Pursuant to this scheme, did persons at Marsh repeatedly instruct you and others at AIG to submit specific quotes for insurance on non-renewal business that you believed were less favorable than quotes submitted by incumbent insurance companies?

THE DEFENDANT:  Yes.

MR. KNAPP:  And did you believe that these requests for quotes were also designed to ensure AIG quotes would not be selected, and the incumbent quotes would be selected by the policyholder?

THE DEFENDANT:  Yes.

MR. KNAPP:   And did you believe that Marsh would deceive policyholders into believing that Marsh had obtained truly competitive bids, thus tricking policyholders in selecting other insurance companies' quotes?

THE DEFENDANT:  Yes.

**MR. KNAPP:  On repeated occasions, did you and others at AIG comply with these requests by submitting such quotes, thereby assisting Marsh obtain property in the form of millions of dollars in commission and fees from each of numerous policyholders and insurance companies?**

**THE DEFENDANT:  Yes.**

**MR. KNAPP:  Likewise, during that time, did AIG routinely benefit from the scheme when AIG was the incumbent insurance company?**

**THE DEFENDANT:  Yes.**

MR. KNAPP:  In those cases, when AIG and Marsh reached agreement as to what AIG would quote to renew certain business, did you believe that Marsh would protect AIG by arranging for other insurance companies to submit losing quotes specified by Marsh, thereby allowing AIG to retain business in connection with its incumbent insurance policies, without competitive bidding, and to obtain property in the form of millions

of dollars in insurance premiums from each of the numerous policyholders?

THE DEFENDANT:  Yes.

285.     Like Radke, Tateossian faces a maximum sentence of a term of four years in jail, and he too is cooperating with the Attorney General's ongoing investigation.

286.     On February 15, 2005, James Mohs and Carlos Coello, two additional AIG employees, pleaded guilty in connection with AIG's involvement in the bid-rigging scheme.

287.     Mohs, an assistant manager and later a manager of American Home's Excess Casualty Unit, testified at his plea hearing that from April 2002 through 2004, "Marsh and AIG personnel periodically instructed" him to submit specific quotes for insurance rates.  The transcript of Mohs' guilty plea reads, in relevant part:

> From April 2002 through 2004 while at AIG, an insurance company in New York  County, I and other individuals participated in a scheme with individuals at Marsh Inc, an insurance brokerage firm in Manhattan.  From approximately April 2002 through 2004 I was employed by AIG, an insurance company in New York County.
>
> In October of 2002 I was promoted to assistant manager of an underwriting unit at A[IG] that was dedicated exclusively to Marsh.  In approximately one year after that I was promoted to manager of this unit.
>
> During my career at AIG, I and other employ ess [sic] participated in a scheme with individuals at Marsh Inc, also based in Manhattan.  ***The goals of this scheme included allowing Marsh to control the market and to protect incumbent insurance carriers including AIG when their bid was up for renewal***.
>
> During this time period, Marsh and AIG personnel periodically instructed me to submit specific quotes for insurance rates that I believed, number 1, were higher than those of incumbent carriers.
>
> Number [2], were designed to insure that the incumbent carriers would win certain business and number 3, resulted in clients being tricked and deceived by their deceptive bidding practice.  ***On numerous occasions I and other complied with these requests by***

*submitting such quotes*.  By doing so, we assisted Marsh to obtain property in the form of commissions and fees from policy holders and insurance companies.

*In turn AIG periodically benefitted from this scheme when AIG was the incumbent carrier.  In those cases I believe the other carriers were submitting non competitive quotes specified by Marsh thereby allowing AIG to obtain property in the form of insure [sic] premiums in excess of $1,000 from policy holders.*

Pursuant to this scheme I intentionally engaged in deception and intentionally conveyed quotes to policy holders through Marsh and under false and fraudulent pretenses.

288.    Like Radke and Tateossian, Mohs pleaded guilty to the crime of Scheme to Defraud in the First Degree, and faces a maximum sentence of four years in jail.  He, too, is cooperating with the New York Attorney General's ongoing investigation.

289.    Coello was an underwriter in the Excess Casualty Unit of American Home.  He testified at his plea hearing on February 15, 2005 that from September 2002 through September 2004, he "and others at AIG" participated in the bid-rigging scheme.  Coello said his participation was "done at the direction of others at AIG and Marsh."  The transcript of Coello's sworn testimony reads, in relevant part:

During – from September of 2002 through September 2004, I and others at AIG participated in a scheme with individuals at Marsh Inc, an insurance brokerage firm based in Manhattan.  I was employed as an underwriter at the time and this was done at the direction of others.

*              *              *

This was done at the direction of others at AIG and Marsh.  During this time period Marsh and AIG periodically instructed me to submit specific quotes that I believed were higher than those of incumbent carriers and were designed to insure the incumbent carrier would win certain business and resulted in clients being tricked and deceived by a deceptive bidding process.

*I complied with these requests and by doing so assisted Marsh to obtain property in the form of commissions and fees from policy*

- 81 -

> *holders.  And in turn AIG periodically benefitted from this*
> *scheme when AIG was the incumbent carrier in those cases.  I*
> *believe other carriers also submitted noncompetitive quotes that*
> *were higher thereby, allowing AIG to obtain property in the form*
> *of insurance premiums from more than one client.*

> Pursuant to this scheme, I intentionally engaged in deception and
> intentionally conveyed quotes to Marsh under false and fraudulent
> pretenses.

290.    Although charged with the crime of Scheme to Defraud in the First Degree,

Coello pleaded guilty to the lesser included offense of Scheme to Defraud in the Second Degree,

a Class A misdemeanor that carries a maximum sentence of one year in prison.  Like the three

other AIG executives who pleaded guilty, Coello has agreed to cooperate with the New York

Attorney General's ongoing investigation.

291.    On November 16, 2004, John Keenan, a Senior Underwriter in the Specialties

Excess Casualty Unit at Zurich American Insurance Company, pleaded guilty to violating New

York General Business Law §§ 340 and 341 – attempting to commit the crime of Combination in

Restraint of Trade and Competition.  *The transcript of Mr. Keenan's plea hearing indicates*

*that he participated in the illegal bid-rigging when he was employed at AIG, prior to joining*

*Zurich*:

> From about August [2002] to September [2004], Mr. Keenan was a
> Senior underwriter in the Specialties Excess Casualty Unit at
> Zurich American Insurance Company, Zurich an Insurance
> Company in Manhattan.

> *              *              *

> During this time period, brokers at Marsh instructed Mr. Keenan
> and other Zurich underwriters to submit protective quotes on
> business where Marsh had predetermined which insurance carrier
> would win the bid.

> Such quotes were referred to as B quotes and later as alternative
> leads.

Mr. Keenan understood that such quotes were intended to allow Marsh to control the bidding process, protect the incumbent and convince the insured that the incumbent had the best bid.

This could be accomplished by either bidding at a higher price than the incumbent, or by providing less attractive terms for the insurance program.

Brokers at Marsh often gave Mr. Keenan either the incumbent's bid, a specific target, or range within which to bid so that Mr. Keenan could ensure that his bid was less favorable than that of the incumbent.

On many occasions, Mr. Keenan complied with these requests by submitting such quotes, and believes that this activity allowed Marsh to obtain property in the form of millions of dollars in commissions and fees from each of the numerous policyholders and insurance companies.

Likewise, during this time, Zurich periodically benefitted from this scheme when  Zurich was the incumbent insurance company.

In those cases when Zurich and Marsh had reached agreement as to what Zurich would quote to renew certain business, Mr. Keenan believed that Marsh would protect Zurich by arranging for other insurance companies to submit losing quotes specified by Marsh, thereby allowing Zurich to retain business in connection with its incumbent insurance policies without competitive bidding.

And to obtain property in the form of millions of dollars in insurance premiums from each of numerous policyholders.

Mr. Keenan understood that Zurich benefitted in an additional manner, when Zurich submitted a B quote on the lead layer of insurance, Marsh often gave Zurich a place on the excess layer.

***From [2001] to [2002], Mr. Keenan engaged in similar conduct while employed at American Home[,] a division of AIG[,] which is another insurance company in Manhattan***.

292.    On August 3, 2005, James Spiegel, a Senior Underwriter in the Specialties Excess

Casualty Unit at Zurich American Insurance Company, pleaded guilty to a Class E felony of

Scheme to Defraud in the first degree and faces a maximum of four years in prison.  Like John

Keenan, *the transcript of Mr. Spiegel's plea hearing indicates that he participated in the illegal bid-rigging while he was employed at AIG, prior to joining Zurich*:

> THE DEFENDANT [Mr. Spiegel]:  From about September, 2001, to about September, 2004, I was a Senior Underwriter in the Specialties Excess Casualty  Unit at Zurich American Insurance Company, an insurance company in New York County.
>
> I worked in the part of the Unit that was dedicated to Marsh Global Broking, a subsidiary of Marsh USA, Inc., an insurance brokerage based in New York county.  In July, 2002, I became the manager of this Unit.
>
> During the time period that I worked in this Unit, brokers at Marsh instructed me and other Zurich underwriters to submit purposefully losing quotes on business where Marsh had predetermined which insurance carrier would win the bid.  Such quotes were often referred to as "B quotes" and "protective quotes."
>
> I understood that such quotes were intended to allow Marsh to control the bidding process, protecting the incumbent and convince the insured that the incumbent had the best bid.  This could be accomplished by either bidding at a higher price than the incumbent, or by or by [sic] providing less attractive terms for the insurance program.
>
> Brokers at Marsh often gave me either the incumbent's bid, a specific target, or a range within which to bid so that I could ensure that this bid was less favorable than that of the incumbent.
>
> On many occasions, I complied with these requests by submitting such quotes, and believe that activity allowed Marsh to obtain property in the form of more than $1,000.00 in commission and fees from each of numerous policyholders and and [sic] insurance companies.
>
> Likewise, during this time, Zurich benefited from this scheme when Zurich was the incumbent insurance company or was otherwise designated by Marsh to win the business.  In those cases, Marsh set a target price for Zurich to quote.  I almost never quoted below the target price.  I believe that Marsh would protect Zurich by arranging for other insurance companies to submit losing quotes specified by Marsh, thereby allowing Zurich; one, to retain business in connection with incumbent insurance policies, or gain new business, both without competitive bidding; and, two, to

obtain property in the form of more than $1,000.00 from each of numerous policy-holders in the form of premiums.

I understood that Zurich benefited in additional [sic] manner; when Zurich submitted "B quotes" on the lead layer of insurance. Marsh often gave Zurich a place on an excess layer.

Both as the incumbent carrier or designated winner who hit target prices set by Marsh, and as the provider of purposefully losing quotes, I understood that my actions resulted in clients being tricked and deceived by a deceptive bidding process.

*From about 1996 to 2001, I was an underwriter employed by American Home, a division of AIG, another insurance company in New York County. While in American Home, I engaged in similar conduct, whereby I would hit target prices set by Marsh and expected to keep the business*.

293.    The guilty pleas of numerous executives from several other companies also implicate AIG in the bid-rigging scheme.

294.    For example, Todd Murphy, a Global Broking Coordinator in the Excess Casualty Division in the Global Broking Unit of Marsh, Inc., pleaded guilty on August 2, 2005 to Scheme to Defraud in the Second Degree, a Class A misdemeanor that carries a maximum sentence of one year in prison. At his plea hearing, Mr. Murphy testified, in relevant part:

I and others at March [sic] *participated in a scheme with individuals at various insurance companies, including AIG*, ACE and Zurich. The primary goal of this scheme was to maximize Marsh's profits by controlling the market and protecting incumbent insurance carriers when their business was up for renewal.

295.    Similarly, Nicole Michaels, an insurance broker in the Excess Casualty Division of Marsh Global Broking, Inc., a subsidiary of Marsh USA, Inc., pleaded guilty on August 2, 2005 to Attempt to Act in Combination of Restrain of Trade and Competition in violation of General Business Law §§ 340-341, a Class A misdemeanor that carries a maximum sentence of one year in jail. At her plea hearing, Ms. Michaels testified, in relevant part:

From about 1997 to about September, 2004, I was an insurance broker in the Excess Casualty Division of Marsh Global Broking, Inc., a subsidiary of Marsh USA, Inc., an insurance brokerage in New York County.

While in that Division, I worked on a team of Marsh brokers dedicated to handling the placement of insurance business with AIG, an insurance company in New York County, as well as a team dedicated to handling the placement of insurance with Zurich American Insurance Company, another insurance company in New York County.

***During this time, I participated in a scheme with individuals of various insurance companies, including Zurich and AIG***.  The primary goal of this scheme was to maximize Marsh's profits by controlling the market and protecting selected insurance companies from competition, to ensure that the selected insurance companies would win certain business.

During this time period, I instructed underwriters to submit purposefully losing quotes on business where [M]arsh predetermined which insurance carrier would win the bid.  Such quotes were often referred to as "B quotes," "back-up quotes," "protective quotes" and "fake quotes."

*          *          *

On many occasions, such insurance companies complied with such requests by submitting purposefully losing quotes, which Marsh, in turn, showed to its clients.

Likewise, during this time, when an insurance company was the incumbent carrier or was otherwise designated to win, I, and other brokers, would direct such carriers to hit a target price.  The target price was a price that Marsh determined an incumbent or otherwise-designated insurance company should quote to win the business.  ***AIG and Zurich almost never presented a quote that was lower than the target price.  In these instances, I believed that Marsh would protect the incumbent, either AIG or Zurich, by arranging for other insurance companies to submit losing quotes specified by Marsh.***

296.    On September 15, 2005, *Bloomberg.com* reported that William Gilman and Joseph Peiser – both former managing directors of Marsh who were fired during that company's internal probe into bid-rigging – were indicted, along with six other Marsh executives.  Gilman

and Peiser were charged with a total of 37 counts, including Scheme to Defraud in the First

Degree, an E felony; Combination in Restraint of Trade and Competition, an E felony; and

various counts of Grand Larceny in the First, Second and Third Degrees, respectively B, C and D

felonies.  The article reported that "Gilman, 62, enforced a system of fake bidding at the world's

largest broker, threatening to take business away from insurers such as American International

Group, Inc. if they didn't inflate quotes, ensuring clients would renew their policies with existing

insurers."

297.     An article in *The Wall Street Journal* on September 15, 2005 reported that "Mr.

Spitzer alleged that the scheme raised clients' costs in at least 35 instances, in a few cases by $1

million or more."

298.     A press release issued by the NYAG in announcing the indictments on September

15, 2005 stated that,

> Today's indictment charges that from November 1998 to
> September 2004, *the defendants colluded with executives at*
> *American International Group "AIG"*, Zurich American
> Insurance Company "Zurich", ACE USA "ACE", Liberty
> International Insurance Company "Liberty" and other companies
> *to rig the market for excess casualty insurance*.

299.     The indictment itself stated, in relevant part:

> Defendants, who were executives and employees assigned to the
> Excess Casualty Unit of Marsh Global Broking ("MGB"), a
> subsidiary of Marsh, Inc. ("Marsh"), a leading insurance
> brokerage, together with other individuals known and unknown to
> the Grand Jury, *including executives and employees of American*
> *International Group ("AIG")*, Zurich American Insurance
> Company ("Zurich"), ACE USA ("ACE"), Liberty International
> Insurance Company ("Liberty") and other insurance companies
> known to the Grand Jury ("the Accomplice Companies"), *devised,*
> *implemented and perpetuated a scheme whereby they*
> *fraudulently and collusively obtained millions of dollars for*
> *Marsh and the Accomplish Companies by rigging the market for*
> *excess casualty insurance.*

- 87 -

\*          \*          \*

Defendants, and other participants in the scheme, engaged in fraudulent conduct as follows:  Marsh employees, including defendants, falsely represented to customers that MGB had solicited bids from insurance companies in an open and competitive bidding process.  In fact, defendants rigged the process:  first, by determining which Accomplice Company would win the business; second, by setting a "target" for the predetermined winner to submit as its bid; and third, by obtaining "losing bids" from employees at other Accomplice Companies.

\*          \*          \*

As defendants intended, ***the customer selected the insurance company with the most attractive bid, unaware that the selection had been fraudulently pre-ordained, and paid premiums, fees and commissions to Marsh and the Accomplice Companies***.

The scheme generated large financial rewards for Marsh and the Accomplice Companies.  Marsh earned millions of dollars in commissions and fees ***and the Accomplice Companies earned millions of dollars in premiums***.

300.    In a September 15, 2005 article, *The New York Times* quoted Attorney General Spitzer – in announcing the indictments – as saying, "There's no argument for a bid that cheats the customer and adds to the already high cost of insurance.  ***There will be more criminal cases against carriers who were part of this scheme***."

301.    The NYAG's investigation into bid-rigging is continuing.

### 6.     AIG and Greenberg Respond to the Spitzer Complaint

302.    *TheStreet.com* reported that, on October 15, 2004, one day after the Spitzer Complaint was filed and the first two AIG executives' guilty pleas were announced, Defendant Greenberg announced in a call with analysts, "We are sickened by this action that took place and [are] doing everything to root this out promptly.  ***As CEO of AIG, I take responsibility for everything that goes on within the company***."

- 88 -

303.     Defendant Greenberg also revealed during the call that AIG had received a

subpoena from Attorney General Spitzer sometime during the prior month – September 2004 –

and,  in response, the Company had launched an internal investigation.

304.     On October 18, 2004, *The Wall Street Journal* reported that, during that same

October 15, 2004 call, ***Defendant Greenberg also admitted that he knew, since at least early***

***2002, that AIG had been paying contingent commissions***.  Greenberg tried to deflect blame,

stating that in July 2002 and October 2003, he and others at AIG sought guidance from the New

York State Department of Insurance on the issue of contingent commissions, but never received

a definitive response.

305.     However, according to the same *Wall Street Journal* article, Department of

Insurance Superintendent Gregory V. Serio characterized AIG's inquiries in 2002 and 2003 as

essentially "a complaint" that Marsh was pressuring AIG to pay larger amounts of contingency

commissions.

306.     On October 16, 2004, the *Journal News* reported that, in response to Defendant

Greenberg's October 15, 2004 statements, Michael Berry, a spokesman for the Department of

Insurance noted that, "I think the feeling was that the Department's stance was clear that it was

just understood that nothing had changed since the August 1998 circular letter. Our position is

that ***this is all a distraction.  AIG never asked us for any guidance on contract steering and bid***

***rigging***."

307.     A "Circular Letter" is an official policy statement of the Department of Insurance.

The circular letter to which Berry referred was Circular Letter 22, dated August 25, 1998, which

was addressed to "All Licensed Brokers and Property/Casualty Insurers" concerning the

"Disclosure of Brokers' Compensation."

308.    The letter, which was signed by Bonnie Steingart, the Deputy Superintendent and General Counsel of the Department, *notified all brokers and insurers that they were obligated to fully disclose to customers all commission and fee agreements*.  The letter reads in its entirety, with emphasis added:

> An alleged market development had recently come to the attention of the Department that appears to warrant scrutiny.  *The development centers on the allegation that undisclosed compensation, in addition to commissions, is being paid to brokers by insurers as additional compensation for the placing of business without such information being furnished to insureds.* Pursuant to Section 2101(c) of the New York Insurance Law ("NYIL"), a broker is the legal representative of the insured.  It is the position of the Department that the undisclosed receipt of additional compensation is sufficient to create the perception that brokers are conflicted in their loyalties and *that such conduct may constitute a violation of Section 2110 as a dishonest or untrustworthy practice.*
>
> Accordingly, pursuant to the sections of the law noted above, as well as Article 23 of the NYIL, this Department offers the following guidance:
>
> - All compensation arrangements between an insurer and a broker should be reduced to writing and agreed to by both parties;
>
> - *All such compensation arrangements should be disclosed to insureds prior to the purchase so as to enable insureds to understand the costs of the coverage and the motivation of their broker in placing the business*;
>
> - All fees paid to brokers should be included as factors in the establishment of an insured's premium rates;
>
> - *All fees paid to brokers (and reasons for such fee payments) should be included in a broker file maintained by the insurer*; and
>
> - *The insurer's internal auditing procedures should include verification that all fees paid to brokers are proper and within the parameters of the New York Insurance Law and Department regulations*.

The Department will review these matters in future market conduct investigations of insurers and brokers.

309.    On February 9, 2005, *Bloomberg* reported that Defendant Greenberg – in an apparent attempt to minimize AIG's wrongdoing – issued a statement that said: "We continue to believe that the issue that has been the primary focus of the New York Attorney General's investigation of AIG is confined to one broker relationship and one unit."  Similarly, AIG's General Counsel, Ernest Patrikis, told analysts in a conference call that same day, "We looked at every piece of smoke we could find.  We found no fire."

310.    According to a February 15, 2005 *Financial Times* article, on that same February 9, 2005 call with analysts, Defendant Greenberg lashed out at federal regulators, accusing them of turning "foot-faults into murder charges" in the course of their investigations.[1]

---

[1]    Sadly, this may not have been the first time that Defendants AIG and Greenberg had sought to turn back the heat on government regulators.  On October 29, 2004, *The New York Times* reported that, Leading Authorities, a Washington public relations firm, had sent emails on behalf of AIG to several financial industry experts, offering the experts fees of at least $25,000 **if they agreed to attack Attorney General Spitzer and defend the insurance industry**.  In his October 25, 2004 email to the financial industry experts, Mark French, the president of Leading Authorities, stated: "We have had an inquiry from A.I.G. for assistance in getting the insurance industry's side of the story out to the public." AIG claimed not to have knowledge of the email until October 28, 2004.  French later said he had sent the email at the behest of Qorvis Communications, a Washington public relations firm that worked for AIG until the Company fired Qorvis on October 25, for reasons purportedly unrelated to the email.

Likewise, Defendant Greenberg's February 9 comments apparently would not be the *last* time that he attempted to use high-profile surrogates or others to aid him in his defense against regulators.  On April 25, 2005, *MSNBC.com* published a *Newsweek* article which reported that Greenberg had called New York Senator Charles Schumer to ask the senator for a "supportive statement."  The call came after Attorney General Spitzer announced on ABC's "This Week with George Stephanopoulos" on April 10, 2005 that there was "overwhelming" evidence of "fraud" against Greenberg.

Moreover, on May 6, 2005, *The New York Times* reported that Defendant Greenberg had encouraged John C. Whitehead, the former chairman of Goldman Sachs, to write an op-ed piece in *The Wall Street Journal* criticizing New York Attorney General Eliot Spitzer.  On April 22, 2005, *The Wall Street Journal* published Mr. Whitehead's piece, entitled, "Mr. Spitzer Has Gone Too Far," that blasted Mr. Spitzer's investigations and suggested that the Attorney General's focus on Greenberg was motivated by politics.

Finally, in its August 8, 2005 edition, *Fortune* reported that, in response to the Delaware Department of Insurance's mid-1990s probe into AIG relationship with Coral Re, discussed *infra*: "**Private detectives from Kroll showed up in neighborhoods where two Delaware regulators lived, knocking on doors, asking questions.  The detectives made it known that they were acting on behalf of AIG.  'They were clearly trying to intimidate us,' says a former regulator.**"

311.     The August 8, 2005 edition of *Fortune* reported that, in response to Defendant Greenberg's "foot-fault" comment, Attorney General Spitzer stated, "Hank Greenberg should be very, very careful talking about foot faults.  Too many foot faults, and you can lose the match. ***But more importantly, these aren't just foot faults***."

312.     Likewise, the March 7, 2005 edition of *Fortune* reported that Patrikis's February 9 comments, by suggesting to investors that AIG's examination of the bid-rigging scheme turned up very little, had "angered" Attorney General Spitzer, who said in mid-February that he expects more criminal cases involving AIG employees in the future.

313.     Indeed, on February 15, 2005, during an interview on Fox News' "Your World With Neil Cavuto," Attorney General Spitzer questioned the conclusions of AIG's internal investigation, stating that, "[W]ith the guilty pleas that are being entered today, there will now be four individuals from AIG who will have pled guilty.  And as a consequence, whatever claim they've made that only one person was implicated is clearly wrong, and ***the problems there are more expansive than, certainly, their internal audit had demonstrated to them***."

### F.     AIG USED INCOME SMOOTHING PRODUCTS AND OTHER TECHNIQUES TO FALSELY INFLATE ITS EARNINGS

314.     On February 9, 2004, Attorney General Spitzer and the SEC began a probe into AIG's use of non-traditional insurance products, or so-called "finite" reinsurance agreements.

315.     In a February 14, 2005 press release entitled, "AIG Issues Statement Regarding Subpoenas," AIG announced the NYAG and SEC's investigation.  That press release stated, in relevant part:

> Subsequent to the earnings conference call on Wednesday, February 9, AIG received subpoenas from the Office of the Attorney General for the State of New York and the Securities and Exchange Commission ***relating to investigations of nontraditional insurance products and certain assumed reinsurance transactions and AIG's accounting for such transactions*** . . . .

316.     In response to this news on February 14, 2005, the price of AIG stock fell by 2.2 percent, from $73.12 to $71.49.

317.     The investigation initially focused on a reinsurance transaction between AIG and General Re, a wholly-owned subsidiary of Berkshire Hathaway, that allowed AIG to improperly present to the investing public an incorrect picture of its finances by adding a total of $500 million in premiums revenues and $500 million to its claims reserves during the fourth quarter of 2000 and first quarter of 2001.  *Defendant Greenberg, who was subpoenaed by the government in connection with this investigation, personally initiated the General Re deal*.

318.     While the government's investigation at first targeted only AIG's dealings with General Re, the investigation later expanded to include a litany of other accounting improprieties, including: the transactions that AIG entered into with several other reinsurers, including Defendants Union Excess and Richmond, two off-shore reinsurance companies that the Company secretly controlled;  so-called "Top Level" journal entries that improperly boosted AIG's claims reserves and other accounts;  improperly boosting the Company's underwriting results by disguising underwriting losses as investment losses and by accounting for so-called "life settlements" as underwriting income;  and the Company's mischaracterizing revenues from workers' compensation premiums.

319.     As alleged in greater detail below, on March 30, 2005, *AIG publicly admitted that its accounting for the AIG-General Re deal and its transactions with Union Excess and Richmond, was improper.*  AIG also disclosed that day that these accounting improprieties, along with several others, would likely lead to a *restatement of (or a charge to) earnings of approximately $1.77 billion.*

320.    On this news, AIG stock dropped 1.8 percent on March 30, 2005, from $58.20 to $57.16, on heavy trading.  In further response to this disclosure, on March 31, 2005, AIG's stock fell another 3.1 percent, from $57.16 to $55.41.

321.    The following day, on April 1, 2005, in the wake of this news and reports that Defendants Greenberg and Murphy may have been involved in ordering the removal of documents from AIG's Bermuda offices, as well as the destruction of computer files and tape recordings concerning the Company's reinsurance deals, AIG stock dropped another 8 percent, falling from $55.41 to $50.95, on extremely heavy trading.

322.    As alleged in greater detail below, AIG's May 31, 2005 restatement confirmed that the improper transactions described above were ***"done to accomplish a desired accounting result"*** and were not properly disclosed.

323.    As a result of this misconduct, AIG has been investigated by numerous government and regulatory agencies and has been named as a defendant in a civil suit brought by the New York Attorney General.  In connection with these improprieties, SEC civil complaints and charges by the DOJ have been brought against two former General Re executives, alleging that they aided and abetted securities fraud at AIG.  Ultimately, these accounting improprieties at AIG led to an enormous restatement wherein the Company acknowledged that its income had been inflated by nearly $4 billion and that shareholder equity would be reduced by $2.26 billion.

### 1.    AIG Improperly Used A $500 Million Finite Reinsurance Deal with General Re to Falsely Improve Its Financial Statements

#### a.    Background on Claims Reserves, Reinsurance and Relevant Accounting Rules

324.    The insurance business is regulated by the states.  The primary purpose of such regulation is to ensure that companies are financially sound and have set aside enough of the premium money to pay claims when they come are made, which often occurs years after the

premiums are collected.  The money set aside to pay claims is called "reserves" or "loss reserves."

325.    The market pays close attention to fluctuations in insurers' reserves as an indicator of the quality of those companies' earnings.  During a period of growth, insurers typically report increased premium income as well as an increase in reserves necessary to cover potential future claims on the new policies being written.  If an insurer's premium income increases but its reserves do not (or do not increase at the same pace as premiums), investors tend to worry, fearing that the insurer may not be setting aside sufficient reserves to meet its future obligations under the policies.  Indeed, such under-reserving could jeopardize the insurer's long-term financial health.

326.    Similarly, a reduction of reserves during a period of premium growth may indicate that an insurer is improperly using its reserves to boost its profits.

327.    Reinsurance is what insurers use to buffer against the risks they have assumed, *i.e.*, to help spread the risk and cover the cost of future claims from policies that they have already sold.  "Finite" reinsurance – also known as "non-traditional" or "loss-mitigation" insurance – is an aggressive form of reinsurance designed to limit those risks in a manner more profitable than regular reinsurance.  Under such transactions, the company passing off the losses usually "borrows" the claims reserves from another company – the reinsurer – and pays the reinsurer for the privilege of doing so.

328.    When used properly, finite reinsurance allows insurers to spread their risk of loss on an asset or business over time, and also to distribute risk among other insurers willing to assume that risk in exchange for premiums.  ***For such an arrangement to be proper, however, the company buying the reinsurance policy must transfer "significant" risk to the reinsurer***

*selling the policy*.  (*See* Statement of Financial Accounting Standards No. 113, Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts.)

329.    However, if such an arrangement fails to transfer sufficient risk to the reinsurer, the agreement does not qualify as "insurance" because GAAP – under FASB 113: Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts –  requires insurance and reinsurance transactions to transfer "significant" risk from one party to another if either intends to account for the transaction as insurance.  *Without the transfer of significant risk, such a transaction must be accounted for as a financing arrangement, not as insurance*.

330.    If a purported reinsurance transaction is deemed to be a financing arrangement and not insurance, the transaction has to be accounted for as a loan, rather than insurance.  That, in turn, diminishes the assets on the insurer's balance sheet while at the same time increasing its liabilities.

### b.    Background on the AIG-General Re Transaction

331.    In late 2000 and early 2001, AIG and General Re completed a two-part transaction that allowed AIG to book $250 million in premiums revenues and $250 million of claims reserves to its balance sheet for the fourth quarter 2000, and then another $250 million in premiums revenues and $250 million in claims reserves during the first quarter of 2001.

332.    The transaction was between National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), an AIG subsidiary, and Cologne Re, a Dublin unit of General Re.  Pursuant to the deal, Cologne Re transferred to National Union a package of insurance claims and insurance premiums.  National Union received and booked a total of $500 million in premiums revenue and also added $500 million to its claims reserves (thereby inflating AIG's premiums revenue and reserves).  The terms of the transaction appeared to have required AIG to make an additional $100 million of claims payments in the event that those additional losses

developed. However, as alleged below, these additional claims payments were a fiction because AIG bore no risk of having to pay them.

333. Importantly, the transaction came at a time when investors were concerned about the adequacy of AIG's reserves. On October 26, 2000, AIG had announced a nine percent increase in net income for the just-ended third quarter, a figure that was in line with market expectations. However, AIG's stock fell by six percent that day because the market was apparently concerned that two cents out of the per-share income for the quarter were attributable to a reduction in AIG's claims reserves.

334. Reflecting this sentiment, Dresdner Kleinwort Wasserstein  analyst Kenneth Zuckerberg noted that "the downward pressure on [AIG's] stock" was due, in part, to "concerns about the negative change in P&C [Property & Casualty] loss reserves." Likewise, Bear Stearns analyst Michael Smith wrote, "Put simply, the reduction in reserves caused some investors to challenge the quality of the company's earnings."

335. Similarly, Morgan Stanley Dean Witter's October 27, 2000 analyst report highlighted the importance of claims reserves to the market. The report also cautioned that future decreases in AIG's reserves could be cause for concern. That report stated, in relevant part:

> The market was disturbed by AIG's net reserve decrease of $59 million, $43 million of which related to its Transatlantic Holdings reinsurance subsidiary. Pass the popcorn, we've seen this movie before . . . to us this looks like a classic buying opportunity. AIG has reduced reserves twice recently – in the second and fourth quarters of 1999 – and the market reacted badly then as well. AIG bounced back in both cases because 1) like today, the explanation for the reserve decline seems reasonable and 2) ***more important, no "other shoe" ever dropped. We don't believe another shoe will drop this time either.***

> *We do care a lot about reserves, and if we saw a steady trend of unexplained releases during a period of premium growth, we'd definitely be concerned.* But that's not the case here.

336.   The AIG-General Re deal also came at a time when AIG was preparing to bid for American General, a life insurance company that had been the subject of a competing offer from an AIG rival, Prudential of Britain.  AIG wanted to keep its share price high in order to acquire American General with as few AIG shares as possible.  In fact, as alleged in greater detail below, in order to avoid paying American General shareholders a significant premium on the acquisition, AIG's share price had to trade above a certain range.

337.   On March 18, 2005, *CBS MarketWatch* published an article entitled, "AIG to Reveal Details of Gen Re Deal."  The article stated, in relevant part:

> *There's also concern that the Gen Re deal may have helped AIG manipulate its results at a time when it was trying to acquire a large rival called American General.*
>
> U.K. insurer Prudential Plc announced an agreement to buy American General for $26.5 billion on March 12, 2001.  AIG trumped that offer and ended up finalizing the acquisition in late August that year.
>
> *AIG's bid depended on its shares trading within a specific range,* **The New York Times** *reported on March 15.  If the stock dropped too far, the acquisition would have collapsed, the newspaper added.*
>
> *The Gen Re transaction helped support AIG's share price because it allowed the company to artificially inflate premiums and reserves without knocking reported earnings over two quarters in late 2000 and early 2001*, according to the report.
>
> "If regulators tie earnings and stock manipulation to an acquisition that would be a major concern," A.G. Edwards' Newsome said.

338.   Likewise, on March 28, 2005, *The New York Times* reported that the "[New York] attorney general's office said the [General Re] deal *artificially increased AIG's premium reserves and helped [AIG] acquire another company*."

c.     The Government Begins Investigating AIG's
Accounting for the General Re Transaction and
Some Details of the Improper Deal Are Disclosed

339.    As alleged above, on February 14, 2005, AIG announced that it had received

subpoenas on February 9, 2005 from both the SEC and the NYAG.  AIG described the

subpoenas as "relating to investigations of non-traditional insurance products and certain

assumed reinsurance transactions *and AIG's accounting for such transactions*."

340.    The price of AIG stock fell 2.2 percent on this news, from $73.12 to $71.49, on

heavy trading.

341.    The subpoenas had been prompted by the NYAG's and the SEC's investigation

into General Re in late-December 2004 and early-January 2005.  On December 30, 2004,

General Re had announced that it had received a request from the SEC for "documentation and

information relating to non-traditional or loss mitigation products."  One week later, on January

6, 2005, General Re announced that it had received a subpoena from the NYAG seeking

"virtually identical documents and information" sought the prior week by the SEC.

342.    On March 4, and March 8, 2005, *The Wall Street Journal* reported that the DOJ

had joined in the SEC and NYAG investigation into the AIG-General Re transaction, in part

*because Defendant Greenberg had personally initiated the transaction* by calling General Re's

then-chief executive, Defendant Ferguson, in late 2000 to set up the deal.

343.    On March 15, 2005, AIG announced during a conference call with investors and

analysts that the Company could not rule out a finding by PwC, AIG's outside auditor, that there

was a "material weakness" in AIG's internal controls.

344.    Internal controls are a company's policies for ensuring that all its assets, liabilities

and transactions are properly accounted for.  AIG's 2004 Form 10-K defines a "material

weakness" as a "control deficiency, or combination of control deficiencies, that results in more

than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."

345.    In response to the news of March 15 and from the preceding evening, the price of AIG stock fell 3 percent, from $63.85 to $61.92, on heavy trading.

346.    On March 16, 2005, *The Wall Street Journal* reported that AIG placed Defendant Christian Milton, a vice president for reinsurance, on leave for having helped execute the deal with General Re.   That same news article also reported that an e-mail from a top General Re executive referred to a conversation in which Milton said that ***Defendant Greenberg's motivation for the General Re deal was to add to AIG's claims reserves***.[2]

347.    The March 17, 2005 edition of *Business Week* quoted one source close to the investigation as saying (referring to the AIG-General Re deal): "***[Greenberg] personally asked for this.  He was doing something to defraud investors by cooking the books and changing the outcome***."

348.    On March 17, 2005, *The Wall Street Journal* reported that the NYAG's and SEC's probes had widened to include additional accounting issues, in particular AIG's transactions with two off-shore reinsurance companies – Defendants Richmond and Union

---

[2]    Also on March 16, 2005, *The New York Times* reported that AIG and General Re may have engaged in additional improper transactions.  The *Times* reported that International Lease Finance Corporation, a wholly-owned AIG subsidiary that typically accounts for nearly 10 percent of AIG's overall earnings, purchased a "residual value" or "legacy" insurance policy from General Re during the Class Period.  The transaction was undertaken to allow International Lease to reduce, by at least hundreds of millions of dollars, the amount of debt the company had taken on in relation to airplane leases.  However, the transaction also contained a provision in which International Lease effectively guaranteed that General Re would not suffer any losses from a decline in the value of the planes.  Not only was International Lease able to reduce its reported liability on the aircraft, but the transaction allowed the company to treat the leases on the planes as financial leases, which allowed International Lease to recognize income from the leases more quickly than it otherwise could.

Excess, who together reinsured approximately $1.2 billion of AIG's expected future claims (known as "recoverables") as of the end of 2003.

349.    AIG stock continued to drop on this March 17, 2005 news, falling from $62.90 to $60.80, a 3.3 percent decline.

350.    On or about March 21, 2005, AIG fired Milton, along with Defendant Smith, after both men signaled they would invoke their Fifth Amendment rights against self-incrimination when being interviewed by government regulators.

### d.    AIG Admits That It Misled Investors and Regulators

351.    *On March 25, 2005, The Wall Street Journal reported that AIG had uncovered at least 30 transactions with a dozen or more off-shore reinsurance companies – including Richmond and Union Excess – that AIG may have improperly accounted for.*

352.    On March 27, 2005, *AIG fired Defendant L. Michael Murphy, a longtime AIG executive and confidant of Defendant Greenberg* who worked at American International Co., a Bermuda-based unit of AIG that provides management services to other insurers.  Defendant Murphy, an AIG lawyer who helped the Company set up numerous off-shore insurance-related entities in Bermuda, had reportedly been terminated *for not cooperating with AIG's internal investigation into the Company's reinsurance transactions.*

353.    *On March 28, 2005, The Wall Street Journal reported that as many as 12 AIG executives had been subpoenaed by the SEC in connection with its investigation, and that as many as 30 AIG executives had knowledge of the financial transactions at issue.*

354.    That so many high-level AIG executives would be implicated in AIG's reinsurance transactions – in addition to Defendant Greenberg's personal involvement in the General Re deal – is not surprising.  In fact, AIG's senior management is intimately involved in

the Company's reinsurance agreements via AIG's internal reinsurance "security committee."

According to AIG's SEC filings:

> ***The utilization of reinsurance is closely monitored by an internal reinsurance security committee, consisting of members of AIG's senior management.*** No single insurer is a material reinsurer to AIG nor is AIG's business substantially dependent upon any reinsurance contract.

> \*     \*     \*

> ***AIG's Reinsurance Security Department conducts ongoing detailed assessments of the reinsurance markets and current and potential reinsurers, both foreign and domestic…. This department also reviews the nature of the risks ceded and*** the need for collateral. In addition, AIG's Credit Risk Committee reviews the credit limits and concentrations with any one insurer.

> \*     \*     \*

> ***AIG evaluates the financial condition of its reinsurers through an internal reinsurance security committee consisting of members of AIG's senior management.***

355.    On March 29, 2005, *The Wall Street Journal* reported that, on March 28, 2005, AIG's outside counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), met with the SEC, NYAG and NYDOI. Paul, Weiss reportedly told the regulators that they were reviewing numerous AIG transactions with reinsurers other than General Re, including AIG's dealings with Union Excess and Richmond. Paul, Weiss also reportedly informed the government that ***they had uncovered evidence that AIG had misled investors and regulators in the Company's regulatory filings***.

356.    According to *The Wall Street Journal*, on or about March 29, 2005, Paul, Weiss told those same regulators via conference call that ***the Company had intentionally given false information to the NYDOI during a routine inspection of AIG's property-casualty business earlier this year***. The NYDOI had reportedly been seeking information about an AIG

- 102 -

reinsurance deal from 2000 or 2001, focusing on whether AIG had transferred enough risk to the

reinsurer to allow AIG to account for the transaction as "insurance" (rather than the less-favored

accounting treatment for a loan).  The Journal reported that the information AIG provided in

response to the NYDOI was **"intentionally false"**:

> [Paul, Weiss] told the authorities that AIG officials had
> exaggerated the degree to which risk was transferred to the
> reinsurer . . . In describing other findings from AIG's internal
> probe, [Paul, Weiss] said they had uncovered evidence suggesting
> that past filings were misleading.  **But in this case, [Paul, Weiss]**
> **admitted that the information provided during the [NYDOI]**
> **examination earlier this year was intentionally false and not an**
> **honest mistake**.

        **e.**        **AIG Admits Improperly Accounting for Its Transactions**
                 **with General Re, Union Excess, Richmond and Others**

357.    On March 30, 2005, **AIG issued a press release in which the Company**

**acknowledged that the General Re transaction had been improperly recorded**:

> **Based on its review to date, AIG has concluded that the Gen Re**
> **transaction documentation was improper and, in light of the lack**
> **of evidence of risk transfer, these transactions should not have**
> **been recorded as insurance.**  Therefore, AIG's financial
> statements will be adjusted to recharacterize such transactions as
> deposits rather than as consolidated net premiums.

358.    The press release also warned that the Company's internal review was not yet

complete, and further announced that:

> In preparation for the issuance of the Form 10-K, management
> reviewed the accounting treatment for certain additional items with
> its independent accountants.  Some of these matters were
> subsequently disclosed by AIG to various federal and state law
> enforcement and regulatory authorities.  The continuing review
> had led AIG management to conclude that the accounting for
> certain of these matters may need to be recharacterized or
> otherwise adjusted.  **Certain but not all of the original**
> **characterizations resulted from transactions which appear to**
> **have been structured for the sole or primary purpose of**
> **accomplishing a desired accounting result**.

359.     As discussed in greater detail below, AIG also announced that it had discovered evidence showing that it controlled Richmond and possibly Union Excess, two off-shore reinsurers previously represented to be entities that were independent of AIG.  The Company's press release indicated that consolidating the two reinsurers on AIG's financials would result in a reduction of ***approximately $1.1 billion in AIG's consolidated shareholders' equity*** as of December 31, 2004.

360.     AIG also announced several other accounting problems, in light of which the Company disclosed that it:  (i) will consolidate Capco Reinsurance Co., a Barbados reinsurer, and rebook $200 million as underwriting losses instead of capital losses; (ii) was reviewing estimates relating to deferred acquisition costs at its general-insurance and financial-services units, and may take a charge of about $370 million for associated revisions; (iii) found misclassified investment-income items, which resulted in an improper increase of net investment income by about 4 percent from 2000 through 2004; and (iv) planned to expense deferred compensation granted to AIG executives through SICO.

361.     In total, AIG estimated that its financials required a restatement of (or charge to) earnings that ***could lower the Company's net worth by $1.77 billion***.

362.     AIG's March 30, 2005 press release also announced that the Company's 2004 10-K would be delayed until April 30, 2005 – beyond the March 31, 2005 extended due date – "in order to provide AIG, its Board of Directors and its new management adequate time to complete their extensive review of AIG's books and records."

363.     As a result of these disclosures, the price of AIG's stock fell on March 30 by 1.8 percent, from $58.20 to $57.16.

364.    On March 31, 2005, *The Wall Street Journal* reported that Defendant PwC had received a subpoena in February relating to the AIG-General Re transaction and that the government's investigations into AIG could widen even beyond those transactions that the Company identified in its March 30 press release.

365.    In response to the news of March 31, AIG stock dropped 3 percent, from $57.16 to $55.41, on heavy trading.

366.    On April 1, 2005, *The Wall Street Journal* reported that governmental regulators were looking at accounting issues in addition to those AIG disclosed by the Company on March 30:

> Authorities are taking a deeper look at accounting at American International Group Inc. – going beyond transactions that AIG already has admitted were improper – to examine actions the company may have taken to polish performance measures closely watched by insurance-industry investors, people familiar with the matter say.
>
> \*       \*       \*
>
> Some Wall Street analysts braced for more bad news at AIG. Problems identified so far are primarily in the company's accounting for its U.S. units, where transparency is highest, rather than overseas, where less disclosure is often required, cautioned Alain Karaoglan, an insurance analyst with Deutsche Bank Securities Inc . . . .

367.    Likewise, late in the morning on April 1, 2005, *Bloomberg* reported, *inter alia*, that analysts were concerned that "AIG's problems are just going to spread and spread."

368.    As described in greater detail below, *The Wall Street Journal* also reported on April 1, 2005 that on March 26, 2005, Paul, Weiss attorneys conducting an internal investigation at the Company's Bermuda offices discovered that records were missing and that ***an AIG employee had destroyed computer records and tape recordings of business meetings***.

369.     At approximately 1:48 p.m. on April 1, 2005, Reuters reported that three lawyers in AIG's Bermuda office had quit their jobs "over concerns relating to an investigation of the insurer's accounting practice . . . ."

370.     About 40 minutes later, Reuters also reported that governmental investigators had expanded the scope of their investigations into AIG's accounting:

> Investigators probing American International Group Inc. are looking at about 20 transactions that could have been improperly accounted for by the insurer, a source close to the investigation said on Friday.

> \*       \*       \*

> Previously, sources have said authorities were looking at around 10 transactions for evidence of improper accounting at AIG.

371.     In response to the various news released on April 1, 2005, the price of AIG's stock closed down 8 percent, falling from $55.41 to $50.95.

372.     On April 8, 2005, *The New York Times* reported that Defendant Greenberg himself had initiated the AIG-General Re deal by calling General Re's then-CEO, Ronald Ferguson, on October 31, 2000.  *The Wall Street Journal* also reported that day that, ***"[i]n the call, Mr. Greenberg told Mr. Ferguson he wanted to do a deal with General Re to boost AIG's reserves for the coming quarter***, and said General Re would receive a fee, according to people familiar with the situation."  That same article also reported that, in a later phone call to Warren Buffett – the CEO of Berkshire Hathaway, General Re's parent company – ***Ferguson recounted Greenberg's frustration with Wall Street's criticism of AIG's reserve levels***.  Ferguson also reportedly told Mr. Buffett that he and Greenberg had come up with a deal to address the problem.

373.    On April 3, 2005, Greenberg's personal lawyer, David Boies, appeared on the Charlie Rose Show on PBS.  Mr. Boies, commenting on the Company's March 30 disclosures, stated that AIG's accounting was "not something that goes to the integrity either of the company or the man [referring to Greenberg]." Mr. Boies added that the General Re transaction is "not a hole in the balance sheet.  It's not fraud." When asked whether Greenberg thought he was breaking the law, Boies responded, "No, absolutely not."

374.    Appearing on ABC's "This Week with George Stephanopoulos" on April 10, 2005, Attorney General Spitzer took issue with Mr. Boies' statements.  Mr. Spitzer described AIG as **"a black box run with an iron fist by a CEO who did not tell the public the truth**. That is the problem."  He also stated: **"These are very serious offenses, over a billion dollars of accounting frauds that AIG has already acknowledged,"** and that the **"evidence is overwhelming that these were transactions created for the purpose of deceiving the market. We call that fraud.  It is deceptive.  It is wrong.  It is illegal**."

375.    The next day, April 11, 2005, Mr. Buffett was interviewed by the SEC and NYAG in connection with his knowledge of the AIG-General Re deal.  Mr. Buffett reportedly told the regulators that he was never given details of the transaction, nor did he ever see the actual contracts.  However, as reported by *The Wall Street Journal* on April 12, 2005, **Mr. Buffett confirmed that "Hank [Greenberg] knew about the deal" between AIG and General Re**.

376.    One day after Buffett's interview, Defendant Greenberg appeared for a deposition before the SEC, DOJ and NYDOI.  However, **he repeatedly invoked his Fifth Amendment right against self-incrimination and refused to answer the government's questions**.

377.   A May 4, 2005, *Wall Street Journal* article indicated that the Federal Bureau of Investigations had begun conducting criminal probes of accounting at insurance companies, including AIG. That article read, in relevant part:

> FBI field officers congregated in Washington, D.C., last week to discuss the topic of improper accounting gimmicks and whether they were widely used across the insurance industry, Mr. Swecker said.  As for AIG, he said that FBI agents are for now "standing by" as New York Attorney General Eliot Spitzer, working with the Justice Department, conducts an investigation.
>
> "I would not classify that as a full-blown investigation on our part," Mr. Swecker said.
>
> Brian Lamkin, Chief of the FBI's financial crimes section, said his office was coordinating with the SEC and state insurance commissioners in a probe of the insurance industry.

378.   As detailed below, AIG's massive May 31, 2005 restatement – as well as the litany of civil and criminal proceedings brought in connection with the government's investigation into AIG's reinsurance dealings – confirmed that the AIG-General Re transaction, among numerous others, had been accounted for improperly and with the purpose of misleading investors in order to inflate the price of AIG's stock.

### f.       Full Details of the AIG-General Re Deal Emerge

379.   The details of the General Re transaction as reported in the media were later confirmed and clarified by: (1) a civil complaint the NYAG filed against AIG, Greenberg and Smith on May 26, 2005; (2) the SEC's June 2005 civil complaint against Defendants Houldsworth and Napier, and (3) documents filed in connection with the criminal proceedings the DOJ brought against Defendants Houldsworth and Napier.  Together, all these documents showed the following.

### i.   Greenberg Initiates the Improper AIG-General Re Deal

380.   AIG, and Defendant Greenberg in particular, were keenly aware of the market's concerns about the level of the Company's claims reserves after its October 26, 2000 earnings announcement.

381.   On or about October 31, 2000, AIG's Vice President for Investor Relations sent Greenberg several third quarter analyst reports and noted the concern about the decline in reserves.

382.   That same day, a memorandum was written – apparently by AIG's Vice President of Investor Relations – entitled, "AIG-MRG Request."  The memorandum lists as the proposal – apparently articulated by Defendant Greenberg – "GCR transfer $200m - $500m of reserves to AIG for a six to nine month period."  The memorandum states that the need for the reserves may have been "in response to analysts' negative reaction to AIGs [sic] reserve reduction at Q3."

383.   The memorandum memorializes several persons' "thoughts." For example, under "REF Thoughts," referring apparently to Defendant Ferguson, the memorandum stated: "Due diligence is important, make certain we do not create (reporting) problems of our own."  Under "JPB Thoughts" – referring apparently to General Re's current CEO, Joseph P. Brandon – the memorandum reads that it "[m]ay be best to stay away from the US companies to avoid large fluctuations in our reported reserves. Use non-US entities. KR Dublin?"

384.   The memorandum also states: that "Chris" – apparently referring to Christian Milton – "only want[s] reserve impact"; that Greenberg had called Milton earlier for a status report on the proposal; and that Milton "*confirmed that [the proposal] is to address the criticism they received from the analysts.*"

385.   Defendant Greenberg called Defendant Ronald E. Ferguson – at the time, the CEO of General Re – on or about October 31, 2000 to solicit help in structuring a transaction

between AIG and General Re that would transfer between $200 million and $500 million of claims reserves to AIG through a reinsurance agreement between the two companies.

386.     Greenberg suggested to Ferguson that General Re purchase reinsurance from AIG because that would allow the Company to show increased reserves.  Greenberg explained that, given the market's concerns about AIG's claims reserves, the transaction would only need to last for six to nine months.   Ferguson responded that the proposal would be highly unusual, given that General Re was in the business of *selling* – not buying – reinsurance.  Accordingly, the two men discussed the possibility of AIG paying General Re a fee for its role in the transaction.

387.     During the October 31, 2000 phone call and subsequent conversations, ***Defendant Greenberg made clear to Ferguson that any such transaction, while increasing AIG's claims reserves, would not require AIG to assume any actual insurance risk.  Ferguson understood that what Greenberg was describing was not a bona fide reinsurance transaction – which would have required AIG to assume actual insurance risk from General Re – but rather a transaction that would only look like reinsurance for AIG's accounting purposes.***

> ii.     **Senior AIG and General Re Executives Negotiate and Structure the Transaction With Full Knowledge It Involved No Real Transfer of Risk**

388.     In early November 2000, Ferguson – in consultation with Elizabeth Monrad ("Monrad"), General Re's then-CFO, and Defendant Napier, a Senior Vice President at General Re's Stamford, Connecticut office – decided to enter into the deal that Greenberg requested. Defendant Houldsworth, the CEO of Cologne Re Dublin ("CRD"), a General Re subsidiary in Dublin, Ireland, was also later tasked with helping put together the transaction.  Defendant Greenberg designated Defendant Milton as the lead representative for AIG on the matter, though Defendants Smith and Castelli were also involved in making the deal happen.

389.   Given the improper nature of the transaction, Defendant Ferguson – in an email to Defendant Houldsworth and others – instructed those involved with the AIG-General Re transaction to keep the matter confidential: "Note to all – let's keep the circle of people involved in this as tight as possible."

390.   Similarly, the cover note to the underwriting file for the transaction stated:

> Specific guidance has been received from [Ferguson] that **this file is to be kept confidential and consequently to be kept locked in [a CRD underwriter's] desk at all times.** Permission to review this file is to be sought from the [CRD underwriter], [Ferguson,] John Houldsworth or [the CEO of Cologne Re Germany]. In CRD the only personnel authorized to review the file are [the CRD underwriter], John Houldsworth and [Houldsworth's assistant].

391.   For approximately two months, Houldsworth, Napier, Monrad and others at General Re worked with Milton to structure the deal using two contracts between CRD and National Union, an AIG subsidiary that was to actually receive and book the claims reserves added pursuant to the contracts.

392.   Defendant Milton conveyed to Napier what Greenberg wanted, and Napier then worked with Milton, Houldsworth, Monrad and others to structure the transaction accordingly.

393.   The final product that was ultimately produced consisted of two separate "retrocession" contracts[3] between National Union and CRD. Under the two contracts, the first of which was effective December 1, 2000 (the "First Contract") and the second of which was effective March 31, 2001 (the "Second Contract") (both as the "Contracts"), National Union purported to reinsure CRD for a total of $600 million in losses in exchange for CRD's payment of $500 million in premiums.

---

[3]   "Retrocession" is, in essence, the reinsurance of reinsurance – a transaction in which a reinsurer cedes to another reinsurer all or part of a reinsured risk that the ceding reinsurer had previously assumed.

394.    Although the First Contract contained an effective date of December 1, 2000, the actual terms of the contract were not agreed to until late December 2000, and the contract was not signed by the parties until August 2001.  Similarly, the Second Contract – which had an effective date of March 31, 2001 – was not signed by the parties until September 2001.

395.    On the face of each contract, National Union reinsured CRD for up to $300 million in losses, which CRD "is or becomes obligated to pay under the Original Reinsurance Contracts written by [CRD]."

396.    According to the Contracts, CRD was to pay National Union $250 million in premiums per contract, for a total of $500 million in premiums.  Of the $500 million in premiums, $490 million was on a "funds withheld" basis (*i.e.*, the money was never paid to National Union but was retained by CRD) and $10 million was supposedly "paid" to National Union.  In fact, however, the $10 million was pre-funded by National Union in a side deal described in greater detail below.

397.    According to the language on the face of the Contracts, AIG was assuming insurance risk of $100 million over and above the amount of premiums the Company was to receive.  ***However, the additional $100 million of risk was a fiction, having been added by Houldsworth – with Defendants Milton's and Napier's knowledge and approval – to give the appearance that risk was being transferred under the arrangement***.  ***All parties to the transactions understood that AIG was, in reality, only obligated to pay a total amount of $500 million in losses, which was equal to the amount of premium the Company was receiving from General Re***.

398.    The Contracts also failed to reflect the following side agreements developed by Houldsworth and others with Milton:  (i) that AIG would pay General Re $5.2 million in fees for

putting the deal together; (ii) that in order to pay General Re its $5.2 million fee and pre-fund the $10 million in "premiums" CRD was obligated to pay to National Union, General Re and AIG commuted a separate, unrelated reinsurance contract – between General Re and another AIG subsidiary, Hartford Steam Boiler Inspection and Insurance Company ("HSB") – to hide the true reason for the transfer of funds between AIG and General Re; and (iii) that General Re created a fake paper trail to make it appear as though *General Re* had solicited the Contracts (despite the fact that AIG had initiated the transaction).

399.    On or about November 7, 2000, Napier distributed a memorandum to Ferguson, Monrad, General Re's then-Head of North American Operations, and three other senior-level General Re employees.  The memorandum contained the subject line, "MRG" (*i.e.*, Defendant Greenberg) and attached the October 27, 2000 analyst report described above.  Napier's memorandum stated:

> Based upon [the analyst's] numbers, AIG reduced reserves $59m. It will be interesting to understand more about the $500m figure [AIG has] been using for [the proposed deal with General Re]. Perhaps [AIG is] planning for further releases in Q4 [2000] and are seeking a means to offset the cosmetic impact.

400.    In an email exchange between Ferguson and an undisclosed General Re executive on November 6 and 7, 2000, the executive notes on November 6 that "Chris" (referring apparently to Christian Milton) had changed the transaction from one with a "6 to 9 month duration" to one with "a 24 month term with a declining balance."  The emails' subject line is entitled, "MRG Request 10/31/00 – Update."   The same executive later tells Ferguson that "[w]e are pushing to meet Chris' commitment to MRG that we will have general ideas by the end of the week" and that "[t]he next step will be to meet with AIG representatives to discuss the details of the structure."

401.    After initial discussions about how to structure the deal, Monrad and Napier turned to CRD, a General Re subsidiary in Ireland, to effectuate the transaction. On or about November 13, 2000, Monrad called Houldsworth – the CEO of CRD and the Chief Underwriter for the "Alternative Solutions" business unit of General Re – and told him about the proposed transaction.

402.    On November 15, 2000, Houldsworth emailed Monrad, Napier and others at General Re, attaching a draft slip or "term sheet" for the deal and a cover email which summarized the issue as "can CRD provide a retrocession contract transferring approximately $500m of reserves on a funds withheld basis to the client **with the intention that no real risk is transferred** and that this may well be commuted or gradually reduced in a few years."

403.    In the same email, Houldsworth also stated:

- "[The] reserves [ceded by CRD to AIG] should be fairly stable."

- "We must maintain underlying client confidentiality and will not allow [AIG] to inspect our records or receive detail in loss reports of contract structures and loss profiles. . . . We must maintain our ability to manage our portfolio freely without interference or notification to [AIG]."

- ***"Given that we will not transfer any losses under this deal it will be necessary for [AIG] to repay any fee [(i.e., premium paid by CRD)] plus the margin they give us for entering this deal***."

404.    Napier's contemporaneous handwritten notes regarding the AIG-General Re deal refer to a "non risk deal," a "side deal" to repay CRD its fee and premium paid to AIG, and that CRD "pay[s] AIG $10M fee [*i.e.*, premium]; AIG pay[s CRD] $10M fee back + fee for deal."

405.    Houldsworth proposed structuring the Contracts so that they *appeared* to transfer $100 million in insurance risk from General Re to AIG.  This was done to allow AIG to record the $500 million in claims reserves, even though the parties to the contracts knew that the $500

million in losses being transferred (*i.e.*, "reinsured" by) AIG, through National Union, lacked the sufficient transfer of risk to qualify as reinsurance for accounting purposes.

406.   On or about November 14, 2000, Houldsworth told a number of his colleagues at Cologne Re and in the Alternative Solutions Group that Monrad told him that AIG had taken down its claims reserves to increase the Company's third quarter 2000 results and wanted to hide their claims reserves reductions at year-end by "borrowing" reserves from General Re. Houldsworth also stated that the transaction had to be done outside the United States so that it would not be apparent that General Re was accounting for the transaction differently than AIG.

407.   In a November 14, 2000 telephone conversation between Houldsworth and Monrad, Houldsworth suggested adding $100 million in purported risk to the Contracts:

> I was thinking of doing something like a 600m, well [AIG] might not accept this, I presume they need risk transfer to put on the thing!  So something like a 600m limit for 500m, obviously, underlying reserves 500m . . . . The only question is, in my viewpoint, clearly we got to have risk transfer in there.

408.   However, both Monrad and Houldsworth knew that Defendant Greenberg wanted a transaction without the transfer of risk, and that there was no risk associated with the losses they were proposing to have AIG reinsure.  In that same conversation on November 14, 2000, the following exchange took place:

> Monrad:   So let's assume they take the deposit liability I will tell you any way we structure it yes it's got to look more like deposit *because they are not really looking to take risks!*  Well I think if we spend a lot of time trying to figure out how to transfer 500m of risk, we won't get this deal done in the time they want.
>
> Houldsworth:   Yeah, I mean as you say, if there's enough pressure on their end, *they'll find ways to cook the books won't they*?! [Monrad laughs] It's no problem there, it's up to them!  We won't help them to do that too much.  We'll do nothing illegal!

409.   On November 15, 2000, Houldsworth, Monrad and Napier had another conversation about the deal wherein they again acknowledged the lack of risk being transferred to AIG in the transaction and identified the resulting need for a "handshake" deal between the Company and General Re:

> Houldsworth:   **There is clearly no risk transfer.  You know there is no money changing hands**.
>
> Monrad:   **[AIG] may have a tough time getting the accounting they want out of the deal that they want to do. . .  They are not looking for real risk**…
>
> *        *        *
>
> Napier:   [W]hat would happen if we just did this where there was no risk?  I mean we just charge them a fee for doing this deal.
>
> Houldsworth:   Well what I was thinking is if you know, we charge them, if we give them a fee on this, my idea would be for them to, they would have to come to you and say what that fee is plus some sort of margin, you must have agreed to give that to us before we will sign this deal, or at the same time as we sign this deal so you know, net, we get our margin and I think it's just the same thing, but I think to give them a deal with no risk in it and just charge them a fee you can assume their auditors are being pushed in one direction, but I think that's going too far.  I think that's detail, you know they are going to come to that and if they suggest it, then fine, **but I just can't see how on earth anybody, you know we can charge the 500m for a 500 limit and get them to book that as a reserve but I would be staggered if they get away with that.**
>
> Napier:   **Then the way to do this, if there is risk in this, the way to become whole requires [Greenberg] and [Ferguson] to have a handshake**.

410.   In a telephone call that same day about arranging a meeting with AIG about the transaction, Napier said to Houldsworth and Monrad:

> So it just seems to me [that setting up a meeting at AIG is] the next
> step here and *[Greenberg is] calling daily on this*.  He's pretty
> excited about it so it would not be a problem to get a team of AIG
> people together in the next day or two [to discuss what General Re
> has come up with as the potential transaction].

411.    On November 17, 2000, Defendant Greenberg again called Defendant Ferguson to discuss the deal.  Ferguson told Greenberg that he thought that General Re had put together a structure that would accomplish Greenberg's objectives.  ***They also discussed the fact that AIG would "not bear real risk" in the transaction and that AIG would end up paying General Re a $5 million fee***.

412.    On or about November 17, 2000, Napier emailed Milton and Monrad a draft slip of the proposed transaction.  The email contained the subject heading "Project A", and Napier included an overview that said, in relevant part:

> As I mentioned this afternoon, Ron's discussions with MRG
> established the following points:
>
> -    The Dublin structure outlined below [in attached slip] appears
>      workable.
>
> -    You may want to divide the transaction into two parts – one for
>      2000 and one for 2001.
>
> -    The fee to [General Re] will be 1% or $5m.
>
> -    We need to work out a mechanism for [General Re] to recover
>      the 2% fee advanced to AIG under the agreement.
>
> -    ***You, Howie Smith, [Monrad] and I have been appointed to
>      work out the details***.
>
> -    A point that may not be sufficiently clear in the discussion
>      document is the term of the agreement.  In accordance with our
>      conversations, we anticipate terminating the agreement at 24
>      months via a communication."

413.    Several weeks later, in late November or early December 2000, Defendants Smith, Castelli and Milton (and others at AIG) met with Monrad, Napier and another General Re

executive at AIG's offices.  At the meeting, the AIG executives were told that General Re was going to account for the transaction differently than AIG – *i.e.*, that General Re would be accounting for the losses as deposits,[4] whereas AIG intended to account for the portfolios as reinsurance.

414.    On or about December 7, 2000, Napier told Houldsworth that Greenberg had agreed to pay General Re a $5 million fee for the transaction.

415.    Also on December 7, 2000, Napier emailed Houldsworth and Monrad.  Napier informed them that Milton had agreed that AIG would proceed with the transaction as outlined in the draft slip and in accordance with the conversations between Greenberg and Ferguson, and that the transaction would be completed in two installments of $250 million each, one in late-2000 and one in early 2001.  Napier's email read, in relevant part: "Chris called this morning to say they want to proceed as outlined in John's slip and in accordance with REF's conversation with MRG.  Two installments, $250m each, one for '00, the other in '01."

416.    In a conversation on December 8, 2000, Monrad told Houldsworth and Napier that she had had told Milton that General Re had accounted for the losses as deposits and that therefore "there would not be symmetrical accounting."  ***In other words, Milton fully understood that General Re did not intend to account for the Contracts as reinsurance***:

> Monrad:         ***We told AIG that there would not be symmetrical accounting here***.
>
> Houldsworth:  Okay, fine.
>
> Monrad:         ***We told them that was one of the aspects of the deal they would have to digest***.

---

[4]   In other words, most of the CRD loss portfolios being used for the transaction were *already* reinsured and the losses in the portfolios were not expected to exceed the amounts available to pay the associate claims.  Thus, CRD already accounted for those loss portfolios as deposits – *i.e.*, money CRD owed to those being insured by CRD – and not as reinsurance reserves.

| | |
|---|---|
| Houldsworth: | That's fine then.  That should do it, shouldn't it? It's so unlikely to be an issue so . . . |
| Monrad: | ***We haven't heard any push back from them in terms of can you change this, change that so*** . . . |
| Napier: | ***It's quite to the contrary.  When [Milton] called he said we're going to take it as*** - - |
| Monrad: | ***It's a go***. |
| Napier: | ***- - we like it***. |
| Houldsworth: | Okay.  Okay. |
| Monrad: | Done. |

417.     In an effort to make the $500 million AIG-General Re transaction appear legitimate, Houldsworth – in a December 8, 2000 email to several General Re employees – queried whether CRD "need[s] to produce a paper trail offering the transaction to the client?"

418.     On or about December 11, 2000, Napier told Houldsworth that AIG did, in fact, want an offer letter so as to create a paper trail.  When Houldsworth mentioned that he would put Napier's name on the letter to AIG, ***Napier replied, "that way you've really got me on the hook, I'm right there with you."  Napier added that the letter was a good idea because then AIG would have something in their files and "everything ought to be pretty clean."***

419.     On December 20, Houldsworth had a subordinate send an email to Milton that attached a draft term sheet for the AIG-General Re transaction, as well as a December 12, 2000 draft letter from Houldsworth to Milton.  The draft letter – which read, in part, "I hope that I can give you a little more background on the proposal we hope that you will be able to help us with" – implied that *General Re had approached AIG* about the transaction, when if fact just the opposite was true.  The draft letter later was later signed by Houldsworth in final form, dated December 17, 2000.

420.    On December 27, 2000, Houldsworth faxed and emailed Milton a separate letter with the same false implication.  The letter read, in relevant part:

> We are encouraged that you believe AIG will be able to provide us with cover for [reinsurance transactions] that we originally had in mind. . . .
>
> Consequently we have drafted a contract wording for discussion purposes which I have attached for your examination. You will note that the Reinsurer's participations have been amended in Schedule A to reflect your agreement to accept $250m of current liabilities with a maximum exposure of $300m . . .
>
> I hope that on review of the draft agreement you will be able to support this cover and look forward to hearing from you shortly with your initial comments.

421.    The next day, Milton confirmed in a phone call to Houldsworth and Napier that Milton had received the December 27, 2000 letter and that he would be emailing Houldsworth that same day to accept General Re's "proposal."

422.    On or about December 28, 2000, ***Houldsworth asked a senior General Re finite reinsurance executive "how much cooking goes on" at AIG; Houldsworth was told, "they'll [AIG] do whatever they need to make their numbers look right."***

423.    On or about December 28, 2000, Houldsworth spoke with Milton and Napier, who told him that AIG needed the first half of the transaction to be booked by year-end and that the Company would book it as a top-line entry.

424.    On or about December 28, 2000, Milton sent Houldsworth an email confirming AIG's participation in the first half of the transaction.

425.    On or about February 16, 2001, Monrad told Houldsworth that she had spoken to Defendant Smith, who told her that AIG booked the first half of the transaction in 2000.

426.    On or about February 16, 2001, Napier emailed Houldsworth and Monrad to inform them that Smith and Milton had decided that the most efficient way to transfer funds to

General Re as a secret payment for the transaction would be to commute – *i.e.*, terminate – an unrelated transaction between General Re and HSB, an AIG subsidiary, which would result in General Re retaining $15 million that it otherwise was not entitled to keep.

427.    Napier's February 16, 2001 email also indicated that Smith and Milton said it was important for AIG to book the second part of the transaction during the first quarter of 2001.

428.    On or about March 8, 2001, Houldsworth sent Milton a signed copy of the sham contract for the first half of the "reserve" transaction, effective December 1, 2000 – ***in other words, effective on a date that occurred before the contract had even been drafted*** – which, by its false terms, provided that CRD would pay National Union a 2 percent, or $5 million, loss transfer payment.

429.    On or about April 2, 2001, AIG electronically filed with the SEC its Form 10-K for the year ending December 31, 2000.  The 10-K included $250 million in phony reserves from the sham transaction between AIG and General Re.

430.    On or about May 15, 2001, AIG filed its First Quarter 2001 Form 10-Q.  The 10-Q included the second $250 million in phony reserves from the sham transaction between AIG and General Re.

431.    On or about August 21, 2001, Napier sent a letter to Milton, indicating that the two-stage reserve transfer had been completed and the only remaining issue was the transfer of funds so that General Re could be paid for its services in setting up the deal.

432.    On or about August 28, 2001, Milton sent Houldsworth a signed copy of the sham contract for the first half of the "reserve" transaction.

433.    On or about September 6, 2001, a CRD executive sent Milton a signed copy of the sham contract for the second half of the "reserve" transaction," effective March 31, 2001 – ***in***

*other words, effective on a date that occurred before the contract had even been drafted* –
which, by its false terms, provided that CRD would pay National Union a 2 percent, or $5
million, loss transfer payment.

434.     On or about October 2, 2001, Milton sent a CRD executive a signed copy of the
sham contract for the second half of the "reserve" transaction.

> ### iii.     AIG And General Re Engage in Additional Transactions to Effectuate the Undisclosed Side Agreements That Concealed the True, Improper Nature of the AIG-General Re Deal

435.     The Contracts' terms provided for General Re to pay AIG $10 million for the
reinsurance; in fact, however, by executing several additional contracts, AIG and General Re
were able to carry out their side agreement pursuant to which AIG would pay General Re a $5.2
million fee for the deal.  As alleged below, this was accomplished by AIG and General Re
canceling an unrelated contract, pursuant to which General Re withheld $15.2 million in monies
that it otherwise would have paid to AIG.  *Of that $15.2 million, General Re used $10 million
to "pay" AIG the fee set forth in the Contracts – in other words, AIG pre-funded the $10
million so that General Re paid nothing out of pocket.  General Re used the remaining $5.2
million as its undisclosed fee for agreeing to set up the AIG-General Re transaction*.

436.     In a telephone conversation on February 16, 2001, Monrad told Houldsworth that
she had spoken to Defendant Smith, who said that AIG had already booked the first half of the
transaction in 2000.  Smith had done so even though the mechanism for AIG to pre-fund the $10
million in "premiums" and to pay General Re the $5.2 million fee had not yet been agreed upon.

437.     That same day, Napier sent an email to Houldsworth and Monrad informing them
that Smith and Milton had decided that the most efficient way to transfer the money to General
Re would be to commute – *i.e.*, terminate – an unrelated transaction between General Re and an

AIG subsidiary, HSB, leaving General Re with approximately $15.2 million that it otherwise would have returned to HSB.

438.    This "unrelated" transaction between General Re and HSB was not finalized until December 2001.  At the time, General Re held more than $30 million in an account that would be owed to HSB if the contract were commuted.  AIG and General Re decided to commute the HSB contract and distribute the proceeds from the account roughly as follows:  $7.5 million to HSB, $9.5 million to AIG/National Union and $15.2 million to General Re.

439.    The commutation agreement between General Re and HSB was executed on December 21, 2001, under which General Re was expressly obligated to pay HSB $7.5 million.  To effect the transfers of the remaining $9.5 million to AIG without raising suspicions, on December 27, 2001, General Re and National Union executed a retrocession agreement ("General Re-National Union Contract") whereby National Union agreed to reinsure General Re for any losses General Re became obligated to pay under its reinsurance contract with HSB, the contract that had just been commuted (meaning there could not possibly be any losses incurred under that contract).  Under the General Re-National Union Contract, General Re paid National Union $9.5 million in "premiums" for a contract that had no purpose other than to mask the true reason for the transfer of these funds between General Re and AIG.

### g.    Effects of the Improper AIG-General Re Deal

440.    As Houldsworth and others at General Re anticipated, AIG accounted for the Contracts as if they were legitimate reinsurance contracts that transferred risk from General Re to AIG.  By treating the Contracts as if they were real reinsurance contracts, AIG falsely inflated its reserves by $250 million and its premiums by $250 million in the financial statements contained in the Company's 2000 Form 10-K that AIG filed with the SEC on April 2, 2001.  Likewise, AIG falsely inflated its reserves by an additional $250 million and its premiums by $250 million

in the financial statements contained in the Company's First Quarter 2001 Form 10-Q that AIG
filed with the SEC on May 15, 2001.

441.    Reflecting the impact of the First Contract, on February 8, 2001, AIG issued its
fourth quarter 2000 earnings release in which Defendant Greenberg stated:  "AIG had a very
good quarter and year. . . .  We added $106 million to AIG's general insurance net loss and loss
adjustment reserves for the quarter, and together with the acquisition of HSB Group, Inc.,
increased the total of those reserves to $25.0 billion at year-end 2000."

442.    Analysts reacted favorably to the added reserves and premiums, including one
analyst who noted:

> We think this quarter was a good example of AIG doing what it
> does best:  growing fast and making the numbers.  The key
> takeaways were 20% local currency growth in international life
> premium equivalents, an increase from last quarter's 18.5% growth
> rate, and another acceleration of growth in nonlife insurance, with
> domestic general premiums growing 17.7% compared to 8.7% last
> quarter.  *As important was the change in reserves:  AIG added
> $106 million to reserves and the paid/incurred ratio fell to 97.1%,
> the lowest level since the first quarter of 1999.*
>
> *Finally, AIG put to rest a minor controversy from last quarter by
> adding $106 million to reserves, worth 7.1 points on the
> combined ratio.*  This lowered the paid/incurred ratio to 97.1%,
> the lowest level since the first quarter of 1999.  For the full year,
> reserve increases were 2% of earned premiums for a paid/incurred
> ratio of 99.1%, down from 100.2% in 1999.

443.    On or about February 8, 2001, Dresdner Kleinwort Wasserstein analyst Kenneth
Zuckerberg noted that "AIG added to loss reserves during the quarter – the net change was $106
million – a clear positive from an earnings quality standpoint."  Similarly, Bear Stearns analyst
Michael Smith wrote:

> In past quarters, American International Group has received
> criticism from some corners regarding what has been viewed to be
> a rather small increase in loss reserves, but we believe there is little

room for criticism on this score in the most recent quarter.  The
company increased reserves by a total of $106 million . . . .

444.    Likewise, in AIG's first quarter 2001 earnings release issued on April 26, 2001,

Defendant Greenberg highlighted the claims reserves that the Company had added to its books:

> AIG had a solid first quarter, benefiting from a continuing
> strengthening of pricing in the commercial property casualty
> market, as well as strong performance by our overseas life
> insurance business and financial services businesses . . .
>
> **We added $63 million to AIG's general insurance net loss and
> loss adjustment reserves for the quarter**, bringing the total of
> those reserves to $25.0 billion at March 31, 2001.

445.    AIG's earnings release that day was not an insignificant event – the Company

surprised the market by announcing that it had exceeded the consensus forecast among Wall

Street analysts by a penny a share.  It was the first positive surprise on earnings by AIG in a year.

446.    Analyst Smith of Bear Stearns pointed to AIG's increased claims reserves as a

positive sign for the Company, writing that "the underlying quality of general insurance results

also improved, evidenced by the increase in loss reserves . . . ."

447.    The impact of the $500 million AIG-General Re deal on the Company's financial

statements was significant.  Without the fictional loss reserves added to AIG's balance sheet

through the Contracts, AIG's reported loss reserves would have been $250 million less in the

fourth quarter of 2000 and $500 million less in the first quarter 2001.  In other words, the $106

million increase to reserves that Defendant Greenberg trumpeted in AIG's fourth quarter 2000

earnings release was in reality *a $144 million decrease in reserves*, and the $63 million increase

in reserves he highlighted in AIG's first quarter 2001 earnings release was in reality *a $187

million decrease in reserves* for that quarter alone, and a cumulative decrease of $331 million for

the two quarters.

### h.   Regulatory Fallout From the AIG-General Re Deal

448.   On May 9, 2005, *The Wall Street Journal* reported that Defendant Napier had received a Wells notice from the SEC on May 2, 2005.

449.   On May 10, 2005, *The New York Times* reported that Monrad had also received a Wells notice from the SEC.

450.   On May 11, 2005, *The Wall Street Journal* reported that Defendant Houldsworth had also received a Wells notice from the SEC.

451.   On May 13, 2005, *The Wall Street Journal* reported that Defendant Houldsworth – who had also been notified by the Department of Justice that he was a target of an ongoing criminal investigation – had been placed on unpaid leave by General Re.[5]

452.   On May 20, 2005, Defendant Ferguson reportedly invoked his Fifth Amendment rights in response to questions from the SEC and DOJ.  As a result of Ferguson's decision to plead the Fifth, General Re terminated its consulting agreement with him, an arrangement that had been in place since October 2001, the month in which he resigned as CEO of the company.

453.   On June 6, 2005, General Re terminated Houldsworth after it learned that he had agreed to plead guilty in connection with charges brought against him in connection with his involvement in the AIG-General transaction.

454.   On June 6, 2005, the SEC initiated an enforcement action against Defendant Houldsworth by filing a civil complaint against him in the U.S. District Court for the Southern

---

[5]   That same article also reported that in late 2004, Houldsworth had been banned by Australian regulators from practicing in the insurance industry in Australia. That punishment had stemmed from several improper reinsurance transactions that Houldsworth negotiated and entered into with FAI, a now-defunct Australian insurer, that helped lead to that company's demise.

District of New York.  The SEC Complaint alleges that Houldsworth aided and abetted AIG in committing securities fraud, and noted:

> *This case is not about the violation of technical accounting rules. It involves the deliberate or extremely reckless efforts by senior corporate officers of a facilitator company (Gen Re) to aid and abet senior management of an issuer (AIG) in structuring transactions, having no economic substance, that were designed solely for the unlawful purpose of achieving a specific, and false, accounting effect on the issuer's financial statements.*

455.   In partial settlement of the SEC's claims, Houldsworth – without admitting or denying guilt – consented to the entry of a partial final judgment: permanently enjoining him from future violations of the Exchange Act;  permanently barring him from serving as an officer or director of a public company; and deferring to a later date the determination of civil penalties and disgorgement.  In addition, Houldsworth consented to an SEC administrative order, based on the injunction, that bars him from appearing or practicing before the SEC as an accountant.

456.   Commenting on the case, Linda Chatman Thomsen, Director of the SEC's Division of Enforcement, said: ***"AIG's fraud did not occur in isolation.  With this case, we are holding accountable an individual who, even though outside AIG, knowingly assisted the company to manipulate its financial results."***

457.   Likewise, Mark K. Schonfeld, Director of the SEC's Northeast Regional Office, said, "This is another step in our ongoing investigation into the abuse of insurance and reinsurance to falsify a company's financial results.  ***Here the defendant helped to structure a sham transaction designed solely to enable AIG to achieve a specific, and false, accounting result***."

458.   On June 9, 2005, Houldsworth pled guilty in the U.S. District Court for the Eastern District of Virginia to one count of conspiring to file false financial reports, falsified books and records or to mislead auditors.  As part of his plea arrangement, Houldsworth agreed

to cooperate with the United States Attorney's Office in the Eastern District of Virginia and the Department of Justice's Fraud Section in their ongoing investigations of AIG and General Re. Sentencing is set for December 9, 2005, and Houldsworth faces up to five years in jail and fines of at least $250,000.

459.    One day later, on June 10, 2005 in the U.S. District Court for the Eastern District of Virginia, Defendant Napier also pled guilty to one count of criminal conspiracy to violate the federal securities laws.  He too is scheduled to be sentenced on December 9, 2005 and faces up to five years in jail and fines of at least $250,000.

460.    Also on June 10, 2005, the SEC initiated an enforcement action against Defendant Napier by amending its earlier-filed complaint against Houldsworth to include Napier as a defendant.  That action, styled as *SEC v. Houldsworth and Napier*, 05 Civ. 5325 (LAP) (the "SEC Complaint"), alleges that Houldsworth and Napier aided and abetted AIG with respect to its violations of Sections 10(b), 13(a), 13(b)(2) and 13(b)(5) of the Exchange Act.  Like Houldsworth, Napier – without admitting or denying guilt – consented to the entry of a partial final judgment against him:  permanently enjoining him from future violations of the above-cited provisions; barring him from serving as an officer or director of a public company for five years; and deferring to a later date the determination of civil penalties and disgorgement.  Napier also agreed to assist the SEC in its continuing investigation.

461.    The government's investigation of the AIG-General Re deal may have ensnarled yet another General Re executive – current CEO Joseph P. Brandon.  On June 7, 2005, *The Wall Street Journal* reported that

>    Mr. Houldsworth plans to tell investigators about the roles played
>    by other senior General Re executives he said were involved in the
>    transaction, including former Chief Financial Officer Elizabeth

> Monrad **and current Chief Executive Joseph Brandon, to whom Ms. Monrad reported**, said a person familiar with the matter.
>
> Mr. Brandon isn't mentioned in the civil complaint [against Houldsworth].  In an interview with regulators in April, Berkshire Chairman and Chief Executive Warren Buffett said he and Mr. Brandon discussed General Re's accounting for the AIG deal several times but didn't go into details.

462.    On July 14, 2005, *The Wall Street Journal* reported more specifics into the

government's investigation into Brandon's possible role in, or knowledge about, the AIG-

General Re transaction:

> **Officials are trying to determine what Mr. Brandon knew about the transaction – and when – including whether he knew AIG's reason for doing it.  They are also trying to determine whether Mr. Brandon knew of an opportunity to end the deal through a so-called commutation, and thus had deeper knowledge of the transaction**.
>
> *        *        *
>
> One of the documents investigators are now examining is an October 2002 email – written roughly two years after the AIG contract was struck – by Mr. Houldsworth, who was then head of Cologne Re, a General Re unit based in Dublin.  In that email, which Mr. Houldsworth sent to four colleagues at General Re and Cologne Re but not to Mr. Brandon, Mr. Houldsworth referred to Mr. Brandon's alleged role in deciding whether to continue or unwind the AIG deal.
>
> "Joe Brandon is meant [sic] to be discussing this with the client at the first opportunity," Mr. Houldsworth wrote in the email, a copy of which was reviewed by *The Wall Street Journal*.  The email added:  "We obviously would like to either commute [as we are entitled], or be paid an additional fee for continuing.  At this point I agree we should leave this with Joe but continue to follow up periodically in case it gets forgotten."
>
> *        *        *
>
> Investigators are also asking questions about a series of conversations between Messrs. Brandon and Buffett in which Mr. Buffett asked Mr. Brandon about General Re's accounting for the AIG deal, people close to the situation say.  After checking into

- 129 -

General Re's accounting for the deal, Mr. Brandon reported back to Mr. Buffett in a later conversation that the accounting was proper, these people say.

\*      \*      \*

Investigators are drilling into how much detail Mr. Brandon learned about the AIG deal around the time of the conversations with Mr. Buffett.  Mr. Brandon asked for paperwork on the AIG deal, but he told investigators he didn't review the paperwork, people close to the matter say.

\*      \*      \*

**Another document, dated Oct. 31, 2000, suggests Mr. Brandon offered advice on how to structure the AIG transaction**.[6]  That document, included in Mr. Spitzer's civil complaint, lists in point-form Mr. Ferguson's and Mr. Brandon's suggestions on how to structure the deal, referring to the executives by their initials. After the initials JPB, which several people familiar with the document say refers to Mr. Brandon, are various suggestions including:  "May be best to stay away from U.S. companies to avoid large fluctuations in our reported reserves.  Use non-U.S. entities. KR Dublin?"

KR Dublin refers to Cologne Re, which eventually took part in the transaction.  According to the note, Mr. Brandon also suggested "funds withheld," a method of accounting for some reinsurance transactions that was also eventually employed by General Re in accounting for the AIG deal.

463.    On September 9, 2005, *Bloomberg.com* reported that Brandon had received a Wells Notice from the SEC on September 8, 2005 in connection with his role in the AIG-General transaction.  On September 12, 2005, *The Wall Street Journal* reported that the SEC alleges that Brandon "violated or aided and abetted violations" of the securities laws.

464.    At least two additional current and former General Re executives received Wells notices from the government.  On September 12, 2005, the same *Wall Street Journal* article reported that, "[i]n addition to Mr. Brandon, Robert Graham, General Re's assistant general

---

[6]   *See* paragraph 383 *supra*.

counsel, and Christopher Garand, a former General Re executive who resigned Aug. 31, also were told by regulators they are likely to face civil charges for similar violations, Berkshire said."

> **2.     AIG Concealed Its True Relationship With Union Excess and Richmond to Allow the Company to Improperly Account for Its Reinsurance Transactions With Those Entities**

465.     In its March 30, 2005 press release, AIG was forced to admit that it controlled both Union Excess and Richmond, two off-shore reinsurers that the Company had previously represented were independent entities.

466.     With respect to Richmond, AIG announced in its March 30, 2005 press release that Richmond was under sufficient AIG control so as to require consolidation on the Company's books:

> Although AIG owns only a minority ownership interest in Richmond, *the review of the operations of the Richmond subsidiaries has shown significant previously undisclosed evidence of AIG control*.  Therefore, AIG has determined that Richmond should be treated as a consolidated entity in AIG's financial statements.

***In other words, AIG had been buying reinsurance from itself – liabilities that the Company previously claimed had been transferred to Richmond were actually still AIG's responsibility***.

467.     This disclosure ran contrary to the apparent ownership arrangement of Richmond that had been previously disclosed.  Indeed, it had been long known that Munich Re, owned a 49 percent interest in Richmond, while AIG only owned 19 percent.  *TheStreet.com* reported on March 31, 2005 that several former AIG employees believe that Munich Re became involved in Richmond as a favor to AIG. The article stated in part:

> Although Munich Re was the single largest equity owner of one of the AIG firms, Richmond Insurance, AIG disclosed Wednesday that it effectively controls Richmond.  The tiny reinsurer appears to

have served as a dumping ground for AIG's poor performing insurance policies over the years.

Even AIG was forced to admit as much Wednesday, when it disclosed the partial results of an internal investigation into allegations of accounting irregularities at the nation's largest insurer.

AIG said the lawyers conducting the inquiry found that Richmond should be treated as a "consolidated entity'' on AIG's books, even though AIG owns just 19.9% of the Bermuda based reinsurer. The lawyers rendered their verdict after reviewing "significant previously undisclosed evidence of AIG's control.''

TheStreet.com reported last week that Munich Re reports a 49% equity stake in Richmond in its corporate filings.

*In effect, the lawyers concluded that AIG had been doing deals with itself when it sold some of the risk of a future loss on an underlying insurance policy to Richmond. The numerous reinsurance deals with Richmond enabled AIG over the year [sic] to free up capital so it could underwrite more policies and reduce the reserves it needed to cover potential claims.*

*But since Richmond was an alter ego of AIG, those policies were never really transferred off AIG's books. By doing deals with Richmond, AIG only made it seem that it had been engaging in arm's length transactions with an ostensibly independent reinsurer.*

The findings of AIG's internal inquiry would appear to confirm the worst suspicions of state and federal investigators, *who believe many of AIG's former and current top executives resorted to Enron like subterfuge* to manipulate the company's earnings.

So it begs the question: Why would Munich Re, the world's largest reinsurer, be involved in such a venture in the first place?

After all, despite AIG's talk about "significant previously undisclosed evidence," AIG's virtual control over Richmond was not a well kept secret in the Bermuda insurance market.

*As reported by TheStreet.com, the Bermuda insurance registry lists AIG as Richmond's "management company." The only published telephone number for Richmond is the general number for AIG's main Bermuda offices. All three of Richmond's top executives also are high ranking AIG executives in Bermuda.*

*Additionally, a 2004 report prepared by the Bermuda Insurance Institute lists AIG as the "sponsor company" of Richmond,* which is set up as a so called "rent a captive" reinsurer.  Rent a captives are usually set up by an insurer or a group of insurers as a way to provide additional coverage to their customers.  In effect, a company buying coverage from a rent a captive acts as its own insurer by getting to "rent" the capital of the insurers standing behind the enterprise.

Surely all of this was no secret to Munich Re, which has had a 49% equity stake in Richmond for more than a decade.

*        *        *

*Several former AIG employees  all of whom were interviewed on condition of anonymity – believe Munich Re got involved in Richmond as a favor to their longtime customer.*  Historically, they say, AIG has had a longstanding business relationship with the German based reinsurer.

One employee suggested that Munich Re's investment in Richmond might be nothing more than an "accommodation" to an important industry player.  From Munich Re's perspective, the investment in Richmond was relatively insignificant.

*For AIG, however, Richmond was no insignificant matter. These former employees say that over the years, Richmond was used as place for the insurer to dump poor performing policies.*

*In fact, one former employee, who worked in AIG's risk management division, says reinsurance policies could not be purchased from Richmond without approval of AIG's senior management.*

Of course, Richmond may be just the tip of the iceberg when it comes to AIG's use of small off-shore reinsurers.

AIG's lawyers are close to deciding that the insurer also secretly controlled Union Excess Reinsurance, another off-shore reinsurer that entered into dozens of transactions with AIG.  The insurers lawyers have found that Union Excess, which operates out of the offices of the Barbados based law firm Chancery Chambers, is partially owned by Starr International, AIG's largest shareholder, owning about $19 billion of AIG stock.

468.    On April 6, 2005, *TheStreet.com* reported that the NYAG and SEC questioned executives from Munich Re on April 6, 2005, in connection with Munich Re's involvement with Richmond.

469.    On May 26, 2005, *The New York Times* reported that Munich Re had sold its long-held 49.9 percent stake in Richmond through a clause in its original agreement to invest in it when Richmond was created in 1986.  (The clause, in the form of a put option, gave Munich Re the ability to sell its stake to AIG.)  That article also reported that "***A.I.G., according to a former senior executive, used Richmond and Union Excess as 'dumping grounds' for poor-performing insurance policies it had sold to clients.***  The clients then filed large claims, causing losses A.I.G. did not want to report."

470.    With respect to Union Excess, AIG announced in its March 30, 2005 press release:

> AIG has no direct equity interest in Union Excess.  However, based upon AIG's review to date, including consideration of previously undisclosed facts, ***AIG now believes that a significant portion of the ownership interests of Union Excess shareholders are protected under financial arrangements with Starr International Company, Inc. ("SICO"), a private holding company which owns approximately 12% of AIG's outstanding common stock and whose board of directors consists of current and former members of AIG management*** . . . .

471.    AIG's cryptic reference to SICO in its March 30 press release is explained by subsequent press reports indicating that AIG helped hide its control over Union Excess and Richmond by using Astral Reinsurance Co. ("Astral") – a subsidiary of SICO – to guarantee the ownership interests of the other insurers who had invested in Union Excess and Richmond.

472.    Astral had acted as a reinsurer for AIG from 1984 through 1998, and was managed by top AIG executives, including Defendant Murphy.  According to an April 7, 2005 *Wall Street Journal* article, from 1993 through 1998, AIG reported in its state insurance

department filings that it did business with Astral, but was unaffiliated with it.  Astral was liquidated in 2002, at the time holding more than $1.39 billion in AIG stock.

473.    On April 7, 2005, *The New York Times* reported that Munich Re told government regulators that Astral played a role in AIG secretly backing Union Excess and Richmond. Specifically, AIG accomplished this by inviting other insurers to invest in Union Excess and Richmond and simultaneously guaranteeing that Astral would buy back the insurers' ownership interests at their original purchase price if the insurers wanted to back out.  In other words, by allowing shareholders of Union Excess and Richmond the right to unconditionally have their investments redeemed, AIG was, in fact, backing the two off-shore reinsurers.

474.    On August 3, 2005, *The New York Times* reported that "A.I.G. argued [in its 2004 annual report] that its independent auditors did know the facts and circumstances surrounding Starr International's involvement with Union Excess."

475.    The press reports and AIG's March 30, 2005 disclosures were later confirmed by AIG's massive May 31, 2005 restatement, described in greater detail below.

### a.    AIG's History of Concealing from Regulators the Company's True Relationship with Its Off-Shore Reinsurers

476.    AIG's admitted control over Union Excess and Richmond was, to say the least, a long time coming.  In fact, AIG not only failed to make these disclosures until more than *a decade* after it created Union Excess and Richmond, but several times the Company actively misled regulators about its true relationship with the two off-shore reinsurers.  This deceit began in connection with AIG's creation of Coral Re, a Barbados-based reinsurer that was very similar in nature to both Union Excess and Richmond.

477.    In 1987, AIG set up Coral Re, a Barbados-based reinsurer, for the purpose of reinsuring AIG business.  By 1991, AIG had purchased approximately $1 billion in reinsurance from Coral Re, even though Coral Re had a capitalization of only $15 million.

478.    By the early 1990s, Coral Re had come under regulatory scrutiny from insurance departments in Delaware, New York and Pennsylvania.

479.    An August 8, 2005, *Fortune* article summarized AIG's misconduct during the Delaware Insurance Commission's investigation into Coral Re.  Indeed, as with seemingly every other government investigation the Company has faced, AIG – and in particular, Defendant Greenberg – did not take kindly to Delaware's probe:

> It soon became clear that Coral Re had one customer: AIG. Furthermore, much of the business that AIG handed off to Coral Re had previously been in the hands of its now insolvent reinsurers.  By shifting those deals to Coral Re, AIG avoided having to bring the losses back on its own books.  The more regulators examined Coral Re, the more they were convinced that it was under AIG's control.  This was no small matter.  Insurers must submit reinsurance deals with affiliated companies to state authorities so that they can judge whether they are truly arm's-length transactions.  ***AIG, however, insisted that Coral was not an affiliate and refused some of the regulators' requests for information, saying the offshore company simply didn't want to make it available.***
>
> Finally, the Delaware insurance department did something extraordinary:  It filed a Freedom of Information Act request with the Arkansas Development and  Finance Authority – one of Coral Re's shareholders – and obtained a "confidential private-placement memorandum" prepared for investors by Goldman Sachs.  ***It stated that AIG had created Coral Re so that AIG could do more business in the U.S.***  While AIG had no direct ownership in Coral Re, it lined up the company's shareholders and arranged for a bank to finance their investments in the reinsurer.
>
> ***AIG pushed back hard.  Greenberg called Donna Lee Williams, then the Delaware insurance commissioner, to inform her of his displeasure.  Williams won't discuss the details, but she sums up the exchange this way:  "Mr. Greenberg is not always the most pleasant person to deal with."  (One of her subordinates says***

*Williams was so offended by what he said that she hung up on him.)  Private detectives from Kroll showed up in neighborhoods where two Delaware regulators lived, knocking on doors, asking questions.  The detectives made it known that they were acting on behalf of AIG.  "They were clearly trying to intimidate us," says a former regulator.*

In the mid-1990s several states ruled that AIG's dealings with Coral Re were sham transactions that had been accounted for improperly because there was no real risk transferred between the

companies.  AIG grudgingly agreed to wind up its business with Coral Re.  But it declared victory in its dustup with the regulators. It never admitted that Coral Re was an affiliate.  It was never fined. *The states simply made AIG promise to report any similar reinsurance transactions in the future.*

480.    Indeed, in resolving that investigation, the Delaware Department of Insurance's

report stated, in relevant part:

In order to alleviate the Department's concerns regarding the close relationship of the AIG companies to Coral Re, the Company has agreed to stop ceding any business to Coral and commute $100 million of the reinsurance credits currently being taken.  *The Company has also agreed to report any reinsurer that has the previously mentioned characteristics as an affiliated reinsurer in future filings with the state insurance regulators*.

481.    In 1995, the New York Insurance Department also raised concerns that AIG

might control Coral Re.  The regulator's concern was that, pursuant to GAAP accounting on a

consolidated basis, if an insurer purchases reinsurance from a reinsurance company that it owns

or controls, the insurer cannot claim on its books a reinsurance recoverable – *i.e.*, protection

against potential losses covered by the reinsurance – because the insurer is effectively reinsuring

itself.  In addition, under Section 1505 of the New York Insurance Law, AIG was required to file

such arrangements for review by the New York Insurance Department before entering into them.

482.     In its examination that year, the New York Insurance Department cited the following facts as evidence that AIG controlled Coral Re: (1) AIG created Coral Re; (2) AIG found the investors and drafted all documents related to the initial capitalization of Coral Re; (3) Coral Re was undercapitalized from the start and assumed huge amounts of risk through the sale of reinsurance to AIG; (4) in 1991, approximately 83 percent of Coral Re's assets were pledged for letters of credit with AIG as the beneficiary; (5) a material amount of the premiums from AIG to Coral Re was paid to a bank that is an affiliate of AIG and acted as collateral agent on the letters of credit; (6) all of Coral Re's management and administrative functions were performed by an AIG affiliate; (7) AIG unilaterally amended certain provisions in its reinsurance contracts with Coral Re; and (8) there were numerous relationships between the Coral Re investors and AIG.[7]

483.     As a condition of resolving the New York Insurance Department's examination, the Department mandated – like the Delaware Insurance Department had done – that AIG agree to stop purchasing reinsurance from Coral Re and that *AIG "report any reinsurer that has characteristics similar to Coral Re as an affiliate reinsurer in future filings with state insurance regulators."*[8]

484.     *However, at no time during the negotiations for the resolution of the Coral Re examination or thereafter did AIG disclose to the New York Insurance Department – or for that matter, to the Delaware Insurance Department – that it already had two preexisting offshore affiliates with "characteristics similar to Coral Re" – Union Excess and Richmond.*

---

[7]     For example, a director of AIG also sat on the board of an investor company, one of the Coral Re investors had common officers and a common chairman with AIG, and investors, Coral Re and AIG entities shared the same management company.

[8]     AIG had reached a similar settlement with Delaware in 1992.

485.    AIG had formed Richmond in 1986 and formed Union Excess (under a different name) in 1991, both for a purpose nearly identical to Coral Re.  Although there were minor variations between the three entities, Richmond, Union Excess and Coral Re shared the following "characteristics": (1) they were created by AIG; (2) AIG found the investors and drafted all documents related to the initial capitalization; (3) they were undercapitalized; (4) they had passive investors backed by AIG or its affiliates; (5) the management and administrative functions of each were performed by the same AIG affiliate; and (6) officers of the three off-shore entities had numerous relationships with AIG and with each other.[9]

486.    In fact, on August 8, 2005, *Fortune* reported that:

> In a routine filing with Delaware authorities in 1996, an AIG
> division reported that it had transferred large pieces of reinsurance
> from Coral Re to a Barbados company called Union Excess.

487.    Joseph Umansky, a former senior vice president of AIG and president of AIG Reinsurance Advisers who was responsible for setting up Union Excess, has given testimony to the NYAG that he modeled the Union Excess structure on Coral Re.  ***He further testified that he had multiple conversations with both Defendants Smith and Greenberg about Union Excess, and that they too were aware that Union Excess was modeled after Coral Re***.  Nonetheless, they failed to make the required disclosure to the requisite insurance departments.

---

[9]    For example, Coral Re, Richmond and Union Excess all shared a management company owned by Defendant AIG, the three entities had investors in common, certain individuals sat on the board of all three, and Defendant Murphy, an AIG employee, was an officer and alternate director of Richmond.

488.     AIG's deceit was not limited to omissions.  On or about January 7, 1999, the Insurance Department had also requested that AIG file a formal Disclaimer of Control with respect to Richmond.[10]

489.     In response, by letter dated November 10, 1999, AIG and its subsidiary, AIUO Ltd. ("AIUO"), filed a Disclaimer of Control.  The filing was signed by Defendant Murphy and omitted three critical facts bearing directly on the issue of control: (1) a Richmond subsidiary had a management agreement with an AIG subsidiary; (2) Richmond's investors had a put agreement with AIUO, obligating AIUO to repurchase their shares at a value that rendered the "investments" riskless to the investors; and (3) Defendant Greenberg, on behalf of AIG, had guaranteed AIUO's put obligations to the investors under the Shareholders Agreement.  At least two of these omissions may have violated specific New York Insurance Department regulations.[11]

490.     Defendant Murphy had apparently written a second version of the filing that included the three omitted facts described above.  ***However, AIG's lawyers decided to send the original version***.  As reported in a September 20, 2005 *Wall Street Journal* article:

> According to two people familiar with the situation, Mr. Murphy drafted and signed a second version of the New York-state filing that described accurately AIG's ties to Richmond.  It was AIG lawyers in New York who chose which version to file with regulators, according to the two people.

---

[10]   Under New York law, where questions exist concerning control over an insurance company, the suspected controlling entity may file a Disclaimer of Control to resolve the issue under Insurance Law § 1501(c) and Insurance Department regulation 11 N.Y.C.R.R. § 80-1.3.  If the disclaimer is accepted by the Insurance Department, the filing entity is deemed to not control the insurer.

[11]   11 N.Y.C.R.R. § 80-13(b)(2) required Defendant Murphy to report any interest that AIG had in Richmond's securities.  11 N.Y.C.R.R. § 80-1.3(c) required Defendant Murphy to report any contract for services between AIG and Richmond.

491.    AIG's submission had its intended effect – in a letter dated November 13, 2000, the Department of Insurance determined that, "[b]ased on Mr. Murphy's representations and subsequent correspondence, the Department has determined that AIUO, Ltd. does not control Richmond pursuant to Section 1501(a)(2) of the New York Insurance Law."

492.    Even as AIG's internal investigation and the government's investigations were uncovering facts that would lead to this acknowledgment, AIG continued its efforts to hide the true nature of its relationships to these off-shore insurers.

493.    For example, in November 2004, in the wake of the disclosure of the NYAG's inquiry into finite insurance, a Richmond investor had advised Defendant Murphy that it wanted to sell its shares back to AIG.  Beginning on or about March 16, 2005, Defendant Murphy called meeting of Richmond's board of directors to discuss the investor's desire to sell its shares, as well as to assess the NYAG's investigation.  The meeting was subsequently adjourned over several days.  The meeting was tape recorded and, according to routine practice, an AIG employee took possession of and stored the recordings after the meeting.  Over the weekend of March 19, 2005, *Defendant Murphy removed the recordings and issued a directive that electronic files of any draft transcripts of the recordings be deleted*.

494.    Moreover, AIG unequivocally stated in a March 16, 2005 memorandum printed on "DBG Legal Services" letterhead – which was apparently given to the Department of Insurance in further response to their 1999 inquiry regarding AIG's relationship with Richmond – that "although an AIG entity owns 19.9% of Richmond Insurance Company Ltd. (Bermuda) it does not control the insurer."

### b. During the Government's Investigation Into AIG's Reinsurance Transactions, Defendants Removed and/or Destroyed Evidence at AIG's Bermuda Offices

495.    Several newspapers reported that on March 25, 2005, lawyers for either Defendant Greenberg or SICO (a private company that Greenberg controls) had removed boxes of documents from an AIG office in Bermuda that the Company shares with C.V. Starr and/or SICO. *The Wall Street Journal* reported on April 1, 2005 that Greenberg's *personal* lawyers removed the documents.   However, on April 4, 2005, *The New York Times* reported that the documents were removed by one or more lawyers for SICO.  In fact, the lawyers appear to represent both defendants.

496.    The August 8, 2005 edition of *Fortune* reported:

> By March 22 a legal team from Paul Weiss Rifkind, one of the two firms conducting the internal inquiry, arrived at the AIG building in Hamilton [Bermuda], where SICO also had offices, to review documents and conduct interviews.
>
> *            *            *
>
> On Wednesday, March 23, a group from David Boies's New York firm, representing Greenberg and SICO, arrived on the scene.  The AIG lawyers had placed boxes of SICO records in a fourth-floor office and marked the files with stickers, yellow for AIG and blue for "non-AIG" files.  The Boies team began reviewing the records under the supervision of an AIG employee posted outside the room -- and after receiving explicit instructions that no documents could be removed. (Greenberg's lawyers insist they never agreed to such a condition.)
>
> On Thursday, after orders had gone out across the company to secure files for regulators, AIG employees in Dublin seized a computer used by a single SICO official sharing company office space there, confiscated her key, and changed the door locks.  The SICO team reacted quickly.  That night, while Paul Weiss attorneys returned to the U.S. for the long Easter weekend, Mike Murphy, the Greenberg loyalist who worked for both AIG and SICO, leased secure storage space in Bermuda.  The AIG building was officially closed the next day for Good Friday, but the Boies team used Murphy's electronic passkey to gain entry that morning.

> Then, with the help of movers, they hauled 82 boxes of SICO and "non-AIG" documents out of the building.
>
> *       *       *
>
> At 10:45 a.m. on Saturday the Boies group returned to look for any files that may have been left behind.  But this time they were confronted by attorneys from AIG's Bermuda law firm and the head of the company's Bermuda office, who ordered them to leave the premises.

497.    The April 1, 2005 edition of *The Wall Street Journal* reported that, on March 26, 2005, Paul, Weiss attorneys conducting an internal investigation at the Company's Bermuda offices discovered that records were missing and that ***an AIG employee had destroyed computer records and tape recordings of business meetings***.

498.    That same article reported that New York Attorney General Eliot Spitzer referred to these events as a "document caper" and warned Paul, Weiss that the Company had ***"serious criminal exposure"*** and that ***he would indict AIG*** if appropriate measures were not taken.  Two days later, Greenberg announced his resignation as AIG Chairman.

499.    The stories in the press concerning the "document caper" were substantiated by the NYAG's May 26, 2005 complaint against AIG, Defendant Greenberg and Defendant Smith. According to that complaint, Defendant Murphy – described as Defendant Greenberg's "Assistant to the Chairman, Director: Foreign Companies" – "ordered destruction of documents relating to [AIG's] off-shore entities."  The NYAG complaint alleges further that "[o]ver the weekend of March 19, [2005], Murphy removed the recordings" of secret meetings concerning AIG's control over Richmond, "and issued a directive that electronic files of any draft transcripts of the records be deleted."

500.    Specifically, beginning on or about March 16, 2005, Defendant Murphy called a board of directors meeting to discuss, *inter alia*, the NYAG's investigation.  The meeting, which

was adjourned over several days, was tape recorded and an AIG employee took possession of and stored the recordings.  Over the weekend of March 19, 2005 Defendant Murphy removed the recordings and issued a directive that electronic files of any draft transcripts of the recordings be deleted.  However, unbeknownst to Defendant Murphy, a hard copy of the draft transcript of the meeting exists and was subsequently turned over to AIG management, who provided it to law enforcement and regulatory authorities.

501.    In response to these events, on April 7, 2005, Judge Hellerstein "So Ordered" a Stipulation and Order executed by the SEC with Defendants AIG, Greenberg and C.V. Starr that prohibits the three defendants from destroying documents or otherwise interfering with the SEC's investigation.  The April 7 Order also incorporates by reference an April 7, 2005 letter agreement between the SEC, the NYAG, AIG, C.V. Starr, and SICO that sets forth procedures for securing documents located at "joint AIG/Starr facilities."

### 3. Defendants Used "Top Side" Adjustments to Improperly Boost AIG's Claims Reserves and Other Accounts

502.    AIG's use of finite reinsurance was not the only means that the Company employed to improperly inflate its financials.

503.    On May 9, 2005, *The New York Times* reported that a former AIG employee claimed that the Company regularly altered its reserves to help meet earnings expectations during the 1990s and as late as 2001:

> **Executives at the American International Group, Inc., the giant insurer, regularly made changes to the company's reserves to help meet earnings goals through much of the 1990's, according to a former employee who was briefed on the adjustments.**
>
> **Although they were not made in every quarter, the changes were nonetheless common at A.I.G., this person said last week**.
>
> Insurance reserves, the money set aside to pay future claims, are closely watched by investors.  The types of reserves that were most

commonly adjusted by the company to enhance its earnings related to directors' and officers' liability insurance, the former employee said.

\*       \*       \*

*The former employee who was briefed on the reserve adjustments said that A.I.G. workers were directed by upper-level managers to cut reserves on directors' and officers' policies – known as D.&O. in the business.  "In D.&O., where you have tens of millions of dollars in reserves, you could pick up $100 to $200 million in a heartbeat," the former employee said.  "The end of the quarter, end of year – that's when it would happen*."

But the ex-employee, *who was briefed on adjustments made as recently as 2001, said, "This was done regularly and it was very distressing."*

504.    A May 10, 2005, *The Wall Street Journal* article reported that members of AIG senior management beyond Defendants Greenberg and Smith participated in or knew about the top level adjustments:

Investigators involved in the multiple probes of American International Group Inc.'s accounting say **they believe knowledge of and participation in questionable "top level" accounting adjustments extend beyond two of the insurance company's former senior executives, people familiar with the probes said.**

The more AIG executives who knew about any such practices, the more problematic the scenario for AIG become as it struggles to resolve the probes into accounting maneuvers over five or more years. The top-level adjustments – so named by the company because of senior management's alleged involvement – include shaving reserve levels, moving expenses and revenue between quarters and mislabeling some capital gains as investment income.

\*       \*       \*

In recent weeks, AIG has sought to distance current management from the accounting woes.  **But authorities believe that the extensive nature of the problems may make it less likely that a tiny number of departed executives were solely responsible, the people said**.

\*       \*       \*

- 145 -

> *A spokesman and lawyer for Mr. Greenberg, who also left in March, have maintained that other senior managers – and even the company's directors and auditors – were aware of the accounting entries. Yesterday, Mr. Smith's attorney, Andrew M. Lawler, said that the top executives for each of AIG's operating units signed off on that unit's financial statements before they were filed with the Securities and Exchange Commission or other regulators.* "Presumably when they certified them, they believed them all to be accurate," he said."

505.    These reports were later corroborated by the allegations contained in the NYAG's May 26, 2005 complaint against Defendants AIG, Greenberg and Smith.  Indeed, the NYAG's investigation revealed that, on numerous occasions before the Company issued its quarterly reports – including in late 2000, early 2001 and other periods dating back to the early 1990s – Defendants AIG, Smith and others made unsupported accounting entries that increased AIG's claims reserves levels.

506.    Toward the end of each reporting period, AIG performs an extensive process of consolidating the financial information from its various subsidiaries.  Part of that process includes making company-wide accounting entries called "topside" or "top level" adjustments.

507.    **Defendant Smith personally directed that a number of unsupported changes be made to AIG's claims reserves.**  He did so by directing a subordinate, Vincent Cantwell ("Cantwell"), who kept track of the changes by recording them in a spiral-bound notebook.[12] Cantwell then copied the relevant pages of the notebook and gave them to a clerk to enter into AIG's official books and records.  After making the entries, the clerk kept copies of the pages for his records.

_____

[12]  On April 21, 2005, *TheStreet.com* reported that on April 15, 2005, AIG had placed Mr. Cantwell on leave.  Mr. Cantwell is an AIG vice president who worked in the Comptroller's office and reported to Defendant Castelli.

508.     These topside adjustments improperly increased AIG's claims reserves by approximately $32 million in the fourth quarter of 2000, and by $70 million in the first quarter of 2001.

509.     Defendant Smith and Cantwell made similar, unsupported changes for reporting periods at least as far back as the early 1990s.

510.     In addition, Defendant Sullivan also knew about and was involved with the top level adjustments to AIG's claims reserves.

511.     As alleged in greater detail below, AIG admitted as part of its May 31, 2005 restatement that these "Top Level" adjustments and others were made and were, in fact, inappropriate.  AIG's 2004 Form 10-K states, in relevant part, that "[c]ertain accounting entries originated at the parent company level had the effect of reclassifying realized capital gains to net investment income, as well as adjusting other line item reclassifications and other segment financial information."  The restatement makes clear *"that certain [Top Level] entries appear to have been made at the direction of certain former members of senior management without appropriate documentation or support."*

512.     The August 8, 2005 edition of *Fortune* reported that PwC was involved in Defendant Smith's improper topside adjustments:  "Smith's lawyer says the adjustments were approved by the company's auditors."

**4.      AIG Engaged in Multiple Transactions to Make Its Underwriting Results Appear More Favorable Than They Actually Were**

513.     The concept of insurance is simple.  Clients, *i.e.*, the insureds, pay premiums to insurance companies who, in return, provide coverage for losses resulting from accidents or catastrophes.  Insurance companies aim to set premiums high enough to cover all the claims that

they will have to pay (plus their expenses) while still having some revenue left over as profit. The process of figuring out how much money to charge in premiums is called "underwriting."

514.    Insurance companies make money a second way as well.  Premiums are typically paid up-front, but claims are paid after accidents happen.  Between the time that premiums are received and claims are paid, insurance companies can invest the money and derive income from those investments.

515.    As with all publicly-traded companies, an insurance company's ability to make money is the key measure of that company's value as an investment.  But *how* the insurer makes its money is critically important as well.  While insurance companies derive substantial revenues from investing premiums, many in the insurance industry – and especially Defendant Greenberg and his top AIG officers – consider an insurance company's ability to make money through the underwriting process the core of the insurance business and the key to understanding whether the insurance company will enjoy sustained profits in the long run.  As Defendant Greenberg himself reportedly commented in a September 21, 1992 *Crain's Business Insurance* article, "If you don't make a profit in your basic business, which is underwriting, you won't make a profit for very long."

516.    AIG's 2001 Form 10-K reiterated that profits from underwriting is a key measure of an insurance company's success:

> **AIG believes that underwriting profit is the true measure of the performance of the core business of a general insurance company**.
>
> *            *            *
>
> **A major part of the discipline of a successful general insurance company is to produce an underwriting profit, exclusive of investment income**. If underwriting is not profitable, losses incurred are a major factor. The result is that the premiums are inadequate to pay for losses and expenses and produce a profit;

- 148 -

therefore, investment income must be used to cover underwriting losses.  If assets and the income therefrom are insufficient to pay claims and expenses over extended periods, an insurance company cannot survive. For these reasons, AIG views and manages its underwriting operations separately from its investment operations.

517.    Likewise, *Fortune* magazine reported on August 8, 2005:

In the insurance business, most companies actually lose money writing policies and earn their profits by investing premiums.  ***But Greenberg had always preached that underwriting was paramount – and AIG's record of making money on underwriting gave it a premium multiple on Wall Street.  The market valued underwriting profits far more highly than volatile investment results***.

518.    In order to maintain the appearance of AIG's seemingly remarkable success in this area, Defendants Greenberg, Smith and others engaged in a scheme to (1) hide certain of the Company's underwriting losses by improperly characterizing such losses from AIG's auto warranty insurance and Brazilian life insurance businesses as investment losses; and (2) improperly bolster its underwriting income by mischaracterizing its accounting for revenues it received from so-called "life settlement" policies.

### a.    AIG Disguised Its Underwriting Losses

### i.    Auto Warranty Losses

519.    In the mid-1990s, AIG began writing auto warranties.  This business proved to be disastrous – by 1999, AIG's subsidiary National Union projected auto warranty claims of $420 million, amounting to a loss of approximately $210 million from that business.  However, rather than post a loss of this size and publicly reveal AIG's underwriting misstep, Defendant Smith, with Defendant Greenberg's approval, decided to recharacterize this loss in AIG's "basic business" as a less embarrassing investment loss.

520.     In a December 20, 1999 memorandum, Defendant Smith outlined a scheme for carrying out the plan.  Apparently aware of the improper nature of the scheme, Defendant Smith directed that "[d]iscussion of this deal should be limited to as few people as possible."

521.     On or about March 6, 2000, Defendant Smith met with other high-level AIG executives, including Joseph Umansky, and discussed how to convert the auto warranty losses into investment losses.  *According to the NYAG, Umansky has testified that Defendant Smith directed the plan to recharacterize the losses*.

522.     Umansky is a former senior vice president of AIG and president of AIG Reinsurance Advisers, an AIG reinsurance unit.  He recently retired from the Company after 22 years and was one of approximately 80 members of Defendant C.V. Starr, the exclusive partnership that provides deferred compensation to current and former high-level AIG executives.

523.     Umansky described the plan in an April 20, 2000 memorandum to Defendants Greenberg and Smith:

> *Our objective was to convert an underwriting loss into a capital loss.*  The approach we devised is unique but conceptually, somewhat simple.  AIG forms an off-shore reinsurer and reinsures the warranty book into that wholly-owned subsidiary.  AIG then sells the subsidiary through a series of partial sales, thus recognizing a capital loss.  As the warranty losses emerge they are recognized in this off-shore company that is not consolidated as part of AIG.  The accounting is aggressive and there will be a significant amount of structuring required in order to address all the legal, regulatory and tax issues.

524.     In other words, the scheme was for AIG to "invest" in an off-shore shell corporation.  The shell corporation would assume AIG's auto warranty losses and then fail, leaving AIG with an investment loss, instead of an embarrassing insurance underwriting failure.

525.     At Defendant Smith's direction, Umansky sought an off-shore vehicle suitable for "reinsuring" AIG's auto warranty losses.  Umansky had learned that Western General Insurance Ltd. – a company with which AIG had a longstanding business relationship, including Western General's agreement to serve as one of the original investors in Defendant Richmond – was planning to wind down its off-shore subsidiary, CAPCO Reinsurance Company, Ltd. ("CAPCO"), a small Barbados insurance company.  Umansky suggested, and Defendant Smith approved, that AIG use CAPCO as the off-shore vehicle for the auto warranty scheme.

526.     An August 8, 2000 email between AIG executives reflects the purpose for which the Company would utilize CAPCO:  "The purpose of the CAPCO structure is to transfer U/W losses (approx. $200 MM) on [sic] warranty business from NUFI, primarily, to Capital losses over the next 3-4 years."

527.     However, AIG had to gain control of CAPCO without *appearing* to do so. Indeed, if AIG *overtly* controlled CAPCO, the Company would then have to consolidate CAPCO's underwriting results on its books, thereby defeating the sole purpose of the scheme (*i.e.*, removing the underwriting results from AIG's books).

528.     Under New York Insurance Law, insurance companies are presumed to "control" entities in which they own "ten percent or more of the voting securities."  N.Y. Ins. Law § 1501(a)(2).  Therefore, on paper, AIG needed to make it appear that someone else controlled CAPCO.

529.     AIG's assumption of control over CAPCO involved several steps.  First, Western General transferred almost all of the existing business and capital out of CAPCO, leaving only $200,000 in capital and reducing CAPCO to a shell.

530.    Second, AIG needed to identify investors to serve as CAPCO's nominal shareholders, thereby masking AIG's control of CAPCO.  According to the NYAG's complaint, Umansky testified that, to find these "investors," Defendant Greenberg personally sent him to Switzerland to meet with AIG's private bank in Zurich, which then helped find three suitable passive, non-U.S. investors for the deal.

531.    Third, AIG had to invest in CAPCO.  In an August 11, 2000 memorandum, Defendant Smith authorized American International Reinsurance Company ("AIRCO") – AIG's Bermuda-domiciled subsidiary that, according to the Company's SEC filings, "acts primarily as an internal reinsurance company for AIG's foreign life operations" – to purchase non-voting CAPCO shares for $170 million.  The August 11, 2000 memorandum was copied to Joseph Umansky and Defendant Murphy.

532.    In addition, the three Zurich "investors" each paid $6.33 million to CAPCO for voting common shares for a total of $19 million.  However, the "investors" did not have to use their own funds.  Instead, their purchases of the CAPCO securities were financed entirely by non-recourse loans from another AIG subsidiary, which Defendants Greenberg and Smith, among others, knew "in all probability" would never be repaid.  The August 8, 2000 email, referenced above, read in relevant part:

> AIGCC would get a $19 Million capital contribution.  Lend the money (via AGPB) to the 3 investors who must use the loan proceeds to purchase Common Stock of CAPCO.  AIGCC gets a secured interest in the Common Stock (from the investors, but has no direct ownership of CAPCO).  The loans mature June 30, 2005 & interest rate is 6% compounded annually.  All payments of P&I are balloons, at maturity.
>
> The $19 million loans will, in all probability, b[ecome] worthless at some time in the future (it is anticipated that the structure will be completely unwound in 3-4 years).  Assuming full write down, AIGCC would end up with negative retained earnings.  Total

capital structure would still be positive because of the offsetting
capital injection above.  Since AIGCC is unaudited, the negative
retained earnings is not the major issue it would be with an audited
company.

533.    Thus, even if their CAPCO "investment" became worthless, the Swiss investors

would incur no liability on the loans, and would therefore not suffer any losses.  Although the

three individual investors did not play an active role in managing CAPCO, they each received a

$33,000 fee for every year of their "investment" and another $33,000 payment upon its

termination.

534.    John L. Marion, President of Western General, and a director of Defendant Union

Excess, was appointed a director and served as president of CAPCO.  In fact, however, AIG

exercised complete control over CAPCO.  AIG appointed MIMS International (Barbados) Ltd. to

manage CAPCO and AIG Global Investment Corp. (Ireland) Limited to handle CAPCO's

investments.

535.    Umansky kept Defendants Greenberg and Smith and other senior executives

apprised of CAPCO's progress.  In a November 16, 2000 memorandum to Defendants

Greenberg, Smith and others, Umansky wrote:

> The warranty treaty (#21) is designed to cover $210 million of
> losses through a unique structure.  The cash has been transferred
> into the structure and is shown on our balance sheet as assets;
> nothing has yet been charged to expense.  The expectation is that
> as the losses develop and are recovered from the reinsurer, a
> capital loss will be recognized.

536.    Having successfully gained control of CAPCO, AIG then needed to transfer its

underwriting losses to CAPCO.  To accomplish this, CAPCO – for a premium of only $20

million – reinsured National Union for the all-but-certain $210 million in auto warranty losses.

According to the NYAG's complaint, Umansky testified that the transaction was designed to lose

money for CAPCO, a fact known to both Defendants Greenberg and Smith.  In or around early

2001, CAPCO began paying out on reinsurance claims to National Union in order to cover the auto warranty losses.

537.    The scheme worked.  On or about September 25, 2001, Umansky reported: "Warranty structure (Capco) is working.  2001 will be second year end.  I want to close down the structure as soon as possible."

538.    As planned, CAPCO steadily paid AIG for the incoming auto warranty claims that it had reinsured.  Also as anticipated, by the end of 2001, these payments had nearly depleted CAPCO's assets.  All that remained was for AIG – which, through its subsidiary, AIRCO, still held CAPCO stock – to determine how to account for this now worthless investment.  In the fourth quarter of 2001, AIG sold $68 million of its shares back to CAPCO for pennies on the dollar, realizing an enormous investment loss.  Over time, AIRCO, at Defendant Smith's direction, wrote off the balance of its interest in CAPCO as a loss.

539.    The end result of this complex series of transactions was that AIG had moved its underwriting losses to an off-balance sheet entity where AIG investors could not see them. Instead, AIG reported a far less noticeable investment loss.

540.    By 2002, CAPCO had fulfilled its purpose, and its board of directors and shareholders voted to wind up its affairs and liquidate it.

541.    In a memorandum dated September 9, 2002, Umansky informed Defendants Greenberg and Smith that "CAPCO will be liquidated by year-end.  AIG contracts in CAPCO will be commuted or novated by September 30."

542.    Umansky later reported in a March 4, 2003 memorandum to Defendants Greenberg and Smith that "Capco has been liquidated and the AIG contracts novated."

543.    Despite the plan's obvious success, Umansky had begun expressing misgivings about its propriety.  In a memorandum to Greenberg and Smith dated May 22, 2002, Umansky wrote: ***"The Capco structure needs to be revamped in order to put us farther from criticism in today's environment."***

544.    In a March 30, 2005 press release, AIG admitted that its transactions with CAPCO

> ***involved an improper structure created to recharacterize underwriting losses as capital losses***.  That structure, which consisted primarily of arrangements between subsidiaries of AIG and Capco, will require that Capco be treated as a consolidated entity in AIG's financial statements.  The result of such consolidation is to recharacterize approximately $200 million of previously reported capital losses as an equal amount of underwriting losses relating to auto warranty business from 2000 through 2003.

545.    According to the NYAG's May 26, 2005 complaint, Umansky has testified that the transaction was fraudulent.

546.    When Defendant Greenberg was asked by government investigators in April 2005 about his involvement in CAPCO, he refused to answer by invoking his right not to testify under the Fifth Amendment.

547.    As alleged in greater detail below, in AIG's May 31, 2005 restatement, the Company admitted to the improper nature of its arrangement with CAPCO.

### ii.    Brazilian Life Insurance Losses

548.    In 1999, AIG's Brazilian life insurance business had experienced unfavorable underwriting results that were magnified by currency exchange losses caused by the collapse of the Brazilian real.  To avoid reporting these negative results, Defendants Greenberg and Smith, among others, devised a scheme to convert these Brazilian losses into investment losses.

549.     To effectuate this scheme, AIG entered into a series of complex and fraudulent

reinsurance transactions, known as "Nan Shan I" and "Nan Shan II" about which Defendant

Greenberg personally was apprised.  Like the CAPCO scheme described above, the result of Nan

Shan I and II was to covert AIG's underwriting losses into investment losses.

(a)      <strong>Nan Shan I</strong>

550.     According to the NYAG's complaint, Umansky has given sworn testimony that,

in 1999, he attended a meeting with Defendant Smith and another AIG employee in which Smith

directed Umansky to recharacterize underwriting losses arising from Unibanco Seguros

("UNISEG"), AIG's Brazilian life insurance business.  Without this plan, UNISEG's negative

results would have been recorded as underwriting losses on the books of AIG's subsidiary

AIRCO, the same entity that AIG used to purchase CAPCO's shares in the auto warranty

scheme.

551.     The following plan was conceived: Defendant Union Excess was to reinsure

AIRCO for the already-existing underwriting losses, but would be made whole through a "swap"

transaction between Union Excess and AIRCO.  The effect of these transactions would have

been to convert AIG's Brazilian life insurance losses to investment losses.

552.     A December 9, 1999 internal AIG email described the purpose of the transaction:

> [W]e have a foreign exchange loss of $44m in our Brazilian life
> operations and we are being asked to come up with a reinsurance
> contract before the end of the year which will somehow "cancel"
> out the loss.  The source of the request is from Joe Umansky's
> team, apparently based on Howie Smith's instructions.

553.     This initial plan proved unworkable because Union Excess was not licensed to

reinsure life insurance.  At Defendant Smith's direction, AIG searched for another entity whose

underwriting results would be reported on the line at AIRCO where the Brazilian losses would

have appeared.  AIG later identified such an entity: Nan Shan Life Insurance Company, Ltd.

("Nan Shan"), a Taiwanese AIG company that had incurred major accident and health losses in 1999.

554.     The new plan called for Union Excess to reinsure AIRCO for Nan Shan's losses; AIRCO, in order to "compensate" Union Excess, entered into the swap transaction with Union Excess, for which AIRCO declared an investment loss.  After these steps were carried out, AIRCO's – and therefore AIG's – Brazilian underwriting losses were converted to investment losses.

555.     Umansky briefed Defendants Greenberg and Smith about this transaction.

556.     When questioned about the transaction in April 2005, Greenberg refused to answer, invoking his rights under the Fifth Amendment.

### (b)     Nan Shan II

557.     In an effort to convert more underwriting losses into investment losses, AIG repeated this scheme in 2000.

558.     On or about March 9, 2000, an executive in AIG's Life Management Division received an email discussing Nan Shan I.  He responded, "Are you aware that MRG wants a similar transaction for 2000 for about $56 million" and later wrote, "does anyone know anything about this similar transaction for 2000 for about $56m, mentioned by Hank?"

559.     Indeed, Defendants Greenberg and Smith were well aware of the Nan Shan I transaction, and were briefed on the Nan Shan II transaction as well.  According to the NYAG's complaint, Umansky gave sworn testimony that he notified both Defendants Smith and Greenberg about the Nan Shan II transaction.

560.     For example, in an April 20, 2000 memorandum to Defendants Greenberg and Smith, Umansky wrote:

> This contract is one where a significant recovery is realized and a compensating arrangement through a swap generates a capital loss for [American Life Insurance Company] and a gain for the reinsurer. The accounting is very aggressive and it's a duplication of a contract that was done last year. The 1999 swap will not be repeated, although a similar swap will be put in place to accomplish the same objective. There are a number of other issues that I look forward to discussing with you on Monday.

561.    Under the Nan Shan II transaction or "cover," as it was referred to in an internal AIG May 10, 2000 email, Union Excess agreed to reinsure AIRCO for $30 million of losses arising from Nan Shan's 2000 accident year. In consideration, AIRCO paid Union Excess $2 million for the reinsurance. Because Nan Shan's losses were certain, this agreement was, according to that same email, "designed to yield a 28m underwriting benefit (2m premium and 30m recovery)" for AIRCO, where the Nan Shan losses would have been be reported.

562.    As with the first Nan Shan transaction, Union Excess needed to be "made whole." To accomplish this, AIRCO entered into three swap transactions with Union Excess, which were later terminated with an "investment loss" to AIRCO of $28.3 million. Thus, and like the first Nan Shan transaction, the result of this transaction was to convert $28 million in underwriting losses into capital losses.

### b.    AIG Created False Underwriting Income By Improperly Accounting for Revenues From Its "Life Settlements" Business

563.    In another dubious effort to fraudulently improve the appearance of AIG's underwriting results, Defendant Greenberg caused the Company to report income from its "life settlements" investments as underwriting income.

564.    Beginning in 2001, AIG had entered into the "life settlements" business. In a life settlement, an investor purchases an insurance policy from a policyholder who is near the end of his or her life – typically from sick or elderly persons – for a price somewhat higher than the cash surrender value of the policy. The policyholder receives an immediate – though discounted

– payout on the policy.  The investor continues paying premiums on the policy and collects the benefits when the policyholder dies.  The investor's motivation in carrying out the transaction is that the death benefits the investor ultimately receives will exceed the sum of the cash paid to the policyholder plus any premiums the investor pays until the policyholder dies.  In other words, the investor bets that the policyholder will die sooner rather than later.

565.     Defendants AIG and Greenberg decided that, from a public relations perspective, it was best not to use AIG's name in handling the Company's life settlements business.  Indeed, as *Forbes* Magazine opined it in its March 19, 2001 issue, "This is a pretty ghoulish way to make a buck, but as a cold-blooded investment it sounds good."

566.     On or about April 16, 2001, Defendant Greenberg expressed his concerns about the life settlements to AIG's David Fields ("Fields"), who was in charge of the initiative.  Defendant Greenberg wrote in a memorandum to Fields, "It seems to me that anybody doing anything in the field stands the risk of adverse PR . . . I am uneasy about this."

567.     AIG and Defendant Greenberg were also concerned that under GAAP, purchasers of life settlements must carry the investment at a loss since the purchase price of such a policy exceeds its cash surrender value at the time of purchase.  Thus, to avoid the public relations risk and the accounting issues, AIG decided to carry out its life settlement transactions through a third-party trust.

568.     Defendant Greenberg worked with Fields and Defendant Murphy to set up the life settlements structure.  In a September 19, 2001 memorandum to Defendant Greenberg, Fields reported that AIG would set up a trust called Coventry Life Settlement Trust ("Coventry"), which would be majority owned by Hanover Life Reassurance (Ireland) Limited, a non-AIG entity.  Coventry would act as owner and administrator of a trust that ***would permit AIG to book***

*its life settlement activities as underwriting volume, thereby enhancing AIG's underlying insurance underwriting results*.

569.     Under Fields's plan, American Home, an AIG subsidiary, was to loan Coventry all of the funds necessary to purchase the life settlement policies and pay the premiums on the policies.  However, instead of using that money directly to purchase life settlements, Coventry would use the borrowed funds to pay a "premium" to an Alaskan insurance subsidiary of AIG known as American International Specialty Lines Insurance Co. ("AISLIC") in exchange for a fake surety insurance policy (*i.e.*, a policy that would guarantee Coventry's obligations to third parties).  Coventry would then file a "claim" with AISLIC for the same amount that it had just paid to AISLIC as a premium.  AISLIC would pay the amount back to Coventry, which would use the same funds to purchase the life settlements and pay its other expenses.

570.     When the death benefits were ultimately paid under the life settlements, Coventry would pay the benefits to AISLIC as further "premium" on the insurance policy, and AISLIC could then report the life settlement income as underwriting income on its false surety policy.

571.     On or about September 26, 2001, Fields wrote to Defendant Greenberg: "Coventry will sign documents partnering with us as soon as practicable - which at the latest should be Monday, October 1st.  We expect premium production of at least $10 Million before the end of that week."  Two years later, on or about August 4, 2003, Defendant Smith reported to Greenberg that net written premiums for life settlements had grown to $927 million with losses incurred of $851 million and a GAAP underwriting profit of $76 million.

572.     AIG has continued to falsely report this investment income as underwriting income through the end of 2004, contributing to the Company's highly-touted underwriting results.

573.     In 2004, the Alaska Department of Insurance issued a determination that AISLIC's policy with Coventry did not constitute insurance, and directed AISLIC to correct its underwriting reporting.  Facing this adverse determination from the state where AISLIC was domiciled, AIG moved its life settlement business off-shore to AIRCO – the same entity used in the CAPCO and Nan Shan schemes.  AIG continues to account for this investment as if it were insurance.

574.     In April 2005, Greenberg invoked his Fifth Amendment privilege when asked about the Coventry matter.

575.     In its May 31, 2005 restatement, AIG admitted that "the accounting for these transactions as insurance and reinsurance is a misapplication of GAAP that should be corrected through restatement."

## 5.     The Government Investigates AIG's Loss Ratio

576.     On April 1, 2005, *The Wall Street Journal* issued an article titled "Probe of AIG Hits On More Potential Problems."  The article stated in part:

> Authorities are taking a deeper look at accounting at American International Group Inc. – going beyond transactions that AIG already has admitted were improper – to examine actions the company may have taken to polish performance measures closely watched by insurance industry investors, people familiar with the matter say.
>
> *               *               *
>
> ***Now regulators also are scouring deals to determine whether AIG improperly capped its underwriting "loss ratio," which reflects the percentage of each premium dollar that an insurer pays in claims, the people familiar with the matter say.*** Regulators also want to know if any transactions were used to artificially bolster AIG's surplus capital. The amount of insurance that an insurer can sell is generally defined by its surplus capital under state insurance department guidelines.

577.   On April 12, 2005, *The Wall Street Journal* issued an article entitled, "Regulators

Are Also Probing AIG's 'Loss Ratio.'"  The article stated in part:

> How do [AIG's reinsurance] contracts buff a loss ratio? Under
> insurance accounting, expected proceeds from a reinsurance
> contract offset underwriting losses, thus improving the insurer's
> loss ratio.  Under accounting for loans, however, there is no
> offsetting of losses, and thus no buffing of the loss ratio.
>
> In a report last year Fitch Ratings provided a simple example of the
> type "finite risk" reinsurance at issue: An insurer signs a pact with
> a reinsurer under which the reinsurer takes responsibility for
> paying all claims on a given set of policies between 60 cents and
> 65 cents per premium dollar.  In other words, the insurer caps its
> exposure at a 60% loss ratio, though it becomes responsible again
> for claims if they top a 65% loss ratio.
>
> So far, so good. But Fitch notes that these contracts can turn
> aggressive and problematic very quickly.  Let's say that the
> policies covered by the reinsurance contract involve a type of
> insurance that typically results in losses of 65% or more – making
> it almost certain that the reinsurer will have to pay up.
>
> Under a rule of thumb used by the accounting and insurance
> industry over the past decade, reinsurance deals have to pose a
> 10% chance that the reinsurer will lose at least 10% of the
> premium it collects for the policyholder to book it as reinsurance.
> In this example, if the insurer and the reinsurer set the premium
> high enough to cover the reinsurer's expected payments (including
> money earned from investing the premium), the contract
> essentially becomes a loan, not a reinsurance policy.  The insurer
> paid the reinsurer a premium knowing full well it will almost
> certainly get most, if not all, the money back in claims.
>
> AIG's low loss ratios have helped another metric used to evaluate
> the financial health of insurance companies: the combined cost of
> paying claims and administrative expenses, called a "combined
> ratio." AIG also long has prided itself on some of the insurance
> industry's tightest cost controls for administrative expenses,
> leading to below average expense ratios.
>
> ***AIG's combined ratio topped 100% only once, in 2002, in the 10
> years through 2003, while its competitors averaged 109%.  AIG's
> impressive ratios have helped the firm earn coveted top ratings
> from credit agencies and investors' trust.***

### 6.    AIG's Massive Restatement of Earnings

#### a.    AIG's Disclosures Leading up to the Restatement

578.    In a March 17, 2005, *The Wall Street Journal* article, the paper reported that, on March 15, 2005, AIG had announced during a conference call with investors and analysts that the Company could not rule out a finding by PwC that there was a "material weakness" in AIG's internal controls.  (Internal controls are a company's policies for ensuring that all its assets, liabilities and transactions are properly accounted for.)

579.    On March 30, 2005, AIG issued a press release entitled "AIG Delays Form 10-K Filing to Complete Review," which detailed the previously disclosed accounting improprieties and also announced several other accounting issues.   The Company indicated that the aggregate effect of the accounting issues would shave more than $1.7 billion from shareholders' equity. AIG also stated that: (1) "the Gen Re transaction documentation was improper and, in light of the lack of evidence of risk transfer, these transactions should not have been recorded as insurance";  (2) AIG may, in fact, control Union Excess, the result of which would be a maximum of a $1.1 billion reduction in shareholders' equity; and (3) in light of "significant previously undisclosed evidence of AIG control" over Richmond, the Company would consolidate Richmond in AIG's financials.

580.    The press release also stated in relevant part:

- Capco: The transactions with Capco Reinsurance Company, Ltd. ("Capco"), a Barbados domiciled reinsurer, involved an improper structure created to recharacterize underwriting losses as capital losses. That structure, which consisted primarily of arrangements between subsidiaries of AIG and Capco, will require that Capco be treated as a consolidated entity in AIG's financial statements. The result of such consolidation is to recharacterize approximately $200 million of previously reported capital losses as an equal amount of underwriting losses relating to auto warranty business from 2000 through 2003.

- Covered Calls: From 2001 to 2003, AIG entered into a series of transactions with third parties whereby AIG subsidiaries would sell in the money call options on bonds in their portfolios that had unrealized appreciation associated with them. Through a series of forward transactions and swaps that allowed AIG to retain the bonds, AIG recognized net investment income in the amount of the unrealized gains. ***The cumulative increase in net investment income from these transactions was approximately $300 million with a corresponding decrease in realized capital gains over the three year period***. There was no effect on AIG's consolidated shareholders' equity.

- Receivables: AIG continues to assess the recoverability of certain balances, consisting mainly of receivables in the domestic general insurance operations, to determine whether additional charges would be appropriate. AIG currently believes that the after tax impact of these charges would not exceed $300 million.

In addition

- AIG is reviewing its prior estimates relating to deferred acquisition costs and certain other accruals and allowances with respect to AIG's general insurance and financial services subsidiaries to determine if adjustments are necessary. These revisions could result in an aggregate after tax charge of approximately $370 million.

- AIG may reclassify certain items previously identified and reported as net investment income. The aggregate effect of the misclassifications AIG has identified to date was to increase reported net investment income over the period from 2000 through 2004 by approximately four percent. The reclassification will have no effect on AIG's consolidated shareholders' equity as of December 31, 2004.

- AIG has determined to change its accounting treatment to expense the deferred compensation granted to certain AIG employees by SICO. The magnitude of these amounts in prior years has been disclosed in the notes to AIG's audited financial statements, but not included as expenses in the calculation of AIG's consolidated net income. Although the expense will be a charge to reported earnings, the change will have no negative impact on shareholders'

equity because an equal amount will be treated as deemed contributions from SICO to additional paid in capital.

581.    On March 31, 2005, *The Washington Post* issued an article entitled "Breadth of Company's Problems Stands Out."  The article stated in relevant part:

> *The troubling things about the $1.7 billion in accounting problems reported Wednesday by American International Group Inc. are their number and variety, accounting and finance experts said.*
>
> The eight accounting issues revealed by the company range from a transaction with a company closely linked to AIG that could reduce shareholder equity by $1.1 billion to others that were improper but will have little or no effect.
>
> *"My initial reaction was 'Wow!' They have about eight different new issues here, and it pretty much covers the waterfront" of improper accounting, said University of Georgia accounting professor Dennis R. Beresford.  "It's an indication that a lot of things are messed up."*
>
> *                    *                    *
>
> Morgan Stanley & Co. analyst William M. Wilt and his team wrote that *"the depth and breadth of troubles and apparent lack of accounting controls at AIG is alarming."*

582.    On May 1, 2005, AIG issued a press release entitled, "AIG Nears Completion of Internal Review;  Will Restate Results; Provides Update on Internal Review and Timing of Form 10-K," in which it announced that it would again delay filing its 2004 Form 10-K, this time until May 31, 2005.

583.    In the press release, the Company announced its decision to restate its financial statements for the years ended December 31, 2000, 2001, 2002 and 2003,  the quarters ended March 31, June 30 and September 30, 2003 and 2004, and the quarter ended December 31, 2003. The press release also confirmed much of what had been reported in the press and had been disclosed by AIG previously in its March 30, 2005 press release.

584.    The press release stated, in relevant part:

American International Group, Inc. ("AIG") announced today that it is nearing completion of the extensive internal review of its books and records conducted in connection with the preparation of its 2004 Annual Report on Form 10-K.  The findings of that review, together with the results to date of investigations conducted by outside counsel at the request of AIG's Audit Committee and in consultation with AIG's independent auditors, PricewaterhouseCoopers LLP ("PwC"), have ***resulted in AIG's decision to restate its financial statements for the years ended December 31, 2003, 2002, 2001 and 2000, the quarters ended March 31, June 30 and September 30, 2004 and 2003 and the quarter ended December 31, 2003.***  AIG's prior financial statements for those periods and its previously announced unaudited financial results for the year and quarter ended December 31, 2004 should therefore no longer be relied upon.

AIG currently expects that it will be able to file its Form 10-K no later than May 31, 2005, which will allow it adequate time to complete its review and restate its financial statements, and allow PwC time to complete its audits.

Based on its internal review to date, ***AIG has determined that consolidated shareholders' equity at December 31, 2004 would be reduced by approximately $2.7 billion*** as a result of the adjustments for items classified as corrections of accounting errors totaling approximately $2.0 billion, or as fourth quarter changes in estimates, including estimates for tax accruals, deferred acquisition costs, and other contingencies and allowances, totaling approximately $700 million.  ***These reductions would result in a decrease of approximately 3.3 percent in AIG's unaudited consolidated shareholders' equity of $82.87 billion at December 31, 2004,*** which amount was previously announced in AIG's earnings release dated February 9, 2005.

*        *        *

***The restatement will correct errors in prior accounting for improper or inappropriate transactions or entries that appear to have had the purpose of achieving an accounting result that would enhance measures important to the financial community and that may have involved documentation that did not accurately reflect the nature of the arrangements.***

*        *        *

AIG expects to receive unqualified audit opinions from PwC with respect to its consolidated financial statements and its internal control assessment process.  However, *as a result of its internal review, AIG management has identified certain control deficiencies, including (i) the ability of certain former members of senior management to circumvent internal controls over financial reporting in certain circumstances,* (ii) ineffective controls over accounting for certain structured transactions and transactions involving complex accounting standards and (iii) ineffective balance sheet reconciliation processes*.  These deficiencies are "material weaknesses" as defined by the Public Company Accounting Oversight Board's Auditing Standard No. 2.*  Consequently, management has concluded that AIG's internal control over financial reporting was ineffective as of December 31, 2004.  *Accordingly, PwC will issue an adverse opinion with respect to AIG's internal control over financial reporting*.  AIG has begun to actively address the control deficiencies identified by its review.  Management's report on AIG's internal controls and a summary of AIG's remediation plans will be included in the Form 10-K.

Martin J. Sullivan, AIG President and Chief Executive Officer, said: "We are disappointed that we have not yet been able to file our Form 10-K.  We are working diligently to complete the filing, at the same time assuring we have accurate financial statements, rigorous accounting, greater transparency and thorough disclosure.  We know how difficult these past several months have been for those who put their trust in AIG.

"*We now know that there were serious issues with our internal controls*, and that it is necessary for us to address those issues and strengthen our controls.  We are taking actions that will enable AIG to reinforce its credibility and the trust and confidence of our stakeholders."

585.    The May 1, 2005 press release contained a list of accounting improprieties, which were later confirmed in AIG's May 31, 2005 restatement (as detailed below).

586.    On May 3, 2005, *The Wall Street Journal* issued an article entitled, "As AIG's Disclosures Mount, Its Stock Rallies," regarding AIG's May 1, 2005 disclosures.  The article stated in relevant part:

*American International Group Inc.'s internal review of accounting improprieties found that some appear to have been*

- 167 -

*orchestrated by former Chief Executive Maurice R. "Hank" Greenberg and another ousted top AIG official, people familiar with the matter say.*

American International Group said in a statement late Sunday that "certain former members of senior management" were able "to circumvent internal controls." *The statement added that accounting entries that boosted AIG's net worth by about $100 million since 2000 "appear to have been made at the direction of certain former members of senior management without appropriate support."*

*The statement didn't name the former executives, but people familiar with AIG's continuing review by two outside law firms say the references included Mr. Greenberg and Howard I. Smith, who was AIG's chief financial officer until the company ousted him in March for refusing to cooperate with investigators. Government regulators also have documents and testimony suggesting the two former executives were behind financial moves that smoothed or boosted the company's earnings in recent years, people familiar with the matter said.*

\*     \*     \*

*David Boies, an attorney for Mr. Greenberg, defended the accounting moves.  "Those decisions were made not merely by former senior management, but by present senior management, including operational heads and the company's present directors and auditors*," he said in a statement.  "Accounting decisions are often matters of judgment, and particularly in light of changed circumstances, a different regulatory climate and an understandable desire to avoid conflicts with regulators, it is understandable that prior decisions would now be second guessed."

\*     \*     \*

*But, in its most damning admission, AIG said an assessment related to the current investigation had found serious flaws in its controls, mainly related to "the ability of certain former members of senior management to circumvent internal controls over financial reporting in certain circumstances.*" That finding constitutes a "material weakness" and means that PricewaterhouseCoopers will "issue an adverse opinion with respect to AIG's internal control over financial reporting."

Mr. Boies took issue with that: "*The suggestion that there were inadequate financial controls at AIG is at odds with the good faith efforts of the board, AIG's auditors, and the company's senior management (both those who have left and those who have not); it is also inconsistent with the conclusions of the company's auditors and audit committee.*"

### b.    AIG'S 2004 Form 10-K

587.    On May 31, 2005, AIG finally filed its thrice-delayed 2004 Form 10-K and in so doing, restated its earnings for four years and several quarters.  The Restatement adjustments indicate how AIG had overstated its earnings, misapplied GAAP, recorded transactions that were not insurance as if they were insurance, reclassified transactions as more favorable categories then the transactions actually were, overstated assets and understated liabilities.

588.    The numbers involved in the restatement were dramatic: the Company reduced previously announced or reported net income for 2004 by 12 percent, or $1.32 billion, to $9.73 billion.  Overall the restatement reduced AIG's net income from 2000 through 2004 by $3.9 billion, or 10 percent.  AIG also reduced the value of its shareholders' equity by $2.26 billion, to $80.61 billion.   The Company also made other corrections that do not affect previously reported net income, but materially change the business segment reporting of premiums, underwriting results, net investment income, realized capital gains and losses, claims reserves, and other items.

589.    The Restatement was shocking, in many respects:

(a)    Magnitude:  as alleged above, the restatement resulted in a reduction of pre-tax income of more than $3.9 billion;

(b)    Time period:  the restatement spans the period from January 1, 2000 through September 30, 2004, and for certain transactions, prior periods were also involved;

(c)    Breadth:  AIG restated 26 different kinds of transactions, affecting reported net income, stockholders' equity, consolidated business segment reporting of premiums,

underwriting results, net investment income, realized capital gains and losses, and/or operating income;

(d)     <u>Impact on AIG's control environment</u>:  the egregious lack of controls within AIG allowed certain of the defendants, including Defendants Greenberg and Smith, to improperly convert underwriting losses to investment losses; incorrectly record reinsurance transactions; convert realized and unrealized gains into investment income; improperly alter loss reserves using "top level" adjustments without adequate support; incorrectly record various expenses, assets, reserves and retained earnings;  improperly account for its hedging activity; and improperly record its deferred income tax balances; and

(e)     <u>Admission of Wrongdoing</u>:  ***The Company not only admitted that its published financial statements during the Class Period were false, but it also admitted that there was significant fraudulent activity by its top management***.

590.     The facts revealed by AIG's 2004 10-K not only substantiated Lead Plaintiff's allegations (as described above), but also disclosed many additional accounting problems, illustrating just how pervasive the improprieties at the Company were.

591.     In its Restatement, AIG initially stated:

> As part of its internal review, AIG evaluated the financial reporting consolidation process and the resulting financial statements as well as the appropriateness of AIG's prior accounting and reporting decisions.  Based on this evaluation, the restatement includes corrections of errors in current or prior accounting periods for improper or inappropriate transactions or entries identified by the review.  ***In many cases these transactions or entries appear to have had the purpose of achieving an accounting result that would enhance measures believed to be important to the financial community and may have involved documentation that did not accurately reflect the true nature of the arrangements***.  In certain instances, these transactions or entries may also have involved misrepresentations to members of management, regulators and AIG's independent auditors.  ***The restatement***

> *includes adjustments, some of which had been previously identified but considered not to be sufficiently material to require correction.*  In addition, AIG determined that certain accounts should be adjusted for the year ended December 31, 2004 to reflect changes in estimates made in the fourth quarter of 2004.  The aggregate effect of these changes in estimates resulted in an after tax charge of approximately $1.19 billion.

592.    The Restatement included seven general areas in which the Company made accounting adjustments.

593.    The first was in the area of "risk transfer," and implicated the Company's accounting for certain of its insurance and reinsurance transactions.  The 10-K stated that:

> To recognize the cash flows under an insurance contract as premium and losses, GAAP requires the transfer of risk.  If risk transfer requirements are not met, an insurance contract is accounted for as a deposit, resulting in the recognition of cash flows under the contract as deposit assets or liabilities and not as revenues or expense.  *AIG has concluded, based upon its internal review, that there was insufficient risk transfer to qualify for insurance accounting for certain transactions where AIG subsidiaries either wrote direct insurance or assumed or ceded reinsurance*.  These transactions are now recorded using deposit accounting.  The changes resulting from the change to deposit accounting affect both the consolidated balance sheet and statement of income.

The principal transactions affected were General Re, Union Excess and Richmond, and also the reinsurance transactions entered into by several AIG subsidiaries, AIG Re, AIG Risk Finance and AIG Risk Management.

(a)    With respect to the $500 million AIG-General Re sham reinsurance agreement,  AIG "concluded that *the transaction was done to accomplish a desired accounting result and did not entail sufficient qualifying risk transfer.  As a result, AIG has determined that the transaction should not have been recorded as insurance*.  AIG's restated financial statements recharacterize the transactions as a deposit rather than as insurance," in conformity

with SFAS No. 113.  The AIG-General Re deal-related adjustments had the following effects on

AIG's income statement and balance sheet accounts:[13]

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Premiums and other considerations | $  245 | $  - | $  - | $  (258) | $  (250) |
| Incurred policy losses and benefits | 250 | - | - | (258) | (250) |
|  |  |  |  |  |  |
| Consolidated Balance Sheet: |  |  |  |  |  |
| Reserve for losses and loss expenses | (250) | (500) | (500) | (500) | (250) |
| Other liabilities | 250 | 500 | 500 | 500 | 250 |

(b)    As to Union Excess:

*AIG has concluded, based on documents and information identified during the course of the internal review, that reinsurance ceded to Union Excess Reinsurance Company, Ltd., a Barbados-domiciled reinsurer (Union Excess), did not result in risk transfer because of AIG's control over certain transactions undertaken directly or indirectly with Union Excess*, including the timing and nature of certain commutations.

*                    *                    *

In addition, *as a result of certain facts and circumstances related to the formation of Union Excess, as well as certain relationships with Starr International Company, Inc. (SICO), Union Excess is now included in AIG's consolidated financial statements*.  The facts and circumstances surrounding SICO's involvement with Union Excess were not properly reflected in AIG's books and records, were not known to all relevant AIG financial reporting personnel and, AIG now believes, were not known to AIG's independent auditors.  *For example, a significant portion of the ownership interests of Union Excess shareholders are protected against loss under financial arrangements with SICO. Additionally, from its formation in 1991, Union Excess has reinsured risks emanating primarily or solely from AIG subsidiaries, both directly and indirectly.  Further, it appears that the employees responsible for the reinsurance related to Union Excess managed that relationship to prevent significant losses or gains to Union Excess so that substantially all of the risks and rewards of the underlying reinsurance inured to AIG.*  This

_____

[13]   Numbers reflected in this and subsequent charts with respect to the Restatement are in millions, unless otherwise indicated.

relationship allowed AIG to absorb substantially all the economic returns, which in turn caused Union Excess to be deemed a variable interest entity (VIE).[14]

The adjustments and restatement relating to Union Excess had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Premiums and other considerations | $ 386 | $ 439 | $ 673 | $ 726 | $ 251 |
| Net investment income | 259 | 304 | 233 | 179 | 140 |
| Realized capital gains (losses) | (48) | (17) | 105 | 39 | 61 |
| Incurred policy losses and benefits | 671 | 433 | 683 | 638 | 955 |
| Insurance acquisition and other operating expenses | 48 | 48 | 52 | 111 | 63 |
| Net income | (78) | 160 | 180 | 127 | (368) |
|  |  |  |  |  |  |
| Consolidated Balance Sheet: |  |  |  |  |  |
| Premiums and insurance balances receivable, net of allowance | 2,417 | 1,923 | 1,477 | 956 | 119 |
| Reinsurance assets | (5,511) | (5,815) | (5,856) | (5,382) | (4,763) |
| Other assets | 1,607 | (2,549) | 2,760 | 2,561 | 2,327 |
| Total shareholders equity | (951) | (873) | (1,033) | (1,213) | (1,340) |

(c)     With respect to Richmond, AIG concluded that Richmond "*should be treated as a consolidated entity in AIG's financial statements due to AIG's ability to exert control over that entity*."  This conclusion was based on, *inter alia*, "arrangements and documents, including put agreements requiring an AIG subsidiary to purchase the Richmond shares . . . ."

(d)     AIG also determined that adjustments were needed for certain reinsurance transactions entered into by three AIG subsidiaries – AIG Re, AIG Risk Finance and AIG Risk Management – because "certain transactions lacked sufficient risk transfer to qualify for insurance accounting under GAAP."

---

[14]   A variable interest entity is an off-balance sheet entity that is not self-supporting, in that it cannot finance its activities without support from another entity and is therefore subject to consolidation.

(e)     The adjustments and restatement relating to Richmond, AIG Re, AIG Risk Finance and AIG Risk Management had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **Consolidated Statement of Income** | | | | | |
| Premiums and other considerations | $ (287) | $   33 | $ (856) | $ (924) | $ (815) |
| Incurred policy losses and benefits | (159) | 53 | (862) | (561) | (739) |
| Insurance acquisition and other operating expenses | (112) | (62) | (35) | (242) | (65) |
| Net income | (26) | - | 22 | (66) | (4) |
| **Consolidated Balance Sheet:** | | | | | |
| Balance Sheets | | | | | |
| Premium and insurance balances receivable, net of allowance | (362) | (389) | (537) | (752) | (932) |
| Reinsurance assets | (529) | (1,185) | (912) | (937) | (1,032) |
| Other assets | 947 | 1,126 | 634 | 807 | 989 |
| Reserve for losses and loss expenses | (1,154) | (1,609) | (1,609) | (995) | (748) |
| Reserve for unearned premiums | 82 | 112 | (31) | (131) | (347) |
| Funds held by companies under reinsurance treaties | (740) | (1,019) | (1,021) | (1,103) | (1,040) |
| Other liabilities | 1,910 | 2,114 | 1,850 | 1,392 | 1,120 |
| Total shareholders' equity | (77) | (51) | (52) | (73) | (7) |

594.     The second major category of the Restatement concerned the Company's loss reserves, with respect to which AIG determined that ***"the IBNR [losses incurred but not reported] included in the General Insurance reserve for losses and loss expenses was adjusted on a regular basis without appropriate support for the changes requested to be made."***

Further:

> Although AIG does not believe that any change materially affected the integrity of AIG's loss reserve position because in each instance IBNR as adjusted was determined to be within an appropriate tolerance of the applicable actuarial point estimate, AIG has determined that the unsupported decreases in reserves generated independently from the actuarial process constituted errors which should be corrected and has restated the amounts of carried reserves accordingly.  As a result, the fourth quarter 2002 charge relating to the increase in the General Insurance ***reserve for losses and loss expenses, previously reported as $2.8 billion, has been restated to $2.1 billion*** to reduce the original charge by the cumulative effect of the correction of the unsupported adjustments to reserves through that date (approximately $700 million).

595.    The adjustments and restatement relating to AIG's loss reserves had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Incurred policy losses and benefits | $ 302 | $ 342 | $ (351) | $ 137 | $ 223 |
| Net income | (196) | (222) | 228 | (89) | (145) |
| Consolidated Balance Sheet: |  |  |  |  |  |
| Reserve for losses and loss expenses | 880 | 578 | 236 | 587 | 450 |
| Total shareholders' equity | (572) | (375) | (153) | (381) | (292) |

596.    The third major category of the Restatement involved AIG's accounting for net investment income. On this issue, "AIG determined that the accounting for certain transactions had the effect of improperly converting capital gains into net investment income and was not consistent with GAAP." There were several significant transactions under this category, the total of which improperly converted more than $1.1 billion in capital gains into net investment income.

(a)    The first set of restated transactions involved so-called "covered calls," which involves having a long position in an asset combined with a short position in a call option on the same underlying asset. AIG concluded that "[t]hese transactions were accounted for as sales and subsequent purchases and appear to have been initiated to increase net investment income. *AIG has determined that, because AIG was able to cause the bonds to be returned from the third parties even after the third parties exercised the call options, AIG did not cede control over the bonds and therefore the transactions should not have been accounted for as sales and subsequent purchases but rather as financings.*" In other words, these were phony trades made for the improper purpose of inflating reported earnings. The adjustments and restatement relating to covered calls had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Net Investment Income | $ 35 | $ (179) | $ (7) | $ (146) | $ - |
| Realized capital gains (losses) | 57 | 118 | 61 | 55 | - |
| Net income | 59 | (40) | 35 | (59) | - |

(b)     The second set of restated transactions involved AIG's hedge fund accounting, which involved AIG – in connection with certain investments, including hedge fund limited partnerships – recording certain redemptions as gains.  However, the Company found that "in certain cases, the redemption resulted in inappropriate gain recognition because the proceeds were required to be immediately reinvested in the funds.  In addition, the cost bases of certain funds were misallocated in determining gains."  Like the covered calls, these transactions appear to have been made for the purpose of inflating AIG's reported earnings.  The adjustments and restatement relating to AIG's hedge fund accounting had the following effects on AIG's income statement accountants:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Net Investment Income | $ 11 | $ 29 | $ 159 | $ (177) | $ (101) |
| Other revenues | (9) | -- | 26 | (27) | (87) |
| Net income | 2 | 19 | 120 | (133) | (122) |

(c)     The third set of restated transactions involved the Company's synthetic fuel investments, whereby certain AIG subsidiaries invest in companies that invest in synthetic fuel production facilities as a means of generating income tax credits:

> *As a result of a misapplication of GAAP, AIG recorded net investment income or, in some cases, other revenues, on a pretax basis rather than reflecting the tax credit as a reduction of income tax expense*, thereby increasing net investment income for AIG's life insurance and retirement services segment and other revenues for the financial services segment.  *Certain of these entries were previously identified but not corrected as the amounts were viewed as not sufficiently material to require correction.*

The adjustments and restatement relating to AIG's synthetic fuel investments had the following effects on AIG's income statement accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Net Investment Income | $ (203) | $ (238) | $ (259) | $ (31) | $ - |
| Other revenues | (143) | (200) | (165) | (212) | (79) |
| Income taxes | (346) | (438) | (424) | (243) | (79) |

(d)    The fourth set of restated transactions involved AIG's muni tender option bond program, wherein the Company improperly recorded gains on the transfer of certain municipal bonds that ended up in a trust that AIG controlled.  The adjustments and restatement relating to AIG's muni tender option bond program had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Net investment income | $ 65 | $ 60 | $ 44 | $ 11 | $ – |
| Realized capital gains (losses) | 27 | (148) | (47) | (194) | 22 |
| Net income | 60 | (57) | (2) | (119) | 14 |
| Consolidated Balance Sheet: |  |  |  |  |  |
| Other assets | – | – | 2,075 | 2,199 | 1,449 |
| Other liabilities | – | – | 2,075 | 2,199 | 1,449 |

(e)    The fifth set of restated transactions involved "DBG/AIG Capital Corporation Intercompany Dividend."  This was an improper treatment of an inter-company dividend recorded as investment income and an offsetting operating expense, when both should have been eliminated.  The Restatement stated that in 2002, "AIG Capital Corporation issued shares of its preferred stock to National Union in exchange for shares of IFLC's common stock. AIG did not eliminate the preferred stock investment in consolidation, instead recording the dividend as income in net investment income and as corresponding expense in other operating expense.  AIG has now determined that this accounting is a misapplication of GAAP."  The

adjustments and restatement relating to this issue had the following effects on AIG's income statement accounts:

| | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income | | | | | |
| Net investment income | $ (100) | $ (100) | $ – | $ – | $ – |
| Insurance acquisition and other operating expenses | (100) | (100) | – | – | – |

597.    The fourth major category of the Restatement involved "Top Level Adjustments and Other Directed Entries (other than loss reserves)," wherein accounting entries *"made at the direction of certain former members of senior management"* improperly reclassified more than $2.6 billion of realized capital gains into net investment income.  Top level adjustments are entries that were made at the parent-company level to AIG's consolidated financial statements that were not part of the financial records of the various entities (*e.g.*, subsidiaries) being consolidated into AIG's financial statements:

> Certain accounting entries originated at the parent company level had the effect of reclassifying realized capital gains to net investment income, as well as adjusting other line item reclassifications and other segment financial information. ***In some cases, expense deferrals were increased or reserves decreased, both having the effect of increasing reported earnings***.  In other cases, the adjustments affected revenue and expense recognition between reporting periods or among business segments. ***Certain of these entries were previously identified but considered not to be sufficiently material to require correction.***  As part of its internal review, AIG analyzed and assessed "top level" adjustments since 2000 and ***determined that certain entries appear to have been made at the direction of certain former members of senior management without appropriate documentation or support.***

The Restatement reverses all unsupported "top level" and other directed entries – including nearly $1 billion attributable to foreign life insurance capital gains[15] that had previously been

---

[15]  This item involved $999 million relating to "Foreign Life Insurance Net Investment Income Reclassification," which represented capital gains on certain investments involving AIG's Southeast Asia insurance business.

identified but not corrected because they were viewed as "immaterial" – which resulted in the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **Consolidated Statement of Income** | | | | | |
| Premiums and other considerations | $   130 | $   250 | $   (199) | $   (272) | $   (184) |
| Net investment income | (384) | (783) | (733) | (514) | (155) |
| Realized capital gains (losses) | 108 | 559 | 374 | 223 | 126 |
| Other revenues | 267 | 89 | 92 | 70 | 80 |
| Incurred policy losses and benefits | 57 | 195 | (337) | (417) | (97) |
| Insurance acquisition and other operating expenses | (229) | (115) | 47 | 272 | 95 |
| Net income | 213 | 26 | (112) | (241) | (112) |
| **Consolidated Balance Sheet** | | | | | |
| Premiums and insurance balances receivable, net of allowance | (15) | (265) | (456) | (398) | (306) |
| Reserve for losses and loss expenses | - | (30) | (306) | (246) | (95) |
| Other liabilities | 252 | 231 | 251 | 155 | (10) |
| Total shareholders' equity | (206) | (401) | (454) | (342) | (105) |

598. The fifth major category of the Restatement involved the conversion of more than $300 million in underwriting losses to capital losses, which ***"includes transactions and entries that had the principal effect of improperly characterizing underwriting losses as capital losses."*** Further,

> [a]lthough these errors have a minimal effect on consolidated shareholders' equity at December 31, 2004, ***they have an effect on underwriting results in each year***. This category also includes insurance and reinsurance transactions where AIG's accounting resulted in errors relating to the timing and classification of income recognition as well as errors relating to the timing of premium recognition.

Consequently, AIG's core insurance business appeared to be materially better than it actually was. There were several significant transactions under this category.

(a) The first set of restated transactions involved AIG's subsidiary, Capco. (*See* paragraphs 519 through 547 *supra*.) The transactions at issue

***involved an improper structure created to recharacterize underwriting losses relating to auto warranty business as capital losses***.  That structure, which appears to have not been properly disclosed to appropriate AIG personnel or its independent auditors, ***consisted primarily of arrangements between subsidiaries of AIG and Capco that require Capco to be treated as a consolidated entity in AIG's financial statements.***  The result of such consolidation is to reverse capital losses for the years.

(b)    The second set of restated transactions involved AIG's subsidiary, AIRCO

Reinsurance (*see* paragraphs 550 through 562 *supra*):

In each of 1999 and 2000, AIRCO entered into stop loss reinsurance agreements with Union Excess relating to accident and health business of Nan Shan.  Concurrently with each reinsurance agreement, AIRCO entered into a swap agreement with Union Excess, under which the payments were linked to payments under the reinsurance agreement.  ***The transaction had the effect of converting incurred policy losses into capital losses.  AIG has determined that its prior accounting was a misapplication of GAAP and has reversed both the cessions under the reinsurance agreement and the corresponding swaps***.

(c)    The third set of restated transactions involved the so-called "Robert Plan,"

which involved an impairment charge on certain impaired surplus notes that were incorrectly

recorded as capital losses rather than underwriting losses:

AIG has restated the accounting for surplus notes purchased as part of a litigation settlement in 2002 with The Robert Plan Corporation (The Robert Plan).  Pursuant to the settlement agreement, the surplus notes were to be repaid through profits received from a managing general agency relationship with The Robert Plan. When AIG deemed that repayment under the surplus notes was unlikely, ***AIG recorded the impairment charge as realized capital losses rather than underwriting losses***.  AIG now believes that this accounting treatment was an error and has restated the impairment charges as underwriting losses.

(d)    The adjustments and restatement relating to CAPCO, AIRCO and The

Robert Plan had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **Consolidated Statement of Income** | | | | | |
| Premiums and other considerations | $    - | $    - | $    (43) | $    - | $    1 |
| Realized capital gains (losses) | 116 | 19 | 48 | 66 | 58 |
| Incurred policy losses and benefits | - | - | 130 | - | 192 |
| Insurance acquisition and other operating expenses | (6) | (2) | 1 | - | - |
| Net income | 79 | 20 | (65) | 66 | (133) |
| | | | | | |
| **Consolidated Balance Sheet:** | | | | | |
| Collateral and guaranteed loans, net of allowance | (116) | (55) | - | - | - |
| Short-term investments, at cost | - | - | (100) | (120) | (120) |
| Other assets | (5) | (7) | (22) | (67) | (133) |
| Total shareholders' equity | (30) | (109) | (129) | (64) | (130) |

599.    The sixth major category was "Asset Realization," namely that AIG found that "adjustments should be made to the value of certain assets included in its consolidated balance sheet."  There were several significant transactions under this category:

(a)    The first set of restated transactions involved AIG's "Domestic Brokerage Group (DBG) Issues":

> A review of allowances for doubtful accounts and other accruals recorded by certain DBG member companies has led AIG to conclude that the allowances related to certain premiums receivable, reinsurance recoverables and other assets were not properly analyzed in prior periods and that appropriate allowances were not properly recorded in AIG's consolidated financial statements.  ***Certain relevant information was known by certain members of senior management*** but, AIG now understands, not previously disclosed to the independent auditors.  In addition, various accounts were not properly reconciled.

The adjustments and restatement relating to DBG issues had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **Consolidated Statement of Income** | | | | | |
| Insurance acquisition and other operating expenses | $    (52) | $    (224) | $    (23) | $    (22) | $    (27) |
| Net income | 34 | 146 | 15 | 13 | 17 |
| | | | | | |
| **Consolidated Balance Sheet:** | | | | | |
| Premium and insurance balances receivable, net of allowance | (864) | (918) | (1,142) | (1,166) | (1,249) |
| Reserve for loss and loss expenses | (509) | (509) | (509) | (509) | (509) |

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Reserve for unearned premiums | (81) | (81) | (81) | (81) | (107) |
| Total shareholders' equity | (290) | (324) | (470) | (484) | (497) |

(b)      The second set of restated transactions, entitled, "Other Than Temporary Declines," involved the timing with which impaired investments were written down: "AIG has determined that realized capital losses with respect to certain impaired investments were not recorded in the appropriate periods, and the restatement will thus affect the timing of previously reported realized capital losses."  The adjustments and restatement relating to this set of transactions had the following effects on AIG's income statement accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Realized capital gains (losses) | $    4 | $   463 | $   307 | $  (209) | $  (202) |
| Net income | 2 | 301 | 200 | (136) | (132) |

600.    The seventh major category was entitled, "Other GAAP Corrections."  In its review, AIG "considered the application of certain accounting principles to specific businesses and transactions, and has determined that *certain misapplications of GAAP are errors that require restatement of its financial statement*s."  The effect on net income of these corrections, after income taxes, amounted to approximately $1.8 billion.  There were several significant transactions under this category.

(a)      The first set of restated transactions involved life settlements (*see* paragraphs 563 through 575 *supra*), about which the Company stated:

> AIG, through an insurance subsidiary and non-consolidated trusts, which are deemed to be a qualifying special purpose entity and a VIE, engages in this business.  The non-consolidated trusts purchase life insurance policies from policyholders at an initial price and pay additional premiums to keep the policies in force until the insured dies.  AIG's proportionate share of the net death benefits from the purchased contracts, net of reinsurance to a third party reinsurer, was recorded as premium.  The costs incurred by the trusts to acquire the contracts and keep them in force were recorded as paid losses by AIG, net of reinsurance.  AIG's

accounting resulted in upfront gain recognition of expected profits and premium recognition for amounts loaned to the trusts by other AIG subsidiaries.

*AIG has determined, in light of new information which was not available to management or AIG's independent auditors at the time the initial accounting determination was made, that the accounting for these transactions as insurance and reinsurance is a misapplication of GAAP that should be corrected through restatement*.

The adjustments and restatement relating to Life Settlements had the following effects on AIG's income statement and balance sheet accounts:

| | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income | | | | | |
| Premiums and other considerations | $    (915) | $    (809) | $    (603) | $    (147) | $    - |
| Net investment income | (134) | (143) | (114) | (20) | - |
| Incurred policy losses and benefits | (850) | (743) | (552) | (134) | - |
| Net income | (129) | (136) | (107) | (22) | - |
| | | | | | |
| Consolidated Balance Sheet: | | | | | |
| Other invested assets | (486) | (253) | (142) | (28) | - |
| Premiums and insurance balances receivable, net of allowance | (3,075) | (1,842) | (774) | - | - |
| Other assets | 341 | 219 | 111 | 29 | - |
| Reserve for losses and loss adjustment expenses | (1,734) | (1,026) | (527) | (134) | - |
| Funds held by companies under reinsurance treaties | (1,242) | (601) | (193) | - | - |
| Total shareholders' equity | (396) | (270) | (129) | (22) | - |

(b)      The second set of restated transactions involved AIG's accounting for deferred compensation granted to AIG executives by SICO, a private company controlled by Defendant Greenberg:

The amount of deferred compensation granted by SICO has previously been disclosed in the notes to AIG's consolidated financial statements but was not included as an expense in the calculation of AIG's consolidated net income because the amounts had been determined not to be material to AIG's consolidated

results of operations in any individual period.  The expense related to SICO deferred compensation is recorded as a charge to reported earnings in the periods restated, with an offsetting entry to additional paid-in capital reflecting amounts deemed contributed by SICO.  For prior periods, AIG has recorded a reduction of $905 million in retained earnings on its December 31, 1999 consolidated balance sheet and a corresponding increase to additional paid-in capital.  The volatility in the expense is attributable to the variable accounting as well as the fact that shares are allocated only in alternate years.

The adjustments and restatement relating to AIG's account for deferred compensation paid by SICO had the following effects on AIG's income statement accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Insurance acquisition and other operating expenses | $ 56 | $ 275 | $ (173) | $ 45 | $ 293 |
| Net income | $ (56) | $ (275) | $ 173 | $ (45) | $ (293) |

(c)      The third set of restated transactions involved AIG's accounting for derivatives, which refers to certain transactions that were improperly recorded as hedges because they did not meet the requirements to qualify for hedge accounting treatment.  The adjustments and restatement relating to AIG's accounting for derivatives had the following effects on the Company's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Realized capital gains (losses) | $ (109) | $ 104 | $ (14) | $ (36) | $ - |
| Other revenues | 524 | (1,357) | (503) | (370) | 1,265 |
| Net income | 252 | (783) | (323) | (252) | 822 |
|  |  |  |  |  |  |
| Consolidated Balance Sheet: |  |  |  |  |  |
| Financial services assets: |  |  |  |  |  |
| Securities available for sale, at market value | 8,021 | 8,328 | 9,263 | 6,264 | (156) |
| Securities purchased under agreements to resell, at contract value | (7,325) | (7,325) | (7,825) | (6,325) | - |
| Financial services liabilities: |  |  |  |  |  |
| Securities sold under agreements to repurchase, at contract value | 2,061 | 1,003 | 197 | (340) | (216) |
| Unrealized loss on swaps, options and forward transactions | (2,199) | (610) | 394 | 1,566 | 333 |
| Retained earnings | (394) | (646) | 136 | 459 | 711 |
| Accumulated other comprehensive income | 1,412 | 1,439 | 1,424 | 121 | (134) |
| Total shareholders' equity | 1,018 | 792 | 1,561 | 581 | 577 |

(d)    The fourth set of restated transactions involved AIG's accounting for deferred income taxes.  Specifically, for certain foreign subsidiaries for which AIG plans to permanently reinvest undistributed earnings, "AIG incorrectly provided U.S. deferred taxes on the unrealized appreciation associated with investment securities in accumulated other comprehensive income."  For certain foreign subsidiaries for which AIG does not have plans for permanent reinvestment of undistributed earnings, "U.S. deferred taxes were incorrectly omitted on certain components of other comprehensive income."  The adjustments and restatement relating to AIG's account for deferred income taxes had had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Net income | $    (5) | $   (23) | $   (22) | $    - | $    - |
| Consolidated Balance Sheet: |  |  |  |  |  |
| Total shareholders' equity | 889 | 761 | 490 | 324 | 166 |

(e)    The fifth set of restated transactions involved "foreign currency translation," which refers to incorrectly recording foreign currency gains and losses as an element of shareholders' equity rather than recording them as a component of income or loss. The adjustments and restatement relating to this set of transactions had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Realized capital gains (losses) | $  (127) | $  (193) | $   (52) | $   44 | $    - |
| Net income | (124) | (193) | (53) | 75 | 119 |
| Consolidated Balance Sheet |  |  |  |  |  |
| Other assets | 163 | 143 | 31 | (6) | (15) |
| Reserve for losses and loss expenses | (25) | (407) | (882) | (902) | (747) |
| Total Shareholders' equity | 131 | 358 | 594 | 583 | 476 |

(f)     The sixth set of restated transactions involved deferred acquisition costs ("DAC"), which refers to costs incurred in generating life insurance contracts that were improperly capitalized.   AIG stated that its "internal review identified a misapplication of GAAP with respect to General Insurance DAC. ***As a result of 'top level' entries, substantially all costs associated with underwriting and marketing operations were deferred***.   The internal review determined that certain of these costs did not vary sufficiently with the production of business and should not have been deferred."   The adjustments and restatement relating to this set of transactions had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Incurred policy losses and benefits | $ (265) | $ (231) | $ (188) | $ (133) | $ (134) |
| Insurance acquisition and other operating expenses | 321 | 287 | 285 | 450 | 310 |
| Net income | (33) | 2 | (12) | (138) | (40) |
| Consolidated Balance Sheet |  |  |  |  |  |
| Deferred policy acquisition costs | (485) | (432) | (383) | (307) | (85) |
| Other assets | (92) | (94) | (146) | (204) | (214) |
| Total Shareholders' equity | (344) | (311) | (313) | (301) | (163) |

(g)     The seventh set of restated transactions involved the commutation of certain insurance and reinsurance contracts, which resulted in an overstatement of both premium income and policy losses.   The adjustments and restatement relating to these commutations had the following effects on AIG's income statement and balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Premiums and other considerations | $ (370) | $ (405) | $ (79) | $ 4 | $ (312) |
| Incurred policy losses and benefits | 370 | (405) | (79) | 4 | (312) |
| Consolidated Balance Sheet |  |  |  |  |  |
| Reserves for losses and loss expenses | 151 | 58 | 51 | 51 | - |
| Insurance balances payable | (93) | (51) | (51) | (51) | - |

(h)     The eighth set of restated transactions involved recording certain transactions as "dollar roll transactions," which were improperly recorded as income but should have been recorded as derivatives with changes in their market value reported as income or loss. The adjustments and restatement relating to these transactions had the following effects on AIG's income statement accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Realized capital gains (losses) | $    16 | $   (98) | $   157 | $   (46) | $   (26) |
| Net income | 16 | (98) | 157 | (46) | 26 |

(i)     The ninth set of restated transactions involved improper recording of sales and gains for syndication of the tax benefits generated by affordable housing real estate properties which should have been recorded as financings because of AIG guarantees.  The adjustments and restatement relating to this set of transactions had the following effects on AIG's income statement balance sheet accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income |  |  |  |  |  |
| Other revenues | $   (39) | $   (44) | $   (43) | $   (71) | $ (126) |
| Net income | (25) | (28) | (28) | (46) | (82) |
| | | | | | |
| Consolidated Balance Sheet: |  |  |  |  |  |
| Other invested assets | 1,452 | 1,652 | 1,585 | 1,427 | 1,172 |
| Investment income due and accrued | (289) | (254) | (222) | (149) | (109) |
| Other assets | (1,688) | (2,009) | (7) | (5) | (2) |
| Other liabilities | (30) | (154) | 1,770 | 1,644 | 1,360 |
| Total shareholders' equity | (322) | (297) | (269) | (241) | (195) |

(j)     The tenth set of restated transactions involved the reclassification of SunAmerica Partnerships' earnings from other operations to asset management in segment reporting.  The adjustments and restatement relating to this set of transactions had the following effects on AIG's income statement accounts:

|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Consolidated Statement of Income | | | | | |
| Other revenues | $ 661 | $ 323 | $ 243 | $ 475 | $ 764 |
| Insurance acquisition and other operating expenses | 661 | 353 | 247 | 475 | 764 |

601.    Finally, the Company also disclosed that it was substantially increasing its

reserves for asbestos and environment exposures:

> As a result of the internal review, AIG has determined that its
> carried reserves for net losses and loss expenses are required to be
> restated and adjusted . . . *In addition, AIG has increased the
> reserves for asbestos and environmental exposures included
> within the reserve for net losses and loss expenses by $850
> million in the fourth quarter of 2004 to reflect a change in
> estimate*.

602.    Of the $850 million added to these reserves, asbestos reserves were increased by

$650 million and environmental reserves were bolstered by the remaining $200 million.  The

increases to the asbestos reserves were nothing short of dramatic.  For example, at December 31,

2002, AIG's asbestos reserves totaled $400 million.  At year-end 2003, asbestos reserves totaled

$386 million.   At year-end 2004, before the $650 million adjustment, AIG's asbestos reserves

totaled $410 million.  *In other words, AIG's $650 million adjustment more than doubled the

Company's December 31, 2004 asbestos reserves, bringing it up to a total of $1.06 billion*.

603.    AIG describes the adjustment as needed merely "to reflect a change in estimate."

However, the Company fails to adequately explain why a change in that estimate would reveal

such a massive under-reserving for asbestos liabilities such that the required $650 million

adjustment increased the previously-reported 2004 year-end reserves amount *by nearly 160

percent.  Given that amounts set aside for reserves affect net income, the reasonable inference

is that AIG had been under-reserving for asbestos liabilities so as to inflate its earnings during

the Class Period*.

604.    The following three charts summarize the effects of the various restatement items on three key financial indicators – shareholders' equity, net income and revenues:

**Total Shareholders' Equity**

| December 31,<br>(in millions) | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **Total Shareholders' Equity, as Previously Announced or Reported** | **$82,871** | **$71,253** | **$59,103** | **$52,150** | **$47,439** |
| Adjustments: | | | | | |
| Risk Transfer: | | | | | |
|     Union Excess | (951) | (873) | (1,033) | (1,213) | (1,340) |
| Loss Reserves | (572) | (375) | (153) | (381) | (292) |
| "Top Level" Adjustments and Other Directed Entries (other than loss reserves) | (206) | (401) | (454) | (342) | (105) |
| Asset Realization: | | | | | |
|     Domestic Brokerage Group (DBG) Issues | (290) | (324) | (470) | (484) | (497) |
| Other GAAP Corrections: | | | | | |
|     Accounting for Derivatives (FAS 133 Hedge Accounting) | 1,018 | 792 | 1,561 | 581 | 577 |
|     Accounting for Deferred Taxes | 889 | 761 | 490 | 324 | 166 |
|     Life Settlements | (396) | (270) | (129) | (22) | -- |
|     Affordable Housing | (322) | (297) | (269) | (241) | (195) |
| Fourth Quarter 2004 Changes in Estimates Effect on Statement of Income | (1,187) | -- | -- | -- | -- |
| All Other -- Net | (247) | (236) | 159 | 156 | 271 |
|     Total Adjustments | (2,264) | (1,223) | (298) | (1,622) | (1,415) |
| **Total Shareholders' Equity, as Adjusted or Restated** | $80,607 | $70,030 | $58,805 | $50,528 | $46,024 |

**Net Income**

| Years Ended December 31,<br>(in millions) | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **Net Income, as Previously Announced or Reported** | **$11,048** | **$9,274** | **$5,519** | **$5,363** | **$6,639** |
| Adjustments: | | | | | |
| Risk Transfer: | | | | | |
|     Union Excess | (78) | 160 | 180 | 127 | (368) |
| Loss Reserves | (196) | (222) | 228 | (89) | (145) |
| Net Investment Income: | | | | | |
|     Covered Calls | 59 | (40) | 35 | (59) | -- |
|     Hedge Fund Accounting | 2 | 19 | 120 | (133) | (122) |
|     Muni Tender Option Bond Program | 60 | (57) | (2) | (119) | 14 |

**Net Income**

| Years Ended December 31, (in millions) | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| "Top Level" Adjustments and Other Directed Entries (other than loss reserves) | 213 | 26 | (112) | (241) | (112) |
| Conversion of Underwriting Losses to Capital Losses | 79 | 20 | (65) | 66 | (133) |
| Asset Realization: | | | | | |
| Other Than Temporary Declines | 2 | 301 | 200 | (136) | (132) |
| Other GAAP Corrections: | | | | | |
| Accounting for Derivatives (FAS 133 Hedge Accounting) | 252 | (783) | (323) | (252) | 822 |
| Accounting for Deferred Taxes | (5) | (23) | (22) | -- | -- |
| Foreign Currency Translation (FAS 52) | (124) | (193) | (53) | 75 | 119 |
| Life Settlements | (129) | (136) | (107) | (22) | -- |
| SICO Deferred Compensation | (56) | (275) | 173 | (45) | (293) |
| Fourth Quarter 2004 Changes in Estimates | (1,187) | -- | -- | -- | -- |
| All Other – Net | (209) | (62) | 95 | (363) | (148) |
| Total Adjustments | (1,317) | (1,265) | 347 | (1,191) | (498) |
| **Net Income, as Adjusted or Restated** | $9,731 | $8,009 | $5,866 | $4,172 | $6,141 |

**Other Revenues**

| Years Ended December 31, (in millions) | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **Other Revenues, as Previously Announced or Reported** | $11,728 | $10,914 | $10,074 | $9,710 | $8,523 |
| Adjustments: | | | | | |
| Net Investment Income: | | | | | |
| Synthetic Fuel Investment | (143) | (200) | (165) | (212) | (79) |
| Hedge Fund Accounting | (9) | -- | 26 | (27) | (87) |
| "Top Level" Adjustments and Other Directed Entries (other than loss reserves) | 267 | 89 | 92 | 70 | 80 |
| Other GAAP Corrections: Accounting for Derivatives (FAS 133 Hedge Accounting) | 524 | (1,357) | (503) | (370) | 1,265 |
| SunAmerica Partnerships | 661 | 323 | 243 | 475 | 764 |
| All Other — Net | (44) | (51) | 11 | (104) | (126) |
| Total Adjustments | 1,256 | (1,196) | (296) | (168) | 1,817 |
| **Other Revenues, as Adjusted or Restated** | $12,984 | $9,718 | $9,778 | $9,542 | $10,340 |

605.    AIG's 2004 10-K also disclosed serious problems with the Company's internal

controls.  PwC found – in stark contrast to its findings from its extensive review earlier in the

year and from its numerous other audits and reviews over the past twenty-plus years – multiple

and severe deficiencies in AIG's internal control over financial reporting.  PwC's Report to the

Board of Directors and Shareholders, incorporated into the 2004 10-K, stated in relevant part:

> Control Environment:  ***Certain of AIG's controls within its control environment were not effective to prevent certain members of senior management, including the former Chief Executive Officer and former Chief Financial Officer, from having the ability, which in certain instances was utilized, to override certain controls and effect certain transactions and accounting entries***.  ***In certain of these instances, such transactions and accounting entries appear to have been largely motivated to achieve desired accounting results and were not properly accounted for in accordance with GAAP***.  Further, in certain of these instances, information critical to an effective review of transactions, accounting entries, and certain entities used in these transactions and accounting entries, were not disclosed to the appropriate financial and accounting personnel, regulators and AIG's independent registered public accounting firm.  As a result, discussion and thorough legal, accounting, actuarial or other professional analysis did not occur.  This control deficiency is based primarily on these overrides. Specifically, this control deficiency permitted the following:
>
> - ***Creation of Capco, a special purpose entity used to effect transactions that were recorded to convert, improperly, underwriting losses to investment losses and that were not correctly accounted for in accordance with GAAP, resulting in a misstatement of premiums and other considerations, realized capital gains (losses), incurred policy losses and benefits and related balance sheet accounts.***
>
> - ***Incorrect recording under GAAP of reinsurance transactions that did not involve sufficient risk transfer, such as the Gen Re transaction, and in some cases also related to entities which should have been consolidated, such as Union Excess and Richmond***.  This incorrect recording under GAAP resulted in a misstatement of premiums and other considerations, incurred policy losses and benefits, net investment income, reinsurance assets, deferred policy acquisition costs, other assets, reserve for losses and loss expenses, reserve for unearned premiums, other liabilities and retained earnings.  See below for a

related discussion under Controls over the evaluation of risk transfer.

- **Various transactions, such as Covered Calls and certain "Top Level" Adjustments**, converted realized and unrealized gains into investment income, thereby incorrectly applying GAAP, resulting in a misstatement of net investment income, realized capital gains (losses), and accumulated other comprehensive income.

- **Incorrect recording under GAAP of changes to loss reserves and changes to loss reserves through "Top Level" Adjustments** without adequate support, resulting in a misstatement of incurred policy losses and benefits, reserves for losses and loss expenses, foreign currency translation adjustments and retained earnings.

Controls over the evaluation of risk transfer: **AIG did not maintain effective controls over the proper evaluation, documentation and disclosure of whether certain insurance and reinsurance transactions involved sufficient risk transfer to qualify for insurance and reinsurance accounting**. These transactions included Gen Re, Union Excess, Richmond and certain transactions involving AIG Re, AIG Risk Finance and AIG Risk Management.  As a result, AIG did not properly account for these transactions under GAAP, resulting in a misstatement of premiums and other considerations, incurred policy losses and benefits, net investment income, reinsurance assets, deferred policy acquisition costs, other assets, reserve for losses and loss expenses, reserve for unearned premiums, other liabilities, and retained earnings.

Controls over certain balance sheet reconciliations: **AIG did not maintain effective controls to ensure the accuracy of certain balance sheet accounts in certain key segments of AIG's operations**, principally in the Domestic Brokerage Group. Specifically, accounting personnel did not perform timely reconciliations and did not properly resolve reconciling items for premium receivables, reinsurance recoverables and intercompany accounts.  As a result, insurance acquisition and other operating expenses, premiums and insurance balances receivable, reinsurance assets, other assets and retained earnings were misstated under GAAP.

Controls over the accounting for certain derivative transactions: **AIG did not maintain effective controls over the evaluation and documentation of whether certain derivative transactions qualified under GAAP for hedge accounting**, resulting in a

misstatement of net investment income, realized capital gains (losses), other revenues, accumulated other comprehensive income (loss) and related balance sheet accounts.

Controls over income tax accounting: *AIG did not maintain effective controls over the determination and reporting of certain components of the provision for income taxes and related deferred income tax balances*.  Specifically, AIG did not maintain effective controls to review and monitor the accuracy of the components of the income tax provision calculations and related deferred income taxes and to monitor the differences between the income tax basis and the financial reporting basis of assets and liabilities to effectively reconcile the differences to the deferred income tax balances.  As a result, deferred income taxes payable, retained earnings and accumulated other comprehensive income were misstated under GAAP.

*The control deficiencies described above resulted in the restatement of AIG's 2003, 2002, 2001 and 2000 annual consolidated financial statements and 2004 and 2003 interim consolidated financial statements*, as well as adjustments, including audit adjustments relating to the derivative matter described above, to AIG's 2004 annual consolidated financial statements.  Furthermore, these control deficiencies could result in other misstatements in financial statement accounts and disclosures that would result in a material misstatement to the annual or interim AIG consolidated financial statements that would not be prevented or detected.  Accordingly, management has concluded that these control deficiencies constitute material weaknesses.

\*        \*        \*

*As a result of the material weaknesses described above, AIG management has concluded that, as of December 31, 2004, AIG's internal control over financial reporting was not effective* based on the criteria in Internal Control – Integrated Framework issued by COSO.[16]

---

[16]  On August 10, 2005, *CBS Marketwatch* reported that AIG had discovered and corrected an *additional* accounting problem, this time at its aircraft leasing business, International Lease Finance Corp. ("ILFC").  In particular, AIG booked a $333 million charge to reflect a restatement of ILFC's books for the past five years to correct its accounting for derivatives, currency transactions, and certain payments from aircraft and engine manufacturers (that were improperly accounted for as revenue).

606.   Finally, although the Restatement technically applies only to the reporting periods from 2000 through 2004, AIG admitted that several of its accounting problems affected the Company's financials in 1999 and prior periods.

607.   For example, with respect to "Domestic Brokerage Group (DBG) Issues," the 2004 Form 10-K states:

> AIG's restated financial statements reflect the recording of appropriate amounts for these reserves and allowances for doubtful accounts for the appropriate time period, resulting in an after-tax reduction in consolidated shareholders' equity at December 31, 1999 of $514 million.

608.   With respect to "SICO Deferred Compensation," the 2004 Form 10-K states, "For prior periods, AIG has recorded a reduction of $905 million in retained earnings on its December 31, 1999 consolidated balance sheet and a corresponding increase to additional paid-in capital."

609.   In addition, Defendants Union Excess and Richmond had both been providing reinsurance to AIG *since at least 1991*.  AIG has admitted that it should have included these entities in its consolidated financial statements.

610.   Thus, *AIG has admitted that several of the accounting improprieties identified in the Restatement affected its 1999 and prior years' financials, with several such transactions – notably, deferred compensation provided by SICO and the reinsurance provided by Union Excess and Richmond – dating back for more than a decade*.

### c.   Greenberg's Response to the Restatement

611.   In response to the Company's decision to restate its earnings – and with an apparent desire to share the blame – Defendant Greenberg has suggested that others within AIG, as well as the Company's outside auditors, were fully aware of the alleged wrongdoing.

612.   For example, in a May 3, 2005 *Wall Street Journal* article entitled, "Pricewaterhouse's Squeeze Play," the newspaper reported:

In a statement, David Boies, an attorney for former AIG Chairman and Chief Executive Maurice R. "Hank" Greenberg, said a finding of weak internal controls would be "inconsistent with the conclusions" of Pricewaterhouse and AIG's audit committee "after extensive review." *A spokesman for Mr. Greenberg's lawyers said that, in a report to AIG's audit committee on March 7, after 50,000 hours of work auditing AIG's internal controls, Pricewaterhouse at that point "was unambiguous as to its finding that there were no material control deficiencies*."

613.    The next day, in a May 4, 2005 letter to the 17 other members of AIG's Board of

Directors, Defendant Greenberg noted that the Board had not previously questioned management

regarding the items being restated.  Greenberg wrote, in relevant part:

> Given the innuendo contained in AIG's release of May 1 which can be interpreted as impugning the integrity of prior and present AIG management, I was surprised that this press release provided no factual basis to explain why AIG or PricewaterhouseCoopers changed its position.  It is clear that the restatement entails hindsight analysis about complicated accounting issues which were originally made on a good faith basis by management (former and present) and AIG's auditors *without objection or inquiry from the Board or any member of the Board*.

614.    Similarly, a  June 1, 2005 *New York Times* article stated, in relevant part:

> *Mr. Greenberg's spokesman has questioned why PricewaterhouseCoopers gave a verbal report to A.I.G.'s audit committee in February affirming the company had no material weaknesses, later coming to a wholly different conclusion.*
>
> Mr. Greenberg's legal team took issue with two major items from the annual report:  the $850 million charge to account for asbestos and environmental claims and the characterization of Union Excess, an offshore reinsurance company whose results A.I.G. said it would consolidate.  *According to Mr. Greenberg's lawyers, asbestos reserves were audited by PricewaterhouseCoopers in 2004 and found to be adequate*.

615.    As alleged in greater detail below, on or about July 26, 2005, Defendant

Greenberg made available to the media his so-called "white paper," in which he implicated PwC

as having been aware of and/or approved many of the improper accounting issues detailed in AIG's May 31, 2005 restatement.

> **G.     AIG MARKETED AND SOLD "INCOME SMOOTHING" INSURANCE PRODUCTS AND PARTICIPATED IN OFF-BALANCE-SHEET TRANSACTIONS THAT AIG KNEW, OR SHOULD HAVE KNOWN, VIOLATED GAAP**

616.     According to recently settled investigations into AIG by the SEC, the DOJ and other governmental authorities, from as early as 1997 through 2002, AIG engaged in an aggressive effort to market and sell non-traditional insurance products and otherwise engaged in off-balance-sheet transactions that AIG knew, or should have known, would have the effect of improperly "smoothing" other companies' earnings.

617.     As discussed more fully below, AIG has settled several of those investigations, pursuant to which the Company has agreed to pay more than ***$136 million*** in fines and restitution.  For example, in September 2003, AIG paid $10 million to settle charges brought by the SEC in connection with AIG's sale of a "non-traditional" or "finite" insurance product to Brightpoint, that AIG knew would allow Brightpoint – in violation of GAAP – to improperly hide nearly $12 million in losses.

618.     More recently, in November 2004, AIG paid $126 million to settle charges brought by the SEC and DOJ in connection with AIG's marketing and sale of off-balance-sheet transactions that allowed PNC to improperly remove more than $760 million in bad assets from its balance sheet.

619.     The SEC and DOJ continue to investigate similar AIG transactions with other companies.

1.       **AIG Marketed and Sold Non-Traditional Insurance Products to Other Public Companies that AIG Knew, or Should Have Known, Violated GAAP and Had the Effect of Illegally "Smoothing" Those Companies' Earnings**

620.       Although AIG entered into the Brightpoint transaction in January 1999, prior to the beginning of the Class Period, AIG improperly recorded income from that transaction during the Class Period.  Moreover, during the Class Period, AIG failed to timely inform the public of the SEC's investigation into its role in the Brightpoint deal, and AIG improperly withheld documents that the SEC requested pursuant to its investigation of the Brightpoint deal.  These acts – all concealed from investors – subjected AIG to millions of dollars in fines during the Class Period.

621.       In 1998 and 1999, AIG and Brightpoint negotiated and executed a deal for "non-traditional" or "finite" reinsurance that both companies knew violated GAAP and allowed Brightpoint to "hide" nearly $12 million in losses.

622.       Although in July 2000, the SEC requested that AIG produce documents in connection with the deal, the SEC's investigation into AIG's role in the transaction did not become public until September 11, 2003, at which time the SEC brought both civil and administrative proceedings against AIG and others.  To settle the matters, AIG's agreed, *inter alia*, to pay a $10 million fine.

623.       At that time, the SEC also revealed AIG's blatant misconduct in connection with its investigation between July 2000 and October 2002.  The SEC's September 11, 2003 press release stated that *"[t]he $10 million penalty against AIG reflects the gravity of its misconduct. It also reflects the fact that, in the course of the Commission's investigation, AIG did not come clean.  On the contrary, AIG withheld documents and committed other abuses, as outlined in the administrative order, compounding its overall misconduct*."

a.     **GAAP and Insurance**

624.     Under GAAP, when it is "probable" that an insured will realize an insurance recovery against a specified loss, the insured is entitled to record a receivable on its balance sheet in the amount of the probable recovery and, for income statements purposes, net the amount of probable recovery against the loss, thereby reducing the loss.

625.     The recovery must be an "insurance" recovery.  A recovery is not an "insurance" recovery unless the insurance policy transfers some risk from the insured to the insurer.  If a policy does not involve risk transfer, GAAP treats it as a financing arrangement, with all premiums to be accounted for as deposits.

b.     **Background on AIG's Development of "Income Statement Smoothing" Products Specifically Designed to Circumvent GAAP and SEC Rules**

626.     In 1997, AIG developed a so-called "non-traditional" insurance product that was to be underwritten by the Loss Mitigation Unit ("LMU") of AIG's subsidiary, National Union. *The stated purpose of the product was "income statement smoothing,"* i.e., enabling public reporting companies to which the product was sold to spread the recognition of known, quantified losses over several future reporting periods instead of reporting the loss all at once.

627.     According to the September 11, 2003 SEC Order Instituting Proceedings against AIG in connection with the AIG-Brightpoint deal, an AIG accountant wrote a report (the "AIG White Paper"), that provided guidance on how AIG was to treat accounting and regulatory issues that arose in connection with the non-traditional insurance product.

628.     The AIG White Paper was *distributed to 32 management level AIG and National Union employees in October 1997, including National Union's president, the President of AIG's Financial Lines Claims Division and two other senior officers.*

629.     According to the AIG White Paper, one of the principal "attributes" of the "non-traditional" insurance was "[i]ncome statement smoothing" – in other words, this retroactive "insurance" could be structured to enable the "insured" to recognize losses over several reporting periods, rather than all at once in the period within which the loss occurred.  This smoothing effect could be accomplished by having the retroactive "insurance" policy pay a known loss in the first year of the policy, while allowing the "insured" to reimburse AIG over several subsequent years by paying premiums that were, in essence, loan repayments.  The "insured" benefited by recording the "premium" expenses as it paid them over several years, rather than recording the entire loss in one period.

630.     *The AIG White Paper openly acknowledged that the relevant accounting rules were specifically designed to avoid this "income smoothing" effect*.  In the AIG White Paper's own words, new accounting rules were "specifically introduced in response to abuse by insureds who did not recognize loss events as they occurred but rather as they were paid via financing arrangements."  *Nevertheless, the AIG White Paper set forth ways to avoid these "unintended accounting . . . consequences," most notably by suggesting that the insurance contracts not include terms that might suggest the true nature of the underlying "insurance."*  The AIG White Paper proposed instead that AIG and its clients should rely on their "relationship" for contractual terms that, if disclosed, would require the loss to be immediately recognized.  In other words, *the AIG White Paper proposed that these essential terms be contained only in an oral side agreement between AIG and its client.*

631.     As reported in *Fortune* magazine on August 8, 2005, Mark K. Schonfeld, the SEC's Northeast regional director, described the AIG White Paper as having "completely

contradicted everything [AIG had] been saying about how [the Brightpoint deal] was just the fault of one [Loss Mitigation Unit] guy who wasn't getting supervised."

632.    In the SEC's September 11, 2003 press release, Stephen M. Cutler, then the Director of the SEC's Division of Enforcement, described these insurance products as "*just vehicles to commit financial fraud*."

633.    In a March 15, 2005, *Wall Street Journal* article, Robert E. Omahne, a former AIG executive within its National Union subsidiary, commented on the importance of sales of such non-traditional insurance products – including finite reinsurance – to the Company:

> Among those who joined the game was AIG's Robert E. Omahne, who had been churning out cookie-cutter policies for corporate directors and officers. "It was boring," he recalls. Finite "was a chance to be creative." Mr. Omahne went on to help AIG become a big player in the field, selling policies to major companies. *He says he always made sure that AIG took on sufficient risk, but he says others at AIG were less careful*.
>
> "*The culture at AIG was to make budgets. Everybody seized on finite as a way to make their numbers. Anything having to do with finite sprung up all over the company*."

634.    Similarly, on August 8, 2005, *Fortune* quoted a former AIG vice president – apparently referring to Omahne – as saying, "All of a sudden you have this product that makes the difference between whether you make your budget or whether you are way under. It made huge money for us, and it was considered a sure bet because you didn't have the risks that you had with traditional insurance."

635.    Mr. Omahne reportedly warned Defendant Greenberg of the perils of AIG's finite reinsurance policies. The March 15, 2005 *Wall Street Journal* article stated:

> *[Omahne] says he asked Mr. Greenberg to stop other AIG units from selling finite insurance because he worried whether their policies would past [sic] regulatory muster, to no avail.* AIG and Mr. Greenberg declined to comment.

636.     In fact, that article reported that Mr. Omahne had been approached by Brightpoint

in 1998, a company that was seeking a finite reinsurance deal to help offset higher than expected

losses – a deal that, as discussed in greater detail below, was put together by other underwriters

at AIG:

> In 1998, Mr. Omahne says cellphone distributor Brightpoint Inc. of
> Plainfield, Ind., approached him seeking a policy to absorb part of
> $29 million loss in England because it was much higher than the
> $13 to $18 million loss it earlier had disclosed.  "I told them to
> take a walk," he says.  AIG and Brightpoint declined to comment.
>
> But other AIG underwriters, from its so-called Loss Mitigation
> Unit, agreed to help Brightpoint – a decision they likely came to
> regret.  ***The unit's marketing literature said that "companies can
> secure coverage for existing claims in order to contain or avoid
> any negative impact on financial statements [to] provide comfort
> to Wall Street."***

### c.     AIG's Deal with Brightpoint

637.     In January 1999, AIG executed a contract with Brightpoint for "non-traditional"

income smoothing insurance that was effective from August 1, 1998 through August 1, 2001 in

order to allow Brightpoint – in violation of GAAP – to illegally hide approximately $12 million

in losses.

638.     John Delaney and Timothy Harcharik, the controller and director of risk

management at Brightpoint, respectively, negotiated the Brightpoint deal with Louis Lucullo, at

the time an assistant vice president of Nation Union's Loss Mitigation Unit.

639.     To help structure the Brightpoint deal, AIG brought into the discussions the AIG

accountant who had written the accounting guidance contained in the AIG White Paper.

640.     The final policy ("Policy") that AIG wrote for Brightpoint consisted of two

governing documents:  The Binder of Coverage (the "Binder"), and the policy itself.  AIG and

Brightpoint executed the Binder on January 6, 1999, *but back-dated it to be effective August 1, 1998*.

641.    Under the final terms of the Policy, Brightpoint was to pay approximately $15 million in monthly "premiums" over the prospective three-year term of the agreement. Brightpoint also paid a $100,000 fee to AIG for putting the deal together.  In return, AIG immediately paid Brightpoint a one-time, lump-sum payment of $11.9 million, which Brightpoint recorded in 1998 as an "insurance receivable."

642.    The Policy provided two separate limits of coverage: Limit A and Limit B.  Limit A had an aggregate limit of $15 million, while Limit B had a per-loss limit of $15 million. Although Limit A was not referred to as being "retroactive," it effectively provided broad, retroactive coverage.  Limit B, on the other hand, provided traditional, prospective fidelity insurance coverage.  AIG and Brightpoint structured the Policy this way because, if the retroactive component stood alone, it would be obvious to Brightpoint's auditors that Brightpoint was paying $15 million in premiums for $15 million of coverage.

643.    At AIG's suggestion, the Policy did not contain an express provision granting Brightpoint the right to a refund under Limit A in the event that Brightpoint ended up paying more in premiums than it claimed in losses.  However, AIG and Brightpoint entered into an oral side agreement by which Brightpoint could receive such a refund.

644.    The terms of AIG's oral agreement with Brightpoint were reflected in a contemporaneous internal AIG memorandum as follows, with emphasis in original:

> Brightpoint had already taken a charge for the [trading] division
> . . . assuming the $15M of insurance recovery would happen.
> Brightpoint's auditors . . . wanted more evidence that an insurance
> recovery was possible.  Otherwise, Brightpoint would be in a
> position to possibly restate the charge already taken . . . The
> feedback from [the Auditors] was that they wanted a letter from

> AIG explaining the use of the policy in case there are no proceeds paid by Chubb . . . If for some reason Chubb pays the loss or a portion of the loss, the $15M [million] or the balance after a partial loss payment by AIG would have to be returned as well.  This would be returned under a future claim submitted by Brightpoint under Sub-Limit A.  THUS, SUB-LIMIT A WAS MADE TO BE EXTREMELY BROAD AND ANY PAYMENTS MADE SHOULD ALWAYS BE MADE WITHOUT LIMITATIONS BY COVERAGE; ONLY LIMITATIONS TO PREMIUM RECEIVED.

645.    An internal AIG memorandum to the President of AIG's Financial Lines Claims Division states:

> **AIG is not at risk for this arrangement** and maintains the benefit of collecting cash without giving interest on the float.  There were no specific required timeframes established for AIG's payments under this policy (due to the fact that **the policy was purposely constructed so as to _not_ appear as a finite risk policy for accounting reasons**) and the verbal agreement was that AIG would pay within a _reasonable_ time period."

### d.    The SEC Begins Investigating AIG's Dealings with Brightpoint

646.    In July 2000, the SEC began investigating AIG's dealings with Brightpoint.  The SEC initially submitted requests for information to AIG in July 2000, and then in November 2001, subpoenaed AIG for the production of documents.  However, AIG never disclosed that it had received the SEC's information request or subpoena.

647.    On September 11, 2003, the SEC instituted and settled civil and administrative proceedings against AIG, Brightpoint, and several employees of the two companies, including Louis Lucullo, a Senior Vice President of National Union's Loss Mitigation Unit.  In announcing the proceedings and settlements, Wayne M. Carlin, the Regional Director of the SEC's Northeast Regional Office, stated:

> In this case, **AIG worked hand in hand with Brightpoint personnel to custom-design a purported insurance policy that allowed Brightpoint to overstate its earnings by a staggering 61**

*percent.* This transaction was simply a 'round-trip' of cash from Brightpoint to AIG and back to Brightpoint. By disguising the money as 'insurance,' AIG enabled Brightpoint to spread over several years a loss that should have been recognized immediately.

#### e. The SEC's Administrative Proceedings Against AIG

648.    The SEC's settled Administrative Order against AIG concluded that:

*AIG violated Section 10(b) of the Exchange Act and Rule 10b-5 by negotiating a purported insurance policy with Brightpoint, knowing that the primary purpose of the policy was to provide Brightpoint with a means for misrepresenting its losses as insured losses and for making material misstatements in its public filings. AIG further participated in the fraudulent scheme by sending a letter to the Auditors stating that there would be a "probable" "insurance recovery" under the Policy, when AIG knew that the recoveries under the policy would be merely a refund of the money that Brightpoint previously had deposited with AIG.*

*        *        *

Delaney, Harcharik and AIG implemented a scheme to defraud Brightpoint's investors by employing an insurance contract to hide losses and by misleading Brightpoint's auditors. AIG was aware that Brightpoint needed to provide evidence of insurance to its auditors or it would be required to restate its previously announced estimate for the UK Losses. *AIG worked with Delaney and Harcharik to alter the language of the contract so that certain accounting "red flags" would be eliminated and minimized.* AIG knew that these red flags pertained to potential concerns of Brightpoint auditors. AIG orally agreed with Harcharik that AIG would return all monies paid under the contract to Brightpoint. *Further, AIG signed and faxed a letter to the Auditors confirming that Brightpoint was entitled to receive these "insurance proceeds" from AIG. AIG was aware that the letter served as audit evidence for the Auditors and was aware of Delaney's and Harcharik's desired objectives for the transaction,* AIG thus violated Section 10(b) and Rule 10b-5 of the Exchange Act.

649.    The Order directed AIG to disgorge the $100,000 fee it charged Brightpoint for putting together the insurance policy, with prejudgment interest of $37,535. AIG was also

- 204 -

ordered to retain an Independent Consultant to "conduct a comprehensive review of . . . the internal controls, policies, practices and procedures that AIG's Domestic Brokerage Group has put into place to ensure that Insurance Products will not be structured to facilitate violations of the federal securities laws." The consultant is to also make binding recommendations concerning AIG's internal controls to ensure that AIG's insurance products will not be used in the future to violate the securities laws.

650.    Finally, the SEC ordered that ***"AIG shall cease and desist from committing or causing any violations, or committing or causing any future violations, of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and from causing any violations or future violations of Exchange Act Rule 13b2-2."***

### f.    The SEC's Civil Proceedings Against AIG

651.    On September 11, 2003, the SEC also filed a related civil action in the Southern District of New York, *Securities and Exchange Commission v. Brightpoint, Inc., American International Group, Inc., et al.*, No. 03 CV 7045 (HB). That complaint, which named AIG and Brightpoint as defendants, among others, alleged that AIG violated Section 10(b) of the Exchange Act and Rules 10b-5 and 13b2-2.

652.    The Final Judgment, to which AIG consented, required AIG to pay a $10 million civil penalty, which – in the SEC's words – reflected "AIG's participation in the Brightpoint fraud, as well as misconduct by AIG during the Commission's investigation into the matter."

### g.    AIG's Misconduct During the SEC's Investigation

653.    Only after the settlement was announced did AIG's misconduct during the course of the investigation – which occurred during the Class Period – become publicly known.

654.    Mark K. Schonfeld, Associate Regional Director of the SEC's Northeast Regional office, said (with emphasis added):

> *The $10 million penalty against AIG reflects the gravity of its misconduct.  It also reflects the fact that, in the course of the Commission's investigation, AIG did not come clean.  On the contrary, AIG withheld documents and committed other abuses, as outlined in the administrative order, compounding its overall misconduct.*

655.     Specifically, during the course of the investigation, AIG failed to produce large quantities of documents that were responsive to the SEC's various information requests and subpoenas.  According to the SEC's Order against AIG:

> Beginning in July 2000, the Commission's staff issued to AIG two voluntary requests and, beginning in November 2001, the Commission's staff issued various subpoenas for documents.  On November 1, 2002, at the Commission's staff's request, ***AIG provided a sworn certification that AIG's production pursuant to all Commission subpoenas was complete.  The Commission believes that the certification was substantially erroneous***.

> After AIG provided this sworn certification, the Commission's staff made various further inquiries, which led to the production of a large quantity of documents, ***many of which should have been produced before the certification was made***.  The Commission now understands that ***AIG's document search prior to its sworn certification did not include the files of the former LMU president or other key individuals associated with the LMU*** and other locations in which responsive documents were likely to be found.  Nor did AIG conduct an adequate search of the LMU computer drive prior to its certification.  As a result, documents that were relevant to the investigation and called for under an October 2000 voluntary request and later subpoenas were not produced until December 2002 and January 2003.

> ***AIG also had not produced the White Paper until October 29, 2002, even though the White Paper was directly relevant to a position AIG took in a Wells meeting prior to the that date and in its Wells Submission in September 2002, namely, that the conduct at issue here was the result of inadequate training and support for the employee who dealt with Brightpoint.  At the time AIG made these representations to the Commission's staff, AIG was aware of, but had never produced, the White Paper***.  The White Paper demonstrates that the conduct of its employee was consistent with the guidance given in the White Paper – ***a document that itself had had wide circulation among management ranks***.

The Commission believes that AIG should have produced the
White Paper in response to the voluntary requests and subpoenas.
AIG disputes this point.  In any event, the Commission believes
that AIG should have produced the White Paper before a Wells
meeting in which the subject matter of the document was put
directly in issue by AIG.[17]

656.   AIG, in response to the announced proceedings against it in connection with the

Brightpoint deal, issued a press release on September 11, 2003 that read, in relevant part:

The Consent Decree issued by the Securities and Exchange
Commission relates to a "non-traditional" insurance product with
respect to which a single insurance policy was issued in 1999 by an
AIG subsidiary. AIG consented to the SEC Order to settle the
matter and neither admitted nor denied the SEC's findings.

AIG acknowledges that mistakes were made in the underwriting of
this policy. ***Consistent with its longstanding commitment to
ensure that it has sound and effective internal controls, AIG has
taken steps to correct those mistakes.*** AIG's profit from this policy
was less than $100,000.

657.   AIG's failure to disclose the SEC investigation and its failure to provide

documents requested by the SEC constituted material omissions and acts for the purpose of

artificially inflating AIG's stock price.

### 2.   AIG Entered Into Off-Balance-Sheet Transactions With PNC and Other Public Companies that AIG Knew, or Should Have Known, Violated GAAP and Had the Effect of Illegally "Smoothing" Those Companies' Earnings

658.   Despite the Company's having portrayed the Brightpoint deal as an isolated

incident perpetrated by a lone, unsupervised AIG employee, AIG had in fact marketed and sold

off-balance-sheet transactions to several public companies.  AIG knew, or should have known,

---

[17]   Other regulators apparently also had problems obtaining information from AIG.  The August 8,
2005 edition of *Fortune* reported that "Greenberg treated state oversight as an annoyance. ***Examiners
had to pry data out of the company.  'No one wanted to do the AIG exam because it was always a
battle,'*** says New York State Insurance Superintendent Howard Mills.  ***'There was a disdain for
regulators, and it fostered a corporate ethos that wasn't good for the company.'***"

that these transactions violated GAAP and had the effect of improperly "smoothing" at least one of the companies' earnings.

659.    As a result of these off-balance-sheet transactions, the SEC and DOJ brought civil proceedings against AIG, that the Company settled by agreeing to pay $80 million in fines and to disgorge the $46.36 million it received as fees in connection with the transactions.

660.    Not only did AIG improperly include the $46.36 million as premiums revenue during the Class Period, but after the SEC was investigating this transaction, AIG made at least three false public statements regarding the extent of the investigation.

661.    AIG Financial Products Corp. ("AIG-FP") is a wholly-owned, direct subsidiary of AIG, operating as part of AIG's Financial Services business segment.

662.    From at least February 2000 through January 2002, AIG – primarily through AIG-FP – developed, marketed and entered into with publicly traded companies ("counter-parties") certain structured financial products that utilized so-called "special purpose entities" ("SPEs").

663.    The structured financial products involved the creation of a corporation or similar limited liability entity, *i.e.*, the SPE, that would "hold" volatile assets.  Generally speaking, the counter-parties would either transfer assets or contribute cash to the SPE, which would, in turn, purchase the potentially volatile assets.  The counter-parties would thereafter *not* consolidate the SPE on their financial statements.

664.    As a result, as marketed by AIG-FP, the counter-parties could have recognizable gains on their income statement if the SPEs' assets *appreciated* in value, *but no concomitant recognizable losses if those assets declined in value*.

665.    AIG-FP claimed the deconsolidation – or off balance sheet treatment – of these SPEs complied with GAAP.   However, as described in greater detail below, AIG knew – or should have known – that the SPEs did not comply with GAAP and that it was therefore improper for the counter-parties to the transactions not to consolidate the SPEs in their financial statements.

### a.    GAAP Standards for Non-Consolidation of SPEs

666.    At all relevant times, GAAP required three principal conditions in order for the counter-party not to consolidate the SPE on its financial statements:  (1) AIG-FP, as the majority owner of the SPE, would have to be an independent party making a "substantive capital investment" in the SPE, which GAAP defined as at least 3 percent of the SPE's capital; (2) AIG-FP would have control over the SPE; or (3) AIG-FP would have to have "substantive risks and rewards" of ownership of the SPE's assets.

667.    GAAP further provides that fees paid to the owner of the SPE for structuring the transaction are treated as a return of the owner's initial capital investment.  Because AIG received these fees in advance, it did not satisfy the 3 percent investment requirement for consolidation.

### b.    GAITS Product

668.    Between June 2000 and March 2001, wholly-owned subsidiaries of AIG-FP entered into five "Guaranteed Alternative Investment Trust Security" ("GAITS") transactions with insurance company subsidiaries of two publicly traded companies.

669.    AIG-FP received a fee in each of the GAITS transactions.  In the first three GAITS transactions, the counter-parties prepaid three years' annual fees at the closing.  In the other two transactions, AIG was prepaid five-and-one-half years' annual fees at the closing.

670.     The two counter-parties to the five GAITS transactions invested a total of $231,659,000 in the SPE trusts.  The SPE trusts in the five transactions were not consolidated on the financial statements of either AIG or the counter-parties to the transactions.  Rather, each party recorded its investment in the SPE trust on its balance sheet as an "available for sale" security.

671.     However, the GAITS transactions failed to satisfy the GAAP requirement for non-consolidation of the SPE because AIG-FP, as the independent third-party investor in the SPE, failed to make a "substantive capital contribution" in the SPE of at least 3 percent of the SPE's assets.

672.     This was so because, under GAAP, structuring fees paid by either the SPE or the counter-party to an investor in the SPE must be deducted from the investor's capital investment for purposes of determining whether the transaction complies with the capital investment requirement for non-consolidation.  AIG-FP's receipt of structuring fees pursuant to the GAITS transactions reduced AIG-FP's "substantive capital investment" below the GAAP-required 3 percent minimum.

### c.     C-GAITS Product

673.     Similar to the GAITS product, AIG marketed and sold another transaction called "Contributed Guaranteed Alternative Investment Trust Security ("C-GAITS").  AIG marketed the C-GAITS product to several public companies, and sold it to PNC so that PNC could improperly remove over $700 million in volatile assets from its financial statements.

674.     The C-GAITS product called for the counter-party to transfer to the SPE troubled or other potentially volatile assets – such as loans or equities – and cash.  In exchange, the counter-party would receive nonvoting Senior Class A Preferred stock in the SPE that could be converted into Class A common stock.  The common stock, if issued, could be voted only to

liquidate the SPE.  Although the preferred stock would bear a dividend, the dividend would be noncumulative, would be paid from the cash (if any) derived from the non-cash assets contributed by the counter-party to the SPE, and then only if there were sufficient funds available after the payment of certain fees.

675.    The AIG-FP subsidiary would charge the counter-party, or the SPE, an annual fee.

676.    If the value of the assets held by the SPE appreciated, the counter-party could exercise rights of redemption and liquidation that would terminate the transaction and allow the counter-party to recognize the gains on its income statement.  However, so long as the assets remained in the SPE, the counter-party's reported earnings supposedly would not be affected by variations in the value of the assets because the assets would not be consolidated on the counter-party's financial statements and changes in the value of the counter-party's preferred interest in the SPE would be recorded in the "Other Comprehensive Income" line within the Shareholders' Equity section of the counter-party's balance sheet.

677.    The C-GAITS transactions did not satisfy the GAAP requirement that AIG, as the independent third-party investor in the SPE, make a "substantive capital investment" in the SPE of at least 3 percent of the SPE's assets.  Thus, PNC was required to consolidate the SPE.

### i.    AIG and PNC Enter into Two C-GAITS Transactions

678.    AIG ultimately entered into a total of three C-GAITS transactions with PNC between June 28, 2001 and November 30, 2001.  Through these transactions, PNC sought to remove a total of more than $750 million loan and venture capital assets from its balance sheet. *However, AIG failed to inform PNC that AIG had been asked during its negotiations with other potential counterparties on May 29, 2001 and November 1, 2001 to increase its*

***substantive capital investment from 3 percent to 5 percent so as to avoid violating GAAP's
problems requirements for non-consolidations of SPEs.***

679.    For each of its transactions with PNC, AIG formed two limited liability
corporation SPEs, each called a "PAGIC" entity.   A purpose of the PAGIC transactions was to
allow PNC to remove the potentially volatile loans and venture capital assets from its financial
statements, and to instead record PNC's preferred share investments in the PAGIC entities as
"available for sale" securities.  PNC could only obtain this favorable accounting treatment if
each of the PAGIC transactions met the GAAP requirements for non-consolidation of an SPE.

680.    In PAGIC I and PAGIC II, PNC transferred to the PAGIC entities loans and
participations in loans ("loan assets") that PNC viewed as presenting a substantial risk of loss.  In
PAGIC I, PNC transferred to the first PAGIC entity $257.4 million in loan assets, plus cash.  In
PAGIC II, PNC transferred to the second PAGIC entity $334.8 million in loan assets.

681.    The PAGIC I transaction provided for PNC to pay AIG fees exceeding the $11.6
million AIG contributed in the transaction.  Likewise, the PAGIC II transaction provided that
PNC was to pay AIG fees exceeding the $16.9  million that AIG contributed in the transaction.
The agreements further provided that PNC was to pay AIG a portion of the fees at the closing of
the transaction, with the remainder of the minimum amount due to AIG to be paid in equal
amounts over the subsequent four years.

682.    PNC treated both transactions as complying with GAAP's requirements for non-
consolidation.  Thus, PNC removed from its financial statements the assets it had transferred to
the PAGIC entities, instead recording the value of its preferred share investments in the PAGIC
entities as "available for sale" securities.

683.    In fact, the PAGIC I and II transactions did not satisfy GAAP because the payment of structuring fees to AIG in connection with the PAGIC I and II transactions reduced AIG's "substantive capital investment" below the 3 percent minimum level that GAAP required in order for PNC to properly not consolidate the SPEs.

684.    The PAGIC I and II transactions violated GAAP for additional reasons.  First, AIG was unable to benefit from any appreciation in the value of the assets that PNC transferred to the SPEs because PNC had the right at any time to liquidate the SPE and then receive the benefit of the appreciated assets.  Second, AIG did not bear any "substantive risks" because: (1) the fees that it had received exceeded the amount AIG had contributed to the SPEs, (2) the amount that AIG had contributed was invested in highly-rated debt securities and was therefore protected from loss, and (3) AIG would receive dividends on its preferred stock regardless of how the assets in the SPEs performed.  Further, AIG did not treat changes in the value of the assets PNC contributed as having any impact on AIG's income statement.  Rather, AIG treated any change in the value of those assets as being offset by a corresponding change in its liability on the preferred stock PNC received in connection with each transaction – *i.e.*, if the assets PNC contributed declined in value, AIG treated its liability on the preferred stock as having decreased by an equal amount.

685.    Therefore, under GAAP, it was improper for PNC to not consolidate the PAGIC entities into its financial statements and regulatory reports.  This resulted in: (1) a material 21 percent overstatement of PNC's earnings per share for the third quarter of 2001, (2) material understatements of the amounts of PNC's nonperforming loans and assets reported in PNC's financial statements and regulatory reports for the second and third quarters of 2001, and (3) material overstatements of the amounts of reductions in loans held for sale and securities

available for sale reported in PNC's financial statements and regulatory reports for the second and third quarters of 2001.

### ii.   AIG Enters into a Third C-GAITS Transaction with PNC

686.   On November 30, 2001, AIG and PNC closed their third C-GAITS transaction ("PAGIC III").

687.   Pursuant to this transaction, PNC transferred to the PAGIC entities $169.6 million of venture capital investments held by its nonbank subsidiaries, plus cash.

688.   The PAGIC III transaction called for AIG to receive fees that exceeded the $8 million that AIG contributed to the PAGIC entities pursuant to the transaction.  The agreement also provided that AIG was to be paid a portion of the fees at the transaction's closing, with the remainder to be paid over the ensuing four years.

689.   The PAGIC III transaction did not satisfy the GAAP requirement that AIG, as the independent third-party investor in the SPE: (1) make a "substantive capital investment" in the SPE of at least 3 percent of the SPE's assets, and (2) have substantive risks and rewards of ownership of the SPE's assets.  The PAGIC III transaction failed to satisfy these requirements for the same reasons alleged in paragraphs 683 and 684 herein.

690.   As a result, PNC should have included the venture-capital investments and other assets of the PAGIC entities in its financial statements and regulatory reports, by consolidating the PAGIC entities.  PNC's failure to do so resulted in, among other things, (1) a material understatement of PNC's fourth quarter 2001 loss per share of approximately 25 percent; (2) an overstatement of 2001 earnings per share by 52 percent; (3) an understatement of the amount of PNC's nonperforming assets, (4) an overstatement of the amount of reductions in loans held for sale, and (5) an overstatement of the amount of securities available for sale.

### iii.    AIG And PNC Unwind and Restructure the Three PAGIC Transactions

691.    By January 29, 2002, AIG learned that, due to problems with the accounting for the C-GAITS transactions, PNC decided to consolidate the PAGIC entities onto PNC's financial statements.

692.    On January 22, 2003, AIG and PNC liquidated the PAGIC entities.  After the liquidation, AIG received the additional fees pursuant to the PAGIC transaction agreements.

693.    On July 18, 2002, the SEC instituted and settled administrative proceedings against PNC by issuing a Cease and Desist Order that found that PNC's accounting for the PAGIC transactions violated GAAP.

694.    The SEC charged PNC with violating, or causing violations of, Sections 10(b), 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1 and 13a-13.  PNC consented to the issuance of the Order without admitting or denying the SEC's findings.

695.    On June 2, 2003, PNC ICLC Corp. ("PNC-ICLC"), a wholly owned indirect subsidiary of PNC, entered into a deferred prosecution agreement with the DOJ pursuant to which PNC-ICLC agreed to pay $90 million in restitution and $25 million in penalties.  As part of the agreement, PNC-ICLC accepted responsibility for its behavior as set forth in the "Statement of Facts," which acknowledged that each PAGIC transaction violated GAAP's requirements for PNC's non-consolidation of the PAGIC entities.

696.    AIG-FP and its counter-parties to the GAITS transactions did not unwind or restructure the five previously consummated GAITS transactions until April 7, 2003 (one transaction unwound), May 5, 2003 (two transactions unwound) and September 25, 2003 (two transactions unwound).

### d.     Criminal and Civil Proceedings Against AIG in Connection with Its Role in the GAITS and C-GAITS Transactions

697.     On January 30, 2002, AIG disseminated a press release in which the Company "confirmed that its subsidiary, AIG Financial Products Corp., entered into three structured transactions with the PNC Financial Services Group, Inc. (PNC)."  The press release further stated that "[t]he entities involved in these transactions were consolidated into AIG's financial statements, and thus were included on AIG's consolidated balance sheet.  *AIG has not entered into any other transactions using this structure."*

698.     Less than one month later, on February 21, 2002, AIG confirmed that the SEC had served AIG with a subpoena in connection with the PNC PAGIC transactions.

699.     In response to this revelation, AIG stock price dropped by 4 percent, from a close of $73.72 on February 20, to a close of $71.04 on February 21, 2002.

700.     According to the February 27, 2002 edition of *Business Week Online*, on February 25, 2002, at a meeting with reporters, Greenberg reportedly brushed aside concerns over the SEC's inquiry, stating:  "*There's a difference between complex transactions and dishonest transactions.  If we're going to go back to simple transactions, we can start trading in beads*."

701.     For the next two years the SEC continued its investigation of AIG.  Then, on September 21, 2004, AIG issued a press release announcing that the SEC was considering bringing a civil action against the Company in connection with the PNC transactions.  The press release read, in relevant part:

> AIG and its subsidiary AIG Financial Products Corp. (AIG-FP) have been informed by the Staff of the Securities and Exchange Commission (SEC) that the Staff is considering recommending that the SEC bring a civil action against AIG and AIG-FP alleging violations of the federal securities laws.  The Staff's communication, commonly referred to as a "Wells Notice," arises

out of the SEC's investigation entitled In the Matter of PNC
Financial Services Group, Inc. (PNC), and involves certain
transactions marketed by AIG-FP prior to 2003, including three
transactions entered into by a subsidiary of AIG-FP between June
2001 and November 2001.  The PNC transactions were the subject
of an SEC action against PNC in 2002, and were terminated early
the next year.

AIG and AIG-FP believe that the proposed action would be
unwarranted and will respond to the Staff.

702.    The following week, on September 29, 2004, AIG issued a press release

announcing that **the Department of Justice had begun a criminal investigation into AIG's role**

**in connection with the PNC transactions**.

### i.    SEC Proceedings Against AIG

703.    On November 30, 2004, the SEC announced the filing – and settlement – of a

civil case against AIG in the U.S. District Court for the District of Columbia. The SEC's

complaint alleged that AIG violated the antifraud provisions of the federal securities laws and

aided and abetted PNC's violations of reporting and record-keeping provisions of those laws.

Specifically, the SEC alleged that AIG violated Section 17(a) of the Securities Act, Section 10(b)

of the Securities Exchange Act and Exchange Act Rule 10b-5, and aided and abetted PNC's

violations of Section 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 12b-20

and 13a-13.

704.    Pursuant to the SEC's settlement with AIG, the Company consented to the entry

of final judgment that required the company to **disgorge $46,366,000**,[18] which represented the

$39,821,000 in fees AIG received from PNC, plus $6,545,000 in prejudgment interest.

---

[18]   On August 13, 2005, the *Pittsburgh Tribune-Review* reported that, in addition to AIG having to
disgorge this $46.3 million for the benefit of PNC shareholders, the Company is slated to contribute **an
additional $4 million** to settle the shareholder class action lawsuit against PNC currently pending in the
Western District of Pennsylvania.

705.    The settlement also permanently enjoins AIG from violating Section 10(b) of the

Securities Exchange Act; Section 17(a) of the Securities Act; aiding and abetting violations of

Section 13(a) of the Exchange Act and Section 13(b)(2)(A) of the Exchange Act.

706.    AIG is also required to retain an Independent Consultant to examine certain AIG

transactions between January 1, 2000 and December 2, 2004 (*i.e.*, the date of the final judgment)

to determine whether the transactions were used or were designed to violate GAAP or SEC rules.

707.    Moreover, pursuant to the settlement, AIG must establish a Transaction Review

Committee to review and determine the appropriateness of certain transactions proposed to be

undertaken by AIG after December 2, 2004 (*i.e.*, the date of the final judgment).

708.    As it had been with the SEC's investigation into the Company's deal with

Brightpoint, AIG was reportedly "uncooperative" with the SEC's investigation into the

Company's deals with PNC.  As *Fortune* reported in its August 8, 2005 edition:

> If Brightpoint was "strike one" for Greenberg, PNC soon became
> "strike two."  ***Once again, AIG was "basically uncooperative"
> with the SEC's investigation, says a senior regulator in the case:
> "They kept talking about their impeccable reputation."***

### ii.    DOJ Proceedings Against AIG

709.    Also on November 30, 2004, the Deputy Attorney General James B. Comey,

Assistant Attorney General Christopher A. Wray of the Criminal Division of the Department of

Justice, and FBI Director Robert Mueller – all members of the President's Corporate Fraud Task

Force – announced that AIG and two of its subsidiaries had reached a settlement to resolve

criminal liability associated with the PAGIC transactions.  The agreement was officially entered

into by the AIG Fraud Section of the DOJ's Criminal Division (the "Fraud Section"), and the

U.S. Attorney for the Southern District of Indiana (which, in October 2004, had notified AIG

that it was the target of grand jury investigations regarding "non-traditional" insurance or "income smoothing" products – in connection with the Brightpoint transaction).

710.    Pursuant to the settlement agreement, **AIG-FP agreed to pay $80 million** in penalties.

711.    As part of the agreement, AIG also accepted responsibility for the conduct of its employees in connection with the Brightpoint transaction.

712.    Pursuant to the agreement, the Fraud Section agreed not to prosecute AIG or its subsidiaries (except for AIG-FP and its subsidiaries, as discussed below) in connection with (1) the marketing or sale of the GAITS and C-GAITS transactions, or (2) the marketing and sale of income smoothing products that were the subject of the SEC's investigation styled, "In re Certain Loss Mitigation Insurance Products," which included AIG's transaction with Brightpoint.

713.    In connection with the agreement, on November 30, 2004, the Fraud Section also entered into a Deferred Prosecution Agreement (the "DPA") with AIG-FP PAGIC Equity Holding Corp. ("AIG-FP PAGIC"), an AIG-FP subsidiary, in the Western District of Pennsylvania. Along with the DPA, the Fraud Section concurrently entered into a separate agreement with AIG-FP.

714.    The DPA provided, *inter alia*, that:

- AIG-FP PAGIC "accepts responsibility for its conduct;"

- The United States was to file a criminal complaint in the U.S. District Court for the Western District of Pennsylvania charging AIG-FP PAGIC with aiding and abetting securities fraud in connection with the GAITS and C-GAITS transactions;

- The Fraud Section will recommend to the court that prosecution on the complaint be deferred for 12 months, and that if AIG-FP PAGIC fulfilled its agreement to

cooperate with the government, the Fraud Section would seek dismissal of the complaint 30 days after the expiration of the 12 months.

715.    The Fraud Section's separate, concurrent agreement with AIG-FP provided, *inter alia*, that:

- "AIG-FP accepts responsibility for the conduct of its employees";

- That AIG-FP will pay a penalty of $80,000,000;

- That, except for the DPA with AIG-FP PAGIC, the Fraud Section will not prosecute AIG-FP for any conduct by AIG-FP relating to the GAITS, C-GAITS and PAGIC transactions provided AIG-FP fulfills its agreement to cooperate with the government in its investigation of these matters.

716.    Despite this apparent closure, the investigations related to the C-GAITS and GAITS transactions may not be complete.  In its March 7, 2005 edition, *Fortune* reported that Attorney General Spitzer and the SEC are investigating whether Defendant Greenberg personally promoted the non-traditional insurance or "income statement smoothing" products to the heads of other companies.

### 3.    AIG Misled Investors About The Scope Of The Government's Investigations Into PNC and Brightpoint

717.    AIG also misled investors about the scope of the various governmental investigations into the PNC and related transactions.  Specifically, AIG issued three press releases in connection with those investigations, dated January 30, 2002, September 21, 2004 and September 29, 2004.

718.    AIG's January 30, 2002 press release read, in relevant part, and with emphasis added:

American International Group, Inc. (AIG) has confirmed that its subsidiary, AIG Financial Products Corp., entered into three

> structured transactions with The PNC Financial Services Group, Inc. (PNC).
>
> PNC has reported that it relied on advice from its independent auditors concerning the accounting treatment of these transactions.
>
> The entities involved in these transactions were consolidated into AIG's financial statements, and thus were included on AIG's consolidated balance sheet. ***AIG has not entered into any other transactions using this structure***.

719.   AIG's September 21, 2004 press release – which announced that the SEC was considering bringing a civil action against AIG in connection with the PNC transactions – read, in relevant part:

> AIG and its subsidiary AIG Financial Products Corp. (AIG-FP) have been informed by the Staff of the Securities and Exchange Commission (SEC) that the Staff is considering recommending that the SEC bring a civil action against AIG and AIGFP alleging violations of the federal securities laws. The Staff's communication, commonly referred to as a "Wells Notice," arises out of the SEC's investigation entitled In the Matter of PNC Financial Services Group, Inc. (PNC), and involves certain transactions marketed by AIG-FP prior to 2003, including three transactions entered into by a subsidiary of AIG-FP between June 2001 and November 2001. The PNC transactions were the subject of an SEC action against PNC in 2002, and were terminated early the next year.
>
> AIG and AIG-FP believe that the proposed action would be unwarranted and will respond to the Staff.

720.   AIG's September 29, 2004 press release – which announced that the DOJ had begun a criminal investigation into AIG's role in connection with the PNC transactions – read, in relevant part:

> [AIG] announced that its subsidiary AIG Financial Products Corp. (AIG-FP) has been informed by the U.S. Department of Justice that it is a target of an investigation involving possible violations of the federal securities laws. AIG believes that this notification relates to substantially the same matter described in its announcement last week that the Securities and Exchange Commission Staff is considering recommending that the

Commission bring a civil action alleging violations of the federal securities laws.

AIG believes that any action by either the SEC or Justice Department would be unwarranted.  **AIG intends to cooperate with this investigation**.

721.  ***These three press releases were misleading in that they failed to fully disclose the scope of the SEC's and DOJ's investigation.***  In particular, by identifying only the PNC transactions, AIG gave investors the false impression that the government was only investigating the PNC transactions.  ***However, in reality – as alleged above – the government was investigating five similar, additional transactions that AIG entered into with two counterparties other than PNC.***

722.  The SEC and DOJ share this view.  On Monday, October 4, 2004, AIG issued a press release stating that the DOJ and SEC had warned the Company that it misled investors when AIG issued the three press releases between January 2002 and September 2004.  Specifically, the SEC and DOJ believe that the three press releases failed to reveal the full scope of the government's investigations into the PNC transactions.

723.  With respect to AIG's January 30, 2002 press release, the SEC viewed the statement, "AIG has not entered into any other transactions using this structure," as misleading because AIG-FP had entered into *five* other transactions – *i.e.*, the GAITS transactions – with two other counterparties.

724.  Similarly, the SEC deemed AIG's September 21, 2004 press release ***"a continuation of the problem that [the SEC] perceives with the January 30, 2002 press release"*** ***– namely, that the September 21, 2004 press release was "false and misleading in that[,] by identifying only the PNC transactions[,] "the September 21, 2004 press release "provided a***

*false impression."*  The SEC also held the position that AIG's September 21, 2004 press release should have named the GAITS counterparties.

725.    With respect to AIG's September 29, 2004 press release, the SEC believed that the Company ***did not present a fair picture of the scope of the Department of Justice's target notification and thereby continued the allegedly misleading disclosure that had begun in 2002.***"

726.    Similarly, the DOJ saw AIG's September 29, 2004 press release as misleading:

> The Department stated that its target notification described the scope of its investigation as covering possible violations of the securities laws involving, among other matters, AIG-FP's role in the sale and promotion of securities designed to achieve an accounting result which did not conform to GAAP.  In addressing the scope of its investigation, the Department confirmed that the investigation covers **both** the **GAITS structure** and the **PNC transaction structure (referred to as C-GAITS)** and the alleged failure of AIG-FP to 'timely unwind' the GAITS transactions, as well as alleged misleading marketing of C-GAITS  products to various entities with which **transactions were not consummated**.  The marketing of **GAITS and C-GAITS** products ceased prior to 2003 and five GAITS transactions were either unwound or restructured during 2003.  (emphasis added)

727.    On October 18, 2004, *Business Week Online* issued an article entitled, "AIG: Why The Feds Are Playing Hardball," explaining the government's dismay with the three misleading press releases. The article stated in relevant part:

>  ***(AIG)*** is ***seriously on the outs with both law enforcement agencies***. The trouble seems to have begun on Sept.  21, when the SEC informed AIG that it may bring civil securities-fraud charges against it for allegedly helping PNC Financial Services Group Inc. (PNC) hide underperforming loans in 2001.  Eight days later, the Justice Dept. told AIG that it is under criminal investigation for the same deals.  ***Things got noticeably worse on Oct. 4, when both Justice and the SEC warned AIG that it may have misled investors when it issued three press releases that allegedly failed to reveal the full scope of the probes***.

That makes four warnings in three weeks from agencies not usually known for quibbling over the wording in company press releases.  AIG says it intends to cooperate -- but in its latest statements it still contends that any action by the two agencies "would be unwarranted" and that charges it misled investors are "without merit." ***The complaints about AIG's press releases boil down to this: The company said it was under investigation for certain deals, "including three transactions" with PNC -- but failed to mention that the investigations also covered five additional deals with two other insurers***.

728.    In response to AIG's announcement on October 4, 2004, the price of AIG's stock fell from $68.72 to close at $66.50 on October 5, a 3.2 percent drop.

## H.    DEFENDANT GREENBERG INVESTIGATED FOR MANIPULATING AIG'S STOCK IN CONNECTION WITH THE COMPANY'S AUGUST 2001 ACQUISITION OF AMERICAN GENERAL AND AGAIN IN FEBRUARY 2005

729.    Recent press reports, as well as recordings of conversations between Defendant Greenberg and traders of AIG stock, reveal that Defendant Greenberg attempted to manipulate the price of AIG stock on several occasions.  One instance occurred in August 2001, when Defendant Greenberg tried to call Richard "Dick" Grasso – at the time the head of the NYSE – in an effort to have Grasso pressure NYSE floor specialists into purchasing shares of AIG so as to prop up its stock price in the days leading up to AIG's acquisition of American General.  The other instances occurred in February 2005, when Defendant Greenberg repeatedly called AIG traders and directed them to purchase sufficient quantities of the Company's shares to try to stabilize and raise the price of AIG stock.

### 1.    Defendant Greenberg Manipulated the Price of AIG Stock in Connection With the Company's August 2001 Acquisition of American General

730.    On August 29, 2001, AIG acquired American General.  According to AIG's 2002 Form 10-K, in connection with the acquisition, AIG issued approximately 290 million shares of common stock, in an exchange for all the outstanding common stock of American General based

on an exchange ratio of 0.5790 shares of AIG common stock for each share of American General common stock.

731. According to a May 11, 2001 AIG press release, the terms of the deal were that American General shareholders were to receive AIG common stock according to an exchange ratio that was to be determined based on the 10-day average price of AIG's common stock ending three days prior to the August 29, 2001 closing. The exchange ratio was that American General shareholders would receive AIG stock valued at $46 per American General share so long as AIG's average stock price during the 10-day pricing period was between $76.20 and $84.22. If AIG's price was equal to or less than $76.20, or equal to or more than $84.22, American General shareholders were to receive 0.6037 or 0.5462 AIG shares, respectively.

732. *As a result of this exchange ratio agreement, if AIG's stock price fell $1 below $76.20, it would have cost the Company approximately $150 million more in AIG stock to acquire American General.*

733. Within the relevant 10-day period, AIG's stock price was sliding close to the lower limit. On August 14, 2001 the average price was $80.47. By August 26, it had declined to $77.04, and had hit a low of $76.39. Thus, AIG was very close to having to pay American General shareholders tens, or perhaps hundreds, of millions of dollars in additional AIG stock.

734. The NYSE uses the "specialist" system to make markets in its listed stocks. The specialists make an orderly market, matching buyers and sellers. When buyers and sellers can't agree on a price, specialists usually will step in with their own capital to facilitate trading.

735. On November 24, 2004, *The Wall Street Journal* reported that **the U.S. Attorney's Office for the Southern District of New York announced it had launched a criminal**

*investigation into whether Defendant Greenberg had violated federal securities laws by trying*

*to inflate the price of AIG stock in connection with AIG's acquisition of American General.*

736.     According to that same article, Defendant Greenberg called Richard "Dick"

Grasso, the then-head of the NYSE, in an effort to convince Grasso to pressure the "market

specialists" in AIG stock to buy additional shares of AIG in order to prop up its market price in

the days leading up to the closing of the American General acquisition.

737.     Grasso reportedly was not in the office the day that Defendant Greenberg

allegedly called in August 2001, but one of Grasso's assistants relayed Greenberg's request to

traders on the trading floor to implement the request.

### a.     Background on Defendant Greenberg's Relationship with Grasso and the NYSE

738.     On October 3, 2003, *The Wall Street Journal* reported that on October 23, 2002,

Defendant Greenberg wrote a letter to Grasso to complain about the specialists' handling of

AIG's stock.  In response, Grasso allegedly pressured the specialist firm Spear, Leeds & Kellogg

– which handled AIG's stock – to buy more AIG shares.  The *Journal* article also raised

questions about whether Grasso acted because of Defendant's Greenberg's role from 1996 to

mid-2002 as a NYSE board member and member of the compensation committee that had

approved the multi-million dollar Grasso compensation package that later led to Grasso's ouster.

739.     According to an October 3, 2003 *Globe and Mail* article, in his October 23, 2002

letter to Grasso, Defendant Greenberg complained that Spear needed to commit more of its own

money to buy AIG shares, which had been falling.  As reported on November 24, 2004 in *The*

*Wall Street Journal*, Defendant Greenberg's letter also threatened that he would move AIG's

stock listing elsewhere, saying, "I can do much better on another Exchange."

740.    The *Globe & Mail* article cited sources familiar with the incident who said that Grasso then went to the NYSE trading floor and suggested to Spear that it buy more AIG shares. According to an October 10, 2003 *CBSNews.com* article, the story was confirmed by a person at Goldman Sachs familiar with the situation.

741.    The *Globe & Mail* reported that, in response to Grasso's "suggestion," Spear allegedly increased its buying of AIG shares, which temporarily stabilized the stock, but caused $14 million in trading losses for Spear.

742.    Edward Kwalwasser, the NYSE's executive vice president for regulation, noted that while the NYSE typically receives about 560 letters each year from firms questioning trading in their stocks, such inquiries – whether directed to Grasso or others – typically are routed to the NYSE's market surveillance unit, which then investigates the matter.

743.    ***"In 16 years as a [NYSE floor] member, I've never seen management of the stock exchange come down and specifically talk to a specialist about complaints by [a] company as to their market making on the floor,"*** said Robert McCooey, who runs the brokerage firm of Griswold Co.

744.    *The Wall Street Journal* reported on October 3, 2003, that the NYSE had planned to ask its floor specialists whether they had been pressured into trading shares of AIG.  Edward Kwalwasser announced at that time:  "We will ask the specialists what their impressions were and we will also look at what happened in the marketplace."  The *Journal* also reported that the NYSE's move followed the reports of Defendant Greenberg's complaints to Grasso.

745.    Defendant Greenberg was not shy about admitting that he had contacted the heads of the NYSE to complain.  On October 10, 2003, the *Financial Times* printed an op-ed piece by Defendant Greenberg entitled, "Shake up the NYSE Specialist System or Drop It."  In it,

Defendant Greenberg states, "I have been critical of the specialist system for some time – before

during and after my tenure on the NYSE board of directors."  He goes on to state, with emphasis

added:

> Since AIG listed on the NYSE in 1984, I have not hesitated to try
> to ensure that AIG shareholders have a level playing field.  *I have*
> *regularly contacted our previous and present specialist firms, as*
> *well as Goldman Sachs, the owner of our present specialist firm*.
> In addition, *I have contacted the chairmen of the NYSE, both*
> *Richard Grasso and his predecessors.  I shall continue to do so*
> *while John Reed is chairman and after his successor is named*.

746.    On November 3, 2003, *The Wall Street Journal* reported that the SEC was

investigating whether Grasso had engaged in "influence trading" by allegedly pressuring Grasso.

747.    Several months later, on March 12, 2004, *The Wall Street Journal* reported that

the SEC was planning to subpoena Grasso and Greenberg in connection with the October 2002

incident.

748.    As reported in *The Wall Street Journal* on November 26, 2004, in apparent

response to the investigations into Defendant Greenberg, in or around November 2004, the

NYSE began warning the specialist firms to closely monitor communications they have with

corporate executives so as to avoid pressure to manipulate stock prices.

## 2.    Defendant Greenberg Manipulated the Price of AIG Stock in February 2005

749.    According to the NYAG's investigation and recent press reports, Defendant

Greenberg also manipulated the price of AIG stock by ordering AIG traders to buy shares of the

Company's stock in February 2005 in an effort to prop up its stock price.

750.    On May 6, 2005, *The New York Times* issued an article titled "Insurer Ex-Chief Is

Called Target of Stock Inquiry."  The article stated in part:

> *Federal prosecutors in Manhattan have opened an investigation*
> *into whether Maurice R. Greenberg, the former chairman and*

*chief executive of the insurance giant American International Group, orchestrated an effort to manipulate the company's stock price in his final weeks as chief*, people officially briefed on the inquiry said yesterday.

The investigation was prompted by an executive with the company's trading group, who told the company late last week that he had talked with Mr. Greenberg about A.I.G.'s stock price in February, at a time that it had begun to fall sharply. People who have heard a recording of the conversations say *Mr. Greenberg can be heard instructing the trader to buy shares of A.I.G.  Such purchases may violate federal securities law*.

*The conversations between the trader and Mr. Greenberg were captured on a recording system used by the trading division,* the people briefed on the inquiry said. The recordings of those conversations were reviewed by the company and its lawyers. Afterward, the recordings were turned over to prosecutors with the United States attorney's office in Manhattan and the Securities and Exchange Commission.

*Federal prosecutors, the people briefed on the inquiry said, have since subpoenaed all of A.I.G.'s recordings from its trading group, which are said to date back as much as two years*.

The development is a significant turning point in the investigation, as investigators branch out into examining possible market manipulation. It also gives federal prosecutors a more prominent role in the inquiry.  Since the beginning of the year, federal and state officials have been examining transactions A.I.G. used to make its financial position appear stronger than it really was.

The development also shows that Mr. Greenberg remains a focal point in the investigation despite being forced to step down as head of the company. Mr. Greenberg, who turned 80 on Wednesday, resigned as chief executive of A.I.G. on March 14 and as chairman later that month.

Mr. Greenberg, an imperious chief executive who has clashed with regulators in the past, built American International Group over four decades into a global giant in commercial insurance and life insurance.

*      *      *

It is unclear why Mr. Greenberg may have called the trader in February.  The executive, however, was known for championing his company's stock and browbeating those perceived as less

enthusiastic.  The remarkable performance of A.I.G. stock over the decades was often cited by Mr. Greenberg as a measure of his success as chief executive.

Purchases by a company of its own stock are not inherently illegal. ***But companies must follow rules to ensure that they are not buying to prop up the stock price artificially.***  The purchases said to have been ordered in February may not have been part of such a program, people who have heard the recordings said.

John C. Coffee, a securities law expert at Columbia, said, "***If you were making purchases with the intent of artificially distorting the market - making the market reach an artificial price that would not be the normal product of supply and demand - that is something that violates***" the S.E.C.'s general prohibition of *market manipulation and fraud*.

751.   On May 9, 2005, *The Wall Street Journal* reported – with respect to the February 2005 trades Defendant Greenberg ordered be made – that "details on the tapes suggested that trades had been made."  The article also noted that **"some legal observers said it is highly unusual for a chief executive to call a trading desk directly to inquire about the stock price, and that action could raise questions as to intent**," and that "federal prosecutors are also looking into a directive Mr. Greenberg gave to Big Board executives in 2001 to support AIG stock when the insurer was closing an acquisition."

752.   These reports were confirmed by the NYAG, who in its May 26, 2005 complaint against Defendant Greenberg and others, included detailed allegations of market manipulation that occurred on at least two occasions in February 2005.  The NYAG's allegations are based on *recorded telephone calls* ("trader tapes") between Defendant Greenberg and the traders of AIG stock.

753.   The first incident happened in early February.  On February 1, 2005, AIG had disclosed that a series of natural disasters would increase 2005 underwriting losses.  As trading progressed on February 3, 2005, AIG's stock price reached a low of $65.86.  Trader tapes reveal

that Defendant Greenberg called an AIG trader and instructed the trader to begin repurchasing AIG shares on the open market, explaining that **_"I don't want the stock below $66 so keep buying."_** The trader asked Defendant Greenberg whether there was any limit on how many shares he should purchase to prevent the stock decline, to which Defendant Greenberg responded **_"[i]f you have to go to half a million [shares], go to half a million shares."_**  Defendant Greenberg's manipulation of the market was apparently a success – the closing price of AIG stock on February 3, 2005 was $66.28.

754.    The second incident in February 2005 occurred on February 18, 2005, just four days after AIG had announced that the NYAG and SEC had subpoenaed information from the Company in connection with its finite reinsurance transactions.

755.    In response to AIG's disclosure of the investigations on February 14, 2005, AIG's share price had declined from a close of $73.12 on February 11, to a close of $69.68 on February 17.

756.    On February 18, 2005, AIG's share price opened at $69.50.  Trader tapes reveal that, later that same day, Defendant Greenberg called an AIG trader and directed the trader to begin repurchasing shares of AIG stock.  Defendant Greenberg, from aboard his private jet, instructed the trader to buy 250,000 shares of AIG stock.  When the trader purchased only 25,000 shares, which apparently failed to sufficiently bolster AIG's share price, Defendant Greenberg called back and told the trader: **_"I want you to be a little bit more aggressive . . . If you have to go up to half a million shares, go up to half a million."_**

757.   Just before the close of trading that day, and after the 3:50 p.m. cutoff prohibiting companies from repurchasing their own shares,[19] Defendant Greenberg ordered the trader to buy even more shares, telling the trader that "you can keep buying a little more stock, its alright. *I wanna push it up a bit if we can*."

758.   Greenberg had, during this exchange or on a different occasion, expressed his lack of concern for violating the New York Stock Exchange's 3:50 p.m. cutoff.  As reported in the August 8, 2005 *Fortune* article, "All I Want is an Unfair Advantage," a trader told Defendant Greenberg that he could not purchase AIG shares in the last 10 minutes of trading because Kathy Shannon, AIG's deputy general counsel, had said it would be improper.  *Fortune* reported that, according to the trading tapes of that conversation, ***Defendant Greenberg's response was, "I don't give a fuck what Kathy Shannon says!"***

759.   Defendant Greenberg attempted to manipulate the market of AIG's shares on additional occasions in February 2005 as well.  According to a May 11, 2005 article in *The Wall Street Journal*, Defendant Greenberg ordered improper trades on February 14 and 22 as well.  That article reads, in relevant part:

> *Maurice R. "Hank" Greenberg, as chief executive officer of American International Group Inc., ordered a reluctant AIG trader to buy 250,000 of AIG's sinking shares near the market close on the day the insurer disclosed it had received regulatory subpoenas into its accounting*, a person familiar with the matter says.
>
> The directive – and at least two others by Mr. Greenberg – are the subject of state and federal probes into whether the once-powerful insurance titan sought to manipulate AIG's share price.  The probes could pose new problems for Mr. Greenberg, who resigned as AIG's CEO in March.

---

[19]   The prohibition on company buybacks after 3:50 p.m. is designed, in part, to prevent issuers from "marking the close" in their own stock.

*The AIG trader told Mr. Greenberg the transaction could be viewed as improper, the person said, because it was too close to the market close*.  Under securities law, a company loses a "safe harbor" of buying its own shares if it makes the transaction in the final 10 minutes of market trading.  Indeed, the trading firm on the floor of the New York Stock Exchange that oversees trading of AIG shares refused to accept the order, the person said.  It is unclear whether the AIG trade was ever done.

\*       \*       \*

The key will be the timing of the order and Mr. Greenberg's intent.  A CEO could be charged with conspiracy or market manipulation if he is trying to buy his company's stock for the purpose of moving the price, legal specialists say.  *"It's extremely rare for a CEO to call a trading desk personally – which suggests a focus on price, not movement," says Steven Thel, law professor at Fordham University in New York. A chief executive can defend a buyback by saying the stock was a good investment but can't buy back the shares to support a price or prevent it from falling, he says*.

\*       \*       \*

At issue in the latest controversy is trading on February 14.  Before the market opened that day, AIG issued a news release disclosing that the Securities and Exchange Commission and state regulators had issued subpoenas to AIG seeking information its accounting for "non-traditional insurance products."

Trading in AIG shares that Monday was hectic.  More than 14.4 million AIG shares changed hands, compared with average daily volume of less than 6.5 million.  The shares soon began sinking from the $73.12 close the previous Friday.

*At around 3:50 p.m. on February 14, 10 minutes before the closing bell on the NYSE, Mr. Greenberg called the AIG trader with urgent orders:  Buy 250,000 shares immediately to keep the share price above $73, according to a person familiar with the call.*

*The trader told Mr. Greenberg he couldn't place the order, because it was timed so close to the end of the trading day, the person said.  Mr. Greenberg ordered the trader to do it anyway, this person says*.  When the AIG trader attempted to make the trade, the NYSE "specialist" – the elite floor traders who oversee the auctioning of shares and sometimes buy and sell shares for

their own accounts to keep orderly markets – wouldn't accept the order, this person said. The stock wound up falling 2.2% that day to $71.36 on the Big Board.

Mr. Greenberg is likely to have spoken with Keith Duffy, an experienced trader on the trading desk of AIG's global investments unit, or another trader, Matthew Wojcik, according to people with knowledge of the situation.

Mr. Duffy didn't return calls for comment. "This is a very uncomfortable situation," Mr. Wojcik said, but refused to comment further.

In addition to the Feb. 14 call, Mr. Greenberg directed AIG's trader, Mr. Duffy, to buy back shares on two other days in February, according to a person familiar with the matter. ***On Feb. 3, he told Mr. Duffy to buy AIG shares to keep the stock price of above $66, and on Feb. 22, the AIG chief directed him to buy shares to keep the price above $68, this person said. On both occasions, the purchases were made, this person said.*** It is unclear what times and how many shares were involved.

760. Defendant Greenberg's attempt to boost the price of AIG stock on February 14, 2005, was particularly egregious. As alleged above, AIG had disclosed on February 14, 2005 that it had been subpoenaed by federal and state regulators in connection with the Company's accounting for certain reinsurance transactions – a disclosure that caused the price of AIG's stock to fall by 2.2 percent that day. Thus, ***Defendant Greenberg's attempt to keep the price of AIG's stock above $73 that day was a blatant attempt to minimize the damages for which he and the Company (and other defendants) would ultimately be held accountable***.

## I.   CONTINUED EFFECTS OF DEFENDANTS' MISCONDUCT

### 1.   Revelation of the Fraud Caused Massive Declines in AIG Stock

761. AIG's share price fell by 24 percent between the time the government's investigations revealed the improprieties at the Company and the end of the Class Period, dropping from $66.99 on October 13, 2004 to $50.95 on April 1, 2005. In fact, because the price

of the stock partially recovered between disclosures, the actual loss due to the fraud was even greater.

762.    As detailed in the chart below, the disclosures about the fraud at AIG revealed the truth about the Company's financial results and business performance, as well as the defendants' fraudulent concealment of these facts, and resulted in the prior artificial inflation being removed from AIG's stock price, thereby damaging Lead Plaintiff and members of the Class.

| Date | Disclosures | AIG Stock Price Decline |
|---|---|---|
| February 21, 2002 | AIG revealed that the SEC had subpoenaed the Company in connection with its transactions with PNC. | From $73.72 to $71.04 (4.0%) |
| October 4-5, 2004 | AIG disclosed that the SEC and DOJ had warned the Company that its three press releases between January 2002 and September 2004 (regarding the government's investigation into AIG's PNC and Brightpoint deals) had misled investors. | From $68.72 to $66.50 (3.2%) |
| October 14, 2004 | NYAG announced that AIG had been implicated in a scheme to pay contingent commissions to, and rig bids with, Marsh and others. | From $66.99 to $60.00 (10.0%) |
| October 15, 2004 | Further response to the NYAG's October 14 disclosure. | From $60.00 to $57.85 (3.6%) |
| February 14, 2005 | AIG announced that the SEC and NYAG had subpoenaed the Company in connection with its finite reinsurance transactions. | From $73.12 to $71.49 (2.2%) |
| March 15, 2005 | AIG disclosed that it could not rule out a finding by PwC that there was a "material weakness" in the Company's internal controls. | From $63.85 to $61.92 (3.0%) |
| March 17, 2005 | Widely reported that the SEC and NYAG had expanded their probes to include additional accounting issues, such as AIG's transactions with Defendants Richmond and Union Excess. | From $62.90 to $60.80 (3.3%) |
| March 30, 2005 | AIG admits that it had improperly accounted for its $500 million reinsurance deal with General Re and that the Company intended to reduce shareholders' equity by approximately $1.7 billion due to several additional accounting problems. | From $58.20 to $57.16 (1.8%) |

| Date | Disclosures | AIG Stock Price Decline |
|------|-------------|-------------------------|
| March 31, 2005 | Media reports that regulators believe AIG's March 30 announcement did not disclose the full extent of the Company's accounting problems and that criminal charges were possible. Media reports that PwC had been subpoenaed by regulators. Moody's downgraded AIG's credit rating. | From $57.16 to $55.41 (3.1%) |
| April 1, 2005 | Media reports that regulators had expanded their investigation to include additional transactions and that the government was also now examining AIG's underwriting "loss ratio."  Media reports that the NYAG had threatened to indict AIG because documents and recordings of business meetings had been removed and/or destroyed at AIG's Bermuda offices.  Media reports that three lawyers at AIG's Bermuda office resigned over concerns relating to the government investigations. | From $55.41 to $50.95 (8.0%) |

### 2. Numerous Members of AIG's Senior Management and Other Senior Executives Have Been Fired, Forced to Resign or Placed "On Leave"

763. The recent investigations into AIG's various frauds have caused numerous top executives to leave the Company:

- As noted above, on March 14, 2005 AIG announced that its Board of Directors had forced Defendant Greenberg to resign from his post as CEO, a position he had held *since 1967*, though the Board allowed him to remain non-executive chairman.  It was not until Attorney General Spitzer threatened to *indict* the Company that, on March 29, 2005, Defendant Greenberg resigned from that position as well.  Finally, on June 8, 2005 Defendant Greenberg resigned from the Board, ending his 45-plus years with AIG.

- AIG also announced on March 14, 2005 that its CFO, Defendant Smith, was placed "on leave."  On March 21, 2005, Defendant Smith, along with Defendant Milton, were terminated after invoking their Fifth Amendment right against self-incrimination while being questioned by government investigators.   Smith later resigned from AIG's Board on June 10, 2005.

- On March 27, 2005, AIG also fired Defendant Murphy after he reportedly refused to cooperate with the Company's internal investigation.

- On April 15, 2005, AIG placed Defendant Castelli "on leave" and, according to AIG's 2004 10-K, subsequently fired him.

- On April 21, 2005, *TheStreet.com* reported that on April 15, 2005, AIG had placed Vincent Cantwell on leave. Cantwell is an AIG vice president who worked in the Company's Comptroller's office, reported to Defendant Castelli and helped carry out Defendant Smith's unsupported "Top Side" adjustments.

- On May 16, 2005, *The Wall Street Journal* reported that AIG "plans to force six or more senior executives to leave the company in the next two weeks as probes into its accounting reach beyond Maurice "Hank" Greenberg, who departed in March as chief executive officer, and the fired chief financial officer Howard Smith, say people familiar with the situation. Most executives on the list worked in finance."

### 3.   Government Investigations

764.   In addition to the myriad of government investigations alleged above,

Defendants' wrongdoing has spawned additional government inquiries into AIG's improper

practices:

- On May 20, 2005, *The Wall Street Journal* reported that a grand jury had been empanelled to hear evidence of potential criminal wrongdoing by individuals at Defendant AIG: "Attorneys from New York Attorney General Eliot Spitzer's office are presenting evidence to grand jury convened in New York that could lead to criminal indictment of one or more individuals, a person familiar with the matter said." A May 23, 2005 *Wall Street Journal* article reported that ***"Messrs. Greenberg and Smith aren't the sole targets of the grand jury, according to people familiar with the matter***."

- *The Wall Street Journal* reported on April 25, 2005 that AIG Reinsurance and Transatlantic Reinsurance Co. – two AIG subsidiaries – were two of seventeen reinsurers

subpoenaed by the Florida Insurance Commissioner the week of April 18, 2005 in connection with that office's investigation into the improper use of finite reinsurance.

- On May 10, 2005, *The Wall Street Journal* reported that Transatlantic Holdings Inc. ("Transatlantic"), an AIG subsidiary, had received subpoenas from the Florida and Georgia state insurance departments for information relating to finite reinsurance and reinsurance transactions. That same article revealed that Transatlantic has also been subpoenaed by the New York Department of Insurance for information relating to Transatlantic's relationship with "a foreign reinsurer" and Gallagher Healthcare Insurance Services Inc.  Defendant Greenberg was chairman of Transatlantic until he resigned from that position in early April  2005.

- On May 18, 2005, *Reuters* reported that Florida Office of Insurance Regulation ordered AIG to produce information about the company's previously undisclosed accounting misrepresentations and to fire those employees responsible for the misrepresentations made in the Company's financial statements.  The Florida order also required AIG to file by July 1, 2005 "true and correct" financial statements for the years of 2000 through 2005 for all AIG entities licensed in Florida.  **If AIG did not comply with the order, the state said it would suspend AIG from doing business in the state**.

- As alleged above, on May 26, 2005, the NYAG filed a civil complaint against Defendants AIG, Greenberg and Smith, asserting claims for violations of New York State General Business Law and Insurance, as well as common law fraud. The complaint also alleges that Defendants Greenberg, Smith and AIG's senior management engaged in sham transactions to falsify the Company's financial results, hid underwriting losses and created false underwriting income and repeatedly deceived state regulators about AIG's ties to off-shore entities.

- During the week of June 6, 2005, the SEC filed a civil complaint and the DOJ filed criminal charges against Defendants Houldsworth and Napier.  Concurrent with the filing of the criminal charges by the DOJ, Defendants Houldsworth and Napier each pled guilty to conspiracy to file false financial reports, falsify books, records and accounts and mislead auditors.

4.      **Downgrades in AIG's Credit Rating**

765.    The revelations of the enormous frauds at AIG and the resulting investigations have resulted in numerous downgrades in AIG's credit ratings.

766.    For example, on October 29, 2004, Standard & Poor's changed its outlook on AIG's counterparty rating to "negative."   According to an October 30, 2004 *Financial Times* article, the ratings agency's decision was based on "concerns that AIG's 'growth-orientated' culture could make it more susceptible to scrutiny than other insurers, and that it could face reputational damage, financial settlements and litigation costs."  Standard & Poor's also warned that it was considering cutting AIG's "AAA" long-term rating.

767.    On March 15, 2005, Fitch Ratings cut AIG's long term rating from "AAA" to "AA-plus," citing the continuing government investigations and Defendant Greenberg's ouster as CEO.

768.    On March 30, 2005, Standard and Poor's lowered AIG's AAA rating to AA+, citing AIG's delay in filing its 2004 Form 10-K, as well as "an aggressive culture" of AIG's management under Defendant Greenberg.

769.    On May 2, 2005, *CBS MarketWatch* issued an article titled "Market Pulse: Moody's cuts AIG long-term debt ratings to 'Aa2.'"  The article stated in part:

> ***Moody's on Monday downgraded the long-term senior debt ratings on American International Group Inc. to "Aa2" from "Aa1." The move comes after AIG further delayed the filing of its 2004 Form 10-K and said that the extensive financial review, which is not yet complete, has yielded further evidence of financial misstatements.*** The ratings remain on review for a
>
> possible further downgrade, Moody's said. Moody's also lowered the debt and insurance financial strength ratings of several supported entities, including the group's supported life insurance and mortgage insurance subsidiaries, and of members of AIG's

Domestic Brokerage Group, to "Aa2" from "Aa1." ***They also remain on review for a further possible downgrade.***

770.    Also on May 2, 2005, *The Wall Street Journal* reported that "Fitch downgraded financial services behemoth AIG's long term issuer rating and unsecured senior debt rating to double-A, from double-A-plus.  The ratings company also slashed all of New York-based AIG's insurance company ratings, to double-A-plus, from a stellar triple-A."  Fitch cited as its rationale the fact that "the uncertainty surrounding AIG's financial condition and future financial performance has grown to levels beyond the expectations embedded in Fitch previous rating levels . . . This band of uncertainty includes the potential adverse impact of recent events on the company's competitive position, expense ratio average, earnings level and volatility, business mix, capital levels and strategic plans."

771.    On June 3, 2005, *CBS MarketWatch* reported that Standard & Poor's had cut AIG's credit and debt ratings again:

> [S&P] lowered its long-term counterparty credit and senior debt ratings on AIG . . . to "AA" from "AA+" and removed them from CreditWatch, where they had been placed under review for a possible downgrade.
>
> *            *            *
>
> ***The downgrade "reflects both the size and scope of the accounting adjustments," S&P credit analyst Grace Osborne said.***

772.    The effects of the Company's lower credit ratings have become clear.  In its First Quarter Form 10-Q, filed with the SEC on June 28, 2005, AIG stated (with emphases in the original), that:

> These ratings actions have affected and will continue to affect AIG's business and results of operations in a number of ways.
>
> • **Downgrades in AIG's debt ratings will adversely affect AIG's results of operations**. AIG relies on external

sources of financing to fund several of its operations. The cost and availability of unsecured financing are generally dependent on the issuer's long-term and short-term debt ratings. The recent downgrades and any future downgrades in AIG's debt ratings will increase AIG's borrowing costs and therefore adversely affect AIG's results of operations.

- **The downgrade in AIG's long-term senior debt ratings will adversely affect AIGFP's ability to compete for certain businesses**. Credit ratings are very important to the ability of financial institutions to compete in the derivative and structured transaction marketplaces. Historically, AIG's triple-A ratings provided AIGFP a competitive advantage. The downgrades will reduce this advantage and, for specialized financial transactions that generally are conducted only by triple-A rated financial institutions, counterparties may be unwilling to transact business with AIGFP except on a secured basis. This could require AIGFP to post more collateral to counterparties in the future. See below for a further discussion of the effect that posting collateral may have on AIG's liquidity.

- **Although the financial strength ratings of AIG's insurance company subsidiaries remain high compared to many of their competitors, the downgrades have reduced the previous ratings differential**. The competitive advantage of the ratings to AIG's insurance company subsidiaries may be lessened accordingly. The recent regulatory inquiries, internal investigations, and delay in the filing of the 2004 Annual Report on Form 10-K, as well as negative publicity, had caused independent producers and distributors of AIG's domestic life and retirement services products to be more cautious in placing business with AIG subsidiaries. AIG is unable to predict the effect of these issues on AIG's business, including any increase in associated surrender or replacement activity.

- **As a result of the downgrades of AIG's long-term senior debt ratings, AIG has been required to post approximately $1.16 billion of collateral with counterparties to municipal guaranteed investment agreements and financial derivatives transactions**. In the event of a further downgrade, AIG will be required to post additional collateral. It is estimated that, as of the close of business on June 23, 2005, based on AIG's outstanding municipal guaranteed investment agreements and financial derivatives transactions as of such date, a further

- 241 -

downgrade of AIG's long-term senior debt ratings to 'Aa3' by Moody's or 'AA-' by S&P would permit counterparties to call for approximately $2.10 billion of additional collateral. Further, additional downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIG manages its liquidity. The actual amount of additional collateral that AIG would be required to post to counterparties in the event of such downgrades depends on market conditions, the market value of the outstanding affected transactions and other factors prevailing at the time of the downgrade. The requirement to post additional collateral may increase if additional counterparties begin to require credit support from AIG through collateralization agreements. Additional obligations to post collateral will increase the demand on AIG's liquidity.

773.   Similarly, AIG's 2004 Form 10-K states that current regulatory investigations "may reduce the willingness of counterparties to engage in business with AIG.  Uncertainty concerning the ultimate outcome of these actions and proceedings may also make AIG products and services less attractive in the marketplace.  Further, these matters may affect the manner in which certain AIG subsidiaries conduct business and AIG's ability to obtain regulatory approvals for new lines of business or for further acquisitions."

## J.   DEFENDANTS' OTHER BAD ACTS

774.   Defendants have also engaged in a number of other improprieties that are not only indicative of their scienter, but also show that Defendants have a long-established pattern of disregarding the law when it suits their needs.

### 1.   AIG Mischaracterized Premiums From Workers Compensation Policies

775.   As the NYAG's probes into AIG progressed, investigators learned that, for more than a decade, AIG had illegally booked some of its workers compensation premiums as general-liability insurance premiums.  This allowed the Company to avoid paying into a state fund to pay benefits due from insolvent insurers.  ***This practice continued for years despite the fact that the***

*improper arrangement was called to the attention of high-ranking AIG employees in 1989 and despite Defendants Greenberg and Tizzio having been warned by the Company's general counsel as early as 1992 that the practice was "permeated with illegality" and that the "result of this conduct is that AIG makes millions of dollars illegally each year.*"

776.   When selling workers compensation insurance, insurers generally pay higher premium taxes and pay additional monies into state funds, known as special assessment funds. AIG avoided paying these monies by using a secret side agreement with customers (one never filed with, or approved by, the New York Insurance Department) that had the effect of re-characterizing a portion of workers compensation premiums as general or auto liability insurance, where there were no additional taxes or other assessments.

777.   *High-ranking employees of AIG had been warned as early as 1989 that these practices were illegal*.  For example, in a June 1989 memorandum, an AIG employee memorialized a meeting he had with his supervisors, in which he urged the Company to discontinue the practice. *The employee stated that the practices constituted a violation of the risk assessment rules and amounted to "illicit tax evasion," and added that he "pointed out the prospect we will be caught."*  The employee memorialized one supervisor's response:

> [He] responded to the effect that none of my presentation was news to him; and that in fact he had made a similar presentation (using stronger language) to his superiors some time ago.  The policy decision in those higher councils had been to continue the illicit practices, pending discovery and implementation of another effective scheme to avoid some substantial part of the taxes and Assigned Risk assessments on our Worker's Compensation business.  Therefore [he] prohibited me from directing our operations staffs to adopt the recommendation above.

778.   From 1989 through 1991, the employee continued to memorialize his view that the practice was illegal, and, indeed, that it "imperils the insurance licenses of the insurance companies for which we produce business."

779.    In 1991, AIG's new general counsel, E. Michael Joye ("Joye"), reviewed the practice.  Joye's interview notes that he made during his inquiry reflect that employees had been told *"that MRG [referring to Defendant Greenberg] knows the whole prog. & that he wants it this way."*  In fact, one interviewee told him, *"You should be aware that MRG [referring to Defendant Greenberg] knows about this and has approved it."*

780.    Joye learned in his interviews about the high cost that AIG would have to incur in order to "get legal" – that the Company would have to hire approximately 40 new employees to properly assemble the Company's filings, would have to charge clients more, and would have to pay "much higher" assessment fees.

781.    Joye's notes reflect that at one stage, an employee went to AIG's president and was told *"that MRG did not want him to change things to make it legal - he wants to continue as is."*  In another interview, a witness recounted a meeting he and others had with Defendant Greenberg.  *According to the notes, "MRG" asked "are we legal?" When an employee responded, "If we were legal, we wouldn't be in business," then "MRG began laughing and that was the end of it."*

782.    In addition to being told of AIG's history of noncompliance, Joye learned that for years AIG had evaded answering certain questionnaires from the California Department of Insurance.  A responsive submission, one employee reported, *"would reveal that we had made false reports."*

783.    In a January 31, 1992 memorandum to Defendant Greenberg, Joye summarized his findings.

784.    According to an April 27, 2005 *Wall Street Journal* article,

> *Mr. Joye has told investigators that he left the memo on Mr. Greenberg's desk, a person familiar with the matter said.*

> ***Regulators have been told that the matter was discussed in Mr. Greenberg's presence on multiple occasions***, a person familiar with the matter said.

785.    In the memorandum, Joye warned that the practices that he had examined were ***"permeated with illegality"*** the result of which "is that AIG makes millions of dollars illegally each year."  Moreover, ***"[t]he situation is so serious that it could threaten the continued existence of senior management in its current form."***

786.    Joye bluntly concluded that ***"[a] jury could find that the above conduct constitutes various kinds of State and Federal civil and criminal violations, including common law fraud, mail fraud, Securities Act violations, RICO violations, State statutory and regulatory violations, State tax fraud and breach of contract."***

787.    Joye's memorandum recommended specific "corrective actions," including an immediate end to the illegal conduct, discharging the employees involved, providing restitution, and instituting a compliance program.

788.    However, AIG did none of these things.  According to the August 8, 2005 edition of *Fortune*:

> After finishing the memo, ***Joye met with [Defendant Thomas] Tizzio.  What was Greenberg going to do?  Nothing, Tizzio told him, according to Joye's later account.  Greenberg had decided that correcting the problem would be too expensive*** . . . . Appalled at the news, Joye tendered his letter of resignation on the spot, packed up his office, and left the building.  He had been at AIG for eight months.[20]

---

[20]    Mr. Joye's resignation did not sit well with Defendant Greenberg.  According to the same *Fortune* article, "[t]wo weeks after Joye quit, Greenberg sent a short note to Jules Kroll, founder of the well-known corporate-intelligence firm, forwarding background material about Joye.  It is unclear whether Kroll actually dispatched private detectives to investigate Joye, although it is known that Greenberg commissioned Kroll on at least one other occasion to investigate people who accused his company of impropriety."

789.    Instead, the Company engaged one or more law firms to review Joye's memorandum.  The review was named the "AIG - X MATTER," and fax transmission sheets related to the review bore handwritten notations: "Extremely Confidential."

790.    In conducting the investigation, the two law firms reviewed a 1989 memorandum from AIG's actuarial department.  A portion of the memorandum discussed how proper booking of workers compensation premiums would increase assessments and taxes that AIG would have to pay.  *In the margins of the copy from the lawyers' files are two notations.  One reads "! Admits Div 50 is avoiding proper WC tax + [state assessment] charges."  The other reads "$20-30M tax and [state assessment] dodge."*

791.    One of the law firm's draft memoranda described the two main practices that Joye had found unlawful.  As to one, the firm – reportedly Sullivan & Cromwell LLP – reported a possible defense, but added: "We should not be understood as endorsing this argument, or suggesting that it would necessarily carry the day in a litigation or regulatory proceeding.  Nor should we be understood as condoning [the practice]."  At best, the draft noted, the practice "may be" in a "grey area."

792.    As to the second practice, the firm observed that it was even "more problematic," but noted that it "appears" that the genesis of the practice was not an "intent to reduce RMLs or premium taxes" and that recent efforts to reduce the extent of understatement have been "partially successful."  Finally, the firm noted, "[o]n a going-forward basis, both practices . . . are being discontinued."

793.    The firm also produced a draft memorandum titled "Duty to Report Internal Insurance Fraud" which analyzed a corporation's duty to report fraud under the laws of a several states.  This draft concluded that *"in their capacity as agents of a corporation, corporate*

*directors and officers must cause the corporation to report fraudulent insurance*

*transactions."*  The draft also stated, "An obligation of a director or an officer, including the

general counsel of an insurance corporation . . . to disclose internal insurance fraud might exist

as a result of the individual's fiduciary duties to the corporation and its shareholders as

developed under the New York Business Corporation Law."

794.    Along these lines, on April 27, 2005, *The Wall Street Journal* reported that

> the lawyers told Mr. Greenberg and other top AIG officials in
> writing that while Mr. Joye's rhetoric was hyperbolic, his legal
> opinion was correct and that the company should "stop these
> practices," according to a person who has seen that memo.

795.    Although AIG has reported that it believes that its inappropriate booking of

workers compensation premiums has been discontinued, the Company is unsure *when* the illegal

practice stopped.  In addition, AIG has admitted that is has no evidence that it ever disclosed the

practice to the regulators of any state.  To the contrary, each year AIG files forms with the New

York Insurance Department, reporting the amount of workers compensation premiums it has

received for each of the preceding nine years.  In 2000, those forms continued to reflect the

understated number falsely reported in 1991.

796.    On April 27, 2005, the California Department of Insurance announced that it was

examining whether AIG had underreported workers' compensation premiums to California

regulators.  According to a *Los Angeles Times* article dated April 28, 2005, entitled "State to

Check AIG Premiums":

> *The California Department of Insurance said Wednesday [April*
> *27] that it would examine whether American International*
> *Group Inc. underreported its workers' compensation insurance*
> *premiums to state regulators.*
>
> Insurance Department spokesman Norman Williams said the
> agency was alerted by news reports that authorities were looking
> into AIG's booking of workers' comp premiums in New York as

part of a larger probe of the insurers' accounting practices.
*California regulators, Williams said, "will look into" the matter*
*"to make sure that businesses and consumers are not being hurt*
*by those practices here."*

\*      \*      \*

In New York, AIG is being audited by Atty. Gen. Eliot Spitzer's
office and the state's insurance superintendent to determine
whether it understated the workers' comp premiums it collected so
it could reduce its payments to a state fund that pays benefits to
injured workers who had been covered by failed insurance
companies.

*California has a similar guaranty fund . . . . Taxes and fees based*
*on total reported policy sales are used to finance the guaranty*
*fund and administration of the state's workers' compensation*
*insurance program* [Williams] said. *AIG's workers comp*
*premiums in California hit $866 million in 2003.*

797.     As an April 30, 2005 article in *The Economist* noted, misallocation of premiums

could be especially damaging in states such as California, where AIG is a major workers'

compensation underwriter and the state's workers compensation plan is underfunded.  The article

stated in relevant part:

> New York's insurance department and attorney-general say that
> during the 1980s and 1990s [AIG] deliberately misallocated
> premiums for workers' compensation to general revenue, thus
> avoiding a special tax to cover insolvent insurers.  This would not
> have been damaging in New York, where the workers'
> compensation fund was flush, but it could have mattered in other
> states where workers' compensation firms have gone bust and
> where AIG is a large underwriter, such as California.  Not
> surprisingly, on April 27th California's insurance commissioner,
> John Garamendi, said he would be investigating.  None of the
> transactions was recent, but that may be little solace to AIG.  How
> much more will drip out?

### 2.     Defendant Greenberg's Fraudulent Conveyance of Nearly 42 Million Shares of AIG Stock

798.     In a thinly-veiled attempt to shield his personal assets from being targeted to

satisfy potential judgments and/or settlements in this and related litigations, Defendant

Greenberg transferred more than 41 million shares of AIG stock to his wife, Corinne P. Greenberg, on March 11, 2005.

799.    On April 12, 2005, Defendant Greenberg filed a Form 4 "Statement of Changes in Beneficial Ownership" ("April 12 Form 4") with the SEC.   According to the April 12 Form 4, on March 11, 2005, Defendant Greenberg – just three days before he resigned as CEO of AIG – gifted 41,399,802 shares of AIG common stock to his wife.  Specifically, the April 12 Form 4 states that the March 11, 2005 "transaction represents a gift of 41,399,802 shares to Corinne P. Greenberg."

800.    The 41,399,802 shares of AIG common stock were valued at approximately *$2.68 billion* on the date the conveyance was made.

801.    The conveyance appears to have been made by Defendant Greenberg, and received by Mrs. Greenberg, without fair consideration, and with actual intent to hinder, delay, or defraud Lead Plaintiff and all members of the Class.

802.    On April 14, 2005, *The Wall Street Journal* reported:

> **Maurice R. "Hank" Greenberg gave his wife the vast majority of his $2.3 billion in shares of American International Group Inc. in an effort to shield the fortune from future lawsuits, a person close to his legal team said.**
>
> Though this person said the tactic wasn't intended to protect the fortune from any lawsuits that could spring from the current accounting scandal at AIG, Mr. Greenberg wanted to protect the wealth he built up during nearly four decades running the financial company from unrelated litigation that might later crop up.

The article also noted that, **"[a]t least one public official accused Mr. Greenberg of trying to shield assets from shareholders that might sue him,"** and according to a legal expert quoted in the article, "This is an asset protection move that I think many people will say is too little too late."

803.    In response to this fraudulent transfer, Lead Plaintiff commenced a separate

lawsuit, styled as *Ohio Public Employees Retirement System et al. v. Maurice R. "Hank"

Greenberg and Corinne P. Greenberg*, No. 05 Civ. 5072, which seeks to, *inter alia*, set aside

Defendant Greenberg's March 11 transfer as a fraudulent conveyance under New York's Debtor

and Creditor Law.

804.    On June 28, 2005, on the eve of a pre-motion conference before the Court with

respect to the transfer, Mrs. Greenberg transferred the 41,389,802 shares back into joint

ownership status with Defendant Greenberg.

### 3.    Other Regulatory Action Against AIG

805.    On June 8, 2005, *TheStreet.com* reported that the NASD had settled enforcement

actions against numerous brokers, including Defendant AIG's Royal Alliance Associates

("Royal Alliance") division, which agreed to pay $6.6 million in fines – the largest fine of the

fifteen brokers implicated in the scheme.

806.    The article further reported that Royal Alliance/AIG and the other settling entities

had, in exchange for extra fees from certain mutual fund companies, improperly recommended

those mutual funds to its clients "without any consideration of the merits of those funds."

Indeed, this arrangement was not dissimilar to the conflict of interest that permeated AIG's

collusion with Marsh to promote AIG's insurance policies in return for AIG's paying Marsh

millions of dollars in improper contingent commissions.

807.    *TheStreet.com* went on to describe the arrangement:

> The NASD said Wednesday that the brokers took extra fees from a
> group of mutual fund companies in return for a promise to promote
> those funds to their brokerage customers.
>
> The settlement is part of the NASD's ongoing enforcement action
> against so-called payment-for-shelf-space agreements. ***Regulators
> contend that these secret revenue-sharing deals are improper***

> *because they encourage brokers to tout certain mutual funds to*
> *their customer without any consideration of the merits of those*
> *funds*.

> "When recommending mutual fund investments, firms must act on
> the basis of the merits of the funds and the investment objective of
> the customers and not because of other benefits the brokerage firm
> will receive," said NASD Vice Chairman Mary Schapiro.
> "NASD's prohibition on the receipt of directed brokerage is
> designed to eliminate these conflicts of interest."

808.    On June 9, 2005, *The New York Times* reported that, in total, six affiliates of AIG

– including SunAmerica Securities Inc., FSC Securities Corp., Sentra Securities Corp., Spelman

& Co. and Advantage Capital Corp. – had settled after agreeing to pay multimillion dollar fines

each as well.

### 4.    Other Litigation Relating to AIG's Reinsurance Business

809.    Moreover, on July 6, 2005, *seventeen insurance companies filed a complaint*

*against Defendant AIG* and Trenwick American Reinsurance Corporation ("Trenwick"),

*alleging fraud in connection with certain reinsurance contracts covering various AIG units*

and backed by the seventeen insurance companies as reinsurers.

810.    The complaint alleges that through AIG's fraudulent scheme, carried out at least

in part by Defendant Milton, the Company "has manufactured more than $81 million in

fraudulent 'paid losses' for which [AIG] has asserted almost $73 million in wrongful demands

for payment under reinsurance contracts ceded to the plaintiffs."

### 5.    AIG's Role in Promoting Abusive Tax Shelters

811.    On April 28, 2005, an article in *The New York Times* reported that papers filed in

connection with a Department of Justice lawsuit in Washington implicate Defendant AIG as

having a role in questionable tax shelters:

> *New court papers indicate that the American International*
> *Group helped dozens of wealthy individuals make use of*

*questionable tax shelter intended to shield hundreds of millions of dollar in profits from federal taxes.*

A.I.G. is under scrutiny by federal and New York regulators looking into questionable insurance transactions that the company used to dress up its financial strength.

On a separate front, the company is mentioned repeatedly in Department of Justice papers that have been filed recently in connection with a lawsuit by a Kentucky investor against the government that is now pending in federal claims court.

In that case, Robert W. Ervin of Sturgis, Ky., his family partners and related partnerships sued the government in the United States Court of Federal Claims in Washington in September 2003 after the Internal Revenue Service denied Mr. Ervin's losses of $40 million for 1999. Mr. Ervin had filed an income tax return for that year claiming $40 million in currency-trading losses that offset his sale earlier in 1999 of three cable television businesses for $40 million. Those losses, he contends, were legitimately generated through trades carried out by A.I.G.

The I.R.S. subsequently denied the trading losses, saying that they were artificial transactions that amounted to an abusive tax shelter known as Son of Boss. The $40 million in capital gains from the sale of the cable business carried a tax bill of around $15 million, which the I.R.S said was due, along with a penalty of $4 million. The case goes to trial in June.

A.I.G. is not a defendant in the case. *Rather, government papers – motions memos and an independent expert's report – filed in connection with the case describe how the company actively took part in carrying out trades in 1999 for the tax shelter set up for Mr. Ervin. A.I.G. earned about $1 million for its work, the government said*.

BDO Seidman, the accounting firm, developed, marketed and sold the tax shelter to Mr. Ervin. But A.I.G., along with Sentinel Advisors, a hedge fund based in Vermont, were "co-promoters" of Mr. Ervin's and others' similar transactions, according to a government paper filed last month.

*Both A.I.G. and Sentinel, the government papers say, set up the limited liability companies needed for Mr. Ervin's transactions, and A.I.G. carried out the trades that the government contends are artificial losses invalid for deductions*.

\*    \*    \*

- 252 -

> According to the government's papers, *an A.I.G. subsidiary*
> *known in 1999 as A.I.G. International and now called the A.I.G.*
> *Trading Group engaged in what an independent expert called*
> *"surprising" and "unusual" activities on behalf of the limited*
> *liability companies set up by Mr. Ervin and his two brothers.*
> *A.I.G.'s activities, the report said, showed the loss-making*
> *transactions to be a sham, with no economic substance*….

## VII.    FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.    DEFENDANTS' FALSE AND MISLEADING FINANCIAL STATEMENTS

#### 1.    False and Misleading Statements Relating to Third Quarter 1999

812.    On October 28, 1999, AIG issued a press release entitled, "AIG Reports Third Quarter 1999 Net Income Rose 17.8 percent to $1.27 Billion."  The press release stated, in relevant part:

> *American International Group, Inc. (AIG) today reported that its*
> *income for the third quarter of 1999 increased 17.8 percent to*
> *$1.27 billion, compared to $1.08 billion in the third quarter of*
> *1998.  For the first nine months of 1999, net income totaled*
> *$3.74 billion, an increase of 18.4 percent, compared to $3.16*
> *billion in the same period of 1998*.
>
> *          *          *
>
> Income before taxes, minority interest for the third quarter of 1999
> amounted to $1.87 billion, an increase of 15.0 percent over the
> $1.62 billion reported in 1998.  For the first nine months of 1999,
> income before income taxes and minority interest increased 20.9
> percent to $5.58 million from $4.62 billion reported last year.
> Included in these results were pretax realized capital gains of $54.1
> million and $131.1 million for the third quarter and nine months of
> 1999, respectively, compared to $56.2 million and $140.4 million
> for the same periods in 1998.
>
> *          *          *
>
> Revenues in the third quarter of 1999 rose 6.6 percent to $9.64
> billion from $9.04 billion in the year-earlier quarter.  For the first
> nine months, revenues totaled $29.66 billion, an increase of 13.8
> percent over $26.06 billion in 1998.

At September 30, 1999, AIG's consolidated assets and shareholders' equity approximated $259 billion and $32.3 billion, respectively.

***Commenting on the third quarter results, AIG Chairman M.R. Greenberg said, "AIG had a good quarter, in which most of our businesses did quite well.*** Catastrophe losses for AIG exceeded those of recent quarters, with the impact of Hurricane Floyd in the United States, earthquakes in Turkey, Greece and Taiwan and a typhoon in Japan. ***But the underlying strength of our basic businesses was demonstrated in a solid gain in operating results and net income***. Once again, last year's third quarter has been restated to reflect the consolidation of SunAmerica, in accordance with pooling of interests accounting.

813.    On November 15, 1999, AIG filed its Third Quarter 1999 Form 10-Q with the SEC. The Third Quarter 1999 10-Q was signed by Defendant Smith. AIG reported consolidated revenues of $9.6 billion and net income of $1.3 billion for the quarter ended September 30, 1999 and year to date revenues of $29.7 billion and net income of $3.7 billion for the nine months ended September 30, 1999. AIG's General Insurance business segment reported revenues of $4.3 billion, net premiums earned of $3.6 billion and operating income of $833 billion for the quarter ended September 30, 1999 and year to date revenues of $13.5 billion net premiums earned of $11.4 billion and operating income of $2.6 billion for the nine months ended September 30, 1999. AIG's Life Insurance business segment reported revenues of $4.3 billion, GAAP premiums/premium income of $2.8 billion and operating income of $750 million for the quarter ended September 30, 1999 and year to date revenues of $13.1 billion, GAAP premiums/premium income of $8.6 billion and operating income of $2.1 billion for the nine months ended September 30, 1999.

814.    The Third Quarter 1999 10-Q also stated, in relevant part:

During the first nine months of 1999, AIG's net premiums written and net premiums earned increased 13.6 percent and 10.3 percent respectively, from those of 1998.

\* \* \*

*The commercial insurance market remains highly competitive* and excessively capitalized, both domestically and overseas.

\* \* \*

General Insurance operating income in the first nine months of 1999 increased 21.5 percent when compared to the same period of 1998.

\* \* \*

AIG is a major purchaser of reinsurance for its general insurance operations. *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs.*

\* \* \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations. *AIG enters into these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities. These reinsurance agreements have been approved by the appropriate regulatory authorities*.

\* \* \*

Net income amounted to $3.74 billion in the first nine months of 1999 and $3.16 billion in the same period of 1998.

815. Defendants' statements concerning AIG's financial results relating to Third Quarter of 1999 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)     That during the Third Quarter of 1999, AIG executives were engaged in an illegal bid-rigging scheme;

(b)     That during the Third Quarter of 1999, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)     Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)     Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)     Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)     That during the Third Quarter of 1999, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)     That AIG artificially inflated its earnings by receiving premium payments based on the illegal Brightpoint transaction.

816.    Defendants' statements concerning AIG's financial results for the Third Quarter of 1999 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 2.    False and Misleading Statements Relating to Fourth Quarter and Year-End 1999

817.    On February 10, 2000, AIG issued a press release entitled, "AIG Reports 1999 Net Income Rose 18.1 Percent to Record $5.06 Billion."  The press release stated, in relevant part:

> ***American International Group, Inc. (AIG) today reported that its net income for 1999 increased 18.1 percent to $5.06 billion from $4.28 billion in 1998.  For the fourth quarter of 1999, net income totaled $1.31 billion, an increase of 17.2 percent, compared to $1.12 billion in the same period of 1998***.

> *            *            *

> Income before income taxes and minority interest for the year 1999 increased 19.7 percent to $7.51 billion from $6.28 billion reported last year.  For the fourth quarter of 1999, income before taxes and minority interest amounted to $1.93 billion, an increase of 16.4 percent over the $1.66 billion reported in 1998.  Included in these results were pretax realized capital gains of $122.0 million and losses of $9.1 million for the year and fourth quarter of 1999, respectively, compared to gains of $123.7 million and losses of $16.7 million for the same periods in 1998.

> *            *            *

> ***Revenues for the year 1999 rose 13.8 percent to $40.66 billion from $35.72 billion in 1998.  Fourth quarter revenues totaled $11.00 billion, an increase of 13.9 percent over $9.66 billion in the year earlier quarter***.

> At December 31, 1999, AIG's consolidated assets approximated $267 billion, an increase of 14 percent, compared to $234 billion at the prior year-end.  In 1999, shareholders' equity increased to approximately $33 billion, a 10 percent increase over the $30 billion reported at December 31, 1998.

> *Commenting on the fourth quarter and full year results, AIG Chairman M.R. Greenberg said, "AIG had a good fourth quarter and a strong year overall.  Our net income for 1999 rose 18.1 percent to a record $5.06 billion.*… Excluding [certain] losses and realized capital losses, AIG's income as adjusted for the fourth quarter increased 17.4 percent to $1.36 billion, or $0.87 per share.
>
> *"Worldwide general insurance net premiums written rose 4.7 percent in the fourth quarter and 11.2 percent for the full year 1999.*  All of these results include the consolidation of Transatlantic Holdings, Inc. and 21st Century Insurance Group in 1999 and in the third and fourth quarters of 1998.  *We achieved an underwriting profit of $122.2 million in the quarter, and a record $669.2 million for 1999.*  Excluding catastrophe losses, our combined ratio for the fourth quarter was 96.96, compared to 95.97 in the last year's quarter."

818.    On March 30, 2000, AIG filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 1999 (the "1999 10-K").  AIG reported consolidated revenues of $40.7 billion and net income of $5.0 billion for the year ended December 31, 1999.  AIG's General Insurance business segment reported revenues of $18.4 billion, net premiums earned of $15.5 billion and operating income of $3.4 billion.

819.    PwC certified that AIG's consolidated financial statements presented fairly, in all material respects the financial position of the Company and the consolidated results of operations and their cash flows in conformity with generally accepted accounting principals.

820.    The 1999 Annual Report also contained a letter from Defendant Greenberg and his son, Evan – at the time AIG's COO – which stated in relevant part:

> *AIG had a very good year in 1999, reporting a solid increase in earnings*.  At year end, AIG was better positioned than ever to capitalize on the expanding global economy, the continued opening of emerging markets, and the many opportunities presented by technology and new distribution channels for insurance and financial services products.
>
> *           *           *

AIG's earnings set a number of records in 1999. . . . AIG holds Triple A ratings, the highest awarded by the principal rating services Standard & Poor's and Moody's, as do a number of our operating businesses worldwide.

821.   The 1999 Annual Report also contained the following:

Report of Management's Responsibilities

**_The management of AIG is responsible for the integrity and fair presentation of the consolidated financial statements, related notes thereto and all other financial information presented herein.  The consolidated financial statements have been prepared in conformity with generally accepted accounting principles and include amounts based on the best estimates and judgments of management._**

**_AIG maintains an internal control structure designed to provide reasonable assurance that assets are safeguarded from loss or unauthorized use, that transactions are recorded in accordance with management's direction and that the financial records are reliable for the purposes of preparing financial statements and maintaining accountability of assets._**  The management of AIG applies the concept of reasonable assurance by weighing the cost of an internal control structure against the benefits to be derived. The internal control structure is supported by the careful selection, training and development of qualified personnel, an appropriate division of responsibilities and the dissemination of written policies and procedures throughout AIG. The internal control structure is continually reviewed and evaluated by means of an internal audit function and periodically assessed by PricewaterhouseCoopers LLP, independent accountants, to the extent required under generally accepted auditing standards in connection with their annual audit of AIG's financial statements.

The Audit Committee of the Board of Directors is comprised solely of outside directors and meets regularly with management, the independent accountants and the internal auditors to review the scope and results of the audit work performed.  Both the internal auditors and the independent accountants have unrestricted access to the Audit Committee, without the presence of management, to discuss the results of their work and views on the adequacy of the internal control structure, the quality of financial reporting and any other matters they believe should be brought to the attention of the Audit Committee.

822.   The 1999 10-K also stated, in relevant part:

*The insurance industry is highly competitive*.  Within the United States, AIG's general insurance subsidiaries compete with approximately 3,000 other stock companies, specialty insurance organizations, mutual companies and other underwriting organizations.

\*　　\*　　\*

In AIG's general insurance operations, 1999 net premiums written and net premiums earned increased 11.2 percent and 10.3 percent, respectively, from those of 1998.  In 1998, net premiums written increased 8.8 percent and net premiums earned increased 13.5 percent when compared to 1997.

\*　　\*　　\*

During the latter part of 1999, the commercial insurance market began to experience some rate increases.  *However, this market remains competitive* and excessively capitalized.

\*　　\*　　\*

AIG is a major purchaser of reinsurance for its general insurance operations.  *AIG is cognizant of the need to exercise good judgment in the selection and approval of both foreign and domestic companies participating in its reinsurance programs*.

\*　　\*　　\*

AIG's general reinsurance assets amounted to $19.13 billion and resulted from AIG's reinsurance arrangements.

\*　　\*　　\*

AIG enters into certain intercompany reinsurance transactions for its general and life operations.  *AIG enters these transactions as a sound and business practice in order to maintain underwriting control and spread insurance risk among various legal entities. These reinsurance agreements have been approved by the appropriate regulatory authorities*.

823.    Defendants Greenberg, Smith, Hoenemeyer, Tizzio and Broad signed AIG's Form 10-K for 1999.

824. On or about October 9, 2001, AIG filed with the SEC a Form 8-K that included supplemental financial statements and financial statement schedules for the three years ended December 31, 2000 and for six months ended June 30, 2001. The 8-K explained that the financial information contained therein "has been restated to give retroactive effect to the acquisition of American General Corporation (AGC) on a pooling of interests basis, is presented in accordance with generally accepted accounting principles."

825. The Form 8-K reported consolidated revenues of $51.34 billion and net income of $6.19 billion for the year ended December 31, 1999. AIG's General Insurance business segment reported net premiums earned of $15.54 billion and operating income of $3.48 billion.

826. Defendants' statements concerning AIG's financial results relating to the Fourth Quarter and fiscal year 1999 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a) That during the Fourth Quarter and fiscal year 1999, AIG executives were engaged in an illegal bid-rigging scheme;

(b) That during the Fourth Quarter and fiscal year 1999, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i) Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii) Improperly increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)    Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)    That during the Fourth Quarter and fiscal year 1999, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)    That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)    That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)    That AIG falsely inflated its earnings by including premiums it received from the illegal Brightpoint transaction.

827.    Defendants' statements concerning AIG's financial results for the Fourth Quarter and fiscal year 1999 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 3.    False and Misleading Statements
###        Relating to First Quarter 2000

828.    On April 27, 2000, AIG issued a press release entitled, "AIG's First Quarter 2000 Income Excluding Realized Capital Gains (Losses) Rose 15.5 Percent to $1.36 Billion." The press release stated, in relevant part:

> ***American International Group, Inc. (AIG) today reported that its net income for the first quarter of 2000 increased 12.3 percent to $1.35 billion, compared to $1.20 billion in the first quarter of 1999.***  Excluding net realized capital gains (losses), income increased 15.5 percent to $1.36 billion, compared to $1.18 billion in the first quarter of 1999.
>
> *        *        *
>
> Income before taxes, minority interest and realized capital gains (losses) for the first quarter of 2000 increased 14.9 percent to $2.01 billion from $1.75 billion reported in 1999.
>
> ***Revenues in the first quarter of 2000 rose 10.8 percent to $10.89 billion from $9.82 billion in the year-earlier quarter.***  AIG's shareholders' equity rose over $500 million to approximately $33.8 billion at March 31, 2000, after open market purchases during the quarter of 10.4 million shares of AIG common stock. At that date, AIG's consolidated assets approximated $278 billion.
>
> Commenting on the first quarter's results, AIG Chairman M.R. Greenberg said, "Overall, it was a good quarter for AIG.  Each of our principal business groups produced solid results.
>
> "Worldwide general insurance net  premiums written rose 4.3 percent in the quarter, and we achieved an adjusted underwriting profit of $211.5 million.  Our combined ratio was 95.78, compared to 95.28 in last year's first quarter.  Excluding catastrophe losses of $25 million in the quarter versus zero in last year's first quarter, the combined ratio for first quarter 2000 was 95.17.  We added $22 million to AIG's net loss and loss adjustment reserves in the quarter, bringing the total of such reserves to $24.6 billion at March 31.   This reserve increase was reduced by $75 million of catastrophe losses paid in the first quarter from pre-2000 incurred losses.
>
> ***"Domestically, rates in the commercial property-casualty insurance market continue to firm.  A growing number of classes***

> *are responding to the need for price increases.*  Workers' compensation rates are increasing in many states.  Property is stronger, as are energy and some liability classes.  AIG continues to monitor this part of our business carefully, canceling, non-renewing or losing business where we are unwilling to meet competitors' pricing.  For the quarter, this amounted to $110 million of reduced premiums written.  *Excluding the non-renewed business and also risk finance business, which is very transaction oriented, Domestic Brokerage Group net premiums written grew approximately 10 percent in the quarter. . . ."*

829.  On May 15, 2000, AIG filed its First Quarter 2000 Form 10-Q with the SEC.  The First Quarter 2000 10-Q was signed by Defendant Smith.  *AIG reported consolidated revenues of $10.9 billion and net income of $1.3 billion for the three months ended March 31, 2000.*  AIG's General Insurance business segment reported revenues of $4.8 billion net premiums earned of $4.1 billion and operating income of $887 million for the three months ended March 31, 2000  AIG's Life Insurance business segment reported revenues of $4.9 billion GAAP premiums/premium income of $ 3.3 billion and operating income of $783 million for the quarter ended March 31, 2000.

830.  The First Quarter 2000 10-Q also stated, in relevant part:

> *During the first three months of 2000, the net premiums written and net premiums earned in AIG's general insurance operations increased 4.3 percent and 8.8 percent, respectively, from those of 1999.*

> *       *       *

> During the latter part of 1999, the commercial insurance market continued to experience some rate increases.  *However, this market remains competitive* and excessively capitalized.

> *       *       *

> General insurance operating income in the first three months of 2000 decreased 0.5 percent when compared to the same period of 1999.

> *       *       *

AIG is a major purchaser of reinsurance for its general insurance operations. ***AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs***.

\*        \*        \*

AIG's general reinsurance assets amounted to $19.39 billion and resulted from AIG's reinsurance arrangements.

\*        \*        \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations. ***AIG enters into these transactions as a sound and prudent business practice in order to maintain underwriting control and spread risk among various legal entities. These reinsurance agreements have been approved by the appropriate regulatory authorities***.

831.    Defendants' statements concerning the First Quarter of 2000 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)    That during the First Quarter of 2000, AIG executives were engaged in an illegal bid-rigging scheme;

(b)    That during the First Quarter of 2000, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)    Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)    Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)    Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying

higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)     That during the First Quarter of 2000, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in turn, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities;

(f)     That AIG falsely inflated its earnings by including premiums received through the illegal Brightpoint transaction;

(g)     AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the First Quarter of 2000 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to:  AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; the conversion of underwriting losses to capital losses; the failure to account for the deferred compensation provided by Defendant SICO; and AIG's hedge fund accounting.

832.     Defendants' statements concerning AIG's financial results for the First Quarter of 2000 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

**4.** **False and Misleading Statements**
**Relating to Second Quarter 2000**

833. On July 27, 2000, AIG issued a press release entitled "AIG's Second Quarter

2000 Income Excluding Realized Capital Gains (Losses) Rose 13.1 Percent to $1.43 Billion."

The press release stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its
> income excluding net realized capital gains (losses) increased 13.1
> percent to $1.43 billion in the second quarter and 14.2 percent to
> $2.79 billion for the first six months of 2000.  Net income for the
> second quarter of 2000 increased 10.2 percent to $1.41 billion,
> compared to $1.28 billion in the second quarter of 1999.  For the
> first six months of 2000, net income totaled $2.75 billion, an
> increase of 11.2 percent compared to $2.48 billion in the same
> period of 1999.
>
> *          *          *
>
> Income before income taxes, minority interest and realized capital
> gains (losses) for the second quarter of 2000 amounted to $2.13
> billion, an increase of 12.8 percent over the $1.89 billion reported
> in 1999.
>
> For the first six months of 2000, income before income taxes,
> minority interest and realized capital gains (losses) increased 13.8
> percent to $4.14 billion from $3.64 billion reported last year.
>
> Revenues in the second quarter of 2000 rose 12.1 percent to $11.43
> billion from $10.20 billion in the year-earlier quarter.  For the first
> six months, revenues totaled $22.32 billion, an increase of 11.5
> percent over $20.02 billion in 1999.
>
> At June 30, 2000, AIG's consolidated assets and shareholders'
> equity approximated $281 billion and $34.8 billion, respectively.
>
> Commenting on the second quarter results, AIG Chairman M.R.
> Greenberg said, "It was a good quarter for AIG overall, with strong
> results from most of our major businesses and continued progress
> in terms of firming pricing in the U.S. property-casualty market.
>
> "***Worldwide general insurance net premiums written rose 7.5***
> ***percent in the quarter, and we achieved an adjusted underwriting***
> ***profit of $227.9 million.***  The combined ratio was 95.92, compared
> to 94.60 for the second quarter of 1999.  During the quarter, we
> continued to pay claims, amounting to $57 million, related to last

- 267 -

year's catastrophes, and also incurred new net catastrophe losses of $19 million.

"Domestically, there is an increasingly better tone to the commercial property-casualty market as rates continue to firm. While the trend is in the right direction, it is important to remember that rates declined significantly over the past eight or nine years, and therefore further increases are necessary. Workers' compensation rates are also strengthening, but this remains a difficult class and we continue to be very selective in underwriting workers' compensation business. In this environment, we continue to exercise underwriting discipline throughout the AIG organization. During the second quarter, we canceled or non renewed $114 million of business worldwide that did not meet our underwriting standards, continuing a strategy we have followed successfully for the past several years."

834.     On August 14, 2000, AIG filed its Second Quarter 2000 Form 10-Q with the SEC. The Second Quarter 2000 10-Q which was signed by Defendant Smith. *AIG reported consolidated revenues of $11.4 billion and net income of $1.4 billion for the quarter ended June 30, 2000* and year to date revenues of $22.3 billion and net income of $2.8 billion for the six months ended June 30, 2000. *AIG's General Insurance business segment reported revenues of $5.1 billion, net premiums earned of $4.5 billion and operating income of $884 million for the quarter ended June 30, 2000 and year to date revenues of $9.8 billion, net premiums earned of $8.5 billion and operating income of $1.8 billion for the six months ended June 30, 2000.* AIG's Life Insurance business segment reported  revenues of $5.1 billion, GAAP premiums/premium income of $3.4 billion and operating income of $866 million for the quarter ended June 30, 2000 and year to date revenues of $10.0 billion, GAAP premiums/premium income of $6.7 billion and operating income of $1.6 billion for the six months ended June 30, 2000.

835.     The Second Quarter 2000 10-Q also stated, in relevant part:

*During the first six months of 2000, the net premiums written and net premiums earned in AIG's general insurance operations increased 5.9 percent and 9.7 percent, respectively, from those of 1999.*

\*      \*      \*

*During the latter part of 1999, the commercial insurance market continued to experience some rate increases.  However, this market remains competitive* and excessively capitalized.

\*      \*      \*

General insurance operating income in the first six months of 2000 decreased 1.3 percent when compared to the same period of 1999.

\*      \*      \*

AIG is a major purchaser of reinsurance for its general insurance operations.  *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance program*.

\*      \*      \*

AIG's general reinsurance assets amounted to $19.45 billion and resulted from AIG's reinsurance arrangements.

\*      \*      \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations.  *AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities.  These reinsurance agreements have been approved by the appropriate regulatory authorities.*

\*      \*      \*

At June 30, 2000, general insurance reserves for losses and loss expenses (loss reserves) amounted to $38.36 billion.

\*      \*      \*

AIG-FP participates in the derivatives dealer market conducting, primarily as principal, an interest rate, currency, equity and credit derivative products business.  *AIGFP also enters into structured transactions including long-dated forward exchange contracts,*

*options transactions, liquidity facilities and investment*
*agreements and invests in a diversified portfolio of securities*.

836.    Defendants' statements concerning AIG's financial results relating to the Second

Quarter of 2000 were each false and misleading when made because they misrepresented or

omitted the following material adverse facts that the Defendants knew at the time the statements

were made:

(a)    That during the Second Quarter of 2000, AIG executives were engaged in

an illegal bid-rigging scheme;

(b)    That during the Second Quarter of 2000, AIG derived a substantial portion

of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the

scheme having:

(i)    Defrauded AIG's customers into believing that the bids they

received were honest, legitimate and competitive;

(ii)    Improperly increased the prices that customers paid for premiums,

resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)    Illegally "protected" AIG's business from competition by virtually

guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying

higher premiums than they would have if there had truly been competitive bidding in the

insurance marketplace;

(c)    That during the Second Quarter of 2000, AIG derived a substantial portion

of its revenues and profits from the Company's payment of at least tens of millions of dollars in

illegal "contingent commissions" to Marsh and other insurance brokers who, in return,

improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)      That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)      That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)      That during the Second Quarter of 2000, AIG directly participated in securities fraud(s) by selling one or more GAITS products that AIG knew would result in material misstatements of the counter-parties' financial results;

(g)      That during the Second Quarter of 2000, AIG derived millions of dollars from the sale of one or more of the illegal GAITS products;

(h)      That during the Second Quarter of 2000, AIG inflated its earnings by including premiums received through its illegal Brightpoint transaction;

(i)      That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Second Quarter of 2000 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; the conversion of underwriting losses to capital losses; the failure to account for the deferred compensation provided by Defendant SICO; and AIG's hedge fund accounting.

(j)      Defendants' statements concerning AIG's financial results for the Second Quarter of 2000 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

5.      **False and Misleading Statements**
        **Relating to Third Quarter 2000**

837.    On October 26, 2000, the Company issued a press release entitled "AIG's Third

Quarter Income Excluding Realized Capital Gains (Losses) Rose 14.6 Percent to $1.41 Billion."

The press release stated in part:

> American International Group, Inc. (AIG) today reported that its
> income excluding net realized capital gains (losses) increased 14.6
> percent to $1.41 billion in the third quarter and 14.4 percent to
> $4.21 billion for the first nine months of 2000.
>
> Net income for the third quarter of 2000, including net realized
> capital gains (losses), increased 9.3 percent to $1.39 billion,
> compared to $1.27 billion in the third quarter of 1999.  For the first
> nine months of 2000, net income totaled $4.14 billion, an increase
> of 10.6 percent, compared to $3.74 billion in the same period of
> 1999.
>
> *            *            *
>
> Income before income taxes, minority interest and realized capital
> gains (losses) for the third quarter of 2000 amounted to $2.10
> billion, an increase of 15.8 percent over the $1.81 billion reported
> in 1999.  For the first nine months of 2000, income before income
> taxes, minority interest and realized capital gains (losses) increased
> 14.5 percent to $6.24 billion from $5.45 billion reported last year.
>
> Revenues in the third quarter of 2000 rose 15.6 percent to $11.14
> billion from $9.64 billion in the year-earlier quarter.  For the first
> nine months, revenues totaled $33.46 billion, an increase of 12.8
> percent over $29.66 billion in 1999.
>
> At September 30, 2000, AIG's consolidated assets and
> shareholders' equity approximated $295 billion and $36.5 billion,
> respectively.
>
> ***Commenting on the third quarter results, AIG Chairman Mr.***
> ***Greenberg said, "AIG had a very good quarter, with increased***
> ***momentum on the domestic commercial insurance pricing front,***
> ***strong results from our overseas general insurance business, an***
> ***excellent quarter for life insurance, and outstanding results in***
> ***our financial services and asset management businesses."***

"Worldwide general insurance net premiums written increased 8.1 percent to $4.29 billion, our largest quarterly percentage increase of the year, and we achieved an adjusted underwriting profit of $192.7 million.  Our combined ratio was 96.25, compared to 96.56 in last year's third quarter.  General insurance operating income for the quarter posted a 14.0 percent increase over last year.  Overall, our general insurance business is in very strong shape around the world and our underwriting results continue to be satisfactory."

838.    On November 14, 2000, AIG filed its Third Quarter 2000 Form 10-Q with the SEC.  The Third Quarter 2000 10-Q was signed by Defendant Smith.  ***AIG reported consolidated revenues of $11.1 billion and net income of $1.4 billion for the quarter ended September 30, 2000*** and year-to-date revenues of $33.5 billion and net income of $4.1 billion for the nine months ended September 30, 2000.  AIG's General Insurance business segment reported revenues of $4.8 billion, net premiums earned of $4.1 billion and operating income of $902 million for the quarter ended September 30, 2000 and year to date revenues of $14.7 billion, net premiums earned of $12.6 billion and operating income of $2.7 billion for the nine months ended September 30, 2000.  AIG's Life Insurance business segment reported  revenues of $5.0 billion, GAAP premiums/premium income of $3.3 billion and operating income of $821 million for the quarter ended September 30, 2000 and year to date revenues of $15.0 billion, GAAP premiums/premium income of $9.9 billion and operating income of $2.5 billion for the nine months ended September 30, 2000.

839.    The Third Quarter 2000 10-Q also stated, in relevant part:

***During the first nine months of 2000, the net premiums written and net premiums earned in AIG's general insurance operations increased 6.6 percent and 10.9 percent, respectively, from those of 1999.***

*        *        *

- 273 -

> *During the latter part of 1999, the commercial insurance market continued to experience some rate increases. However, this market remains competitive* and excessively capitalized.

*    *    *

> General insurance operating income in the first nine months of 2000 increased 1.7 percent when compared to the same period of 1999.

*    *    *

> AIG is a major purchaser of reinsurance for its general insurance operations. *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance program*.

*    *    *

> AIG's general reinsurance assets amounted to $19.38 billion and resulted from AIG's reinsurance arrangements.

*    *    *

> AIG enters into certain intercompany reinsurance transactions for its general and life operations. *AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities. These reinsurance agreements have been approved by the appropriate regulatory authorities*.

*    *    *

> At September 30, 2000, general insurance reserves for losses and loss expenses (loss reserves) amounted to $38.7 billion.

840.   Defendants' statements concerning AIG's financial results relating to the Third Quarter of 2000 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)   That during the Third Quarter of 2000, AIG executives were engaged in an illegal bid-rigging scheme;

- 274 -

(b)     That during the Third Quarter of 2000, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)     Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)     Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)     Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)     That during the Third Quarter of 2000, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That during the Third Quarter of 2000, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(f)       That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(g)       That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities;

(h)       That during the Third Quarter of 2000, AIG directly participated in securities fraud(s) by selling one or more GAITS products that AIG knew would result in material misstatements of the counter-parties' financial results;

(i)       That during the Third Quarter of 2000, AIG derived millions of dollars from the sale of one or more of the illegal GAITS products;

(j)       That AIG had received a voluntary request for information from the SEC in July 2000 regarding the Company's dealings with Brightpoint;

(k)       That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Third Quarter of 2000 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; the conversion of underwriting losses to capital losses; the failure to account for the deferred compensation provided by Defendant SICO; and AIG's hedge fund accounting.

841.   Defendants' statements concerning AIG's financial results for the Third Quarter of 2000 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

**6.      False and Misleading Statements Relating
to Fourth Quarter and Year End 2000**

842.    On February 8, 2001, AIG issued a press release entitled "AIG Reports 2000 Net

Income Excluding Realized Capital Gains (Losses) Rose 14.8 Percent to Record $5.74 Billion."

The press release stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its
> income excluding net realized capital gains (losses) increased 14.8
> percent to $5.74 billion for the year 2000 and 15.9 percent to $1.53
> billion in the fourth quarter of 2000.
>
> Net income for 2000, including net realized capital gains (losses),
> increased 11.5 percent to $5.64 billion, compared to $5.06 billion
> in 1999.  For the fourth quarter of 2000, net income totaled $1.50
> billion, an increase of 14.1 percent, compared to $1.31 billion in
> the same period of 1999.
>
> Revenues for the year 2000 rose 13.1 percent to $45.97 billion
> from $40.66 billion in 1999.  Fourth quarter revenues totaled
> $12.51 billion, an increase of 13.8 percent over $11.00 billion in
> the year earlier quarter.
>
> At December 31, 2000, AIG's consolidated assets approximated
> $303 billion, an increase of 13 percent, compared to $268 billion at
> the prior year-end
>
> *      *      *
>
> Income before taxes, minority interest and realized capital gains
> (losses) for the year 2000 increased 14.8 percent to $8.49 billion
> from 7.39 billion reported last year.  For the fourth quarter of 2000,
> income before income taxes, minority interest and realized capital
> losses amounted to $2.24 billion, an increase of 15.9 percent over
> the $1.94 billion reported in 1999.
>
> *      *      *
>
> Commenting on the fourth quarter and full year 2000, AIG
> Chairman M.R. Greenberg said, "AIG had a very good quarter and
> year . . . Net income for the year 2000 before realized capital gains
> and losses rose 14.8 percent to a record $5.74 billion, or $2.45 per
> share.  AIG is well positioned in 2001 in our principal markets.
> ***The strengthening rate environment across the board, both in the
> U.S. property-casualty market and in key overseas markets, is a***

*major positive event for our industry and most particularly for AIG.*

\*     \*     \*

"*We added $106 million to AIG's general insurance net loss and loss adjustment reserves for the [fourth] quarter, and together with the acquisition of HSB Group, Inc., increased the total of those reserves to $25.0 billion at year-end 2000.*

"*The Domestic Brokerage Group benefited in the fourth quarter from the broad strengthening of commercial property-casualty rates* and our array of specialized products and services tailored to the changing needs of our customers. *Stronger rates are evident across virtually all classes of business, and we believe rates will continue to firm.*"

\*     \*     \*

General insurance pretax income before realized capital gains for the year 2000 was $3.49 billion, 9.4 percent above the $3.19 billion reported last year.  For the fourth quarter of 2000, general insurance pretax income before realized capital gains (losses) was $855.2 million, an increase of 11.1 percent compared to $769.5 million in 1999.

843.    On April 2, 2001, AIG filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2000 ("the 2000 10-K").  *AIG reported consolidated revenues of $46.0 billion and net income of $5.6 billion for the year ended December 31, 2000*.  AIG's General Insurance business segment reported revenues of $20.1 billion, net premiums earned of $17.4 billion and operating income of $3.5 billion.  AIG's Life Insurance business segment reported segment reported revenues of $20.5 billion, GAAP premiums/premium income of $13.6 billion and operating income of $3.4 billion.  PwC certified that AIG's consolidated financial statements presented fairly, in all material respects the financial position of the Company and the consolidated results of operations and their cash flows in conformity with generally accepted accounting principals.

844.    AIG's 2000 Annual Report included a "Letter to Shareholders" from Defendant

Greenberg, which stated, in relevant part:

> AIG started the new millennium on a positive note.  Net income
> rose 11.5 percent to a record $5.64 billion, while earnings per share
> totaled $2.41, an increase of 12.1 percent over 1999.
>
> *       *       *
>
> AIG's financial condition is strong and we hold Triple A ratings
> from the principal rating services, Moody's and Standard &
> Poor's.

845.    The 2000 Annual Report also contained the following:

> Report of Management's Responsibilities
>
> **The management of AIG is responsible for the integrity and fair
> presentation of the consolidated financial statements, related
> notes thereto and all other financial information presented
> herein.  The consolidated financial statements have been
> prepared in conformity with generally accepted accounting
> principles and include amounts based on the best estimates and
> judgments of management.**
>
> **AIG maintains an internal control structure designed to provide
> reasonable assurance that assets are safeguarded from loss or
> unauthorized use, that transactions are recorded in accordance
> with management's direction and that the financial records are
> reliable for the purposes of preparing financial statements and
> maintaining accountability of assets.**  The management of AIG
> applies the concept of reasonable assurance by weighing the cost
> of an internal control structure against the benefits to be derived.
> **The internal control structure is supported by the careful
> selection, training and development of qualified personnel, an
> appropriate division of responsibilities and the dissemination of
> written policies and procedures throughout AIG. The internal
> control structure is continually reviewed and evaluated by means
> of an internal audit function and periodically assessed by
> PricewaterhouseCoopers LLP, independent accountants, to the
> extent required under generally accepted auditing standards in
> connection with their annual audit of AIG's financial statements.**
>
> The Audit Committee of the Board of Directors is comprised
> solely of outside directors and meets regularly with management,
> the independent accountants and the internal auditors to review the

scope and results of the audit work performed.  Both the internal auditors and the independent accountants have unrestricted access to the Audit Committee, without the presence of management, to discuss the results of their work and views on the adequacy of the internal control structure, the quality of financial reporting and any other matters they believe should be brought to the attention of the Audit Committee.

846.    The 2000 10-K stated also stated, in relevant part:

*The insurance industry is highly competitive*.  Within the United States, AIG's general insurance subsidiaries compete with approximately 3,000 other stock companies, specialty insurance organizations, mutual companies and other underwriting organizations.

\*        \*        \*

*Commencing in the latter part of 1999 and continuing through 2000, the commercial property-casualty market place has experienced rate increases.  Virtually all areas of [Domestic Brokerage Group] have experienced rate increases.*  Overall, DBG's net premiums written increased $508 million or 6.1 percent in 2000 over 1999.  These increases compared to an increase of $106 million or 1.3 percent in 1999 over 1998.

\*        \*        \*

AIG is a major purchaser of reinsurance for its general reinsurance operations.  *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs.*

\*        \*        \*

AIG's general reinsurance assets amount to $22.90 billion and resulted from AIG's reinsurance arrangements.

\*        \*        \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations.  *AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities.  These reinsurance agreements have been approved by the appropriate regulatory authorities.*

\*        \*        \*

AIG-FP participates in the derivatives dealer market conducting, primarily as principal, an interest rate, currency, equity and credit derivative products business.  AIG-FP also enters into structured transactions including long-dated forward foreign exchanges contracts, option transactions, liquidity facilities and investment agreements and invests in a diversified portfolio of securities. AIG-FP derives substantially all its revenues from proprietary positions entered in connection with counterparty transactions rather than from speculative transactions.  Revenues in 2000 increased 43.3 percent from 1999 compared to a 33.9 percent increase during 1999 from 1998.

847.   AIG's Form 10-K for 2000 was signed by Defendants Greenberg, Smith, Hoenemeyer, Tizzio and Broad.

848.   On or about October 9, 2001, AIG filed with the SEC a Form 8-K that included supplemental financial statements and financial statement schedules for the three years ended December 31, 2000 and for six months ended June 30, 2001.  The 8-K explained that the financial information contained therein "has been restated to give retroactive effect to the acquisition of American General Corporation (AGC) on a pooling of interests basis, is presented in accordance with generally accepted accounting principles."

849.   The Form 8-K reported consolidated revenues of $57.03 billion and net income of $6.64 billion for the year ended December 31, 2000.  AIG's General Insurance business segment reported net premiums earned of $17.41 billion and operating income of $3.5 billion.

850.   The Form 8-K also stated, in relevant part:

> **_Commencing in the latter part of 1999 and continuing through 2000, the commercial property-casualty market place has experienced rate increases_**.  Virtually all areas of DBG have experienced rate increases.  Overall, DBG's net premiums written increased $508 million or 6.1 percent in 2000 over 1999.
>
> *          *          *
>
> General insurance operating income in 2000 increased 1.3 percent when compared to 1999.

\*     \*     \*

AIG is a major purchaser of reinsurance for its general insurance operations. ***AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs***.

\*     \*     \*

AIG's general reinsurance assets amounted to $22.90 billion and resulted from AIG's reinsurance arrangements . . . ***AIG manages its credit risk in its reinsurance relationships by transacting with reinsurers that it considers financially sound***, and when necessary AIG holds substantial collateral in the form of funds, securities and/or irrevocable letters of credit.

\*     \*     \*

AIG's Reinsurance Security Department conducts ongoing detailed assessments of the reinsurance markets and current and potential reinsurers, both foreign and domestic. ***Such assessments include, but are not limited to, identifying if a reinsurer is appropriately licensed, and has sufficient financial capacity, and the local environment in which a foreign reinsurer operates***. ***This department also reviews the nature of the risks ceded and the need for collateral***. In addition, AIG's Credit Risk Committee reviews the credit limits for and concentrations with any one reinsurer.

AIG enters into certain intercompany reinsurance transactions for its general and life operations. ***AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities***. ***These reinsurance agreements have been approved by the appropriate regulatory authorities***.

851.   Defendants' statements concerning AIG's financial results relating to the Fourth Quarter and fiscal year 2000 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)     That during the Fourth Quarter and fiscal year 2000, AIG executives were engaged in an illegal bid-rigging scheme;

(b)     That during the Fourth Quarter and fiscal year 2000, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)     Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)     Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)     Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)     That during the Fourth Quarter and fiscal year 2000, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That during the Fourth Quarter and fiscal year 2000, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of

millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(f)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(g)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities, including the General Re transaction detailed above in paragraphs 324 through 447;

(h)     That during the Fourth Quarter and fiscal year 2000, AIG directly participated in securities fraud(s) by selling one or more GAITS products that AIG knew would result in material misstatements of the counter-parties' financial results;

(i)     That during the Fourth Quarter and fiscal year 2000, AIG derived millions of dollars from the sale of one or more of the illegal GAITS products;

(j)     That AIG was withholding information relevant to an ongoing SEC investigation into the Company's dealings with Brightpoint.

(k)     That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Fourth Quarter and fiscal year 2000 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to:  AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; the conversion of underwriting losses to capital losses;

the failure to account for the deferred compensation provided by Defendant SICO; and AIG's hedge fund accounting.

852.   Defendants' statements concerning AIG's financial results for the Fourth Quarter and fiscal year 2000 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 7.   False and Misleading Statements Relating to First Quarter 2001

853.   On April 3, 2001, AIG issued a press release entitled, "AIG Announces Offer to Acquire American General for $46 Per Share or Approximately $23 billion."  In announcing the proposed transaction, Defendant Greenberg stated, "We are making this offer to [American General] and hope to commence merger discussions in the very near future.  We believe that the combination of our two companies is uniquely attractive, in terms of mix of businesses and distribution channels, and would be highly beneficial financially to both of our shareholder groups."

854.   On April 26, 2001, AIG issued a press release entitled "AIG's First Quarter 2001 Income Rose 15.2 Percent to $1.57 Billion" The press release stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its income excluding the cumulative effect of an accounting change and net realized capital gains (losses) for the first quarter of 2001 increased 15.2 percent to $1.57 billion, compared to $1.36 billion in the first quarter of 2000.  ***Net income increased 13.8 percent to $1.53 billion, compared to $1.35 billion in the first quarter of 2000***.
>
> ***Revenues in the first quarter of 2001 rose 11.6 percent to $12.15 billion from $10.89 billion in the year-earlier quarter.***  At March 31, 2001, AIG's consolidated assets and shareholders' equity approximated $315 billion and $41.7 billion, respectively.
>
> *        *        *

Commenting on the first quarter's results, AIG Chairman M.R. Greenberg said, *"AIG had a solid first quarter, benefiting from a continuing strengthening of pricing in the commercial property-casualty market, as well as strong performance by our overseas life insurance business and financial services businesses.* Excluding the cumulative effect of an accounting change and realized capital gains and losses, AIG's net income rose 15.2 percent in the quarter to $1.57 billion, or $0.67 per share.

*"In worldwide general insurance, net premiums written gained 15.1 percent to $4.86 billion, reflecting the broad increases in commercial pricing both in the United States and in key overseas markets.  Our adjusted underwriting profit for the quarter totaled $256.4 million and our worldwide combined ratio was 95.89, compared to 95.78 in last year's first quarter.*

*"The Domestic Brokerage Group, including the results of the insurance operations of HSB Group, Inc., reported a 27.5 percent gain in net premiums written to $2.65 billion, a record level, and a combined ratio of 98.19, compared to 100.92 last year.  Rates continued to firm during the quarter but, as mentioned in last quarter's earnings release, additional strengthening is required in order to return pricing to satisfactory levels after years of eroding rates."*

\*        \*        \*

*"We added $63 million to AIG's general insurance net loss reserves for the quarter, bringing the total of those reserves to $25.0 billion at March 31, 2001."*

\*        \*        \*

*General insurance pretax income before realized capital gains (losses) for the first quarter of 2001 was $972.3 million, an increase of 11.2 percent compared to $874.7 million last year.*

Worldwide general insurance net premiums written in the first quarter of 2001 amounted to $4.86 billion, 15.1 percent ahead of the $4.23 billion reported last year.

*General insurance net investment income rose 7.9 percent to $715.9 million in 2001 from $663.2 million last year.*

855.    On May 15, 2001, AIG filed its First Quarter 2001 Form 10-Q with the SEC.  The

First Quarter 2001 10-Q was signed by Defendant Smith.  AIG reported consolidated revenues of

$12.2 billion and net income of $1.5 billion for the quarter ended March 31, 2001.  AIG's

General Insurance business segment reported revenues of $5.4 billion net premiums earned of

$4.7 billion and operating income of $951 million for the three months ended March 31, 2001

AIG's Life Insurance business segment reported revenues of $5.4 billion, GAAP

premiums/premium income of $3.5 billion and operating income of $939 million for the quarter

ended March 31, 2001.

856.   AIG's First Quarter 2001 10-Q stated, in relevant part:

During the first three months of 2001, net premiums written and
net premiums earned increased 15.1 percent and 15.0 percent,
respectively, from those of 2000.

\*        \*        \*

**Commencing in the latter part of 1999 and continuing through
2001, the commercial property-casualty market place has
experienced rate increases.  Virtually all areas of DBG have
experienced rate increases.**  Overall, DBG's net premiums written
increased $572 million or 27.5 percent in 2001 over 2000.

\*        \*        \*

General insurance operating income in the first three months of
2001 increased 7.3 percent when compared to the same period of
2000.

\*        \*        \*

AIG is a major purchaser of reinsurance for its general insurance
operations.  **AIG is cognizant of the need to exercise good
judgment in the selection and approval of both domestic and
foreign companies participating in its reinsurance programs.**

\*        \*        \*

AIG's general reinsurance assets amounted to $23.78 billion and
resulted from AIG's reinsurance arrangements.  Thus, a credit
exposure existed at March 31, 2001 with respect to reinsurance
recoverable to the extent that any reinsurer may not be able to
reimburse AIG under the terms of these reinsurance arrangements.

\*        \*        \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations. ***AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities.  These reinsurance agreements have been approved by the appropriate regulatory authorities.***

\*        \*        \*

At March 31, 2001, general insurance reserves for losses and loss expenses (loss reserves) amounted to $40.72 billion.

857.    Defendants' statements concerning the First Quarter of 2001 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)    That during the First Quarter of 2001, AIG executives were engaged in an illegal bid-rigging scheme;

(b)    That during the First Quarter of 2001, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)    Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)    Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)    Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)    That during the First Quarter of 2001, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in

illegal "contingent commissions" to Marsh and other insurance brokers who, in return,

improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the

Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially

enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite"

or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were

not approved by the appropriate regulatory authorities, including the General Re transaction

detailed above in paragraphs 324 through 447.

(f)     That during the First Quarter of 2001, AIG directly participated in

securities fraud(s) by selling one or more GAITS products that AIG knew would result in

material misstatements of the counter-parties' financial results;

(g)     That during the First Quarter of 2001, AIG derived millions of dollars

from the sale of one or more of the illegal GAITS products;

(h)     That AIG was withholding information relevant to an ongoing SEC

investigation into the Company's dealings with Brightpoint.

(i)     That AIG's net income, revenues, shareholders' equity and other key

financial measures were overstated for the First Quarter of 2001 as a result of the improper

transactions identified in the Company's May 31, 2005 restatement, including but not limited to:

AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other

directed entries; AIG's accounting for Life Settlements; the failure to account for the deferred

compensation provided by Defendant SICO; AIG's hedge fund accounting; and the Company's

accounting for derivatives.

858.    Defendants' statements concerning AIG's financial results for the First Quarter of 2001 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 8.    False and Misleading Statements Relating to Second Quarter 2001

859.    On July 26, 2001, AIG issued a press release entitled, "AIG's Second Quarter 2001 Income Excluding Realized Capital Gains (Losses) Rose 15.8 Percent to $1.66 Billion." The press release stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its income excluding net realized capital gains (losses) increased 15.8 percent to $1.66 billion in the second quarter and, also excluding the first quarter cumulative effect of a FASB mandated accounting change, 15.5 percent to $3.23 billion for the first six months of 2001.
>
> **Net income for the second quarter of 2001 increased 15.6 percent to $1.63 billion, compared to $1.41 billion in the second quarter of 2000**.  For the first six months of 2001, net income totaled $3.16 billion, an increase of 14.7 percent compared to $2.75 billion in the same period of 2000.
>
> **Revenues in the second quarter of 2001 rose 10.1 percent to $12.58 billion from $11.43 billion in the year-earlier quarter**.  For the first six months, revenues totaled $24.73 billion, an increase of 10.8 percent over $22.32 billion in 2000.
>
> *        *        *
>
> Commenting on second quarter performance, AIG Chairman M.R. Greenberg said, "AIG had a good second quarter as a result of solid progress in most of our principal businesses and geographic markets.  **Excluding realized capital gains and losses, AIG's net income rose 15.8 percent to $1.66 billion.  In the property-casualty market, pricing continued to improve.**  While the global economy remains soft, the flight to quality underway in many markets benefits AIG with our strong ratings and financial condition.  We have undertaken a number of new marketing initiatives and alliances, and launched an array of new products that will benefit future growth in our business.

*"Reflecting rate increases in the commercial property-casualty market, worldwide general insurance net premiums written grew 12.3 percent (15.8 percent in original currency) to $5.06 billion. The combined ratio improved to 95.52 in the second quarter of 2001, compared to 95.92 a year ago*.

\* \* \*

*"In the United States, our Domestic Brokerage Group had record net premiums written of $2.82 billion and a combined ratio of 98.77.  In last year's second quarter, net premiums written were $2.21 billion and the combined ratio was 99.27.  While rates continue to firm,* much more is needed for the industry to get back on an even keel and achieve overall profitability.  In fact, over the past decade, rates declined for many classes of business by 50 to 75 percent.  Over the same period, policy conditions broadened, which increased exposures in many areas, while loss cost trends have also increased significantly."

\* \* \*

*General insurance pretax income before realized capital losses for the second quarter of 2001 was $946.2 million, 6.6 percent above the $887.6 million last year.  For the first six months of 2001, general insurance pretax income before realized capital gains (losses) was $1.92 billion, an increase of 8.9 percent, compared to $1.76 billion in 2000.*

Worldwide general insurance net premiums written in the second quarter of 2001 amounted to $5.06 billion, 12.3 percent ahead of the $4.50 billion in 2000.  For the first six months of 2001, general insurance net premiums written were $9.92 billion, an increase of 13.6 percent, compared to $8.73 billion last year.

\* \* \*

Income before income taxes, minority interest and realized capital gains (losses) for the second quarter of 2001 amounted to $2.43 billion, an increase of 14.0 percent over the $2.13 billion reported in 2000.  For the first six months of 2001, income before income taxes, minority interest, cumulative effect of a first quarter accounting change and realized capital gains (losses) increased 14.7 percent to $4.75 billion from $4.14 billion reported last year.

860.   On August 14, 2001, AIG filed its Second Quarter 2001 Form 10-Q with the SEC. The Second Quarter 2001 10-Q was signed by Defendant Smith. **AIG reported consolidated revenues of $12.6 billion and net income of $1.6 billion for the quarter ended June 30, 2001 and year to date revenues of $24.7 billion and net income of $3.2 billion for the six months ended June 30, 2001**. AIG's General Insurance business segment reported revenues of $5.4 billion, net premiums earned of $4.7 billion and operating income of $910 million for the quarter ended June 30, 2001 and year to date revenues of $10.8 billion, net premiums earned of $9.5 billion and operating income of $1.9 billion for the six months ended June 30, 2001. AIG's Life Insurance business segment reported revenues of $5.8 billion, GAAP premiums/premium income of $3.8 billion and operating income of $1.1 billion for the quarter ended June 30, 2001 and year to date revenues of $11.2 billion, GAAP premiums/premium income of $7.4 billion and operating income of $2.0 billion for the six months ended June 30, 2001.

861.   The Second Quarter 2001 10-Q also stated, in relevant part:

> **During the first six months of 2001, net premiums written and net premiums earned increased 13.6 percent and 11.2 percent, respectively, from those of 2000.**
>
> *       *       *
>
> **Commencing in the latter part of 1999 and continuing through 2001, the commercial property-casualty market place has experienced rate increases. Virtually all of DBG have experienced rate increases**. Overall, DBG's net premiums written increased $1.18 billion or 27.5 percent in the first six months of 2001 over 2001.
>
> *       *       *
>
> General insurance operating income in the first six months of 2001 increased 5.1 percent when compared to the same period of 2000.
>
> *       *       *

AIG is a major purchaser of reinsurance for its general insurance operations. ***AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs***.

*       *       *

AIG's general reinsurance assets amounted to $23.88 billion and resulted from AIG's reinsurance arrangements.

*       *       *

AIG enters into certain intercompany reinsurance transactions for its general and life operations. ***AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities.  These reinsurance agreements have been approved by the appropriate regulatory authorities***.

*       *       *

At June 30, 2001, general insurance reserves for losses and loss expenses (loss reserves) amounted to $40.84 billion.

*       *       *

On May 11, 2001, AIG announced that it has entered into a definitive agreement to acquire American General Corporation (American General).  American General shareholders will receive $46 per American General share in AIG common stock, subject to a collar mechanism.  The transaction, which has been approved by the boards of directors of both companies, will be a tax-free reorganization and will be accounted for using the pooling of interests method.  The transaction values American General at approximately $23 billion.  AIG expects to receive the remaining regulatory approvals for the acquisition in August and plans to close the transaction as soon as possible thereafter.

862.    Defendants' statements concerning AIG's financial results relating to the Second Quarter of 2001 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)      That during the Second Quarter of 2001, AIG executives were engaged in an illegal bid-rigging scheme;

(b)      That during the Second Quarter of 2001, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)      Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)      Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)      Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)      That during the Second Quarter of 2001, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)      That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)      That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities;

(f)        That during the Second Quarter of 2001, AIG directly participated in securities fraud by selling one or more C-GAITS products to PNC that AIG knew would result in material misstatements of PNC's financial results;

(g)        That during the Second Quarter of 2001, AIG derived millions of dollars from the sale of the illegal C-GAITS products to PNC;

(h)        That AIG was withholding information relevant to an ongoing SEC investigation into the Company's dealings with Brightpoint;

(i)        That during the Third Quarter of 2001, Richard "Dick" Grasso – at Defendant Greenberg's urging – had specialists at the NYSE purchase millions of dollars of AIG stock in order to fraudulently inflate AIG's stock price in the period leading up to AIG's acquisition of American General on August 29, 2001.

(j)        That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Second Quarter of 2001 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; AIG's accounting for Life Settlements; the failure to account for the deferred compensation provided by Defendant SICO; AIG's hedge fund accounting; and the Company's accounting for derivatives.

(k)        Defendants' statements concerning AIG's financial results for the Second Quarter of 2001 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 9.    False and Misleading Statements
###        Relating to Third Quarter 2001

863.    On August 29, 2001 the Individual Defendants caused AIG to issue a press

release entitled "AIG Announces Closing of American General Acquisition." The press release

stated in relevant part:

> American International Group, Inc. (AIG) announced today the
> closing of its acquisition of American General Corporation
> (American General).
>
> Based on today's closing date, American General shareholders will
> receive 0.5790 of a share of AIG common stock in exchange for
> each share of American General common stock.
>
> Commenting on the announcement, AIG Chairman M.R.
> Greenberg said, "We are pleased to have American General as a
> member of the AIG family.  This acquisition represents an
> excellent strategic fit that creates new opportunities for both
> organizations, benefiting our customers and shareholders.
> American General joins the leading U.S.-based international
> insurance and financial services organization, and the largest
> underwriter of commercial insurance in the United States.  AIG is
> also the leading international life and general insurance
> organization, and the addition of American General will
> significantly expand AIG's domestic life business."
>
>                    *        *        *
>
> "Over the past few months, AIG and American General have
> initiated extensive studies to identify and plan for revenue
> enhancement programs.  We will begin immediately to implement
> these programs and are enthusiastic about realizing the benefits of
> bringing American General into the AIG family.  We expect this
> acquisition to be accretive to AIG's earnings."
>
>                    *        *        *
>
> In addition, AIG announced that its Board of Directors has revoked
> its previously existing authorization to purchase AIG common
> stock in the open market.

864.    On October 25, 2001, AIG issued a press release entitled "AIG's Third Quarter

2001 Income Rose 14.1 Percent to $1.92 Billion."  The press release stated, in relevant part:

American International Group, Inc. (AIG) today reported that its core income increased 14.1 percent to $1.92 billion in the third quarter and 13.9 percent to $5.69 billion for the first nine months of 2001.  These results are in line with guidance furnished during AIG's October 9 investor conference call.

\*       \*       \*

Revenues in the third quarter of 2001 increased 12.9 percent to $15.73 billion from $13.93 billion in the year-earlier quarter.  For the first nine months, revenues totaled $46.0 billion, an increase of 10.2 percent over $41.74 billion in 2000.

At September 30, 2001, AIG's consolidated assets and shareholders' equity are approximately $467 billion and $50.8 billion, respectively.

\*       \*       \*

[Commenting on third quarter results, AIG Chairman M.R. Greenberg said] AIG's net pretax losses from the September 11 terrorist attacks (including our share of majority-owned Transatlantic Holding's losses) are $820 million.  While it is impossible for any company to forecast these losses with precision, this is our best estimate.  ***In addition, we have a high level of confidence in the reinsurance that we have in place in connection with these coverages***.  Approximately 30% is with AAA-rated, 40% with AA-rated and 29% with A-rated companies.  Clearly, AIG's strong financial condition is not impacted by these losses.

AIG's core earnings were on target in the third quarter.  We achieved solid growth and profitability in our major businesses, including property-casualty, life insurance and financial services.

\*       \*       \*

Our worldwide property-casualty business had strong premium growth in the third quarter, even as overseas growth was adversely impacted by the stronger U.S. dollar. ***Our Domestic Brokerage Group again achieved record net premiums written of $2.74 billion.*** Worldwide general insurance net premiums written in the third quarter of 2001 amounted to $4.98 billion, 16.1 percent ahead of the $4.29 billion in 2000.

Property-casualty pricing has been rising both in the U.S. and in our Foreign Insurance operations. Growing demand and the flight to quality across a wide section of our business is contributing to

substantial premium growth in our Domestic Brokerage Group as well as in a number of foreign countries.

*     *     *

In the third quarter, worldwide life insurance premiums and other considerations amounted to $10.46 billion; including Foreign Life Insurance premiums in U. S. dollars of $5.21 billion (see supplementary data information). Since the September 11 terrorist attacks, our worldwide life insurance business has been experiencing a boost in demand.

*     *     *

AIG's Financial Services Group had excellent results for the quarter. Operating income increased 20.8 percent.  Our aircraft leasing business, International Lease Finance Corporation (ILFC), continues to be very profitable.  Because ILFC has the youngest and most efficient fleet in the industry, its aircraft remain in high demand from its airline clients.

AIG Financial Products Corp. had good results in spite of the slowdown in economic activity.  The Consumer Finance operations of AIG are performing satisfactorily and are benefiting from the addition of American General's domestic consumer finance operation, which had strong third quarter growth. AIG Trading continues to show improvement following the restructuring that we implemented earlier this year.

*     *     *

General insurance pretax income before realized capital gains (losses) for the third quarter of 2001 excluding World Trade Center and related losses, rose 11.8 percent to $970.5 million, compared to $868.3 million last year.  Including these losses, general insurance operating income was $201.5 million.  For the first nine months of 2001, general insurance pretax income before realized capital gains (losses) and World Trade Center and related losses rose 9.8 percent to $2.89 billion, compared to $2.63 billion in 2000.  Including these losses, operating income was $2.12 billion for the first nine months of 2001.

Worldwide general insurance net premiums written in the third quarter of 2001 amounted to $4.98 billion, 16.1 percent ahead of the $4.29 billion in 2000.  For the first nine months of 2001, general insurance net premiums written were $14.90 billion, an increase of 14.4 percent, compared to $13.02 billion last year.

> General insurance net investment income rose 7.2 percent to
> $724.3 million in the third quarter and 7.4 percent to $2.15 billion
> in the first nine months of 2001.

865.    On or about November 6, 2001, AIG filed a Form 8-K with the SEC.  The 8-K

included as an exhibit AIG's October 25, 2001 press release.

866.    On November 14, 2001, AIG filed its Third Quarter 2001 Form 10-Q with the

SEC.  The 10-Q was signed by Defendant Smith.  AIG reported consolidated revenues of $15.7

billion and net income of $327 million for the quarter ended September 30, 2001 and year to date

revenues of $46.0 billion and net income of $3.5 billion for the nine months ended

September 30, 2001.  AIG's General Insurance business segment reported revenues of $5.48

billion, net premiums earned of $4.98 billion and operating income of $112 million for the

quarter ended September 30, 2001 and year to date revenues of $16.3 billion, net premiums

earned of $14.3 billion and operating income of $2.0 billion for the nine months ended

September 30, 2001.  AIG's Life Insurance business segment reported  revenues of $7.8 billion,

GAAP premiums/premium income of $4.9 billion and operating income of $1.3 billion for the

quarter ended September 30, 2001 and year to date revenues of $22.7 billion, GAAP

premiums/premium income of $14.1 billion and operating income of $4.1 billion for the nine

months ended September 30, 2001.

867.    The Third Quarter 2001 10-Q also stated, in relevant part:

> On August 29, 2001, American General Corporation (AGC) was
> acquired by AIG.

*       *       *

> AIG's net income declined 27.7 percent to $3.50 billion during the
> first nine months of 2001. AIG's income before income taxes,
> minority interest, cumulative effect of accounting changes and
> realized capital gains (losses) declined 20.9 percent to $5.97 billion
> during the first nine months of 2001.  These declines resulted from
> the impact of the following charges:

- 299 -

(a) $2.02 billion with respect to pre-tax acquisition, restructuring and related charges . . . ; and

(b) $900 million before taxes and minority interest share in World Trade Center (WTC) and related losses incurred in 2001 . . . .

Excluding these charges and American General's home services operating income, which is being managed as a "closed block", from AIG's income before taxes, minority interest, cumulative effect of accounting changes and realized capital gains (losses), adjusted operating income increased 13.2 percent to $8.54 billion during the first nine months of 2001, due to increased growth and profitability in AIG's major businesses, including General Insurance, Life Insurance and Financial Services Operations.

*     *     *

During the first nine months of 2001, net premiums written and net premiums earned increased 14.4 percent and 13.4 percent, respectively, from those of 2000.

*     *     *

*Commencing in the latter part of 1999 and continuing through 2001, the commercial property-casualty market place has experienced rates increases*.  *Virtually all areas of DBG have experienced rate increases*.  Overall, DBG's net premiums written increased $1.80 billion or 28.1 percent in the first nine months of 2001 over 2000.

*     *     *

General insurance operating income for the first nine months of 2001 decreased 26.2 percent to $1.97 billion due to the WTC and related losses.

*     *     *

AIG is a major purchaser of reinsurance for its general insurance operations.  *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs*.

*     *     *

AIG held general reinsurance assets of $24.81 billion at September 30, 2001 as a result of its reinsurance arrangements.

- 300 -

*       *       *

AIG enters into certain intercompany reinsurance transactions for
its general and life operations. **AIG enters these transactions as a
sound and prudent business practice in order to maintain
underwriting control and spread insurance risk among various
legal entities. These reinsurance agreements have been approved
by the appropriate regulatory authorities**.

*       *       *

At September 30, 2001, general insurance reserves for losses and
loss expenses (loss reserves) amounted to $41.92 billion.

868.    Defendants' statements concerning AIG's financial results relating to the Third

Quarter of 2001 were each false and misleading when made because they misrepresented or

omitted the following material adverse facts that the Defendants knew at the time the statements

were made:

(a)    That during the Third Quarter of 2001, AIG executives were engaged in

an illegal bid-rigging scheme;

(b)    That during the Third Quarter of 2001, AIG derived a substantial portion

of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the

scheme having:

(i)    Defrauded AIG's customers into believing that the bids they

received were honest, legitimate and competitive;

(ii)    Illegally increased the prices that customers paid for premiums,

resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)    Illegally "protected" AIG's business from competition by virtually

guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying

higher premiums than they would have if there had truly been competitive bidding in the

insurance marketplace;

(c)     That during the Third Quarter of 2001, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities;

(f)     That during the Third Quarter of 2001, AIG directly participated in securities fraud by selling one or more C-GAITS products to PNC that AIG knew would result in material misstatements of PNC's financial results;

(g)     That during the Third Quarter of 2001, AIG derived millions of dollars from the sale of the illegal C-GAITS products to PNC;

(h)     That AIG was withholding information relevant to an ongoing SEC investigation into the Company's dealings with Brightpoint.

(i)     That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Third Quarter of 2001 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; AIG's accounting for Life Settlements; the failure to account for the deferred

compensation provided by Defendant SICO; AIG's hedge fund accounting; and the Company's accounting for derivatives.

869.    Defendants' statements concerning AIG's financial results for the Third Quarter of 2001 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

870.    In addition, during the Third Quarter of 2001, Richard "Dick" Grasso – at Defendant Greenberg's urging – had specialists at the NYSE purchase millions of dollars of AIG stock in order to fraudulently inflate AIG's stock price in the period leading up to AIG's acquisition of American General on August 29, 2001.

### 10.    False and Misleading Statements Relating to Fourth Quarter and Year-End 2001

871.    On February 7, 2002, AIG issued a press release entitled, "AIG Reports Fourth Quarter 2001 Net Income of $1.87 Billion."  The press release stated, in relevant part:

> ***American International Group, Inc. (AIG) today reported that its fourth quarter 2001 net income was $1.87 billion, compared to $1.80 billion in the fourth quarter of 2000***.
>
> Core income increased 10.3 percent to $1.98 billion or $0.75 per share, compared to $1.79 billion or $0.68 per share in the fourth quarter of 2000.  These 2001 results include $0.03 per share to Enron surety losses and a provision for Northridge earthquake claims.
>
> *          *          *
>
> Core income is net income as reported adjusted to exclude the cumulative effect of accounting changes (principally related to EITF 99-20, "Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets"), realized capital gains (losses), acquisition, restructuring and related charges, World Trade Center and related losses and the American General home services business, which is being managed as a closed block. Core income includes AIG and Transatlantic Holdings, Inc. surety losses related to Enron of $57.2

million ($0.02 per share) and a provision for Northridge earthquake claims of $20.4 million ($0.01 per share).

\*       \*       \*

Revenues for the year 2001 rose 10.2 percent to $63.24 billion from $57.37 billion in 2000. Fourth quarter revenues totaled $16.69 billion, an increase of 8.3 percent over $15.41 billion in the year earlier quarter.

At December 31, 2001, AIG's consolidated assets and shareholders' equity approximated $490 billion and $52 billion, respectively.

\*       \*       \*

Commenting on these results, AIG Chairman M. R. Greenberg said, "AIG had a satisfactory fourth quarter and a strong full year 2001, a year of unprecedented challenges to our industry, nation and the global economy."

\*       \*       \*

"Worldwide general insurance net premiums written grew 14.7 percent (17.5 percent in original currency) to $20.10 billion in 2001 and 15.4 percent (17.6 percent in original currency) in the fourth quarter to $5.20 billion. *In the United States, our Domestic Brokerage Group had record net premiums written of $11.24 billion, an increase of 27.7 percent in the year 2001 and $3.03 billion, an increase of 26.6 percent in the fourth quarter. The year-end renewal season brought significant new business to AIG, as companies sought to do business with the strongest insurers, and industry capacity was less readily available than a year ago. While renewal rates have trended higher, they still are not adequate in light of a decade of price erosion in the property-casualty industry.*

"Our Foreign General business in the fourth quarter benefited from the same trends evident in the U.S. marketplace, although premium growth as reported was partially offset by the impact of a stronger U.S. dollar."

872.    On April 1, 2002 AIG filed with the SEC its Annual Report on Form 10-K for the

fiscal year ended December 31, 2001 ("the 2001 10-K"). *AIG reported consolidated revenues*

*of $62.4 billion and net income of $5.3 billion for the year ended December 31, 2001. AIG's*

*General Insurance Business segment reported revenues of $22.1, net premiums earned of $19.4 billion and operating income of $2.9  billion.*  AIG's Life Insurance business segment reported segment reported revenues of $30.7 billion, GAAP premiums/premium income of $19.2 billion and operating income of $5.4 billion.  PwC certified that AIG's consolidated financial statements presented fairly, in all material respects the financial position of the Company and the consolidated results of operations and their cash flows in conformity with generally accepted accounting principals.

873.    AIG's 2001 Annual Report to Shareholders, stated in relevant part:

AIG AT A GLANCE

AIG is one of the world's leading corporations with a history of more than 80 years in the two largest of its four principle businesses:  General Insurance and Life Insurance. Enhancing this profitable core, AIG has been steadily growing two other key business areas  Financial Services and Retirement Savings & Asset Management.

\*          \*          \*

AIG has the highest ratings and is one of the world's most innovative companies, well positioned to capitalize on opportunities on behalf of its clients throughout the global marketplace.  While AIG's products and services have changed over the years with the needs of its customers, ***the AIG core values of integrity, quality service, financial strength and responsive leadership will never change***.

874.    The 2001 Annual Report also contained a "Letter to Shareholders" from Defendant Greenberg, which stated in relevant part:

AIG has emerged from September 11 an even stronger and more focused organization. Our financial strength is undiminished and our commitment to our clients unwavering. By promptly stepping up to the plate with ideas, coverages, capital and capacity to address the key issues facing our country and economy, we demonstrated what we mean when we say *The Greatest Risk Is Not Taking One*, the central message of our current corporate advertising campaign.

*      *      *

Reaffirming Our Corporate Values

The precipitous collapse of Enron late last year has cast a cloud over all of corporate America.  At AIG our losses in connection with the largest bankruptcy in U.S. history were relatively modest and in no way undermine our strong financial position. However, this bankruptcy does serve as another reminder of the critical importance of doing business with people and institutions of the highest integrity.  If heightened scrutiny in financial markets helps identify and eradicate accounting fraud and other abuses, it will have a positive effect in the long run.

***Investors and analysts are asking all companies, and in particular large companies, for greater financial disclosure.  AIG has always provided complete and accurate financial information, fully complying with federal and state laws and regulations, as well as with the rules governing our business in all countries around the world where we operate. Every year, we work hard to improve our disclosure and we have always maintained good communication with the investment community. We have a number of initiatives underway to provide more information that will meet the needs of investors and analysts in the current environment. . . .***

***We recognize that our most important asset at AIG, even more valuable than our financial capital, is the reputation for integrity that we have earned day after day, year after year doing business around the world.  From our very beginnings, we have emphasized that an insurance policy is a piece of paper that comes with a promise. Even as we have grown to be the largest global company in our industry, we know that nothing is more important than standing behind that promise. The confidence of our policyholders, other customers and investors is the root of our success. We will always be diligent in keeping that confidence by honoring our obligations, adhering to the highest ethical standards, and providing a thorough and accurate picture of our operations and financial performance.***

Our business has grown tremendously over the years, and as you read through this Annual Report you will see that the exemplary profits we have earned for our shareholders emanate from a foundation that has remained much the same over the decades. . . . ***Our products and services have changed with the needs of our customers, but our core values of integrity, quality service, financial strength and innovative leadership will never change.***

875.    The 2001 Annual Report also contained the following:

Report of Management's Responsibilities

**The management of AIG is responsible for the integrity and fair presentation of the consolidated financial statements, related notes thereto and all other financial information presented herein.  The consolidated financial statements have been prepared in conformity with generally accepted accounting principles and include amounts based on the best estimates and judgments of management.**

**AIG maintains an internal control structure designed to provide reasonable assurance that assets are safeguarded from loss or unauthorized use, that transactions are recorded in accordance with management's direction and that the financial records are reliable for the purposes of preparing financial statements and maintaining accountability of assets.**  The management of AIG applies the concept of reasonable assurance by weighing the cost of an internal control structure against the benefits to be derived. The internal control structure is supported by the careful selection, training and development of qualified personnel, an appropriate division of responsibilities and the dissemination of written policies and procedures throughout AIG. **The internal control structure is continually reviewed and evaluated by means of an internal audit function and periodically assessed by PricewaterhouseCoopers LLP, independent accountants, to the extent required under generally accepted auditing standards in connection with their annual audit of AIG's financial statements**.

The Audit Committee of the Board of Directors is comprised solely of outside directors and meets regularly with management, the independent accountants and the internal auditors to oversee the scope and results of the audit work performed.  Both the internal auditors and the independent accountants have unrestricted access to the Audit Committee, without the presence of management, to discuss the results of their work and views on the adequacy of the internal control structure, the quality of financial reporting and any other matters they believe should be brought to the attention of the Audit Committee.

876.    The 2001 10-K also stated, in relevant part:

**The insurance industry is highly competitive**.  Within the United States, AIG's general insurance subsidiaries compete with approximately 3,300 other stock companies, specialty insurance

- 307 -

organizations, mutual companies and other underwriting organizations.

\*      \*      \*

***Commencing in the latter part of 1999 and continuing through 2001, the commercial property-casualty market place has experienced rate increases.  Virtually all areas of DBG have experienced rate increases.***  Overall, DBG's net premiums written increased $2.26 billion or 28.5 percent in 2001 over 2000.  These increases compared to an increase of $408 million or 5.4 percent in 2000 over 1999."

\*      \*      \*

AIG is major purchaser of reinsurance for its general insurance operations.  ***AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs***.

\*      \*      \*

AIG's general reinsurance assets amounted to $27.65 billion and resulted from AIG's reinsurance arrangements.

\*      \*      \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations.  ***AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities.  These reinsurance agreements have been approved by the appropriate regulatory authorities***.

\*      \*      \*

At December 31, 2001, general insurance reserves for losses and loss expenses (loss reserves) amounted to $44.79 billion.

\*      \*      \*

AIG also enters into structured transactions including long-dated forward foreign exchange contracts, option transactions, liquidity facilities and investment agreements and invests in a diversified portfolio of securities.  AIGFP derives substantially all its revenues from proprietary positions entered in connection with ***counterparty transactions*** rather than from speculative transactions.  Revenues in 2001 increased 11.6 percent from 2000 compared to a 43.3

percent increase during 2000 from 1999.  During 2001, operating income increased 16.9 percent from 2000 and increased 34.5 percent during 2000 from 1999.

*      *      *

AIGFP uses SPVs as an integral part of its ongoing operations with respect to specific structured transactions with independent third parties. AIGFP controls and manages the assets and liabilities with respect to these SPVs, subject to certain transaction specific limitations.  These SPVs are fully consolidated by AIG.

*      *      *

***AIG evaluates the financial condition of its reinsurers through an internal reinsurance security committee consisting of members of AIG's senior management***.  No single reinsurer is a material reinsurer to AIG not is AIG's business substantially dependent upon any reinsurance contract.

877.    AIG's Form 10-K for 2001 was signed by Defendants Greenberg, Smith, Castelli, Hoenemeyer, Tizzio and Broad.

878.    Defendants' statements concerning AIG's financial results relating to the Fourth Quarter and fiscal year 2001 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)    That during the Fourth Quarter and fiscal year 2001, AIG executives were engaged in an illegal bid-rigging scheme;

(b)    That during the Fourth Quarter and fiscal year 2001, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)    Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)     Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)     Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)     That during the Fourth Quarter and fiscal year 2001, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities;

(f)     That during the Fourth Quarter and fiscal year 2001, AIG directly participated in securities fraud by selling one or more C-GAITS products to PNC that AIG knew would result in material misstatements of PNC's financial results;

(g)     That during the Fourth Quarter and fiscal year 2001, AIG derived millions of dollars from the sale of the illegal C-GAITS products to PNC;

(h)     That AIG had, in November 2001, received a subpoena from the SEC regarding AIG's dealings with Brightpoint, and that the Company was withholding information relevant to the SEC's ongoing investigation into Brightpoint.

(i)     That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Fourth Quarter and fiscal year 2001 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to:  AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; AIG's accounting for Life Settlements; the failure to account for the deferred compensation provided by Defendant SICO; AIG's hedge fund accounting; and the Company's accounting for derivatives.

879.     Defendants' statements concerning AIG's financial results for the Fourth Quarter and fiscal year 2001 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

**11.     False and Misleading Statements
Relating to First Quarter 2002**

880.     On April 25, 2002, AIG issued a press release entitled, "AIG Reports First Quarter 2002 Income Excluding Realized Capital Gains-Losses-Increased 11.1 Percent to $2.13 Billion."  The press release stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its first quarter 2002 adjusted income, excluding net realized capital gains (losses) and the cumulative effect of an accounting change in 2001, increased 11.1 percent to $2.13 billion, compared to $1.92 billion in the first quarter of 2001.
>
> Net income increased 6.7 percent to $1.98 billion, compared to $1.86 billion in the first quarter of 2001.
>
> *          *          *
>
> Highlights of the first quarter of 2002 include:

- ***Record General Insurance net premiums of $6.33 billion, an increase of 30.2 percent (33.5 percent in original currency), and record General Insurance pretax operating income before realized capital gains (losses) of $1.06 billion.***

- ***A 10.2 percent increase in Financial Services operating income to $473.9 million.***

- An 11.1 percent increase in Retirement Savings & Asset Management operating income to $299.7 million.

*     *     *

At March 31, 2002, AIG's consolidated assets and shareholders' equity approximated $507 billion and $52.6 billion, respectively.

First quarter 2002 income before income taxes, minority interest, realized capital gains (losses) and cumulative effect of an accounting change in 2001 increased 10.6 percent to $3.19 billion from $2.89 billion reported in 2001.

*     *     *

Commenting on the first quarter results, AIG Chairman M.R. Greenberg said: "AIG is off to a very good start in 2002. Excluding realized capital gains and losses, AIG's first quarter net income rose 11.1 percent to a record $2.13 billion.  On a per share basis, income as adjusted rose 12.5 percent in the first quarter. Once again, the strength and diversity of AIG's worldwide portfolio of businesses stood out.  ***In the property-casualty business around the world, rates are continuing to strengthen as we have indicated in prior quarters, helping to produce strong results from our General Insurance business in the quarter.***

*     *     *

***"In the United States, the Domestic Brokerage Group had record net premiums written of $3.45 billion, up 43.2 percent, with a combined ratio of 97.65.  Lexington's surplus lines pool, the industry's largest writer of surplus lines, is off to a very strong start in 2002, with net premiums written totaling $490.1 million, up 122.5 percent over the first quarter of 2001.***  HSB Group, Inc., reported within the Domestic Brokerage Group, had an excellent quarter.  HSB Group, Inc. is a leading provider, through its Hartford Steam Boiler unit, of specialty insurance products, engineering and management consulting services.  ***In the first***

- 312 -

*quarter net premiums written grew 25.8 percent to $128.3 million.*

"Our Domestic Personal Lines business made significant progress in the first quarter.  Net premiums written grew 14.4 percent over the first quarter of 2001 to $726.1 million.  We have increased rates or non-renewed certain classes of business, while building new business.  We expect Domestic Personal Lines to improve its profitability throughout the year."

\*       \*       \*

- *General Insurance pretax income before realized capital gains (losses) for the first quarter of 2002 was $1.06 billion, an increase of 8.5 percent compared to $972.3 million last year.*

- *General Insurance net premiums written in the first quarter of 2002 amounted to $6.33 billion, 30.2 percent ahead of the $4.86 billion reported last year*.

- General Insurance net investment income rose 4.1 percent to $745.4 million in 2002 from $715.9 million last year.

881.    On May 15, 2002, AIG filed its First Quarter 2002 Form 10-Q with the SEC.  The First Quarter 2002 10-Q, was signed by Defendant Smith.  *AIG reported consolidated revenues of $16.1 billion and net income of $2.0 billion for the quarter ended March 31, 2002.*  AIG's General Insurance business segment reported revenues of $6.1 billion, net premiums earned of $5.5 billion and operating income of $933 million for the quarter ended March 31, 2002.  AIG's Life Insurance business segment reported revenues of $7.7 billion, GAAP premiums/premium income of $4.8 billion and operating income of $1.3 billion for the quarter ended March 31, 2002.

882.    The First Quarter 2002 10-Q also stated, in relevant part:

AIG's net income in the first three months of 2002 increased 6.7 percent to $1.98 billion when compared to $1.86 billion in the same period of 2001.

\*       \*       \*

- 313 -

General insurance operating income declined 1.9 percent as a result of realized capital losses increasing from $21 million for the first three months of 2001 to $122 million in the same period of 2002.  Excluding realized capital losses, general insurance operating income increased 8.5 percent, reflecting strong growth in adjusted underwriting profit and continued growth in investment income.

*        *        *

***Premium rates in the General Insurance business are continuing to strengthen both domestically and in key international markets along with policy coverage improvements***. In the Life Insurance segment, the integration of AGC and its operations is proceeding well, and AIG expects that many initiatives underway will increase the growth rate of the domestic life insurance operations to complement the growth in the foreign life operations.

*        *        *

During the first three months of 2002, net premiums written and net premiums earned increased 30.2 percent and 16.6 percent, respectively, from those of 2001.

*        *        *

***Commencing in the latter part of 1999 and continuing through 2002, the commercial property-casualty market place has experienced rate increases.  Virtually all areas of DBG have experienced rate increases***.  Overall, DBG's net premiums written increased $1.04 billion or 43.2 percent in the first three months of 2002 over 2001.

*        *        *

General insurance operating income declined 1.9 percent as a result of realized capital losses increasing from $21 million for the first three months of 2001 to $122 million in the same period of 2002.  Excluding realized capital losses, general insurance operating income increased 8.5 percent, reflecting strong growth in adjusted underwriting profit and continued growth in investment income.

General insurance operating income for the first three months of 2002 decreased 1.9 percent to $933 million.  The contribution of general insurance operating income to income before taxes, minority interest and cumulative effect of an accounting change

- 314 -

was 31.5 percent during the first three months of 2002 compared to 34.0 percent in the same period of 2001.

AIG is a major purchaser of reinsurance for its general insurance operations. ***AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs.***

\* \* \*

AIG held general reinsurance assets of $28.13 billion at March 31, 2002 as a result of its reinsurance arrangements.

\* \* \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations. ***AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities. These reinsurance agreements have been approved by the appropriate regulatory authorities.***

\* \* \*

At March 31, 2002, general insurance reserves for losses and loss expenses (loss reserves) amounted to $45.01 billion.

883. Defendants' statements concerning AIG's financial results relating to the First Quarter of 2002 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a) That during the First Quarter of 2002, AIG executives were engaged in an illegal bid-rigging scheme;

(b) That during the First Quarter of 2002, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)     Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)    Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)   Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)     That during the First Quarter of 2002, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities;

(f)     That AIG was withholding information relevant to an ongoing SEC investigation into the Company's dealings with Brightpoint.

(g)     That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the First Quarter of 2002 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to:

AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other

directed entries; the conversion of underwriting losses to capital losses; AIG's accounting for

Life Settlements; and the Company's accounting for derivatives.

884.    Defendants' statements concerning AIG's financial results for the First Quarter of

2002 were also false and misleading because AIG's financial statements violated GAAP for the

reasons set forth below in paragraphs 961 through 976.

### 12.    False and Misleading Statements Relating to Second Quarter 2002

885.    On July 25, 2002, AIG issued a press release entitled "AIG Reports Second

Quarter 2002 Net Income Rose 37.0 Percent to $1.80 Billion."  The press release stated, in

relevant part:

> American International Group, Inc. (AIG) today reported that its net income for the second quarter of 2002 increased 37.0 percent to $1.80 billion, compared to $1.31 billion in the second quarter of 2001.

> For the first six months of 2002, net income totaled $3.78 billion, an increase of 19.3 percent compared to $3.17 billion in the same period of 2001.

> *        *        *

> Second quarter 2002 adjusted income, excluding net realized capital gains (losses) and the cumulative effect of accounting changes and acquisition, restructuring and related charges in 2001, increased 9.8 percent to $2.21 billion, and 10.4 percent to $4.34 billion for the first six months of 2002.

> *        *        *

> Highlights of the second quarter and six months of 2002 include:

> **-- Record second quarter General Insurance net premiums written of $6.78 billion, an increase of 34.2 percent (35.2 percent in original currency), and 32.2 percent to $13.12 billion for the first six months of 2002.**

*-- Second quarter General Insurance pretax operating income before realized capital gains (losses) of $1.10 billion and $2.15 billion for the first six months of 2002.*

\*       \*       \*

*Commenting on second quarter performance, AIG Chairman M.R. Greenberg said, "AIG had a solid quarter.  Our core insurance and financial services businesses achieved satisfactory results that were partially offset by lower investment income. Even with lower net investment income attributable primarily to market and credit conditions, we achieved strong results from our General Insurance operations.*

\*       \*       \*

"In General Insurance, worldwide net premiums written in the quarter increased 34.2 percent to $6.78 billion.  The combined ratio was 94.09 compared to 95.52 in the second quarter of 2001. *Rates are going up after a decade of price declines and policy form inflation*.  *Many companies have been weakened by this period of extremely competitive pricing.*  The losses following September 11 further ensure a continuing firming of the market for the foreseeable future. *The trend toward firmer pricing is most evident in the U.S. where soft market conditions had been most pronounced and protracted*.  However, it is also apparent in markets around the world.

"*In the United States, the Domestic Brokerage Group had record net premiums written of $3.68 billion, up 42.8 percent, with a combined ratio of 97.25.  Virtually all sectors and lines of business are contributing to this growth and performance. National Union is leading the market for directors and officers insurance.  Rates are rising"* in this difficult class of business in the current environment."

886.    On August 8, 2002, AIG filed its Second Quarter 2002 Form 10-Q with the SEC.

The Second Quarter 2002 10-Q was signed by Defendant Smith.  *AIG reported consolidated*

*revenues of $16.7 billion and net income of $1.8 billion for the quarter ended June 30, 2002*

*and year to date revenues of $32.8 billion and net income of $3.8 billion for the six months*

*ended June 30, 2002*.  AIG's General Insurance business segment reported revenues of $6.4

billion, net premiums earned of $5.9 billion and operating income of $936 million for the quarter

ended June 30, 2002 and year to date revenues of $12.5 billion, net premiums earned of $11.4 billion and operating income of $1.9 billion for the six months ended June 30, 2002.  AIG's Life Insurance business segment reported  revenues of $7.9 billion, GAAP premiums/premium income of $5.2 billion and operating income of $1.2 billion for the quarter ended June 30, 2002 and year to date revenues of $15.6 billion, GAAP premiums/premium income of $9.9 billion and operating income of $2.5 billion for the six months ended June 30, 2002.

887.    The Second Quarter 2002 10-Q also stated, in relevant part:

> Premium rates in the General Insurance business are continuing to strengthen both domestically and in  key international markets, along with policy restrictions and exclusions.

> \*        \*        \*

> During the first six months of 2002, net premiums written and net premiums earned increased 32.2 percent and 20.1 percent, respectively, from those of 2001.

> \*        \*        \*

> AIG's net income in the first six months of 2002 increased 19.3 percent to $3.78 billion when compared to $3.17 billion in the same period of 2001.  Excluding $425 million of acquisition, restructuring and related charges, net of tax incurred in 2001, AIG's net income in the first six months of 2002 increased 5.2 percent.

> \*        \*        \*

> General insurance operating income increased 0.5 percent in the first six months of 2002 compared to the same period in 2001. Excluding realized capital losses, general insurance operating income increased 12.1 percent, reflecting strong growth in adjusted underwriting profit.

> \*        \*        \*

> **During the first six months of 2002, net premiums written and net premiums earned increased 32.2 percent and 20.1 percent, respectively, from those of 2001.**

> \*        \*        \*

> *Commencing in the latter part of 1999 and continuing through 2002, the commercial property-casualty market place has experienced rate increases.  Virtually all areas of DBG have experienced rate increases.*  Overall, DBG's net premiums written increased $2.14 billion or 43.0 percent in the first six months of 2002 over 2001.
>
> *        *        *
>
> General insurance operating income for the first six months of 2002 increased 0.5 percent to $1.87 billion.  The contribution of general insurance operating income to income before income taxes, minority interest and cumulative effect of accounting changes was 32.6 percent during the first six months of 2002 compared to 38.7 percent in the same period of 2001.
>
> *        *        *
>
> AIG is a major purchaser of reinsurance for its general insurance operations.  *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs*.
>
> *        *        *
>
> AIG held general reinsurance assets of $28.87 billion at June 30, 2002 as a result of its insurance arrangements.
>
> *        *        *
>
> AIG enters into certain intercompany reinsurance transactions for its general and life operations.  *AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities.  These reinsurance agreements have been approved by the appropriate regulatory authorities.*
>
> *        *        *
>
> *At June 30, 2002, general insurance reserves for losses and loss expenses (loss reserves) amounted to $45.66 billion*

888.   Defendants' statements concerning AIG's financial results relating to the Second

Quarter of 2002 were each false and misleading when made because they misrepresented or

omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)     That during the Second Quarter of 2002, AIG executives were engaged in an illegal bid-rigging scheme;

(b)     That during the Second Quarter of 2002, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)     Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)     Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)     Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)     That during the Second Quarter of 2002, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)      That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities;

(f)      That AIG was withholding information relevant to an ongoing SEC investigation into the Company's dealings with Brightpoint.

(g)      That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Second Quarter of 2002 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; the conversion of underwriting losses to capital losses; AIG's accounting for Life Settlements; and the Company's accounting for derivatives.

889.    Defendants' statements concerning AIG's financial results for the Second Quarter of 2002 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 13.    False and Misleading Statements Relating to Third Quarter 2002

890.    On October 24, 2002, AIG issued a press release entitled "AIG Reports Third Quarter 2002 Net Income of $1.84 Billion vs. $326.8 Million in 2001."  The press release stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its net income for the third quarter of 2002 was $1.84 billion, compared to $326.8 million in the third quarter of 2001.  For the first nine months of 2002, net income totaled $5.62 billion, an increase of 60.8 percent compared to $3.50 billion in the same period of 2001.
>
> Income as adjusted-excluding net realized capital gains (losses) in both years and in 2001 the cumulative effect of accounting changes and acquisition, restructuring and related charges-increased 54.6

percent to $2.23 billion in the third quarter and 22.3 percent to $6.58 billion for the first nine months of 2002.

*     *     *

Highlights of the third quarter 2002 include:

- Record income as adjusted (excluding realized capital gains (losses)) of $2.23 billion, an increase of 54.6 percent over reported third quarter 2001 income as adjusted (excluding realized capital gains (losses) and acquisition-related charges) and an increase of 13.0 percent over third quarter 2001 income as adjusted (excluding realized capital gains (losses), World Trade Center losses and acquisition-related charges).

- Return on equity of 16.4 percent on an annualized basis.

- Record consolidated assets at September 30, 2002 of approximately $547 billion, an increase of $23 billion over June 30, 2002.

- Record shareholders' equity at September 30, 2002 of approximately $58.7 billion, an increase of $3.7 billion over June 30, 2002.

- Third quarter realized capital losses, primarily in the domestic fixed income portfolio, of $595.6 million.

- ***Record quarter General Insurance net premiums written of $7.08 billion, an increase of 42.2 percent over third quarter 2001***.

- ***General Insurance pretax operating income before realized capital gains (losses) of $1.05 billion***.

*     *     *

- Record General Insurance cash flow of $4.76 billion during the first nine months of 2002.

- General Insurance net loss and loss adjustment reserves totaling $27.04 billion as of September 30, 2002, an increase of $641.1 million and $1.15 billion in the third quarter and nine months of 2002, respectively.

891.    On November 14, 2002, AIG filed its Third Quarter 2002 Form 10-Q with the SEC.  The Third Quarter 2002 10-Q was signed by Defendant Smith and certified as accurate by Defendants Greenberg and Smith.  ***AIG reported consolidated revenues of $17.2 billion and net income of $1.8 billion for the quarter ended September 30, 2002 and year to date revenues of $50.0 billion and net income of $5.6 billion for the nine months ended September 30, 2002***. AIG's General Insurance business segment reported revenues of $6.6 billion, net premiums earned of $6.2 billion and operating income of $842 million for the quarter ended September 30, 2002 and year to date revenues of $19.2 billion, net premiums earned of $17.6 billion and operating income of $2.7 billion for the nine months ended September 30, 2002.  AIG's Life Insurance business segment reported  revenues of $8.0 billion, GAAP premiums/premium income of $5.1 billion and operating income of $1.3 billion for the quarter ended September 30, 2002 and year to date revenues of $23.6 billion, GAAP premiums/premium income of $15.0 billion and operating income of $3.8 billion for the nine months ended September 30, 2002.

892.    The Third Quarter 2002 10-Q also stated, in relevant part:

> AIG's net income in the first nine months of 2002 increased 60.8 percent to $5.62 billion when compared to $3.50 billion in the same period of 2001.  Excluding $1.38 billion of acquisition, restructuring and related charges, and $533 million in World Trade Center and related losses (WTC), net of tax incurred in 2001, AIG's net income in the first nine months of 2002 increased 3.8 percent.  The primary reason for the reduced growth in net income in the first nine months of 2002 relative to historical AIG growth rates was the realized capital loses, net of tax of $955 million and $361 million in 2002 and 2001, respectively.

> *          *          *

> General insurance operating income increased 37.4 percent in the first nine months of 2002 compared to the same period in 2001.  Excluding realized capital gains (losses) and WTC losses of $769 million, including $200 million from Transatlantic in 2001, general insurance operating income increased 10.9 percent, reflecting strong growth in adjusted underwriting profit.

\*      \*      \*

*Premium rates in the General Insurance business are continuing to strengthen both domestically and in key international markets*, along with policy restrictions and exclusions.

\*      \*      \*

During the first nine months of 2002, net premiums written and net premiums earned increased 35.6 percent and 22.7 percent, respectively, from those of 2001.

*Commencing in the latter part of 1999 and continuing through 2002, the commercial property-casualty market place has experienced rate increases. Virtually all areas of DBG have experienced rate increases.* Overall, DBG's net premiums written increased $3.60 billion or 48.4 percent in the first nine months of 2002 over 2001.

\*      \*      \*

General insurance operating income for the first nine months of 2002 increased 37.4 percent to $2.71 billion . . . The contribution of general insurance operating income to income before taxes, minority interest and cumulative effect of accounting changes was 32.1 percent during the first nine months of 2002 compared to 36.4 percent in the same period of 2001.

\*      \*      \*

AIG is a major purchaser of reinsurance for its general insurance operations. *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs*.

\*      \*      \*

AIG held general reinsurance assets of $29.98 billion at September 30, 2002 as a result of its reinsurance arrangements.

\*      \*      \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations. *AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities. These reinsurance agreements have been approved by the appropriate regulatory authorities*.

- 325 -

\*      \*      \*

>  At September 30, 2002, general insurance reserves for losses and
>  loss expenses (loss reserves) amounted to $46.82 billion.

893.    Pursuant to Section 302 of Sarbanes-Oxley Act of 2002, AIG's 10-Q, filed on

November 14, 2002, also included the following certification signed by Defendants Greenberg

and Smith:

>  1.      I have reviewed this quarterly report on Form 10-Q of
>  American International Group, Inc.;
>
>  2.      ***Based on my knowledge, this quarterly report does not
>  contain any untrue statement of a material fact or omit to state a
>  material fact necessary to make the statements made, in light of
>  the circumstances under which such statements were made, not
>  misleading with respect to the period covered by this quarterly
>  report***;
>
>  3.      ***Based on my knowledge, the financial statements, and
>  other financial information included in this quarterly report,
>  fairly present in all material respects the financial condition,
>  results of operations and cash flows of the registrant as of, and
>  for, the periods presented in this quarterly report***;
>
>  4.      The registrant's other certifying officers and I are
>  responsible for establishing and maintaining disclosure controls
>  and procedures (as defined in Exchange Act Rules 13a-14 and 15d-
>  14) for the registrant and we have:
>
>  (a)      designed such disclosure controls and procedures to
>  ensure that material information relating to the registrant, including
>  its consolidated subsidiaries, is made known to us by others within
>  those entities, particularly during the period in which this quarterly
>  report is being prepared;
>
>  (b)      evaluated the effectiveness of the registrant's
>  disclosure controls and procedures as of a date within 90 days prior
>  to the filing date of this quarterly report (the "Evaluation Date");
>  and
>
>  (c)      presented in this quarterly report our conclusions
>  about the effectiveness of the disclosure controls and procedures
>  based on our evaluation as of the Evaluation Date;

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

(a)      all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.      The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

894.    Defendants' statements concerning AIG's financial results relating to the Third Quarter of 2002 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)      That during the Third Quarter of 2002, AIG executives were engaged in an illegal bid-rigging scheme;

(b)      That during the Third Quarter of 2002, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)      Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)     Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)    Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)    That during the Third Quarter of 2002, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)    That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)    That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities;

(f)    That AIG was withholding information relevant to an ongoing SEC investigation into the Company's dealings with Brightpoint.

(g)    That during the Third Quarter of 2002, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(h)    That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(i)      That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(j)      That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Third Quarter of 2002 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; the conversion of underwriting losses to capital losses; AIG's accounting for Life Settlements; and the Company's accounting for derivatives.

895.     Defendants' statements concerning AIG's financial results for the Third Quarter of 2002 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 14.     False and Misleading Statements Relating to Fourth Quarter and Year-End 2002

896.     On February 3, 2003, AIG issued a press release entitled, "AIG to Add to General Insurance Loss Reserves, Company to Take $1.8 Billion Net After Tax Charge in Fourth Quarter 2002."  The press release stated, in relevant part:

> American International Group, Inc. (AIG) announced today that it will incur a net, after tax charge of $1.8 billion in the fourth quarter of 2002 related to an increase of general insurance net loss and loss adjustment reserves.  This action follows the completion of AIG's annual year-end loss reserve study.
>
> In discussing the reserve increase, AIG Chairman M. R. Greenberg made the following comments:
>
> *      *      *
>
> ***This action does not include an asbestos reserve increase.  AIG's reserves for asbestos-related claims continue to be appropriate. As previously stated, AIG's overall asbestos related liabilities are***

*relatively small.*  The vast majority of asbestos and environmental claims emanate from policies written in 1984 and prior years, at a time when AIG's commercial insurance business was very small. Since 1985, standard policies issued by AIG companies have contained an absolute exclusion for asbestos and pollution related damages.

"Overall for 2002, AIG expects to report record general insurance cash flow. AIG's shareholders' equity at year-end 2002 will exceed the record of $58 billion reported at September 30, 2002, despite the reserve charge.

With more than $58 billion in capital and approximately $30 billion in general insurance loss and loss adjustment reserves, AIG's financial strength has never been more valued in the marketplace than it is today, as businesses and consumers seek to purchase insurance from the strongest companies.  Our worldwide general insurance operations are market leaders, and we are well positioned to succeed in the current market environment.

To give some general guidance for 2003, we anticipate AIG will have a good year:

--      Our general insurance business will continue to grow, achieving record premiums both in the United States and overseas. Repeating the trend in 2002, the majority of this premium growth is expected to result from rate increases versus the assumption of additional risk exposures.

--      In January, new cash flow for investments from domestic general insurance operations reached an all-time record of over $800 million.  Total cash flow for all of 2003 should substantially exceed the record level of 2002.  This should have a positive impact on net investment income, even at today's low interest rate levels.

--      With the anticipated growth of earned premium in AIG's general insurance operations, general insurance loss reserves are expected, in the normal course of business, to grow between $4-5 billion in 2003.

--      Our life insurance and financial services businesses are also in excellent shape to report satisfactory results.

--      And we expect to achieve a return on equity of approximately 15 percent in 2003."

897.    On February 13, 2003, AIG issued a press release entitled "AIG Reports 2002 Net

Income of $5.52 billion vs. $5.36 Billion in 2001."  The press release stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its net income for the full year 2002 was $5.52 billion, compared to $5.36 billion in 2001.  The fourth quarter of 2002 resulted in a net loss of $103.8 million, compared to net income of $1.87 billion in the same period of 2001.
>
> On February 3, AIG announced that it would incur a net, after tax charge of $1.8 billion in the fourth quarter of 2002 related to an increase of general insurance net loss and loss adjustment reserves, following the completion of AIG's annual year-end loss reserve study.  Fourth quarter 2002 income as adjusted, excluding the reserve charge and realized gains and losses, increased 13.9 percent to $2.33 billion.  For the full year 2002, income as adjusted was $8.91 billion, an increase of 11.9 percent over the full year 2001, which was also adjusted for the cumulative effect of accounting changes, acquisition, restructuring and related charges and World Trade Center and related losses.
>
> *       *       *
>
> Highlights for 2002 include:
>
> •    Record shareholders' equity at December 31, 2002 of approximately $59 billion, an increase of $0.3 billion over September 30, 2002.
>
> •    Return on equity of 13.2 percent, or 16.5 percent excluding the reserve charge.
>
> •    Record consolidated assets at December 31, 2002 of approximately $563 billion, an increase of $16 billion over September 30, 2002.
>
> •    ***Record 2002 General Insurance net premiums written of $27.4 billion, an increase of 36.4 percent.  Record fourth quarter 2002 General Insurance net premiums written of $7.21 billion, an increase of 38.8 percent.***
>
> •    Record General Insurance cash flow $6.92 billion in 2002.
>
> •    General Insurance net loss and loss adjustment reserves totaling $30.35 billion as of December 31, 2002, an

increase of $4.45 billion and $3.31 billion for the full year and fourth quarter of 2002, respectively.

- Record 2002 Life Insurance premium income, deposits and other considerations of $48.66 billion, an increase of 11.6 percent. Fourth quarter 2002 Life Insurance premium income, deposits and other considerations increased 4.5 percent to $10.62 billion.

Income before income taxes, minority interest, and the cumulative effect of accounting changes was $8.14 billion in 2002 and a loss of $312.5 million in the fourth quarter of 2002.

*        *        *

Commenting on full year and fourth quarter 2002 results, AIG Chairman M. R. Greenberg said, "In 2002 AIG earned $7.12 billion before realized capital losses, even after taking an after tax charge of $1.8 billion to increase general insurance reserves. AIG in 2002 had record revenues of $67.5 billion, record general insurance cash flow of $6.92 billion and record shareholders' equity of $59 billion at year end.

*        *        *

*"The fourth quarter saw a continuation of this year's favorable general insurance growth trends. Net premiums written were a record $7.21 billion in the fourth quarter of 2002, up 38.8 percent over a year ago. Most of this growth is attributable to price increases. Higher rates are necessitated by the consequences of an epidemic of lawsuits in the United States.*

*"In the United States, Domestic Brokerage Group net premiums written in the fourth quarter of 2002 increased 51.3 percent to a record $4.18 billion. The combined ratio was 167.60, but only 94.11 excluding the reserve increase. Pricing continues to firm, especially for large, specialized coverages, an area where AIG has long been the leader. We have an excellent retention rate for quality renewal business, which is being repriced in accordance with current market realities, and we are seeing attractive new business opportunities as the number of competitors in the marketplace with the right solutions and a sound financial footing is declining.*

"HSB Group, Inc., is the industry leader providing equipment breakdown insurance and related engineering and loss control services. Premiums and earnings increased in the fourth quarter of

2002, as a result of business generated directly by HSB units, from customer relationships with AIG's Domestic Brokerage and Foreign General Groups and through services marketed to other property-casualty insurers.

"In the Domestic Personal Lines business, net premiums written increased 36.7 percent to $813.4 million in the fourth quarter 2002. The combined ratio was 99.38, compared to 112.36 in the fourth quarter of 2001.  Market conditions in the automobile insurance line have shown modest improvement, and we continue to refine our underwriting capabilities in the mass-market segment.

\*       \*       \*

Total General Insurance cash flow in 2002 was a record $6.92 billion, compared to $1.86 billion in 2001.  This strong positive trend is continuing into 2003.  New cash flow for investments from general insurance operations in January was well in excess of $1 billion, an all-time record.

General insurance net investment income declined to $673.2 million in the fourth quarter of 2002, from $745.4 million a year ago as a result of low interest rates and the realization of certain investment transactions included in the prior year's quarter. However, net investment income will rise in future quarters as our record cash flow from our general insurance operations is invested, even if interest rates do not rise from their current low levels and equity market conditions remain depressed.

We added $3.31 billion and $4.45 billion to AIG's general insurance net loss and loss adjustment reserves for the quarter and full year, bringing the total of those reserves to $30.35 billion at year-end 2002. This includes the $2.8 billion pretax reserve increase following AIG's annual year-end loss reserve study.

Overall, both our domestic and foreign Life Insurance operations performed well in the fourth quarter. Worldwide Life Insurance operating income grew 19.7 percent, to $1.58 billion, in the fourth quarter of 2002.  Worldwide Life Insurance premium income, deposits and other considerations were $10.62 billion, an increase of 4.5 percent over the fourth quarter of 2001.

\*       \*       \*

- 333 -

In the United States, both productivity gains and new marketing initiatives are contributing to our growth and success in the domestic life insurance business. The cost savings foreseen at the time of the acquisition of American General have been largely realized, and we expect to realize the balance in 2003.

\*        \*        \*

AIG Financial Products Corp. reported operating income of $266.6 million in the fourth quarter of 2002, compared to $233.8 million in the fourth quarter of 2001. AIGFP's excellent record is the result of its ability to provide innovative financial solutions to the needs of its client corporations and governmental entities.

American General Finance had solid earnings growth in the fourth quarter, and credit quality remains good. In our international consumer finance operations, adverse political and economic conditions in Argentina and weakness in the Hong Kong economy adversely impacted our fourth quarter results in those markets. However, overall results were satisfactory.

\*        \*        \*

AIG's Board of Directors expanded AIG's existing share repurchase program through the authorization of an additional 50 million shares.

In summary, AIG has performed well in 2002 in a challenging environment. Our good operating results in the fourth quarter and the positive trends we have seen continuing into January give us confidence that we are on track for achieving solid growth and profitability in the full year of 2003. To provide some additional guidance, we expect 2003 net income (excluding realized capital gains and losses) in the range of $9.9 billion to $10.3 billion or $3.78 to $3.92 per share. These estimates assume a stable worldwide economic and political environment and catastrophe losses remain within the normal range.

898.    On March 31, 2003, AIG filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2002 ("the 2002 10-K"). **AIG reported consolidated revenues of $67.5 billion and net income of $5.5 billion for the year ended December 31, 2001**.

AIG's General Insurance business segment reported revenues of $26.2 billion, net premiums earned of $24.2 billion and operating income of $667 million. AIG's Life Insurance business segment reported segment reported revenues of $31.5 billion, GAAP premiums/premium income of $20.3 billion and operating income of $4.9 billion. PwC certified that AIG's consolidated financial statements presented fairly, in all material respects the financial position of the Company and the consolidated results of operations and their cash flows in conformity with generally accepted accounting principals.

899. AIG's 2002 Annual Report also stated, in relevant part:

> AIG has the highest ratings and is one of the world's most innovative companies, well positioned to capitalize on opportunities on behalf of its clients throughout the global marketplace. While AIG's products and services have changed over the years to meet the changing needs of its customers, ***the AIG core values of integrity, quality service, financial strength and responsive leadership will never change***.

900. The 2002 Annual Report also contained a "Letter to Shareholders," signed by Defendant Greenberg, which stated, in relevant part:

> LETTER TO SHAREHOLDERS
>
> AIG performed well in 2002, under challenging conditions.... In the current environment, AIG's strong balance sheet and dedicated employees play a particularly vital role meeting the insurance and financial needs of our 40 million customers around the world. AIG had net income of $5.52 billion in 2002 or $2.10 per share – compared to $5.36 billion – or $2.02 per share – in 2001. AIG earned more than any other insurance company in the world and is one of the most profitable global financial companies. We earned more than the next 18 largest property-casualty companies in the United States combined and more than all of the major European insurance companies combined. Shareholders' equity increased to a record $59.10 billion at year end.

*     *     *

## Corporate Leadership and Confidence

***AIG is tackling the business and public policy challenges resulting from the crisis of confidence in U.S. corporations. This issue has been receiving a great deal of our attention in two different respects: We are a leader in providing insurance coverages to directors and officers, and we are making certain that the transparency and integrity of AIG's financial disclosure and practices are well understood by every investor who takes an interest in learning about our company.***

*        *        *

***In the current environment, every American corporation must demonstrate to investors and the general public that its results are accurately reported and its management is acting in the best interest of shareholders.*** This year's AIG Annual Report to Shareholders and Form 10-K are more comprehensive and have been formatted to make it easier for readers to find the information they are seeking. We will continue to build on our disclosure and are committed to providing additional meaningful information that does not give the competition a blueprint for replicating our success.

*        *        *

## Stock Performance

AIG common stock declined 27.1 percent in 2002, compared to a decline of 23.4 percent for the S&P 500. However, over virtually any extended period of time, AIG has outperformed the market and has substantially out distanced other insurance and financial services companies. While the stock market reacts-or-overreacts to short term news and sentiments, ***we manage our company to achieve the strongest possible performance for our shareholders over the long term***. This is the only responsible way to run a business, and shareholders who have stayed with us have been well rewarded. At year-end 2002, AIG had a market capitalization of $150.97 billion, compared to $99.07 billion at year-end 1997. Over this same five-year period, AIG common stock, including reinvested dividends, rose 51.3 percent, while the S&P 500 declined 2.9 percent and a peer group of companies declined 9.7 percent. Over the last 10 years, AIG common stock earned an average annual rate of return of 16.8 percent, compared to 7.3 percent for the S&P 500 and 7.7 percent for a peer group of companies.

901.   AIG's 2002 Annual Report included the following representation:

REPORT OF MANAGEMENT RESPONSIBILITIES

The management of AIG is responsible for the integrity and fair presentation of the consolidated financial statements, related notes thereto and all other financial information presented herein. *The consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, and include amounts based on the best estimates and judgments of management*.

*AIG maintains an internal control structure designed to provide reasonable assurance that assets are safeguarded from loss or unauthorized use, that transactions are recorded in accordance with management's direction and that the financial records are reliable for the purposes of preparing financial statements and maintaining accountability of assets. The management of AIG applies the concept of reasonable assurance by weighing the cost of an internal control structure against the benefits to be derived*. The internal control structure is supported by the careful selection, training and development of qualified personnel, an appropriate division of responsibilities and the dissemination of written policies and procedures throughout AIG. The internal control structure is continually reviewed and evaluated by means of an internal audit function and periodically assessed by PricewaterhouseCoopers LLP, independent accountants, to the extent required under auditing standards generally accepted in the United States of America, in connection with their annual audit of AIG's financial statements.

The Audit Committee of the Board of Directors is comprised solely of outside directors and meets regularly with management, the independent accountants and the internal auditors to oversee the scope and results of the audit work performed. Both the internal auditors and the independent accountants have unrestricted access to the Audit Committee, without the presence of management, to discuss the results of their work and views on the adequacy of the internal control structure, the quality of financial reporting and any other matters they believe should be brought to the attention of the Audit Committee.

902.   The 2002 10-K also stated, in relevant part:

*The insurance industry is highly competitive*. Within the United States, AIG's general insurance subsidiaries compete with approximately 3,000 other stock companies, specialty insurance

organizations, mutual companies and other underwriting
organizations.

*      *      *

AIG's revenues in 2002 increased 9.3 percent to $67.5 billion
when compared to $61.8 billion in 2001.  Growth in revenues was
primarily attributable to the growth in net premiums earned from
the general insurance operations."

AIG's net income in 2002 increased 2.9 percent to $5.52 billion
when compared to $5.36 billion in 2001 . . . General insurance
operating income decreased 76.6 percent in 2002 . . . The primary
reasons for this decline were the loss reserve charge of $2.8 billion
and an increased in realized capital losses of over $700 million."

*      *      *

***Premium rates in the General Insurance business are continuing
to strengthen both domestically and in key international markets,
along with policy restrictions and exclusions***.  AIG expects such
growth will continue through 2003. Such increases in premium
growth will have a strong positive impact on cash flow available
for investment. Thus, General Insurance's net investment income
is expected to rise in future quarters even in the current interest rate
environment.

*      *      *

Net premiums written and net premiums earned in 2002 increased
36.4 percent and 25.3 percent, respectively, from those of 2001.  In
2001, net premiums written increased 14.7 percent and net
premiums earned increased 11.2 percent when compared to 2000.

***Commencing in the latter part of 1999 and continuing through
2002 and into the current quarter, the commercial property-
casualty market place has experienced rate increases.  Virtually
all areas of DBG have experienced rate increases as well as
maintaining an excellent retention rate for desired renewal
business***.  ***The vast majority of the increase in 2002 resulted from
rate increases with respect to renewed business.***  Overall, DBG's
net premiums written increased $5.02 billion or 49.2 percent in
2002 over 2001.  These increases compared to an increase of $2.26
billion or 28.5 percent in 2001 over 2000.  DBG produced 55.5
percent of the general insurance net premiums written in 2002,
50.7 percent in 2001 and 45.3 percent in 2000."

*      *      *

- 338 -

AIG is major purchaser of reinsurance for its general insurance operations. **AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs**.

\*       \*       \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations. **AIG enters into these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities**. **These reinsurance agreements have been approved by the appropriate regulatory authorities**. All material intercompany transactions have been eliminated in consolidation.

903.    AIG's Form 10-K for 2002 was signed by Defendants Greenberg, Smith, Castelli, Hoenemeyer, Tizzio, Sullivan and Broad.

904.    AIG's 2002 financial statements and Report on Form 10-K, filed on March 31, 2003, also included the following certification signed by Defendants Greenberg and Smith:

1.    I have reviewed this Annual Report on Form 10-K of American International Group, Inc.;

2.    **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;**

3.    **Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respect the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;**

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a 14 and 15d 14) for the registrant and have:

(a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within

those entities, particularly during the period in which this report is being prepared;

      (b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date); and

      (c)    presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      (a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

      (b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.    The registrant's other certifying officer and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly alter internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

905.    The 10-K also contained the following certifications of Defendants Greenberg and Smith.

1.    The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

906.    Defendants' statements concerning AIG's financial results relating to the Fourth Quarter and fiscal year 2002 were each false and misleading when made because they

misrepresented or omitted the following material adverse facts that the Defendants knew at the
time the statements were made:

(a)    That during the Fourth Quarter and fiscal year 2002, AIG executives were
engaged in an illegal bid-rigging scheme;

(b)    That during the Fourth Quarter and fiscal year 2002, AIG derived a
substantial portion of its revenues and profits from its participation in the illegal bid-rigging
scheme, based on the scheme having:

(i)    Defrauded AIG's customers into believing that the bids they
received were honest, legitimate and competitive;

(ii)    Illegally increased the prices that customers paid for premiums,
resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)    Illegally "protected" AIG's business from competition by virtually
guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying
higher premiums than they would have if there had truly been competitive bidding in the
insurance marketplace;

(c)    That during the Fourth Quarter and fiscal year 2002, AIG derived a
substantial portion of its revenues and profits from the Company's payment of at least tens of
millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers
who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated
prices;

(d)    That by concealing these "contingent commissions," AIG and the
Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially
enormous fines and penalties;

(e)    That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)    That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Fourth Quarter and fiscal year 2002 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to:  AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; the conversion of underwriting losses to capital losses; AIG's accounting for Life Settlements; and the Company's accounting for derivatives.

907.    Defendants' statements concerning AIG's financial results for the Fourth Quarter and fiscal year 2002 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 15.    False and Misleading Statements Relating to First Quarter 2003

908.    On April 24, 2003, the Company issued a press release entitled "AIG Reports First Quarter 2003 Net Income of $1.95 Billion vs. $1.98 Billion in the First Quarter of 2002; Income as Adjusted to Exclude Realized Capital Losses Rose 11.1 Percent to $2.37 Billion." The press release stated in part:

> American International Group, Inc. (AIG) today reported that its first quarter 2003 net income was $1.95 billion or $0.74 per share, compared to $1.98 billion or $0.75 per share in the first quarter of 2002.  First quarter 2003 income as adjusted to exclude net realized capital gains (losses), increased 11.1 percent to $2.37 billion, compared to $2.13 billion in the first quarter of 2002.  Per share income, as adjusted was $0.90, an increase of 11.1 percent over $0.81 in first quarter 2002.
>
> AIG Chairman Maurice R. Greenberg said, "AIG had a good first quarter.  General Insurance, Life Insurance and Financial Services all had double digit growth in operating income, excluding realized

capital losses.  Retirement Savings continues to be impacted by weak global markets.

Shareholders' equity at March 31, 2003, was a record $62 billion. Assets were a record high of $590 billion and the annualized return on equity for the quarter was a strong 16.9 percent."

\*      \*      \*

Highlights of the first quarter of 2003 include:

- Record capital funds (shareholders' equity) at March 31, 2003 of approximately $62 billion, an increase of approximately $3 billion over December 31, 2002.

- Annualized return on equity of 16.9 percent.  Return on equity is net income, before realized capital gains (losses), expressed as a percentage of average shareholders' equity, exclusive of unrealized appreciation (depreciation) of investments, net of taxes.

- Record consolidated assets at March 31, 2003 of approximately $590 billion, an increase of approximately $29 billion over December 31, 2002.

- ***Record General Insurance net premiums written of $8.24 billion, an increase of 30.1 percent over the first quarter of 2002***.

- ***Record General Insurance pretax operating income, excluding realized capital losses, of $1.32 billion***.

- ***Record General Insurance cash flow of $3.24 billion***.

\*      \*      \*

Income before income taxes and minority interest was $2.92 billion in the first quarter of 2003, compared to $2.96 billion in 2002.

909.    On May 14, 2003, AIG filed its First Quarter 2003 Form 10-Q with the SEC.  The First Quarter 2003 10-Q was signed by Defendant Smith and certified as accurate by Defendants Greenberg and Smith.  ***AIG reported consolidated revenues of $18.9 billion and net income of $2.0 billion for the quarter ended March 31, 2003***.  AIG's General Insurance business segment reported revenues of $7.9 billion, net premiums earned of $7.3 billion and operating income of

$1.1 billion for the quarter ended March 31, 2003.  AIG's Life Insurance business segment

reported revenues of $8.6 billion, GAAP premiums/premium income of $5.7 billion and

operating income of $1.2 billion for the quarter ended March 31, 2003.

910.    The First Quarter 2003 10-Q also stated, in relevant part:

AIG's revenues in the first three months of 2003 increased 17.3
percent to $18.9 billion when compared to $16 billion in the same
period of 2002.

*        *        *

AIG's income before income taxes and minority interest decreased
1.2 percent in the first three months of 2003 when compared to the
same period of 2002.

*        *        *

AIG's net income in the first three months of 2003 decreased 1.4
percent to $1.95 billion when compared to $1.98 billion in the
same period of 2002.  Excluding realized capital gains (losses), net
of taxes, AIG's net income in the first three months of 2003
increased 11.1 percent.

*        *        *

General insurance operating income increased 22.6 percent in the
first three months of 2003 compared to the same period in 2002.
Excluding realized capital gains (losses), general insurance
operating income increased 24.8 percent, reflecting stronger
growth in adjusted underwriting profit.

*        *        *

***Premium rates in the General Insurance business are continuing
to strengthen both domestically and in key international markets,
along with policy restrictions and exclusions.  AIG expects that
such rate increases will continue through 2003.***

*        *        *

During the first three months of 2003, net premiums written and
net premiums earned increased 30.1 percent and 32.3 percent,
respectively, from those of 2002.

- 344 -

*Commencing in the latter part of 1999 and continuing through and into the current quarter, the commercial property-casualty market place has experienced rate increases. Virtually all areas of DBG have experienced rate increases, as well as maintaining an excellent retention rate for desired renewal business. The vast majority of the increase in the first three months of 2003 resulted from rate increases with respect to renewed business.* Overall, DBG's net premiums written increased $1.09 billion or 31.7 percent in the first three months of 2003 and 2002.

*        *        *

General insurance operating income for the first three months of 2003 increased 22.6 percent to $1.14 billion. Excluding realized capital gains (losses), general insurance operating income increased 24.8 percent over the same period of 2002. The contribution of general insurance operating income to income before income taxes and minority interest was 39.1 percent during the first three months of 2003 compared to 31.5 percent in the same period of 2002.

*        *        *

AIG is a major purchaser of reinsurance for its general insurance operations. *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs.*

*        *        *

AIG's general reinsurance assets amounted to $29.85 billion at March 31, 2003 and resulted from AIG's reinsurance arrangements.

*        *        *

AIG enters into certain intercompany reinsurance transactions for its general and life operations. *AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities. These reinsurance agreements have been approved by appropriate regulatory authorities.*

*        *        *

At March 31, 2003, general insurance net loss reserves increased $1.17 billion from prior year end to $31.52 billion.

911.     Pursuant to Section 302 of Sarbanes-Oxley Act of 2002, AIG's 10-Q, filed on

May 14, 2003, also included the following certification signed by Defendants Greenberg and

Smith:

> 1.     I have reviewed this quarterly report on Form 10-Q of American International Group, Inc.;
>
> 2.     ***Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report***;
>
> 3.     ***Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report***;
>
> 4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:
>
> > (a)     designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;
> >
> > (b)     evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and
> >
> > (c)     presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;
>
> 5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

(a)      all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.      The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

912.   On July 18, 2003, AIG filed an Amended First Quarter 2003 Form 10-Q with the SEC, which repeated the false statements and omissions in the First Quarter Form 10-Q filed on May 14, 2003.

913.   Defendants' statements concerning AIG's financial results relating to the First Quarter of 2003 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)      That during the First Quarter of 2003, AIG executives were engaged in an illegal bid-rigging scheme;

(b)      That during the First Quarter of 2003, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)      Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)     Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)     Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace, including the $1 million or more in premiums AIG received from Fortune Brands, Inc., as described *supra*;

(c)     That during the First Quarter of 2003, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)     That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the First Quarter of 2003 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; AIG's accounting for Life Settlements; the failure to account for the deferred compensation provided by Defendant SICO; and the Company's accounting for derivatives.

914.    Defendants' statements concerning AIG's financial results for the First Quarter of 2003 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

**16.    False and Misleading Statements
Relating to Second Quarter 2003**

915.    On July 24, 2003, the Company issued a press release entitled "AIG Reports Second Quarter 2003 Net Income Rose 26.4 Percent to $2.28 Billion; Announces Additional 25.0 Percent Increase in Quarterly Common Stock Dividend." The press release stated in part:

> ***American International Group, Inc. (AIG) today reported that its net income for the second quarter of 2003 increased 26.4 percent to $2.28 billion, compared to $1.80 billion in the second quarter of 2002.*** For the first six months of 2003, net income totaled $4.23 billion, an increase of 11.9 percent compared to $3.78 billion in the same period of 2002.
>
> *         *         *
>
> Highlights of the second quarter of 2003 include:
>
> - Record capital funds (shareholders' equity) at June 30, 2003 exceeding $68 billion, an increase of approximately $6 billion over March 31, 2003.
>
> - Record consolidated assets at June 30, 2003 of approximately $620 billion, an increase of approximately $28 billion over March 31, 2003.
>
> - ***Record General Insurance net premiums written of $8.84 billion, an increase of 30.4 percent over the second quarter of 2002***.
>
> - ***Record General Insurance pretax operating income of $1.21 billion, including $83.5 million of realized capital losses***.
>
> - ***General Insurance combined ratio of 92.27 for the second quarter of 2003***.
>
> - ***Record General Insurance cash flow of $5.91 billion in the first six months of 2003***.

- General Insurance net loss and loss adjustment reserves totaling $33.09 billion as of June 30, 2003, an increase of $1.57 billion and $2.74 billion for the second quarter and six months, respectively.

- Life Insurance GAAP premiums of $5.47 billion, up 6.1 percent over the second quarter of 2002.

- Record Life Insurance pretax operating income of $1.56 billion, including $171.1 million of realized capital losses.

- Income before income taxes and minority interest in the second quarter of 2003 increased 23.9 percent.

\*       \*       \*

Commenting on second quarter results, AIG Chairman M.R. Greenberg said, "AIG had a very good quarter. General Insurance, Life Insurance and Financial Services all had record results. Retirement Savings & Asset Management had improved performance as equity markets made gains."

\*       \*       \*

*"Over the second quarter, assets and shareholders' equity both rose to record levels. At June 30, 2003, assets approximated $620 billion and shareholders' equity exceeded $68 billion."*

916.    On August 14, 2003, AIG filed its Second Quarter 2003 Form 10-Q with the SEC. The Second Quarter 2003 10-Q was signed by Defendant Smith and certified as being complete and accurate by Defendants Greenberg and Smith. *AIG reported consolidated revenues of $19.9 billion and net income of $2.3 billion for the quarter ended June 30, 2003 and year to date revenues of $38.8 billion and net income of $4.2 billion for the six months ended June 30, 2003*. AIG's General Insurance business segment reported revenues of $8.4 billion, net premiums earned of $7.8 billion and operating income of $1.2 billion for the quarter ended June 30, 2003 and year to date revenues of $16.3 billion, net premiums earned of $15.0 billion and operating income of $2.4 billion for the six months ended June 30, 2003. AIG's Life Insurance business segment reported revenues of $8.8 billion, GAAP premiums/premium income of $5.5

billion and operating income of $1.6 billion for the quarter ended June 30, 2003 and year to date revenues of $17.3 billion, GAAP premiums/premium income of $11.1 billion and operating income of $2.8 billion for the six months ended June 30, 2003.

> 917.   The Second Quarter 2003 10-Q also stated, in relevant part:

> AIG's revenues in the first six months of 2003 increased 18.4 percent to $38.8 billion when compared to $32.8 billion in the same period of 2002.

> *       *       *

> AIG's income before income taxes and minority interest increased 11.0 percent in the first six months of 2003 when compared to the same period of 2002.  ***General insurance operating income was the primary reason for this growth***.

> *       *       *

> AIG's net income in the first six months of 2003 increased 11.9 percent to $4.23 billion when compared to $3.78 billion in the same period of 2002.

> *       *       *

> General insurance operating income increased 26.0 percent in the first six months of 2003 compared to the same period in 2002. ***This increase was primarily attributable to strong growth in operating income with respect to Domestic Brokerage Group's and Foreign General's operations***.

> *       *       *

> ***Premium rates in the General Insurance business are continuing to strengthen both domestically and in key international markets***, along with policy restrictions and exclusions.  ***AIG expects that rate increases will continue through 200***3.  Such increases will positively impact on cash flow available for investment.

> *       *       *

> ***During the first six months of 2003, net premiums written and net premiums earned increased 30.3 percent and 32.3 percent, respectively, from those of 2002***.

*Commencing in the latter part of 1999 continuing through and into the current quarter, the commercial property-casualty market place has experienced rate increases. Virtually all areas of DBG have experienced rate increases, as well as maintaining an excellent retention rate for desired renewal business. The vast majority of the increase in the first six months of 2003 resulted from rate increases with respect to renewed business.* Overall, DBG's net premiums written increased $2.47 billion or 34.7 percent in the first six months of 2003 over 2002.

\*         \*         \*

General insurance operating income for the first six months of 2003 increased 26.0 percent to $2.36 billion. *The contribution of general insurance operating income to AIG's consolidated income before income taxes and minority interest was 37.1 percent during the first six months of 2003 compared to 32.6 percent in the same period of 2002.*

\*         \*         \*

AIG is a major purchaser of reinsurance for its general insurance operations. *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs.*

\*         \*         \*

AIG's general reinsurance assets amounted to $30.35 billion at June 30, 2003 and resulted from AIG's reinsurance arrangements.

\*         \*         \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations. *AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities. These reinsurance agreements have been approved by the appropriate regulatory authorities.*

\*         \*         \*

*At June 30, 2003, general insurance net loss reserves increased $2.74 billion from prior year end to $33.09 billion.*

918.    Pursuant to Section 302 of Sarbanes-Oxley Act of 2002, AIG's 10-Q, filed on

August 14, 2003, also included the following certification signed by Defendants Greenberg and

Smith:

>    1.    I have reviewed this quarterly report on Form 10-Q/A of American International Group, Inc.;

>    2.    ***Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report***;

>    3.    ***Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report***;

>    4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

>    (a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

>    (b)    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

>    (c)    presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

>    5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

        (a)     all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

        (b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

        6.     The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

919.    Defendants' statements concerning AIG's financial results relating to the Second Quarter of 2003 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

        (a)     That during the Second Quarter of 2003, AIG executives were engaged in an illegal bid-rigging scheme;

        (b)     That during the Second Quarter of 2003, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

        (i)     Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

        (ii)     Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

        (iii)     Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying

higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)      That during the Second Quarter of 2003, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)      That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)      That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)      That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Second Quarter of 2003 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; AIG's accounting for Life Settlements; the failure to account for the deferred compensation provided by Defendant SICO; and the Company's accounting for derivatives.

920.    Defendants' statements concerning AIG's financial results for the Second Quarter of 2003 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

**17.     False and Misleading Statements**
**Relating to Third Quarter 2003**

921.     On October 23, 2003, the Company issued a press release entitled "AIG Reports

Third Quarter 2003 Net Income Rose 26.9 Percent to $2.34 Billion." The press release stated in

part:

> American International Group, Inc. (AIG) today reported that its
> net income for the third quarter of 2003 increased 26.9 percent to
> $2.34 billion, compared to $1.84 billion in the third quarter of
> 2002. For the first nine months of 2003, net income totaled $6.57
> billion, an increase of 16.8 percent compared to $5.62 billion in the
> same period of 2002. Net income excluding realized capital losses
> increased 15.4 percent to $2.58 billion in the third quarter of 2003,
> and 13.5 percent to $7.46 billion for the first nine months of 2003.

922.     On November 14, 2003, AIG filed its Third Quarter 2003 Form 10-Q with the

SEC.  The Third Quarter 2003 10-Q was signed by Defendant Smith and certified as accurate by

Defendants Greenberg and Smith. ***AIG reported consolidated revenues of $20.3 billion and net***

***income of $2.3 billion for the quarter ended September 30, 2003, and year to date revenues of***

***$59.1 billion and net income of $6.6 billion for the nine months ended September 30, 2003***.

AIG's General Insurance business segment reported revenues of $9.0 billion, net premiums

earned of $8.3 billion and operating income of $1.2 billion for the quarter ended September 30,

2003 and year to date revenues of $25.3 billion, net premiums earned of $23.3 billion and

operating income of $3.6 billion for the nine months ended September 30, 2003.  AIG's Life

Insurance business segment reported  revenues of $8.5 billion, GAAP premiums/premium

income of $5.4 billion and operating income of $1.4 billion for the quarter ended September 30,

2003 and year to date revenues of $25.8 billion, GAAP premiums/premium income of $16.6

billion and operating income of $4.2 billion for the nine months ended September 30, 2003.

923.     The Third Quarter 2003 10-Q also stated, in relevant part:

AIG's revenues in the first nine months of 2003 increased by 18.4 percent to $59.12 billion when compared to $49.9 billion in the same period of 2002.

\*      \*      \*

AIG's income before income taxes and minority interest increased 16.6 percent in the first nine months of 2003 when compared to the same period of 2002. ***General insurance operating income was the primary reason for this growth. Similarly, general insurance operating income was the primary factor in the 28.4 percent growth in AIG's income before income taxes and minority interest for the third quarter of 2003 when compared to the third quarter of 2002***.

\*      \*      \*

AIG's net income in the first nine months of 2003 increased 16.8 percent to $6.57 billion when compared to $5.62 billion in the same period of 2002. For the third quarter of 2003, AIG's net income increased 26.9 percent to $2.34 billion when compared to $1.84 billion in the same period of 2002. ***For both the nine month and three month periods, general insurance operating income as well as reduced realized capital losses overall, were the primary factors for these increases over 2002***.

\*      \*      \*

General insurance operating income increased 32.7 percent in the first nine months of 2003 compared to the same period in 2002. General insurance operating income increased 47.4 percent in the third quarter of 2003 when compared to the same period of 2002. ***These significant increases were primarily attributable to strong growth in operating income with respect to Domestic Brokerage Group's and Foreign General's operations***.

\*      \*      \*

***Premium rates in the General Insurance business are continuing to strengthen both domestically and in key international markets, along with policy restrictions and exclusions. AIG expects that rate increases will continue through 2003***. Such increases will positively impact on cash flow available for investment.

\*      \*      \*

During the first nine months of 2003, net premiums written and net premiums earned increased 29.0 percent and 32.9 percent, respectively, from those of 2002.

***Commencing in the latter part of 1999 and continuing through and into the current quarter, the commercial property-casualty market place has experienced rate increases.  Virtually all areas of DBG have experienced rate increases, as well as maintaining an excellent retention rate for desired renewal business.  The vast majority of the increase in the first nine months of 2003 resulted from rate increases with respect to renewed business***.  Overall, DBG's net premiums written increased $3.70 billion or 33.6 percent in the first nine months of 2003 over 2002.

\*        \*        \*

General insurance operating income for the first nine months of 2003 increased 32.7 percent to $3.60 billion.  ***The contribution of general insurance operating income to AIG's consolidated income before income taxes and minority interest was 36.5 percent during the first nine months of 2003 compared to 32.1 percent in the same period of 2002***.

\*        \*        \*

AIG is a major purchaser of reinsurance for its general insurance operations.  ***AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs***.

\*        \*        \*

AIG's general reinsurance assets amounted to $31.68 billion at September 30, 2003 and resulted from AIG's reinsurance arrangements.

\*        \*        \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations.  ***AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities.  These reinsurance agreements have been approved by the appropriate regulatory authorities***.

\*        \*        \*

> At September 30, 2003, general insurance net loss reserves increased $4.35 billion from prior year end to $35.09 billion.

924.   Pursuant to Section 302 of Sarbanes-Oxley Act of 2002, AIG's 10-Q, filed on November 14, 2003, also included the following certification signed by Defendants Greenberg and Smith:

> 1.   I have reviewed this quarterly report on Form 10-Q of American International Group, Inc.;
>
> 2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;
>
> 4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
> > (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b)   [Omitted pursuant to SEC Release No. 33-8238];
> >
> > (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the
registrant's internal control over financial reporting that occurred
during the registrant's most recent fiscal quarter (the registrant's
fourth fiscal quarter in the case of an annual report) that has
materially affected, or is reasonably likely to materially affect, the
registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have
disclosed, based on our most recent evaluation of internal control
over financial reporting, to the registrant's auditors and the audit
committee of the registrant's board of directors (or persons
performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses
in the design or operation of internal control over financial
reporting which are reasonably likely to adversely affect the
registrant's ability to record, process, summarize and report
financial information; and

(b)      Any fraud, whether or not material, that involves
management or other employees who have a significant role in the
registrant's internal control over financial reporting.

925.   The 10-Q also contained the following certification by Defendants Greenberg and

Smith:

1.      The Report fully complies with the requirements of Section
13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.      The information contained in the Report fairly presents, in
all material respects, the financial condition and results of
operations of the Company.

926.   Defendants' statements concerning AIG's financial results relating to the Third

Quarter of 2003 were each false and misleading when made because they misrepresented or

omitted the following material adverse facts that the Defendants knew at the time the statements

were made:

(a)      That during the Third Quarter of 2003, AIG executives were engaged in

an illegal bid-rigging scheme;

(b)      That during the Third Quarter of 2003, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)      Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)      Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)      Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace, including the $1 million or more in premiums AIG received from Vivendi Universal, S.A., as described *supra*;

(c)      That during the Third Quarter of 2003, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)      That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)      That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)     That AIG's net income, revenues, shareholders' equity and other key

financial measures were overstated for the Third Quarter of 2003 as a result of the improper

transactions identified in the Company's May 31, 2005 restatement, including but not limited to:

AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other

directed entries; AIG's accounting for Life Settlements; the failure to account for the deferred

compensation provided by Defendant SICO; and the Company's accounting for derivatives.

927.    Defendants' statements concerning AIG's financial results for the Third Quarter

of 2003 were also false and misleading because AIG's financial statements violated GAAP for

the reasons set forth below in paragraphs 961 through 976.

### 18.   False and Misleading Statements Relating to Fourth Quarter and Year-End 2003

928.    On February 11, 2004, AIG issued a press release entitled "AIG Reports Record

2003 Net Income of $9.27 Billion, an Increase of 68.0 Percent over 2002." The press release

stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its
> net income for the full year 2003 increased 68.0 percent to a record
> $9.27 billion, compared to $5.52  billion in 2002. Net income
> excluding realized capital gains (losses) and cumulative effect of
> an accounting change increased 43.6 percent to a record $10.22
> billion in the full year 2003.
>
> Net income in the fourth quarter of 2003 totaled a record $2.71
> billion compared to a loss of $103.8 million in the same period of
> 2002. Fourth quarter 2003 net income excluding realized capital
> gains (losses) and cumulative effect of an accounting change was a
> record $2.75 billion compared to $537.5 million in the same period
> of 2002. Results for fourth quarter and full year 2002 include the
> $1.8 billion net, after tax general insurance reserve charge.
>
> Income before income taxes, minority interest, cumulative effect of
> an accounting change and pretax realized capital gains (losses) for
> the twelve months of 2003 increased 45.0 percent to $15.34
> billion. Income before income taxes, minority interest, cumulative
> effect of an accounting change and pretax realized capital gains

(losses) for the fourth quarter of 2003 was $4.14 billion, compared
to $671.6 million in the fourth quarter of 2002.

*       *       *

Commenting on full-year and fourth quarter 2003 performance,
AIG Chairman M. R. Greenberg said, "AIG had record results in
2003, with $10.22 billion in net income, excluding realized capital
losses and the cumulative effect of an accounting change."

"In addition to record net income of $9.27 billion, AIG had record
results in 2003 in all four of our core businesses – General
Insurance, Life Insurance, Financial Services and Retirement
Services & Asset Management – and in most other key measures
including shareholders' equity, return on equity, revenues, assets
and cash flow. In the fourth quarter of 2003, AIG had net income
of $2.71 billion, another record, which gives AIG strong
momentum for 2004 and beyond."

929.    On March 15, 2004 AIG filed with the SEC its Annual Report on Form 10-K for

the fiscal year ended December 31, 2003. ***AIG reported consolidated revenues of $81.3 billion***

***and net income of $9.3 billion for the year ended December 31, 2003***.  AIG's General

Insurance business segment reported revenues of $34.5 billion, net premiums earned of $31.7

billion and operating income of $5.1 billion, AIG's Life Insurance business segment reported

revenues of $35.7 billion, GAAP premiums/premium income of $22.9 billion and operating

income of $6.0 billion.  PwC certified that AIG's consolidated financial statements presented

fairly, in all material respects the financial position of the Company and the consolidated results

of operations and their cash flows in conformity with generally accepted accounting principals.

930.    AIG's 2003 Annual Report reported record financial results and stated "AIG's

future has never been more promising."  The report, authored, reviewed and approved by AIG's

Board, contained a "Letter to Shareholders," signed by Defendant Greenberg.  It stated:

AIG achieved record results in 2003. Net income, shareholders'
equity, revenues and assets all were at the highest levels in the
history of our company.  In all four of our businesses – General
Insurance, Life Insurance, Financial Services and Retirement

Services & Asset Management – AIG reached new historic highs in operating income.  AIG is growing profitably across our broad portfolio of businesses, and we implemented several significant initiatives around the world in 2003 to accelerate our progress in the years ahead.

***This performance, which ranks AIG as one of the top companies in the world in any industry, is the end result of long term strategies successfully developed and implemented by dedicated AIG employees throughout our global organization.*** Although we are able to move quickly when new opportunities arise, the strong bottom line growth that we have achieved over the course of 85 years is also the outcome of decades of patient investing to open new markets, develop new lines of business and launch new products.

AIG's strong 2003 results are in keeping with a long history of outstanding performance. . . .

*       *       *

NECESSARY CORPORATE GOVERNANCE REFORMS IMPACT ALL U.S. BUSINESS

***The whole country is paying a price for the gross misdeeds of relatively few executives who shirked their responsibility to create value for all of their corporate constituencies – shareholders, customers and employees – and abused the system to create wealth for themselves and their close associates.  It is unfortunate that the misbehavior of a few companies and their executives could have a negative impact on so many.***

*       *       *

***We also have taken many steps to improve the flow of information to our shareholders and the general public*** to make certain that AIG is well understood. Increased disclosure in our SEC reports, the expensing of stock options, quarterly earnings conference calls and extensive management meetings with investors all address the needs and concerns of shareholders.

***The focus on integrity and building long term value must start at the top if it is to permeate throughout an organization.*** Successful businesses need hands on leaders who have assembled great teams behind them that share the same values and high ethical standards.

*       *       *

AIG'S OUTLOOK HAS NEVER BEEN MORE PROMISING

AIG has a relentless focus on profitable growth.  The foundation for our growth is well established – a strong financial position, more than 50 million customers, an extensive and innovative product range to serve them, unsurpassed distribution penetrating more than 130 countries and jurisdictions, and a powerful entrepreneurial culture.

From our beginnings in Shanghai in 1919, a customer focused, entrepreneurial approach to doing business has been deeply engrained in our culture. By managing our businesses through highly focused profit centers, we have maintained the discipline and focus of owner entrepreneurs even as we have grown to become one of the world's largest companies.  Our employees are compensated for sustainable, long term results through programs that measure and reward performance, benefiting our shareholders and customers over extended time frames – in many cases decades.

931.    AIG's 2003 Annual Report described AIG's internal controls as follows:

AIG maintains an internal control structure designed to provide reasonable assurances that assets are safeguarded from loss or unauthorized use, that transactions are recorded in accordance with management's direction and that *the financial records are reliable for the purposes of preparing financial statements and maintaining accountability of assets*.  The management of AIG applies the concept of reasonable assurance by weighing the cost of an internal control structure against the benefits to be derived. The internal control structure is supported by the careful selection, training and development of qualified personnel, an appropriate division of responsibilities and the dissemination of written policies and procedures throughout AIG.  The internal control structure is continually reviewed and evaluated by means of an internal audit function and periodically assessed by PricewaterhouseCoopers LLP, independent accountants, to the extent required under auditing standards generally accepted in the United States, in connection with their annual audit of AIG's financial statements.

932.    The 2003 10-K also stated, in relevant part:

*The insurance industry is highly competitive*.  Within the United States, AIG's General Insurance subsidiaries compete with approximately 3,000 other stock companies, specialty insurance

organizations, mutual companies and other underwriting organizations.

\*       \*       \*

Commencing in the latter part of 1999 and continuing through 2003, the commercial property-casualty market place has experienced premium rate increases. *Virtually all areas of DBG [Domestic Brokerage Group] have experienced premium rate increases as well as maintaining an excellent retention rate for desired renewal business. The vast majority of the net premiums written increase in 2003 resulted from rate increases with respect to renewal business.  Overall, DBG's net premiums written increased in 2003 and 2002.* Adjusting this growth for cancelled or nonrenewed business, such growth would have approximated 38 percent in 2003 and 56 percent in 2002. *AIG believes that these premium rate increases will continue into 2004 particularly with respect to long tail lines of business where the insurer's stability is critical to the insured.  Based on historical patterns, AIG believes that overall growth in net premiums written will slow as competition for premiums increases in certain lines of business.*

\*       \*       \*

The increase in General Insurance operating income in 2003 was primarily attributable to strong profitable growth in DBG's and Foreign General's operations . . . .

\*       \*       \*

AIG is a major purchaser of reinsurance for its General Insurance operations. *AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs.* AIG insures risks globally and its reinsurance programs must be coordinated in order to provide AIG the level of reinsurance protection that AIG desires.

\*       \*       \*

AIG's general reinsurance assets amounts to $26.76 billion and resulted from AIG's reinsurance arrangements.

\*       \*       \*

AIG enters into certain intercompany reinsurance transactions for general and life operations. *AIG enters these transactions as a sound and prudent business practice in order to maintain*

> *underwriting control and spread insurance risk among various*
> *legal entities. These reinsurance agreements have been approved*
> *by the appropriate regulatory authorities.*
>
> \*     \*     \*
>
> *AIG evaluates the financial condition of its reinsurers through*
> *an internal reinsurance security committee consisting of*
> *members of AIG's senior management.* No single reinsurer is a
> material reinsurer to AIG nor is AIG's business substantially
> dependent on any reinsurance contract.

933.   AIG's Form 10-K for 2003 was signed by Defendants Greenberg, Smith, Castelli,

Hoenemeyer and Sullivan.

934.   Pursuant to Section 302 of Sarbanes-Oxley Act of 2002, AIG's 10-K, filed on

March 15, 2004, also included the following certification signed by Defendants Greenberg and

Smith:

> 1.      I have reviewed this Annual Report on Form 10-K of
> American International Group, Inc.;
>
> 2.      *Based on my knowledge, this report does not contain any*
> *untrue statement of a material fact or omit to state a material fact*
> *necessary to make the statements made, in light of the*
> *circumstances under which such statements were made, not*
> *misleading with respect to the period covered by this report*;
>
> 3.      *Based on my knowledge, the financial statements, and*
> *other financial information included in this report, fairly present*
> *in all material respects the financial condition, results of*
> *operations and cash flows of the registrant as of, and for, the*
> *periods presented in this report*;
>
> 4.      The registrant's other certifying officer and I are
> responsible for establishing and maintaining disclosure controls
> and procedures (as defined in Exchange Act Rules 13a-15(e) and
> 15d-15(e)) for the registrant and have:
>
> (a)      Designed such disclosure controls and procedures,
> or caused such disclosure controls and procedures to be designed
> under our supervision, to ensure that material information relating
> to the registrant, including its consolidated subsidiaries, is made

known to us by others within those entities, particularly during the period in which this report is being prepared;

       (b)     [Omitted pursuant to SEC Release No. 33-8238];

       (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

       (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

       (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

       (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

     935.    The 10-Q also contained the following certification by Defendants Greenberg and

Smith:

       1.     The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

       2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

936.     Defendants' statements concerning AIG's financial results relating to the Fourth Quarter and fiscal year 2003 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)     That during the Fourth Quarter and fiscal year 2003, AIG executives were engaged in an illegal bid-rigging scheme;

(b)     That during the Fourth Quarter and fiscal year 2003, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)     Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)     Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)     Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace, including the several million dollars in premiums AIG received from Fortune Brands, Inc., Vivendi Universal, S.A., Dyson-Kissner-Moran Corporation and Cisco Systems, Inc., as described *supra*;

(c)     That during the Fourth Quarter and fiscal year 2003, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers

who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)     That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Fourth Quarter and fiscal year 2003 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to:  AIG's reinsurance agreements with Defendant Union Excess; "Top Level" adjustments and other directed entries; AIG's accounting for Life Settlements; the failure to account for the deferred compensation provided by Defendant SICO; and the Company's accounting for derivatives.

937.    Defendants' statements concerning AIG's financial results for the Fourth Quarter and fiscal year 2003 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 19.    False and Misleading Statements Relating to First Quarter 2004

938.    On April 22, 2004, AIG issued a press release entitled "AIG Reports First Quarter 2004 Net Income of $2.66 Billion – $1.01 Per Share – an Increase of 35.9 Percent Over 2003." The press release stated, in relevant part:

> American International Group, Inc. (AIG) today reported that its first quarter 2004 net income rose 35.9 percent to $2.66 billion or

$1.01 per share, compared to $1.95 billion or $0.74 per share in the first quarter of 2003.  First quarter 2004 net income excluding realized capital gains (losses) and the cumulative effect of an accounting change, increased 19.9 percent to a record $2.84 billion or $1.08 per share, compared to $2.37 billion or $0.90 per share in the first quarter of 2003.

Income before income taxes, minority interest and the cumulative effect of an accounting change for the first quarter of 2004 was a record $4.29 billion, a 46.8 percent increase over $2.92 billion in the first quarter of 2003.  These results include realized capital gains of $4.9 million in the first quarter of 2004, compared to realized capital losses of $631.5 million in the same period last year.

*       *       *

Commenting on these results, AIG Chairman M. R. Greenberg said, "AIG had a very good quarter led by excellent General Insurance results and strong gains in Life Insurance & Retirement Services.  We achieved net income of $2.66 billion, up 35.9 percent over a year ago. Excluding realized capital gains and losses and the cumulative effect of an accounting change, net income increased 19.9 percent to a record $2.84 billion."

939.    On May 10, 2004, AIG filed its First Quarter 2004 Form 10-Q with the SEC.  The First Quarter 2004 10-Q was signed by Defendant Smith and certified to as accurate by Defendants Greenberg and Smith.  ***AIG reported consolidated revenues of $23.6 billion and net income of $2.7 billion for the quarter ended March 31, 2004***.  AIG's General Insurance Business segment reported revenues of $10.2 billion, net premiums earned of $9.2 billion and operating income of $1.6 billion for the quarter ended March 31, 2004.  AIG's Life Insurance business segment reported revenues of $10.9 billion, GAAP premiums/premium income of $6.9 billion and operating income of $2.1 billion for the quarter ended March 31, 2004.

940.    The First Quarter 2004 10-Q also stated, in relevant part:

The 24.9 percent growth in revenues in the first three months of 2004 was primarily attributable to the growth in net premiums earned from global General Insurance operations as well as growth

in the both General Insurance and Life Insurance Retirement Services net investment income and GAAP Life Insurance Retirement Services premiums.

\*     \*     \*

AIG's income before income taxes, minority interest and cumulative effect of an accounting change increased 46.8 percent in the first three months of 2004 when compared to the same period of 2003.  General Insurance and Life Insurance Retirement Services operating income gains and together with the improvement in realized capital gains (losses) were the primary factors for the increase over 2003 in both pretax income and net income.

\*     \*     \*

AIG's General Insurance operations provide property and casualty products and services throughout the world.  *The increase in General Insurance operating income in the first three months of 2004 compared to the same period of 2003 was primarily attributable to strong growth in operating income with respect to Domestic Brokerage Group's and Foreign General's operations*.

\*     \*     \*

*Overall, premium rates in the General Insurance business have continued to be strong both domestically and in key international markets, although the rates of increase have moderated in most lines and begun to fall in certain classes*.  AIG also continues to be able to modify and limit its contractual obligations by adding appropriate exclusions and policy restrictions.  AIG expects total premiums to increase in 2004 resulting in positive growth in cash flow for investments.

\*     \*     \*

*Commencing in the latter part of 1999 and continuing through the current quarter, the commercial property-casualty market place has experienced premium rate increases, although the rate of increase has moderated in the current quarter*.  DBG also maintains adequate pricing while giving careful attention to underwriting selection, policy terms and conditions, deductibles and attachment points.  Overall, DBG's net premiums written increased in the first three months of 2004 over 2003.  *AIG believes that these premium rate increases will continue in 2004 particularly with respect to long tail lines of business where the insurer's stability is critical to the insured*.  Based on historical

patterns, AIG believes that overall growth in net premiums written will slow as competition for premiums increases in certain lines of business.

\*     \*     \*

The increase in General Insurance operating income in the first three months of 2004 was primarily attributable to strong profitable growth in DBG's and Foreign General's operations and the improvement in realized capital gains (losses) relative to the same period of 2003.

***The contribution of General Insurance operating income to AIG's consolidated income before taxes, minority interest and cumulative effect of an accounting change was 36.5 percent in the first three months of 2004 compared to 39.1 percent in the same period of 2003***.

\*     \*     \*

AIG is a major purchaser of reinsurance for its General Insurance operations.  ***AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs***.

\*     \*     \*

AIG's general reinsurance assets amounted to $26.95 billion at March 31, 2004 and resulted from AIG's reinsurance arrangements.

\*     \*     \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations.  ***AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities.  These reinsurance agreements have been approved by the appropriate regulatory authorities***.

\*     \*     \*

***At March 31, 2004, General Insurance net loss reserves increased $2.11 billion from the prior year end to $38.75 billion.***

941.     Pursuant to Section 302 of Sarbanes-Oxley Act of 2002, AIG's 10-Q, filed on

May 10, 2004, also included the following certification signed by Defendants Greenberg and

Smith:

>    1.     I have reviewed this Quarterly Report on Form 10-Q of American International Group, Inc.;
>
>    2.     ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
>    3.     ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;
>
>    4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
>    (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
>    (b)     [Omitted pursuant to SEC Release No. 33-8238];
>
>    (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
>    (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

942.      The 10-Q also contained the following certification by Defendants Greenberg and Smith:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

943.      Defendants' statements concerning AIG's financial results relating to the First Quarter of 2004 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)      That during the First Quarter of 2004, AIG executives were engaged in an illegal bid-rigging scheme;

(b)      That during the First Quarter of 2004, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)      Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)      Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)      Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)      That during the First Quarter of 2004, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)      That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)      That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)      That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the First Quarter of 2004 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess, "Top Level" adjustments and other

directed entries; AIG's accounting for Life Settlements; the Company's failure to account for the

deferred compensation provided by Defendant SICO; and AIG's hedge fund accounting.

944.    Defendants' statements concerning AIG's financial results for the First Quarter of

2004 were also false and misleading because AIG's financial statements violated GAAP for the

reasons set forth below in paragraphs 961 through 976.

### 20.    False and Misleading Statements Relating to Second Quarter 2004

945.    On July 22, 2004, AIG issued a press release entitled "AIG Reports Second

Quarter 2004 Net Income of $2.86 Billion - $1.09 Per Share; an Increase of 25.7 Percent Over

2003."  The press release stated, in relevant part:

> ***American International Group, Inc. (AIG) today reported that its second quarter 2004 net income rose 25.7 percent to a record $2.86 billion or $1.09 per share, compared to $2.28 billion or $0.87 per share in the second quarter of 2003.***  Second quarter 2004 net income excluding realized capital gains (losses), increased 19.2 percent to a record $3.00 billion or $1.14 per share, compared to $2.52 billion or $0.96 per share in the same period of 2003.
>
> ***Net income for the first six months of 2004 rose 30.4 percent to $5.52 billion or $2.10 per share, compared to $4.23 billion or $1.61 per share in the first six months of 2003.***  For the first six months of 2004 net income excluding realized capital gains (losses) and the cumulative effect of an accounting change, increased 19.5 percent to $5.84 billion or $2.22 per share, compared to $4.89 billion or $1.86 per share in the same period of 2003.
>
> Income before income taxes and minority interest for the second quarter of 2004 was a record $4.39 billion, a 27.9 percent increase over $3.43 billion in the second quarter of 2003.  Income before income taxes, minority interest and the cumulative effect of an accounting change for the first six months of 2004 was $8.68 billion, a 36.6 percent increase over $6.35 billion in the same period of 2003.  These results include realized capital losses of $209.0 million and $204.1 million in the second quarter and six months of 2004, respectively, compared to realized capital losses

of $356.9 million and $988.4 million in the second quarter and six months of 2003, respectively.

*     *     *

Commenting on second quarter results, AIG Chairman M. R. Greenberg said, "AIG had a very good quarter overall, with especially strong results from Worldwide General Insurance operations and Foreign Life & Retirement Services. Second quarter net income was a record $2.86 billion, up 25.7 percent over the second quarter of 2003. Excluding realized capital gains and losses, net income increased 19.2 percent to $3.00 billion. Shareholders' equity at June 30, 2004 was $73.6 billion, and assets increased to a record $736 billion."

946.     On August 9, 2004, AIG filed its Second Quarter 2004 Form 10-Q with the SEC. The Second Quarter 2004 10-Q was signed by Defendant Smith and certified to as accurate by Defendants Greenberg and Smith. ***AIG reported consolidated revenues of $23.8 billion and net income of $2.9 billion for the quarter ended June 30, 2004 and year to date revenues of $47.4 billion and net income of $5.5 billion for the six months ended June 30, 2004***. AIG's General Insurance business segment reported revenues of $10.4 billion, net premiums earned of $9.5 billion and operating income of $1.6 billion for the quarter ended June 30, 2004 and year to date revenues of $20.5 billion, net premiums earned of $18.7 billion and operating income of $3.1 billion for the six months ended June 30, 2004. AIG's Life Insurance business segment reported revenues of $10.5 billion GAAP premiums/premium income of $6.8 billion and operating income of $2.0 billion for the quarter ended June 30, 2004 and year to date revenues of $21.4 billion, GAAP premiums/premium income of $13.7 billion and operating income of $4.1 billion for the six months ended June 30, 2004.

947.     The Second Quarter 2004 10-Q also stated, in relevant part:

The 22.2 percent growth in revenues in first six months of 2004 was primarily attributable to the growth in net premiums earned from global General Insurance operations as well as growth in both General Insurance and Life Insurance Retirement Services net

investment income and GAAP Life Insurance Retirement Services premiums.

* * *

AIG's income before income taxes, minority interest and cumulative effect of an accounting change increased 36.6 percent in the first six months of 2004 when compared to the same period of 2003.  General Insurance and Life Insurance Retirement Services operating income gains, together with the decrease in realized capital losses, generated the increase over 2003 in both pretax income and net income.

* * *

AIG's General Insurance operations provide property and casualty products and services throughout the world.  ***The increase in General Insurance operating income in the first six months of 2004 compared to the same period of 2003 was primarily attributable to strong growth in operating income with respect to Domestic Brokerage Group and Foreign General operations.***

* * *

Overall, ***premium rates in the General Insurance business have continued to be strong both domestically and in key international markets***; however, a few foreign and domestic companies have exhibited pricing practices in the more difficult classes of long tail lines of business, which unsettle the market and add to long term volatility.  ***Both the Domestic Brokerage Group (DBG) and the Foreign General insurance group are benefitting from the flight to quality***.  AIG also continues to be able to modify and limit its contractual obligations by adding appropriate exclusions and policy restrictions.  AIG expects total premiums to increase in 2004 resulting in positive growth in cash flow for investments.

* * *

Like all AIG companies, DBG is benefiting from the flight to quality, a strong profit center focus and growing distribution channels.  Overall, DBG's net premiums written increased in the first six months of 2004 over 2003.  ***AIG believes that moderate premium rate increases will continue in 2004*** particularly with respect to long tail lines of business where the insurer's stability is critical to the insured. Based on historical patterns, AIG believes that overall growth in net premiums written will slow as competition for premiums increases in certain lines of business.

\*      \*      \*

The increase in General Insurance operating income in the first six months of 2004 was primarily attributable to strong profitable growth in DBG and Foreign General operations, the improvement in net investment income and the decline in realized capital losses relative to the same period of 2003.

***The contribution of General Insurance operating income to AIG's consolidated income before income taxes, minority interest and cumulative effect of an accounting change was 36.3 percent in the first six months of 2004 compared to 37.1 in the same period of 2003.***

\*      \*      \*

AIG is a major purchaser of reinsurance for its General Insurance operations. ***AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs.***

\*      \*      \*

AIG's consolidated general reinsurance assets amounted to $26.08 billion at June 30, 2004 and resulted from AIG's reinsurance arrangements.

\*      \*      \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations. ***AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities.  These reinsurance agreements have been approved by the appropriate regulatory authorities.***

\*      \*      \*

At June 30, 2004, General Insurance net loss reserves increased $4.13 billion from the prior year end to $40.78 billion.

948.    Pursuant to Section 302 of Sarbanes-Oxley Act of 2002, AIG's 10-Q, filed on

August 9, 2004, also included the following certification signed by Defendants Greenberg and

Smith:

1.      I have reviewed this Quarterly Report on Form 10-Q of American International Group, Inc.;

2.      ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.      ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)      [Omitted pursuant to SEC Release No. 33-8238];

    (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

949.    The 10-Q also contained the following certification by Defendants Greenberg and Smith:

1.     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

950.    Defendants' statements concerning AIG's financial results relating to the Second Quarter of 2004 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)     That during the Second Quarter of 2004, AIG executives were engaged in an illegal bid-rigging scheme;

(b)     That during the Second Quarter of 2004, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)     Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)    Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)     Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)     That during the Second Quarter of 2004, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)     That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)     That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Second Quarter of 2004 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess, "Top Level" adjustments and other directed entries; AIG's accounting for Life Settlements; the Company's failure to account for the deferred compensation provided by Defendant SICO; and AIG's hedge fund accounting.

951.    Defendants' statements concerning AIG's financial results for the Second Quarter of 2004 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

**21.    False and Misleading Statements
Relating to Third Quarter 2004**

952.    On October 21, 2004, AIG issued a press release entitled "AIG Reports Third

Quarter 2004 Net Income of $2.51 Billion ($0.95 Per Share) and Net Income Excluding Realized

Capital Gains and Losses of $2.54 billion ($0.97 Per Share)."  The press release stated, in

relevant part:

> American International Group, Inc. (AIG) today reported third
> quarter 2004 net income of $2.51 billion or $0.95 per share,
> compared to $2.34 billion or $0.89 per share in the third quarter of
> 2003.  Third quarter 2004 net income excluding realized capital
> gains (losses), was $2.54 billion or $0.97 per share, compared to
> $2.58 billion or $0.98 per share in the same period of 2003.
>
> *         *         *
>
> Net income for the first nine months of 2004 rose 22.3 percent to
> $8.03 billion or $3.05 per share, compared to $6.57 billion or $2.50
> per share in the first nine months of 2003.  For the first nine
> months of 2004, net income excluding realized capital gains
> (losses) and the cumulative effect of an accounting change
> increased 12.3 percent to $8.39 billion or $3.19 per share,
> compared to $7.46 billion or $2.84 per share in the same period of
> 2003.
>
> *         *         *
>
> Income before income taxes and minority interest for the third
> quarter of 2004 was $3.96 billion, a 13.0 percent increase over
> $3.50 billion in the third quarter of 2003.  Income before income
> taxes, minority interest and cumulative effect of an accounting
> change for the first nine months of 2004 was $12.64 billion, a 28.2
> percent increase over $9.86 billion in the same period of 2003.
>
> *         *         *
>
> ***Commenting on AIG's results, AIG Chairman, M.R. Greenberg
> said, "AIG had third quarter net income of $2.51 billion, up 7.5
> percent, even after accounting for the unprecedented succession
> of storms, which included four hurricanes and three typhoons.
> Excluding realized capital gains (losses) and catastrophe losses,
> net income in the third quarter of 2004 increased 16.5 percent
> over a year ago.  For the first nine months of 2004, net income***

*was a record $8.03 billion, up 22.3 percent.  Excluding realized
capital gains (losses), cumulative effect of an accounting change
and catastrophe losses, net income for the first nine months
increased 18.5 percent.*

\*     \*     \*

"General Insurance had a strong quarter in the U.S. and around the
world.  General Insurance operating income excluding realized
capital gains (losses) in the third quarter of 2004 was $894.3
million compared to $1.32 billion a year ago.  Excluding
catastrophe losses and realized capital gains (losses), General
Insurance operating income increased 17.5 percent.  Net premiums
written were a record $10.73 billion, up 19.7 percent over a year
ago.  The General Insurance combined ratio was 99.89, or 92.76
excluding catastrophe losses, compared to 93.05, or 92.17
excluding catastrophe losses, a year ago.

\*     \*     \*

*"At September 30, 2004, General Insurance net loss and loss
adjustment reserves totaled $43.82 billion, an increase of $3.04
billion ($2.30 billion excluding catastrophe losses) and $7.17
billion ($6.44 billion excluding catastrophe losses) for the third
quarter and nine months, respectively.*

*"In the United States, the Domestic Brokerage Group had
excellent premium growth of 20.6 percent in the third quarter.
We continue to benefit from a flight to quality in a number of key
lines of business.  Net premiums written were a record $6.19
billion.  The combined ratio was 101.76, or 94.95 excluding
catastrophe losses, compared to 94.78, or 93.74 excluding
catastrophe losses, in the third quarter of 2003."*

953.    On November 9, 2004, AIG filed its Third Quarter 2004 Form 10-Q with the

SEC.  The Third Quarter 2004 10-Q signed by Defendant Smith and certified to as accurate by

Defendants Greenberg and Smith.  *AIG reported consolidated revenues of $25.4 billion and net

income of $2.5 billion for the quarter ended September 30, 2004 and year to date revenues of

$72.9 billion and net income of $8.0 billion for the nine months ended September 30, 2004*.

AIG's General Insurance business segment reported revenues of $11.2 billion, net premiums

earned of $10.3 billion and operating income of $855 million for the quarter ended

September 30, 2004 and year to date revenues of $31.7 billion, net premiums earned of $29.0

billion and operating income of $4.0 billion for the nine months ended September 30, 2004.

AIG's Life Insurance business segment reported revenues of $11.2 billion, GAAP

premiums/premium income of $7.4 billion and operating income of $2.2 billion for the quarter

ended September 30, 2004 and year to date revenues of $32.6 billion, GAAP premiums/premium

income of $21.1 billion and operating income of $6.3 billion for the nine months ended

September 30, 2004.

> 954.  The Third Quarter 2004 10-Q also stated, in relevant part:

> > The 23.3 percent growth in revenues in the first nine months of
> > 2004 was primarily attributable to growth in net premiums earned
> > from global General Insurance operations as well as growth in both
> > General Insurance and Life Insurance Retirement Services net
> > investment income and GAAP Life Insurance Retirement Services
> > premiums.

> > *       *       *

> > AIG's income before income taxes, minority interest and
> > cumulative effect of an accounting change increased 28.2 percent
> > in the first nine months of 2004 when compared to the same period
> > of 2003.  General Insurance and Life Insurance Retirement
> > Services operating income gains, together with the decrease in
> > realized capital losses, generated the increase over 2003 in both
> > pretax income and net income.

> > *       *       *

> > AIG's General Insurance operations provide property and casualty
> > products and services throughout the world.  ***The increase in
> > General Insurance operating income in the first nine months of
> > 2004 compared to the same period of 2003 was primarily
> > attributable to strong growth in operating income with respect to
> > Domestic Brokerage Group operations***.

> > *       *       *

> > With respect to overall premium rates in the General Insurance
> > business, industry pricing has eroded in some classes of business.
> > Despite this, AIG believes it will still be able to identify profitable

business opportunities and build attractive new business as a result of AIG's broad product line and extensive distribution reach. Both the Domestic Brokerage Group (DBG) and the Foreign General insurance group are benefitting from the flight to quality. AIG also continues to be able to modify and limit its contractual obligations by adding appropriate exclusions and policy restrictions. **AIG expects total premiums to increase in 2004 resulting in positive growth in cash flow for investments**.

\* \* \*

Like all AIG companies, DBG is benefiting from the flight to quality, a strong profit center focus and growing distribution channels. Overall, DBG's net premiums written increased in the first nine months of 2004 over 2003. **AIG believes that moderate premium rate increases will continue in 2004** particularly with respect to long tail lines of business where the insurer's stability is critical to the insured.

\* \* \*

**The increase in General Insurance operating income in the first nine months of 2004 was primarily attributable to strong profitable growth in DBG operations**, the improvement in net investment income and the capital gains realized in 2004 rather than the capital losses realized in 2003.

**The contribution of General Insurance operating income to AIG's consolidated income before income taxes, minority interest and cumulative effect of an accounting change was 31.7 percent in the first nine months of 2004 compared to 36.5 percent in the same period of 2003**. The decrease in the contribution percentage in 2004 was influenced by the impact of the catastrophe losses.

\* \* \*

AIG is a major purchaser of reinsurance for its General Insurance operations. **AIG is cognizant of the need to exercise good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs**.

\* \* \*

AIG's consolidated general reinsurance assets amounted to $25.44 billion at September 30, 2004 and resulted from AIG's reinsurance arrangements.

\* \* \*

AIG enters into certain intercompany reinsurance transactions for its general and life operations. *AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various legal entities. These reinsurance agreements have been approved by the appropriate regulatory authorities.*

\*      \*      \*

At September 30, 2003, General Insurance net loss reserves increased $7.17 billion from the prior year end to $43.82 billion.

955.    Pursuant to Section 302 of Sarbanes-Oxley Act of 2002, AIG's 10-Q, filed on November 9, 2004, also included the following certification signed by Defendants Greenberg and Smith:

1.      I have reviewed this Quarterly Report on Form 10-Q of American International Group, Inc.;

2.      *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.      *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      [Omitted pursuant to SEC Release No. 33-8238];

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

956.     The 10-Q also contained the following certification by Defendants Greenberg and Smith:

1.     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

957.     Defendants' statements concerning AIG's financial results relating to the Third Quarter of 2004 were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)      That during the Third Quarter of 2004, AIG executives were engaged in an illegal bid-rigging scheme;

(b)      That during the Third Quarter of 2004, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)      Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)      Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)      Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)      That during the Third Quarter of 2004, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)      That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)      That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities.

(f)     That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Third Quarter of 2004 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to: AIG's reinsurance agreements with Defendant Union Excess, "Top Level" adjustments and other directed entries; AIG's accounting for Life Settlements; the Company's failure to account for the deferred compensation provided by Defendant SICO; and AIG's hedge fund accounting.

958.    Defendants' statements concerning AIG's financial results for the Third Quarter of 2004 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 22.     False and Misleading Statements Relating to Fourth Quarter and Year-End 2004

959.    On February 9, 2005, AIG issued a press release entitled, "AIG Reports Record 2004 Net Income of $11.05 billion - $4.19 Per Share – An Increase of 19.1 Percent Over 2003." The press release stated in relevant part:

> ***American International Group, Inc. (AIG) today reported that its net income for the full year 2004 increased 19.1 percent to a record $11.05 billion or $4.19 per share, compared to $9.27 billion or $3.52 per share in 2003.***  Net income excluding realized capital gains (losses) and cumulative effect of accounting changes was $11.46 billion or $4.35 per share, compared to $10.22 billion or $3.88 per share in 2003.
>
> *            *            *
>
> Net income for the fourth quarter of 2004 rose 11.5 percent to $3.02 billion or $1.15 per share, compared to $2.71 billion or $1.03 per share in the fourth quarter of 2003.  For the fourth quarter 2004, net income excluding realized capital gains  (losses) and the cumulative effect of an accounting change increased 11.6 percent to $3.07 billion or $1.17 per share, compared to $2.75 billion or $1.05 per share in the same period of 2003.
>
> *            *            *

Income before income taxes, minority interest and cumulative effect of accounting changes for the full year 2004 was $17.25 billion, a 24.0 percent increase over $13.91 billion in 2003. Income before income taxes, minority interest and cumulative effect of an accounting change for the fourth quarter of 2004 was $4.61 billion, a 13.9 percent increase over $4.05 billion in the same period of 2003.

*      *      *

Commenting on these results, AIG Chairman M. R. Greenberg said, "AIG earned record net income in 2004, even after accounting for the unprecedented devastation from the hurricanes, typhoons, earthquake and tsunami in the second half of the year, which affected the entire industry. In addition, *AIG took a charge of $53.0 million after-tax in the fourth quarter in connection with the previously reported settlement reached concerning the Brightpoint and PNC transactions and related matters. The amount of this charge reflects the fact that part of the total cost of the settlement was borne by the AIG Financial Products Corp. incentive compensation pool*.

"The diversification of AIG – with its four principal business segments, multiple profit centers and broad geographic presence throughout the world – was an especially valuable strength for AIG in 2004.  When one or more businesses does not meet our expectations for reasons such as catastrophe losses, market changes or other issues, we have several other profit centers that perform at or above expectations that can enable us to meet our overall objectives.  Our ability to absorb $682.7 million in catastrophe losses, tackle challenging regulatory issues and navigate through a volatile global economic and political environment and still achieve record net income is a testament to the diversity and strength of our franchise.  This diversification, coupled with our unsurpassed capital base, is also a pillar of financial security for our customers."

"AIG has also taken several steps in response to the regulatory issues that we faced in 2004.  We are implementing the settlements of the Brightpoint and PNC transactions. In addition, AIG has been continuing to cooperate with state attorneys general and insurance departments in connection with their investigations of certain practices of brokers and insurers. Approximately 40 outside attorneys have assisted us in our internal review, and they have examined in excess of 850,000 e-mails and 30,000 documents. *Based on all of the information we have today, we continue to believe that the issue that has been the primary focus of the New*

*York Attorney General's investigation of AIG is confined to one broker relationship and one unit, the Excess Casualty Division of American Home Assurance Company."*

"*We will continue to do whatever it takes to assure that every one of our 92,000 employees upholds the highest ethical standards.* AIG has formed a Complex Structured Finance Transaction Committee comprised of senior executives from the businesses and from the finance, legal and claims functions to review certain proposed transactions. Since April, AIG Financial Products Corp. has also had its own Transaction Review Committee."

"In order to provide the highest standards of risk management throughout the organization, we brought together our credit, market and operational risk management capabilities into one Enterprise Risk Management department, which is led by a senior executive who brings nearly 30 years of experience to the function."

"Also, we have augmented on a worldwide basis, in several different languages, our ethics education program to reinforce the standards set forth in our Code of Conduct. We have enhanced the role of the Chief Compliance Officer, who has the support of 250 compliance officers around the world.  Employees have a Compliance Help Line they can contact that is accessible in more than 70 languages."

"Although we are giving these issues our full attention, they have not distracted us from managing our businesses, serving our customers and performing for our shareholders."

*       *       *

*Throughout this press release, AIG presents its operations in the way it believes will be most meaningful and useful, as well as most transparent, to the investing public and others who use AIG's financial information in evaluating the performance of AIG.* That presentation includes the use of certain non GAAP measures.  In addition to the GAAP presentations of net income and operating income, AIG shows both net income and operating income exclusive of realized capital gains (losses), catastrophe losses and the settlement charge.

960.    Defendants' statements concerning AIG's financial results relating to the Fourth

Quarter and year-end 2004 were each false and misleading when made because they

misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

(a)      That during the Fourth Quarter and year-end 2004, AIG executives were engaged in an illegal bid-rigging scheme;

(b)      That during the Fourth Quarter and year-end 2004, AIG derived a substantial portion of its revenues and profits from its participation in the illegal bid-rigging scheme, based on the scheme having:

(i)      Defrauded AIG's customers into believing that the bids they received were honest, legitimate and competitive;

(ii)      Illegally increased the prices that customers paid for premiums, resulting in a "firming" or "strengthening" of the premium prices that customers paid; and

(iii)      Illegally "protected" AIG's business from competition by virtually guaranteeing that AIG's policy-holders would renew their coverage with AIG while paying higher premiums than they would have if there had truly been competitive bidding in the insurance marketplace;

(c)      That during the Fourth Quarter and year-end 2004, AIG derived a substantial portion of its revenues and profits from the Company's payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices;

(d)      That by concealing these "contingent commissions," AIG and the Defendants violated applicable principles of fiduciary law, subjecting AIG to potentially enormous fines and penalties;

(e)     That AIG falsely inflated its earnings and reserves using improper "finite" or "non-traditional" reinsurance transactions and other techniques that violated GAAP and were not approved by the appropriate regulatory authorities;

(f)     AIG's Fourth Quarter 2004 net income and shareholders' net equity as of December 31, 2004 were both overstated by $850 million each relating to asbestos and environmental reserves;

(g)     That AIG's net income, revenues, shareholders' equity and other key financial measures were overstated for the Fourth Quarter and fiscal year 2004 as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to:  AIG's reinsurance agreements with Defendant Union Excess, "Top Level" adjustments and other directed entries; AIG's accounting for Life Settlements; the Company's failure to account for the deferred compensation provided by Defendant SICO; and AIG's hedge fund accounting.

(h)     Defendants' statements concerning AIG's financial results for the Fourth Quarter and fiscal year 2004 were also false and misleading because AIG's financial statements violated GAAP for the reasons set forth below in paragraphs 961 through 976.

### 23.     GAAP Violations

961.     AIG's financial statements and public statements about the Company's financial condition violated GAAP and SEC rules by failing to properly report and disclose the illegal nature of the Company's revenues and its improper accounting for numerous key transactions during the Class Period.

962.     These financial statements, and the statements about them, were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of AIG's operations due to the Company's improper

accounting for and disclosures about, *inter alia*, its revenues, net income, shareholders' equity and claims reserves, in violation of GAAP and SEC rules.

963.    Rather, AIG manipulated its financial statements by recording premiums and fees to which it was not legally entitled, which revenues may be forfeited – via restitution, fines, judgments and associated costs therewith – and which artificially inflated AIG's revenue and income.  In addition, AIG violated GAAP by entering into reinsurance contracts, with both affiliated and unaffiliated entities, that failed to transfer "significant risk" and therefore should have been accounted for as loans under GAAP.

964.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

965.    For the years ended December 31, 1999, 2000, 2001, 2002 and 2003, PwC issued unqualified opinions on AIG's financial statements, which stated that AIG's financial statements prepared by AIG's management, were prepared in accordance with GAAP.  In fact, it is now clear that they were not.  AIG violated numerous GAAP provisions in issuing false and fraudulent financial statements.

966.    Specifically, *SFAS 113 – Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts*, is a key GAAP provision that governs the accounting by

insurance enterprises for reinsurance contracts.  Generally, SFAS 113 applies to all reinsurance contracts entered into after December 15, 1992.

967.    Under SFAS 113 ¶¶ 9, 11, 62-63, for Short Duration Contracts (property and casualty contracts) covering prospective reinsurance, future occurrences, to qualify for favorable accounting treatment requires both of the following:

        (a)    The reinsurer must assume significant insurance risk, and

        (b)    It must be reasonably possible that the reinsurer may realize a significant loss from the transaction or the reinsurer assumes substantially all of the insurance risk relating to the reinsured portions of the underlying contracts.

968.    Reinsurance contracts that do not transfer sufficient risk are classified as deposits or loans.

969.    Implicit in an entity assuming risk is the requirement that both the amount and timing of the reinsurer's payment depend on and directly vary with the amount and timing of claims settled under reinsured contracts.

970.    SFAS 113 does not specifically provide guidance on how to determine exposure to a significant loss.  However, for short-duration contracts significance of loss shall be evaluated by comparing the present value of all cash flows to a reinsurance contract.

971.    For long-duration contracts, SFAS 113 ¶ 12, states that the reinsurance contract must subject the reinsurer to the reasonable possibility of significant loss.  SFAS 113 further states that a reinsurance contract that fails to subject a reinsurer to the reasonable possibility of a significant loss should be accounted for as a financing arrangement or a loan.

972.    SFAS No. 5 – Accounting for Contingencies states in ¶ 44 as follows:

> To the extent that an insurance contract or reinsurance contract
> does not, despite its form, provide for indemnification of the

> insured or the ceding company by the insurer or reinsurer against
> loss or liability, the premium paid less the amount of the premium
> to be retained by the insurer or reinsurer shall be accounted for as a
> deposit by the insured or the ceding company … but if, regardless
> of form, their substance is that all or part of the premium paid by
> the insured or the ceding company is a deposit, it shall be
> accounted for as such.

973.    Although SFAS 113 does not make specific reference to finite risk insurance *per se*, it is generally accepted that it governs the accounting for both finite risk insurance and reinsurance.

974.    Due to the accounting improprieties described herein, AIG presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    *APB Opinion No. 9 – Reporting the Results of Operations*.  APB Opinion No. 9 requires companies to accurately present the financial results of the corporation's operations, and to disclose net income as a reflection of all items of profit and loss recognized during the period;

(b)    *SFAS No. 130 – Reporting Comprehensive Income.*  SFAS Statement No. 130 requires companies to accurately state the income received by the corporation in a reported period.  This Statement establishes standards for the reporting of comprehensive income and its components in a full set of general-purpose financial statements;

(c)    *Statement of Financial Accounting Concepts No. 1 – Objectives of Financial Reporting by Business Enterprises.*  Statement of Financial Accounting Concepts No. 1 provides that the goal of financial reporting is that of transparency and reliability.  Financial reporting should provide information to aid present and potential investors, creditors and other users of financial statements in assessing the amounts, timing, and uncertainty of prospective cash receipts.  Since investors' and creditors' cash flows are related to enterprise cash flows,

financial reporting must provide information sufficient to enable creditors, investors, and other users of financial statements to evaluate the cash flows of the reporting enterprise;

(d)     *Statement of Financial Accounting Concepts No. 1 – Objectives of Financial Reporting by Business Enterprises.*  Statement of Financial Accounting Concepts No. 1 states that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions;

(e)     *Statement of Financial Accounting Concepts No. 1 – Objectives of Financial Reporting by Business Enterprises.*  Statement of Financial Accounting Concepts No. 1 states that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources;

(f)     *Statement of Financial Accounting Concepts No. 1 – Objectives of Financial Reporting by Business Enterprises.*  Statement of Financial Accounting Concepts No. 1 states that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance;

(g)     *Statement of Financial Accounting Concepts No. 1 – Objectional Financial Reporting by Business Enterprises.*  Statement of Financial Accounting Concepts No. 1 states that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of

enterprise resources entrusted.  To the extent that management offers securities of the enterprise

to the public, it voluntarily accepts wider responsibilities for accountability to prospective

investors and to the public in general;

      (h)      *Statement of Financial Accounting Concepts No. 1 – Objectional*

*Financial Reporting by Business Enterprises.*  Statement of Financial Accounting Concepts

No. 1 states that financial reporting should be reliable, in that it represents what it purports to

represent.  That information should be reliable as well as relevant is a notion that is central to

accounting;

      (i)      *Statement of Financial Accounting Concepts No. 2 – Qualitative*

*Characteristics of Accounting Information – Reliability/Representational Faithfulness.*

Statement of Financial Accounting Concepts No. 2 provides that a company's financial

statements must be reliable, transparent, truthful, and accurately reflect the financial performance

of the company;

      (j)      *Statement of Financial Accounting Concepts No. 2 – Qualitative*

*Characteristics of Accounting Information – Reliability/Representational Faithfulness.*

Statement of Financial Accounting Concepts No. 2 addresses the principle of completeness,

which means that nothing is left out of the information that may be necessary to insure that it

validly represents underlying events and conditions;

      (k)      *Statement of Financial Accounting Concepts No. 2 – Qualitative*

*Characteristics of Accounting Information – Reliability/Representational Faithfulness.*

Statement of Financial Accounting Concepts No. 2 states that conservatism be used as a prudent

reaction to uncertainty to try to insure that uncertainties and risks inherent in business situations

are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent; and

(l)     *Statement of Financial Accounting Concepts No. 5 – Recognition and Measurement in Financial Statements of Business Enterprises.*  Statements of Financial Accounting Concepts No. 5 provides generally that the revenue recognized by a corporation in its financial statements must accurately reflect the business operations of the company.

975.     By issuing intentionally false and misleading financial statements, AIG and the AIG Defendants violated all of these principles.

976.     Further, the undisclosed adverse information concealed by Defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**B.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN CONNECTION WITH AIG'S ACQUISITIONS OF HSB GROUP AND AMERICAN GENERAL**

**1.     Defendants' False and Misleading Statements in Connection With AIG's Acquisition of HSB Group**

977.     As alleged above, in connection with AIG's acquisition of HSB Group, on September 15, 2000, AIG filed with the SEC the HSB Group Registration Statement, which included a Joint Proxy Statement/Prospectus.  The HSB Group Registration Statement stated, in relevant part:

> The selected financial data of AIG as of and for the years dated December 31, 1999, 1998, and 1997 … has been derived from consolidated financial statements of AIG, which have been audited by PricewaterhouseCoopers LLP, independent auditors, and incorporated by reference in this proxy statement/prospectus.

\*       \*       \*

> The selected consolidated financial data of AIG as of and for the
> six months ended June 30, 2000 and June 30, 1999 has been
> derived from unaudited, consolidated financial statements filed
> with the Commission and incorporated by reference in this proxy
> statement/prospectus . . . .

978.   As alleged above, AIG restated its financial statements for 2000.  Thus, its

financial results for the first two quarters of that year, which were incorporated into the HSB

Group Registration Statement, contained materially false information.  Additionally, the

materially false and misleading statements contained in AIG's 1999 and 2000 Form 10-Ks,

alleged *supra* at paragraphs 818 through 822 and 843 through 846, respectively, were also

incorporated into the HSB Group Registration Statement.   Likewise, AIG's 1998 Form 10-K –

also incorporated into the HSB Group Registration Statement – contained false and misleading

statements at least with respect to shareholders' equity and retained earnings stemming from the

Company's inappropriate accounting for Domestic Brokerage Group reserves, SICO deferred

compensation, and reinsurance agreements with Defendants Union Excess and Richmond, as

alleged *supra* at paragraphs 606 through 610.

979.   Moreover, the materially false and misleading statements contained in AIG's First

and Second Quarter 2000 10-Qs, alleged *supra* at paragraphs 829 and 830, and 834 and 835,

respectively, were also incorporated into the HSB Group Registration Statement.

**2.     Defendants' False and Misleading Statements in Connection With
AIG's Acquisition of American General**

980.   As alleged above, in connection with AIG's acquisition of American General, on

or about September 15, 2001, AIG filed with the SEC the American General Registration

Statement, which included a Joint Proxy Statement/Prospectus.  The American General

Registration Statement stated, in relevant part:

> The selected consolidated financial data of AIG as of and for the
> years ended December 31, 2000, 1999 and 1998 have been derived
> from consolidated financial statements of AIG, which have been
> audited by PricewaterhouseCoopers LLP, independent
> accountants, and are incorporated by reference in this proxy
> statement/prospectus.
>
> *    *    *
>
> The selected consolidated financial data of AIG as of and for the
> three months ended March 31, 2001 and March 31, 2000 have
> been derived from unaudited consolidated financial statements
> filed by AIG with the SEC and are incorporated by reference in
> this proxy statement/prospectus . . . .

981.    As alleged above, AIG restated its financial statements for 2000 and 2001.  Thus,
AIG's financial results for 2000 and the first quarter of 2001, which were incorporated into the
American General Registration Statement, contained materially false information.  Additionally,
the materially false and misleading statements contained in AIG's 1999 and 2000 Form 10-Ks,
alleged *supra* at paragraphs 818 through 822 and 843 through 846, respectively, were also
incorporated into the American General Registration Statement.  Likewise, AIG's 1998 Form 10-
K – also incorporated into the American General Registration statement – contained false and
misleading statements at least with respect to shareholders' equity and retained earnings
stemming from the Company's inappropriate accounting for Domestic Brokerage Group
reserves, SICO deferred compensation, and reinsurance agreements with Defendants Union
Excess and Richmond, as alleged *supra* at paragraphs 606 through 610.

982.    Moreover, the materially false and misleading statements contained in AIG's First
Quarter 2000 and First Quarter 2001 10-Qs, alleged *supra* at paragraphs 829 and 830, and 855
and 856, respectively, were also incorporated into the American General Registration Statement.

### C.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN CONNECTION WITH AIG'S BOND OFFERINGS

983.   During the Class Period, AIG issued several bonds.  Each of the Registration Statements and Prospectuses pursuant to which those bonds were issued contained false and misleading statements, as alleged herein.

### 1.   Zero Coupon Convertible Senior Debentures

984.   As alleged above, on or about November 9, 2001, AIG issued $1.5 billion worth of Zero Coupon Convertible Senior Debentures due November 9, 2031.  AIG issued these bonds pursuant to a Registration Statement and Prospectus that was filed with the SEC on November 7, 2001 and became effective on November 7, 2001.

985.   The Registration Statement and Prospectus incorporates by reference the following:  AIG's Annual Report on Form 10-K for the year ended December 31, 2000; AIG's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2001 and June 30, 2001; and AIG's Current Reports on Form 8-K, dated August 29, 2001, September 18, 2001, October 9, 2001 and November 6, 2001.

986.   The Registration Statement and Prospectus also stated:

> The consolidated financial statements and financial statement schedules of American International Group, Inc. at December 31, 2000 and 1999 for the three-year period ended December 31, 2000 included in AIG's Annual Report on Form 10-K for the fiscal year December 31, 2000 and incorporated by reference in this prospectus have been audited by PricewaterhouseCoopers LLP, independent accountants, as stated in their report, which is incorporated herein by reference.  Those consolidated financial statements and financial statement schedules are incorporated herein by reference in reliance upon their report given upon the authority of that firm as experts in accounting and auditing.

> The supplemental consolidated financial statements and financial statement schedules of American International Group, Inc. at December 31, 2000 and 1999 and for the three-year period ended December 31, 2000 included in AIG's Current Report on Form 8-

> K, dated October 9, 2001, and incorporated by reference in this prospectus have been audited by PricewaterhouseCoopers LLP, independent accountants, as stated in their report, which is incorporated herein by reference in reliance upon their report given upon the authority of that firm as experts in accounting and auditing.

987.   As alleged above, AIG restated its financial statements for the year 2000.  Thus, AIG's financial results for the year 2000, which were incorporated by reference into the Registration Statement and Prospectus, contained materially false information.  Additionally, the materially false and misleading statements contained in AIG's 1999 and 2000 Form 10-Ks, alleged *supra* at paragraphs 818 through 822 and 843 through 846, respectively, and in AIG's October 9, 2001 and November 6, 2001 Form 8-Ks, alleged *supra* at paragraphs 848 through 850, and 864 and 865, respectively, were also incorporated into the Registration Statement and Prospectus.

988.   Moreover, the materially false and misleading statements contained in AIG's First Quarter 2001 and Second Quarter 2001 Form 10-Qs, as alleged *supra* at paragraphs 829 and 830, and 855 and 856, respectively, were also incorporated into the Registration Statement and Prospectus.

**2.      0.5% Cash Exchangeable Equity-Linked Senior Notes**

989.   As alleged above, on or about May 11, 2000, AIG issued $210 million worth of 0.5% Cash Exchangeable Equity-Linked Senior Notes due May 15, 2007.  AIG issued these bonds pursuant to (1) a Shelf Registration Statement that was filed with the SEC on or about February 24, 2000; (2) a Prospectus dated March 3, 2000; and (3) a Prospectus Supplement that was filed with the SEC on May 10, 2000 and had become effective on May 8, 2000.

990.    The Shelf Registration Statement incorporates by reference certain of AIG's already-filed SEC filings, as well as the Company's subsequent SEC filings made until the bonds are sold:

> The SEC allows AIG to "incorporate by reference" the information AIG files with the SEC, which means that AIG can disclose important information to you by referring to those documents. The information incorporated by reference is considered to be part of this prospectus, and later information that AIG files with the SEC will automatically update and supersede that information as well as the information included in this prospectus. AIG incorporates by reference the documents listed in the accompanying box and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until all the debt securities are sold. This prospectus is part of a registration statement AIG filed with the SEC.

991.    The SEC filings listed in the "accompanying box" that are specifically incorporated by reference are AIG's:  Annual Report on Form 10-K for the year ended December 31, 1998; Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999, June 30, 1999 and September 30, 1999; and Current Report on Form 8-K dated June 3, 1999, as amended.

992.    The Shelf Registration Statement also stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 1998 and AIG's Current Report on Form 8-K dated June 3, 1999, as amended, have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

993.    Like the Shelf Registration Statement, AIG's March 3, 2000 Prospectus incorporates by reference certain of AIG's already-filed SEC filings, as well as the Company's subsequent SEC filings made until the bonds are sold:

> The SEC allows AIG to "incorporate by reference" the information AIG files with the SEC, which means that AIG can disclose important information to you by referring to those documents. The information incorporated by reference is considered to be part of this prospectus, and later information that AIG files with the SEC will automatically update and supersede that information as well as the information included in this prospectus. AIG incorporates by reference the documents listed in the accompanying box and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until all the debt securities are sold. This prospectus is part of a registration statement AIG filed with the SEC.

994.    The SEC filings listed in the "accompanying box" that are specifically incorporated by reference are AIG's:  Annual Report on Form 10-K for the year ended December 31, 1998; Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999, June 30, 1999 and September 30, 1999; and Current Report on Form 8-K dated June 3, 1999, as amended.

995.    The March 3, 2000 Prospectus also stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 1998 and AIG's Current Report on Form 8-K dated June 3, 1999, as amended, have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

996.    The May 8, 2000 Prospectus Supplement stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated into the prospectus accompanying this prospectus supplement by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 1999 have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

997.     Pursuant to the Shelf Registration Statement and March 3, 2000 Prospectus and Prospectus Supplement, also incorporated by reference in this offering was AIG's Annual Report on Form 10-K for the year ended December 31, 1999.

998.     The materially false and misleading statements contained in AIG's Third Quarter 1999 Form 10-Q and 1999 Form 10-K, as alleged *supra* at paragraphs 813 and 814, and 818 through 822, respectively, were incorporated into the Registration Statement and Prospectus.

### 3.     2.85% Medium-Term Notes, Series F

999.     As alleged above, on or about December 2, 2002, AIG issued $500 million worth of 2.85% Medium-Term Notes, Series F due December 1, 2005.  AIG issued these bonds pursuant to, *inter alia*, (1) a Shelf Registration Statement that was filed with the SEC on or about February 24, 2000; (2) a Prospectus dated March 3, 2000; (3) a Prospectus Supplement that was filed with the SEC on January 30, 2001 and had become effective on January 26, 2001; (4) a Prospectus Supplement filed with the SEC on August 7, 2001; and (4) two Pricing Supplements and a Prospectus Supplement that were filed with the SEC on November 27, 2002.

1000.   The Shelf Registration Statement incorporates by reference certain of AIG's already-filed SEC filings, as well as the Company's subsequent SEC filings made until the bonds are sold:

> The SEC allows AIG to "incorporate by reference" the information AIG files with the SEC, which means that AIG can disclose important information to you by referring to those documents.  The information incorporated by reference is considered to be part of this prospectus, and later information that AIG files with the SEC will automatically update and supersede that information as well as the information included in this prospectus.  AIG incorporates by reference the documents listed in the accompanying box and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until all the debt securities are sold.  This prospectus is part of a registration statement AIG filed with the SEC.

1001.   The SEC filings listed in the "accompanying box" that are specifically incorporated by reference are AIG's:  Annual Report on Form 10-K for the year ended December 31, 1998; Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999, June 30, 1999 and September 30, 1999; and Current Report on Form 8-K dated June 3, 1999, as amended.

1002.   The Shelf Registration Statement also stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 1998 and AIG's Current Report on Form 8-K dated June 3, 1999, as amended, have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

1003.   Like the Shelf Registration Statement, AIG's March 3, 2000 Prospectus incorporates by reference certain of AIG's already-filed SEC filings, as well as the Company's subsequent SEC filings made until the bonds are sold:

> The SEC allows AIG to "incorporate by reference" the information AIG files with the SEC, which means that AIG can disclose important information to you by referring to those documents.  The information incorporated by reference is considered to be part of this prospectus, and later information that AIG files with the SEC will automatically update and supersede that information as well as the information included in this prospectus.  AIG incorporates by reference the documents listed in the accompanying box and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until all the debt securities are sold.  This prospectus is part of a registration statement AIG filed with the SEC.

1004.   The SEC filings listed in the "accompanying box" that are specifically incorporated by reference are AIG's:  Annual Report on Form 10-K for the year ended December 31, 1998; Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999,

June 30, 1999 and September 30, 1999; and Current Report on Form 8-K dated June 3, 1999, as amended.

      1005.   The March 3, 2000 Prospectus also stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 1998 and AIG's Current Report on Form 8-K dated June 3, 1999, as amended, have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

      1006.   Pursuant to the Shelf Registration Statement, March 3, 2000 Prospectus and Prospectus Supplements filed with the SEC on January 30, 2001 and August 7, 2001, also incorporated by reference in this offering were AIG's Annual Reports on Form 10-K for the years ended December 31, 1999, December 31, 2000 and December 31, 2001.

      1007.   As alleged above, AIG restated its financial statements for the years 2000 and 2001.  Thus, AIG's financial results for those two years, which were incorporated into the Registration Statement, Prospectus and Prospectus Supplements, contained materially false information.  Additionally, the materially false and misleading statements contained in AIG's 1999, 2000 and 2001 Form 10-Ks, alleged *supra* at paragraphs 818 through 822, 843 through 846, and 872 through 876 respectively, were also incorporated into the Registration Statement, Prospectus and Prospectus Supplements.

      1008.   Moreover, the materially false and misleading statements contained in AIG's Third Quarter 1999 Form 10-Q, as alleged *supra* at paragraphs 813 and 814, were also incorporated into the Registration Statement, Prospectus and Prospectus Supplements.

4.        **2.875% Notes**

1009.   As alleged above, on or about March 23, 2004, AIG announced an offer to exchange $500 million worth of 2.875% Notes 144A securities for an equal amount of registered, like coupon bonds, with a maturity date of May 15, 2008.  AIG issued these bonds pursuant to a Registration Statement and Prospectus that was filed with the SEC on March 22, 2004 and became effective on April 20, 2004.

1010.   The Registration Statement and Prospectus incorporates by reference AIG's Annual Report on Form 10-K for the year ended December 31, 2003.

1011.   Moreover, the Registration Statement and Prospectus presented selected financial data from the fiscal years 2000 through 2003 that "should be read in conjunction with the financial statements and accompanying notes included in AIG's Annual Report on Form 10-K for the year ended December 31, 2003, which is incorporated by reference herein."   The selected financial data presented for fiscal years 2000 through 2003 include, *inter alia*, AIG's revenue, net income and shareholders' equity.

1012.   The Registration Statement and Prospectus also stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 2003 have been incorporated in reliance on the report by PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

1013.   As alleged above, AIG restated its financial statements for the years 2000 through 2003.  Thus, AIG's financial results for 2003, which were incorporated into the Registration Statement and Prospectus, contained materially false information.  Moreover, the selected financial data concerning AIG's revenue, net income and shareholders' equity from 2000 through 2003 presented in the Registration Statement and Prospectus was materially false.

Additionally, the materially false and misleading statements contained in AIG's 2003 Form 10-K, alleged *supra* at paragraphs 929 through 932, were also incorporated into the Registration Statement and Prospectus.

### 5.    4.25% Notes

1014.   As alleged above, on or about March 23, 2004, AIG announced an offer to exchange $1.0 billion worth of 4.25% Notes 144A securities for an equal amount of registered, like coupon bonds, with a maturity date of May 15, 2013.  AIG issued these bonds pursuant to a Registration Statement and Prospectus that was filed with the SEC on March 22, 2004 and became effective on April 20, 2004.

1015.   The Registration Statement and Prospectus incorporates by reference AIG's Annual Report on Form 10-K for the year ended December 31, 2003.

1016.   Moreover, the Registration Statement and Prospectus presented selected financial data from the fiscal years 2000 through 2003 that "should be read in conjunction with the financial statements and accompanying notes included in AIG's Annual Report on Form 10-K for the year ended December 31, 2003, which is incorporated by reference herein."  The selected financial data presented for fiscal years 2000 through 2003 include, *inter alia*, AIG's revenue, net income and shareholders' equity.

1017.   The Registration Statement and Prospectus also stated:

> The consolidated financial statements and financial statement schedules of AIG and its subsidiaries incorporated in this prospectus by reference to AIG's Annual Report on Form 10-K for the year ended December 31, 2003 have been incorporated in reliance on the report by PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in auditing and accounting.

1018.   As alleged above, AIG restated its financial statements for the years 2000 through 2003.  Thus, AIG's financial results for 2003, which were incorporated into the Registration

Statement and Prospectus, contained materially false information.  Moreover, the selected

financial data concerning AIG's revenue, net income and shareholders' equity from 2000

through 2003 presented in the Registration Statement and Prospectus was materially false.

Additionally, the materially false and misleading statements contained in AIG's 2003 Form 10-

K, alleged *supra* at paragraphs 929 through 932, were also incorporated into the Registration

Statement and Prospectus.

### D.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ABOUT GOVERNMENT INVESTIGATIONS

1019.   On January 30, 2002, AIG disseminated a press release that stated, in relevant

part, and with emphasis added:

> American International Group, Inc. (AIG) has confirmed that its
> subsidiary, AIG Financial Products Corp., entered into three
> structured transactions with The PNC Financial Services Group,
> Inc. (PNC).
>
> PNC has reported that it relied on advice from its independent
> auditors concerning the accounting treatment of these transactions.
>
> The entities involved in these transactions were consolidated into
> AIG's financial statements, and thus were included on AIG's
> consolidated balance sheet.  ***AIG has not entered into any other
> transactions using this structure***.

1020.   AIG's statement that "AIG has not entered into any other transactions using this

structure," was false and misleading at the time it was made because AIG had entered into *five*

other similar transactions with two other counter-parties.

1021.   On September 21, 2004, AIG issued a press release that stated, in relevant part:

> AIG and its subsidiary AIG Financial Products Corp. (AIG-FP)
> have been informed by the Staff of the Securities and Exchange
> Commission (SEC) that the Staff is considering recommending
> that the SEC bring a civil action against AIG and AIGFP alleging
> violations of the federal securities laws.  The Staff's
> communication, commonly referred to as a "Wells Notice," arises
> out of the SEC's investigation entitled In the Matter of PNC

Financial Services Group, Inc. (PNC), and involves certain transactions marketed by AIG-FP prior to 2003, including three transactions entered into by a subsidiary of AIG-FP between June 2001 and November 2001. The PNC transactions were the subject of an SEC action against PNC in 2002, and were terminated early the next year.

AIG and AIG-FP believe that the proposed action would be unwarranted and will respond to the Staff.

1022.  Like AIG's January 30, 2002 press release, this statement was false and misleading at the time it was made because, by identifying only the PNC transactions, the September 21, 2004 press release provided investors with the false impression that the government was only investigating AIG's dealings with PNC. However, as alleged above, the government was also investigating five additional transactions that AIG had entered into with two other counter-parties.

1023.  On September 29, 2004, AIG issued a press release that stated, in relevant part:

[AIG] announced that its subsidiary AIG Financial Products Corp. (AIG-FP) has been informed by the U.S. Department of Justice that it is a target of an investigation involving possible violations of the federal securities laws. AIG believes that this notification relates to substantially the same matter described in its announcement last week that the Securities and Exchange Commission Staff is considering recommending that the Commission bring a civil action alleging violations of the federal securities laws.

AIG believes that any action by either the SEC or Justice Department would be unwarranted. AIG intends to cooperate with this investigation.

1024.  This statement was false and misleading at the time it was made for the same reasons alleged above in paragraphs 1020 and 1022.

## VIII.   DEFENDANT PwC's PARTICIPATION IN THE
## FRAUD AND FALSE AND MISLEADING AUDIT REPORTS

1025.   Defendant PwC intentionally or recklessly allowed AIG to file financial statements that did not comply with GAAP.

1026.   AIG is one of PwC's largest and most lucrative clients.  According to AIG's Proxy Statements filed annually with the SEC, AIG paid PwC $44.8 million for services in 2003, $35.9 million of which was for audit and audit-related services; $39.5 million for services in 2002, $31 million of which was for audit and audit-related services; $26.9 million for services in 2001, $15.5 million of which was for audit and audit-related services; and $25.4 million for services in 2000, $14.9 million of which was audit and audit related services.  Cumulatively, AIG paid PwC $136.6 million for services rendered between 2000 and 2003, $97.3 million of which was for audit and audit-related services.

1027.   PwC's receipt of substantial audit and non-audit fees impaired its independence and objectivity with respect to its audits of AIG's financial statements for 1999, 2000, 2001, 2002 and 2003.  Because the compensation of PwC partners is related to the fees produced by the clients for whom they are responsible, the PwC partners on the AIG engagements had a direct financial motive to ensure the retention of AIG as a PwC client and thereby ensure the continuation of tens of millions of dollars in annual fees.  Moreover, PwC's professional status was plainly enhanced by its longstanding and ongoing relationship with AIG, the world's largest insurance conglomerate.

1028.   As a result of its longstanding relationship with AIG and the myriad services it rendered to AIG, PwC personnel were regularly present at AIG's New York headquarters.  PwC had continual access to, and knowledge of, AIG's internal and confidential financial and business information through conversations with AIG employees and management and through

review of AIG's nonpublic documents.  Additionally, PwC personnel had the opportunity to observe and review AIG's business and accounting practices, and to test AIG's internal and publicly reported financial statements, as well as AIG's internal control systems and structures.

1029.  As AIG's purportedly independent auditor, PwC was obligated to audit AIG's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS"), as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"). The Statements of Auditing Standards (codified and referred to herein as "AU § __") are recognized by AICPA as the authoritative interpretation of GAAS.

1030.  PwC was further obligated to report the results of its audits to AIG, its Board of Directors (including the Board's Audit Committee) and the investing public, including Lead Plaintiff and the members of the Class.  The SEC has repeatedly emphasized the importance of meaningful audits being performed by independent accountants:

> [T]he capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.  ***Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised***.

Relationships Between Registrants and Independent Accountants, SEC Accounting Series Release No. 296, 1981 SEC LEXIS 858 (Aug. 20, 1981) (emphasis added).

### A.   FORMS 10-K

#### 1.   1999 10-K

1031.  However, with knowledge of AIG's true financial condition and the myriad improper schemes and transactions in which AIG engaged during 1999 (and even earlier) as

discussed above, or in reckless disregard thereof, PwC certified the materially false and

misleading financial statements of AIG for the fiscal year ended December 31, 1999 and

provided the following materially false and misleading independent auditors' report, dated

February 9, 2000, on those financial statements, which was included in AIG's Form 10-K

Annual Report for 1999:

> Report of Independent Accountants
>
> The Board of Directors and Shareholders American International Group, Inc.:
>
> In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the consolidated financial position of American International Group, Inc. and its subsidiaries (the "Company") at December 31, 1999 and 1998, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 1999, in conformity with accounting principles generally accepted in the United States.  In addition, in our opinion, the financial statement schedules listed in the accompanying index present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.  These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits.  We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for the opinion expressed above.
>
> PricewaterhouseCoopers LLP
> New York, New York
> February 9, 2000

1032.   PwC's February 9, 2000 audit report was materially false and misleading because as PwC knew, or recklessly disregarded, AIG's financial statements for the year ended December 31, 1999, did not present fairly, in all material respects, the financial position of AIG. To the contrary, as PwC knew or recklessly disregarded, AIG's year-end 1999 financial statements were materially misstated and violated GAAP in numerous respects as detailed above. In particular, PwC knew or recklessly disregarded: that AIG falsely inflated its earnings and reserves using reinsurance transactions and other techniques that violated GAAP; that AIG derived a substantial portion of its revenues and profits from its payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices; that AIG's internal controls contained numerous material weaknesses; and that AIG's financial statements violated GAAP for the reasons given in paragraphs 961 through 976 above.

## 2.  **2000 10-K**

1033.   With knowledge of AIG's true financial condition and the myriad improper schemes and transactions in which AIG engaged during 2000 as discussed above, or in reckless disregard thereof, PwC certified the materially false and misleading financial statements of AIG for the fiscal year ended December 31, 2000 and provided the following materially false and misleading independent auditors' report, dated February 7, 2001, on those financial statements, which was included in AIG's Form 10-K Annual Report for 2000:

> Report of Independent Accountants
>
> The Board of Directors and Shareholders
> American International Group, Inc.:
>
> In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the consolidated financial position of American International Group, Inc. and its subsidiaries (the "Company") at December 31, 2000

and 1999, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the accompanying index present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.  These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits.  We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

PricewaterhouseCoopers LLP
New York, New York
February 7, 2001

1034.   PwC's February 7, 2001 audit report was materially false and misleading because as PwC knew, or recklessly disregarded, AIG's financial statements for the year ended December 31, 2000, did not present fairly, in all material respects, the financial position of AIG. To the contrary, as PwC knew or recklessly disregarded, AIG's year-end 2000 financial statements were materially misstated and violated GAAP in numerous respects as detailed above. In particular, PwC knew or recklessly disregarded: that AIG falsely inflated its earnings and reserves using improper "finite" or "nontraditional" reinsurance transactions and other techniques (including half of the risk-free $500 million transaction with General Re) that violated GAAP; that AIG derived a substantial portion of its revenues and profits from its payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and

other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices; that AIG falsely inflated its net income, revenues, shareholders' equity and other key financial measures as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to AIG's reinsurance agreements with Union Excess, "Top Level" adjustments and other directed entries, the conversion of underwriting losses to capital losses, and AIG's accounting for Life Settlements; that AIG's internal controls contained numerous material weaknesses; and that AIG's financial statements violated GAAP for the reasons given in paragraphs 961 through 976 above.

### 3.   <u>2001 10-K</u>

1035.   With knowledge of AIG's true financial condition and the myriad improper schemes and transactions in which AIG engaged during 2001 as discussed above, or in reckless disregard thereof, PwC certified the materially false and misleading financial statements of AIG for the fiscal year ended December 31, 2001 and provided the following materially false and misleading independent auditors' report, dated February 6, 2002, on those financial statements, which was included in AIG's Form 10-K Annual Report for 2001:

<u>REPORT OF INDEPENDENT ACCOUNTANTS</u>

<u>THE BOARD OF DIRECTORS AND
SHAREHOLDERS AMERICAN
INTERNATIONAL GROUP, INC.:</u>

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the consolidated financial position of American International Group, Inc. and its subsidiaries (the "Company") at December 31, 2001 and 2000, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the accompanying index present fairly, in all material respects, the information set forth therein when read in conjunction with the

related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

PricewaterhouseCoopers LLP
New York, New York
February 6, 2002

1036. PwC's February 6, 2002 audit report was materially false and misleading because as PwC knew, or recklessly disregarded, AIG's financial statements for the year ended December 31, 2001, did not present fairly, in all material respects, the financial position of AIG. To the contrary, as PwC knew or recklessly disregarded, AIG's year-end 2001 financial statements were materially misstated and violated GAAP in numerous respects as detailed above. In particular, PwC knew or recklessly disregarded: that AIG falsely inflated its earnings and reserves using improper "finite" or "nontraditional" reinsurance transactions and other techniques (including half of the $500 million risk-free transaction with General Re) that violated GAAP; that AIG derived a substantial portion of its revenues and profits from its payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices; that AIG derived millions of dollars from the sale of the illegal C-GAITS products to PNC; that AIG falsely inflated its net income, revenues, shareholders' equity and other key financial measures as a result of the improper transactions identified in the

Company's May 31, 2005 restatement, including but not limited to AIG's reinsurance

agreements with Union Excess, "Top Level" adjustments and other directed entries, and AIG's

accounting for Life Settlements, derivatives and hedge funds; that AIG's internal controls

contained numerous material weaknesses; and that AIG's financial statements violated GAAP

for the reasons given in paragraphs 961 through 976 above.

### 4.   2002 10-K

1037.  With knowledge of AIG's true financial condition and the myriad improper

schemes and transactions in which AIG engaged during 2002 as discussed above, or in reckless

disregard thereof, PwC certified the materially false and misleading financial statements of AIG

for the fiscal year ended December 31, 2002 and provided the following materially false and

misleading independent auditors' report, dated February 12, 2003, on those financial statements,

which was included in AIG's Form 10-K Annual Report for 2002:

> The Board of Directors and Shareholders
> American International Group, Inc.:
>
> In our opinion, the consolidated financial statements listed in the
> accompanying index present fairly, in all material respects, the
> consolidated financial position of American International Group,
> Inc. and subsidiaries (the "Company") at December 31, 2002 and
> 2001, and the consolidated results of their operations and their cash
> flows for each of the three years in the period ended December 31,
> 2002, in conformity with accounting principles generally accepted
> in the United States of America. In addition, in our opinion, the
> financial statement schedules listed in the accompanying index
> present fairly, in all material respects, the information set forth
> therein when read in conjunction with the related consolidated
> financial statements.  These financial statements and financial
> statement schedules are the responsibility of the Company's
> management; our responsibility is to express an opinion on these
> financial statements and financial statement schedules based on our
> audits.  We conducted our audits of these statements in accordance
> with auditing standards generally accepted in the United States of
> America, which require that we plan and perform the audit to
> obtain reasonable assurance about whether the financial statements
> are free of material misstatement. An audit includes examining, on

a test basis, evidence supporting the amounts and disclosures in the
financial statements, assessing the accounting principles used and
significant estimates made by management, and evaluating the
overall financial statement presentation. We believe that our audits
provide a reasonable basis for our opinion.

PricewaterhouseCoopers LLP
New York, New York
February 12, 2003

1038.   PwC's February 12, 2003 audit report was materially false and misleading

because as PwC knew, or recklessly disregarded, AIG's financial statements for the year ended

December 31, 2002, did not present fairly, in all material respects, the financial position of AIG.

To the contrary, as PwC knew or recklessly disregarded, AIG's year-end 2002 financial

statements were materially misstated and violated GAAP in numerous respects as detailed above.

In particular, PwC knew or recklessly disregarded: that AIG falsely inflated its earnings and

reserves using improper "finite" or "nontraditional" reinsurance transactions and other

techniques that violated GAAP; that AIG derived a substantial portion of its revenues and profits

from its payment of at least tens of millions of dollars in illegal "contingent commissions" to

Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase

AIG's insurance policies at inflated prices; that AIG falsely inflated its net income, revenues,

shareholders' equity and other key financial measures as a result of the improper transactions

identified in the Company's May 31, 2005 restatement, including but limited to AIG's

reinsurance agreements with Union Excess, "Top Level" adjustments and other directed entries,

the conversion of underwriting losses to capital losses, and AIG's accounting for Life

Settlements, hedge funds and derivatives; that AIG's internal controls contained numerous

material weaknesses; and that AIG's financial statements violated GAAP for the reasons given in

paragraphs 961 through 976 above.

5.    <u>2003 10-K</u>

1039.  With knowledge of AIG's true financial condition and the myriad improper

schemes and transactions in which AIG engaged during 2003 as discussed above, or in reckless

disregard thereof, PwC certified the materially false and misleading financial statements of AIG

for the fiscal year ended December 31, 2003 and provided the following materially false and

misleading independent auditors' report, dated February 11, 2004, on those financial statements,

which was included in AIG's Form 10-K Annual Report for 2003:

REPORT OF INDEPENDENT AUDITORS

The Board of Directors and Shareholders of American
International Group, Inc.:

In our opinion, the consolidated financial statements listed in the
accompanying index present fairly, in all material respects, the
consolidated financial position of American International Group,
Inc. and subsidiaries (the "Company") at December 31, 2003 and
2002, and the consolidated results of their operations and their cash
flows for each of the three years in the period ended December 31,
2003, in conformity with accounting principles generally accepted
in the United States of America. In addition, in our opinion, the
financial statement schedules listed in the accompanying index
present fairly, in all material respects, the information set forth
therein when read in conjunction with the related consolidated
financial statements.  These financial statements and financial
statement schedules are the responsibility of the Company's
management; our responsibility is to express an opinion on these
financial statements and financial statement schedules based on our
audits.  We conducted our audits of these statements in accordance
with auditing standards generally accepted in the United States of
America, which require that we plan and perform the audit to
obtain reasonable assurance about whether the financial statements
are free of material misstatement. An audit includes examining, on
a test basis, evidence supporting the amounts and disclosures in the
financial statements, assessing the accounting principles used and
significant estimates made by management, and evaluating the
overall financial statement presentation. We believe that our audits
provide a reasonable basis for our opinion.

PricewaterhouseCoopers LLP
New York, New York
February 11, 2004

1040.   PwC's February 11, 2004 audit report was materially false and misleading because as PwC knew, or recklessly disregarded, AIG's financial statements for the year ended December 31, 2003, did not present fairly, in all material respects, the financial position of AIG. To the contrary, as PwC knew or recklessly disregarded, AIG's year-end 2003 financial statements were materially misstated and violated GAAP in numerous respects as detailed above. In particular, PwC knew or recklessly disregarded: that AIG falsely inflated its earnings and reserves using improper "finite" or "nontraditional" reinsurance transactions and other techniques that violated GAAP; that AIG derived a substantial portion of its revenues and profits from its payment of at least tens of millions of dollars in illegal "contingent commissions" to Marsh and other insurance brokers who, in return, improperly "steered" clients to purchase AIG's insurance policies at inflated prices; that AIG falsely inflated its net income, revenues, shareholders' equity and other key financial measures as a result of the improper transactions identified in the Company's May 31, 2005 restatement, including but not limited to AIG's reinsurance agreements with Union Excess, "Top Level" adjustments and other directed entries and AIG's accounting for Life Settlements, hedge funds and derivatives; that AIG's internal controls contained numerous material weaknesses; and that AIG's financial statements violated GAAP for the reasons given in paragraphs 961 through 976 above.

1041.   In addition, PwC issued each of the audit reports for the years 1999 through 2003 despite the presence of numerous red flags, as alleged *infra* at, *inter alia*, paragraphs 1049, 1051 and 1077(ll).

**B.   PWC'S AUDITS OF AIG VIOLATED GAAS**

1042.   GAAS defines the standards of conduct for auditors in performing and reporting on audit engagements.  Statements on Auditing ("SAS") are recognized by the AICPA as the authoritative interpretation.  Specifically AICPA Professional Standards Auditing Section 220, "Independence" requires an auditor to maintain a mental attitude of independence, and Article IV of the Code of Professional Conduct, "Objectivity and Independence" requires a member to be independent in fact and appearance and free of conflicts of interest.  PwC violated GAAS and breached the requirement of maintaining independence by maintaining a less than arms-length professional and profitable relationship with AIG.

1043.   PwC's lack of independence is also illustrated by the fact that AIG provided high-paying executive jobs to numerous PwC auditors who had serviced the AIG account.  The following current and former AIG executives came to the Company after working as auditors at PwC (or its predecessor, Coopers & Lybrand):

- Defendant Smith joined AIG in 1984 directly from Coopers & Lybrand, where he had been the partner in charge of that firm's insurance practice in the New York office.

- Defendant Castelli came to AIG directly from Coopers & Lybrand, where he specialized in the insurance industry practice.

- Steven J. Bensinger came to AIG after an eleven-year career at Coopers & Lybrand, where he was a partner in that firm's New York insurance practice and served as the engagement partner for the AIG account.  Bensinger has been AIG's CFO, Treasurer and Comptroller since March 2005.

- Saul Basch is the Senior Vice President, Treasurer and CFO of HSB Group, Inc., an AIG subsidiary.  He joined AIG in 1995 after serving as partner-in-charge of Coopers & Lybrand's New York insurance industry practice and as the engagement partner for the AIG account.

- Joseph Umansky, a former senior vice president of AIG and president of AIG Reinsurance Advisers, joined the Company after serving as a partner with Coopers & Lybrand.

- David Herzog, who was named AIG Comptroller and elected AIG Senior Vice President in June 2005, came to AIG in 2000 after holding an "executive position" at Coopers & Lybrand.

- Robert Conry, the Managing Director of AIG Global Investment Group, joined AIG in 1988 after serving as an "insurance industry specialist" with Coopers & Lybrand;

- Robert P. Jacobson is currently AIG's Vice President, Strategic Planning, prior to which he was CFO of AIG's Domestic Brokerage Group.  Before joining AIG, Jacobson was the "partner in charge of the Coopers & Lybrand New York Region Insurance Industry Practice."

1044.   Throughout the Class Period, as part of the services it provided to AIG, PwC had continual and unfettered access to and developed more than a mere working knowledge of AIG's business operations.  PwC was present at AIG's headquarters frequently throughout the year, had unfettered access to AIG documents and employees, and had conversations with AIG management and employees about AIG's financial reporting and accounting practices.  By observing AIG's business operations and accounting practices, PwC developed a strong knowledge of vital corporate, financial, operating and business information of AIG.  PwC was well informed regarding AIG's business and its accounting operations.

1045.   As required under Section 204 of the Sarbanes-Oxley Act of 2002, AIG included in its annual report on Form 10-K a statement that AIG's management is responsible for establishing and maintaining adequate internal controls and procedures for financial reporting. In addition, AIG's management is required to assess the effectiveness of its internal controls at the end of its fiscal year.  PwC is required to attest to and report on AIG's assessment of its effectiveness of its internal controls.

1046.   However, and despite having concluded just weeks earlier that AIG's internal controls scored "quite high," PwC's partner in charge of the AIG engagement informed AIG's Board in March 2005 that because of the requirements of Sarbanes-Oxley, PwC might not be able to issue an unqualified audit opinion because of material weaknesses in AIG's internal control structure.  PwC does not, and cannot, explain why it did not report these material weaknesses earlier.

1.      **PwC Ignored Relevant GAAS Provisions
        in Conducting Its Audits of AIG**

1047.   Throughout the Class Period, PwC intentionally or recklessly conducted its audits of AIG  in a manner that does not comport with GAAP.

1048.   *Statements of Auditing Standards Nos. 55 and 78, In Consideration of Internal Control in a Financial Statement Audit,* require an auditor to assess a company's internal control structure which is comprised of the control environment, accounting systems, and internal control procedures in planning an audit.  Similarly, *SAS No. 60, Communication of Internal Control Related Matters Noted in an Audit*, provides guidance for auditors in identifying and reporting conditions that relate to an entity's internal control structure and sets forth examples of reportable conditions, including deficiencies in internal control structure design as well as failures in the operation of the internal control structure.  Had PwC conducted its audits in accordance with GAAS, it would have notified AIG's Audit Committee – at the beginning of the Class Period or earlier – of these reportable conditions and material weaknesses as required by *SAS No. 60.*

1049.   The factors that negatively affect AIG's control environment – including managements' philosophy and operating style; centralized authority and responsibility; Defendant Greenberg's well-known aggressive, intimidating and domineering characteristics in

controlling both the Board of Directors and the Company as a whole; and the lack of

participation by the Board of Directors or audit committee at AIG – should have been identified

as "red flags" and reflected in PwC's audit plan.

1050.   Indeed, the SEC's Staff Accounting Bulletin No. 99 – promulgated by the SEC in

1999 – states that *"[t]he tone set by top management – the corporate environment or culture*

*within which financial reporting occurs – is the most important factor contributing to the*

*integrity of the financial reporting process*.  Notwithstanding an impressive set of written rules

and procedures, if the tone set by management is lax, fraudulent financial reporting is more

likely to occur."

1051.   An effective accounting system consists of procedures and records that will

accurately and completely identify, analyze, classify, record and report a company's transactions.

The PNC and Brightpoint transactions should have been "red flags" to PwC that AIG's internal

control procedures for recording transactions, specifically finite insurance risk or reinsurance,

were weak and should have been considered in planning and performing the audits of AIG.

1052.   In accordance with *SAS No. 47, Audit Risk and Materiality in Conducting an*

*Audit*, an auditor must evaluate the company's internal control system for the following risks: (1)

"control risk," or whether a misstatement will be prevented or detected on a timely basis by the

entity's internal control; (2) "inherent risk," or whether the possibility exists that there will be a

misstatement due to lack of internal controls; and (3) "detection risk," or whether the auditor will

detect the material misstatement.

1053.   AIG's lack of internal controls, management's ability to override those controls,

and the centralization of authority made misstatements in AIG's financial statements highly

likely.  Because PwC violated these auditing standards it was unable to detect material

misstatements in AIG's financial statements *that the Company has admitted date back to 1991 and prior.*

1054.   PwC's failure to detect the shocking deficiencies in AIG's internal controls – as detailed *supra* at paragraph 605 – was particularly egregious.  PwC supposedly conducted a year-long analysis of AIG's internal controls throughout 2004, as required by the Sarbanes-Oxley Act.  In early January 2005, PwC announced the results of this effort, and "proudly reported," as stated in *The New York Times,* that AIG "scored quite high."

1055.   In his July 26, 2005 "White Paper," Defendant Greenberg stated:

> Within the past year, *PwC devoted more than 50,000 person hours to conducting an exhaustive review of AIG's internal controls over financial reporting. As recently as the March 7, 2005 AIG Audit Committee meeting, which was less than one week from the scheduled filing date of the Form 10-K, PwC reported to AIG's Audit Committee that it had identified no material weaknesses in AIG's internal controls over financial reporting* and, in fact, raised no issues that are now restated in the Form 10-K or deemed them immaterial.

1056.   But on March 15, 2005, after the NYAG and SEC had stepped in, AIG announced during an analyst conference call that it could not rule out a finding by PwC that there was a "material weakness" in AIG's internal controls.  A mere two months later, PwC would "find" a litany of shortfalls in AIG's internal controls, *all of which had been in existence throughout the Class Period and before*.  (*See* paragraph 605 *supra*.)

1057.   Under *SAS No. 82, Consideration of Fraud in a Financial Statement Audit*, and its similarly-titled replacement, *SAS No. 99,*[21] an auditor is responsible for detecting irregularities that will give rise to fraudulent financial reporting.  Pursuant to these provisions, PwC was

---

[21]   *SAS No. 82* applied to audits of financial statements for periods beginning on or after December 15, 1997.  *SAS No. 99* applied to audits of financial statements for periods beginning on or after December 15, 2002.

obligated to assess the risk of material misstatement of financial statements due to fraud.   PwC's

failure to find any weakness in AIG's controls until May 2005 was either intentional or reckless.

1058.   PwC violated *SAS Nos. 82* and *99*, which state an auditor must have considered

the following factors in assessing audit risk:  (i) whether management compensation creates a

motivation to engage in fraudulent financial reporting; and (ii) domination of management by a

small group.

(a)   With respect to management compensation, the salaries, bonuses and other

forms of compensation that AIG awarded to senior management were based, in significant part,

on the Company's performance – including key financial indicators such as net income and

underwriting performance, *items that were falsely improved by the fraud alleged herein*.

According to AIG's 2004 Proxy Statement, in determining compensation for the Company's

CEO "and other members of senior management,"

> a variety of factors are considered, including the performance of
> AIG relative to [a selected group of major companies in the
> insurance industry] ***as measured by standards such as net income
> and its growth over prior periods, return on equity and property
> and casualty underwriting performance***, the level of
> compensation paid to senior officers within the selected group of
> companies, and the level of individual contribution by AIG's
> senior officers to the performance of AIG.

Moreover, through his control over SICO and C.V. Starr, Defendant Greenberg had virtually

unfettered discretion with respect to the major portion of top AIG executives' compensation.

Defendant Greenberg's obsession with underwriting results and otherwise meeting Wall Street's

expectations was common knowledge within the industry.

(b)   On the issue of domination of management by a small group, there is little

doubt that – as alleged above – AIG and its Board were completely dominated and controlled by

Defendant Greenberg (and possibly Defendant Smith as well).  In particular, in planning and

performing its audits of AIG, PwC should have identified the fact that, as a result of this centralized control, Defendant Greenberg – and, in turn, other members of AIG senior management – placed undue emphasis on meeting analysts' earning projections for:  (i) revenues; (ii) pre-tax operating income in its General Insurance and Person Lines Insurance business segments; (iii) earnings per share; (iv) claims reserves on its balance sheet; and (v) AIG's underwriting results and loss ratio.  For example, PwC knew that Defendant Greenberg was obsessive about the Company's reputation for reporting underwriting profits – as was common knowledge to those familiar with AIG – and that Wall Street gave AIG's stock a premium because of this.

1059.   PwC violated *SAS Nos. 82* and *99* by failing to properly evaluate the risk of material misstatements in AIG's financial records by failing to:  (i) exercise the requisite professional skepticism in assessing AIG's financial statements; (ii) recognize that AIG had, in the past, violated GAAP in accounting for, *inter alia*, certain finite risk insurance and reinsurance contracts (*e.g.*, Brightpoint and PNC) and (iii) maintain an effective internal control structure that would prevent financial and accounting misstatements (which, given the Company's admissions in its 2004 Form 10-K, clearly was not done in this case).

1060.   PwC violated *SAS No. 54*, *Illegal Acts by Clients*, which requires an auditor that becomes aware of information concerning an illegal act to understand the nature of the act, understand the circumstances surrounding the act, and obtain sufficient information to evaluate the effects of the act on the financial statements.

1061.   *SAS No. 54* lists as an example of specific information that may raise questions about the existence of illegal acts: ***large payments for unspecified services to consultants, affiliates*** or employees.  As described above, PwC was aware, or recklessly disregarded, that

AIG was making large payments for unspecified services (the hundreds of millions of dollars in "contingent commissions" to Marsh and other insurance brokers), and of AIG's array of unauthorized or improperly recorded transactions, but nonetheless rendered unqualified audit opinions on AIG's financial statements year after year.  Moreover, *SAS N*o. *54* required PwC, in considering the effects of an illegal act on AIG's financial statements, to consider "[a]ll costs related to the loss, such as penalties and fines[.]"  Despite the multi-million dollar penalties and fines imposed on AIG by federal and state authorities in various proceedings against AIG and its counterparties (*e.g.*, Brightpoint and PNC), PwC continued to issue unqualified audit opinions and found no material weakness in AIG's internal controls.

1062.   In addition, PwC violated *SAS No. 54*, which – as described above – requires an auditor to plan and perform an audit to obtain reasonable assurance that the financial statements are free from material misstatements caused by illegal acts.  PwC's audits failed to detect and uncover that AIG paid Marsh and other insurance brokers hundreds of millions of dollars in contingent commissions to guarantee a material portion of its premium revenues.

1063.   Further, GAAS requires auditors to assess the risk that financial statements are materially misstated and provides the auditor with specific factors to be considered in connection with the auditor's assessment of risk.  During its annual audits of AIG, PwC failed to identify or deliberately ignored the following specific audit risks:

      (a)    AIG had the same Chairman and CEO for 37 years.

      (b)    AIG's management, whose compensation – including bonuses and long term incentive compensation – was directly controlled through C.V. Starr and SICO, both off-shore entities affiliated with AIG that were controlled by Defendant Greenberg.

(c)      That AIG had written – and widely distributed – the AIG White Paper, which provided guidance on how to circumvent the restrictions of GAAP and SEC rules (alleged in greater detail *supra* at paragraphs 627 through 631) and was used in connection with AIG's deal with Brightpoint.

(d)      AIG's management violated GAAP and twice violated Section 10(b) of the Securities Exchange Act of 1934 both with respect to its sale of finite reinsurance to Brightpoint and its off-balance sheet transactions with PNC.

(e)      AIG's decision to, in the Brightpoint and PNC deals, ignore its own knowledge that managing earnings was illegal.

(f)      The SEC's announcement in September 2003 that, to settle its probe into AIG's dealings with Brightpoint, the Company was hit with a $10 million fine in large part because (in the SEC's own words):  ***"AIG did not come clean.  On the contrary, AIG withheld documents and committed other abuses***."

(g)      The abrupt resignation of E. Michael Joye in early 1992 (after serving as AIG's General Counsel for *only 8 months*) after Defendants Greenberg and Castelli refused to discontinue AIG's illegal practice of improperly booking premiums from workers' compensation policies.

1064.   In addition, ***PwC long knew about but ignored and/or approved many of the specific accounting improprieties at issue in the Company's May 31, 2005 restatement***.

(a)      On the issue of "Top Side" adjustments (*see* paragraphs 502 through 512 and 597 *supra*):  According to Defendant Greenberg's White Paper, PwC knew about, examined

and approved all "Top Side" adjustments; thus, PwC acted recklessly or intentionally by accepting these adjustments without proper support.[22]

(b)    On the issue of AIG's claims reserves (*see* paragraphs 594 and 595 *supra*): PwC's willingness to do or approve anything in order to please Defendants Greenberg and Smith and other members of AIG management can be seen by the fact that, according to Defendant Greenberg's White Paper, "***PwC acknowledged at the March 7, 2005 AIG Audit Committee meeting that PwC would not have objected if AIG released as much as $500 million to $1 billion in reserves***."

(c)    On the issue of Union Excess and Richmond (*see* paragraphs 465 through 494 and 593 *supra*):

(i)    Defendant Greenberg's White Paper states that PwC should have been aware of the nature of AIG's relationship with Union Excess, given that PwC had access to Union Excess' audited financials and Union Excess was included as a "significant reinsurer" on Schedule F, the statutory financial statements AIG files with state insurance departments.

(ii)    In addition, PwC should have been aware of the true nature of the AIG's relationship with Union Excess and Richmond because these two offshore entities were, in essence, modeled after and shared many characteristics with Coral Re, an entity whose relationship with AIG prompted regulators of several states to investigate Coral Re in the mid-1990s.

(d)    On the issue of AIG's accounting for life settlement policies (*see* paragraphs 563 through 575 and 600(a) *supra*):  Defendant Greenberg's White Paper states that

---

[22]  Similarly, the August 8, 2005 edition of *Fortune* reported that PwC knew about Defendant Smith's improper "Top Side" adjustments:  "***Smith's lawyer says the adjustments were approved by the company's auditors***."

the accounting for life settlements was discussed by AIG's Audit Committee and was even referred to PwC's national office, which approved the accounting.

        (e)     On the issue of SICO's deferred compensation plan (*see* paragraphs 96 through 101 and 600(b)  *supra*): Defendant Greenberg's White Paper states that, "AIG's internal audit staff, Audit Committee and PwC were intimately aware of the mechanics of the [deferred compensation plan at SICO] *since its inception*."   If it is improper under GAAP now, it was improper throughout the Class Period; however, PwC allowed this practice to continue *for several decades*.

        (f)     PwC also approved the accounting for numerous other transactions that were restated, including AIG's accounting for: the synthetic fuel investment program (*see* paragraph 596(c) *supra*);  the DBG inter-company dividend (*see* paragraph 596(e) *supra*); deferred acquisition costs (*see* paragraph 600(f) *supra*); covered calls (*see* paragraph 596(a) *supra*); the muni tender option bond program (*see* paragraph 596(d) *supra*); derivatives (*see* paragraph 600(c) *supra*); deferred income taxes (*see* paragraph 600(d) *supra*); and foreign currency translation. (*See* paragraph 600(e) *supra*.)

1065.   Many of the above-cited adjustments from AIG's Restatement had been previously known to AIG management, its Audit Committee and PwC, but were ignored as supposedly "immaterial."  Those items, though waived as purportedly immaterial when examined individually, added to a pattern of financial statement irregularities and errors that are material.  PwC failed to consider the need to address materiality on the basis of segments of AIG's business that are material to investors, analysts and regulators.  These include the core insurance business, underwriting losses and expense ratios, investment income and loss reserves. PwC failed to consider that, under certain circumstances, even supposedly immaterial

misstatements – if intentional or made for the purpose of misleading investors – are unlawful and that the failure to properly record such items may violate the securities laws.

1066.   In light of the guidance promulgated by the SEC in its Staff Accounting Bulletin No. 99: "Materiality" ("SAB 99"), PwC should have been particularly skeptical about those accounting issues that were supposedly immaterial.  According to SAB 99, when considering materiality, an auditor should evaluate the significance of an item to users of the financial statements and what those users would consider important.   Materiality determination may turn on *where* an item appears in the financial statements.   For example, segment information can cause an item to be material, particularly when that item relates to a significant segment.

1067.   As stated in SAB 99, "an intentional misstatement of immaterial items in a registrant's financial statements may violate Section 13(b)(2) of the Exchange Act and thus be an illegal act.  When such a violation occurs, an auditor must take steps to see that the registrant's audit committee is 'adequately informed' about the illegal act."  PwC failed to do so, either intentionally or recklessly.

1068.   PwC also failed to comply with the following provisions of GAAS:

(a)      AICPA "Audit Risk Alert – 1988/99," which provides that "auditors should be alert for significant unusual or complex transactions, especially those that occur at or near the end of a reporting period," like the $500 million AIG-General Re transaction, "Top Side" adjustments and improper hedge fund transactions.  Moreover, with respect to Top Side adjustments, *SAS 99, Consideration of Fraud in a Financial Statement Audit and Practice Alert 03-2* – for which PwC was responsible for implementing – require that all such top-level adjustments receive additional scrutiny from auditors.

(b)      *AU § 316, Consideration of Fraud in a Financial Statement Audit*, requires an auditor to "specifically assess the risk of material misstatement of the financial statements due to fraud and ... consider assessment in design" audit procedures that mitigate that risk;

(c)      *AU § 326, Evidential Matter*, requires an auditor to obtain sufficient evidence to provide reasonable assurance that the financial statements are free from material misstatements;

(d)      *AU § 220.01*, which provides that "[i]n all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors";

(e)      *AU § 220.03*, which requires that auditors maintain the utmost professionalism, and to remain independent, intellectually honest, and free from any obligation or interest in the client, its management or its owner.

## 2.      PwC's Audit Reports of AIG Violate Basic GAAS Provisions

1069.   Each of PwC's audit reports of AIG during the Class Period (collectively, the "Audit Reports") also falsely represented that the referenced audit was conducted in accordance with GAAS.  This statement in each Audit Report was materially false and misleading because each audit was knowingly or recklessly not performed in accordance with GAAS in at least the following respects:

(a)      PwC violated GAAS Standard of Reporting No. 1, which requires an auditor's report to state whether the financial statements are presented in accordance with GAAP.  Each Audit Report falsely represented that AIG's year-end financial statements were fairly presented in all material respects in conformity with GAAP when they were not for the reasons set forth above.  *SAS 58, Reports on Audited Financial Statements and SAS 79 Amendment to Statements on Auditing Standards 58*, require an auditor to either issue a qualified

opinion or an adverse opinion on financial statements which violated GAAP.  Although AIG

now admits that its financial statements contained billions of dollars in material errors and other

problems throughout the Class Period, PwC issued unqualified opinions on AIG financial

statements in 1999, 2000, 2001, 2002 and 2003.

(b)     PwC violated GAAS Standard of Reporting No. 4, which requires that,

when an opinion on the financial statements as a whole cannot be expressed, the reasons must be

stated.  Inasmuch as AIG's internal controls were so deficient that AIG could not produce

financial information that could be reviewed in accordance with professional standards, PwC

should have stated that it could not render an opinion on the financial statements or rendered an

adverse opinion stating that the financial statements were not fairly presented in all material

respects in accordance with GAAP.  PwC also failed to require AIG to restate its financial

statements (or to withdraw its unqualified opinion) and allowed AIG to make materially false

and misleading statements concerning AIG's financial condition and results to investors during

the Class Period.  The failure to make such a qualification, correction, modification and/or

withdrawal was a violation of GAAS, including Standard of Reporting No. 4.

(c)     PwC violated GAAS General Standard No. 1, which provides "[t]he audit

is to be performed by a person or persons having adequate technical training and proficiency as

an auditor."  Given the complex nature of AIG's reinsurance transactions, PwC should have

ensured that its AIG staff auditors were technically proficient in insurance, reinsurance and finite

risk insurance, and had sufficient familiarity to determine when revenue related to these products

should be recognized under GAAP.

(d)     PwC violated GAAS General Standard No. 2 that requires that an

independence in mental attitude is to be maintained by the auditor in all matters related to the

assignment.  As set forth above, PwC's receipt of substantial nonaudit-related tax and consulting fees from AIG compromised its independence and objectivity with respect to its audits of AIG's year-end 1999, 2000, 2001, 2002 and 2003 financial statements and its reviews of AIG's financial information included in AIG's quarterly filings on Form 10-Q during these years.

(e)     PwC violated GAAS General Standard No. 3, which requires that due professional care must be exercised by the auditor in the performance of the audit and the preparation of the report.  Due professional care concerns what the independent auditor does and how well he or she does it.  PwC violated this standard by, *inter alia*, not recognizing that since 1991 AIG has engaged in finite insurance contracts and reinsurance that failed to qualify for the favorable accounting treatment afforded insurance and should have instead been classified and recorded as loans in AIG's financial statements.

(f)     PwC violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls to determine whether reliance thereon is justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedure to be applied.  The standard provides that "[a] sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed."  AU § 150.02.  GAAS requires an auditor to assess three initial risk factors in order to obtain an understanding of internal controls sufficient to plan the audit.  An auditor must evaluate (i) "control risk," *i.e.*, whether a misstatement will be prevented or detected on a timely basis by the entity's internal controls; (ii) "inherent risk," *i.e.*, whether the possibility exists that there will be a misstatement due to lack of internal controls; and (iii) "detection risk," *i.e.*, whether the auditor will detect the material misstatement.  AU § 319.46.  PwC's audit

methodology purported to assess internal controls and risk in accordance with the foregoing

provisions of GAAS.  According to information posted on PwC's website:

> Beyond the Finance Function
>
> On every audit, our teams seek to understand how management – not just in the finance function, but across your key functional areas – runs the business and manages risk.  This comprehensive view of your business provides a better understanding of the full range of business risks you face and whether those risks pose audit risks.  This approach provides you with greater comfort that your financial statements reflect the company's true performance.
>
> A Controls-based Approach
>
> PwC *Audit* delivers an independent assessment of your company's accounting and reporting practices, business risks, and internal controls while providing valuable insights.  We establish audit comfort by determining how well management's internal controls mitigate the risks of material misstatement in the financial statements.  To validate our judgments, the audit team drills down to the level of your company's transactions and analyzes that data using substantive testing methods.

***Owing to its longstanding relationship with AIG, including its work in connection with its audits of AIG's 1999, 2000, 2001, 2002 and 2003 financial statements, PwC knew or recklessly disregarded facts that evidenced significant weaknesses and deficiencies in AIG's internal control structure and the existence of numerous factors giving rise to a substantial risk of misstatement, and failed to adequately plan its audits or expand its auditing procedures accordingly.***

        (g)     PwC violated GAAS Standard of Field Work No. 3, which requires an

auditor to obtain "sufficient competent evidential matter . . . to afford a reasonable basis for an

opinion regarding the financial statements under audit" as to "the fairness with which they

present, in all material respects, financial position, results of operations, and its cash flows in

conformity with generally accepted accounting principles."  AU §§ 110 and 150.  The risk

associated with an audit determines the nature and extent of the evidentiary matter that must be obtained to assure the auditor that the financial statements are free from material error.  As described above, PwC knew or recklessly disregarded that, due to AIG's internal control deficiencies, PwC could not obtain sufficient competent evidential matter to afford a reasonable basis for issuing an opinion that AIG's year-end 1999, 2000, 2001, 2002 and 2003 financial statements were fairly presented in accordance with GAAP in all material respects.

1070.   PwC's failure to comply with GAAS and PwC's performance on the AIG audits rose to the level of recklessness and/or knowing fraud.  With respect to the $500 million AIG-General Re reinsurance transaction in particular, PwC should have detected the improper nature of the deal because, *inter alia*, PwC had been on notice about similar but equally fraudulent transactions entered into by AIG, *i.e.*, the Brightpoint and PNC transactions:

(a)      AIG signed the agreement with Brightpoint for "non-traditional" income-smoothing insurance in January 1999.  The SEC began to investigate AIG's involvement in the Brightpoint transaction in July 2000, months before AIG entered into the transaction with General Re.  The SEC's investigation continued until October 2002 and culminated in the commencement of civil and administrative proceedings against AIG and Brightpoint in September 2003.  AIG consented to a hefty $10 million fine and other sanctions in these proceedings.  Throughout this period, however, PwC looked away, signing-off on the AIG-General Re transaction and standing by its unqualified audit opinion on AIG's 2000 and 2001 financial statements.

(b)      AIG's three C-GAITS transactions with PNC, which had the effect of improperly "smoothing" PNC's earnings, were entered into between June and November 2001.  This predated PwC's review of the General Re transaction if not the transaction itself.  As

detailed in paragraphs 658 through 711 *supra*, the C-GAITS transactions have been thoroughly

discredited; in January 2002, AIG and PNC liquidated the special purpose entities that had been

created for these transactions; in February 2002, the SEC subpoenaed AIG in connection with its

investigation of the C-GAITS transactions; in July 2002 PNC entered into a Consent Order with

the SEC; in June 2003, an affiliate of PNC entered into a deferred prosecution agreement with

DOJ involving $115 million in restitution and penalties; and all of the C-GAITS transactions

were unwound as of September 2003.  Part of PwC's responsibilities as an independent auditor

was to inquire about and consider the implications of investigations by regulatory authorities.

Nonetheless, PwC turned a blind eye to the General Re transaction throughout this period and

stood by its unqualified audit opinions.

    1071.   Additionally, as reported by the insurance industry newsletter *Schiff's Insurance

Observer* in July 2002, AIG's Audit Committee backed away from its support of the Company's

accounting practices in its committee reports in 2000 and 2001.  ***The Audit Committee reported

that its own oversight did "not provide an independent basis to determine that management

has maintained appropriate accounting and financial reporting principles or appropriate

internal controls[.]***"

    1072.   Along those lines, on May 26, 2005, *The Washington Post* reported in an article

entitled, "Accountants Missed AIG Group's Red Flags":

> But in checking for trouble, PWC might have asked the audit
> committee of AIG's board of directors, which is supposed to
> supervise the outside accountant's work.  ***For two years, the
> committee said it couldn't vouch for AIG's accounting***.

>       *       *       *

> ***Further, the [audit] committee said, it couldn't assure that the
> audit had been carried out according to normal standards or
> even that PWC was in fact "independent.***"

*While the distancing statement by the audit committee is not unprecedented, the AIG's committee's statement is one of the strongest he has seen, said Itzhak Sharav, an accounting professor at Columbia University.  "Their statement, the phrasing, all of it seems to be to get the reader to understand that they're going out of their way to emphasize the possibility of problems that are undisclosed and undiscovered, and they want no part of it*."

\*       \*       \*

The language was also notable because it came at a time when regulators were attempting to beef up audit committee oversight. [Audit Committee member] *Zarb himself served on the so-called Blue Ribbon Panel to Improve Corporate Audit Committees, sponsored in 1999 by the NASD and the New York Stock Exchange in response to SEC warnings at the time about the practice of so-called earnings management and lack of director oversight.  The report called audit committee practices "the ultimate monitor" of the financial reporting process*.

Dan M. Guy, an author of books on accounting standards and a former official at the American Institute of Certified Public Accountants, said that AIG's audit committee statements read to him by a reporter seemed to say, "*We're an audit committee in name only.  We're not doing our job."*

1073.   In addition to issuing the Audit Reports quoted above, as required by SEC rules and *SAS No. 71*, PwC reviewed AIG's materially false and misleading quarterly reports for the first three quarters of each of the years ending December 31, 1999, 2000, 2001, 2002 and 2003. Although PwC was aware of the fraudulent accounting practices and material internal control deficiencies described above, PwC allowed AIG to issue quarterly reports during the Class Period that did not reflect AIG's true financial condition.

**C.      THE TRUTH BEGINS TO EMERGE**

1074.   As alleged herein, the true state of AIG's financials and businesses has begun to emerge since September 2003 through a series of partial disclosures.  Indeed, as a direct result of certain of the disclosures alleged *supra*, the price of AIG's stock has plummeted, falling from

$66.99 on October 13, 2004 (the day before the Spitzer Complaint was made public), to $50.95

as of April 1, 2005 (after disclosures related to AIG's expected restatement), a 24 percent decline

that represents a loss in market capitalization of over $40 billion.

## IX.   DEFENDANTS' ILLEGAL INSIDER SELLING

1075.   While in possession of the undisclosed materially adverse information,

Defendants Broad and Graf made the following sales of AIG stock:

| Name | Date | Shares | | Price | | Proceeds |
|---|---|---|---|---|---|---|
| Eli Broad | 3/20/2001 | 259,572 | $ | 77.05 | $ | 20,000,022 |
| | 12/8/2000 | 147,330 | $ | 101.81 | $ | 14,999,667 |
| | 5/25/2000 | 1,012,500 | $ | 76.66 | $ | 77,618,250 |
| | 3/16/2000 | 375,000 | $ | 66.62 | $ | 24,982,500 |
| | 3/2/2000 | 194,827 | $ | 58.00 | $ | 11,299,966 |
| | 11/23/1999 | 997,500 | $ | 70.33 | $ | 70,154,175 |
| | 9/23/1999 | 296,908 | $ | 60.62 | $ | 17,998,562 |
| | 9/7/1999 | 406,780 | $ | 63.92 | $ | 26,001,377 |
| | 9/3/1999 | 915,000 | $ | 61.62 | $ | 56,382,300 |
| | | **4,605,417** | | | $ | **319,436,821** |
| | | | | | | |
| John A. Graf | 09/15/2004 | 7,900 | $ | 71.32 | $ | 563,428 |
| | 09/15/2004 | 1,900 | $ | 71.29 | $ | 135,451 |
| | 09/15/2004 | 6,200 | $ | 71.35 | $ | 442,370 |
| | 09/15/2004 | 21,500 | $ | 71.15 | $ | 1,529,725 |
| | 09/15/2004 | 7,200 | $ | 71.26 | $ | 513,072 |
| | 09/15/2004 | 7,600 | $ | 71.17 | $ | 540,892 |
| | 09/15/2004 | 20,400 | $ | 71.14 | $ | 1,451,256 |
| | 09/15/2004 | 18,500 | $ | 71.30 | $ | 1,319,050 |
| | 09/15/2004 | 7,800 | $ | 71.18 | $ | 555,204 |
| | 09/15/2004 | 7,800 | $ | 71.27 | $ | 555,906 |
| | 09/15/2004 | 44,000 | $ | 71.25 | $ | 3,135,000 |
| | 09/15/2004 | 13,400 | $ | 71.13 | $ | 953,142 |
| | 09/15/2004 | 12,700 | $ | 71.28 | $ | 905,256 |
| | 09/15/2004 | 23,200 | $ | 71.16 | $ | 1,650,912 |
| | 09/15/2004 | 8,000 | $ | 71.20 | $ | 569,600 |
| | 09/15/2004 | 2,100 | $ | 71.24 | $ | 149,604 |
| | 09/15/2004 | 6,300 | $ | 71.31 | $ | 449,253 |
| | 09/15/2004 | 1,300 | $ | 71.23 | $ | 92,599 |
| | 09/15/2004 | 600 | $ | 71.22 | $ | 42,732 |
| | 09/15/2004 | 80,999 | $ | 71.12 | $ | 5,760,648 |
| | 09/15/2004 | 100 | $ | 71.19 | $ | 7,119 |
| | 06/01/2004 | 1,100 | $ | 72.96 | $ | 80,256 |
| | 06/01/2004 | 1,100 | $ | 72.95 | $ | 80,245 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 06/01/2004 | 1,000 | $ 72.92 | $ 72,920 |
| | 06/01/2004 | 1,000 | $ 72.91 | $ 72,910 |
| | 06/01/2004 | 1,000 | $ 72.77 | $ 72,770 |
| | 06/01/2004 | 1,000 | $ 72.89 | $ 72,890 |
| | 06/01/2004 | 1,000 | $ 72.92 | $ 72,920 |
| | 06/01/2004 | 1,100 | $ 72.82 | $ 80,102 |
| | 06/01/2004 | 1,100 | $ 72.89 | $ 80,179 |
| | 06/01/2004 | 1,300 | $ 72.88 | $ 94,744 |
| | 06/01/2004 | 1,200 | $ 72.95 | $ 87,540 |
| | 06/01/2004 | 1,300 | $ 73.05 | $ 94,965 |
| | 06/01/2004 | 1,500 | $ 72.91 | $ 109,365 |
| | 06/01/2004 | 1,000 | $ 72.95 | $ 72,950 |
| | 06/01/2004 | 1,500 | $ 72.85 | $ 109,275 |
| | 06/01/2004 | 1,400 | $ 72.90 | $ 102,060 |
| | 06/01/2004 | 1,500 | $ 72.93 | $ 109,395 |
| | 06/01/2004 | 1,300 | $ 72.99 | $ 94,887 |
| | 06/01/2004 | 1,300 | $ 72.84 | $ 94,692 |
| | 06/01/2004 | 1,300 | $ 72.89 | $ 94,757 |
| | 06/01/2004 | 1,000 | $ 72.94 | $ 72,940 |
| | 06/01/2004 | 200 | $ 72.84 | $ 14,568 |
| | 06/01/2004 | 1,000 | $ 72.98 | $ 72,980 |
| | 06/01/2004 | 1,000 | $ 73.03 | $ 73,030 |
| | 06/01/2004 | 200 | $ 72.97 | $ 14,594 |
| | 06/01/2004 | 400 | $ 72.99 | $ 29,196 |
| | 06/01/2004 | 1,600 | $ 72.86 | $ 116,576 |
| | 06/01/2004 | 200 | $ 73.10 | $ 14,620 |
| | 06/01/2004 | 200 | $ 73.02 | $ 14,604 |
| | 06/01/2004 | 400 | $ 72.93 | $ 29,172 |
| | 06/01/2004 | 100 | $ 72.94 | $ 7,294 |
| | 06/01/2004 | 100 | $ 72.97 | $ 7,297 |
| | 06/01/2004 | 400 | $ 72.99 | $ 29,196 |
| | 06/01/2004 | 500 | $ 72.93 | $ 36,465 |
| | 06/01/2004 | 400 | $ 72.83 | $ 29,132 |
| | 06/01/2004 | 1,000 | $ 73.04 | $ 73,040 |
| | 06/01/2004 | 700 | $ 72.83 | $ 50,981 |
| | 06/01/2004 | 900 | $ 72.81 | $ 65,529 |
| | 06/01/2004 | 700 | $ 72.81 | $ 50,967 |
| | 06/01/2004 | 700 | $ 72.90 | $ 51,030 |
| | 06/01/2004 | 700 | $ 72.87 | $ 51,009 |
| | 06/01/2004 | 600 | $ 72.98 | $ 43,788 |
| | 06/01/2004 | 600 | $ 72.97 | $ 43,782 |
| | 06/01/2004 | 600 | $ 72.98 | $ 43,788 |
| | 06/01/2004 | 1,500 | $ 72.79 | $ 109,185 |
| | 06/01/2004 | 1,000 | $ 72.92 | $ 72,920 |
| | 06/01/2004 | 1,600 | $ 72.84 | $ 116,544 |

| Name | Date | Shares | | Price | | Proceeds |
|------|------|--------|--|-------|--|----------|
| | 06/01/2004 | 1,700 | $ | 73.07 | $ | 124,219 |
| | 06/01/2004 | 4,000 | $ | 72.93 | $ | 291,720 |
| | 06/01/2004 | 4,600 | $ | 72.93 | $ | 335,478 |
| | 06/01/2004 | 4,100 | $ | 72.90 | $ | 298,890 |
| | 06/01/2004 | 4,000 | $ | 72.89 | $ | 291,560 |
| | 06/01/2004 | 4,000 | $ | 72.92 | $ | 291,680 |
| | 06/01/2004 | 3,900 | $ | 72.75 | $ | 283,725 |
| | 06/01/2004 | 4,600 | $ | 72.76 | $ | 334,696 |
| | 06/01/2004 | 3,500 | $ | 72.85 | $ | 254,975 |
| | 06/01/2004 | 3,500 | $ | 72.90 | $ | 255,150 |
| | 06/01/2004 | 3,300 | $ | 72.93 | $ | 240,669 |
| | 06/01/2004 | 3,100 | $ | 72.86 | $ | 225,866 |
| | 06/01/2004 | 4,600 | $ | 72.91 | $ | 335,386 |
| | 06/01/2004 | 5,300 | $ | 72.78 | $ | 385,734 |
| | 06/01/2004 | 4,900 | $ | 72.94 | $ | 357,406 |
| | 06/01/2004 | 3,000 | $ | 72.88 | $ | 218,640 |
| | 06/01/2004 | 1,800 | $ | 72.92 | $ | 131,256 |
| | 06/01/2004 | 19,900 | $ | 72.75 | $ | 1,447,725 |
| | 06/01/2004 | 15,000 | $ | 72.85 | $ | 1,092,750 |
| | 06/01/2004 | 12,500 | $ | 72.80 | $ | 910,000 |
| | 06/01/2004 | 11,088 | $ | 72.85 | $ | 807,760 |
| | 06/01/2004 | 9,400 | $ | 72.87 | $ | 684,978 |
| | 06/01/2004 | 5,400 | $ | 72.75 | $ | 392,850 |
| | 06/01/2004 | 6,700 | $ | 72.91 | $ | 488,497 |
| | 06/01/2004 | 6,700 | $ | 72.91 | $ | 488,497 |
| | 06/01/2004 | 6,000 | $ | 72.86 | $ | 437,160 |
| | 06/01/2004 | 5,500 | $ | 72.88 | $ | 400,840 |
| | 06/01/2004 | 3,000 | $ | 72.87 | $ | 218,610 |
| | 06/01/2004 | 10,100 | $ | 72.85 | $ | 735,785 |
| | 06/01/2004 | 2,800 | $ | 72.85 | $ | 203,980 |
| | 06/01/2004 | 2,800 | $ | 72.94 | $ | 204,232 |
| | 06/01/2004 | 2,000 | $ | 73.00 | $ | 146,000 |
| | 06/01/2004 | 2,000 | $ | 72.82 | $ | 145,640 |
| | 06/01/2004 | 2,000 | $ | 72.90 | $ | 145,800 |
| | 06/01/2004 | 2,000 | $ | 72.93 | $ | 145,860 |
| | 06/01/2004 | 2,000 | $ | 72.94 | $ | 145,880 |
| | 06/01/2004 | 2,000 | $ | 73.08 | $ | 146,160 |
| | 06/01/2004 | 2,100 | $ | 72.78 | $ | 152,838 |
| | 06/01/2004 | 1,900 | $ | 72.95 | $ | 138,605 |
| | 06/01/2004 | 1,800 | $ | 72.90 | $ | 131,220 |
| | 06/01/2004 | 1,800 | $ | 72.90 | $ | 131,220 |
| | 06/01/2004 | 2,800 | $ | 72.95 | $ | 204,260 |
| | 06/01/2004 | 2,000 | $ | 72.77 | $ | 145,540 |
| | 06/01/2004 | 2,000 | $ | 72.78 | $ | 145,560 |
| | 06/01/2004 | 2,200 | $ | 72.96 | $ | 160,512 |

| Name | Date | Shares | | Price | | Proceeds |
|---|---|---|---|---|---|---|
| | 06/01/2004 | 2,200 | $ | 72,92 | $ | 160,424 |
| | 06/01/2004 | 2,300 | $ | 72.87 | $ | 167,601 |
| | 06/01/2004 | 2,700 | $ | 72.80 | $ | 196,560 |
| | 06/01/2004 | 2,700 | $ | 72.83 | $ | 196,641 |
| | 06/01/2004 | 2,700 | $ | 72.89 | $ | 196,803 |
| | 06/01/2004 | 2,700 | $ | 72.96 | $ | 196,992 |
| | 06/01/2004 | 2,600 | $ | 72.90 | $ | 189,540 |
| | 06/01/2004 | 2,600 | $ | 72.98 | $ | 189,748 |
| | 06/01/2004 | 2,500 | $ | 72.81 | $ | 182,025 |
| | 06/01/2004 | 2,400 | $ | 72.82 | $ | 174,768 |
| | 06/01/2004 | 2,300 | $ | 73.09 | $ | 168,107 |
| | 12/19/2003 | 78,352 | $ | 63.56 | $ | 4,980,053 |
| | 09/06/2002 | 5,000 | $ | 59.48 | $ | 297,400 |
| | 09/06/2002 | 3,000 | $ | 59.52 | $ | 178,560 |
| | 09/06/2002 | 5,000 | $ | 59.62 | $ | 298,100 |
| | 09/06/2002 | 5,000 | $ | 59.54 | $ | 297,700 |
| | 09/06/2002 | 5,000 | $ | 59.59 | $ | 297,950 |
| | 09/06/2002 | 14,030 | $ | 59.50 | $ | 834,785 |
| | 09/06/2002 | 29,373 | $ | 59.45 | $ | 1,746,224 |
| | 09/06/2002 | 10,000 | $ | 59.55 | $ | 595,500 |
| | 09/06/2002 | 5,000 | $ | 59.45 | $ | 297,250 |
| | 09/06/2002 | 20,000 | $ | 59.60 | $ | 1,192,000 |
| | 09/06/2002 | 26,700 | $ | 59.40 | $ | 1,585,980 |
| | | **785,342** | | | $ | **54,282,790** |

## X.    OTHER EVIDENCE OF DEFENDANTS' SCIENTER

1076.   As alleged herein, Defendants acted with scienter in that Defendants knew or acted with recklessness with respect to the fact that the public documents and statements issued or disseminated in the name of AIG were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding AIG, their control over and/or receipt and/or modification of the allegedly materially misleading misstatements and omissions described herein, which made them privy to confidential proprietary information concerning AIG, participated in the fraudulent scheme alleged herein.

1077.   Defendants' scienter is demonstrated by additional facts and reasonable inferences therefrom.  As described above, there is ample evidence of Defendants' fraudulent conduct and intent, including but not limited to the following allegations.

(a)   AIG's outside counsel reportedly admitted to regulators that the lawyers "had uncovered evidence suggesting that *the company had misled investors and regulators in regulatory filings*."

(b)   AIG admitted in its 2004 Form 10-K that Defendants Greenberg and Smith had engaged in accounting fraud in an effort to falsely inflate the Company's earnings:

> Certain of AIG's controls within its control environment were not effective to prevent certain members of senior management, *including the former Chief Executive Officer and former Chief Financial Officer, from having the ability, which in certain instances was utilized, to override certain controls and effect certain transactions and accounting entries.*  In certain of these instances, *such transactions and accounting entries appear to have been largely motivated to achieve desired accounting results and were not properly accounted for in accordance with GAAP.*

(c)   AIG admitted in its 2004 Form 10-K that the $500 million AIG-General Re transaction "*was done to accomplish a desired accounting result* and did not entail sufficient qualifying risk transfer."

(d)   AIG admitted in its 2004 Form 10-K that "certain [Top Level] entries appear to have been made *at the direction of certain former members of senior management without appropriate documentation or support*."

(e)   AIG admitted in its 2004 Form 10-K that it controls Defendant Union Excess:

> AIG has concluded, based on documents and information identified during the course of the internal review, that reinsurance ceded to Union Excess Reinsurance Company, Ltd., a Barbados-domiciled reinsurer (Union Excess), did not result in risk transfer *because of AIG's control over certain transactions undertaken*

**directly or indirectly with Union Excess, including the timing and nature of certain commutations**.

(f)    AIG admitted in its 2004 Form 10-K that it controls Defendant Richmond:

AIG  has concluded that Richmond Insurance Company, Ltd., a Bermuda-based reinsurance holding company (Richmond) in which AIG currently holds a 19.9 percent ownership interest, **should be treated as a consolidated entity in AIG's financial statements due to AIG's ability to exert control over that entity**.

(g)    AIG admitted in its 2004 Form 10-K that it engaged in "transactions and entries that had the principal effect of improperly recharacterizing underwriting losses as capital losses."  Among others, AIG concluded "that a series of transactions with Capco Reinsurance Company, Ltd. (Capco), a Barbados-domiciled reinsurer, **involved an improper structure created to recharacterize underwriting losses relating to auto warranty business as capital losses**."

(h)    AIG admitted in its 2004 Form 10-K that its accounting for hedge funds was improper:

AIG subsidiaries invest in a variety of alternative asset classes, including hedge fund limited partnerships, that are accounted for as available for securities.  As part of the underlying partnership agreements, such AIG subsidiaries have the right to redeem their interests at defined times.  A redemption allows AIG to record net investment income to the extent there are gains in the underlying funds at the time.  **However, as a result of its internal review, AIG has determined that, in certain cases, the redemption resulted in inappropriate gain recognition because the proceeds were required to be immediately reinvested in the funds**.

(i)    AIG admitted in its May 1, 2005 press release that its restatement will correct errors in prior accounting for improper or inappropriate transactions or entries **that appear to have had the purpose of achieving an accounting result that would enhance measures important to the financial community and that may have involved documentation that did not accurately reflect the nature of the arrangements.**

(j)      AIG reportedly admitted that the Company gave "***intentionally false***" information to the NYDOI during a routine investigation in early 2005.

(k)      AIG's reserves for asbestos liabilities required a $650 million adjustment for the Fourth Quarter of 2004, ***an adjustment that increased the Company's previously-reported 2004 year-end asbestos reserves by nearly 160 percent***.  Given that amounts set aside for claims reserves affect net income, the reasonable inference is that AIG had been under-reserving for asbestos liabilities so as to inflate its earnings during the Class Period.

(l)      AIG paid more than $136 million in fines and restitution between September 2003 and November 2004 to settle SEC and DOJ investigations related to Section 10(b) violations in connection with AIG transactions with Brightpoint and PNC.

(m)      AIG engaged in willful and patent misconduct in connection with those investigations, including – in the SEC's own words – that ***AIG "withheld documents and committed other abuses"*** in the course of those investigations.

(n)      In October 2004, ***the SEC and DOJ accused AIG of misleading investors*** by failing to disclose the full scope of the government's investigations into the PNC transactions.

(o)      At least four AIG executives – as well as two executives of other companies who, at earlier points in their careers, worked at AIG – have pled guilty in connection with the Company's participation in an illegal bid-rigging scheme with Marsh and others.

(p)      Defendant Greenberg and other high-ranking AIG executives were aware, at least as early as July 2002, that AIG was paying hundreds of millions of dollars in improper contingent commissions to Marsh and other insurance brokers.

(q)      AIG decided in October 2004 to stop paying contingent commissions to insurance brokers.

(r)      Defendant Greenberg personally initiated the $500 million AIG-General Re sham reinsurance deal, a transaction that he knew would not transfer any real risk to AIG and would serve no purpose other than to improperly boost the Company's claims reserves during the Fourth Quarter 2000 and First Quarter 2001.

(s)      Defendants Smith, Milton, Castelli, General Re, Ferguson, Houldsworth and Napier helped structure and carry out the $500 million AIG-General Re sham reinsurance deal while knowing that the transaction transferred no real risk to AIG and served no purpose other than to improperly boost the Company's claims reserves during the Fourth Quarter 2000 and First Quarter 2001.

(t)      Defendants Houldsworth and Napier pled guilty in June 2005 in connection with their role in helping structure and carry out the $500 million AIG-General Re sham reinsurance deal.

(u)      The SEC issued Wells Notices to Defendants Houldsworth and Napier, as well as other current and former General Re executives, including Elizabeth Monrad, Joseph P. Brandon, Robert Graham, and Christopher Garand, in connection with their involvement in the $500 million AIG-General Re sham reinsurance deal.

(v)      Defendant Greenberg was warned by Robert Omahne that AIG's sale of finite reinsurance policies could lead to regulatory problems.

(w)      AIG senior management closely monitored AIG's reinsurance contracts, including the nature of the risks ceded by those contracts.

(x)      The AIG White Paper:  (1) provided guidelines for how AIG and its subsidiaries could circumvent the relevant accounting and SEC rules, (2) was written by an accountant working within the office of AIG's comptroller, (3) was widely distributed

throughout AIG and its subsidiaries, and (4) resulted in AIG's marketing and sale of income

smoothing insurance products that were specifically designed to circumvent the relevant

accounting and SEC rules.

(y)     Defendant Smith directed and/or approved AIG's schemes to, *inter alia*,

(i)     make so-called "Top Side" adjustments that improperly increased

the Company's claims reserves and other accounts;

(ii)     convert underwriting losses into investment losses; and

(iii)     mischaracterize income from "life settlement" insurance policies

as underwriting income.

(z)     Defendant Sullivan knew about and was involved in the "Top Side"

adjustments that improperly increased AIG's claims reserves and other accounts.

(aa)     Defendant Murphy:

(i)     was extensively involved in AIG's offshore reinsurance deals,

including the creation of Coral Re and Union Excess and Richmond;

(ii)     made false written representations to the NYDOI in November

2000 that concealed AIG's true relationship with Defendant Richmond;

(iii)     was involved in AIG's scheme to convert underwriting losses into

investment losses; and

(iv)     issued a directive in March 2005 to have recordings of Richmond's

board meetings destroyed in an effort to thwart government regulators.

(bb)     AIG forced Defendant Greenberg to resign and also fired Defendants

Smith, Milton, Castelli, Murphy, as well as other AIG executives.

(cc)     Defendants Greenberg, Smith, Milton and Ferguson invoked their Fifth Amendment right against self-incrimination while being questioned by government investigators about the transactions alleged herein.

(dd)     Defendant Greenberg pressured and worked with Richard "Dick" Grasso to artificially inflate the price of AIG's stock in the period leading up to AIG's acquisition of American General.

(ee)     Defendant Greenberg made repeated phone calls to AIG traders in February 2005, during which he ordered traders to purchase tens of thousands of shares of AIG stock in an effort to stabilize and/or raise its price – in Defendant Greenberg's own words, "I wanna push it up a bit if we can" and "I don't want the stock below $66 so keep buying."

(ff)     On March 11, 2005, Defendant Greenberg transferred to his wife 41.4 million AIG shares, valued at approximately $2.68 billion at the time.

(gg)     The value of Defendant Greenberg's direct holdings in AIG stock increases or decreases by approximately $45.3 million for every dollar change in AIG's stock price.  Moreover, the value of Defendant Greenberg's holdings in AIG stock through his ownership interests in Defendants SICO and C.V. Starr increases or decreases by approximately $33.6 million for every dollar change in AIG's stock price.

(hh)     At least as early as 1992, Defendants Greenberg and Tizzio knew of the illegal nature of AIG's booking of workers' compensation premiums.

(ii)     Defendants Broad and Graf each sold massive amounts of AIG stock during the Class Period, with Defendant Broad selling 4.6 million shares – which represented approximately 17.2 percent of his holdings – for proceeds of $319,436,821 and Defendant Graf selling 785,342 shares for proceeds of $54,282,790.  Moreover, Defendant Graf sold 299,399

shares of AIG stock, for proceeds of $21,322,219 on September 15, 2004 – the same month that

AIG was subpoenaed by the NYAG in connection with its bid-rigging investigation.  Neither of

these defendants made any sales of AIG stock prior to those alleged herein.

(i)     Between 1999 and 2001, while Defendant Graf was an executive at

American General (before that company was acquired by AIG), he did not sell any shares of

American General.

(ii)     Between 1998 and 1999, while Defendant Broad was an executive

at SunAmerica (before that company was acquired by AIG), he sold 350,000 shares of

SunAmerica on December 31, 1998 – which represented approximately 2.3 percent of his

holdings – for proceeds of approximately $29 million.

(iii)     Thus, the insider selling of Defendants Broad and Graf was

unusual or suspicious in timing and amount.

(jj)     Defendant Greenberg's acts which caused the inflation of AIG stock

simultaneously benefited Defendants SICO and C.V. Starr, which hold nearly 12 percent and 2

percent, respectively, of AIG's common stock.  Lead Plaintiff alleges that Defendant

Greenberg's acts were done in his multiple capacities as CEO of AIG and the head of SICO and

C.V. Starr.

(kk)     Defendants Union Excess and Richmond provided billions of dollars of

reinsurance coverage to AIG while knowing that the Company, in fact, controlled them.   By

their complicity with AIG's concealment of the nature of the three entities' true relationship,

Defendants Union Excess and Richmond allowed AIG to falsely inflate its financials by more

than $1 billion during the reporting periods that the Company restated.   Moreover, Defendant

Murphy, in his capacity as a director of Defendant Richmond and in an effort to thwart

government regulators, ordered the destruction of recordings of one or more meetings of Richmond's board of directors in March 2005.   As alleged above, Defendant Murphy also made intentionally false statements in a November 2000 to the NYDOI that concealed AIG's control over Defendant Richmond.

        (ll)     Defendant PwC's scienter may be inferred from:

        (i)     The massive size of the Restatement, which, *inter alia*, slashed $3.9 billion from AIG's net income and $2.26 billion from shareholders' equity;

        (ii)     As alleged in greater detail above, PwC's decision over the years to ignore numerous red flags, including, *inter alia*:

- The "tone at the top" of AIG, which was typified by Defendant Greenberg's 37 years as a CEO who was widely-known to be aggressive, intimidating and domineering in controlling both the Board of Directors and the Company as a whole, thereby creating an environment where reporting underwriting profits and meeting Wall Street expectations were to be met at all costs;

- AIG's management, whose compensation – including bonuses and long-term compensation – was controlled through Defendants C.V. Starr and SICO, both off-shore entities affiliated with AIG that were controlled by Defendant Greenberg;

- AIG's making large payments for unspecified services, namely hundreds of millions of dollars in "contingent commissions" to Marsh and other brokers;

- That AIG had written, and widely distributed, the AIG White Paper, which provided guidance on how to circumvent the restrictions of GAAP and relevant SEC rules;

- AIG management's decision to, in the Brightpoint and PNC deals, ignore its own knowledge that managing earnings (or assisting others to do so) is illegal;

- AIG's payment of more than $136 million in fines and restitution between September 2003 and November 2004 to settle SEC and DOJ investigations related to Section 10(b) violations in connection with AIG's deals with Brightpoint and PNC.

- The SEC's announcement in September 2003 that, to settle its probe into AIG's dealings with Brightpoint, the Company was hit with a $10 million fine in large part because (in the SEC's own words): "AIG did not come clean. On the contrary, AIG withheld documents and committed other abuses";

- The Delaware and New York state insurance departments' investigations during the mid-1990s into AIG's relationship with Coral Re;

- The abrupt resignation of E. Michael Joye in early 1992 – after serving as AIG's General Counsel for only 8 months – in response to Defendants Greenberg and Castelli refusing to discontinue AIG's illegal practice of improperly booking premiums from workers' compensation policies; and

- PwC's knowledge and approval of the accounting for nearly all of the items included in the Restatement, as alleged in greater detail above.

(iii)    After devoting more than 50,000 person-hours to reviewing AIG's internal controls in 2004, PwC concluded in January 2005 that the Company's internal controls "score quite high," only to reverse itself two months later – after Defendant Greenberg's departure from the Company and in the face of federal and state investigations – by suddenly "finding" a litany of shortfalls in the Company's internal controls that had existed during the Class Period and well before then;

(iv)   PwC somehow concluded in January 2005 that AIG's internal

controls contained no material weaknesses, despite the following:

- AIG agreed in September 2003 to pay a *$10 million* fine to

settle the SEC's investigation into the Brightpoint deal, in large part because – in the words of

the SEC – "[i]n the course of the Commission's investigation, *AIG did not come clean.   On the*

*contrary, AIG withheld documents and committed other abuses*";

- The SEC and DOJ accused AIG in October 2004 of

misleading investors by failing to disclose the full scope of the government's investigations into

the PNC transactions;

- The NYAG's October 14, 2004 complaint implicated AIG

in massive illegal schemes to rig bids and pay hundreds of millions of dollars in contingent

commissions to Marsh and other brokers;

- AIG agreed in November 2004 to pay *$126 million in fines*

*and restitution* to settle charges brought by the SEC and DOJ in connection with AIG's sale of

off-balance-sheet transactions to PNC; and

- On November 24, 2004, it was announced that the U.S.

Attorney's Office for the Southern District of New York had begun a criminal investigation into

whether Defendant Greenberg had violated the securities law by trying to inflate the price of

AIG's stock in August 2001 by calling Dick Grasso to ask him to pressure NYSE floor

specialists into buying AIG stock.

(v)   After auditing AIG's asbestos reserves in 2004, PwC concluded

that these reserves were adequate, a fact that was belied by the Company's decision – as part of

its May 31, 2005 restatement – to boost those reserves by $850 million.

(vi)    The importance of keeping AIG as a client, given the lucrative nature of the AIG-PwC relationship that resulted in PwC's receipt of more than $136 million in audit and consulting fees between 2000 and 2003 alone.

(mm)   Defendant Hoenemeyer, a sophisticated businessman, was reckless in failing to fulfill his role as a member and chair of AIG's Audit Committee in that he turned a blind eye to the same red flags, alleged above, that PwC ignored.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

1078.   The market for AIG's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, AIG's securities traded at artificially inflated prices during the Class Period.  The artificial inflation continued until the time AIG admitted and/or the market came to realize the nature and extent of the problems at AIG and the impact of those problems on AIG's financials.

1079.   Plaintiffs and other members of the Class purchased or otherwise acquired AIG securities while relying upon the integrity of the market price of AIG's securities and market information relating to AIG, and have been damaged thereby.

1080.   At all relevant times, the market for AIG's securities was an efficient market for the following reasons, among others:

(a)    AIG's ordinary shares met the requirements for listing, and were listed and actively traded on the NYSE, as well as stock exchanges in London, Paris, Switzerland, Tokyo, Australia, Frankfurt and Mexico, all highly efficient markets.

## XII.   NO SAFE HARBOR

1081.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

- 459 -

The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AIG who knew that those statements were false when made.

## XIII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**For Violations of Section 11 of the Securities Act
with Respect to AIG's $500 Million of 2.85% Medium-Term Notes, Series F
(Against Defendants AIG, Wachovia Securities, Merrill Lynch, PwC, Greenberg, Smith,
Sullivan, Tizzio, Hoenemeyer and Broad)**

1082.   Lead Plaintiff realleges each allegation set forth above, as if set forth fully herein, except to the extent that such allegations sound in fraud.  This claim is not based on fraud and is not intended to sound in fraud.

1083.   This claim is brought against Defendants AIG, Wachovia Securities, Merrill Lynch, PwC, Greenberg, Smith, Sullivan, Tizzio, Hoenemeyer and Broad.

1084.   This claim is brought pursuant to Section 11 of the Securities Act on behalf of those members of the Class who purchased or otherwise acquired securities pursuant to or

traceable to the Registration Statements and Prospectus materials issued by the Company in connection with its offering, on or about November 26, 2002, of $500 million of 2.85% Medium-Term Notes, Series F, due December 1, 2005.

1085.   Defendant AIG is the registrant for the securities and filed the Registration Statement and Prospectus.  Defendants AIG, Greenberg, Smith, Sullivan, Tizzio, Hoenemeyer, Broad, Wachovia Securities and Merrill Lynch were responsible for the contents of the Registration Statements and Prospectuses and caused their filing with the SEC.

1086.   Wachovia Securities and Merrill Lynch were underwriters and sellers with respect to the 2.85% Medium-Term Notes, Series F referred to above.

1087.   The Registration Statements and Prospectus materials issued by the Company in connection with the above-specified securities offering contained untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above.

1088.   As a result, AIG is liable under Section 11 of the Securities Act to all persons or entities that acquired the securities offered by the Company and referenced above.

1089.   Defendants Wachovia Securities and Merrill Lynch are liable to Lead Plaintiff and the Class, pursuant to Section 11(a)(5) of the Securities Act, by virtue of their roles as underwriters for the above-referenced securities offering.

1090.   Defendants Greenberg, Smith, Sullivan, Tizzio, Hoenemeyer and Broad are liable to Lead Plaintiff and the Class, pursuant to Sections 11(a)(1)-(3) of the Securities Act, by virtue of their roles as directors of AIG at the time the said Registration Statement and Prospectus materials were filed, and because Defendants Greenberg, Smith, Broad, and Tizzio signed said Registration Statement and Prospectus materials.

1091.   PwC was the auditor for AIG and consented to being named in the Registration Statement and Prospectus materials as an expert who audited and certified the financial statements of AIG.  As such, PwC is liable to those who purchased the above-described securities under Section 11(a)(4) of the Securities Act.  PwC failed to exercise reasonable care in conducting its 1999 and 2000 audits incorporated by reference into the Registration Statement and Prospectus materials issued in connection with the above-specified offering, and in failing to detect, disclose, and/or correct the material omissions and materially false statements in the Registration Statements and Prospectus materials and incorporated financials.  Further, PwC failed to cause AIG to correct the unsupportable methods and internal control deficiencies described herein.

1092.   At the time the securities were purchased, neither Lead Plaintiff nor any member of the Class knew, or by the reasonable exercise of care could have known, of the facts concerning the inaccurate and misleading statements and omissions alleged herein.

1093.   In connection with the offering and sales of the securities, these Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the U.S. mails.

1094.   By reason of the foregoing, the defendants named in this Cause of Action have violated Section 11 of the Securities Act.

1095.   As a result of the foregoing, Lead Plaintiff, and other members of the Class, were damaged.

**SECOND CAUSE OF ACTION**

**For Violations of Section 11 of the Securities Act
with Respect to AIG's $1.5 Billion of Zero Coupon Convertible Senior Debentures
(Against Defendants AIG, Greenberg, Smith, Castelli and Tizzio)**

1096.   Lead Plaintiff realleges each allegation set forth above, as if set forth fully herein, except to the extent that such allegations sound in fraud.  This claim is not based on fraud and is not intended to sound in fraud.

1097.   This claim is brought against Defendants AIG, Greenberg, Smith, Castelli and Tizzio.

1098.   This claim is brought pursuant to Section 11 of the Securities Act on behalf of those members of the Class who purchased or otherwise acquired securities pursuant to or traceable to the Registration Statements and Prospectus materials issued by the Company in connection with its offering, on or about November 7, 2001, of $1.5 billion of Zero Coupon Convertible Senior Debentures due November 9, 2031.

1099.   Defendant AIG is the registrant for the securities and filed the Registration Statement and Prospectus.  Defendants AIG, Greenberg, Smith, Castelli and Tizzio were responsible for the contents of the Registration Statements and Prospectuses and caused their filing with the SEC.

1100.   The Registration Statements and Prospectus materials issued by the Company in connection with the above-specified securities offering contained untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above.

1101.   As a result, AIG is liable under Section 11 of the Securities Act to all persons or entities that acquired the securities offered by the Company and referenced above.

1102.   Defendants Greenberg, Smith and Tizzio are liable to Lead Plaintiff and the Class, pursuant to Sections 11(a)(1)-(3) of the Securities Act, by virtue of their roles as directors of AIG at the time the said registration statements and corresponding materials were filed, and because each of these defendants, along with Defendant Castelli, signed said registration statements.

1103.   At the time the securities were purchased, neither Lead Plaintiff nor any member of the Class knew, or by the reasonable exercise of care could have known, of the facts concerning the inaccurate and misleading statements and omissions alleged herein.

1104.   In connection with the offering and sales of the securities, these Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the U.S. mails.

1105.   By reason of the foregoing, the defendants named in this Cause of Action have violated Section 11 of the Securities Act.

1106.   As a result of the foregoing, Lead Plaintiff, and other members of the Class, were damaged.

**THIRD CAUSE OF ACTION**

**For Violations of Section 11 of the Securities Act with Respect to AIG's $500 Million of 2.875% Notes and $1 billion of 4.250% Notes**
**(Against Defendants AIG, PwC, Greenberg, Smith, Castelli, Sullivan and Hoenemeyer)**

1107.   Lead Plaintiff realleges each allegation set forth above, as if set forth fully herein, except to the extent that such allegations sound in fraud.  This claim is not based on fraud and is not intended to sound in fraud.

1108.   This claim is brought against Defendants AIG, PwC, Greenberg, Smith, Castelli, Sullivan and Hoenemeyer.

1109.   This claim is brought pursuant to Section 11 of the Securities Act on behalf of those members of the Class who purchased or otherwise acquired securities pursuant to or

traceable to the Registration Statements and Prospectus materials issued by the Company on or about March 22, 2004 in connection with its offer to exchange $1.5 billion of new notes registered under the Securities Act for old notes previously offered in a private placement.  This offering became effective on or about April 20, 2004, and consisted of $500 million of 2.875% Notes due May 15, 2008 and $1 billion of 4.250% Notes due May 15, 2013.

1110.   AIG offered the securities and filed the Registration Statement and Prospectus. Defendants AIG, Greenberg, Smith, Castelli, Sullivan and Hoenemeyer were responsible for the contents of the Registration Statements and Prospectuses and caused their filing with the SEC.

1111.   The Registration Statement and Prospectus materials issued by the Company in connection with the above-specified securities offering contained untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above.

1112.   As a result, AIG is liable under Section 11 of the Securities Act to all persons or entities that acquired the securities offered by the Company and referenced above.

1113.   Defendants Greenberg, Smith, Sullivan and Hoenemeyer are liable to Lead Plaintiff and the Class, pursuant to Sections 11(a)(1)-(3) of the Securities Act, by virtue of their roles as directors of AIG at the time the said registration statements were filed, and because each of these defendants, along with Defendant Castelli, signed said registration statements.

1114.   PwC was the auditor for AIG and consented to being named in the Registration Statement and Prospectuses as an expert who audited and certified the financial statements of AIG.  As such PwC is liable to those who purchased the above-described securities under Section 11(a)(4) of the Securities Act.  PwC failed to exercise reasonable care in conducting its year 2003 audit incorporated by reference into the Registration Statements and Prospectus

materials issued in connection with the above-specified offering, and in failing to detect, disclose, and/or correct the material omissions and materially false statements in the Registration Statements and Prospectus materials and incorporated financials.  Further, PwC failed to cause AIG to correct the unsupportable methods and internal control deficiencies described herein.

1115.   At the time the securities were purchased, neither Lead Plaintiff nor any member of the Class knew, or by the reasonable exercise of care could have known, of the facts concerning the inaccurate and misleading statements and omissions alleged herein.

1116.   In connection with the offering and sales of the securities, these Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the U.S. mails.

1117.   By reason of the foregoing, the defendants named in this Cause of Action have violated Section 11 of the Securities Act.

1118.   As a result of the foregoing, Lead Plaintiff, and other members of the Class, were damaged.

**FOURTH CAUSE OF ACTION**

**For Violations of Section 15 of the Securities Act**
**with Respect to AIG's $1.5 Billion of Zero Coupon Convertible Senior Debentures; $500**
**Million of 2.85% Medium-Term Notes, Series F; $500 Million of 2.875% Notes; and**
**$1 Billion of 4.25% Notes**
**(Against the Individual Defendants and Defendants SICO and C.V. Starr)**

1119.   Lead Plaintiff incorporates the above paragraphs by reference as if fully set forth herein except to the extent that such allegations sound in fraud.  This claim is not based on fraud and is not intended to sound in fraud.

1120.   This claim is brought pursuant to Section 15 of the Securities Act against the Individual Defendants, Defendants SICO and C.V. Starr.

1121.   Each of these Defendants, by reason of their (1) AIG stock ownership; (2) management positions; (3) power to provide significant annual income to top AIG officers; and/or (4) power to take away from top AIG officers millions of dollars worth of stock that had been granted to these officers' as their long-term compensation but which had not vested, was a controlling person of AIG pursuant to Section 15 of the Securities Act.  Each had the power and influence, and exercised such power and influence, to cause AIG to engage in the violations of law complained of herein.

1122.   Neither the Individual Defendants nor SICO nor C.V. Starr made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements and Prospectuses materials issued in connection with the Registration Statements and Prospectus materials specified above in the Section 11 claims, were true and devoid of any omissions of material fact.  Therefore, by reason of their positions of control over the Company, as alleged herein, each of the Individual Defendants, SICO and C.V. Starr are liable jointly and severally with and to the same extent that the Defendants named in the above Section 11 claims are liable because the Registration Statements and Prospectus materials issued by the Company in connection with the securities offerings specified in the above Section 11 claims contained or referenced untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged herein.

**FIFTH CAUSE OF ACTION**

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
with Respect to $210 Million of 0.5% Cash Exchangeable Equity-Linked Senior Notes and
$1.5 Billion of Zero Coupon Convertible Senior Debentures
(Against Defendants AIG, PwC, the Individual Defendants, Hoenemeyer and Broad)**

1123.   Lead Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This claim is asserted against Defendants AIG, PwC, the Individual Defendants, Hoenemeyer and Broad.

1124.   These Defendants knew, or were reckless in failing to know, of the material omissions from, and the misrepresentations contained in, the statements set forth in the relevant Registration Statement and Prospectus, when:  (1) on or about May 11, 2000, AIG issued $210 million of 0.5% Cash Exchangeable Equity-Linked Senior Notes due May 15, 2007; and (2) on or about November 7, 2001, AIG issued $1.5 billion of Zero Coupon Convertible Senior Debentures due November 9, 2031.

1125.   The Registration Statement and Prospectus for the 0.5% Cash Exchangeable Equity-Linked Senior Notes, which incorporated by reference AIG's Third Quarter 1999 Form 10-Q and 1999 Form 10-K, included the materially false and misleading statements contained in those two SEC filings, as alleged above.

1126.   The Registration Statement and Prospectus for the Zero Coupon Convertible Senior Debentures, which incorporated by reference AIG's Annual Report on Form 10-K for the year ended December 31, 2000; AIG's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2001 and June 30, 2001; and AIG's Current Reports on Form 8-K, dated October 9, 2001 and November 6, 2001, included the materially false and misleading statements contained in those SEC filings, as alleged above.

- 468 -

1127.   By reason of the conduct alleged herein, Defendants AIG, PwC, the Individual Defendants, Hoenemeyer and Broad knowingly or recklessly, directly and indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of AIG securities.

1128.   Lead Plaintiff and the Class have suffered substantial damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AIG securities as a result of these Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5.  Lead Plaintiff and the Class would not have purchased AIG securities pursuant to the above-referenced offering, at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the above statements and omissions.  At the time Lead Plaintiff and the Class purchased the above-referenced AIG securities, the fair and true market value of said securities was substantially less than the prices paid by them.

## SIXTH CAUSE OF ACTION

**For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
(Against Defendants AIG, PwC and the Individual Defendants, on behalf of a
Subclass of Holders of the Securities of HSB Group)**

1129.   Lead Plaintiff repeats and realleges each and every paragraph contained above as if fully set forth herein.  This claim is asserted against Defendants AIG, PwC and the Individual Defendants.

1130.   This claim is brought on behalf of the HSB Group Subclass, as defined *supra*.

1131.  On or about September 29, 2000, AIG filed with the SEC the HSB Group

Registration Statement, which included a Joint Proxy Statement/Prospectus in connection with

its acquisition of HSB Group.

1132.  The HSB Group Registration Statement states, in relevant part:

> The selected financial data of AIG as of and for the years dated
> December 31, 1999, 1998, and 1997 … has been derived from
> consolidated financial statements of AIG, which have been audited
> by PricewaterhouseCoopers LLP, independent auditors, and
> incorporated by reference in this proxy statement/prospectus.
>
> *      *      *
>
> The selected consolidated financial data of AIG as of and for the
> six months ended June 30, 2000 and June 30, 1999 has been
> derived from unaudited, consolidated financial statements filed
> with the Commission and incorporated by reference in this proxy
> statement/prospectus . . . .
>
> *      *      *
>
> The consolidated financial statements and schedules of American
> International Group, Inc. at December 31, 1999 and 1998 and for
> the three year period ended December 31, 1999 incorporated by
> reference in this proxy statement/prospectus have been audited by
> PricewaterhouseCoopers LLP, independent auditors as stated in
> their reports, which are incorporated by reference.  Those
> consolidated financial statements and schedules are incorporated
> herein by reference in reliance upon their report given upon their
> authority as experts in accounting and auditing.

1133.  As alleged above, AIG restated its financial statements for 2000.  Thus, its

financial results for the first two quarters of that year, which were incorporated into the HSB

Group Registration Statement, contained materially false information.  Additionally, the

materially false and misleading statements contained in AIG's 2000 Form 10-K, alleged *supra* at

paragraphs 843 through 846, were also incorporated into the HSB Group Registration Statement.

Likewise, AIG's 1998 Form 10-K – also incorporated into the HSB Group Registration

Statement – contained false and misleading statements at least with respect to shareholders' equity and retained earnings stemming from the Company's inappropriate accounting for Domestic Brokerage Group reserves, SICO deferred compensation, and reinsurance agreements with Defendants Union Excess and Richmond, as alleged *supra* at paragraphs 606 through 610.

1134.   Moreover, the materially false and misleading statements contained in AIG's 1999 Form 10-K, and First and Second Quarter 2000 10-Qs, alleged *supra* at paragraphs 818 through 822, 829 and 830, and 834 and 835, respectively, were also incorporated into the HSB Group Registration Statement.

1135.   The Defendants named in this Cause of Action, with knowledge of or reckless disregard for the truth, disseminated or approved the statements in (or incorporated in by reference in) the HSB Group Registration Statement, Prospectus, and Proxy materials issued by AIG in connection with AIG's acquisition of HSB Group in November 2000.  As alleged above, those statements were false and misleading in that they contained material misrepresentations of fact and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

1136.   By participating in the issuance of said statements, Defendants, individually and via a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on holders of HSB Group stock, who acquired AIG shares in the HSB Group acquisition, and concealed material adverse information regarding the then-existing business conditions and financial outlook of AIG.  Defendants employed devices, schemes and artifices to defraud, and engaged in acts, practices and a course of business, as herein alleged, to commit a fraud on the integrity of the market for AIG securities and to maintain artificially high market

prices for the same, such that holders of HSB Group were damaged when they exchanged their stock for AIG stock.

1137.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly and indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the HSB Group Subclass in connection with their acquiring AIG securities.

1138.   The HSB Group Subclass has suffered substantial damages in that, in reliance on the integrity of the market, they exchanged their shares of HSB Group for AIG stock which was artificially inflated as a result of Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein.  The HSB Group Subclass would not have exchanged their shares for AIG shares at the given price, or at all, if they had been aware that the market prices for AIG stock had been artificially and falsely inflated by Defendants' misleading statements and concealment.

<u>**SEVENTH CAUSE OF ACTION**</u>

**For Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**(Against Defendants AIG, PwC, the Individual Defendants and the General Re Defendants**
<u>**on behalf of a Subclass of Holders of the Securities of American General)**</u>

1139.   Lead Plaintiff repeats and realleges each and every paragraph contained above as if fully set forth herein.  This claim is asserted against Defendants AIG, PwC, the Individual Defendants, and the General Re Defendants.

1140.   This claim is brought on behalf of the American General Subclass, as defined

*supra*.

1141.   On or about June 20, 2001, AIG filed with the SEC the American General

Registration Statement, which included a Joint Proxy Statement/Prospectus in connection with

its acquisition of American General.

1142.   The American General Registration Statement stated, in relevant part:

> The selected consolidated financial data of AIG as of and for the
> years ended December 31, 2000, 1999 and 1998 have been derived
> from consolidated financial statements of AIG, which have been
> audited by PricewaterhouseCoopers LLP, independent
> accountants, and are incorporated by reference in this proxy
> statement/prospectus.
>
> *              *              *
>
> The selected consolidated financial data of AIG as of and for the
> three months ended March 31, 2001 and March 31, 2000 have
> been derived from unaudited consolidated financial statements
> filed by AIG with the SEC and are incorporated by reference in
> this proxy statement/prospectus . . . .

1143.   As alleged above, AIG restated its financial statements for 2000 and 2001.  Thus,

AIG's financial results for 2000 and the first two quarters of 2001, which were incorporated into

the American General Registration Statement, contained materially false information.

Additionally, the materially false and misleading statements contained in AIG's 2000 Form 10-

K, alleged *supra* at paragraphs 843 through 846, were also incorporated into the American

General Registration Statement.  Likewise, AIG's 1998 Form 10-K – also incorporated into the

American General Registration Statement – contained false and misleading statements at least

with respect to shareholders' equity and retained earnings stemming from the Company's

inappropriate accounting for Domestic Brokerage Group reserves, SICO deferred compensation,

and reinsurance agreements with Defendants Union Excess and Richmond, as alleged *supra* at paragraphs 606 through 610.

1144.   Moreover, the materially false and misleading statements contained in AIG's First Quarter 2000 and First Quarter 2001 10-Qs, alleged *supra* at paragraphs 829 and 830, and 855 and 856, respectively, were also incorporated into the American General Registration Statement.

1145.   Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the statements in (or incorporated by reference in) the American General Registration Statement, Prospectus, and Proxy materials issued by AIG in connection with AIG's acquisition of American General in August 2001.  As alleged above, those statements were misleading in that they contained material misrepresentations of fact and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

1146.   By participating in the issuance of said statements, Defendants, individually and via a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on holders of American General stock, who acquired AIG shares in the American General acquisition, and concealed material adverse information regarding the then-existing business conditions and financial outlook of AIG.  Defendants employed devices, schemes and artifices to defraud, and engaged in acts, practices and a course of business, as herein alleged, to commit a fraud on the integrity of the market for AIG securities and to maintain artificially high market prices for the same, such that holders of American General were damaged when they exchanged their stock for AIG stock.

1147.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly and indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the American General Subclass in connection with their acquiring AIG securities and, with respect to Defendant Greenberg, took actions to directly manipulate the price of AIG common stock in the periods leading up to AIG's acquisition of American General.

1148.   The American General Subclass has suffered substantial damages in that, in reliance on the integrity of the market, they exchanged their shares of American General for AIG stock which was artificially inflated as a result of Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein.  The American General Subclass would not have exchanged their shares for AIG shares at the given price, or at all, if they had been aware that the market prices for AIG stock had been artificially and falsely inflated by Defendants' misleading statements and concealment.

## EIGHTH CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder – Misstatements and Omissions
### (Against Defendants AIG, PwC, the Individual Defendants, Graf, Hoenemeyer and Broad)

1149.   Lead Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This claim is asserted against Defendants AIG, PwC, the Individual Defendants, Graf, Hoenemeyer and Broad.

1150.   Defendants knew, or were reckless in failing to know, of the material omissions from, and the misrepresentations contained in, the statements as set forth above.

1151.   Throughout the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved releases, statements and reports, referred to

above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

1152.   During the Class Period, Defendants, individually and via a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on purchasers of AIG securities and concealed material adverse information regarding the then existing business conditions and financial outlook of the Company as specified herein.

1153.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly and indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of AIG securities.

1154.   Lead Plaintiff and the Class have suffered substantial damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AIG securities as a result of Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5.  Lead Plaintiff and the Class would not have purchased AIG securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and concealment.  At the time of purchase by Lead Plaintiff and the Class of AIG's securities, the fair and true market value of said securities was substantially less than the prices paid by them.

## NINTH CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder – Market Manipulation
### (Against Defendants AIG and Greenberg)

1155.   Lead Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This claim is asserted against Defendants AIG and Greenberg.

1156.   As alleged in more detail above, Defendants AIG and Greenberg engaged in market manipulation in violation of Rule 10b-5(a) and (c), promulgated under Section 10(b) of the Exchange Act.

1157.   AIG and Defendant Greenberg's acts of market manipulation took place on numerous occasions, including in August 2001, October 2002 and February 2005, as alleged above.

1158.   Specifically, AIG and Defendant Greenberg contacted Richard Grasso, who at the time was the head of the New York Stock Exchange ("NYSE"), in an effort to have Grasso pressure the specialist firm responsible for trading AIG's stock on the floor of the NYSE, Spear, Leeds & Kellogg, to buy more AIG shares in an effort to inflate AIG's stock price.

1159.   AIG and Defendant Greenberg attempted to use AIG's powerful position on the NYSE as the largest insurance company in the world, a prominent issuer company, and a member of the Dow Jones Industrial Average, by threatening Grasso with removing AIG from the NYSE and moving to another exchange if the NYSE did not comply with Defendant Greenberg's demands.

1160.   Defendant Greenberg's acts were especially egregious due to his role from 1996 to mid-2002 as a NYSE board member and member of the compensation committee that approved Grasso's multi-million dollar compensation package.

1161.   In addition, on multiple occasions in February 2005, Defendant Greenberg ordered AIG traders to purchase tens of thousands of shares of AIG stock in an effort to inflate AIG's stock price.

1162.   As a result, during the Class Period, Defendants AIG and Greenberg, while in possession of non-public material information concerning AIG's business and finances, as alleged above, manipulated the NYSE trading mechanisms so as to artificially inflate the price of AIG stock.

1163.   These acts also served to benefit Defendant Greenberg personally, by virtue of his large holdings in AIG stock.

1164.   Defendant Greenberg's February 14, 2005 market manipulation – which occurred on the same day that AIG disclosed it had been subpoenaed in connection with its use of and accounting for finite reinsurance agreements – also served to benefit him (as well as AIG and all other defendants) by holding down losses, and therefore damages, to AIG's shareholders.

1165.   As a result of the foregoing, during the Class Period, Defendants AIG and Greenberg carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Lead Plaintiff and other Class members, and which caused Lead Plaintiff and other members of the Class to purchase AIG shares or interests at artificially inflated prices that they would not have paid had they known of the unlawful conduct alleged herein.

1166.   Defendants AIG and Greenberg: (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the AIG securities, including Lead Plaintiff and other members of the Class, in an effort to benefit themselves through undisclosed manipulative trading tactics

which inflated the pricing of AIG securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

1167.   Defendants AIG and Greenberg individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AIG, as specified herein.

1168.   Defendants AIG and Greenberg employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from the above actions and course of conduct which operated as a fraud and deceit upon Lead Plaintiff and members of the Class.

1169.   By virtue of the foregoing, Defendants AIG and Greenberg have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

<u>**TENTH CAUSE OF ACTION**</u>

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder – Market Manipulation
(Against Defendants AIG, Greenberg, Smith, Milton, Castelli
<u>and the General Re Defendants)</u>**

1170.   Lead Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This claim is asserted against Defendants AIG, Greenberg, Smith, Milton, Castelli and the General Re Defendants.

1171.   As alleged in greater detail above, these Defendants AIG, Greenberg, Smith, Milton, Castelli and the General Re Defendants engaged in market manipulation in violation of Rule 10b-5(a) and (c), promulgated under Section 10(b) of the Exchange Act.

1172.   Specifically, the General Re Defendants worked with Defendants AIG, Greenberg, Smith, Milton, Castelli and others at the Company to design and consummate the

$500 million AIG-General Re sham reinsurance deal with full knowledge that the deal transferred no real risk to AIG and served no purpose other than to improperly boost AIG's claims reserves and premiums revenues during the Fourth Quarter of 2000 and First Quarter of 2001.

1173.   As a result of the foregoing, during the Class Period, Defendants AIG, Greenberg, Smith, Milton, Castelli and the General Re Defendants carried out a plan, scheme and course of conduct which was intended to and, during the Class Period, did deceive the investing public, including Lead Plaintiff and other Class members, by assuring investors that AIG's claims reserves were growing and which caused Lead Plaintiff and other members of the Class to purchase AIG shares or interests at artificially inflated prices that they would not have paid had they known of the unlawful conduct alleged herein.

1174.   Defendants AIG, Greenberg, Smith, Milton, Castelli and the General Re Defendants: (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the AIG securities, including Lead Plaintiff and other members of the Class, which inflated the pricing of AIG securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

1175.   Defendants AIG, Greenberg, Smith, Milton, Castelli and the General Re Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a course of conduct to conceal adverse material information about AIG, as specified herein.

1176.   Defendants AIG, Greenberg, Smith, Milton, Castelli and the General Re Defendants employed devices, schemes and artifices to defraud and a course of conduct and

scheme as alleged herein to unlawfully manipulate and profit from the above actions and course

of conduct which operated as a fraud and deceit upon Lead Plaintiff and members of the Class.

1177.   By virtue of the foregoing, Defendants AIG, Greenberg, Smith, Milton, Castelli

and the General Re Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5

promulgated thereunder.

### ELEVENTH CAUSE OF ACTION

**For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
(Against Defendants Union Excess, Richmond, AIG, Greenberg, and Murphy)**

1178.   Lead Plaintiff repeats and realleges each and every paragraph contained above as

if fully set forth herein.  This claim is asserted against Defendants Union Excess, Richmond,

AIG, Greenberg, and Murphy.

1179.   As alleged in greater detail above, and while in possession of non-public material

information concerning AIG's business and finances, Defendants Union Excess and Richmond –

along with Defendants AIG, Greenberg, and Murphy – designed transactions which served to

artificially inflate AIG's financial results by making it appear that AIG did not control Union

Excess and Richmond, when, in fact, these defendants knew or were reckless in not knowing,

that AIG did control Union Excess and Richmond.  AIG has admitted that it controls these

companies and that AIG's accounting for transactions with Union Excess and Richmond were

improper.

1180.   As alleged herein, Defendant Murphy, a senior executive at AIG's offices in

Bermuda, helped the Company set up numerous off-shore insurance-related entities in Bermuda.

As revealed on April 1, 2005 in *The Wall Street Journal*¸ an attorney for Defendant Greenberg

was reported carting boxes of documents out of an AIG office in Bermuda, and the destruction of

computer records and tape recordings of business meetings was soon after reported.  This event

immediately set in motion the permanent departure from AIG of Defendant Greenberg and the termination of Defendant Murphy for failing to cooperate with AIG's internal investigation into the Company's reinsurance transactions.

1181.   By designing and consummating transactions which served to artificially inflate AIG's financial results, Defendants Union Excess, Richmond, AIG, Greenberg, and Murphy: have (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the AIG securities, including Lead Plaintiff and other members of the Class, through manipulative practices which served to inflate the pricing of AIG securities in violation of the Exchange Act

1182.   Defendants Union Excess, Richmond, AIG, Greenberg, and Murphy individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AIG, as specified herein.

1183.   Lead Plaintiff and the Class have suffered substantial damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AIG securities as a result of these violations of Section 10(b) of the Exchange Act and Rule 10b-5.  Lead Plaintiff and the Class would not have purchased AIG securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements and concealment.  At the time of purchase by Lead Plaintiff and the Class of AIG's securities, the fair and true market value of said securities was substantially less than the prices paid by them.

## TWELFTH CAUSE OF ACTION

### For Violations of Section 20(a) of the Exchange Act
### (Against Defendants SICO, C.V. Starr, Greenberg and the other Individual Defendants)

1184.   Lead Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This Claim is asserted against Defendants SICO, C.V. Starr, Greenberg and the other Individual Defendants.

1185.   Each of the Defendants named in this Cause of Action, by reason of his or its (1) AIG stock ownership; (2) management position; (3) power to provide significant annual income to top AIG officers; and/or (4) power to take away from top AIG officers millions of dollars worth of stock that had been granted to these officers' as their long-term compensation but which had not vested, was a controlling person of the Company within the meaning of Section 20 of the Exchange Act.

1186.   Each of the Defendants named in this Cause of Action had the power, influence and authority to cause, and did cause, directly or indirectly, others to engage in the wrongful conduct complained of herein, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

1187.   The Defendants named in this Cause of Action, as well as other Defendants named in this Complaint, were culpable participants in the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged above.

1188.   By reason of such wrongful conduct, the Defendants named in this Claim are liable pursuant to Section 20(a) of the Exchange Act.

1189.   As a direct and proximate result of their wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities in amounts to be proved at trial.

### THIRTEENTH CAUSE OF ACTION

**For Violations of Section 20A of the Exchange Act**
**(Against Defendants Broad and Graf)**

1190.   Lead Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This Claim is asserted against Defendants Broad and Graf, and is brought on behalf of Lead Plaintiff and Class members who purchased AIG securities at or about the time that Defendants Broad and Graf sold AIG common stock at inflated prices during the Class Period.

1191.   While in possession of material, adverse nonpublic information, Defendant Broad sold 194,827 shares of AIG common stock on March 2, 2000.  STRS Ohio purchased shares of AIG common stock on March 2, 2000.

1192.   While in possession of material, adverse nonpublic information, Defendant Graf sold 78,352 shares of AIG common stock on December 19, 2003.  OP&F purchased shares of AIG common stock on December 19, 2003.

1193.   While in possession of material, adverse nonpublic information, Defendant Graf sold 279,388 shares of AIG common stock on June 1, 2004.  STRS Ohio purchased shares of AIG stock on June 2, 2004.  OP&F purchased shares of AIG common stock on June 1, 2004.

1194.   While in possession of material, adverse nonpublic information, Defendant Graf sold 299,499 shares of AIG common stock on September 15, 2004.  OP&F purchased shares of AIG common stock on September 17, 2004.

1195.   Other Class members purchased AIG stock contemporaneously with other sales during the Class Period by Defendants Broad and Graf.

1196.   Defendants Broad and Graf violated § 10(b) of the Exchange Act, as described herein.

1197.   As a result of the foregoing, Defendants Broad and Graf violated Section 20A of the Exchange Act and are liable to Lead Plaintiff and other Class members who purchased shares of AIG common stock contemporaneously with these defendants' insider sales.

## XIV.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Lead Plaintiff respectfully requests relief and judgment, as follows:

(a)      Determining that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder;

(d)      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)      Such other and further relief as the Court may deem just and proper.

## XV.  **JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.

Dated: New York, New York
December 15, 2006

**JIM PETRO,**
**ATTORNEY GENERAL OF OHIO**

**LABATON SUCHAROW & RUDOFF** LLP

**By**_____

Alan Kopit (Ohio Bar #0031965)
**HAHN LOESER & PARKS LLP**
3300 BP Tower
200 Public Square
Cleveland, Ohio  44114-2301
(216) 621-0150
(216) 274-2478 (Fax)

*Special Counsel to the Attorney General of Ohio*
*and the Ohio State Funds and Co-Lead Counsel*
*for the Class*

Thomas A. Dubbs (TD 9658)
Louis Gottlieb (LG 9169)
Zachary M. Ratzman (ZR 0802)
100 Park Avenue
New York, New York  10017
(212) 907-0700
(212) 818-0477 (Fax)

*Lead Counsel for Lead Plaintiff Ohio State*
*Funds and Lead Counsel for the Class*