Exhibit 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | Master File No. 04 Civ: 8141 |
| ) | |
| **In re American International Group, Inc.** ) | |
| **Securities Litigation** ) | |
| ) | |

## DECLARATION OF JOHN D. FINNERTY, Ph. D. IN SUPPORT
## OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

I, John D. Finnerty, declare pursuant to 28 U.S.C. § 1746, as follows:

**I.   Qualifications**

1.   I am a Professor of Finance and the Director of the Master of Science in

Quantitative Finance Program in the Graduate School of Business Administration

at Fordham University. I was awarded early tenure in 1991, and received the

Gladys and Henry Crown Award for Faculty Excellence in 1997. I have published

13 books, including *Corporate Financial Management*, 3rd ed. (Prentice Hall,

2007*), Project Financing: Asset-Based Financial Engineering,* 2nd ed. (Wiley,

2007), and *Debt Management* (Harvard Business School Press, 2001), and more

than 80 articles and professional papers with respect to corporate finance, fixed

income, and business and securities valuation. I am President of the Eastern

Finance Association, an academic finance organization, and a former President of

the Fixed Income Analysts Society, an association of finance professionals based in New York City. I am also an editor of *FMA Online*, a member of the editorial boards of four other finance journals, and a former editor of *Financial Management*, one of the five leading finance journals in the United States.

2.  I am also a Managing Principal at Finnerty Economic Consulting, LLC (FinnEcon), which provides financial consulting and valuation services to law firms, corporations, industry associations, and government agencies.

3.  Prior to forming FinnEcon, I was a Managing Principal at Analysis Group, Inc., an economic consulting firm. Prior to joining Analysis Group, I was a Partner in the PricewaterhouseCoopers Financial Advisory Services Group for five years, and previously held professional positions at the investment banking firms of Morgan Stanley (Senior Associate), Lazard Frères (Vice President), McFarland Dewey & Co. (Partner), and Houlihan Lokey Howard & Zukin (Director).

4.  I received a Ph.D. in Operations Research from the Naval Postgraduate School, an M.A. in Economics from Cambridge University where I was a Marshall Scholar, and a B.A. in Mathematics from Williams College. Attached as Appendix A is a true and correct copy of my current resume, which lists all publications I have written or co-authored and includes a brief description of my trial and deposition testimony within the past four years.

5.  My firm is being compensated at a rate of $595 per hour for my work on this matter, and my compensation is not contingent on my findings. Some of the analyses have been performed by others working under my direction.

2

## II.    Assignment and Summary of Opinion

6.  Labaton Sucharow LLP, counsel for the plaintiffs in this matter, has asked me to examine and opine on the efficiency of the markets for the common stock and certain debt instruments of American International Group, Inc. ("AIG") during the period starting October 28, 1999 through and including April 1, 2005 (the "Class Period").  The debt instruments I have been asked to opine on are (1) the Zero-Coupon Convertible Senior Debentures, due November 9, 2031, that AIG issued on November 9, 2001, trading under the cusip number 026874AP2 (the "Zero-Coupon Debentures") and (2) the 0.5% Cash Exchangeable Equity-Linked Senior Notes, due May 15, 2007, that AIG issued on May 11, 2000, trading under the cusip number 026874AN7 (the "0.5% Notes") (collectively with the Zero-Coupon Debentures, the "Debt Securities").

7.  I have also been asked to conduct event studies and to opine on whether the common stock price declines on October 14, 2004, October 15, 2004, March 17, 2005, March 30, 2005, March 31, 2005 and April 1, 2005 were directly related to and caused by certain news announcements relating to AIG.

8.  I have also been asked to opine on the approximate number of investors that purchased or sold the Debt Securities, as well as the 2.85% Medium-Term Notes, Series F due December 1, 2005, trading under the cusip number 02687QBB3 (the "2.85% Medium-Term Notes, Series F"), the 2.875% Notes due May 15, 2008, trading under the cusip number 026874AR8 (the "2.875% Notes"), and the 4.25%

3

Notes due May 15, 2013, trading under the cusip number 026874AT4 (the 4.25%

Notes), during the Class Period.

9. It is my opinion that the markets for AIG's common stock and the Debt Securities

were open, developed and efficient during the Class Period.

10. It is my opinion that the declines in AIG's common stock price on October 14,

2004, October 15, 2004, March 17, 2005, March 30, 2005, March 31, 2005 and

April 1, 2005 were directly related to and caused by certain news announcements

related to AIG that are discussed below.

11. It is my opinion that hundreds of investors purchased and sold each of the Debt

Securities, the 2.85% Medium-Term Notes, Series F, the 2.875% Notes, and the

4.25% Notes during the Class Period. Appendix B lists the documents I

considered in coming to my opinions in this matter.

III.   **Market Efficiency**

12. An efficient market is one in which "security prices fully reflect all available

information."[1]   Stock price movements take place only after someone, on the basis

of new information, is able to better assess the value of the asset.[2]   There are three

versions of the Efficient Market Hypothesis ("EMH").[3]   The weak-form of the

EMH states that prices reflect all information contained in past trading. The semi-

---

[1] Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, *Modern Portfolio Theory and Investment Analysis*, 6th ed., 2003, page 402.

[2] Emery, Douglas R., John D. Finnerty, and John D. Stowe, *Corporate Financial Management*, 3rd ed., 2007, page 422.

[3] Fama, Eugene, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 25, March 1970, pages 383-417.

strong-form of the EMH holds that stock prices reflect all publicly available information. The strong-form of the EMH states that stock prices reflect all public and private information. There is little evidence that the strong-form of the EMH holds, and it would be surprising if insiders who are in possession of material non-public information could not earn abnormal trading profits.[4]

13. The focus of my declaration is on the semi-strong-form of the EMH. If a security's price reflects all public information, an investor can rely on it as the market's consensus of the security's fair value. Judge Alfred J. Lechner, Jr, in Cammer v. Bloom,[5] cited commentators Bromberg & Lowenfels ("Bromberg"),[6] in defining three key terms related to market efficiency:

- An open market is one in which anyone, or at least a large number of persons, can buy or sell.

- A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

---

[4] Jaffe, Jeffrey, "Special Information and Insider Trading," *Journal of Business*, 47, July 1974, pages 410-428, and Lorie, James, and Victor Niederhoffer, "Predictive and Statistical Properties of Insider Trading," *Journal of Law and Economics*, 11, April 1968, pages 91-103.

[5] Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989).

[6] *Ibid*. at 1276, citing Bromberg & Lowenfels, *Bromberg and Lowenfels on Securities Fraud and Commodities Fraud*, § 8.6, August 1988.

- An efficient market is one which rapidly reflects new information in price.

These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[7]

14. In determining whether the market for a specific security is efficient, courts typically consider several factors, including but not limited to, the five factors analyzed by Judge Lechner in Cammer:

    a.  the stock's average trading volume;

    b.  the number of securities analysts who followed and reported on the stock;

    c.  the presence of market makers and arbitrageurs;

    d.  the company's eligibility to file a Form S-3 Registration Statement; and

    e.  a cause-and-effect relationship, over time, between unexpected corporate events or financial news releases and an immediate response in stock price.[8]

15. It is my opinion that the Cammer factors are consistent with the economic literature and provide valuable insight into whether the market for a security is efficient. I examined each of these factors for the markets for the Debt Securities and the common stock of AIG. I also considered the principal markets in which AIG's securities were traded and the amount of shares that were held by

---

[7] *Ibid.*

[8] Cammer, at 1286-1287.

institutional investors.  Additionally, I examined the pricing of put and call options and analyzed whether put-call parity held throughout the Class Period.  Put-call parity should hold, at least to a close approximation, if the markets for AIG's common stock and equity options are efficient.

## IV.    Application of the Cammer Factors to the Market for AIG Common Stock
## a.    Cammer Factor One: Weekly Trading Volume

16. High trading volume is indicative of an efficient market.  As stated in Cammer, "The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."[9]  According to Bromberg, "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[10]

17. During the Class Period, the average weekly reported trading volume for AIG's common stock was 28,985,623 shares.  (See Exhibits A and B.)  The average weekly dollar volume of shares traded was $1,975,944,045.  AIG's average weekly trading volume was 1.15% of shares outstanding.  Given the massive size of AIG, I believe this is evidence of a highly liquid market.  The annualized turnover ratio is the annual reported trading volume divided by the number of shares outstanding.

---

[9] *Id.* at 1286.

[10] *Id.* at 1286, citing Bromberg, et al.

A total of 8,223,172,581 shares were traded during the Class Period, and the average number of shares outstanding was 2,506,782,778 shares. Given that the Class Period was 5.43 years, this represents an annualized turnover ratio of 60.41%. (See Exhibit B.)

**b. Cammer Factor Two: Stock Analyst Coverage**

18. Securities analysts play a critical role in promoting the efficiency of the securities markets. Analysts devote substantial amounts of time and resources to collecting and assessing information regarding the securities of the companies they follow. Their ability to provide sophisticated analysis to the public improves the speed at which market prices reflect new information. Within twenty-four hours of a company's earnings release, many stock analysts will have disseminated in-depth research reports, and the price of the company's stock that trades in an efficient market will have reacted accordingly.

19. At least 20 analysts covered AIG at some point during the Class Period.[11] (See Exhibit C.) Practically all the major brokerage firms covered AIG. AG Edwards, Bear Stearns, Deutsche Bank, First Boston, Fox Pitt, Goldman Sachs, JP Morgan, Langen McAlenney, Legg Mason, Lehman Brothers, Merrill Lynch, Morgan Stanley, Prudential Securities, Putnam Lovell, Raymond James, Salomon Smith Barney, UBS Warburg, Wasserstein Perella, William Blair, and Williams Capital all followed AIG.[12]

---

[11] Thomson Financial.

[12] *Ibid.*

8

20. The number of stock analysts at leading broker-dealers who covered AIG during the Class Period is evidence consistent with an efficient market for AIG's common stock during the Class Period.

**c. Cammer Factor Three: Existence of Market Makers and Sophisticated Investors Trading the Stock**

21. AIG's common stock traded on the NYSE throughout the Class Period. The NYSE is the world's largest and most liquid stock exchange. Its infrastructure and participants allow it to provide a reliable, liquid, and efficient marketplace. Its stringent listing standards ensure that issuers are large enough to generate a liquid market, and its regulations insure that material company information is disclosed promptly to investors. In general, for a stock to be listed on the NYSE, the market capitalization of publicly held equity must exceed $60 million.[13]

22. As Bromberg stated:

> [A]t a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the Nasdaq National Market System.[14]

23. The NYSE works on a specialist system, as contrasted with a market-maker system. However, it is clear that numerous financial entities were actively buying and trading AIG common stock. Between 54% and 61% of AIG's shares outstanding were held by institutional investors during the Class Period, as

---

[13] The New York Stock Exchange Listed Company Manual, Section 102.01B.

[14] Cammer at 1292, citing Bromberg.

disclosed in Schedule 13-F filings.[15] (See Exhibit D.)  As of September 30, 1999, there were 919 institutional holders.  By March 31, 2005, this number had increased to 1122.  As of December 31, 1999, 55.3% of AIG's common stock was held by institutional shareholders.[16] As of March 31, 2005, this percentage had increased to 61.5%.[17] (See Exhibit D.) These institutions actively adjusted their holdings of AIG common stock.  The sum of the absolute value of the quarterly change in securities held by each individual institutional shareholder ranged from 73.4 million shares to 239.6 million shares.  This total significantly underestimates the total volume of trading by these institutional shareholders, because it does not take into account instances where institutional shareholders bought and sold during the period.

24. The listing on the NYSE coupled with the substantial institutional shareholdings suggest that the market for AIG's common stock was efficient during the Class Period.

**d.  Cammer Factor Four: AIG's Eligibility to File SEC Form S-3**

25. The Securities Act of 1933 requires companies to file registration statements prior to the sale of securities to the public.  Form S-3 is a simplified form that allows incorporation by reference of Exchange Act reports.[18]  Form S-3 is only available

---

[15] Thomson Financial.

[16] *Ibid.*

[17] *Ibid.*

[18] http://www.sec.gov/about/forms/forms-3.pdf

to large, seasoned companies. The primary requirements are that the issuer has filed all materials required under the Exchange Act for at least twelve months and that the public float of the company's common equity is $75 million or more. As stated in the SEC release establishing the requirements for S-3 eligibility, "This form is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place."[19]

26. AIG was eligible to file on Form S-3 throughout the Class Period and filed on Form S-3 as early as in 1982. The market value of AIG's public float exceeded $120 billion throughout the period, which is 1605 times the float required for S-3 eligibility.[20] (See Exhibit E.)

27. In 2005, the SEC further liberalized the shelf registration requirements, for "well-known seasoned issuers" that meet certain additional requirements. Registration statements filed by these issuers are automatically effective without SEC review. In addition to the Form S-3 requirements, the issuer must have a public common equity float of at least $700 million or have issued at least $1 billion aggregate principal amount of non-convertible debt in the past three years. Although this SEC reform took place after the Class Period, it is indicative of the SEC's view that the market for the common stock of "well-known seasoned issuers'" is highly

---

[19]Cammer, at 1284-1285 citing SEC Securities Act Release No. 6331, 46 Red. Reg. 41,902, reprinted in Fed.Sec.L.Rep. (CCH) Spec. Regs. No. 926, extra ed. (Aug. 13, 1981).

[20]Public float is measured as of January 31st of 1999-2004 and March 31st of 2005.

efficient.  As stated by the SEC, "Today, the largest issuers are followed by sophisticated institutional and retail investors, members of the financial press, and numerous sell-side and buy-side analysts that actively seek new information on a continual basis.  Unlike smaller or less mature issuers, large seasoned public issuers tend to have a more regular dialogue with investors and market participants through the press and media.  The communications of these well-known seasoned issuers are subject to scrutiny by investors, the financial press, analysts, and others who evaluate disclosure when it is made."[21]  AIG currently qualifies as a "well-known seasoned issuer," and if the regulation had been in place during the Class Period, AIG would have met the requirements throughout the Class Period as well.

**e. Cammer Factor Five: Responsiveness of Security Prices to News Events and Loss Causation**

28. I examined the responsiveness of AIG's common stock price to news events to determine whether the market for AIG's common stock was efficient during the Class Period.  I performed an "event study" to investigate this relationship between AIG's common stock price and news events.  An event study is a standard technique that financial economists use to determine whether a security's reaction to a news announcement (or some other event) is statistically significant.  In order to focus on the impact of the company-specific news on the price of a security, one calculates a security's abnormal return around the time of the announcement.  A security's abnormal return is the difference between the security's actual return and its expected return.  A firm's expected return is the return one would expect based

---

[21] Federal Register, Vol. 70, No. 148, August 3, 2005, page 44,727.

on certain market and industry factors.  Once one has calculated a security's

abnormal returns, one can use standard statistical tests to determine whether these

abnormal returns are statistically significant.

29. I calculated the expected return of AIG's common stock by applying the widely

accepted Fama-French Three-Factor model, as well as a modified version designed

to include an insurance industry factor.[22]  Eugene Fama and Kenneth French

developed what is now known as the Fama-French Three-Factor Model in 1993.[23]

The Fama-French Three-Factor Model "has become widely known and adapted."[24]

This model identifies three factors that explain excess stock returns:

- The excess return on the market over treasury bills;

- SMB ("small minus big") – the difference between the returns on small-cap

  stocks and large-cap stocks; and

- HML (high minus low") – the difference between returns on high book-to-

  market stocks and low book-to-market stocks.

30. The regression formula for the Fama-French Three-Factor Model, which is fitted to

daily data, is:

$$R_t - R_f = \alpha + \beta(R_m - R_f) + s\, SMB + h\, HML + e$$

---

[22] Fama, E.F. and K.R. French, "Common Risk Factors, in the Returns on Stocks and Bonds," *Journal of Financial Economics*, 33, (1993), pages 3-56.

[23] *Ibid.*

[24] Emery, Douglas R., John D. Finnerty, and John D. Stowe, *Corporate Financial Management*, 3rd ed., 2007, page 178.

This model has become widely accepted for event study analysis.[25] The Fama-French Three-Factor Model is a significant improvement on the (unadjusted) Capital Asset Pricing Model ("CAPM") because it prices the risks associated with small firm size and financial distress.[26] Morningstar's *Cost of Capital Yearbook*, formerly produced by Ibbotson Associates, uses the Fama-French Three-Factor Model, among others, to calculate the cost of equity capital for firms in various industries.[27]

31. I modified the Fama-French Three-Factor Model to include the returns of an insurance index to take into account the sensitivity of AIG's stock price to movements in other insurance companies' stock prices. To avoid the bias that results from using a standard insurance index that includes AIG, I created a market-weighted custom index (the "Custom Index") consisting of the stock returns of all the members of the S&P 500 Insurance Index as of October 14, 2004, excluding AIG.[28] This sample included a total of 21 firms. The regression formula for my Modified Fama-French Three-Factor Model is:

---

[25] See for example, Boehme, Rodney D. and Sorin M. Sorescu, "The Long-run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Change," *Journal of Finance*, 57, 2002, pages 871-900, and Ang, James S. and Shaojun Zhang, "An Evaluation of Testing Procedures for Long Horizon Event Studies," *Review of Quantitative Finance and Accounting*, 23, 2004, pages 251-274.

[26] Emery, Douglas R., John D. Finnerty, and John D. Stowe, *Corporate Financial Management*, 3rd ed., 2007, page 179.

[27] Morningstar, *Cost of Capital 2007 Yearbook*, 2007, page 23.

[28] The companies included in the index are ACE Ltd., Aflac Inc., The Allstate Corp., AMBAC Financial Group Inc., AON Corp., Chubb Corp., Cincinnati Financial Corp., Hartford Financial Services Group Inc., Jefferson-Pilot Corp, Lincoln National Corp., Loews Corp., Marsh & McLennan Companies Inc., MBIA Inc., MetLife Inc., The Progressive Corp., Prudential Financial Inc., Safeco Corp, Torchmark Corp., The Travelers Companies Inc., Unum Group, and XL Capital Ltd.

$$R_i - R_f = \alpha + \beta(R_m - R_f) + s\, SMB + h\, HML + i\, Custom\, Index + e$$

32. Applying the Fama-French Three-Factor Model and the Modified Fama-French Three-Factor Model, I analyzed AIG's common stock returns on days on which significant news related to AIG was released. Prior to the market opening on October 14, 2004, AIG released its estimates regarding its expected losses relating to Hurricanes Charley, Frances, Ivan, and Jeanne, and Typhoons number 16 (Chaba), 18 (Songda) and 21 (Meari) in Japan.[29] Later that day, prior to 12:16 pm[30], Elliot Spitzer, the Attorney General of the State of New York, announced that the Office of New York State Attorney General had commenced a civil action against Marsh & McLennan Companies for fraud and antitrust violations and had arrested two AIG executives for fraud violations. Spitzer named AIG as one of several firms allegedly involved in bid rigging. AIG's common stock price fell 10.43% on a volume of over 48 million shares, approximately 8 times the average daily trading volume. In order to isolate the impact of the Spitzer announcement on AIG's common stock price, I took the conservative approach of assuming that the decline from the market close of October 13, 2004 until roughly 12:16 pm on October 14, 2004 was attributable to the hurricane announcement. (See Exhibit V.) Because the news release by Spitzer affected the whole insurance index, it is my opinion that the unmodified Fama-French Three-Factor Model is more appropriate to use on October 14. The abnormal return related to just the Spitzer

---

[29] Business Wire, "AIG Issues Estimate of Hurricane and Typhoon Losses," October 14, 2004.

[30] 12:16 pm is the time of the earliest news item reported on Bloomberg related to the Spitzer announcement. Likely the Spitzer announcement occurred prior to 12:16 pm. I have made the conservative assumption that only the decline after 12:16 pm was due to the Spitzer announcement.

announcement was -3.79%, which is significant at the 1% level. That means there is less than a 1% chance that this abnormal return happened by mere chance.

33. On October 15, 2004, the market price of AIG's stock fell further as new negative information came out. Maurice Greenberg, Chairman of AIG, revealed during a conference call with analysts that AIG had initiated an internal investigation in response to a subpoena received from Spitzer in September 2004.[31]  Greenberg also acknowledged that he knew AIG had been paying contingent commissions since 2002.[32] AIG's stock price fell another 3.58% on October 15, 2004. (See Exhibit V.) Because the broader insurance industry was still being impacted by the Spitzer announcement, I used the unmodified Fama-French Three-Factor Model. The abnormal return was -2.71%, which is significant at the 1% level. This means that there is a 1% chance that this negative abnormal return happened by mere chance. Over the next five trading days, the average abnormal return was only 0.40%.

34. On March 17, 2005, The Wall Street Journal reported that the New York Attorney General and the SEC had expanded their investigations to include additional accounting issues. The Wall Street Journal stated that regulators were investigating transactions with Richmond Insurance Co. ("Richmond") and Union Excess Reinsurance Co. ("Union"), who together had reinsured almost $1.2 billion

---

[31] TheStreet.com, "Spitzer Charges Marsh & McLennan in Insurance Racket," October 15, 2004.

[32] The Wall Street Journal, "Risky Business, Insurers Reel from Spitzer's Strike, Subpoena on Bid-Rigging Spurred Rush to Admit Collusion with Broker, Fallout for a Family Dynasty," October 18, 2004.

of AIG's expected future claims.[33]  AIG's stock price fell 3.34% on a volume of 14.8 million shares. (See Exhibit W.) Since the news announcements on March 17, 2005 were largely AIG specific, I applied the Modified Fama-French Three-Factor Model. The abnormal return was -1.99%, which is significant at the 3.5% level. This means that there is a 3.5% chance that this abnormal return happened by mere chance.   The next day the abnormal return was only -0.01%. As a check, I applied the unmodified Fama-French Three-Factor Model and found that the abnormal return was -2.26%, which is significant at the 2.1% level.  This shows that the decline was significant regardless of whether an insurance index is included or excluded from the event study model.

35. On March 30, 2005, AIG announced that it would delay filing its 2004 Form 10-K in order to provide itself with adequate time to review it books and records.[34] AIG announced that it had concluded that its documentation of a reinsurance transaction between an AIG subsidiary and a subsidiary of General Re Corporation ("Gen Re") was improper.  AIG announced that its management had not yet completed its assessment of the effectiveness of AIG's internal financial controls as of December 31, 2004.  AIG estimated that the maximum aggregate effect on AIG's consolidated shareholders' equity at December 31, 2004, due to known accounting errors, was approximately 2% (approximately $1.7 billion) of the previously reported unaudited consolidated shareholders' equity of $82.87 billion.  Standard & Poor's ("S&P") downgraded AIG's debt from AAA to AA+. AIG's share price

---

[33] The Wall Street Journal, "AIG Review of Accounting Finds Blemishes," March 17, 2005.

[34] AIG Press Release, "AIG Delays Form 10-K Filing to Complete Review," March 20, 2005.

fell 1.79% on a trading volume of 25 million shares. (See Exhibit X.) Since the
March 30, 2005 news described above was largely AIG specific, I applied the
Modified Fama-French Three-Factor Model. The abnormal return was -1.61%,
which is significant at the 8.7% level.[35] This means that there is less than a 9%
chance that this negative abnormal return happened by mere chance. As a check, I
also applied the unmodified Fama-French Three-Factor Model. Excluding the
Custom Index, the abnormal return was -1.84%, which is significant at the 6.0%
level. The decline in AIG's stock price was significant irrespective of whether an
insurance index is included in the event study model.

36. On March 31, 2005, Citigroup stated in a stock analyst's report that "AIG's risk
    profile has clearly increased for reasons including investigations of its accounting
    practices and management upheaval ..."[36] A Deutsche Bank analyst report stated
    that, "This is just the beginning of what could be a long process."[37] The Deutsche
    Bank analyst report identified numerous potentially problematic issues for AIG
    that were not discussed in AIG's March 30, 2005 press release. Moody's Investors
    Service downgraded AIG's debt from Aaa to Aa1. The Wall Street Journal
    reported that PricewaterhouseCoopers LLP had received a subpoena in April 2005

---

[35] Published academic research often reports three critical thresholds of statistical significance, 1%, 5%,
and 10%. See for example Guo, Hui and Robert F. Whitelaw, "Uncovering the Risk-Return Relation in
the Stock Market," *Journal of Finance*, 61, June 2006, pages 1433-1463, and Lehn, Kenneth M. and
Mengxin Zhao, "CEO Turnover after Acquisitions: Are Bad Bidders Fired?" *Journal of Finance*, 61,
August 2006, pages 1759-1811.

[36] Citigroup Smith Barney, "AIG: Reducing EPS Estimates; Maintain Hold Rating," March 31, 2005.

[37] Deutsche Bank, "American Intl. Group – Many issues remain for the board," March 31, 2005.

from the SEC regarding its audit work for AIG.[38] *TheStreet.com* reported that

several former AIG employees believed that Munich Re, which had a 49% stake in

Richmond, became involved in the Richmond venture as a favor to AIG. The

market reacted to these negative new announcements by reducing AIG's share

price 3.06% on a volume of 26 million shares. (See Exhibit X.) Using the

Modified Fama-French Three-Factor Model, the abnormal return was -1.54%,

which is significant at the 10.2% level. This means that there is only a 10.2%

chance that this negative abnormal return happened by mere chance. As a check, I

also applied the unmodified Fama-French Three-Factor Model. The abnormal

return was -1.87%, which is significant at the 5.6% level. This shows that the

decline was at least marginally significant regardless of whether an insurance index

is included or excluded from the event study model.

37. On April 1, 2005, the Wall Street Journal reported that Maurice Greenberg agreed

to resign as Chairman on March 29, 2005, because of a threat by Spitzer to

criminally indict AIG.[39] The Wall Street Journal reported that regulators were

"scouring deals to determine whether AIG improperly capped its underwriting

'loss ratio,' ... and whether "any transactions were used to artificially boost AIG's

surplus capital."[40] The Wall Street Journal also reported that an unidentified AIG

employee may have destroyed computer files and tape recordings of company

---

[38] The Wall Street Journal, "SEC Asks AIG's Accountant for Documents on General Re," March 31, 2005.

[39] The Wall Street Journal, "Palace Coup, After a 37-Year Reign at AIG, Chief's Last Tumultuous Days, Faced with Indictment Threat, Directors Move Quickly Against Mr. Greenberg," April 1, 2005.

[40] The Wall Street Journal, "Probe of AIG Hits On More Potential Problems," April 1, 2005.

meetings.[41]  The Wall Street Journal also made reference to a "document caper" in

which attorneys for Starr International Co. and C.V. Starr & Co removed AIG

records from a Bermuda office.[42]  Kevin Callahan, a Boston-based analyst at

Century Capital Management, said, "The concern is that AIG's problems are just

going to spread and spread."[43]  At 1:48 p.m., Reuters reported that three lawyers in

AIG's Bermuda office quit their jobs as a result of the accounting investigation.

About 40 minutes later, Reuters reported that the scope of the accounting

investigation had increased and that the number of transactions being scrutinized

had increased from 10 to 20.  As a result of this series of bad news, AIG's stock

price fell 8.05%.  The steady decline in AIG's share price throughout the day

suggests that the decline in the market was the result of a combination of all these

negative news items. (See Exhibit Y.) Because the April 1, 2005 news discussed

above was largely AIG specific, I applied the Modified Fama-French Three-Factor

Model.  The abnormal return was 5.71%, which is significant at the 1% level.  This

means that there is less than a 1% chance that this abnormal return happened by

mere chance. More than 70 million shares traded, approximately 11 times the

average daily trading volume.  As a check, I also applied the unmodified Fama-

French Three-Factor Model. The abnormal return was -6.16%, which is significant

---

[41] Bloomberg News, "AIG Shares Tumble on Concern About Accounting Probes," April 1, 2005.

[42] The Wall Street Journal, "Palace Coup, After a 37-Year Reign at AIG, Chief's Last Tumultuous Days, Faced with Indictment Threat, Directors Move Quickly Against Mr. Greenberg," April 1, 2005.

[43] Bloomberg News, "AIG Shares Fall to Lowest in Two Years Amid Regulatory Probes," April 1, 2005.

at the 1% level.    This shows that the decline was significant regardless of whether an insurance index is included or excluded from the event study model.

38. On April 3, 2005, Martin Sullivan, President and Chief Executive Officer of AIG, sent a letter to AIG shareholders stating that AIG was working diligently to protect and preserve relevant documents.[44]  The letter noted that AIG had recently become aware of efforts to remove documents and information from its Bermuda building without its permission and that AIG had brought these incidents to the attention of relevant authorities.  Prior to the opening of the market on April 4, 2005, Morgan Stanley and Smith Barney raised their ratings of AIG.[45]  Additionally, the Wall Street Journal issued a correction of its April 1, 2005 story, stating that it had incorrectly reported that AIG documents had been removed from AIG's Bermuda office and then recovered.[46]  The first recorded trade at 8:00 a.m. was $52.01, up 2.08%.[47]  At approximately 1:30 p.m., Elliot Spitzer issued the following press release, "An investigation of certain American International Group financial transactions and the way these transactions were reported is proceeding.  The board and current management of the company are now cooperating with this investigation.  Based upon these efforts, and based upon our knowledge to date, we

---

[44] AIG Press Release, April 3, 2005.

[45] Bloomberg News, "AIG Raised to 'Overweight' at Morgan Stanley," April 4, 2005 and Bloomberg News, "American International Raised to 'Buy' at Smith Barney."

[46] The Wall Street Journal, "AIG Investors Are Learning A Hard Lesson," April 4, 2005.

[47] NYSE TAQ Data.

believe that a civil resolution with the corporation will ultimately be achievable."[48]
Bloomberg News reported at 1:54 p.m. that AIG's stock price had increased in
response to the Spitzer announcement.[49]  AIG's stock price surged to $54.73 at
1:47 p.m. and closed that day at $53.30.

39. Since a portion of the price drop on April 1, 2005 may have been caused by The
Wall Street Journal's initial inaccurate description of the "document caper," I
assessed the minimum portion of the April 1, 2005 decline that was due to news
unrelated to the "document caper."  Since The Wall Street Journal had issued a
correction prior to the market opening on April 4, 2005, I looked at AIG's opening
price on April 4, 2005.  AIG's stock price increased by 2.08%.  A portion of this
increase was likely the result of the two analysts' upgrades.  Taking a conservative
approach, I assumed that 100% of this initial increase in AIG's stock price was the
result of The Wall Street Journal's correction.  I calculated an adjusted abnormal
return for AIG's common stock on April 1, 2005, where I replaced AIG's closing
price on April 1, 2005 with the earliest recorded trade on April 4, 2005.  (See
Exhibit Y.)  Using the Modified Fama-French Three-Factor Model, the abnormal
return was -3.80%, which is significant at the 1% level.  This means that there is a
less than 1% chance that AIG's adjusted abnormal return on April 1 occurred by
mere chance.  As a check, I also applied the unmodified Fama-French Three-
Factor Model.  The abnormal return was -4.24%, which is significant at the 1%

---

[48] Office of New York State Attorney General, "Statement by Attorney General Eliot Spitzer Regarding the AIG Investigation," April 4, 2005.

[49] Bloomberg News, "AIG Shares Jump as Spitzer Says Civil Settlement 'Achievable,'" April 4, 2005.

level.  This shows that the decline was significant regardless of whether an

insurance index is included or excluded from the event study model.

## V.   Put-Call Parity

40. In an efficient market, a relationship called *put-call parity* should hold. Put-call

parity is a relationship that exists between the prices of a company's put and call

options and the price of its common stock.  Testing whether put-call parity holds

can assist in determining whether the market for a stock is efficient.

41. A holder of an equity call option has the right to purchase the underlying stock at a

specified price (the "Strike Price" or "Exercise Price").  A holder of an equity put

option has the right to sell the underlying stock at a specified price.  If put-call

parity holds, the price of the put ("P") will equal the price of the call ("C") minus

the price of the underlying stock ("$S_0$") plus the present value of the exercise price

("PV(X)") plus the present value of the dividends expected to be paid during the

remaining duration of the option ("PV(dividends)"), or:

$$P = C - S_o + PV(X) + PV(dividends).$$  (Equation 1)

Rearranging this equation to express the share price produces the following

equation:

$$S_o = C - P + PV(X) + PV(dividends).$$  (Equation 2)

42. If this relationship does not hold, arbitrageurs should be able to earn riskless profits

by buying the relatively cheap assets and selling the relatively expensive ones.

Academics have argued that in certain situations, short-sale restrictions have

23

limited the ability of arbitrageurs to take advantage of the mispricing of assets.[50]
In particular, it has been argued that if investors are limited in their ability to short
the stock, there would be a tendency for the left-hand side of Equation 2 to be
greater than the right-hand side.

43. Using option pricing data obtained from Optionmetrics' Ivy DB database and
common stock pricing data obtained from Bloomberg, L.P., I was able to examine
whether put-call parity held for AIG during the Class Period. I matched calls and
puts based on their exercise price and expiration date. I took the average of the
best last bid and best last ask quotes to estimate the prices of the calls and puts.
For the price of the stock, I used the stock's last traded price. Expected dividends
were set equal to the actual dividends received during the life of the option. The
dividends and the exercise price were discounted using interpolated yields on
treasury strips obtained from Bloomberg, L.P. To improve the quality of the data,
I deleted options with fewer than six calendar days to maturity or greater than 180
calendar days to maturity and options with a price less than $0.375.[51]

44. After applying these filters, I was left with 5,259 pairs. I calculated the put-call
parity violation for each of these pairs using the following equation:

$$Put-Call\ Parity\ Violation = \frac{\left[S_o - C + P - PV(X) - PV(dividends)\right]}{S_o}.$$

---

[50] Eli Ofek, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales
Restrictions: Evidence from the Options Markets, 74, *Journal of Financial Economics*, 2004, pages 305-
342 [hereinafter *Limited Arbitrage and Short Sale Restrictions*], and Richard B. Evans, Christopher C.
Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and
Option Prices," *Review of Financial Studies* (forthcoming) [hereinafter *Failure is an Option*].

[51] These filters were applied in *Failure is an Option*, page 38.

The average put-call parity violation for the Class Period was -0.5185%. (See Exhibit F.) The median put-call parity violation was -0.2869%. The average AIG put-call parity violation is comparable to that found in published academic research. The authors of *Failure is an Option* found that the average put-call parity violation for 4.5 million pairs trading during 1998 and 1999 was 0.36%. The median put-call parity violation was 0.28%. The standard deviation of the put-call parity violations in their sample was 1.79%

45. A study by Ofek, Richardson, and Whitelaw analyzed 80,614 option pairs between July 1999 and November 2001.[52] It measured put-call parity violations by calculating the ratio, $R = 100 \ln(S/S*)$, where S is the actual stock price and S* is the price predicted by put and call option prices. The average R for their sample was 0.30. The average R for my sample of AIG pairs is -0.521. (See Exhibit F.) The median R for my sample is 0.287. The test results reported in Exhibit F show that the put-call parity relationship held for AIG's stock throughout the Class Period. In particular, there is no evidence that stock prices tended to be too high due to limits on short sales or any other restrictions on trading that could impair market efficiency.

46. I also calculated the average absolute value of put-call parity violations and found it to be 0.5314%. (See Exhibit F.) The average bid-ask spread for AIG's common stock was 0.45% during the Class Period.[53] The average bid-ask spread for call

---

[52] *Limited Arbitrage and Short Sale Restrictions*, page 313.

[53] The Center for Research in Security Prices (CRSP).

and put options written on AIG's stock was over 9.5% during the Class Period.[54]
Thus, an average absolute value of 0.5314% for the put-call parity violations is
very reasonable in light of these average bid-ask spreads and is consistent with the
market for AIG's common stock being efficient during the Class Period.

47. I also examined those options that were trading "near the money."[55] These options
had exercise prices near the price of the stock. The results are roughly the same for
this sub-sample as for the overall sample. The average put-call parity violation
was -0.4777%, the median put-call parity violation was -0.2656%, and the average
absolute value put-call parity violation was 0.4926%. (See Exhibit F.) These test
results are consistent with market efficiency.

48. The fact that the Put-Call Parity relationship held so closely during the Class
Period suggests that AIG's stock price fairly reflected its intrinsic value, as would
be expected in an efficient market. This is further evidence that the market for
AIG's common stock was efficient during the Class Period.

**VI.    Loss Causation**

49. I performed a "loss causation" analysis to determine whether certain declines in
AIG's common stock price during the Class Period were directly related to and
caused by certain news announcements relating to AIG on October 14, 2004,
October 15, 2004, March 17, 2005, March 30, 2005, March 31, 2005 and April 1,

---

[54] Optionmetrics Ivy DB database.

[55] The sample was restricted to those pairs for which $-0.1 < \ln(S_0/\text{Exercise Price}) < 0.1$. This filter is discussed in *Limited Arbitrage and Short Sale Restrictions*, page 340.

2005.  This analysis involves looking at the results of the event studies described in paragraphs 28 through 39.

50. It is my opinion that the -3.79% abnormal return on October 14, 2004 beginning at 12:16 pm, which I calculated by applying the unmodified Three-Factor Fama-French Model, was caused by the Spitzer announcement on that day.  (See Exhibit V.)  The negative abnormal return is significant at the 1% level.  This means that there is a less than 1% chance that this abnormal return happened by mere chance.

51. It is my opinion that the decline in AIG's stock price on October 15, 2004 was caused by Maurice Greenberg's statements during a conference call with analysts that AIG had initiated an internal investigation in response to a subpoena AIG received from Spitzer in September 2004 and that that he knew AIG had been paying contingent commissions since 2002.  The basis for this opinion is the seriousness of the statements made by Greenberg, the absence of other significant news announcements related to AIG on October 15, 2004, and the fact that the abnormal return of -2.71% using the unmodified Three-Factor Fama-French Model is significant at the 1% level.  (See Exhibit V.)  .

52. It is my opinion that the decline in AIG's common stock price on March 17, 2005 was caused by The Wall Street Journal report that the New York Attorney General and the SEC had expanded their investigations to include additional accounting issues, including transactions with Richmond and Union.  The basis for this opinion is that there were no other significant news announcements related to AIG on March 17, 2005 and that the abnormal return of -1.99% using the modified

Three-Factor Fama-French Model is significant at the 3.5% level.  (See Exhibit W.)

53. It is my opinion that the decline in AIG's common stock price on March 30, 2005 was caused by AIG's announcements as well as the S&P downgrade discussed in paragraph 35.  The basis for this opinion is that there were no other significant news items related to AIG on March 30, 2005 and that the abnormal return of -1.61% using the unmodified Three-Factor Fama-French Model is significant at the 8.7% level.  (See Exhibit X.)

54. It is my opinion that the decline in AIG's common stock price on March 31, 2005 was caused by the analysts' reports released that day, the Moody's' downgrade, The Wall Street Journal report regarding the PricewaterhouseCoopers subpoena, and *TheStreet.com* report described in paragraph 36.  The basis for this opinion is that there were no other significant news releases related to AIG on March 31, 2005 and that the abnormal return of -1.54% is significant at the 10.2% level.  (See Exhibit Y.)

55. It is my opinion that a statistically significant portion of the decline in AIG's common stock price on April 1, 2005 was caused by The Wall Street Journal report that Spitzer had threatened to criminally indict AIG, The Wall Street Journal report that regulators were investigating whether AIG had improperly capped its underwriting 'loss ratio' and whether any transactions were used to artificially boost AIG's surplus capital, The Wall Street Journal report that an unidentified AIG employee may have destroyed computer files and tape recordings of company meetings, the concerns voiced by stock analysts, the resignation of three lawyers in

AIG's Bermuda office, and the Reuters report regarding the scope of the accounting investigation. The basis for my opinion is that the abnormal return of 3.80% (the portion of the decline not attributable to the initial media coverage of the "document caper") is significant at the 1% level. (See Exhibit Y.)

## VII.    AIG Debt Securities

56. On or about May 11, 2000, AIG issued $210 million worth of 0.5% Notes. The 0.5% Notes were issued at par, bearing a 0.5% coupon and a 20.6% conversion premium. The 0.5% Notes were initially convertible into the cash value of 7.17523 shares of AIG common stock anytime through April 26, 2007 (15 trading days before maturity). The conversion ratio increased to 10.7629 shares per note on July 31, 2000, effective with a 3-for-2 stock split. The 0.5% Notes were redeemable by AIG beginning on May 15, 2003 (three years after issuance) at a price equal to the greater of (a) the par value of the notes and (b) the conversion value of the notes based on the trailing 20-day average closing price of AIG common stock. AIG will pay the conversion value unless it falls below the par value. The call feature is thus equivalent to par call with a 20 percent redemption cushion.

57. On or about November 9, 2001, AIG issued $1.5 billion worth of the Zero-Coupon Debentures. The Zero-Coupon Debentures were initially priced at 65.801% of par. Subject to certain limitations, the debentures were convertible into 6.0627 shares per $1,000 principal amount of debentures under any of the following circumstances: (1) during any fiscal quarter commencing after December 31, 2001 or on any business day commencing after September 30, 2031, if the closing sale price of AIG common stock exceeds 120% of the conversion price as in effect for

at least (x) 20 trading days in the 30 consecutive trading days ending on the last trading day of the preceding fiscal quarter or (y) one trading day after September 30, 2031; (2) if the debentures have been called for redemption; or (3) upon the occurrence of certain corporate events. Holders were entitled to receive contingent interest starting with the initial six-month period commencing November 9, 2006, if the average closing sale price of AIG common stock for a certain measurement period equals 120% or more of the conversion price. During any period when upside contingent interest is payable, the amount of contingent interest payable per debenture in either the first three months or second three months of such period is equal to the greater of (x) the sum of all regular cash dividends paid by AIG per share on AIG common stock during those three months multiplied by the number of shares of AIG common stock issuable upon conversion of a debenture at the applicable conversion rate and (y) .00125 multiplied by the sum of the issue price and accrued original issue discount for a debenture to the last day of the relevant three-month period. AIG will also pay downside contingent interest for these six-month periods commencing November 9, 2006 if the closing sale price of AIG common stock for a certain measurement period is less than or equal to 95% of the conversion price of the debentures then in effect. The downside contingent interest rate is equal to the difference between (x) the six-month LIBOR (London Interbank Offered Rate) plus the applicable spread (which may be positive or negative) as determined by the contingent interest rate agent and (y) 1.40% (but in no event will be less than zero).[56]

---

[56] LIBOR is the interest rate on loans between banks in the London money market.

58. The Debt Securities were rated by the following rating agencies during the Class Period: Moody's, Standard & Poor's, and Fitch. This is indicative of a market that is actively followed by bond credit analysts. Fixed income research analysts at ABN AMRO, Deutsche Bank, and Credit Suisse First Boston also published research reports on AIG and the Debt Securities during the Class Period. As noted in paragraph 19, at least 20 stock analysts covered AIG at some point during the Class Period.[57] (See Exhibit C.) Practically all the major brokerage firms covered AIG. AG Edwards, Bear Stearns, Deutsche Bank, First Boston, Fox Pitt, Goldman Sachs, JP Morgan, Langen McAlenney, Legg Mason, Lehman Brothers, Merrill Lynch, Morgan Stanley, Prudential Securities, Putnam Lovell, Raymond James, Salomon Smith Barney, UBS Warburg, Wasserstein Perella, William Blair, and Williams Capital all followed AIG. [58]

59. The large number of stock and bond analysts at leading broker-dealers who covered AIG during the Class Period is evidence consistent with an efficient market for AIG's bonds (as well as its stock) during the Class Period because such broad analyst coverage leads to wide and timely dissemination of information relevant to the valuation of AIG securities.

60. The Trade Reporting and Compliance Engine ("TRACE") is the NASD-developed vehicle that facilitates the mandatory reporting of over-the-counter secondary market transactions in eligible fixed income securities. TRACE, which was launched on July 1, 2002, has increased transparency in the corporate bond market.

---

[57] Thomson Financial.

[58] *Ibid.*

The Debt Securities were eligible for, and their trades were reported in, TRACE. Trades of the 0.5% Notes were reported in TRACE beginning March 3, 2003. Trades of the Zero-Coupon Debentures were reported in TRACE beginning July 1, 2002. While the market for a bond issue included in TRACE is not necessarily efficient just because of inclusion in TRACE, the regular reporting in TRACE of trades involving the bonds is nevertheless an important indicator of market efficiency.

61. Academic research has shown that TRACE has increased the efficiency of the markets for TRACE-eligible bonds and for similar bonds. One recent study found that after the implementation of TRACE, trade execution costs fell 50% for TRACE-eligible bonds and also fell for similar bonds.[59] An earlier study, which examined high-yield bonds included in the NASD fixed income pricing system ("FIPS") between January 3, 1995 and October 1, 1995, found that the informational efficiency of the markets for the issuers' bonds was similar to that of their common stock.[60] Since TRACE succeeded FIPS, the two studies suggest that the markets for actively traded corporate bonds have become more efficient due to the introduction of regular trade reporting systems, such as FIPS and TRACE.

62. Both Debt Securities were actively traded. During the period in which trades of the 0.5% Notes were reported in TRACE, the average number of trades per

---

[59] Bessembinder, Hendrik, William Maxwell, and Kumar Venkataraman, "Market Transparency, Liquidity Externalities, and Institutional Trading Costs in Corporate Bonds," *Journal of Financial Economics*, 82, 2006, pages 251-288.

[60] Hotchkiss, Edith S. and Tavy Ronen, "The Informational Efficiency of the Corporate Bond Market: An Intraday Analysis," *Review of Financial Studies*, 15, Winter 2002, pages 1325-1354.

calendar year was 239, and the average par value of the trades was at least $606,647. (See Exhibit G.) During the period in which trades of the Zero-Coupon Debentures were reported in TRACE, the average number of trades per calendar year was 1,506, and the average par value of the trades was at least $3,023,793. (See Exhibit G.) The actual average par value of the trades may be higher because TRACE does not record the amount by which the par value of transactions exceeds $5 million. AIG estimates that the daily trading volume of the Zero-Coupon Debentures between November 7, 2001 and November 9, 2006 was $12,156,000.[61] AIG estimates that the daily trading volume of the 0.5% Notes between May 8, 2000 and May 15, 2007 was approximately $11,000,334.[62]

63. I analyzed the average number of trades per trading day for both Debt Securities. The 0.5% Notes were traded an average of 0.95 times per trading day, and the Zero-Coupon Debentures were traded an average 5.98 times per trading day. I compared this to the average number of trades per trading day of bonds whose transactions were reported in TRACE and were issued prior to the start of the Class Period and were scheduled to mature after the Class Period. The median number of trades per trading day was 0.47. (See Exhibit H.) By this measure of volume, the 0.5% Notes were traded twice as often and the Zero-Coupon Debentures were traded more than 12 times as often as the median bond in this sample of bonds. A chart of the distribution of the average number of trades is shown in Exhibit I.

---

[61] Defendant American International Group, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories, page 5.

[62] Defendant American International Group, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories, page 7.

Since bonds whose transactions are reported on TRACE tend to be liquid, the relatively high volume of trading is evidence that the markets for the Debt Securities were efficient during the Class Period.

64. I also looked at the average number of trades per trading day of convertible bonds whose trades were reported in TRACE during the Class Period. The 0.5% Notes and the Zero-Coupon Debentures were traded more frequently than 30% and 80%, respectively, of this sample of bonds. (See Exhibit J.)  The chart of the distributions of trades per day is shown in Exhibit K.  Exhibit K shows that the Debt Securities' trading activity during the Class Period compares favorably to other convertible bonds whose trades were reported in TRACE.

65. I also examined the average daily dollar value of trading for the Debt Securities. The average daily dollar value of trading during the Class Period for the 0.5% Notes was $576,546 and for the Zero-Coupon Debentures was $18,072,978.  The average daily value of 0.5% Notes and the Zero-Coupon Debentures traded was greater than 70% and 90%, respectively, of those bonds whose transactions were reported in TRACE and which were outstanding during the whole Class Period. (See Exhibit L.) The high value of daily trading in the Debt Securities can be seen in Exhibit M.

66. Comparing the average daily dollar value of trading for the Debt Securities to that of convertible bonds, I found that the 0.5% Notes' and Zero-Coupon Debentures' daily dollar value of trading was higher than 10% and 90%, respectively, of the daily dollar value of trading of the convertible bonds reported on TRACE.  (See

Exhibit N.)  Exhibit O shows that the Debt Securities' value of daily trades during the Class Period was typical for the TRACE eligible convertible bond market.

67. Both issues of Debt Securities were underwritten by Morgan Stanley & Co. Incorporated ("Morgan Stanley"), which has regularly made a market in the Debt Securities during the Class Period.  This is confirmed by Morgan Stanley's trading records.  Morgan Stanley's average value of daily trading volume during the Class Period was $1,841,182 for the 0.5% Notes and $38,722,246 for the Zero-Coupon Debentures. Morgan Stanley was involved in over 6,000 transactions involving the Zero-Coupon Debentures during the Class Period, averaging 1,781 trades per calendar year. (See Exhibit P.)  The fact that a major broker-dealer such as Morgan Stanley underwrote the Debt Securities and subsequently served as an active market maker is further evidence that the markets for the Debt Securities were efficient during the Class Period.

68. The Debt Securities were actively traded by several other broker-dealers during the Class Period.  Deutsche Bank, Citigroup, Bear Stearns, Lehman Brothers and Goldman Sachs all traded the Debt Securities.  Deutsche Bank was involved in over 4,000 transactions involving the Zero-Coupon Debentures during the Class Period, averaging 1,197 trades per calendar year.  (See Exhibit P.)  The 0.5% Notes were traded heavily by Morgan Stanley, Bear Stearns, Citigroup and Deutsche Bank.  The total number of transactions for the four firms during the Class Period was 5,833. (See Exhibit P).  The pricing reported by the brokers is consistent with the pricing reported in TRACE.  I examined the reported trade prices on those days on which TRACE and the brokers reported prices.  The average difference in price

for the 0.5% Notes was only -0.15%.[63] The average difference in price for the Convertible Debentures was only -0.01%. (See Exhibit Q.) The prices are tightly clustered, which is indicative of an efficient market.

69. The broker-dealers who make markets in convertible securities post bid and ask quotes at which they are willing to buy (the bid prices) or sell (the ask prices) convertible securities in transactions with their customers. The difference between the bid and ask quotes for a particular convertible security, referred to as the *bid-ask spread*, reflects the liquidity in the market for that security. A wider spread indicates less liquidity; a narrower spread indicates greater liquidity. For relatively more liquid convertible securities, the typical bid-ask spread is two points (2% of face amount) or less.[64] I calculated the average bid-ask spread for the Debt Securities using two methods. First, I calculated the bid-ask spread as the difference between the bid and the ask quotes divided by the average of the bid and ask quotes using Bloomberg data. The average bid-ask spread for the 0.5% Notes was 0.83%. (See Exhibit R.) The average bid-ask spread for the Zero-Coupon Debentures was 0.69%. (See Exhibit R.)  The average bid-ask spread was lower than the median bid-ask spread of those convertible securities whose transactions were reported in TRACE and which were outstanding during the full Class Period. (See Exhibits S and T.) This is evidence of an efficient market.

---

[63] The average difference in price was calculated as the broker-dealers' price minus the TRACE price divided by the TRACE price. Prices from TRACE and the broker-dealers were weighted by the positions bought or sold in each transaction.

[64] Frank J. Fabozzi, *The Handbook of Fixed Income Securities*, McGraw-Hill, New York, NY, 2005, chapter 60, page 240.

70. Because the Debt Securities were convertible into shares of AIG's common stock or the cash value of shares of AIG common stock, their market prices were closely related to the market price in the efficient market for AIG's common stock. As stated in the prospectus for the Convertible Debentures, "The market price of the debentures is expected to be significantly affected by the market price of AIG common stock."[65] To quantify the relationship between changes in the price of AIG's common stock and changes in the price of the 0.5% Notes, I regressed the daily returns of the 0.5% Notes on the daily returns of AIG's common equity for all days on which the 0.5% Notes traded. Daily returns were calculated in the conventional manner based on the last daily transaction price. I obtained the following parameter estimates:

$$\text{Return}_{0.5\% \text{ Notes}} = 0.000 + 0.221469 \times \text{Return}_{\text{AIG Stock}}.$$

Therefore, a 1% increase in AIG's stock price was associated with a 0.2215% increase in the price of the 0.5% Notes. The t-statistic for this parameter is 22.52496, implying that there is less than a 0.01% chance that this relationship happened by chance. The regression has an adjusted $R^2$ of 0.5032, which means that 50% of the variation in the returns of the 0.5% Notes can be explained by variation in the returns of AIG's common stock.

---

[65] $1,519,734,000 American International Group, Inc., Zero Coupon Convertible Senior Debentures Due 2031, Prospectus, November 7, 2002.

71. I also examined this relationship for the Zero-Coupon Debentures. I regressed the daily returns of the Zero-Coupon Debentures on the daily returns of AIG's common stock for all days on which the Zero-Coupon Debentures traded. Daily returns were calculated in the conventional manner based on the last daily transaction price. I obtained the following parameter estimates:

$$\text{Return }_{\text{Zero-Coupon Debentures}} = 0.000 + 0.136209 \text{ x Return }_{\text{AIG Stock}}.$$

Therefore, a 1% increase in AIG's stock price was associated with a 0.1362% increase in the price of the Zero-Coupon Debentures. The t-statistic for this parameter is 29.43587, which implies that there is less than a 0.01% chance that this relationship happened by chance. The regression has an adjusted $R^2$ of 0.50102, which means that 50% of the variation in the returns of the Zero-Coupon Debentures can be explained by variation in the returns of AIG's common stock.

72. The markets for the Debt Securities responded quickly to new information about AIG during the Class Period. On July 29, 2001, Michael A. Lewis at UBS Warburg raised his rating of AIG from a "buy" to a "strong buy."[66] Tom Davis at Loomis Sayles & Co. was quoted as saying, "Things got far oversold a couple weeks ago ... People's concern about financials was a little extreme."[67] The news led to a 1.14% increase in the price of the Zero-Coupon Debenture and a 3.27% increase in the price of the 0.5% Notes on July 29, 2001, based on the last trading

---

[66] Bloomberg News, "American International Raised to 'Strong Buy' at UBS Warburg," July 29, 2002.

[67] Bloomberg News, "American International, Travelers Lead Insurance Stocks Higher," July 29. 2002.

price. The Bloomberg/EFFAS U.S. Government 10+ Year Gross Price Index fell 1.18% on July 29, 2001.

73. On January 29, 2002, PNC announced that the Federal Reserve had forced it to reduce 2001 earnings because transactions involving AIG had not been accounted for properly.[68] This news led to a 1.31% drop in the price of the Zero-Coupon Debenture on January 29, 2002, based on the last trading price, as compared to a 1.09% increase in the Bloomberg/EFFAS U.S. Government 10+ Year Gross Price Index. The 0.5% Notes were not traded January 24, 2002 through January 29, 2002, however, the price drop based on Morgan Stanley-recorded transactions on January 30 and January 23 was -5.53%.

74. In response to AIG revealing that it had been subpoenaed by the SEC in connection with its transactions with PNC, the price of the 0.5% Notes fell by 2.1%, and the price of the Zero-Coupon Debentures fell by 1.17% over the two-day period of February 21 and February 22, 2002, based on the last trading price. The Bloomberg/EFFAS U.S. Government 10+ Year Gross Price Index increased 0.67% over this two-day period.

75. The October 14, 2004 announcement by Elliot Spitzer that the Office of New York State Attorney General had commenced a civil action against Marsh & McLennan Companies for fraud and antitrust violations and that AIG was implicated in a scheme to pay contingent commissions and rig bids caused the prices of the Debt Securities to fall. According to Bloomberg, the price of the Zero-Coupon Debentures decreased by 0.30% on October 14, based on the last trading price, as

---

[68] Bloomberg News, "AIG Says PNC Partnerships Won't Hurt Earnings," January 30, 2002.

compared to a 0.56% increase in the Bloomberg/EFFAS U.S. Government 10+ Year Gross Price Index. The 0.5% Notes did not trade on October 14 or 15, 2004. According to TRACE, the price of the 0.5% Notes decreased by 1.31% between October 13, 2004 and October 18, 2004, as compared to a 0.36% increase in the price of the 10-year zero-coupon Treasury STRIP.

76. Based on the number of rating agencies which followed AIG's bonds, the number of fixed income research analysts publishing research reports on AIG's bonds, the TRACE eligibility of the Debt Securities and the high level of trading relative to other TRACE-eligible debt securities, the major investment banks regularly making a market in the Debt Securities, the volume of trading in the Debt Securities, the narrow bid-ask spreads for the Debt Securities, the close relationship between the returns on AIG's common stock and the returns on the Debt Securities, and the demonstrated relationship between the release of company-specific news and the prompt price reactions of the Debt Securities, it is my opinion that the market for the Debt Securities was efficient during the Class Period.

## VIII.    Number of Customer Accounts Purchasing or Selling AIG Bonds

77. The Debt Securities, the 2.85% Medium-Term Notes, Series F, the 2.875% Notes, and the 4.25% Notes were purchased or sold by numerous investors during the Class Period. According to Morgan Stanley and Deutsche Bank account records, 273 accounts purchased or sold the 0.5% Notes and 856 accounts purchased or

sold the Zero-Coupon Debentures.[69] (See Exhibit U.)   I did not have access to the equivalent data for the 2.85% Medium-Term Notes, 2.875% Notes, and the 4.25% Notes.  For these three debt securities, I estimated the number of customer accounts that entered into transactions during the Class Period by (1) calculating the ratios of the number of customer accounts that eventually purchased or sold the 0.5% Notes and the Zero-Coupon Debentures to the number of initial purchasers of the 0.5% Notes and the Zero-Coupon Debentures and (2) multiplying that range of ratios by the number of initial purchasers of the other three debt securities.  Using this approach, I estimate that between 477 and 632 investors purchased the 2.85% Medium-Term Notes, Series F, between 693 and 920 investors purchased the 2.875% Notes, and between 748 and 991 investors purchased the 4.25% Notes.[70] (See Exhibit U).   The 4.25% Notes and the 2.875% Notes were both traded on the New York Stock Exchange.  This allowed me to identify the number of institutional holders of these two bonds as of September 2005.  The 4.25% Notes were held by 74 institutional investors.  The 2.875% Notes were held by 40 institutional investors.  It is my opinion that this is evidence that hundreds of investors purchased and sold each of the Debt Securities, the 2.85% Medium-Term Notes, Series F, the 2.875% Notes, and the 4.25% Notes during the Class Period.

---

[69] Morgan Stanley (GLRSNY1-676628-v1-AIG  Morgan Stanley Production Chart - Formatted for Print.xls), Deutsche Bank Transaction Summary Excel Spreadsheets.

[70]The source of the number of initial purchasers is the Defendant American International Group, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories.

## IX.    Conclusion

78.  It is my opinion that the market for the common stock of AIG was efficient during the Class Period.  This opinion is based on the common stock's high volume of trading, the large number of security analysts following AIG, the fact that AIG's common stock trades on the highly liquid NYSE, the substantial number of shares held and traded by institutional investors, AIG's eligibility to file on Form S-3, the demonstrated relationship between the release of company-specific news and the prompt price reactions of AIG's common stock, and the stable relationship between AIG's common stock price and the prices of options on its common stock, which conforms to put-call parity.

79.  It is my opinion that AIG's common stock price declines on October 14, 2004, October 15, 2004, March 17, 2005, March 30, 2005, March 31, 2005 and April 1, 2005 were caused by the news announcements discussed in paragraphs 49 to 55. This opinion is based on the statistical significance of the negative abnormal returns on these days according to my event studies and my analysis of other company news and intra-day stock price movements.

80.  It is also my opinion that the markets for the Debt Securities were efficient during the Class Period. This opinion is based on the number of rating agencies which followed AIG's bonds, the number of fixed income research analysts publishing research reports on AIG's bonds, the TRACE eligibility of the Debt Securities and the high level of trading relative to other TRACE-eligible debt securities, the major investment banks regularly making a market in the Debt Securities, the volume of trading in the Debt Securities, the narrow bid-ask spreads for the Debt Securities, the close relationship between the returns on AIG's common stock and the returns

42

on the Debt Securities, and the demonstrated relationship between the release of company-specific news and the prompt price reactions of the Debt Securities.

81. It is my opinion that hundreds of investors purchased and sold each of the Debt Securities, the 2.85% Medium-Term Notes, Series F, the 2.875% Notes, and the 4.25% Notes during the Class Period.

82. My analysis is based on the materials I have reviewed to date. I reserve the right to amend my opinion and file a supplemental declaration in this matter should I obtain any other significant information that leads me to change any of the opinions expressed in this declaration. To the extent this matter is adjourned for any reason, I further reserve the right to supplement this declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed: February 15, 2008

John D. Finnerty, Ph.D.

43

**APPPENDIX A**

**JOHN D. FINNERTY, PhD**

**Professor of Finance and
Director of the Master of Science in Quantitative Finance Program
Fordham University Graduate School of Business Administration**

**Managing Principal, Finnerty Economic Consulting, LLC**

Phone: (212) 599-1640
Fax: (212) 599-1242
finnerty@finnecon.com

The Lincoln Building
60 East 42nd Street, Suite 2910
New York, NY 10165

Dr. Finnerty teaches corporate finance and investment banking, including project financing. He also specializes in business valuation, securities valuation, derivatives valuation, solvency analysis, calculation of damages, and litigation support for matters involving valuation disputes, securities fraud, solvency, fairness, breach of contract, breach of fiduciary duty, commercial disputes, and employment disputes involving the valuation of employee stock options. He has testified as an expert in valuation, securities, and other financial matters in federal and state court and in arbitration and mediation proceedings. He has also testified as an expert in bankruptcy court concerning the fairness of proposed plans of reorganization.

Dr. Finnerty has published thirteen books, including *Corporate Financial Management*, 3rd ed., *Project Financing: Asset-Based Financial Engineering*, 2nd ed., *Principles of Financial Management*, and *Debt Management*, and more than 80 articles and professional papers in corporate finance, business and securities valuation, and other areas of finance. His writings and teaching have focused on the analysis and valuation of securities, especially fixed income instruments and complex derivative products, and mortgage-backed and other asset-backed securities. Dr. Finnerty is an editor of *FMA Online*, a member of the editorial boards of four other finance journals, and a former editor of *Financial Management*.

Dr. Finnerty worked for more than 20 years as an investment banker. He worked on more than 50 public and private financings, and served as financial advisor in connection with several project financings.

Dr. Finnerty is President and a Director of the Eastern Finance Association, a Director and a past President of the Fixed Income Analysts Society, and. a former Director of the Financial Management Association International. He served as Vice President – Program for the 2006 annual meeting of the Eastern Finance Association. He also served as a member of FASB's Option Valuation Group in connection with the revision of FAS 123.

# APPPENDIX A

## EDUCATION

| | |
|---|---|
| 1977 | Ph.D. in Operations Research, Naval Postgraduate School |
| 1973 | B.A. and M.A. in Economics, Cambridge University; Marshall Scholar |
| 1971 | A.B. in Mathematics, Williams College; magna cum laude with highest honors in Mathematics; Rice Prize in Mathematics; Phi Beta Kappa |

## ACADEMIC EXPERIENCE

| | |
|---|---|
| 1987 - Present | **Fordham University Graduate School of Business Administration, New York, NY** <br> Professor of Finance and Director of the Master of Science in Finance Program. <br> Received tenure in September 1991. <br> Gladys and Henry Crown Award for Faculty Excellence, 1997. |
| 1976 - 1977 | **Naval Postgraduate School, Monterey, CA** <br> Adjunct Professor, Department of Administrative Sciences |
| 1973 - 1976 | **United States Naval Reserve** <br> Instructor, Naval Postgraduate School.  Promoted to Lieutenant, USNR. |

## BUSINESS EXPERIENCE

| | |
|---|---|
| 2003 – Present | **Finnerty Economic Consulting, LLC, New York, NY** <br> Managing Principal |
| 2001 - 2003 | **Analysis Group, Inc., New York, NY** <br> Managing Principal |
| 1997 - 2001 | **PricewaterhouseCoopers, LLP, New York, NY** <br> Partner, Financial Advisory Services Group <br> Dispute Analysis & Investigations securities litigation practice |
| 1995 - 1997 | **Houlihan Lokey Howard & Zukin, New York, NY** <br> Director |
| 1989 - 1995 | **McFarland Dewey & Co., New York, NY** <br> General Partner |
| 1986 - 1989 | **College Savings Bank, Princeton, NJ** <br> Executive Vice President, Chief Financial Officer, Treasurer, Secretary, and Director |

## APPPENDIX A

| | |
|---|---|
| 1982 - 1986 | **Lazard Frères & Company, New York, NY**<br>Vice President, Corporate Finance Department |
| 1977 - 1982 | **Morgan Stanley & Co. Inc., New York, NY**<br>Associate, Corporate Finance Department |

## PROFESSIONAL ASSOCIATIONS

President, Eastern Finance Association (2007-Present) and Director (2005-Present)

President, Fixed Income Analysts Society (2006-2007), and Director (2001- Present)

Editor, FMA Online (2001 - Present)

Editor, *Financial Management* (1993-1999)

Associate Editor, *Journal of Derivatives Accounting* (2003-Present)

Associate Editor, *Journal of Applied Finance* (2000 - 2007)

Member, Advisory Boards, *The Financier* and *Journal of Portfolio Management* (1995 - Present)

Director, Financial Management Association (1991-1999, 2005-2007)

Associate Editor, *Journal of Financial Engineering* (1992-1999)

## OTHER ACTIVITIES

Leadership Giving Co-Chair, Williams College Class of 1971

Co-chairman, New Jersey Special Gifts Program, Williams College Third Century Campaign

Member, Special Gifts Committee, New York City Area for Williams College Third Century Campaign

Vice Chairman, Williams College Class of 1971 25th Reunion Gift Committee

## AWARDS

Marshall Scholar, 1971

Gladys and Henry Crown Award for Faculty Excellence, Fordham Business School, 1997

Best Investments Paper, Southern Finance Association, 2001

Best Corporate Finance Paper, Southern Finance Association, 2006

Bene Merenti Medal, Fordham University, 2007

# APPPENDIX A

## EXPERT TESTIMONY IN LAST FOUR YEARS

| Client | Case | Description of Testimony |
|---|---|---|
| Satterlee Stephens Burke & Burke LLP | First of Michigan v. J.J.B. Hilliard W.L. Lyons<br>NASD Arbitration<br>Case No. 97-05348 | Performed a damages calculation in connection with a wrongful hiring and breach of duty lawsuit. Testified at deposition twice and at arbitration. |
| Proskauer Rose LLP | Heitmeyer v. MBIA<br>American Arbitration Association | Valued tax lien certificates and performed a damage calculation in connection with a breach of contract lawsuit. Testified at arbitration. |
| Bickel & Brewer | VGS v. Castiel et al.<br>Court of Chancery of Delaware, New Castle Division<br>Civil Action No. 17995 | Valued a note and a private issue of convertible preferred stock. Testified at deposition and at trial in the Court of Chancery of the State of Delaware. |
| Weil Gotshal & Manges | Basu et al. v. Bajaj et al.<br>U.S. District Court for the Southern District of New York<br>Case No. 00-CV-4591 | Performed a damages calculation in connection with a breach of contract lawsuit. Testified at deposition and at trial. |
| Demet & Demet | Gauthier et al. v. Journal Sentinel<br>Milwaukee Circuit Court<br>Case No. 99-CV-003572 | Performed a damages calculation in connection with a breach of contract lawsuit. Testified at deposition. |
| Perkins Coie | Nowinski v. Nowinski<br>King County Superior Court State of Washington<br>Case No. 00-2-00100-2 SEA | Testified at deposition and at trial in connection with a matrimonial dispute regarding the value of a business at startup and also regarding the business interpretation of various provisions in the founder's employment agreement. |
| Davis Polk & Wardwell | Dorigol v. J.P. Morgan Chase<br>NASD Arbitration<br>Case No. 99-05013 | Measured an investor's portfolio investment performance, analyzed a series of margin calls, and calculated damages in connection with a matter alleging breach of fiduciary duty. Testified at arbitration. |
| Andrews & Kurth | Dynex v. California Investment Fund<br>U.S. District Court for the Eastern District of Virginia<br>Civil Action No. 01-0145-A | Calculated damages in a breach of contract matter growing out of an aborted merger transaction. Testified at deposition. |
| Stradley Ronon Stevens & Young | Hemispherx v. Asensio<br>U.S District Court for the Eastern District of Pennsylvania<br>Civil Action No. 98-5204 | Calculated the damages resulting from a short seller's defamation of a corporation. Testified at trial. |

# APPPENDIX A

| Client | Case | Description of Testimony |
|--------|------|--------------------------|
| King & Spalding | Wexford v. Fundamental American Arbitration Association | Calculated damages in a breach of contract matter. Testified at arbitration. |
| Faegre & Benson | Bublitz, et al. v. DuPont and Pioneer U.S. District Court for the Southern District of Iowa, Central Division Case No. 4-00-CV-90247 | Analyzed the significance of the changes in a company's employee compensation plans following an acquisition. Testified at deposition. |
| Munsch Hardt Kopf & Harr | Madison v. Omega U.S. District Court for the Eastern District of Michigan Southern Division Case No. 00-CV-72793-DT | Calculated the lost profits in a breach of contract matter. Testified at deposition. |
| Foley Hoag | Triumph v. Ascent Commonwealth of Massachusetts, Superior Court C.A. No. 01-5159-BLS | Valuation of warrants in a breach of contract matter. Testified at deposition. |
| Proskauer Rose LLP | Dujardin v. Liberty Livewire American Arbitrage Association | Valuation of a block of restricted common stock of Liberty Livewire Corporation. Testified at arbitration. |
| Winston & Strawn | Slattery v. United States U.S. Court of Federal Claims Case No. 93-280C | Performed capital calculations and a solvency analysis for Meritor Savings Bank as of the date its regulators closed it. Testified at deposition and at trial in the Court of Federal Claims. |
| Goodwin Procter Skadden Arps Slate Meagher & Flom Swidler Berlin Shereff Friedman | Forum Financial v. Harvard U.S. District Court for the District of Maine Docket No. 00-306-P-C | Valued a mutual fund services provider. Testified at deposition. |
| Coudert Brothers | Marathon v. Schroter and Briltech U.S. District Court for the Southern District of New York Docket No. 2001-CV-0595 (DC) | Calculated the lost profits in a breach of contract matter. Testified at deposition and at trial. |
| Edwards & Angell | In re Jennifer Convertibles Securities Litigation Federal District for the Eastern District of Long Island | Analyzed the stock market impact of various corporate announcements. Testified at deposition. |

## APPPENDIX A

| Client | Case | Description of Testimony |
|---|---|---|
| Cox, Wooton, Griffin, Hansen & Poulos | Miller/Thompson Constructors, Inc. v. Lucas Marine American Arbitration Association Case No. 74-110-Y-01707-01 02 KJC-R | Calculated damages in a breach of contract matter. Testified at arbitration. |
| Perkins Coie | Rhein v. Boeing and TWA U.S. District Court for the Southern District of New York Docket No. 1:98 CV 212 | Analyzed the stock market's assessment of the likelihood a proposed corporate transaction would take place. Testified at mediation. |
| O'Quinn, Laminack & Pirtle | Internet Law Library v. Southridge Capital U.S. District Court for the Southern District of New York Case No. 01 Civ 6600 (RLC) | Performed a damages calculation in connection with a lawsuit alleging breach of contract, fraud, and market manipulation. Testified at deposition. |
| Seyfarth Shaw | Streater v. Scotia Capital NASD Arbitration Case No. 02-04149 | Testified at arbitration regarding the nature of two equity derivative instruments. |
| Proskauer Rose | First Investors v. MetLife NASD, Inc. Case No. 02-05337 | Testified at arbitration regarding damages in a broker raiding case. |
| Kelley Drye & Warren | In the Matter of DHL Airways U.S. Department of Transportation – Office of Hearings, Washington D.C. Docket No. OST-2002-13089 | Testified at an administrative hearing at the U.S, Department of Transportation as to the value of DHL Airways. |
| Prince, Lobel, Glovsky & Tye, Testa Hurwitz Thibeauld | Legion Insurance v. John Hancock Financial Services U.S. District Court for the Eastern District of Pennsylvania Misc. No. 01-162 | Analyzed the causes of failure of Legion Insurance Company. Testified at deposition and at arbitration. |
| Sidley Austin Brown & Wood | CIBC v. Ace Capital Supreme Court of New York County Case No. 02-603921 | Analyzed whether a 'credit event' had occurred based on the definition contained in a credit default swap agreement. Testified at deposition and at trial. |

APPPENDIX A

| Client | Case | Description of Testimony |
|--------|------|------------------------|
| Fish & Richardson | Lehman Brothers v. Wu and Deutsche Bank U.S. District Court for the Southern District of New York Case No. 03 CV 4553 (JSR) | Prepared an expert report concerning the importance of bond market indices in the management of bond portfolios and explaining how bond market indices contribute to a bond dealer's business. Testified at deposition. |
| Bickel & Brewer | Glass v. Ranger Entrepreneurs Court of Chancery of Delaware, New Castle Division Civil Action 20245-NC | Prepared an expert report concerning the investment performance of a hedge fund manager and a supplemental report responding to the hedge fund manager's damage calculation. Testified at deposition. |
| Bingham McCutchen | Meyer v. Roberts and Salomon Smith Barney NASD Arbitration Case No. 00-04772 | Prepared an analysis of the financial consequences of a short-against-the-box strategy. Testified at arbitration. |
| Dechert, Riker, Danzig, Scherer, Hyland & Perretti | GSC Recovery v. Donaldson, Lufkin & Jenrette, et al. Superior Court of New Jersey Law Division: Morris County Docket No. MRS-L-3685-00 Civil Action | Prepared an expert report regarding the economic significance of certain corporate events and the obligation of an affiliated broker-dealer to keep a market-maker prospectus current. Testified at deposition. |
| Satterlee Stephens Burke & Burke Law Offices of Lawrence S. Leibowitz | Baird, Patrick & Co. v. Maxcor Financial et al. NASD Arbitration Case No. 03-07325 | Prepared an expert report concerning the lost profits damages in a broker raiding case. Testified at arbitration. |
| Kaplan & Levenson | McCabe, et al. v. Ernst & Young, LLP, et al. U.S. District Court for the District of New Jersey Case No. 01-CIV-5747(WHW) | Prepared an expert report and a rebuttal report concerning the damages experienced by selling shareholders in a post-merger dispute. Testified at deposition. |
| Weil, Gotshal & Manges | G-I Holdings, Inc. et al. v. Ruddles A. Bennett, Jr., et al. U.S. District Court for the District of New Jersey Adversary Proceeding No. 01-3066 | Prepared two expert reports concerning the financial impact of a corporate restructuring. Testified at deposition. |
| Debevoise & Plimpton | WellPoint Health Networks Inc. and UNICARE Life & Health Insurance Company v. John Hancock Life Insurance Company Arbitration | Prepared an expert report concerning the financial impact of an acquisition. Testified at deposition and at arbitration. |

# APPPENDIX A

| Client | Case | Description of Testimony |
|--------|------|--------------------------|
| Jones Day | MC Asset Recovery v. Southern Company<br>U.S. District Court for the Northern District of Georgia, Atlanta Division<br>Civil Action No. 1:06-CV-0417-BBM | Prepared an expert report concerning the satisfaction of the claims of the unsecured creditors in the bankruptcy of Mirant Corporation and testified at deposition. |
| Wollmuth Maher & Deutsch | State of Arkansas Teacher Retirement System v. Merrill Lynch, et al.<br>District Court, 193rd Judicial District, Dallas County, Texas, Cause No. 04-06699 | Performed damages analysis and rendered opinions concerning the private placement agent's responsibilities and the due diligence process in connection with a securities fraud matter. Testified at deposition. |
| Labaton Sucharow & Rudoff | Richard A. Williamson v. PricewaterhouseCoopers,<br>Supreme Court of the State of New York,<br>Index No. 04-602106 | Analyzed the mispricing of convertible securities and the auditor's failure to detect it. Testified at deposition. |
| Wollmuth Maher & Deutsch | AIG Annuity Insurance Company, et al. v. Sears, Roebuck and Co.<br>District Court, 192nd Judicial District, Dallas County, Texas<br>Cause No. 04-10471 | Analyzed a corporate financial engineering transaction. Testified at deposition. |
| Riker Danzig Scherer Hyland Perretti | John M. Van Deventer et al. v. CS SCF Management Limited et al.<br>Supreme Court of the State of New York<br>Index No. 603151-03 | Valued six businesses and calculated the break-up fees owing to an investment manager due to the early termination of a management contract. Testified at deposition and at trial. |
| Internal Revenue Service | Shell Petroleum v. United States of America<br>U.S. District Court for the Southern District of Texas, Houston Division<br>Index No. H-05-2016 | Provided an expert report concerning auction preferred stock. Testified at deposition and at trial. |
| Air Line Pilots Association | ALPA and U.S. Airways<br>Grievance No. MEC 05-07-01<br>(Investment Banking Fee) | Testified at an arbitration hearing regarding the customary investment banking fee for an investment bank working on an airline reorganization. |
| Sidley Austin | Jack E. Salmon, Jr. v. KPMG LLP et al.<br>Arbitration | Prepared an expert report concerning lost-compensation damages. Testified at deposition and at arbitration. |
| Wolf Haldenstein Adler Freeman & Herz | Boyce v. Soundview Technology Group<br>U.S. District Court for the Southern District of New York<br>C.A. No. 03 CV 2159 (HB) | Prepared an expert report concerning damages in a breach of contract case. Testified at deposition and at trial. |

## APPPENDIX A

## PUBLICATIONS

**Books**

1.  John D. Finnerty, <u>An Illustrated Guide to Bond Refunding Analysis.</u> The Financial Analysts Research Foundation, Charlottesville, VA, 1984.

2.  John D. Finnerty, <u>Corporate Financial Analysis: A Comprehensive Guide to Real-World Approaches for Financial Managers.</u> McGraw-Hill Book Company, New York, 1986.
    a)  Main Selection: Macmillan's <u>The Executive Program</u>
    b)  Alternate Selection: Prentice-Hall's <u>Books for Accountants</u>

3.  John D. Finnerty, Andrew J. Kalotay, and Francis X. Farrell, Jr., <u>The Financial Manager's Guide to Evaluating Bond Refunding Opportunities.</u> Ballinger Publishing Company, Cambridge, MA, 1988.

4.  Douglas R. Emery and John D. Finnerty, <u>Principles of Finance with Corporate Applications.</u> West, St. Paul, MN, 1991.

5.  John D. Finnerty and Martin S. Fridson, eds., <u>The Yearbook of Fixed Income Investing 1995.</u> Irwin Professional Publishing, Chicago, 1996.

6.  John D. Finnerty, <u>Project Financing: Asset-Based Financial Engineering.</u> John Wiley & Sons, New York, 1996.

7.  Douglas R. Emery and John D. Finnerty, <u>Corporate Financial Management.</u> Prentice Hall, Upper Saddle River, NJ, 1997.

8.  Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Principles of Financial Management</u>. Prentice Hall, Upper Saddle River, NJ, 1998.

9.  John D. Finnerty and Douglas R. Emery, <u>Debt Management</u>. Harvard Business School Press, Boston, 2001.

10. Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, 2nd ed. Prentice Hall, Upper Saddle River, NJ, 2004.

11. Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, 3rd ed. Prentice Hall, Upper Saddle River, NJ, 2007.

12. Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, Int. ed. Prentice Hall, Upper Saddle River, NJ, 2007.

13. John D. Finnerty, <u>Project Financing: Asset-Based Financial Engineering</u>, 2nd ed. John Wiley & Sons, New York, 2007.

## APPPENDIX A

### Monographs

1.    John D. Finnerty, "The PricewaterhouseCoopers Credit Derivatives Primer,"
PricewaterhouseCoopers LLP, New York, 1998.

2.    John D. Finnerty, "Structuring Derivative Instruments to Adjust Risk Exposure: The
Arithmetic of Financial Instruments," PricewaterhouseCoopers LLP, New York, 1999.

3.    John D. Finnerty, "A Comparison of Alternative Models for Valuing Employee Stock
Options," Financial Executives Research Foundation, Florham Park, NJ, January 2003.

### Papers Published in Refereed Journals

1.    John D. Finnerty, "How Often Will the Firemen Get Their Sleep?," Management Science (July
1977), pp. 1169-1173.

2.    John D. Finnerty, "Real Money Balances and the Firm's Production Function," Journal of
Money, Credit and Banking (November 1980), pp. 666-671.

3.    John D. Finnerty, "The Behavior of Electric Utility Common Stock Prices Near the Ex-
Dividend Date," Financial Management (Winter 1981), pp. 59-69.

4.    John D. Finnerty, "The Stock Market's Reaction to the Switch from Flow-Through to
Normalization," Financial Management (Winter 1982), pp. 36-47.

5.    John D. Finnerty, "Evaluating the Economics of Refunding High-Coupon Sinking-Fund Debt,"
Financial Management (Spring 1983), pp. 5-10.

6.    John D. Finnerty, "Bank Discount, Coupon Equivalent, and Compound Yields: Comment,"
Financial Management (Summer 1983), pp. 40-44.

7.    John D. Finnerty, "Preferred Stock Refunding Analysis: Synthesis and Extension," Financial
Management (Autumn 1984), pp. 22-28.

8.    John D. Finnerty, "Stock-for-Debt Swaps and Shareholder Returns," Financial Management
(Autumn 1985), pp. 5-17.

9.    John D. Finnerty, "Zero Coupon Bond Arbitrage: An Illustration of the Regulatory Dialectic at
Work," Financial Management (Winter 1985), pp. 13-17.

10.    John D. Finnerty, "Refunding Discounted Debt: A Clarifying Analysis," Journal of Financial
and Quantitative Analysis (March 1986), pp. 95-106.

11.    John D. Finnerty, "A Visit with Alice in Moneyland," Journal of Corporate Finance (Spring
1987), pp. 46-47.

## APPPENDIX A

12. John D. Finnerty, "An Analytical Framework for Evaluating Securities Innovations," Journal of Corporate Finance (Winter 1987), pp. 3-18.

13. John D. Finnerty, "Capital Budgeting and CAPM: Choosing the Market Risk Premium," Journal of Corporate Finance (Winter 1988), pp. 11-14.

14. John D. Finnerty, "Financial Engineering in Corporate Finance: An Overview," Financial Management (Winter 1988), pp. 14-33. Reprinted in Clifford W. Smith, Jr., and Charles W. Smithson, eds., The Handbook of Financial Engineering. Harper & Row, New York, 1990, ch. 3, and in Robert W. Kolb, ed., The Financial Derivatives Reader. Kolb, Miami, 1992, ch. 2.

15. John D. Finnerty, "New Issue Dividend Reinvestment Plans and the Cost of Equity Capital," Journal of Business Research (March 1989), pp. 127-139.

16. John D. Finnerty, "Measuring the Duration of a Floating-Rate Bond," Journal of Portfolio Management (Summer 1989), pp. 67-72. Reprinted in Sanjay K. Nawalkha and Donald R. Chambers, eds., Interest Rate Risk Measurement and Management. Institutional Investor Books, New York, 1999, ch. 32.

17. John D. Finnerty and Victor M. Borun, "An Analysis of Unbundled Stock Units," Global Finance Journal (Fall 1989), pp. 47-69.

18. John D. Finnerty and Michael Rose, "Arbitrage-Free Spread: A Consistent Measure of Relative Value," Journal of Portfolio Management (Spring 1991), pp. 65-77.

19. John D. Finnerty, "The Time Warner Rights Offerings: A Case Study in Financial Engineering," Journal of Financial Engineering (June 1992), pp. 38-61.

20. John D. Finnerty, "The Advance Refunding of Nonredeemable High-Coupon Corporate Debt Through In-Substance Defeasance," Journal of Financial Engineering (September 1992), pp. 150-173.

21. Douglas R. Emery and John D. Finnerty, "A Review of Recent Research Concerning Corporate Debt Provisions," Financial Markets, Institutions & Instruments (December 1992), pp. 23-39.

22. John D. Finnerty and Dean Leistikow, "College Tuition Prepayment Programs: Description, Investment Portfolio Composition, and Contract Pricing," Journal of the Midwest Finance Association (1992), pp. 165-174.

23. John D. Finnerty, "Comment: The Need to Enhance the Effectiveness of Discussants and Some Suggested Guidelines for Session Organizers and Discussants," Financial Practice and Education (Spring/Summer 1993), pp. 15-18.

## APPPENDIX A

24.  John D. Finnerty and Dean Leistikow, "The Behavior of Equity and Debt Risk Premiums," Journal of Portfolio Management (Summer 1993), pp. 73-84.

25.  John D. Finnerty, "Interpreting SIGNs," Financial Management (Summer 1993), pp. 34-47.

26.  John D. Finnerty, "Indexed Sinking Fund Debentures: Valuation and Analysis," Financial Management (Summer 1993), pp. 76-93.

27.  John D. Finnerty and Robert J. Kunze, "Arranging Financing for Biotechnology Ventures," Financier (May 1994), pp. 20-34.

28.  John D. Finnerty, "Valuing Corporate Equity When Value Additivity May Not Hold: The Case of the Newhouse Estate Valuation," Financial Practice and Education (Spring/Summer 1994), pp. 107-115.

29.  John D. Finnerty and Dean Leistikow, "The Behavior of Equity and Debt Risk Premiums": Reply to Comment, Journal of Portfolio Management (Summer 1994), pp. 101-102.

30.  John D. Finnerty, "Range Floaters: Pricing a Bet on the Future Course of Short-Term Interest Rates," Financier (November 1994), pp. 20-27. Reprinted in John D. Finnerty and Martin S. Fridson, eds., The Yearbook of Fixed Income Investing 1995. Irwin Professional Publishing, Chicago, 1996, ch. 8.

31.  John D. Finnerty, "Some Suggested Guidelines for Reviewers," Financial Practice and Education (Fall/Winter 1994), pp. 22-24.

32.  John D. Finnerty, Iftekhar Hasan, and Yusif Simaan, "Designing an Efficient Investment Strategy for Hedging the Future Cost of a College Education," Journal of Investing (Spring 1996), pp. 47-58.

33.  John D. Finnerty, "Credit Derivatives, Infrastructure Finance, and Emerging Market Risk," Financier (February 1996), pp. 64-75.

34.  John D. Finnerty, "Adjusting the Binomial Model for Default Risk," Journal of Portfolio Management (Winter 1999), pp. 93-103.

35.  John D. Finnerty, "The PricewaterhouseCoopers Credit Derivatives Primer:  Total Return Swaps," Financier (vol. 7, 2000), pp. 66-77.

36.  John D. Finnerty, "Premium Debt Swaps, Tax-Timing Arbitrage, and Debt Service Parity," Journal of Applied Finance (vol. 11, 2001), pp. 17-22.

37.  John D. Finnerty and Mark S. Brown, "An Overview of Derivatives Litigation, 1994 to 2000," Fordham Journal of Corporate & Financial Law (vol.7, 2001), pp. 131-158.

**APPPENDIX A**

38. John D. Finnerty and Dwight Grant, "Alternative Approaches to Testing Hedge Effectiveness under SFAS No. 133," Accounting Horizons (June 2002), pp. 95-108.

39. John D. Finnerty and Douglas R. Emery, "Corporate Securities Innovation: An Update," Journal of Applied Finance (Spring/Summer 2002), pp. 21-47.

40. John D. Finnerty, "Adjusting the Comparable-Company Method for Tax Differences when Valuing Privately Held "S" Corporations and LLCs," Journal of Applied Finance (Fall/Winter 2002), pp.15-30.

41. John D. Finnerty and Murray Grenville, "An Introduction to Credit Swaps," Financier (vol. 9, 2002), pp. 51-63.

42. John D. Finnerty and Murray Grenville, "An Introduction to Credit Spread Options," Financier (vol. 9, 2002), pp. 64-75.

43. John D. Finnerty and Dwight Grant, "Testing Hedge Effectiveness under SFAS 133," The CPA Journal (April 2003), pp. 40-47.

44. John D. Finnerty and George M. Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," Stanford Journal of Law, Business & Finance (Spring 2003), pp. 213-263.

45. John D. Finnerty and Douglas R. Emery, "The Value of Corporate Control and the Comparable Company Method of Valuation," Financial Management (Spring 2004), pp. 91-99.

46. John D. Finnerty, "Exact Formulas for Pricing Bonds and Options When Interest Rate Diffusions Contain Jumps," Journal of Financial Research (Fall 2005), pp. 319-341.

47. John D. Finnerty," Extending the Black-Scholes-Merton Model to Value Employee Stock Options," Journal of Applied Finance (Fall/Winter 2005), pp. 25-54.

48. John D. Finnerty, Michael J. McAllister, and Maureen M. Chakraborty, "Calculating Damages in Broker Raiding Cases," Stanford Journal of Law, Business & Finance (Spring 2006), pp. 261-297.

49. John D. Finnerty, "Using Contingent-Claims Analysis to Value Opportunities Lost Due to Moral Hazard Risk," Journal of Risk (Spring 2006), pp. 55-83.

50. John D. Finnerty and Gautam Goswami, "Determinants of the Settlement Amount in Securities Fraud Class Action Litigation," Hastings Business Law Journal (Summer 2006), pp. 453-486.

51. John D. Finnerty and Mary Kuan, "When the Insurance Regulators Sneeze, the Hybrid Market Can Catch a Cold," Journal of Insurance Regulation (Summer 2007), pp. 87-120.

## APPPENDIX A

### Other Papers and Articles

1.   John D. Finnerty, "A Closer Look at Preferred Stock Financing," Public Utilities Fortnightly (November 6, 1980), pp. 41-43.

2.   John D. Finnerty, "Evaluating a Stock-for-Debt Swap: The Proper Framework," Public Utilities Fortnightly (August 5, 1982), pp. 27-32.

3.   John D. Finnerty, "How to Lower the Cost of Floating a New Stock Issue," Public Utilities Fortnightly (March 17, 1983), pp. 25-29.

4.   John D. Finnerty, "The Pluses of Zeros," Euromoney (May 1985), p. 67.

5.   John D. Finnerty, "Refunding High-Coupon Debt," Midland Corporate Finance Journal (Winter 1986), pp. 59-74.

6.   John D. Finnerty, "The Case for Issuing Synthetic Convertible Bonds," Midland Corporate Finance Journal (Fall 1986), pp. 73-82. Reprinted in Clifford W. Smith, Jr., and Charles W. Smithson, eds., The Handbook of Financial Engineering. Harper & Row, New York, 1990, ch. 21.

7.   John D. Finnerty, "Where is the Value Added in Securities Innovation," in John Thackray, ed., Chief Financial Officer USA 1987, SPL Associates Limited, London, 1987, pp. 202-205.

8.   John D. Finnerty, "An Analysis of Tuition Prepayment Plans," in Proceedings of the Invitational Conference on College Prepayment and Savings Plans. College Entrance Examination Board, New York, 1988, pp. 25-31.

9.   John D. Finnerty, "A Private Solution to a Public Problem: A Response from the Private Sector to the College Saving Crisis," in Tax Incentives for Education. United States Senate Committee on Finance, Washington, D.C., March 15, 1988, pp. 194-204.

10.  John D. Finnerty, "How to Cope with Rising College Costs," Tax Management Financial Planning Journal (May 31, 1988), pp. 224-228.

11.  John D. Finnerty, "Measuring the Risk Premium on the Market Portfolio," in Frank J. Fabozzi, ed., The Institutional Investor Focus on Investment Management. Ballinger, Cambridge, MA, 1989, pp. 161-167.

12.  John D. Finnerty, "Measuring the Duration of Floating-Rate Debt Instruments," in Frank J. Fabozzi, ed., Advances & Innovations in the Bond and Mortgage Markets. Probus, Chicago, 1989, pp. 77-96.

## APPPENDIX A

13.  John D. Finnerty and Herbert S. Adler, "Make Securities Innovation Work to Your Advantage," Butterworths Journal of International Banking and Financial Law (February 1992), pp. 64-67.

14.  John D. Finnerty, "An Overview of Corporate Securities Innovation," Journal of Applied Corporate Finance (Winter 1992), pp. 23-39. Reprinted in Donald H. Chew, Jr., ed., The New Corporate Finance: Where Theory Meets Practice. McGraw-Hill, New York, 1993, pp. 212-228, and in Raymond H. Rupert, ed., The New Era of Investment Banking. Probus, Chicago, 1993, ch. 16.

15.  John D. Finnerty, "Financial Engineering," in the New Palgrave Dictionary of Money and Finance, vol. 2. Macmillan, London, 1992, pp. 56-63.

16.  John D. Finnerty, "Structures and Contracts which Reallocate Risk," in proceedings of the conference on Structured Finance: Design, Engineering & Production. Euromoney, Brussels, June 4-5, 1992, pp. 75-96.

17.  John D. Finnerty, "Sources of Value Added from Structuring Asset-Backed Securities to Reduce or Reallocate Risk," in Charles Stone, Anne Zissu, and Jess Lederman, eds., The Global Asset Backed Securities Market. Probus, Chicago, 1993, ch. 3.

18.  John D. Finnerty, Burton L. Raimi, and Neil R. Crowley, "Designing Securities to Qualify as Capital for Bank Regulatory Purposes," in Charles A . Stone and Anne Zissu, eds., Global Risk Based Capital Regulations: Management and Funding Strategies. Irwin Professional Publishing, Burr Ridge, IL, 1994, ch. 8.

19.  Douglas R. Emery and John D. Finnerty, "Using a PERCS-for-Common Exchange Offer to Reduce the Costs of a Dividend Cut," Journal of Applied Corporate Finance (Winter 1995), pp. 77-89.

20.  John D. Finnerty, "Financial Engineering as a Solution to Interest-Rate Risk Management Challenges," in Anthony G. Cornyn, Robert A. Klein, and Jess Lederman, eds., Controlling & Managing Interest-Rate Risk. New York Institute of Finance, New York, 1997, ch. 17.

21.  John D. Finnerty, "Russian Settlements Will Put Credit Derivatives to the Test," American Banker (December 4, 1998), p. 21.

22.  John D. Finnerty, "Will Credit Derivatives Survive the Stress Test?" Solutions (Winter 1999), pp. 5, 8.

23.  Keith R. Ugone and John D. Finnerty, "Measuring Damages in Securities Fraud Class Action Lawsuits," CD-ROM accompanying Michael R. Young, ed., Accounting Irregularities and Financial Fraud. Harcourt Professional Publishing, New York, 2000.

24.  Douglas R. Emery and John D. Finnerty, "Capital Investments," in Burton S. Kaliski, ed., Encyclopedia of Business and Finance, vol. 1. Macmillan, New York, 2001, pp. 81-85.

# APPPENDIX A

25. John D. Finnerty, "Securitizing Political Risk Investment Insurance: Lessons from Past Securitizations," in Theodore H. Moran, ed. International Political Risk Management: Exploring New Frontiers. World Bank, Washington, DC, 2001, pp. 77-147.

26. John D. Finnerty and Dwight Grant, "How to Test Hedge Effectiveness Under FAS 133," Estratégica (April/June 2001), pp. 8-16.

27. John D. Finnerty, "Debt Innovative," Fordham Business Magazine (Spring/Summer 2001), pp. 24-25.

28. Robert Sidorsky and John D. Finnerty, "Standing to Sue Under Rule 10b-5: A Fresh Look at the New Investment Doctrine," Securities Regulation Law Journal (Summer 2001), pp. 113-198.

29. John M. Althoff and John D. Finnerty, "Testing Hedge Effectiveness," in Henry A. Davis, ed., FAS 133 and the New Derivatives Accounting Landscape. Institutional Investor, New York, Fall 2001, pp. 44-51.

30. John D. Finnerty and George M. Pushner, "Meeting the New Standard for 10b-5 Class Action Damage Calculations," Analysis Group/Economics Issue Brief, 2002.

31. John D. Finnerty and Heidi Donoghue, "The Trend in Corporate Financial Disclosure," in Esmeralda O. Lyn and George J. Papaioannou, eds., Financial Services in the Evolving Global Marketplace. Hofstra University Press, New York, 2002, pp. 192-209.

32. John D. Finnerty, "How Companies Account for the Cost of Options," Wall Street Journal, October 10, 2002, p. A15.

33. John D. Finnerty and George M. Pushner, "Rule 10b-5 vs. Section 11 Securities Fraud Class-Action Damages," Analysis Group/Economics Issue Brief, 2002.

34. John D. Finnerty, "Damages Estimation After Natural Disasters," in Jack P. Friedman, ed., Litigation Support Report Writing for Accounting, Finance, and Economic Issues. Wiley, New York.

35. John D. Finnerty, "Valuing Employee Stock Options: A Comparison of Alternative Models," FMA Online (Summer 2003).

36. John D. Finnerty, "Calculating Damages in Broker Raiding Cases," in John Siegal, Protecting Corporate IP Assets: Enforcing Restrictive Covenants in the Employment Context. Practising Law Institute, New York, 2005, pp. 111-145.

## Patents

1. Peter A. Roberts, John D. Finnerty, and Hamish W. M. Norton, "Methods and Apparatus for Restructuring Debt Obligations," United States Patent Number 4,648,038, March 3, 1987.

## APPPENDIX A

2.  Peter A. Roberts, John D. Finnerty, and Hamish W. M. Norton, "Methods and Apparatus for Restructuring Debt Obligations," United States Patent Number 4,739,478, April 19, 1988.

3.  Peter A. Roberts and John D. Finnerty, "Methods and Apparatus for Funding a Future Liability of Uncertain Cost," United States Patent Number 4,752,877, June 21, 1988.

4.  Peter A. Roberts and John D. Finnerty, "Methods and Apparatus for Insuring the Funding of a Future Liability of Uncertain Cost," United States Patent Number 4,839,804, June 13, 1989.

## APPENDIX B
## DOCUMENTS CONSIDERED

### Legal Documents:

In Re American International Group, Inc. Securities Litigation, Consolidated Third Amended
Class Action Compliant, December 15, 2006.

Defendant American International Group, Inc.'s Responses and Objections to Plaintiff's First Set
of Interrogatories, June 22, 2007.

Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989).

### News Releases / Reports:

Bloomberg News, "AIG Says PNC Partnerships Won't Hurt Earnings," January 30, 2002.

Bloomberg News, "PNC Probe by SEC Widens With Subpoena to Ernst & Young, AIG,"
February 20, 2002.

Business Wire, "AIG Issues Estimate of Hurricane and Typhoon Losses," October 14, 2004.

Bloomberg News, "Spitzer Investigation Reveals Corruption In Insurance Industry," October 14,
2004.

Bloomberg News, "Marsh, AIG and Insurer Stocks Plunge as Spitzer Begins Probe," October 14,
2004.

Bloomberg News, "Marsh Employees Implicated in Plea Deals by Two AIG Executives,"
October 14, 2004.

Bloomberg News, "Insurer Shares Gain on the Prospect of '03 Rate Increases," October 15,
2002.

TheStreet.com, "Spitzer Charges Marsh & McLennan in Insurance Racket," October 15, 2004.

Bloomberg News, "AIG Teleconference: Greenberg Responds to Spitzer Inquiry," October 15,
2004.

Bloomberg News, "AIG is a 'Buy' Amid Spitzer Probe, Goldman and Merrill Say," October 15,
2004.

Bloomberg News, "Bonds of Insurance Brokers, Sellers Weaken on Spitzer Charges," October
15, 2004.

Wall Street Journal, "Risky Business, Insurers Reel from Spitzer's Strike, Subpoena on Bid-
Rigging Spurred Rush to Admit Collusion with Broker, Fallout for a Family Dynasty,"
October 18, 2004.

Wall Street Journal, "AIG Review of Accounting Finds Blemishes," March 17, 2005.

- 1 -

**APPENDIX B**
**DOCUMENTS CONSIDERED**

Bloomberg News, "General Re Ex-Chief May Be Investigated Over AIG Role, WSJ Says," March 17, 2005.

Bloomberg News, "AIG Review Reveals Figures That May Need Adjusting, WSJ Says," March 17, 2005.

AIG Press Release, "AIG Delays Form 10-K Filing to Complete Review," March 30, 2005.

Bloomberg News, "AIG Officials Intentionally Gave False Information, WSJ Says," March 30, 2005.

Bloomberg News, "Standard & Poor's Seifert: AIG's Accounting, 'Hold' Rating," March 30, 2005.

Bloomberg News, "AIG Credit Rating Cut by Standard & Poor's, Loses AAA Status," March 30, 2005.

Citigroup Smith Barney, "AIG: Reducing EPS Estimates; Maintain Hold Rating," March 31, 2005.

Deutsche Bank, "American Intl. Group – Many issues remain for the board," March 31, 2005.

Wall Street Journal, "SEC Asks AIG's Accountant for Documents on General Re," March 31, 2005.

Bloomberg News, "AIG's Auditors Subpoenaed for Documents in Probe, WSJ Reports," March 31, 2005.

Bloomberg News, "AIG's Accounting Disclosure May Not Be the Last, NYT Says," March 31, 2005.

Bloomberg News, "Bloomberg Markets Magazine Examines AIG's Future In Wake of Scan," March 31, 2005.

Bloomberg News, "AIG Debt Rating Is Cut by Moody's to Aa1 Over Accounting Flaws," March 31, 2005.

Bloomberg News, "AIG's Credit-Rating Cut May Reduce Earnings Growth," March 31, 2005.

Wall Street Journal, "Palace Coup, After a 37-Year Reign at AIG, Chief's Last Tumultuous Days, Faced with Indictment Threat, Directors Move Quickly Against Mr. Greenberg," April 1, 2005.

Wall Street Journal, "Probe of AIG Hits on More Potential Problems," April 1, 2005.

Bloomberg News, "U.S. Regulators Probe AIG for Other Possible Problems, WSJ Says," April 1, 2005.

## APPENDIX B
## DOCUMENTS CONSIDERED

Bloomberg News, "AIG's Board Moved After Spitzer's Indictment Threat," April 1, 2005.

Bloomberg News, "AIG Shares Tumble on Concern About Accounting Probes," April 1, 2005.

Bloomberg News, "AIG Shares Fall to Lowest in Two Years Amid Regulatory Probes," April 1, 2005.

Bloomberg News, "American Int'l-AIG downgrading to Hold from Buy@AGED," April 1, 2005.

AIG Press Release, April 3, 2005.

Bloomberg News, "AIG Sends Letter to Shareholders," April 3, 2005.

Bloomberg News, "AIG Finds Efforts to Remove Documents from Bermuda Building," April 3, 2005.

Bloomberg News, "AIG Raised to 'Overweight' at Morgan Stanley," April 4, 2005.

Bloomberg News, "American International Raise to 'Buy' at Smith Barney," April 4, 2005.

Wall Street Journal, "AIG Investors Are Learning A Hard Lesson," April 4, 2005.

Office of New York State Attorney General, "Statement by Attorney General Eliot Spitzer Regarding the AIG Investigation," April 4, 2005.

Bloomberg News, "AIG Shares Jump as Spitzer Says Civil Settlement 'Achievable,'" April 4, 2005.


### Books:

Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, *Modern Portfolio Theory and Investment Analysis*, 6th ed., John Wiley & Sons, 2003, page 402.

Emery, Douglas R., John D. Finnerty, and John D. Stowe, *Corporate Financial Management*, 3rd ed., Prentice Hall, 2007, page 422.

Morningstar, *Cost of Capital 2007 Yearbook*, 2007.

### Journals and Articles:

Bessembinder, Hendrik, William Maxwell, and Kumar Venkataraman, "Market Transparency, Liquidity Externalities, and Institutional Trading Costs in Corporate Bonds," *Journal of Financial Economics,* 82, 2006, pages 251-288.

## APPENDIX B
## DOCUMENTS CONSIDERED

S. Chakravarty and A. Sarkar, "Liquidity in U.S. Fixed Income Markets: A Comparison of the Bid-Ask Spread in Corporate, Government and Municipal Markets," Purdue University and Federal Reserve Bank of New York working paper.

Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, (forthcoming).

Fama, Eugene, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 25, March 1970, pages 383-417.

Fama, E.F. and K.R. French, "Common Risk Factors, in the Returns on Stocks and Bonds," *Journal of Financial Economics*, 33, (1993), pages 3-56.

Boehme, Rodney D. and Sorin M. Sorescu, "The Long-run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Change," *Journal of Finance,* 57, 2002, pages 871-900.

Ang, James S. and Shaojun Zhang, "An Evaluation of Testing Procedures for Long Horizon Event Studies," *Review of Quantitative Finance and Accounting*, 23, 2004, pages 251-274.

Hotchkiss, Edith S. and Tavy Ronen, "The Informational Efficiency of the Corporate Bond Market: An Intraday Analysis," *The Review of Financial Studies*, 15, Winter 2002, pages 1325-1354.

G. Hong and A. Warga, "An Empirical Study of Corporate Bond Market Transactions," *Financial Analysts Journal*, 56, 2000, pages 32-63.

James, Lorie and Victor Niederhoffer, "Predictive and Statistical Properties of Insider Trading," *Journal of Law and Economics*, 11, April 1968, pages 91-103.

Jaffe, Jeffrey, "Special Information and Insider Trading," *Journal of Business*, 47, July 1974, pages 410-428.

Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets, *Journal of Financial Economics*, 74, 2004, pages 305-342.

**Other Sources:**

Bloomberg LLP.

Optionmetrics Ivy DB database

Thomson Financial

**APPENDIX B**
**DOCUMENTS CONSIDERED**

NYSE TAQ Data

The New York Stock Exchange Listed Company Manual.

U.S. Securities and Exchange Commission, Form S-3, General Instructions

Federal Register, Vol. 70, No. 148, August 3, 2005, page 44,727.

Morgan Stanley (GLRSNY1-676628-v1-AIG Morgan Stanley Production Chart - Formatted for Print.xls)

Bear Stearns Transaction Summary (Bates numbers: BSC 0001 – BSC 0085)

Citicorp Transaction Summary (Bates numbers: CGMI 0001 - CGM 0086)

Goldman Sachs Transaction Summary

Lehman Brothers Transaction Spreadsheet (Bates numbers: LBI 2 – LBI 3)

Deustche Bank Transaction Summary

$210,000,000 American International Group, Inc. 0.5% Cash Exchangeable Equity-Linked Senior Notes due May 15, 2007, Prospectus Supplement, May 8, 2000.

$1,519,734,000 American International Group, Inc., Zero Coupon Convertible Senior Debentures Due 2031, Prospectus, November 7, 2002.