**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————— x
                                            :
                                            :        <u>**ECF CASE**</u>
IN RE AMERICAN INTERNATIONAL GROUP,         :
INC. SECURITIES LITIGATION                  :        Master File No. 04 Civ. 8141 (JES) (AJP)
                                            :
This Document Relates To:  All Actions      :        <u>Oral Argument Requested</u>
                                            :
———————————————————— x


<u>**LEAD PLAINTIFF'S REPLY BRIEF IN FURTHER SUPPORT OF**</u>
<u>**ITS MOTION FOR CLASS CERTIFICATION**</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... iii

I.      THE THREE OHIO STATE FUNDS ARE DISTINCT ENTITIES ................................ 1

II.     THIS ACTION MEETS THE REQUIREMENTS OF RULE 23(a) ................................. 2

        A.      Rule 23(a)(3): Lead Plaintiff's Claims Are Typical of the Claims of
                Other Class Members .............................................................................................. 2

                1.      Purchases of AIG Stock by Certain of the Three Ohio State
                        Funds Following Disclosures Do Not Make the Funds Atypical ................. 2

                        (a)     All the Ohio State Funds Did Not Increase Their
                                Holdings in AIG Stock After Disclosures of the Fraud ................... 5

                2.      Purchases Made Based on "Value," or Pursuant to "Index"
                        Trading or Quantitative Modeling, Do Not Render the  Three
                        Ohio State Funds Atypical ........................................................................... 6

                        (a)     Purchases Made Based on Belief of a "Good Value"
                                Satisfy Reliance ............................................................................... 7

                        (b)     Trades Made Pursuant to Index and Quantitative
                                Strategies Satisfy Reliance ............................................................... 7

        B.      Rule 23(a)(4): The Three Ohio State Funds Will Adequately Protect the
                Interests of the Class .............................................................................................. 9

                1.      Lead Plaintiff's Credibility Is Not Subject to Attack Because of
                        the Three Ohio State Funds' Purported Failure to Preserve
                        Certain Documents ..................................................................................... 9

                        (a)     The Three Ohio State Funds Preserved and Produced All
                                Relevant, Non-Duplicative Documents ............................................ 9

                        (b)     Numerous Courts Have Certified Classes Even Where
                                the Proposed Class Representatives Actually Destroyed
                                Relevant Documents ....................................................................... 12

                2.      Defendants' Oft-Rejected Conflict Arguments Are Unavailing .............. 13

                        (a)     Courts Routinely Reject "Conflict"  Arguments Made
                                By Defendants Here ......................................................................... 13

                        (b)     There Is No Conflict Between Class Members with Only
                                Bid-Rigging Claims and Class Members with Claims
                                Based on Both the Bid-Rigging and Accounting Frauds .................. 14

                        (c)     No Conflict Exists Between Lead Plaintiff and Class
                                Members Who Acquired AIG Stock Through the HSB
                                and American General Mergers ....................................................... 16

III.    THIS ACTION MEETS THE REQUIREMENTS OF RULE 23(b)(3) ......................... 17

        A.      There Is Predominance Between Bid-Rigging and Accounting Frauds ............... 17

        B.      Issues of Reliance Predominate .......................................................................... 17

1. Standards for Establishing Reliance at the Class Certification Stage ............................................................................................... 17

2. Defendants Have Not Satisfied Their Burden of Rebutting the Fraud-on-the-Market Presumption of Reliance .................................... 19

 (a) Dr. Finnerty Properly Controlled for the Insurance Industry's Price Decline on October 14 and 15, 2004 ........................... 19

 (b) Defendants' Own Experts Have Approved or Used Confidence Levels Below the 95% Level ................................................ 20

 (c) News of the Fraudulent AIG-Gen Re Transaction Caused the Price of AIG's Stock to Decline ................................. 22

C. Loss Causation Is a Common Issue for All Class Members ................................ 23

IV. THE COURT SHOULD CERTIFY THE CLASS WITH RESPECT TO AIG BONDS ............................................................................................ 24

V. CONCLUSION ............................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*In re Alstom SA Sec. Litig.*,
   No. 03-6595, 2008 WL 4053361 (S.D.N.Y. Aug. 26, 2008).........................................................*passim*

*In re AM Int'l, Inc. Sec. Litig.*,
   108 F.R.D. 190 (S.D.N.Y. 1985) .............................................................................. 3, 4, 7, 15

*In re Avon, Sec. Litig.*,
   No. 91 Civ. 2287 (LMM), 1998 WL 834366 (S.D.N.Y. Nov. 30, 1998) .................................................. 4

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)................................................................................................ 17, 18, 19

*Bello v. Integrated Res., Inc.*,
   No. 88 Civ. 1214 (CSH), 1990 WL 52087 (S.D.N.Y. Apr. 19, 1990)........................................................ 5

*Berwecky v. Bear, Stearns & Co.*,
   197 F.R.D. 65 (2000) ................................................................................................ 5, 24

*In re Blech Sec. Litig.*,
   No. 94 Civ. 7696, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) .................................................. 24, 25

*Bovee v. Coopers & Lybrand*,
   216 F.R.D. 596 (S.D. Ohio 2003)........................................................................................ 13

*In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*,
   Case No. 02-6030, 2006 WL 891362 (D.N.J. Apr. 4, 2006) ................................................................ 14

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
   No. 03-2522, 2006 WL 1180267 (N.D. Cal. May 3, 2006)................................................................ 15

*Cosmas v. DelGiorno*,
   No. CV-94-1974, 1995 WL 62598 (E.D.N.Y. Feb. 8, 1995) ................................................................ 9

*In re DaimlerChrysler AG Sec. Litig.*,
   216 F.R.D. 291 (D. Del. 2003) ........................................................................................ 16

*Darquea v. Jarden Corp.*,
   No. 06 Civ. 722 (CLB), 2008 WL 622811 (S.D.N.Y. Mar. 6, 2008) ............................................... 2, 18

*Davis v. Merrill Lynch*,
   906 F.2d 1206 (8th Cir. 1990) ........................................................................................ 24

*Dura Pharms. v. Broudo*,
   544 U.S. 336 (2005)................................................................................................ 16

*Feder v. Elec. Data Sys. Corp.*,
   429 F.3d 125 (5th Cir. 2005) .................................................................................... 4, 8

*Fisher v. Plessey Co. Ltd.*,
   103 F.R.D. 150 (S.D.N.Y. 1984) .................................................................................. 14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2008) .................................................................................. 24

*In re Frontier Ins. Group, Inc. Sec. Litig.*,
   172 F.R.D. 31 (E.D.N.Y. 1997) ...................................................................................... 3

*Gary Plastic Packaging Corp. v. Merrill Lynch*,
   119 F.R.D. 344 (S.D.N.Y. 1988) ................................................................................... 4

*Gary Plastic Packaging Corp. v. Merrill Lynch*,
   903 F.2d 176 (2d Cir. 1990) .......................................................................................... 4

*In re GenesisIntermedia, Inc. Sec. Litig.*,
   232 F.R.D. 321 (D. Minn. 2005) ................................................................................... 5

*In re Geopharma, Inc. Sec. Litig.*,
   399 F. Supp. 2d 432 (S.D.N.Y. 2005) ........................................................................ 22

*Glidepath Holding B.V. v. Spherion Corp.*,
   No. 04 Civ. 9758, 2007 WL 2176072 (S.D.N.Y. July 26, 2007) .............................. 23

*In re HealthSouth Corp. Sec. Litig.*,
   213 F.R.D. 447 (N.D. Ala. 2003) .......................................................................... 15, 17

*Hicks v. Morgan Stanley & Co.*,
   No. 01-10071, 2003 WL 21672085 (S.D.N.Y. July 16, 2003) .................................. 24

*In re Honeywell Int'l Inc. Sec. Litig.*,
   211 F.R.D. 255 (D.N.J. 2002) ..................................................................................... 15

*In re Initial Public Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) .......................................................................................... 18

*Kadas v. MCI Systemhouse Corp.*,
   255 F.3d 359 (7th Cir. 2001) ....................................................................................... 21

*In re King Pharms., Inc., Sec. Litig.*,
   No. 03 Civ. 77, 2007 WL 1830757 (E.D. Tenn. June 22, 2007) ............................... 16

*Kovaleff v. Piano*,
   142 F.R.D. 406 (S.D.N.Y. 1992) .................................................................................. 5

*Lapin v. Goldman Sachs & Co.*,
   No. 04 Civ. 2236, 2008 WL 4222850 (S.D.N.Y. Sept. 15, 2008) ................. 2, 18, 24, 25

*Lehocky v. Tidel Techs., Inc.*,
  220 F.R.D. 491 (S.D. Tex. 2004) ................................................................................. 21

*In re Micron Techs., Inc. Sec. Litig.*,
  247 F.R.D. 627 (D. Idaho 2007) ................................................................................. 18

*Miller v. Asensio & Co.*,
  364 F.3d 223 (4th Cir. 2004) ....................................................................................... 22

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132 (S.D.N.Y. 2008) .................................................................................. 3

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) ........................................................................................ 5

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) .......................................................................... 14, 15

*In re Nature's Sunshine Product's Inc. Sec. Litig.*,
  251 F.R.D. 656 (D. Utah 2008) ................................................................................... 18

*In re Nortel Networks Corp. Sec. Litig.*,
  No. 01 Civ. 1855, 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) ........................... 3, 8

*In re Olsten Corp. Sec. Litig.*,
  3 F. Supp. 2d 286 (E.D.N.Y. 1998) ............................................................................ 16

*In re Omnicom Group, Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) ........................................................................ 23

*Oscar Private Equity Inv. v. Allegiance Telecom Inc.*,
  487 F.3d 261 (5th Cir. 2007) ................................................................................. 17, 18

*In re Oxford Health Plans, Inc.*,
  191 F.R.D. 369 (S.D.N.Y. 2000) ................................................................................ 15

*People United for Children v. City of New York*,
  214 F.R.D. 252 (S.D.N.Y. 2003) .................................................................................. 9

*In re Polaroid ERISA Litig.*,
  240 F.R.D. 65 (S.D.N.Y. 2006) ................................................................................... 13

*In re Priceline.com Inc.*,
  236 F.R.D. 89 (D. Conn. 2006) ..................................................................................... 7

*Rocco v. Nam Tai Elecs., Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ..................................................................... 3, 4, 5, 13

*Rolex Employees Ret. Trust v. Mentor Graphic Corp.*,
  136 F.R.D. 658 (D. Or. 1991) ....................................................................................... 4

*Ross v. Abercrombie & Fitch Co.*,
   No. 05 Civ. 0819, 2008 WL 4059873 (S.D. Ohio Aug. 26, 2008) ...................................... 18

*In re SCOR Holding (Switzerland) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008) ............................................................................ 14

*Saddle Rock Partners v. Hiatt*,
   No. 96 Civ. 9474, 2000 WL 1182793 (S.D.N.Y. Aug. 21, 2000) ........................................ 9

*In re Salomon Analyst Metromedia*,
   236 F.R.D. 208 (S.D.N.Y. 2006) ...................................................................................... 3

*In re Salomon Analyst Metromedia*,
   2008 WL 4426412 (2d Cir. Sept. 30, 2008) ............................................................. *passim*

*In re Schering-Plough Corp. Sec. Litig.*,
   No. 01 Civ. 829, 2003 WL 25547564 (D.N.J. Oct. 10, 2003) ............................................ 8

*In re Seagate Tech. II Sec. Litig.*,
   843 F. Supp. 1341 (N.D. Cal. 1994) .......................................................................... 15, 16

*Smithkline Beecham Corp. v. Apotex Corp.*,
   247 F. Supp. 2d 1011 (N.D. Ill. 2003), *aff'd*, 365 F.3d 1306 (7th Cir. 2004) ...................... 21

*Sprague v. General Motors Corp.*,
   133 F.3d 388 (6th Cir. 1998) .......................................................................................... 5

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998) ...................................................................................... 13

*Thompson v. Jiffy Lube Int'l, Inc.*,
   2007 WL 608343 (D. Kan. Feb. 22, 2007) ...................................................................... 13

*Toure v. Cent. Parking Sys. of New York*,
   No. 05-5237, 2007 WL 2872455 (S.D.N.Y. Sept. 28, 2007) ............................................ 17

*In re UBS Auction Rate Sec. Litig.*,
   No. 08 Civ. 2967, 2008 WL 2796592 (S.D.N.Y. July 16, 2008) ........................................ 5

*United States v. Conner*,
   262 F.App'x 515 (4th Cir. 2008) .................................................................................... 21

*United States v. Rutkoske*,
   506 F.3d 170 (2d Cir. 2007) .......................................................................................... 23

*United States v. Schiff*,
   538 F. Supp. 2d 818 (D.N.J. 2008) ................................................................................ 23

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
   Nos. Civ. 99-274, Civ. 99-846, 2004 WL 1305849 (D. Del. June 9, 2004) ........................ 21

*In re Vivendi Universal, S.A.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ................................................................................ 13

*Wagner v. Barrick Gold Corp.*,
  251 F.R.D. 112 (S.D.N.Y. 2008) ..................................................................... 3, 18, 24

*Waisome v. Port Authority of New York and New Jersey*,
  948 F.2d 1370 (2d Cir. 1991) ................................................................................. 21

*Weil v. Long Island Sav. Bank, FSB*,
  200 F.R.D. 164 (E.D.N.Y. 2001) ............................................................................ 13

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 (N.D. Okla. 2007) ................................................................ 23

*Wilson v. Comtech Telecomm. Corp.*,
  648 F.2d 88 (2d Cir. 1981) ..................................................................................... 22

*In re World Access Inc. Sec. Litig.*,
  310 F. Supp. 2d 1281 (N.D. Ga. 2004) ..................................................................... 4

*In re WorldCom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ...................................................................... 5, 7, 8

*Ziemack v. Centel Corp.*,
  163 F.R.D. 530 (N.D. Ill. 1995) ............................................................................. 15

## OTHER AUTHORITIES

1 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 3.26
  (4th ed. 2008) ........................................................................................................ 14

The Ohio Public Employees Retirement System ("OPERS"), State Teachers Retirement System of Ohio ("STRS Ohio") and the Ohio Police & Fire Pension Fund ("OP&F") (collectively, "Lead Plaintiff" or the "Ohio State Funds"), respectfully submit (1) this reply memorandum of law in further support of their motion for class certification; and (2) the accompanying declaration of Zachary M. Ratzman ("Ratzman Decl.") in support thereof.

In nearly 80 pages of briefs (and hundreds of pages of expert reports and exhibits), Defendants attempt to defeat class certification using a "kitchen sink" approach that raises as many purported "issues" as possible with the hope that one "sticks." Yet Defendants' briefs ignore the fact that **this Court certified the class and appointed OPERS and STRS Ohio as class representatives in the Freddie Mac securities case**. (Ratzman Decl. Ex. 1.) So too, here, for the reasons below, the Court should reject Defendants' arguments and grant Lead Plaintiff's motion in its entirety.

## I.   THE THREE OHIO STATE FUNDS ARE DISTINCT ENTITIES

Although OPERS, STRS Ohio and OP&F were all appointed as Lead Plaintiff in this action by the Court in February 2005, the three Funds are not – as Defendants implicitly argue – a single institution, for purposes of class certification or otherwise. Rather, each of the Funds operates with its own retirement constituency, investment assets, governing board, legal department and investment personnel. Each institution also has its own document retention and document preservation policies and practices.

Moreover, each of the three Funds has its own distinct investment strategy and investment procedures. For example, OP&F relies entirely on independent, external advisers that have complete discretion to make day-to-day investment decisions. Six of OP&F's external advisers purchased AIG stock on the Fund's behalf during the Class Period – five of them based their investment decisions on fundamental research (*e.g.*, analyst reports, SEC filings, earnings releases, historical prices), while one made its purchases and sales using quantitative investment strategies.[1]

---

[1]   "Quantitative" investment strategies use complex mathematical and statistical modeling to make investment decisions about particular securities. These models include variables such as a stock's historical price, earnings per share, and/or other financial information. *See* Richard Tortoriello, *Quantitative Strategies for Achieving Alpha* 3 (McGraw-Hill 2008).

OPERS and STRS Ohio also have external investment advisers that purchased AIG on their behalf during the Class Period.  However, unlike OP&F, OPERS and STRS Ohio also have *internally*-managed portfolios that purchased AIG during the Class Period.  Those internally-managed portfolios rely heavily on "indexing" and quantitative investment strategies.[2]

The investments of all three Funds are extremely diversified, and AIG was one of literally thousands of investments that they held during the Class Period.

## II.      THIS ACTION MEETS THE REQUIREMENTS OF RULE 23(a)

### A.      Rule 23(a)(3): Lead Plaintiff's Claims Are Typical of the Claims of Other Class Members

Defendants argue that the three Ohio State Funds are subject to "unique defenses" and are thus atypical for two reasons: (1) certain of the Funds allegedly increased their AIG stock holdings after disclosures of the fraud; and (2) certain of the Funds used indexing or quantitative investment strategies to purchase AIG stock.  Each argument fails on the merits.[3]

#### 1.      Purchases of AIG Stock by Certain of the Three Ohio State Funds Following Disclosures Do Not Make the Funds Atypical

Arguing that "Lead Plaintiff" increased "its" holdings in AIG stock after the disclosure of AIG's frauds, Defendants argue that the three Ohio State Funds may be subject to a unique defense because "a plaintiff cannot rely on [the presumption of reliance] if it continued to increase its holdings after being placed on notice of the alleged fraud."  (AIG Br. at 11.)[4]  This argument fails, for several reasons.

---

[2]   "Indexing" is a passive investment strategy that attempts to replicate the investment returns of a broad market index (*e.g.*, S&P 500 or Russell 1000) by investing in some or all of the individual stocks within the index. *See* Zvi Bodie et al., *Essentials of Investments* 125 (Irwin 1992) (1995).

[3]   "[T]he rule barring certification of plaintiffs subject to unique defenses is not rigidly applied in this Circuit; in fact, a representative may satisfy the typicality requirement even though the party may later be barred from recovery by a defense particular to him [or her] that would not impact other class members." *Lapin v. Goldman Sachs & Co.*, No. 04 Civ. 2236, 2008 WL 4222850, at *82 (S.D.N.Y. Sept. 15, 2008) (Sullivan, J.); *Darquea v. Jarden Corp.*, No. 06 Civ. 722, 2008 WL 622811, at *3 (S.D.N.Y. Mar. 6, 2008) (Brieant, J.) (same).

[4]   "AIG Br." refers to AIG's August 20, 2008 brief opposing class certification; "Greenberg Br." refers to the September 23, 2008 brief by Maurice R. Greenberg (and related entities and individuals); "Gen Re Br." refers to the September 23, 2008 brief by the Gen Re Defendants; and "Moving Br." refers to Lead Plaintiff's February 20, 2008 brief in support of its motion for class certification.

First, as Your Honor recognized in *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131 (S.D.N.Y. 2007), "there is no *per se* rule" that a plaintiff is atypical because it increased its holdings after the disclosure or partial disclosure of an alleged fraud. *Id.* at 136. Rather, the relevant inquiry is whether a plaintiff *relied on the market* in making the purchases at issue. Indeed, as this Court has found:

> The fact that a purchaser may have also considered a number of other factors in making his decision to purchase does not render him subject to a unique defense, *so long as he substantially or significantly relied upon either the challenged statements or the integrity of the market*.

*In re AM Int'l, Inc. Sec. Litig.,* 108 F.R.D. 190, 195 (S.D.N.Y. 1985) (Sprizzo, J.) (emphasis added) (citing *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 92 (2d Cir. 1981)).

As such, numerous courts in the Second Circuit have held that increases in holdings made post-disclosure do not defeat typicality where the purchases were made in reliance on public information or the integrity of the market. *See*, *e.g.*, *In re Monster Worldwide, Inc. Sec. Litig*., 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (Rakoff, J.) ("As numerous courts have held, the fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [the representative] relied on the integrity of the market during the class period…"); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 117 (S.D.N.Y. 2008) (Berman, J.) (finding typicality where plaintiff relied on public information in making post-class period purchases pursuant to an "investment technique used to decrease the average cost of the investment"); *In re Salomon Analyst Metromedia*, 236 F.R.D. 208, 216 (S.D.N.Y. 2006) (Lynch, J.) ("[T]he fact that a [plaintiff] purchased additional shares in reliance on the integrity of the market *after* the disclosure of corrective information has no bearing on whether or not [the plaintiff] relied on the integrity of the market during the class period. . . ."), *rev'd on other grounds*, -- F.3d --, 2008 WL 4426412 (2d Cir. Sept. 30, 2008).[5]

---

[5]   *See also In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855, 2003 WL 22077464, at *3 (S.D.N.Y. Sept. 8, 2003) (Berman, J.) (although plaintiff purchased Nortel stock "well after the alleged fraud was exposed," court found typicality because "reliance is clearly alleged" and was a question for the jury); *In re Frontier Ins. Group, Inc. Sec. Litig.*, 172 F.R.D. 31, 42 (E.D.N.Y. 1997) (Nickerson, J.) (finding typicality where there was no evidence that plaintiff's post-disclosure purchases were made "independent of market information"). The same is

Cases that Defendants cite (*see* AIG Br. at 11) are in accord, because the common basis for the courts' findings of atypicality in those decisions were facts that undermined the assertion of reliance in connection with the plaintiffs' post-disclosure purchases.  For example, *Gary Plastic Packaging Corp. v. Merrill Lynch*, 903 F.2d 176 (2d Cir. 1990), did not even involve the purchase of stock.  Rather, in that case, the plaintiff – a closely held corporation with only four shareholders – alleged that it had purchased $100,000 certificates of deposit relying "solely on the oral representations" of the defendant broker.  *See Gary Plastic Packaging Corp. v. Merrill Lynch*, 119 F.R.D. 344, 346-47 (S.D.N.Y. 1988).  The district court found the plaintiff atypical because it had purchased several CDs after learning that the broker's oral representations regarding the CDs were false and *that the fraud was ongoing* – the result being that "the elements of materiality and reliance, crucial in any fraud case, are undermined." *Id.* at 348.

Likewise, in *Rocco*, 245 F.R.D. at 135-36, the individual plaintiff had argued that his post-disclosure purchases were "made strategically" based on his belief that the company had put its problems behind it and had "upside potential." *Id.* at 136.  However, the Court questioned whether the plaintiff had relied on the market in making those purchases, and cited the fact that the plaintiff claimed to have been aware of a second, *undisclosed* fraud at the time of the purchases.  *Id.* ("The fact that [plaintiff] is alleging this second fraud and still made his post-class purchases while this ongoing issue was known to him makes him subject to potential unique defenses.").[6]

Unlike in those cases, ***there are no questions concerning the three Ohio State Funds' reliance because there is absolutely no evidence that any of the Funds (or their external advisers) relied on non-***

---

true for courts outside this Circuit.  *See Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005) ("Reliance on the integrity of the market prior to disclosure of alleged fraud . . . is unlikely to be defeated by post-disclosure reliance on the integrity of the market.").

    6   The other cases on which Defendants rely are similarly distinguishable.  *See In re World Access Inc. Sec. Sec. Litig.*, 310 F. Supp. 2d 1281, 1300 (N.D. Ga. 2004) (finding that individual plaintiff could not show reliance because his rationale for post-disclosure purchases was his belief that the defendant company would be acquired by WorldCom); *Rolex Employees Ret. Trust v. Mentor Graphic Corp.*, 136 F.R.D. 658, 663-64 (D. Or. 1991) (post-disclosure purchases made by trustee on behalf of trust where court questioned whether defendants' misstatements were "material" to his investment decisions); *AM Int'l*, 108 F.R.D. at 194 (finding atypical several individual investors whose *only* purchases of the stock at issue were made after the end of the class period).  Finally, in *In re Avon, Sec. Litig.*, No. 91 Civ. 2287, 1998 WL 834366, at *7-8 (S.D.N.Y. Nov. 30, 1998) (McKenna, J.), the Court found the individual plaintiff *satisfied* typicality despite his post-disclosure increase in holdings.

4

*public information or anything other than the integrity of the market at the time they made their purchases of AIG securities*, whether before or after the disclosure of AIG's fraud. (*See* Section II.A.2.)

Moreover, *Defendants do not cite, nor does our research reveal, any cases in which a court has found an institutional investor atypical based solely on its having increased its holdings after disclosures or partial disclosures of fraud*.[7]  Such a *per se* rule (that the Court rejected in *Rocco*) would disqualify as class representatives virtually all institutional investors, many of whom use indexing and other investment strategies that naturally lead to post-disclosure purchases.  Automatically disqualifying such investors would defeat Congress's preference for institutional investors to serve as lead plaintiffs. *See In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967, 2008 WL 2796592, at *4 (S.D.N.Y. July 16, 2008) (McKenna, J.).[8]

> **(a)** **All the Ohio State Funds Did Not Increase Their Holdings in AIG Stock After Disclosures of the Fraud**

Even if the Court deems the three Ohio State Funds' post-disclosure purchases to be relevant, *all three of the three Funds did not increase their holdings in AIG stock*, as Defendants misleadingly argue. (AIG Br. at 1, 11-12.)  As Defendants know, each of the three Funds has its own unique trading pattern.  For example, with respect to the October 14 and 15, 2004 bid-rigging disclosures:

---

[7]   Accordingly, the other cases on which Defendants rely are distinguishable from the facts here. *See Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65 (2000) (individual plaintiff); *Kovaleff v. Piano*, 142 F.R.D. 406, 407-08 (S.D.N.Y. 1992) (individual plaintiff).

[8]   For the same reasons, the Court should reject Defendants' argument that class certification is inappropriate because "hundreds of institutional investors and hundreds if not thousands of other investors also made post-class period purchases" that "will subject them to individualized reliance inquiries." (Greenberg Br. at 21-24.)  That argument is absurd, and would lead to the denial of class certification in *every* case.  *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 301 (S.D.N.Y. 2003) (Cote, J.) (certifying class despite defendants' claim that "separate trials would show that the individual class members would have purchased WorldCom securities at the same price that they did even if they had known of" the fraud).

The cases on which Defendants rely (*see* Greenberg Br. at 22-24) are inapposite.  For example, *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1256 (2d Cir. 2002), was not even a securities class action.  In *Moore*, the court held that RICO and common law fraud claims based on the oral misrepresentations by insurance brokers could not be certified because the "brokers did not adopt a materially uniform approach in their individual sales presentations." *See also Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (declining to certify class in ERISA case where plaintiffs sought lifetime health care benefits because "the class claims were based on widely divergent facts"); *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 332 (D. Minn. 2005) (denying class certification because, *inter alia*, plaintiffs "rejected the fraud-on-the-market theory for purposes of this [m]otion"); *Bello v. Integrated Res., Inc.*, No. 88 Civ. 1214 (CSH), 1990 WL 52087, at *3 (S.D.N.Y. Apr. 19, 1990) (Haight, J.) (denying class certification where a "genuine dispute" existed over individual plaintiff's reliance on the purchase offer based on his personal communications with a company official).

- OPERS *sold 7,691 more shares than it purchased* in the thirty days after the initial bid-rigging disclosures.  (Ratzman Decl. Ex. 2 at 17-18.)  Similarly, OPERS *sold 108,261 more shares than it purchased* between October 14, 2004 and the end of the Class Period.  (*Id.*)

- OP&F (through its external investment advisers) *sold 40,050 more shares than it purchased* in the thirty days after the initial bid-rigging disclosures.  (Ratzman Decl. Ex. 2 at 11.)  Similarly, OP&F *sold 65,350 more shares than it purchased* between October 14, 2004 and the end of the Class Period.  (*Id.*)

- STRS Ohio did not make any purchases on the days of the bid-rigging disclosures.  A few days later, it increased its holdings by less than 10% (Ratzman Decl. Ex. 3), and nearly half of those purchases were made on behalf of STRS Ohio by INTECH and Jacobs Levy – two external investment advisers that use quantitative strategies.  (Ratzman Decl. Ex. 2 at 11.)

With respect to the March and April 2005 accounting fraud disclosures:

- OPERS *sold 222,170 more shares than it purchased* between the end of the Class Period and the 90-day look-back period. (Ratzman Decl. Ex. 2 at 18*.*)  Moreover, OPERS *did not purchase any AIG stock* during the five-week period following the accounting fraud disclosures. (*Id.*)

- STRS Ohio *sold 180,913 more shares than it purchased* between the end of the Class Period and the end of the 90-day look-back period.  (Ratzman Decl. Ex. 2 at 29.)

- Between April 1, 2005 and the end of the 90-day look-back period, OP&F's external advisers purchased more shares than they sold.  However, between October 15, 2004 and the end of the 90-day look-back, OP&F increased its holdings by only 2.1%. (Ratzman Decl. Ex. 4.)

Thus, even assuming, *arguendo,* that Defendants' atypicality argument has any validity, it simply does not apply to the facts here.

### 2.    Purchases Made Based on "Value," or Pursuant to "Index" Trading or Quantitative Modeling, Do Not Render the Three Ohio State Funds Atypical

Defendants also contend that "Lead Plaintiff will be subject to the unique defense that its trades in AIG securities were not made in reliance on the integrity of the market" because certain of the Funds' trades were made on the basis of:  (a) recommendations that AIG stock was a "good value" at the time (Greenberg Br. at 16-19); and (b) index trading strategies or quantitative modeling.  (Greenberg Br. at 16-20.)  These arguments are without merit.

        **(a)**      **Purchases Made Based on Belief of a "Good Value" Satisfy Reliance**

Citing the testimony of an internal STRS Ohio analyst and two external investment advisers to OP&F and OPERS, Defendants argue that their "good value" purchases of AIG somehow "were not made in reliance on integrity of the market." (Greenberg Br. at 16-19.)  However, Defendants conveniently omit testimony from each of those witnesses that ***all the purchases in question were made based on public information***, such as AIG's SEC filings, quarterly earnings releases and analyst reports.[9]  Where as here, a plaintiff relies on public information in determining that a particular stock is a good value – an assessment that depends on *the price* of the stock – the courts find reliance and typicality satisfied.  *See AM Int'l*, 108 F.R.D. at 195 (Sprizzo, J.) (finding typicality where plaintiff purchased stock on belief that, *inter alia*, "her purchase of AMI stock would be a good long-term investment"); *WorldCom*, 219 F.R.D. at 281-82, 300-01 (finding typicality where plaintiff's belief that securities were "undervalued" was based on "public information").[10]

        **(b)**      **Trades Made Pursuant to Index and Quantitative Strategies Satisfy Reliance**

With respect to index trading, Defendants cite the testimony of Timothy Steitz, (Greenberg Br. at 19-20), an OPERS analyst *who was not involved in the purchase or sale of any AIG securities*.[11] Although Mr. Steitz speculated that pursuant to OPERS' passive indexing strategies, "OPERS was not relying specifically [on companies] having provided complete and accurate information reflecting [their] true financial status," (Greenberg Br. at 20), Mr. Steitz was not testifying about OPERS' transactions in AIG and was not testifying as either a 30(b)(6) witness or as an expert on indexing investment strategies.[12]   In any event, the risks associated with indexing strategies that Defendants identify are inherent to *all* investors who engage in index trading or quantitative models.  Yet courts have repeatedly

---

    [9]   (Ratzman Decl. Ex. 6 at 122-23, 278-79; Ex. 7 at 14-15, 22, 59-60; Ex. 8 at 36-40, 144, 150-52.)

    [10]   *See also In re Priceline.com Inc.*, 236 F.R.D. 89, 96 n.1 (D. Conn. 2006) ("Defendants' contention that [plaintiff] did not rely upon the efficiency of the market in purchasing Priceline stock because he believed that the market did not accurately value Priceline shares is meritless.").

    [11]   (Ratzman Decl. Ex. 9 at 156-57, 169-76.)

    [12]   In fact, counsel for OPERS repeatedly objected on those grounds to the questioning of Mr. Steitz regarding OPERS' index portfolios.  (Ratzman Decl. Ex. 9 at 143-44.)

held that such trading satisfies typicality.  *See Nortel*, 2003 WL 22077464 at *3 (finding that institutional

investor's "indexed trading" satisfied typicality "because a jury may conclude that pursuing an index

strategy entails reliance"); *WorldCom*, 219 F.R.D. at 300-01 (rejecting defendants' argument of non-

reliance where institutional plaintiffs "invested passively by balancing their portfolios to mimic market

indices"); *In re Schering-Plough Corp. Sec. Litig.*, No. 01 Civ. 829, 2003 WL 25547564, at *4-5 (D.N.J.

Oct. 10, 2003) ("[T]hat a portion of [plaintiff's] shares were bought by simply replicating index funds …

does not perforce preclude [it] from *invoking* the fraud-on-the-market theory because these [index] funds

relied on . . . the efficiency of the market … as well as [Schering's] historical and current stock price….").

Finally, Defendants take issue with INTECH, which served as one of several external investment

advisers to OP&F and STRS Ohio at times during the Class Period and used quantitative modeling to

make investment decisions.  Specifically, Defendants cite the testimony of David Hurley, an executive

vice president of INTECH, who speculated that a company's withdrawal of its financial statements would

not impact INTECH's decision to buy or sell that company.  (Greenberg Br. at 20.)

But again, if a company withdraws its financial statements, *that is public information*.  Mr.

Hurley did not testify that INTECH would make the same purchases and sales if it learned of *non*-public

information regarding a company's intent to withdraw its fraudulent financial statements.  INTECH, like

all investors, is entitled to rely on the price of companies' stock, including the lower price *resulting from*

the disclosure that the company may have to restate its earnings because its financial statements are

inaccurate.  Along those lines, Mr. Hurley testified that *INTECH's trading model is based on the price of

companies' stock*, as well as historical prices and historical price volatility.[13]   Under similar facts, courts

have rejected arguments similar to Defendants' here, and found reliance and typicality satisfied.  *See

Feder*, 429 F.3d at 138 (holding that institutional investor relied on the integrity of the market during the

class period despite purchasing 19,000 shares in the week following company's disclosure of an earnings

revision); *Cosmas v. DelGiorno*, No. CV-94-1974, 1995 WL 62598, at *4 (E.D.N.Y. Feb. 8, 1995)

---

[13]   (Ratzman Decl. Ex. 10 at 28-29, 49-50, 90-91.)

(Glasser, J.) (finding typicality where plaintiff purchased stock, based on public information and pursuant

to an "averaging down" investment strategy, after company filed amended 8-K restating its financials).

**B.      Rule 23(a)(4): The Three Ohio State Funds Will
          Adequately Protect the Interests of the Class**

Defendants argue inadequacy because of the Funds' supposed failure to preserve documents and

because of purported "conflicts."  Both contentions are without merit.

**1.      Lead Plaintiff's Credibility Is Not Subject to Attack Because of the Three
          Ohio State Funds' Purported Failure to Preserve Certain Documents**

Defendants claim that Lead Plaintiff's "credibility is subject to attack" because of the three Ohio

State Funds' purported "failure to comply with their document preservation obligations." (AIG Br. at 5,

19.)  This argument is without merit.[14]

**(a)      The Three Ohio State Funds Preserved and Produced
          All Relevant, Non-Duplicative Documents**

First and foremost, there is absolutely ***no evidence that the three Ohio State Funds destroyed***

***any relevant, non-duplicative documents***.  To the contrary, all such documents were preserved and

produced in this litigation, and Defendants' arguments otherwise are unfounded and entirely speculative.

In fact, in response to Defendants' document requests, the three Ohio State Funds produced 260,000

pages of documents, including ***documentation for every trade in AIG securities for a six-year period***

***from six months prior to the Class Period through three months after the end of the Class Period***.

Defendants nevertheless complain that the Funds failed to implement formal document

preservation measures (*i.e.*, "litigation holds") at the start of the litigation and did not maintain all their

electronic back-up tapes.  (AIG Br. at 5-6, 19.)  However, Defendants ignore the fact that all three Funds

had procedures in place that resulted in the preservation of all relevant, non-duplicative documents.[15]  For

example, with respect to OP&F:

---

[14]   "[I]t is generally inappropriate to deny certification based on questions going to the credibility of named
plaintiffs." *People United for Children v. City of New York*, 214 F.R.D. 252, 264 (S.D.N.Y. 2003) (Ward, J.); *Saddle
Rock Partners v. Hiatt*, No. 96 Civ. 9474, 2000 WL 1182793, at *5 (S.D.N.Y. Aug. 21, 2000) (Stein, J.) (same).

[15]   (Ratzman Decl. Ex. 11 at 165;  Ex. 12 at 20, 89-90;  Ex. 13 at 54, 110-11;  Ex. 14 at 216;  Ex. 15 at 47-48;
Ex. 16 at 96-98, 144-45;  Ex. 17 at 112-13, 115-16.)

- In November 2003, the Fund implemented an institution-wide prohibition on the destruction of documents in connection with an unrelated case that applied to ***all*** investment-related documents, which necessarily included all documents that could be relevant to this case.[16] That hold was in effect until at least 2007.

- In addition, OP&F had a policy that required employees to print, file and preserve any business records, including emails – a policy that was adhered to.[17]

With respect to OPERS:

- The Fund's general counsel issued an "informal" litigation hold in November 2004, when the Fund was first considering this litigation.[18]

- Pursuant to the informal hold, the personnel within OPERS' investment department who were involved in the Fund's AIG's investments preserved all materials, whether hard copy or electronic, pertaining to those investments.[19]

- Moreover, the practice of OPERS' investment department staff has been to "forever" retain all hard copy documents on which they rely to make investment decisions.[20]

With respect to STRS Ohio:

- STRS Ohio also had policies in place, including electronic backup procedures, that effectively preserved all electronic documents, including emails.[21]

- Since before the litigation began, the practice of STRS Ohio's employees was to "retain everything," and the Fund had saved emails "indefinitely" on back-up tapes.[22]

- Moreover, in May or June 2005, STRS Ohio implemented the EVault system, an electronic discovery tool, that "imported" and preserved all of the archived emails that had been stored on existing back-up tapes from 1998 through 2005.[23]

  - Since 2005, EVault has maintained copies of all such emails and attachments, as well as "productivity" documents (such as Word and Excel files), and archived calendars, tasks, and data from the network drives.[24]

---

[16]   (Ratzman Decl. Ex. 13 at 54, 110-11;  Ex. 14 at 189, 194-95;  Ex. 15 at 144-46.)

[17]   (Ratzman Decl. Ex. 13 at 58-60;  Ex. 15 at 27, 47-48, 81-83.)

[18]   (Ratzman Decl. Ex. 12 at 90-92;  Ex. 17 at 109-10.)

[19]   (Ratzman Decl. Ex. 12 at 89-92;  Ex. 17 at 109, 112-13, 115-16;  Ex. 18 at 193.)  Defendants cite testimony that OPERS' electronic discovery tool, the "MailMeter" system, "purges" email after 45-60 days.  (AIG  Br. at 5.) What Defendants fail to mention, however, is that fact *is irrelevant* because MailMeter ***does not*** delete emails in individuals' inboxes, outboxes, or archived folders.  (Ratzman Decl. Ex. 16 at 83.)

[20]   (Ratzman Decl. Ex. 12 at 79-81.)

[21]   (Ratzman Decl. Ex. 16 at 27-29, 85, 97-99.)

[22]   (Ratzman Decl. Ex. 16 at 27, 85, 115-18.)

[23]   (Ratzman Decl. Ex. 16 at 97-98.)

[24]   (Ratzman Decl. Ex. 16 at 28-29, 87, 98-100, 103-04.)

     ○   Moreover, documents created by STRS Ohio staff in the course of analyzing or recommending investments are also preserved in EVault.[25]

Defendants falsely claim that "key investment personnel testified that they regularly discarded materials pertaining to AIG." (AIG Br. at 5.)  Defendants' selective quotations from the transcripts of Messrs. Ball, Cottrell and Warner grossly misrepresent their testimony:

- Defendants cite the testimony of Mr. Ball of OPERS, where he states that he "deletes things that [he's] uninterested in."[26]  However, Mr. Ball then testified that after moving e-mails to his "delete" folder – he then "scan[s] the delete box for AIG materials *and then drag[s] those into an AIG folder" to preserve them*.[27]

- Defendants cite the testimony of Mr. Warner of STRS Ohio, whose normal practice was not to retain documents of "less importance."[28]  But when asked whether he could have looked at "emails or other information on AIG and then discarded" them, *Mr. Warner replied "no."[29]*

- Defendants cite the testimony of Mr. Cottrell of STRS Ohio, who states his *general* practice is to read email and either save or delete it.[30]  However, Mr. Cottrell did not testify that he ever deleted a single AIG-related email, and in fact, repeatedly stated that *he "didn't follow [AIG] at all" and that he had "no information on AIG" and "no documents on AIG."[31]*

Defendants claim that "Lead Plaintiff produced only a small number of emails and virtually no documents responsive to defendants' request for internal analysis, reports and evaluations related to its transactions in AIG." (AIG Br. at 5-6, 19.)  However, those complaints reflect a willful misunderstanding of the three Ohio State Funds' investment procedures.  Indeed, testimony by the three Funds' witnesses make clear that the vast majority of the Funds' investments in AIG were made pursuant to indexing strategies, pursuant to quantitative modeling, and/or by external investment advisers – in other words, without active decisions by the Funds' personnel that could possibly generate such analyses.  Specifically:

---

[25]   (Ratzman Decl. Ex. 16 at 57, 85, 110-12.)

[26]   (Ratzman Decl. Ex. 19 at 275.)

[27]   (Ratzman Decl. Ex. 19 at 269 (emphasis added).)  In fact, Mr. Ball went above and beyond his duties to ensure his relevant documents were preserved.  After receiving the litigation hold, he retained every piece of email that related to AIG, and diligently performed a search of his network and hard drive "to be…maybe a little bit more thorough" even though it was his understanding that an electronic search of his documents would also be performed by OPERS' IT department.  (*Id.* at 267-70, 273.)

[28]   (Ratzman Decl. Ex. 6 at 287-88; 294-96.)

[29]   (Ratzman Decl. Ex. 6 at 295 (emphasis added).)

[30]   (Ratzman Decl. Ex. 20 at 105-06.)

[31]   (Ratzman Decl. Ex. 20 at 101-02, 127-28.)

11

- OP&F relies exclusively on external managers for its investment decisions and thus does not participate in any day-to-day investment decisions.[32]  Thus, no documents are generated by or kept at OP&F concerning such decisions.[33]

- With respect to OPERS, the vast majority of its internally managed domestic equities holdings are indexed, and therefore involve *no decision-making*.[34]  The remaining portion of OPERS' internally managed domestic equities holdings is an "enhanced" index, which involves only *minimal* decision-making within very restrictive parameters.[35]  *Moreover, OPERS did not have an internal analyst who "covered" AIG for most of the Class Period*.[36]  Accordingly, OPERS did not create many documents relating to its "analysis" of AIG.

- At STRS Ohio, roughly two-thirds of its internally-managed domestic equities portfolios are either indexed or quantitative in nature and thus do not involve "decisions" by investment staff.[37]  Moreover, in-house investment personnel at both STRS Ohio and OPERS were rarely (if ever) required to memorialize their investment decisions by formal analyses or written recommendations.[38]

In sum, Defendants' entirely speculative claims that the three Ohio State Funds did not preserve all relevant, non-duplicative documents concerning AIG are completely without merit.

### (b)   Numerous Courts Have Certified Classes Even Where the Proposed Class Representatives Actually Destroyed Relevant Documents

Even assuming, *arguendo*, that any relevant documents were destroyed here – and they were not – that still would not be grounds for denying class certification.  In fact, Defendants do not – and cannot – cite a single case in which any court declined to appoint a class representative solely because it had failed to preserve documents.[39]  To the contrary, numerous courts – including those cited by Defendants – appointed class representatives that actually destroyed relevant documents.  *See, e.g.*, *In re Vivendi*

---

[32]   (Ratzman Decl. Ex. 13 at 44-46, 132;  Ex. 14 at 91.)

[33]   (Ratzman Decl. Ex. 13 at 44.)

[34]   (Ratzman Decl. Ex. 12 at 130;  Ex. 18 at 56, 70-71, 79;  Ex. 19 at 65-66.)

[35]   (Ratzman Decl. Ex. 12 at 40-41, 51-52, 131;  Ex. 18 at 79, 88;  Ex. 19 at 57-58.)

[36]   (Ratzman Decl. Ex. 18 at 92.)

[37]   (Ratzman Decl. Ex. 6 at 66-67; Ex. 16 at 249.)

[38]   (Ratzman Decl. Ex. 6 at 228-30, 295;  Ex. 12 at 40-41; Ex. 19 at 83-84, 101.)

[39]   Defendants' two cases on this point are distinguishable.  This Court's decision in *Rocco* did not involve the alleged failure to preserve documents.  Rather, the Court merely noted that the failure to comply with document requests "could impact [plaintiff's] credibility if this information were brought before the jury at trial." *Rocco*, 245 F.R.D. at 137-38.  Here, in contrast, the Ohio State Funds have fully complied with Defendants' document requests by producing more than 260,000 pages of documents, including documentation of all their trades in AIG. *Thompson v. Jiffy Lube Int'l, Inc.*, 2007 WL 608343, at *4 n.14 (D. Kan. Feb. 22, 2007), did not involve class certification, but rather a motion for sanctions based on  plaintiff's counsel having lost the contact information for four witnesses.  Here, there is no evidence that the Ohio State Funds failed to preserve any relevant, non-duplicative documents.

*Universal, S.A.*, 242 F.R.D. 76, 86 (S.D.N.Y. 2007) (Holwell, J.) (certifying class where class representative admitted to destroying relevant documents); *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) (Pauley, J.) (holding that plaintiff who destroyed documents before his deposition was adequate); *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 616 (S.D. Ohio 2003) (although the court "does not approve of the shredding of documents after a document request is served," it "does not believe that the possible misconduct or mistaken action by one of several plaintiff merits denying a motion to certify that otherwise should be granted"); *Weil v. Long Island Sav. Bank, FSB*, 200 F.R.D. 164, 172 (E.D.N.Y. 2001) (certifying class where "it does not appear that [document destruction was] done to thwart the outcome of her case"); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 96 (S.D.N.Y. 1998) (Pollack, J.) (finding plaintiff adequate despite having failed to produce all trade records).

        2.      **Defendants' Oft-Rejected Conflict Arguments Are Unavailing**

Defendants argue that the Ohio State Funds' interests conflict with class members (1) who purchased AIG stock before October 14, 2004 and sold after that date before the accounting frauds were disclosed; and (2) "who were on the opposite side from Lead Plaintiff in either of AIG's . . . mergers with American General and HSB." (AIG Br. at 13.)[40]  These and similar "conflict" arguments have been repeatedly rejected by the courts.

        (a)      **Courts Routinely Reject "Conflict"**
                         **Arguments Made By Defendants Here**

"As a rule, courts are generally skeptical of defenses to class certification based on conflicts between the proposed class members," *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, No. 02-6030, 2006 WL 891362, at *8 (D.N.J. Apr. 4, 2006), because a defendant's efforts to ensure "adequate representation" is a ruse to avoid class certification altogether. *See Fisher v. Plessey Co. Ltd.*, 103 F.R.D. 150, 157 n.7 (S.D.N.Y. 1984) (Conner, J.) (noting that the "objective of [defendants'] . . . legal assault is to insure 'no' representation for the class").

---

[40]  Defendants argue that the same purported conflicts between Lead Plaintiff and Class Members also exist between the members of the putative Class. (AIG Br. at 13 n. 14.)  Defendants' arguments regarding intra-class conflict fail for the same reasons as its arguments regarding conflict between the Lead Plaintiff and the Class.

Thus, courts find that a supposed conflict bars certification only in very exceptional cases. *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 571 (S.D.N.Y. 2008) (Cote, J.) ("The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be *fundamental*, and *speculative conflict should be disregarded* at the class certification stage.") (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001)); 1 Herbert Newberg & Alba Conte, Newberg on Class Actions § 3.26 (4th ed. 2008) (same). To defeat class certification on this ground, a defendant must show "that any asserted conflict is so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 514-15 (S.D.N.Y. 1996) (Sweet, J.). Defendants fail to meet this heavy burden.[41]

> **(b)     There Is No Conflict Between Class Members with Only Bid-Rigging Claims and Class Members with Claims Based on Both the Bid-Rigging and Accounting Frauds**

There is, of course, no conflict in a class consisting of investors harmed by a scheme to artificially inflate the value of a company's stock by different methods. *See In re Alstom SA Sec. Litig.*, No. 03-6595, 2008 WL 4053361, *5 (S.D.N.Y. Aug. 26, 2008) (Marrero, J.) (rejecting argument that conflict exists between class members whose fraud claims were premised on "two distinct courses of conduct" that "occurred during different – albeit overlapping – time periods").

Relying primarily on *In re Seagate Technology II Sec. Litig.*, 843 F. Supp. 1341 (N.D. Cal. 1994), Defendants argue that such a conflict exists here. (AIG Br. at 15.) Defendants' reliance on *Seagate II* is misplaced. Indeed, *Seagate II*'s analysis of so-called intra-class conflicts between holders and in-and-out traders (*i.e.*, those who purchased and sold all their securities within the class period) has been repeatedly rejected by courts in the Second Circuit and elsewhere. *See*, *e.g.*, *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, No. 03-2522, 2006 WL 1180267, at *7 (N.D. Cal. May 3, 2006) (explaining that *Seagate*

---

[41]    If Defendants truly believed these arguments had merit, they could easily have raised them in the Spring of 2005, when Lead Plaintiff amended the complaint to include allegations relating to AIG's accounting frauds. Instead, on April 6, 2005, Defendants stipulated that "because of recent events concerning AIG," Lead Plaintiff should be permitted time to amend its complaint to include allegations regarding the newly-revealed accounting fraud. (Ratzman Decl. Ex. 21.) Moreover, when the San Francisco Public Employees Retirement System addressed the possibility of conflicts in its motion for lead plaintiff, Defendants were absolutely silent. (Ratzman Decl. Ex. 22.) The Court should not permit Defendants to lie in ambush for three years only to raise this issue now.

*II's rule* would bar virtually all class actions); *In re Honeywell Int'l Inc. Sec. Litig.*, 211 F.R.D. 255, 261 (D.N.J. 2002) (holding that "[c]onflicts such as those discussed in *Seagate II* are present in almost every large, complex securities case"); *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 377 (S.D.N.Y. 2000) (Brieant, J.) (observing that "the holding in *Seagate* has been widely discredited").[42]  Indeed, any purported conflict between in-and-out traders and plaintiffs who held their shares until the end of the Class Period relates to damages, not to liability, which does not defeat class certification.  *See Alstom*, 2008 WL 4053361 at *5; *NASDAQ Market-Makers*, 169 F.R.D. at 513; *AM Int'l*, 108 F.R.D. at 196.

In any event, the reasoning of *Seagate II* is inapplicable here.  *Seagate II* discussed the potential for conflict in cases involving partial disclosures of a *single* kind of fraud where the interests of investors who sold their stock after early disclosures could potentially differ from investors who held their stock until the end of the Class Period and argue that inflation remained in the stock until the end of the class period.  No such conflict exists here.  Both investors who held their stock until the end of the class period and investors who sold after the disclosure of bid-rigging (but before the disclosure of the accounting fraud), have an identical interest in claiming injuries resulting from the full disclosure of bid-rigging fraud on October 14-15, 2004.  For example, if a class member who purchased AIG stock when it was inflated by $10 from bid-rigging *and* inflated by an additional $15 from the accounting fraud sells her shares two days after the disclosures concerning bid-rigging, she would be entitled to recover $10 per share.  If that same class member had instead sold her shares after the accounting fraud disclosures, she could recover $25 per share.  The additional recovery by such class members who sell after the accounting fraud disclosures does *not* come at the expense of those who sold immediately after the bid-rigging disclosures

---

[42]   Although Defendants cite *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447 (N.D. Ala. 2003), as an example of a court "agree[ing] with the reasoning of *Seagate*" (AIG Br. at 15), that decision declined to take up the conflict issues and instead noted that "the two district court cases within the Eleventh Circuit that have addressed these issues have declined to follow *Seagate II*."  Similarly, while AIG is correct in asserting that *Ziemack v. Centel Corp.*, 163 F.R.D. 530 (N.D. Ill. 1995) cites *Seagate II* (AIG Br. at 15, n.15), *Ziemack* ultimately denied defendants' motion to decertify the class.

but before the accounting fraud disclosures.[43] *See Dura Pharms. v. Broudo*, 544 U.S. 336, 344 (2005) (holding that a plaintiff can only establish liability for a loss "when the facts … become generally known").[44]  Therefore, there is no conflict.

Indeed, this Court has previously observed that the inflation attributable to AIG's accounting fraud remained in its stock price even after the October 14 and 15, 2004 disclosures of the bid-rigging fraud.  (Ratzman Decl. Ex. 22 at 26.)

>    **(c)      No Conflict Exists Between Lead Plaintiff and Class
>              Members Who Acquired AIG Stock Through the HSB
>              and American General Mergers**

Defendants also argue that investors like Lead Plaintiff who owned a greater percentage of AIG stock than HSB and American General stock somehow benefited from the alleged fraud because the artificial inflation in AIG stock meant that those two companies were acquired with less dilution of AIG stock.  (*See* AIG Br. at 16-18.)  Without citing any authority, Defendants speculate that these Class members would somehow be obligated to "offset" any damages to which they are entitled by the amount of this supposed benefit, and therefore would not want to prove inflation at the time of the American General and HSBC acquisitions.  (AIG Br. at 17.)

Arguments virtually identical to Defendants' here have been rejected by courts in this circuit.  For example, in *In re Olsten Corp. Securities Litigation*, 3 F. Supp. 2d 286 (E.D.N.Y. 1998) (Boyle, J.), the court found that the proposed class representative was adequate despite a purported conflict between the representative, who purchased on the open market, and plaintiffs who acquired their stock via a merger. The court explained that defendants' "argument generally relates to the measure of damages and is otherwise insufficient to defeat consolidation." *Id.* at 296.  *See Toure v. Cent. Parking Sys. of New York*, No. 05-5237, 2007 WL 2872455, at *7 (S.D.N.Y. Sept. 28, 2007) (Pauley, J.).  Here, even assuming

---

[43]   Under *Dura*, the bid-rigging plaintiffs' damages are solely driven by the amount of the stock drop after the October 14 and 15, 2004 disclosures, not the total amount of inflation that may still be in the stock at the time of the sale.  *Dura*, 544 U.S. at 344.

[44]   Defendants also ignore the fact that, even the few courts that have "followed" *Seagate II* have remedied potential conflict by, *inter alia*, appointing additional class representatives.  *See, e.g.*, *In re DaimlerChrysler AG Sec. Litig.*,  216 F.R.D. 291, 297 (D. Del. 2003); *In re King Pharms., Inc., Sec. Litig.*, No. 03 Civ. 77, 2007 WL 1830757, at *1 (E.D. Tenn. June 22, 2007).

*arguendo* that a set-off is required for the so-called "dilution benefit," both investors in HSB and American General and investors who acquired AIG stock on the open market share the goal of proving that AIG's share price was inflated and that the disclosures caused their injury.[45]

## III.    THIS ACTION MEETS THE REQUIREMENTS OF RULE 23(b)(3)

### A.    There Is Predominance Between Bid-Rigging and Accounting Frauds

Defendants argue that the facts and legal issues concerning the bid-rigging and accounting frauds are distinct, and therefore common questions do not predominate "between these two groups of putative class members." (AIG Br. at 20.)   However, as discussed above (*see* Section II.B.2, *supra*), this argument is without merit.  *See Alstom*, 2008 WL 4053361 at *5, *8, *11 (finding predominance despite defendants' arguments that plaintiffs' claims "represent two distinct groups of shareholders founded upon two distinct courses of conduct" that "occurred during different – albeit overlapping – time periods" and "did not share a common motive").

### B.    Issues of Reliance Predominate

Whether Class members relied on a particular misrepresentation or omission, or schemes to defraud, does not raise individual issues in this case because reliance is presumed pursuant to the fraud-on-the-market doctrine enunciated by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

#### 1.    Standards for Establishing Reliance at the Class Certification Stage

Citing *Oscar Private Equity Investment v. Allegiance Telecom Inc.*, 487 F.3d 261 (5th Cir. 2007), Defendants ask this Court to disregard more than 20 years of Supreme Court and Second Circuit precedent by finding that: (1) in order for a plaintiff to invoke *Basic*'s fraud-on-the-market presumption of reliance, a plaintiff must first establish the *separate* Section 10(b) element of loss causation; and (2) a plaintiff must *prove*, by a preponderance of the evidence *at the class certification stage*, the element of

---

[45]    Defendants fare no better in citing *HealthSouth*, 213 F.R.D. at 447, where the lead plaintiff had purchased its shares only on the open market and thus lacked standing to sue on behalf of those who obtained their stock via mergers. *Id.*  Here, two of the Ohio State Funds acquired AIG stock on the open market *and* through the mergers, and therefore have standing to bring suit.

loss causation. (*See* AIG Br. at 21-22; Greenberg Br. at 2-7.)  However, that is not the law in the Second

Circuit.  (*See also* Letter from Thomas A. Dubbs to Hon. John E. Sprizzo, dated October 23, 2008.)

A little more than a month ago, the Second Circuit reiterated the clear, three-part test for

determining whether plaintiffs are entitled to the presumption of reliance under *Basic*:

> The *Basic* Court thereby set forth a test of general applicability that where a defendant has
> (1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal
> well-developed (i.e., efficient) market, investors' reliance on those misrepresentations may
> be presumed.  ***This is all that is needed to warrant the presumption***.

*In re Salomon Analyst Metromedia Litig.*, -- F.3d --, 2008 WL 4426412, at *6 (2d Cir. Sept. 30, 2008)

(emphasis added); *see also id.* at *8 ("if plaintiffs can show that the … misrepresentation was material

and publicly transmitted into a well-developed market, then reliance will be presumed").

***Nowhere does Salomon suggest that loss causation – a Section 10(b) element that is***

***conceptually distinct from reliance – must be shown as a prerequisite to invoking the fraud-on-the-***

***market presumption***.  In fact, the *Salomon* court affirmatively rejected the proposition that a plaintiff

must show "an impact on price" at class certification in order to invoke the presumption. *Id.* at *8

("plaintiffs do not bear the burden of showing an impact on price").[46]

Thus, to determine whether Lead Plaintiff can rely on the presumption of reliance, this Court

need only determine whether Lead Plaintiff has shown that Defendants' misrepresentations (or deceptive

acts) were publicly disclosed, were material and whether AIG securities traded in an efficient market.  *Id.*

at *6.  No more is required.[47]

---

[46]   The *Salomon* court thus left standing the holdings of numerous judges in this District who have flatly
rejected *Oscar* on the basis that loss causation is a *merits issue* unrelated to any Rule 23 requirement that, under *In
re Initial Public Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006), may not be scrutinized at this juncture.  As Judge
Sullivan recently found, "Several courts in this District have expressly addressed . . . *Oscar*, and *all have rejected
the notion that a showing of loss causation is a requirement at the class certification stage*." *Lapin*, 2008 WL
4222850, at *15-16.  *See also Alstom*, 2008 WL 4053361, at *10; *Darquea*, 2008 WL 622811, at *4; *Wagner*, 251
F.R.D. at 119.  What is more, *every court* outside the Fifth Circuit that has addressed *Oscar* rejects its reading of
*Basic*.  *See In re Nature's Sunshine Products Inc. Sec. Litig.*, 251 F.R.D. 656, 665 (D. Utah 2008); *Ross v.
Abercrombie & Fitch Co.*, No. 05 Civ. 0819, 2008 WL 4059873, at *3 (S.D. Ohio Aug. 26, 2008); *In re Micron
Technologies, Inc. Sec. Litig.*, 247 F.R.D. 627, 634 (D. Idaho 2007).

[47]   Although *Salomon* recognized that a defendant could try to rebut the presumption of reliance at class
certification, ***the court made clear that the defendant bears the burden of rebutting the presumption***.  *Salomon*,
2008 WL 4426412 at *9.  And while *Salomon* permits the courts to hold Rule 23 hearings, such hearings need not be

### 2.   Defendants Have Not Satisfied Their Burden of Rebutting the Fraud-on-the Market Presumption of Reliance

Lead Plaintiff has clearly shown that Defendants' misstatements (and deceptive conduct) were material, were disclosed to the public, and that AIG's securities traded in an efficient market.  (*See* Moving Br. at 19-20.)  Accordingly, Lead Plaintiff and the Class are entitled to the presumption of reliance.  *See Salomon*, 2008 WL 446412, at *6.  Defendants have the burden of rebutting the presumption by proving "the absence of a price impact."  *Id.* at *9.  Defendants have not satisfied that burden.

### (a)   Dr. Finnerty Properly Controlled for the Insurance Industry's Price Decline on October 14 and 15, 2004

Despite it being Defendants' burden to show otherwise, Dr. Finnerty found that the drops in AIG's stock price in response to the bid-rigging disclosures on October 14 and 15, 2004 were statistically significant at the 1% level (*see* Moving Br. at 19),[48] which is not surprising given that the October 14 decline was the largest single-day drop in AIG's stock since the market crash of 1987.

Shockingly, Defendants argue that Dr. Finnerty's assessment of the price declines on October 14 and 15, 2004 should not have controlled for the fact that the bid-rigging disclosures on those days also caused a decline in the stock price of nearly every insurance company in the industry because on other days, no such adjustments were necessary.  (AIG Br. at 22.)  However, Dr. Finnerty's testimony establishes that, pursuant to the most *basic* principles of statistical design, it was entirely proper (and

---

evidentiary in nature; to the contrary, the Second Circuit warned that "[t]o avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial portions" at the class certification stage, the district courts have "considerable discretion to limit both the discovery and the extent of the hearing on Rule 23 requirements." *Id.* at *11. *See Basic*, 485 U.S. at 249 n.29 (noting that on the issue of whether a defendant has rebutted the presumption of reliance, "[p]roof of that sort is a matter for trial").

[48]   A statistical result is statistically significant if it is unlikely to have occurred randomly.  "Statistically significant at the 1% level" means that there is only a 1% chance that the observed change occurred merely by chance.  Alternatively, one could describe that result as being reported with a 99% confidence level, *i.e.*, a 99% likelihood that the observed change was not random.   In other words, results that are statistically significant at the 1%, 5% or 10% levels can also be described as significant at the 99%, 95% or 90% confidence levels, respectively. *See* David Tabak, et al., *Materiality and Magnitude: Event Studies in the Courtroom*, in Litigation Services Handbook 19.1 (Roman L. Weil ed., John Wiley & Sons, Inc. 2001) (Ratzman Decl. Ex. 23.)

indeed, necessary) to do so because otherwise the results would be biased by using an index that is affected by *the same news* as the stock being studied.[49]

### (b) Defendants' Own Experts Have Approved or Used Confidence Levels Below the 95% Level

Defendants ask the Court, in essence, to rule that two drops in AIG's stock price – March 30 and 31, 2005 – "do not meet the standard minimum level of significance" because Dr. Finnerty calculated that these declines were statistically significant at the 91.3% and 89.8% confidence levels, respectively. (AIG Br. at 21.) ***Despite the fact that both defense experts have approved or actually used confidence levels at 90%***, Defendants take the untenable position that the 95% level establishes an evidentiary *bright line*, where all levels above it are automatically deemed significant and all levels below it are not. (*See Id.*)

However, there is no magic in the 95% level, and the mere fact that a stock price decline on a given day is slightly below that arbitrary level does not render the drop *per se* immaterial. Dr. Finnerty testified as such, as well as to the fact that the strong trend among experts in the finance field today is to report statistical findings at the 99%, 95% *and* 90% confidence levels.[50]

In fact, ***one of Defendants' own experts agrees with Dr. Finnerty that the 90% confidence level is accepted by courts***. Dr. David Tabak, the Greenberg Defendants' expert, wrote the following on the issue of materiality in a Litigation Services Handbook entitled, "The Role of the Financial Expert":

> ***It is not clear what level of statistical significance corresponds to a legal definition of materiality***. As Mitchell and Netter point out, the 95 percent confidence level is commonly used, ***while the 90 percent and 99 percent levels are also options***.

(Ratzman Decl. Ex. 23 at 19.9 (emphasis added).) Moreover, Dr. Charles C. Cox, AIG's expert, ***published at least one article in which he reports certain of his findings as being significant at the 10% level*** (*i.e.*, the 90% confidence level). (Ratzman Decl. Ex. 24 at 1229.)

---

[49]   (Ratzman Decl. Ex. 25 at 113-115, 410-412;  Ex. 26 ¶¶ 7-11.)

[50]   (Ratzman Decl. Ex. 25 at 75-77, 79, 81-84, 101-102.)

In addition, Dr. Finnerty analyzed three top journals in the field of finance from 2005 to 2008 and found that ***nearly 70% of the articles that reported significance levels included the 10% level*** (*i.e.*, the 90% confidence level).  (Ratzman Decl. Ex. 26 ¶¶ 14-16.)

Dr. Finnerty's view is also supported by judges like Judge Richard Posner and others who – in both civil and criminal cases – have considered statistical evidence with confidence levels below 95%. *See*, *e.g.*, *United States v. Conner*, 262 F.App'x 515, 519 (4th Cir. 2008) (affirming conviction based on evidence including statistician's testimony whose findings were presented at a 90% confidence level); *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362 (7th Cir. 2001) (Posner, J.) (rejecting the proposition that statistical evidence below "the conventional 5% significance level" is inadmissible); *Smithkline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1037-38 (N.D. Ill. 2003) (Posner, J.), *aff'd*, 365 F.3d 1306 (7th Cir. 2004) ("95 percent ... is an arbitrary measure of statistical significance … especially … when the burden of persuasion … is the undemanding 'preponderance' standard").[51]

Moreover, at least one court has certified a securities class action where the plaintiff's expert calculated changes in stock price using a "78% confidence interval." *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 507 (S.D. Tex. 2004).[52]

Thus, it is clear that Defendants have not met their burden of proving the absence of price movement in AIG stock on March 30 and March 31, 2005.[53]

---

[51]  In addition, the Second Circuit has declined to adopt a *per se* rule regarding the probative value of statistical evidence.  *See Waisome v. Port Authority of New York and New Jersey,* 948 F.2d 1370, 1376 (2d Cir. 1991) ("There is no minimum statistical threshold requiring a mandatory finding that a plaintiff has demonstrated a violation of Title VII. Courts should take a 'case-by-case approach' in judging the significance or substantiality of disparities, one that considers not only statistics but also all the surrounding facts….").

[52]  Further, courts have held that the issue of statistical significance is a jury question.  *See In re Pfizer Inc. Sec. Litig.*, -- F.Supp.2d --, 2008 WL 2627131, at *10 (S.D.N.Y July 1, 2008) (Swain, J.) ("[T]he Court cannot determine as a matter of law whether such links were statistically insignificant because statistical significance is a question of fact."); *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, Nos. Civ. 99-274, Civ. 99-846, 2004 WL 1305849, at *6 (D.Del. June 9, 2004) ("Statistical significance ... is a question of fact for the jury as it is an issue of evidentiary weight.").

[53]  As discussed in Dr. Finnerty's rebuttal declaration, Defendants' remaining contentions – which were not discussed in, but rather merely *alluded to*, in the Greenberg Defendants' brief (*see* Greenberg Br. at 8) – are also without merit.  (Ratzman Decl. Ex. 26 ¶¶ 21-62.)

**(c)     News of the Fraudulent AIG-Gen Re Transaction
Caused the Price of AIG's Stock to Decline**

The Gen Re Defendants argue that Lead Plaintiff must show *what portion* of the March 30, 2005

decline was caused by news about AIG *that was specific to Gen Re*.  (Gen Re Br. at 18.)  This is not the

law.  Rather, it is the Gen Re Defendants' burden to prove that news about the AIG-Gen Re Transaction

on March 30 (and on March 17 and March 31)[54] did not affect the price of AIG securities, *see Salomon*,

2008 WL 4426412 at *9, a burden they have not met.

Dr. Finnerty's expert report and testimony establish that several disclosures *of the fraud at AIG*

caused the decline in AIG's stock price on March 30.[55]  Dr. Finnerty also testified that his event study was

designed to exclude factors *unrelated to* the fraud.[56]  Thus, Dr. Finnerty concluded that news of the

accounting fraud caused the decline in AIG's stock price on March 30, 2005 and other factors did not.

On March 30, AIG admitted for the first time that the AIG-Gen Re Transaction was fraudulent.  Thus,

news related to the AIG-Gen Re Transaction was *a* material cause of the stock price decline on that day.

Lead Plaintiff need not show anything more.  *See Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 92

(2d Cir. 1981) ("[A] plaintiff is not required to prove that the defendant's act was the sole and exclusive

cause of his injury; he need only show that it was 'substantial,' *i.e.*, a significant contributing cause.");

*Miller v. Asensio & Co.*, 364 F.3d 223, 132-33 (4th Cir. 2004) (affirming jury verdict: "[t]o satisfy the

loss causation element, a plaintiff need not show that a misrepresentation was the sole reason" for the

loss); *In re Geopharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 453 (S.D.N.Y. 2005) ("Defendants

overstate the nature of plaintiffs' burden at this stage of the proceedings when they argue that plaintiffs

must exclude all other possible causes of the artificial inflation.").

---

[54]   Contrary to the Gen Re Defendants' arguments (Gen Re Br. at 2, 6), Dr. Finnerty's February 2008 report
also identifies Gen Re-specific news as causes for the declines in AIG's stock price on March 17 and 31.  (*See*
February 20, 2008 Ratzman Declaration in Support of Lead Plaintiff's Motion for Class Certification ("Feb. 20
Ratzman Decl.") Ex. 2 ¶¶ 36, 54, Exs. W, X.)  Thus, loss causation has been shown with respect to the Gen Re
Defendants as to those two dates as well.

[55]   (Ratzman Decl. Ex. 25 at 233, 242-43;  Feb. 20 Ratzman Decl. Ex. 2 ¶¶ 35, 53, Ex. X thereto.)

[56]   (Ratzman Decl. Ex. 25 at 52-53.)

The Gen Re Defendants cite no authority for the proposition that a plaintiff must, at class certification, parse *the simultaneous disclosure of multiple fraudulent transactions and acts* to determine *what percentage* of the price decline was caused by each.[57]  Rather, that is a damages question that need not be answered at class certification.  *See Glidepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072, at *16 (S.D.N.Y. July 26, 2007) (Karas, J.).

Moreover, as the Second Circuit made clear in *Salomon*, it is *Defendants'* burden to show that AIG's admission that the AIG-Gen Re Transaction was fraudulent did not "measurably impact the market price of" AIG.  *See Salomon*, 2008 WL 4426412 at *11 n.9.  Gen Re did not even submit an expert report in support of its position.  For that reason alone, Gen Re's loss causation argument fails under *Salomon*.[58]

## C.    Loss Causation Is a Common Issue for All Class Members

Like reliance, loss causation is common to all class members because it can be shown on a class-wide basis by analyzing, *inter alia*, whether the price declines in AIG securities on the six dates in question were caused by disclosures of the fraud.   Here, the Complaint alleges (*see*, *e.g.*, Compl. ¶ 762), and Dr. Finnerty's testimony establishes, that disclosures relating to the two frauds caused statistically significant drops in AIG's stock price on six dates.  (*See* Moving Br. at 19-20.)  As Judge Sullivan recently found, that fully satisfies loss causation at class certification:

---

[57]    The cases on which Defendants rely (*see* Gen Re Br. at 18-19) are inapposite.  *See United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007) (reviewing sentencing based on lower court's calculating "shareholders' loss" as "the difference between the purchase price and value on" a random date "three months after the end of the charged conspiracy"); *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 549 (S.D.N.Y. 2008) (granting summary judgment:  event study failed to distinguish between market reaction to *new* information versus "negative commentary on previous disclosures"); *United States v. Schiff*, 538 F. Supp. 2d 818, 836-38 (D.N.J. 2008) (granting *in limine Daubert* motion to exclude expert for not considering disclosures unrelated to fraud); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1266 (N.D. Okla. 2007) (granting summary judgment *Daubert* challenge:  plaintiff's expert failed to "separate the effects of fraud-related inflation from the effects of *non-fraud* risks").

[58]    Lead Plaintiff's evidence of a statistically significant price decline on March 30 (*see* Section III.B.2(c)) also defeats the Gen Re Defendants' claim that the AIG-Gen Re Transaction was immaterial to AIG's investors. (Gen Re. Br. at 20-21.)  Materiality can also be shown where there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Salomon*, 2008 WL 4426412 at *7 (quoting *Basic*).  Gen Re cannot credibly argue that the truth about the $500 million AIG-Gen Re Transaction – that it was a sham deal concocted solely to boost AIG's reserves at a time when the market was closely watching the levels of those reserves (*see* Compl. ¶¶ 331-447) – would not have been viewed by reasonable investors as having significantly altered the total mix of information.

> Despite [defendant's] protests that [plaintiff's expert's] methodology is flawed, "a battle of the experts" is not appropriate . . . *the relevant question is only whether Plaintiff's expert's methodology will apply to the entire class*.

*Lapin*, 2008 WL 4222850 at *16 (emphasis added). *See also Alstom*, 2008 WL 4053361 at *11 ("plaintiffs need only establish that they 'may be able to . . . prove loss causation" at trial"); *Wagner*, 251 F.R.D. at 119 (finding loss causation based on expert's testimony of "a loss associated with" disclosures of fraud); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 167 (S.D.N.Y. 2008) (Conner, J.) (plaintiffs could "conceivably prove loss causation"). To hold otherwise would require the Court to engage in a full-scale battle of the experts – a position rejected by the Second Circuit. *See Salomon*, 2008 WL 4426412 at *11.

## IV.    THE COURT SHOULD CERTIFY THE CLASS WITH RESPECT TO AIG BONDS

Defendants offer several meritless arguments in opposing certification of investors who sustained injury based on their purchases of AIG bonds. There is no basis for Defendants' assertion that Lead Plaintiff must have purchased each bond in order to have standing to bring Section 11 claims for all bond issues in dispute. Whether a class representative must show cognizable injury for each type of security at issue raises an issue of typicality under Rule 23, not of Article III standing. *Hicks v. Morgan Stanley & Co.*, No. 01-10071, 2003 WL 21672085 (S.D.N.Y. July 16, 2003) (Baer, J.). Where, as here, the Section 11 claims for all of the bond issuances are premised on identical claims of fraud, courts routinely grant class certification even if the class representative did not buy each of the securities in dispute. *See*, *e.g.*, *Berwecky*, 197 F.R.D. at 71.

Because Lead Plaintiff purchased the 4.25% Notes, its bond claims are typical. Defendants cannot evade this result by arguing that Lead Plaintiff's investments in AIG bonds resulted in "net gains." Courts reject the notion that net gains on the sales of securities bar the prosecution of a fraud claim. *See Davis v. Merrill Lynch,* 906 F.2d 1206, 1218 (8th Cir. 1990); *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2003 WL 1610775, at *26 (S.D.N.Y. Mar. 26, 2003) (Sweet, J.). Here, Defendants' own expert points out that Lead Plaintiff suffered losses of  $46,050 on the 4.25% bonds it purchased on March 15, 2005. (*See*

Tabak Decl. Ex. 9b.)  Accordingly, Lead Plaintiff has established damages under Section 11 for those

purchases regardless of gains on separate transactions.  *See Blech*, 2003 WL 1610775 at *26.

       Finally, the Court should reject Defendants' attacks on Dr. Finnerty's methodology in finding

numerosity regarding bond purchasers, as well as their attempts at undermining his conclusions that the

markets for the AIG bonds are efficient.[59]  "[A] 'battle of the experts' is not appropriate at the class

certification stage, as the relevant question is only whether Plaintiff's expert's methodology will apply to

the entire class." *Lapin*, 2008 WL 4222850 at *16.  As Defendants fail to show why Dr. Finnerty's

analysis would not apply to the entire class, their arguments should be rejected.

## V.  CONCLUSION

       For the foregoing reasons, Lead Plaintiff respectfully requests that this Court grant Lead

Plaintiff's motion for class certification in its entirety.

Dated:  New York, New York
        November 7, 2008

           **SHERYL CREED MAXFIELD,**
           **FIRST ASSISTANT ATTORNEY GENERAL**
           **OFFICE OF THE OHIO ATTORNEY GENERAL**

           **LABATON SUCHAROW LLP**

           By      /s/ Thomas A. Dubbs
               Thomas A. Dubbs (TD 9658)
               Louis Gottlieb (LG 9169)
               Zachary M. Ratzman (ZR 0802)
Alan Kopit (Ohio Bar #0031965)     Michael W. Stocker (MS 1309)
**HAHN LOESER & PARKS LLP**     Donald P. Delaney (DD 4962)
200 Public Square, Suite 2800       Krista T. Rosen (KR 2950)
Cleveland, Ohio  44114-2301
(216) 621-0150              140 Broadway
(216) 274-2478 (Fax)        New York, New York  10005
                    (212) 907-0700
*Special Counsel to the Attorney General of Ohio and the*  (212) 818-0477 (Fax)
*Ohio State Funds and Co-Lead Counsel for the Class*

           *Lead Counsel for the Ohio State Funds and the Class*

---

[59]   Defendants do not contest market efficiency or numerosity with respect to AIG common stock.