**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
: 
: 
:   ECF CASE
: 
IN RE AMERICAN INTERNATIONAL GROUP,   : 
INC. SECURITIES LITIGATION   :   Master File No. 04 Civ. 8141 (DC) (AJP)
: 
This Document Relates To:  All Actions   :   <u>Oral Argument Requested</u>
: 
———————————————————— x

**MEMORANDUM OF LAW IN SUPPORT OF CO-LEAD COUNSEL'S MOTION FOR AN**
**AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES AND LEAD**
**<u>PLAINTIFF'S REQUEST FOR REIMBURSEMENT OF EXPENSES</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT..........................................................................................1

ARGUMENT ......................................................................................................................3

I.   CO-LEAD COUNSEL IS ENTITLED TO THE REASONABLE ATTORNEYS'
     FEE REQUESTED HEREIN ....................................................................................3

     A.   The Percentage-of-Recovery Method Is Appropriate and Preferable ....................3

     B.   A Fee of 6% of the Cash Settlement Account Is Fair and Reasonable ..................4

     C.   The Requested Fee Was Negotiated with Lead Plaintiff and Is Presumptively
          Reasonable ...........................................................................................................6

     D.   The Requested 6% Fee Is More Than Appropriate Under the *Goldberger*
          Factors...................................................................................................................7

          1.   The Time and Labor Expended By Counsel ................................................7

          2.   The Magnitude and Complexities of the Litigation ....................................9

          3.   The Risks of the Litigation......................................................................10

          4.   The Quality of Representation ..................................................................12

          5.   The Results Achieved Justify the Requested Fee......................................13

          6.   Public Policy Considerations Support the Requested Fee...........................13

     E.   The Class's Reaction to the Fee Request .............................................................14

     F.   The Lodestar "Cross-Check" Supports the Reasonableness of the Requested
          Fee.......................................................................................................................15

          1.   Counsel's Lodestar Multiplier Is Very Low..............................................16

II.  COUNSEL SHOULD BE REIMBURSED FOR THEIR OUT-OF-POCKET
     EXPENSES REASONABLY INCURRED IN CONNECTION WITH THIS
     ACTION .................................................................................................................16

          1.   Costs of Notice Program ..........................................................................18

III. THE OHIO STATE FUNDS ARE ENTITLED TO REIMBURSEMENT OF
     REASONABLE COSTS AND EXPENSES, INCLUDING LOST WAGES ..............19

CONCLUSION.................................................................................................................22

i

## TABLE OF AUTHORITIES

### CASES                                                                Pages

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03 MDL 1529,
 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) .................................................................. 5, 12

*Alpine Pharmacy v. Chas. Pfizer & Co.*,
 481 F.2d 1045 (2d Cir. 1973) .......................................................................................... 13

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
 No. 02 Civ. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ................................. 9

*In re Arakis Eenergy Corp.  Sec. Litig.*, No. 95 CV 3431(ARR)
 2001 WL 1590512 (E.D.N.Y. Oct 31, 2001) ................................................................... 17

*In re Bisys Sec. Litig.*,
 No. 04-3840 (JSR), 2007 WL 2049726 (S.D.N.Y. July 16, 2007) ...................................... 4

*In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS),
 2002 WL 31720381 (S.D.N.Y. Dec. 4, 2002) ................................................................... 5

*Blum v. Stenson*,
 465 U.S. 886 (1984) .............................................................................................. 3, 4, 15

*Boeing Co. v. Van Gemert*,
 444 U.S. 472 (1980) ........................................................................................................ 3

*In re Bristol-Myers Squibb Sec. Litig.*,
 No. 00-1990 (D.N.J. May 11, 2006) ............................................................................... 19

*In re Cardinal Health Inc. Sec. Litig.*,
 528 F. Supp. 2d 752 (S.D. Ohio 2007) ............................................................................ 5

*In re Cavanaugh*,
 306 F.3d 726 (9th Cir. 2002) ......................................................................................... 20

*City of Detroit v. Grinnell Corp.*,
 495 F.2d 448 (2d Cir. 1974) ............................................................................................ 7

*In re Charter Commc'ns, Inc. Sec. Litig.*, No. 02 Civ. 1886,
 2005 WL 4045741 (E.D. Mo. Jun. 30, 2005) ............................................................. 5, 21

*In re DPL, Inc. Sec. Litig.*,
 307 F. Supp. 2d 947 (S.D. Ohio 2004) ............................................................................ 5

*In re Doral Fin. Corp. Sec. Litig.*,
 563 F. Supp. 2d 461 (S.D.N.Y. 2008) ............................................................................ 10

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
 No. 01-3624, 2008 WL 4178130 (S.D. Tex. Sept. 8, 2008) ............................................ 12

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
No. 05-10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) .............................. 6

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) .............................................. passim

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000) .................................................. passim

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)............................................................ 15

*Hicks v. Morgan Stanley*, No. 01-10071,
2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ........................................ 5

*In re Ikon Office Solutions, Inc.*,
277 F.3d 658 (3d Cir. 2002) .................................................. 11

*In re Indep. Energy Holdings PLC Sec. Litig.*,
302 F. Supp. 2d 180 (S.D.N.Y. 2003) ........................................... 17

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748 (2d Cir. 1998) ................................................... 8

*In re Lloyd's Am. Trust Fund Litig.*,
No. 96 Civ. 1262 (RWS), 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ............... 4

*In re Lucent Technologies, Inc., Sec. Litig.*,
327 F. Supp. 2d 426 (D.N.J. 2004) ............................................ 12

*Luciano v. Olsten Corp.*,
109 F.3d 111 (2d Cir. 1997) .................................................. 15

*Maley v. Del Global Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................... 5, 9, 13, 14

*In re Merrill Lynch Tyco Research Sec. Litig.*,
49 F.R.D. 124 (S.D.N.Y. 2008) ................................................ 13

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK),
2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) ........................................ 8

*Missouri v. Jenkins*,
491 U.S. 274 (1989)......................................................... 4, 15

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
711 F.2d 1136 (2d Cir. 1983) ................................................. 15

*In re Nortel Networks Corp. Sec. Litig.*,
539 F.3d 129 (2d Cir. 2008) ............................................... 15, 16

*In re Prudential Sec. Inc. Ltd. P'ship Litig.*,
   985 F. Supp. 410 (S.D.N.Y. 1997) ............................................................... 14

*Pub. Employees' Ret. Assoc. of Colorado v. Deloitte & Touche LLP*,
   No.07-1704, 2009 WL. 19134 (4th Cir. Jan. 5, 2009) ...................................... 10

*In re Rite Aid Corp. Sec. Litig.*,
   362 F. Supp. 2d 587 (E.D. Pa. 2005) ............................................................. 5

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d  294 (3d Cir. 2005) ........................................................................ 14

*Silverberg v. People's Bank*,
   No. 00-9548, 2001 WL 1268149 (2d Cir. Oct. 16, 2001)................................... 5

*In re Sterling Foster Inc. Sec. Litig.*,
   238 F. Supp. 2d 480 (E.D.N.Y. 2002) ............................................................ 4

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999) ............................................................. 10

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   No. 01 Civ. 11814 (MP), 2004 WL1087261 (S.D.N.Y. May 14, 2004) ............. 10

*In re Tyco Int., Ltd. Multidistrict Litig.*,
   535 F. Supp. 2d 249 (D. N.H. 2007)............................................................... 5

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
   724 F. Supp. 160 (S.D.N.Y. 1989) ............................................................... 14

*In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM),
   2007 WL 4115808, at *6 (S.D.N.Y. Nov. 7, 2007)........................................... 9

*Wal- Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005), *cert. denied sub nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart
   Stores, Inc.*, 544 U.S. 1044 (2005)........................................................... 3, 4

*In re The Warnaco Group, Inc. Sec. Litig.*, 00 Civ. 6266 (LMM),
   2004 WL 1574690,  (S.D.N.Y. July 13, 2004) .................................................. 5

*Wells v. Monarch Capital Corp.*,
   129 F.3d 1253 (1st Cir. 1997)....................................................................... 11

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ............................................................ 7

*In Re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005)...................................................... 19, 20

## STATUTES

Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4 (a)(4) ......................................... 1

## OTHER AUTHORITIES

Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Stud. 27 (2004) ........................................................................................... 6

## PRELIMINARY STATEMENT

Labaton Sucharow LLP and Hahn Loeser & Parks LLP, Court-appointed Co-Lead Counsel for

the Ohio Public Employees Retirement System ("OPERS"), State Teachers Retirement System of Ohio

("STRS Ohio") and the Ohio Police & Fire Pension Fund (collectively, "Lead Plaintiff" or the "Ohio

State Funds"), respectfully submit this memorandum of law in support of (1) their motion, pursuant to

Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure, on behalf of all plaintiffs' counsel who

contributed to the prosecution of this action, for an award of attorneys' fees and reimbursement of out-of-

pocket litigation expenses to be paid out of the gross Cash Settlement Account,[1] which will include

interest; and (2) Lead Plaintiff's application for reimbursement of its reasonable costs and expenses

(including lost wages) directly relating to the representation of the Settlement Class, pursuant to the

Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4 (a)(4).

Lead Plaintiff has reached a proposed settlement of the claims alleged against defendant

PricewaterhouseCoopers LLP ("PwC") in the above captioned litigation (the "Action") for $97.5 million

(the "Settlement") under the terms set forth in the Agreement of Compromise and Settlement

("Stipulation") executed on September 29, 2008.  This Settlement, if approved by the Court, would be the

eighth largest settlement entered into by an accounting firm to settle a securities fraud class action and is

an exceptional result reached through Lead Plaintiff and Co-Lead Counsel's persistent efforts.

Co-Lead Counsel respectfully seek an award of attorneys' fees in the amount of 6% of the Cash

Settlement Account, or $5.85 million, plus accrued interest, and reimbursement of $4,878,836.07 in out-

of-pocket expenses reasonably incurred in the course of pursuing the claims against PwC, with interest.

Lead Plaintiff, supported by the Declarations of Julie E. Becker, Esq. and William J. Neville, Esq., seeks

reimbursement of $30,000 in costs as a result of the time expended by OPERS and STRS Ohio in

representing the Class.  *See* Declaration of Thomas A. Dubbs in Support of Proposed Class Settlement,

---

[1] All capitalized terms not otherwise defined herein have the same meaning as that defined in the settling parties' Agreement of Compromise and Settlement ("Stipulation") executed on September 29, 2008.

Plan of Allocation and Award of Attorneys' Fees and Expenses, dated January 13, 2009 ("Dubbs Decl."), Ex. 3 and 4 .[2]

The request is eminently reasonable when one considers: (i) the outstanding result for the Settlement Class; (ii) the amount of work done by Co-Lead Counsel; (iii) the Settlement Class's reaction to the request; and (iv) the amount of fees awarded by courts within this Circuit in comparable cases.  The reasonableness of the requested fee also is amply supported by comparing it to Counsel's PwC-related lodestar of more than $10.7 million--resulting in a lodestar multiplier of only 0.54.  The requested expenses are also reasonable, as they are the type that are regularly reimbursed by courts within this Circuit and they were necessary for the thorough prosecution of the PwC claims.

In addition, to date there have only been *two* objections to Counsel's fee and expense request (and none to Lead Plaintiff's expense request), despite extensive dissemination of notice, and those objections are wholly without merit.[3]  Both objections are lodged by "professional objectors," one of whom does not even have standing to object.  *No* institutional investor has objected to the attorneys' fee or expense request.

Specifically, pursuant to this Court's Preliminary Approval Order, dated October 14, 2008, Co-Lead Counsel caused more than 2 million copies of the Notice of Proposed Settlement, Motion for Attorneys' Fees and Expenses Award and Fairness Hearing ("Notice") and Proof of Claim ("Proof of Claim") forms to be disseminated to potential Settlement Class members who could be identified through reasonable effort using AIG's transfer agent records and an outreach program to brokers/nominees.  *See* Affidavit of Peter Craig of Complete Claims Solutions, LLC, Exhibit 2 to Dubbs Decl. at  ¶¶ 3-9, 14-16. A publication notice regarding the Settlement and the settlement hearing was transmitted over PR Newswire and Bloomberg News Services and ran in *The Wall Street Journal* on October 29, 2008 and

---

[2] All exhibits referenced herein and in Lead Plaintiff's submissions in connection with approval of the Settlement are annexed to the Dubbs Decl.  For clarity, citations to exhibits that themselves have attached exhibits, will be referenced as "Ex. ___ - ___."  The first numerical reference refers to the designation of the entire exhibit attached to the Dubbs Decl. and the second reference refers to the exhibit designation within the exhibit itself.

[3] These objections are addressed in Lead Plaintiff's Memorandum of Law in Response to Objections Concerning the Proposed Settlement With Defendant PricewaterhouseCoopers LLP, filed herewith.

October 30, 2008, respectively.  *Id.* ¶ 6.  The notices and Proof of Claim form were also posted on Co-Lead Counsel's website and the website dedicated to the Settlement, created by the Administrator, for easy downloading by interested investors.  Dubbs Decl. ¶ 9.   The Notice advised Settlement Class members of the procedures and deadlines for objecting to any aspect of the Settlement.  It specifically advised that Counsel intended to seek an award of attorneys' fees that would not exceed 9% of the Cash Settlement Account and reimbursement of expenses not to exceed $6 million, plus interest (both figures being significantly larger than the actual amounts that are requested).  In addition, the Notice informed Settlement Class members that Lead Plaintiff could seek up to $30,000 for reimbursement of its time and expenses.  The time for Class members to object to the applications for fees and reimbursement of expenses expired on December 30, 2008.

**ARGUMENT**

I.  **CO-LEAD COUNSEL IS ENTITLED TO THE
    REASONABLE ATTORNEYS' FEE REQUESTED HEREIN**

    A.  **The Percentage-of-Recovery
       Method Is Appropriate and Preferable**

It is well-settled that attorneys who represent a class and achieve a benefit for class members are entitled to a reasonable fee as compensation for their services.  The Supreme Court has recognized that "a lawyer who recovers a common fund for the benefit of persons other than . . . his client is entitled to a reasonable attorneys' fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  The Second Circuit, similarly, has confirmed that attorneys who create a "common fund" are entitled to "a reasonable fee—set by the court—to be taken from the fund."  *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

The Supreme Court has suggested that in the case of a common fund, the attorneys' fee awarded should be determined on a percentage-of-recovery basis.  *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class…").  Since then, the trend of the district courts within the Second Circuit is to use the percentage of the fund approach rather than the lodestar method to calculate attorneys' fees.  *See Wal-*

*Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method…"), *cert. denied sub nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005).  As was noted in *In re Bisys Securities Litigation,* No. 04-3840 (JSR), 2007 WL 2049726, at *2 (S.D.N.Y. July 16, 2007) (Rakoff, J.):

> The percentage method, 'though not without flaws, is often preferable to the lodestar method to determine attorneys' fees in class actions because it reduces the incentive for counsel to drag the case out [and] fewer judicial resources will be spent in evaluating the fairness of the fee petition.' *Hicks v. Morgan Stanley & Co*., 2005 U.S. Dist. LEXIS 24890, at *23 (S.D.N.Y. October 24, 2005). The lodestar method remains highly useful, however, as a 'cross-check' to further ensure reasonableness.

The percentage-of-recovery approach is also the most efficient means of rewarding the work of class action lawyers.  *See In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002) (Sweet, J.) ("The percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system."); *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 446 (S.D.N.Y. 2004) (Sweet, J.).  "Courts favor the percentage of the fund method because lodestar 'created an unanticipated disincentive to early settlements,' tempted lawyers to run up their hours, and 'compell[ed] district courts to engage in a gimlet-eyed review of line-item fee audits."  *In re Sterling Foster Inc. Sec. Litig.,* 238 F. Supp. 2d 480, 487 (E.D.N.Y. 2002).  In sum, this Court should use the percentage-of-recovery method in determining a reasonable attorneys' fee here.

**B.      A Fee of 6% of the Cash Settlement Account Is Fair and Reasonable**

A reasonable percentage fee award generally should emulate what counsel would receive had they been bargaining for services in the marketplace.  *See Missouri v. Jenkins*, 491 U.S. 274, 285 (1989).  If this action were a non-representative litigation, the customary fee arrangement would similarly be contingent, on a percentage basis, and ***much higher than 6% of the recover***y.  *See Blum*, 465 U.S. at 904 ("In tort suits, an attorney might receive one third of whatever amount the plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery.").

A 6% attorneys' fee falls well below the median range of fees awarded by courts in common-fund cases in this Circuit since *Goldberger*. *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (McMahon, J.) ("Courts in this Circuit have awarded fees ranging from 15% to 50% of the settlement fund.") (awarding 33-1/3% fee). Indeed many courts presiding over class actions within the Second Circuit have awarded fees of 30% or more. *See, e.g., Silverberg v. People's Bank*, No. 00-9548, 2001 WL 1268149, at *1 (2d Cir. Oct. 16, 2001) (affirming district court order awarding attorney's fees and expenses of nearly 33-1/3% of settlement fund); *Bisys*, 2007 WL 2049726, at *3 (30% fee on $65 million settlement); *Hicks v. Morgan Stanley*, No. 01-10071, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (Holwell, J.) ("the 30% fee is consistent with fees awarded in comparable class action settlements in the Second Circuit."); *In re The Warnaco Group, Inc. Sec. Litig.*, 00 Civ. 6266 (LMM), 2004 WL 1574690, at *2 (S.D.N.Y. July 13, 2004) (McKenna, J.) (awarding 30% of the settlement fund); *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (Sweet, J.) (awarding one-third of the settlement fund).

The requested fee is also eminently reasonable when one considers attorneys' fee awards in a sample of class action settlements of over $100 million. *See, e.g., In re Tyco Int'l., Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 266-67 (D.N.H. 2007) (awarding attorney fee of 14.5% of $3.2 billion settlement fund); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 770 (S.D. Ohio 2007) (awarding attorney fee of 18% of $600 million settlement); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03 MDL 1529, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (McKenna, J.) (awarding attorney fee of 21.4% of the almost $455 million settlement); *In re Charter Commc'ns, Inc. Sec. Litig.*, No. 02 Civ. 1886, 2005 WL 4045741, at *19 (E.D. Mo. Jun. 30, 2005) (awarding attorney fee of 20% of $146 million settlement); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) (awarded attorney fee of 25% of a $126 million settlement); *In re DPL, Inc. Sec. Litig.*, 307 F. Supp. 2d 947, 953-54 (S.D. Ohio 2004) (awarding attorney fee of 20% of $110 million settlement).

A recent empirical study of attorneys' fees in class actions nationwide also substantiates awarding the requested fee. Professors Theodore Eisenberg of Cornell Law School and Geoffrey P. Miller of New

York University Law School studied two comprehensive class action data sets covering the 1993-2002 period and concluded that the amount of recovery is the most important determinant of the attorney fee award.  Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. EMPIRICAL LEGAL STUD. 27 (2004).  *See* Dubbs Decl. Ex. 16.  Eisenberg and Miller developed an innovative "lookup table" by which courts can evaluate the reasonableness of a fee request by comparing the request with average awards in cases of similar magnitude.  *See id.* at 72-73, Table 7.  The "lookup table" sets forth, in ten deciles, recovery ranges, mean and median fee percents, and standard deviation fee percentages.  *Id.* at 73, Table 7.  The authors argue that fee requests falling within one standard deviation of the mean should be viewed as generally reasonable.  *Id.* at 74.

For example Table 7 indicates, with respect to Published Opinion data, that for settlements between $79 million and $190 million, the mean fee percentage is 17.6% and the median fee percentage is 15% with a standard deviation of 9.2%.  *Id.* at 73, Table 7.  The mean and median fee percentages using Class Action Reports data are even higher, at 20.3% and 20.8% respectively.  Here, the requested fee of 6% of the $97.5 million recovery is well below either the mean or median and substantially less than a fee within the standard deviations--namely a high-end fee of more than 25%.

### C.   The Requested Fee Was Negotiated with Lead Plaintiff and Is Presumptively Reasonable

The amount of the requested fee was the subject of informed negotiation between Lead Counsel and the Office of the Ohio Attorney General on behalf of Lead Plaintiff.  Dubbs Decl. ¶ 23; Ex. 6.  Accordingly, it is subject to the presumption that it is reasonable and should be awarded by the Court.

"Since passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable."  *In re EVCI Career Colls. Holding Corp. Sec. Litig.,* No. 05-10240, 2007 WL 2230177, at * 16 (S.D.N.Y. July 27, 2007) (McMahon, J.).  In both Global Crossing and WorldCom, the courts were strongly persuaded by the fee agreements reached with the lead plaintiffs in those cases.  *See In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 466 (S.D.N.Y. 2004) (Lynch, J.) ("in class action cases under the PSLRA, courts presume fee requests

submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead

counsel are reasonable"); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 353 (S.D.N.Y. 2005)

(Cote, J.) ("When class counsel in a securities lawsuit have negotiated an arm's-length agreement with a

sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses

the application following close supervision of the litigation, the court should give the terms of that

agreement great weight.")

     Thus, the requested 6% fee is extremely reasonable and should be approved.

    **D.**    **The Requested 6% Fee Is More Than**
              **Appropriate Under the *Goldberger* Factors**

     Additionally, in determining a reasonable attorneys' fee, district courts are also guided by the

factors first articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.

1974).  As summarized more recently in *Goldberger*, these factors include:

> (1) time and labor expended by counsel; (2) magnitude and complexities
> of the litigation; (3) risk of the litigation . . . ; (4) quality of
> representation; (5) requested fee in relation to the settlement; and (6)
> public policy considerations.

*Goldberger*, 209 F.3d at 50.  As discussed below, application of these criteria to the facts now before this

Court shows that Counsel's fee request is clearly reasonable and warranted.

    **1.**    **The Time and Labor Expended By Counsel**

     As detailed in Counsel's declarations concerning fees and expenses, submitted herewith, they

have devoted substantial time and effort to the prosecution of the claims against PwC in this Action and

to the settlement of the claims on terms very favorable to the Settlement Class.  The Settlement follows

nearly four years of litigation that included:

- Fully-briefed motion practice, on two separate occasions, to determine the lead
  plaintiff;

- Motions to dismiss filed by more than 20 defendants, all of which (except one) the
  Court denied in April and May 2006;

- The production and review of nearly 45 million pages of documents by defendants
  and non-parties, including more than 28 million pages produced by PwC; and

- More than 40 depositions conducted to date during class and fact discovery.[4]

Counsel devoted a total of 30,856.10 hours to prosecution of the claims against PwC, resulting in a combined "lodestar" amount of $10,735,768 at Counsel's regular and current billing rates.  *See* Dubbs Decl. Exs. 18-A;  20-A.  (As explained by the Second Circuit in *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998), "current rates, rather than historical rates, should be applied in order to compensate for the delay in payment.")  If the Court approves the Settlement, Co-Lead Counsel will also devote additional hours to the settlement administration and distribution process, without any additional compensation.  The time and effort committed by Counsel to this Action amply support the requested fee.

With respect to billing rates, Co-Lead Counsel submit that the rates billed, averaging $348 per hour, are comparable to peer plaintiffs' and defense-side law firms litigating matters of similar magnitude in this District.  Indeed, similar or higher billing rates have been approved by other courts in this District. *See In re Merrill Lynch & Co. Research Reports Sec. Litig*., No. 02 MDL 1484 (JFK), 2007 WL 313474, at *22 (S.D.N.Y. Feb. 1, 2007) (Keenan, J.) (approving billing rates up to $850 per hour and observing that "[t]he rates charged by counsel, though high, are not inordinate for top-caliber New York law firms").[5]

With respect to the hours worked, Co-Lead Counsel submit that the substantial time devoted to litigating the claims against PwC reflects the tremendous effort needed to prosecute those claims and to bring them to a favorable resolution.  There are a number of core attorneys on the case who have devoted large amounts of their time to the litigation in order to insure continuity and proper allocation of resources. Document review was structured to limit overall cost, with the bulk of the initial review being conducted by junior attorneys hired by Labaton Sucharow.  Dubbs Decl. ¶¶ 82-84.  These junior attorneys were carefully supervised so as to eliminate any inefficiencies.  Substantial effort went into investigating

---

[4] For a full recitation of the procedural and litigation history of the Action, the Court is respectfully referred to the Dubbs Decl.

[5] The billing rates of Counsel here ranged from $275 per hour to $825 per hour. *See* Dubbs Decl. Ex.18-A; 20-A.  Sample defense firm billing rates, gathered from bankruptcy court filings, in many cases exceeded these rates.  Ex. 17.

the claims against PwC; drafting the amended complaints (the First Amended Complaint added PwC as a defendant); responding to PwC's separate motion to dismiss, reviewing and analyzing the 45 million page document production, including more than 28 million pages of complex accounting work papers produced by PwC; class discovery (in which PwC was an active participant); preparation for the fact depositions and extensive analysis of loss causation issues, damages issues and complex accounting issues.  Dubbs Decl. ¶¶ 34-86.   In sum, we estimate the lodestar directly related to our efforts in the litigation with respect to the PwC claims amounts to be more than $10.7 million.  Exs. 18-A; 20-A.

As further supported by the lodestar cross-check, discussed below, Co-Lead Counsel submit that the first *Goldberger* factor weighs strongly in favor of the requested attorneys' fee.

## 2.        The Magnitude and Complexities of the Litigation

Courts have recognized the "notorious complexity" of securities class action litigation, especially against auditor defendants.  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006) (Kram, J.);  *see also In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *6 (S.D.N.Y. Nov. 7, 2007) (McMahon, J.) (in awarding attorneys' fees for settlement with defendant auditor and others, noting complexity of legal and factual accounting issues); *Maley*, 186 F. Supp. 2d at 364 (in approving settlement and awarding fees, noting obstacle of proving auditor's scienter).

Here, in addition to the complex issues of law and fact associated with securities class actions generally, this case presented a *sui generis* fraud involving contingent commissions and alleged bid-rigging and an extraordinarily complex sets of accounting issues that led to AIG's $3.9 billion Restatement with respect to approximately ***two dozen separate types*** of transactions.[6]  Dubbs Decl. ¶ 90-95.  Co-Lead Counsel devoted thousands of hours to learning and analyzing the applicable accounting rules, analyzing AIG's accounting transactions and policies, piecing together the decision-making and documentation for the allegedly improper transactions, reviewing and analyzing PwC's work papers

---

[6] Additionally, given PwC's position as AIG's outside auditor, there were issues concerning whether PwC could be connected to damages relating to the contingent commission and bid-rigging fraud.

related to these transactions and determining PwC's involvement and knowledge of the alleged fraud.

Dubbs Decl. ¶¶ 78-86.  Given the failure of the government and regulators to pursue any claims against

PwC, Co- Lead Counsel could not have relied on such proceedings to help prove the class's claims,

adding to the complexity and magnitude of the efforts required to prosecute the case.

### 3.  The Risks of the Litigation

The Second Circuit has identified 'the risk of success as "perhaps the foremost" factor to be

considered in determining' a reasonable award of attorneys' fees.  *In re Global Crossing Sec. & ERISA*

*Litig.*, 225 F.R.D. at 467 (quoting *Goldberger*, 209 F.3d at 54).  Courts continue to recognize that "[l]ittle

about litigation is risk-free, and class actions confront even more substantial risks than other forms of

litigation."  *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01 Civ. 11814 (MP), 2004 WL 1087261, at

*3 (S.D.N.Y. May 14, 2004) (Pollack, J.).

The contingency risk here was significant and supports the requested fee.  Co-Lead Counsel

undertook this action on a strictly contingent-fee basis, and prosecuted this action with no guarantee of

compensation or recovery of any out-of-pocket costs. (Indeed, Co-Lead Counsel has received no

compensation or reimbursement to date.)  *See In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399

(S.D.N.Y. 1999) (Pollack, J.) (class counsel not only undertook risks of litigation, but advanced its own

funds and financed the litigation).

As discussed in the Dubbs Declaration, the pursuit of this case through Defendants' motions to

dismiss, vigorously contested class discovery, a motion for class certification and fact and expert

discovery has revealed potential barriers to recovery that lie ahead.  Dubbs Decl. ¶¶ 90-97.  For example,

PwC has argued that Lead Plaintiff could not establish a claim against it under Section 10(b) of the

Exchange Act.  PwC would likely maintain that, at most, the evidence showed negligence in PwC's

auditing of AIG and not that it intended to aid the fraud at AIG.  *See, e.g., In re Doral Fin. Corp. Sec.*

*Litig.*, 563 F. Supp. 2d 461, 465-67 (S.D.N.Y. 2008) (Rakoff, J.) (dismissing securities fraud case against

PwC for failure to plead scienter); *Pub. Employees' Ret. Assoc. of Colorado v. Deloitte & Touche LLP*,

No.07-1704, 2009 WL 19134 (4th Cir. Jan. 5, 2009) (affirming dismissal of securities fraud claims

against outside auditor on element of scienter); *In re Ikon Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002) (affirming summary judgment dismissing securities fraud claims against outside auditor on elements of scienter and causation); *Wells v. Monarch Capital Corp.*, 129 F.3d 1253 (1st Cir. 1997) (affirming summary judgment dismissing securities fraud claims against outside auditor on element of scienter).

As noted above, no governmental or regulatory charges were ever brought against PwC.  Further, PwC remains AIG's auditor to this day, based on a public request for proposal ("RFP") process overseen by AIG's independent corporate governance consultant, Arthur Levitt, Jr., former Chairman of the United States Securities and Exchange Commission.  PwC could also point to AIG's Form 10-K for the year 2004 and argue that AIG itself admits that its prior management concealed material facts not only from investors, but from PwC itself.  *See, e.g.*, 2004 Form 10-K at 33 ("Such determination was based, in part, on arrangements and documents. . .that appear not to have been previously disclosed to appropriate AIG financial personnel or AIG's independent auditors.")  While Co-Lead Counsel believe its claims against PwC had a strong prospect of prevailing at trial, these issues illustrate the risks in prosecuting those claims.

The risk related to establishing loss causation with respect to PwC and PwC's relative fault (compared to other defendants) in the fraud also supports the requested fee.  In addition to facing the proverbial "battle of the experts," there was a risk that Settlement Class damages with respect to PwC could be reduced to less than the amount that the Settlement Class is recovering through the Settlement. For example, PwC likely would have argued to the jury that loss causation could not be established and, in any event, PwC was not principally responsible for AIG's fraudulent acts.  Although Lead Plaintiff and Co-Lead Counsel believe they could counter any such arguments to defeat a motion for summary judgment and prevail at trial, there were clearly substantial litigation risks if settlement had not been achieved.  Dubbs Decl. ¶¶ 96-97.

Accordingly, Co-Lead Counsel submit that an analysis of the risks faced by the Settlement Class strongly supports the requested fee award.

4.      **The Quality of Representation**

Co-Lead Counsel also submit that the quality of their representation supports the reasonableness of the requested fee.

Given the factual intricacies of the claims, the presence of numerous contested issues (including scienter, causation and damages), and the resources possessed by PwC, this case required the expertise and capacity of Co-Lead Counsel and their proven ability to prosecute cases over an extended period and through trial.  As the Court is aware, Labaton Sucharow has many years of experience in complex federal civil litigation, particularly the litigation of securities and other class actions.  Dubbs Decl. Ex. 19.  Likewise, Hahn Loeser, one of Ohio's largest and most respected law firms, has served as lead counsel in, and has defended, many class actions in the securities area, as well as in the areas of banking law, privacy, real estate, and antitrust law.   Dubbs Decl. Ex. 20 – C.  This Settlement represents a highly favorable result for the Settlement Class, and one that is attributable to the diligence, determination, and hard work of Co-Lead Counsel.

The quality of opposing counsel is also important in evaluating the quality of Co-Lead Counsel's work.  *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529, 2006 WL 3378705, at \*3 (S.D.N.Y. Nov. 16, 2006) (McKenna, J.) ("The fact that the settlements were obtained from defendants represented by formidable opposing counsel from some of the best defense firms in the country also evidences the high quality of lead counsels' work.").  The skill, tenacity, experience and resources of Cravath Swaine & Moore LLP, counsel for PwC, are well known.  *See, e.g., In re Lucent Technologies, Inc., Sec. Litig.*, 327 F.Supp.2d 426, 437 (D.N.J. 2004) (noting that Cravath "is one of the premier law firms in the world, with a well-rooted reputation for exceptional legal services" and "represents some of the most sophisticated clients in the world in defense of putative class action securities litigations"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, No. 01-3624, 2008 WL 4178130, at \*29 n.49 (S.D. Tex. Sept. 8, 2008) (identifying Cravath as one of the "excellent law firms" involved in the Enron litigation)

**5.      The Results Achieved Justify the Requested Fee**

The fifth *Goldberger* factor, the relation of the requested fee to the Settlement, also supports the requested attorneys' fee.  As discussed above, this Settlement provides the Class with a substantial all-cash recovery of $97.5 million and was achieved despite many complexities and risks.  The proposed Settlement would be the eighth largest settlement ever by an auditor in a securities class action and the fourth largest settlement ever by an auditor in a securities class action where the auditor had not been sued by the government in connection with the audits at issue.  This result is very compelling.  As also discussed above, fees in the amount of 6% of a recovery are well below those that have regularly been awarded by courts within this Circuit and the Eisenberg and Miller study indicates that such a fee is extremely reasonable.

Moreover, as discussed below, the fee would provide a lodestar multiplier of just *0.54*.  Co-Lead Counsel submit that given these factors, the results achieved amply support the requested fee.

**6.      Public Policy Considerations Support the Requested Fee**

"In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."  *Maley*, 186 F. Supp. 2d at 373.  Private actions such as this one serve to further the objective of the federal securities laws to protect investors and consumers against fraud and other deceptive practices.  The Second Circuit has taken into account the social and economic value of class actions and the need to encourage counsel to undertake such litigation.  *See Alpine Pharmacy v. Chas. Pfizer & Co.*, 481 F.2d 1045, 1050 (2d Cir. 1973).

As a practical matter, such lawsuits can be maintained only if competent counsel can be retained to prosecute them.  This will occur if courts award reasonable and adequate compensation for such services where successful results are achieved, often after years of litigation.  "Public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *In re Merrill Lynch Tyco Research Sec. Litig.* 49 F.R.D. 124, 141 (S.D.N.Y. 2008)(Keenan, J.). As Judge Brieant has noted:

> A large segment of the public might be denied a remedy for violations of the securities laws if contingent fees awarded by the courts did not fairly compensate counsel for the services provided and the risks undertaken.

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 169 (S.D.N.Y. 1989)

(Brieant, J.).

> As Judge Holwell also explained in *Hicks*:

>> Private actions to redress real injuries further the objectives of the federal securities laws by protecting investors and consumers against fraud and other deceptive practices. . . .To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding. ***The concept of a private attorney acting as a private attorney general is vital to the continued enforcement and effectiveness of the Securities Acts***.

2005 WL 2757792, at \*9.

Here, a class action was the ***only way*** that investors could obtain compensation for the alleged wrongdoing from PwC.  As noted above, no government entity or regulator has filed claims against PwC, relating to its audits of AIG.

But for the willingness of Co-Lead Counsel to assume these risks, Settlement Class members would never have been able to recover from PwC.

###### E.  The Class's Reaction to the Fee Request

"The reaction of the Class," while not one of the formal *Goldberger* factors, "is entitled to great weight by the Court."  *Maley*, 186 F. Supp. 2d at 374; *see also In re Prudential Sec. Inc. Ltd. P'ship Litig.,* 985 F. Supp. 410, 416 (S.D.N.Y. 1997) (Pollack, J.) ("In determining the reasonableness of a requested fee, numerous courts have recognized that 'the lack of objections from members of the class is one of the most important reasons.'"). As discussed above, the Administrator has mailed more than 2 million packets containing the Notice and Proof of Claim form to potential Settlement Class members directly and through their brokers/nominees, informing them, *inter alia*, that Co-Lead Counsel would be requesting an award of attorneys' fees of no more than 9% and expenses not to exceed $6 million, plus interest.  Dubbs Decl. Ex. 2 ¶ 16.   The time to object to the fee request expired on December 30, 2008 and there have only been ***two*** objections by putative Settlement Class members to the request for fees and expenses – a significant endorsement of the proposed fee.  *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d

294, 305 (3d Cir. 2005) (two objectors out of 300,000 class members; "such a low level of objection is a 'rare phenomenon.' ")

Moreover, neither of these objections credibly challenge Co-Lead Counsel's request. One objector simply relies on the 3% fee approved in the $1.14 billion settlement of *In Re Nortel Networks Corp. Securities Litigation* No. 01-1855 (S.D.N.Y.), to argue that Co-Lead Counsels' request is excessive, without any recognition of the differences between the two cases. Dubbs Decl. ¶¶ 101-105. The other simply states that, while they have not had enough time to fully consider the fee and expense request, $6 million in expenses "appears excessive." There is no consideration of the amount of work that went into prosecuting the PwC claims. Both of these objections are without merit.[7] Dubbs Decl. Ex. 9.

### F. The Lodestar "Cross-Check" Supports the Reasonableness of the Requested Fee

The Second Circuit encourages the practice of performing a lodestar "cross-check" on the reasonableness of a fee award based on the percentage approach. *See Goldberger*, 209 F.3d at 50. The lodestar is calculated by multiplying the number of hours expended on the litigation by a particular attorney or paralegal by his or her current hourly rate. The hourly billing rate to be applied is the attorney's normal hourly billing rate, so long as that rate conforms to the billing rate charged by attorneys with similar experience in the community where the counsel practices, *i.e.,* the "market rate." *See Blum*, 465 U.S. at 895; *Hensley v. Eckerhart*, 461 U.S. 424, 447 (1983) ("[M]arket standards should prevail…") (Brennan, J., concurring in part and dissenting in part); *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'") (quoting *Blum*, 465 U.S. at 896 n.11).[8]

---

[7] For a full rebuttal of these objections, please see Lead Plaintiff's Memorandum of Law in Response to Objections Concerning the Proposed Settlement With Defendant PricewaterhouseCoopers LLP.

[8] Additionally, the Supreme Court and other courts have held that the use of current rates is proper because such rates more adequately compensate for inflation and loss of use of funds. *See Jenkins*, 491 U.S. at 283-84; *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (use of current rates appropriate where services provided within two or three years of fee application). As mentioned, the current rates of counsel are in accordance with the competitive market

"Under the lodestar method of fee computation, a multiplier is typically applied to the lodestar." *Global Crossing*, 225 F.R.D. at 468.  "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."  *Id.* (citing *Goldberger*, 209 F.3d at 47; *Savoie*, 166 F.3d at 460).

### 1.    Counsel's Lodestar Multiplier Is Very Low

The total lodestar of Counsel here related to prosecuting the claims against PwC is $10,735,768.  Dubbs Decl. Exs. 18-A; 20-A.  This represents 30,856.10 hours spent by attorneys, paralegals, investigators and professional analysts furthering the prosecution of the PwC claims.  Counsel compiled the hours from contemporaneous time records maintained by each individual who participated in the prosecution of the Action.  *Id.*

Here, Counsel's lodestar of $10,735,768 represents a "multiplier" of only 0.54.   This lodestar multiplier is *very* low.   In *In re Nortel Networks Corp. Securities Litigation*, 539 F.3d 129, 134 (2d Cir. 2008) the Second Circuit recently ruled that a $34 million fee, representing a 2.04 multiplier was "*toward the lower end of reasonable fee awards*." (emphasis added.)   Likewise, in *Bisys*, 2007 WL 2049726, at *3, the court found that the reasonableness of the 30% fee on the $65 million settlement was confirmed by the multiplier of 2.99, noting that "[s]uch a multiplier falls well within the parameters set in this district and elsewhere."

In short, the reasonableness of the requested attorneys' fee is readily confirmed by the lodestar "cross-check."  Co-Lead Counsel submits that the requested fee should be awarded.

## II.    COUNSEL SHOULD BE REIMBURSED FOR THEIR OUT-OF-POCKET EXPENSES REASONABLY INCURRED IN CONNECTION WITH THIS ACTION

In addition to a reasonable attorneys' fee, Co-Lead Counsel respectfully seek reimbursement in the amount of $4,878,836.07 for out-of-pocket expenses reasonably incurred in connection with prosecuting the PwC claims.  Co-Lead Counsel have submitted declarations attesting to the accuracy of

---

hourly rates in their respective legal communities for cases of this sort.  Such rates necessarily reflect the reputation, experience, care, and success records of counsel.

its expenses and it is well-established that such expenses are properly recovered by counsel.  *In re Indep.*

*Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (Scheindlin, J.) (court

may compensate class counsel for reasonable out-of-pocket expenses necessary to representation of

class); *Arakis Energy*, 2001 WL 1590512, at *17 n.12 ("Courts in the Second Circuit normally grant

expense requests in common fund cases as a matter of course.").

Counsel's declarations, annexed as Exhibits 18 and 20 to the Dubbs Declaration, itemize the

various categories of expenses incurred by Co-Lead Counsel.  Co-Lead Counsel submit that these

expenses were reasonably and necessarily incurred in prosecuting the PwC claims and achieving the

proposed Settlement.  Counsel further submits that these expenses, which include costs such as expert and

consultant fees, the costs of establishing and using an electronic database to conduct discovery,

photocopying, postage and transportation are the type for which "the paying, arms' length market"

reimburses attorneys and should therefore be reimbursed from the Settlement Fund.  *Global Crossing*,

225 F.R.D. at 468.  Dubbs Decl. Exs. 18-B; 20-B.

Indeed, certain of these costs saved the Settlement Class considerable expense.  For example, by

creating an electronic document repository and using Merrill Legal Computer Solutions, Inc. ("Merrill"),

one of the leading litigation technology support companies, Co-Lead Counsel achieved substantial

savings for the Class by working primarily electronically and saving hundreds of thousands of dollars in

copying costs.  One set of copies of PwC's 28 million-page document production at the rate of just 10

cents per page would have cost $2.8 million.  At a minimum, two sets of documents is required in

litigation in order to maintain the integrity of the "master" set.  Thus the copying of PwC's document

production alone would have cost at least $5.6 million.  Had Co-Lead Counsel relied on a paper

production, copying-related costs alone would have exceeded all of the costs actually expended by Co-

Lead Counsel on behalf of the Settlement Class.  Dubbs Decl. Ex. 18-B; 20-B.

Another significant expense was the cost of consulting experts who provided critical assistance in

the areas of accounting, insurance, loss causation, and damages.  As discussed above, securities cases

involving accounting issues require extensive and costly expert analysis.  Experts' expenses totaled

approximately $4.4 million, and represented 90% of total expenses.  Dubbs Decl., Ex. 8-B; 20-B.  Co-Lead Counsel received crucial advice and assistance from these experts throughout the course of the litigation.  Their expertise enabled counsel to fully frame the issues, gather relevant evidence and make a realistic assessment of provable damages.

The Notice advised potential Settlement Class members that Co-Lead Counsel would seek reimbursement of expenses of up to $6 million.  Dubbs Decl. Ex. 2 – A at 2, 5.  The expenses sought here are well below this "cap."

### 1.     Costs of Notice Program

Co-Lead Counsel is also seeking, on behalf of the court-appointed Administrator Complete Claims Solutions ("CCS"), payment of the unreimbursed costs and fees incurred to date in executing the notice program for Settlement Class members and administering the Settlement.  CCS is requesting a payment of $2,259,082.52.  *See* CCS Aff. ¶ 20, Dubbs Decl. Ex. 2 - G.[9]

As discussed in the Dubbs Decl. ¶ 10, CCS was retained by Co-Lead Counsel after an assessment of its fees and prior experience in administering other large settlements.

Here, CCS undertook an extensive effort to execute the notice program.  Through records maintained by AIG, information gathered from brokerage firms and requests made by individuals and brokerage firms, CCS mailed more than 2 million notices.  *See* CCS Aff. ¶ 16, Dubbs Decl. Ex. 2.  The printing of the Notices cost $577,200, and postage alone cost more than $1.3 million.  Additionally, CCS reimbursed numerous brokers $297,294.58 for their costs in researching their records and forwarding the Notice and Proof of Claim form to beneficial owners.  Ex. 2-G.  Accordingly, CCS has incurred substantial out-of-pocket expenditures.

The Notice program also included providing substantial personal assistance to potential class members.  *See* CCS Aff. ¶ 11, Dubbs Decl. Ex. 2.  For instance, in order to address Settlement Class questions effectively, CCS created a special "800" telephone line.  CCS established a multi-option "800"

---

[9] Pursuant to the Stipulation and the Court's Preliminary Approval Order, CCS has already been reimbursed for $445,143.00 of its incurred costs through October 30, 2008.

line where potential Settlement Class members could either listen to pre-recorded information or directly

speak with a representative and request information.  In the aggregate, more than 6,173 calls have been

placed to the "800" number.  *Id*.  CCS spent a significant amount of time assisting potential class

members who required assistance.[10]

### III. THE OHIO STATE FUNDS ARE ENTITLED TO REIMBURSEMENT OF REASONABLE COSTS AND EXPENSES, INCLUDING LOST WAGES

The PSLRA, 15 U.S.C. §78u-4(a)(4), limits a class representative's recovery to an amount

"equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other

members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the

award of reasonable costs and expenses (including lost wages) directly relating to the representation of

the class to any representative party serving on behalf of a class."  Here, as explained in the Declarations

of Julie E. Becker, Esq. and William J. Neville, Esq., submitted herewith, OPERS and STRS Ohio are

seeking reimbursement of $30,000 in lost wages related to their active participation in this Action.  Dubbs

Decl. Ex. 3 and 4.

Many cases have approved reasonable payments to compensate class representatives for the time

and effort devoted by them on behalf of a class.  *See In re General Motors Corp. Sec. & Derivative Litig.*,

Slip Op. No. MDL 1749 (E.D. Mich. Jan. 6, 2009) (awarding $184,205 to two institutional class

representatives and $1,000 to each of the named plaintiffs) (Dubbs Decl. Ex. 21); *In re Bristol-Myers

Squibb Sec. Litig.*, Slip Op., No. 00-1990 (D.N.J. May 11, 2006) (awarding $58,948.64 to institutional

class representative) (Dubbs Decl. Ex. 22); *In Re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*,

364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (awarding $100,000 collectively to eight lead plaintiffs, for

having "fully discharged their PSLRA obligations and … been actively involved throughout the litigation

… communicat[ing] with counsel throughout the litigation, review[ing] counsels' submissions,

---

[10]   CCS will also incur additional costs and expenses between now and the distribution of the
Settlement, which is expected to occur by the end of 2009 or in early 2010.  As is customary in securities
class actions, Co-Lead Counsel will request authorization from the Court for payment to the
Administrator at the time of distribution for the costs and fees incurred between now and then.

indicat[ing] a willingness to appear at trial, and … kept informed of the settlement negotiations, all to effectuate the policies underlying the federal securities laws.")

Indeed, given that the central objective of the PSLRA was to "protect[] investors who join class actions against lawyer-driven lawsuits by . . . increas[ing] the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel,'" (*In re Cavanaugh*, 306 F.3d 726, 737 (9th Cir. 2002)), it would be unreasonable to penalize institutional class plaintiffs, like the Ohio State Funds here, for devoting time to the litigation by denying them reimbursement.  Undertaking litigation, especially against a major corporation with near-unlimited resources, represents a significant commitment for anyone, and to deny compensation for the time incurred in carrying out this commitment is contrary to the purpose and language of the PSLRA.  As the court held in *Xcel Energy*:

> In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including . . . the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by that plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery. Furthermore, courts consider not only the efforts of the representative plaintiffs in pursuing claims, but also the important policy role they play in the enforcement of the federal securities laws on behalf of persons other than themselves. Such enforcement is vital because if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted.

364 F. Supp. 2d at 1000.

Here, OPERS and STRS Ohio have devoted at least 675 hours to the litigation, including meetings with counsel, time devoted to responding to extensive document requests and interrogatories and producing more than 260,000 pages of documents, preparation for and attendance at ten class discovery depositions, many of which lasted an entire day, review of court filings and correspondence and telephone conversations with counsel.  Dubbs Decl. ¶¶ 20-23, 43-56; Ex. 3-4.  While assisting with the prosecution of this Action, OPERS and STRS Ohio employees were unable to perform their regular responsibilities on behalf of their Funds, which lost those services.

Lead Plaintiff is seeking reimbursement for that portion of their time related to the PwC claims. As explained in counsels' declarations, the hourly rates utilized are based on fund employees' annual salaries with benefits and related administrative overhead (*e.g.*, $175 per hour for general counsel of the Funds).  *See In re Charter Commc'ns, Inc. Sec. Litig*., No. MDL 1506, 2005 WL 4045741, at *24-25 (E.D. Mo. June 30, 2005) (Shaw, J.) (awarding institutional lead plaintiff $26,625 based on managing director's estimated hourly rate of $300, and noting that "Courts in this District have routinely approved such reimbursements").

Co-Lead Counsel and the Ohio State Funds respectfully submit that the $30,000 sought, based on Lead Plaintiff's extensive involvement in the Action from inception to settlement, is eminently reasonable and should be granted.

## CONCLUSION

For the foregoing reasons, Co-Lead Counsel respectfully requests that this Court enter the proposed fee order awarding attorneys' fees of 6% of the Cash Settlement Account of $97.5 million, or $5.85 million, with interest; reimbursement of out-of-pocket litigation expenses in the amount of $4,878,836.07, with interest; reimbursement of Lead Plaintiff's expenses in the amount of $30,000 and reimbursement of the Administrator's expenses in the amount of $2,259,082.52, to be paid out of the Cash Settlement Account.

Dated:  New York, New York
        January 13, 2009

**RICHARD CORDRAY,
ATTORNEY GENERAL OF OHIO**

**LABATON SUCHAROW LLP**

By   /s/ Thomas A. Dubbs
       Thomas A. Dubbs (TD 9658)
       Louis Gottlieb (LG 9169)
       Nicole M. Zeiss (NZ 3894)
       Zachary M. Ratzman (ZR 0802)

Alan Kopit (Ohio Bar #0031965)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114-2301
(216) 621-0150
(216) 274-2478 (Fax)

140 Broadway
New York, New York  10005
(212) 907-0700
(212) 818-0477 (Fax)

*Special Counsel to the Attorney General of Ohio and the Ohio State Funds and Co-Lead Counsel for the Class*

*Co-Lead Counsel for Lead Plaintiff Ohio State Funds and Co-Lead Counsel for the Class*