**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————— x
:
:        **ECF CASE**
:
IN RE AMERICAN INTERNATIONAL GROUP,   :
INC. SECURITIES LITIGATION              :        Master File No. 04 Civ. 8141 (DC) (AJP)
:
This Document Relates To:  All Actions    :
:
——————————————————————— x

## DECLARATION OF THOMAS A. DUBBS IN SUPPORT OF PROPOSED CLASS SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF ATTORNEYS' FEES AND EXPENSES

THOMAS A. DUBBS declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Labaton Sucharow LLP ("Labaton Sucharow"), Court-appointed Co-Lead Counsel for the Ohio Public Employees Retirement System ("OPERS"), State Teachers Retirement System of Ohio ("STRS Ohio"), and Ohio Police & Fire Pension Fund ("OP&F") (collectively as "Lead Plaintiff" or the "Ohio State Funds"), and the Class in the above-titled action (the "Action").  I am admitted to practice before this Court.

2.      I was actively involved in the prosecution of this case, am intimately familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision and active participation in the Action.

3.      I respectfully submit this declaration in support of Lead Plaintiff's motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the Settlement of this class action with respect to Defendant PricewaterhouseCoopers LLP ("PwC") and the Plan of Allocation of the Net Settlement Fund (the "Plan of Allocation").[1]  I also submit this declaration in support of Co-Lead Counsel's motion for an award of attorneys' fees and reimbursement of counsel's expenses incurred during the prosecution of this Action and Lead Plaintiff's application for reimbursement of its reasonable

---

[1] All capitalized terms herein are defined in the Stipulation and have the same meaning as that set forth in the Stipulation.

costs and expenses directly relating to the representation of the Class, pursuant to the Private Securities

Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4 (a)(4).

I.      **BENEFITS OF THE SETTLEMENT TO THE CLASS**

4.      The Stipulation and Agreement of Settlement (the "Stipulation"), filed with the Court on

October 3, 2008 and preliminarily approved by the Court by order entered on October 15, 2008, provides

for the gross payment of $97,500,000 in cash (the "Settlement Fund") by PwC to the Class in exchange

for a release of the Settled Claims brought against it.   Since September 30, 2008, the Settlement Fund has

been invested in securities backed by the full faith and credit of the United States government and has

been earning interest for the benefit of the Class.

5.      After the deduction of any attorneys' fees, expenses and notice and administration costs

approved by the Court, together with any taxes and tax expenses that may be payable by the Settlement

Fund, the Net Settlement Fund will be distributed to Authorized Claimants, *i.e.,* Class Members who

submit timely and valid Proof of Claim forms, in accordance with the Plan of Allocation.  (The allocation

formula utilized was designed by the Class's damages consultants to provide Class Members with the

strongest claims a greater share of the recovery.)

6.      The Settlement was only reached after more than four years of extensive investigation,

fact discovery involving the review of more than 45 million pages of documents and the taking of more

than 40 depositions; and after several months of settlement discussions, including two mediation sessions

before former federal judge Layn R. Phillips.

II.     **THE COURT'S PRELIMINARY APPROVAL ORDER AND
        DISSEMINATION OF PRE-HEARING NOTICES**

7.      Lead Plaintiff moved for preliminary approval of the Settlement on October 3, 2008.  On

October 15, 2008, the Court issued a Preliminary Approval Order Providing for Notice and Hearing in

Connection With Proposed Class Action Settlement (the "Preliminary Approval Order").  *See* Exhibit 1

hereto.[2]

      8.     In the Preliminary Approval Order, the Court made the following findings,

determinations and directives, among others:

      (a)     granted preliminary approval to the Settlement as sufficiently fair, reasonable and adequate to warrant dissemination of notice to the Class and a hearing on the fairness of the Settlement;

      (b)     scheduling a hearing (the "Settlement Hearing") for January 20, 2009 at 3:00 p.m. to consider, among other things, whether the proposed Settlement is fair, reasonable, and adequate and should be finally approved; whether the proposed Plan of Allocation of the Net Settlement Fund is fair and reasonable and should be approved; whether the Final Order and Judgment as provided under the Stipulation should be entered; whether Counsel's application for an award of attorneys' fees and reimbursement of expenses should be granted; and whether Lead Plaintiff's application for reimbursement of expenses should be granted;

      (c)     approving the form, substance and requirements of the Notice of Pendency of Class Action and Proposed Settlement ("Notice"), the Summary Notice of Pendency of Class Action and Hearing on Proposed Settlement ("Publication Notice") and the Proof of Claim form;

      (d)     appointing Complete Claim Solutions, LLC ("CCS") to administer the notice program and Settlement, under the supervision of Counsel; and directing that the notices be disseminated; and

      (e)     establishing procedures and deadlines for Class Members to exclude themselves from the Settlement or object to the Settlement, Plan of Allocation, the attorneys' fees and reimbursement of expenses requested by Counsel and the reimbursement of expenses requested by Lead Plaintiff.

      9.     Annexed hereto as Exhibit 2 is the Affidavit of Peter Craig of Complete Claim Solutions

("CCS Aff.").  The CCS Affidavit attests to, among other things, the efforts made to disseminate the

Notice and Proof of Claim forms, the web-posting of the Notice and Proof of Claim forms and

publication of the Publication Notice, all in compliance with the Preliminary Approval Order.  The

notices and Proof of Claim form were also posted on Co-Lead Counsel's website.

      10.     CCS was selected after a careful review of its fees and its experience with other large

class action settlement administrations.

---

[2] All exhibits referenced in Lead Plaintiff's submissions in connection with approval of the Settlement are annexed hereto.  For clarity, citations to exhibits that themselves have attached exhibits, will be referenced as "Ex. ___ - ___."  The first numerical reference refers to the designation of the entire exhibit attached here and the second reference refers to the designation within the exhibit itself.

11.     Co-Lead Counsel has actively monitored the progress of the notice program and administration of the Settlement.  In addition to frequent telephone conferences with Co-Lead Counsel and email communications, CCS has sent counsel status reports summarizing specific data to chart the progress of the claims administration process.  Accordingly, Co-Lead Counsel has been able to monitor the number of: (1) notice packets mailed; (2) notice packets requested by brokers/nominees; (3) notice packets requested directly by potential class members; (4) notice packets re-mailed to an updated address; (5) calls from potential Settlement Class members; (6) notice packets returned as undeliverable; (7) exclusions requested; and (8) claims filed.

12.     In order to assure thorough dissemination of the notice, CCS worked diligently to notify all the potential class members identified by AIG's transfer agent as owners of record and all brokers/nominees who may have purchased AIG securities for the benefit of others.

13.     To date, 2,225,192 notice packets have been disseminated to potential Class Members. *See* Exhibit 2 at ¶16.  Notice packets were also made available for downloading on Labaton Sucharow's website and the website created by CCS specifically for purposes of this Settlement.

## III.     SUMMARY OF ALLEGATIONS AND CLAIMS

14.     This securities fraud class action was brought under the Securities Act of 1933 and the Securities Exchange Act of 1934 against American International Group, Inc. ("AIG" or the "Company") and several of its former senior executives, PwC, and other defendants concerning, *inter alia*, the Defendants' false and misleading statements, deceptive conduct and direct market manipulation between 1999 and 2005.

### A.     Relevant Parties

#### 1.     Key Defendants

15.     AIG is a Delaware corporation, with its principal place of business located in New York, New York.  AIG is a holding company that, through its subsidiaries, is engaged in a broad range of insurance and insurance-related activities in the United States and abroad.  AIG's securities are registered

pursuant to Section 12(b) of the Exchange Act, and are listed on the New York Stock Exchange, as well as stock exchanges in London, Paris, Switzerland, Tokyo, Frankfurt, Australia, and Mexico.  AIG is not a party to this Settlement.

16.     PwC is a limited liability partnership, whose offices are located at 1177 Avenue of the Americas, New York, New York.  PwC (and its predecessor Coopers & Lybrand) has maintained a client relationship with AIG for more than twenty years.  PwC served as AIG's outside auditor and principal accounting firm prior to and during the Class Period, and certified the accuracy and completeness of certain of the Company's materially false and misleading statements as alleged in the Amended Complaint.

## 2.     Lead Plaintiff

17.     OPERS  is an instrumentality of the State of Ohio that operates pursuant to Chapter 145 of the Ohio Revised Code and represents more than 908,000 active and retired state public employees. OPERS had assets of more than $69 billion as of September 2008, making it the largest state pension fund in Ohio and the tenth largest state pension fund in the United States. *See* Declaration of Julie E. Becker, dated January 13, 2009, ¶ 1, Exhibit 3 hereto.  OPERS purchased shares of AIG common stock, as well as AIG bonds, during the class period and is alleged to have suffered damages as a result of the alleged fraud.

18.     STRS Ohio is an instrumentality of the State of Ohio that operates pursuant to Chapter 3307 of the Ohio Revised Code and had assets of more than $51 billion as of November 2008.  STRS Ohio serves more than 297,000 active, inactive and retired Ohio public educators.  *See* Declaration of William J. Neville, dated January 13, 2009, ¶ 1, Exhibit 4 hereto.  STRS Ohio purchased shares of AIG common stock during the class period and is alleged to have suffered damages as a result of the alleged fraud.

19.     OP&F is an instrumentality of the State of Ohio that operates pursuant to Chapter 742 of the Ohio Revised Code and had assets of approximately $14 billion as of December 31, 2007.  *See* true and correct copy of excerpt of 2007 OP&F Annual Report, Exhibit 5 hereto.  OP&F serves more than

52,000 active police officers and firefighters, retirees, and beneficiaries and survivors.  OP&F purchased shares of AIG common stock during the class period and is alleged to have suffered damages as a result of the alleged fraud.

20.     All three Ohio State Funds are represented by the Office of the Ohio Attorney General. The Honorable Richard Cordray is currently the Ohio Attorney General.

21.     The three Ohio State Funds and the Ohio Attorney General's Office have played an active role in monitoring and participating in this litigation, including reviewing pleadings, motions and other court filings, participating in the discovery process, attending significant hearings and mediations, and participating in frequent conference calls and in-person meetings with Co-Lead Counsel.

22.     As set forth in the attached declaration of Assistant Attorney General Dennis P. Smith, the Attorney General and the general counsels of the three Ohio State Funds strongly endorse the Settlement.  *See* Declaration of Dennis P. Smith, dated January 13, 2009, ¶¶ 8-10, Exhibit 6 hereto.

23.     The amount of the requested attorneys' fee was negotiated between Lead Counsel and the Office of the Ohio Attorney General on behalf of Lead Plaintiff.  The Attorney General supports the fee request as a fair and reasonable request that comports with the terms of the negotiated fee agreement. (*See Id.* ¶¶ 11-16.)

### B.     The Alleged Frauds

24.     The Amended Complaint alleges, *inter alia*, that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by issuing false and misleading periodic reports, which were filed with the Securities and Exchange Commission ("SEC") during the period from October 28, 1999 through April 1, 2005, inclusive (the "Class Period"), containing false and misleading statements concerning AIG's financial results and operations.  Specifically, AIG is alleged to have: (1) been involved in a market division scheme that involved its paying improper contingent commissions to, and rigging bids with, Marsh & McLennan and others in the insurance industry ("Market Division Fraud"), and (2) engaged in a massive accounting fraud scheme ("Accounting Frauds") resulting in a $3.9

billion Restatement.  In addition, AIG and Defendant Maurice R. "Hank" Greenberg, AIG's former longtime Chairman and Chief Executive Officer, are alleged to have inflated the price of AIG common stock by using the Company's share buyback program to directly manipulate the market for AIG's stock.

25.     PwC is alleged to have, *inter alia*, improperly certified the accuracy and completeness of the materially false and misleading statements contained in certain of AIG's public filings with the SEC.

26.     The material misstatements by AIG, PwC and other Defendants are alleged to have caused AIG's securities to trade at artificially inflated prices during the Class Period, ultimately causing damages to those who purchased AIG securities at artificially inflated prices when the truth was allegedly disclosed later.

27.     PwC has denied all of Lead Plaintiff's allegations and does not admit, as part of this Settlement, to any wrongdoing.

**C.      The Corrective Disclosures**

28.     The inflation caused by AIG's Market Division Fraud was removed on October 14 and 15, 2004, when the New York Attorney General's Office implicated AIG in a scheme to pay improper contingent commissions to, and illegally rig bids with, Marsh & McLennan and others in the insurance industry.   The inflation caused by AIG's Accounting Frauds was removed through a series of partial disclosures made by AIG and through news reports in the Spring of 2005.

**D.      Post Class Period Events**

29.     On May 31, 2005, AIG released its 2004 Form 10-K (the "Restatement"), which restated the Company's financial statements for the years ended December 31, 2000, 2001, 2002, 2003, and the first three quarters of 2004.   The Restatement slashed AIG's net income by $3.9 billion and reduced shareholder's equity by $2.26 billion.

30.     On February 9, 2006, AIG announced that it had settled the various lawsuits and investigations brought by the New York Attorney General's Office ("NYAG"), SEC, U.S. Department of

Justice ("DOJ"), and the New York Department of Insurance ("NYDOI"), pursuant to which AIG has agreed to pay more than $1.6 billion as follows:

> (a)    $800 million in restitution (and fines) to defrauded investors in connection with AIG's accounting fraud;

> (b)    $375 million to AIG customers who purchased insurance policies at prices inflated by the Company's bid-rigging;

> (c)    $343 million to be distributed to all fifty states in connection with AIG's underpayment of workers compensation premium taxes;

> (d)    $100 million in fines to the NYAG; and

> (e)    $25 million in fines to the DOJ.

31.    On June 9 and 10, 2006 respectively, Defendants John Houldsworth and Richard Napier pleaded guilty to conspiracy to commit securities fraud in connection with the role in carrying out the AIG-Gen Re Transaction.

32.    On February 25, 2008, a jury found Defendant Ronald E. Ferguson (Gen Re's former Chief Executive Officer), Defendant Christian M. Milton (AIG's former Vice President of Reinsurance), as well as three former Gen Re executives, guilty of 16 counts each of securities fraud and other charges in connection with their involvement in the $500 million AIG-Gen Re Transaction.

33.    No government or regulatory proceedings have been brought against PwC in connection with its auditing of AIG.  After the  Accounting Frauds were disclosed, AIG retained Arthur Levitt, Jr., former Chairman of the United States Securities and Exchange Commission, as an independent corporate governance expert to advise the Company in connection with its public request for proposal ("RFP") process to determine which accounting firm would serve as its outside auditor.  That process concluded that PwC should continue as AIG's auditor, which it still does to this day.

IV.     **PROCEDURAL HISTORY OF THE ACTION**

    A.     **Pleadings and Case Management**

34.     Between October 15, 2004 and December 7, 2004, 10 class action complaints were filed against AIG, Hank Greenberg and several other defendants.  Those complaints included allegations relating only to the Market Division Fraud and did not name PwC as a defendant.

35.     By Order dated February 7, 2005, Judge Laura Taylor Swain appointed the Ohio State Funds to serve as Lead Plaintiff and approved Lead Plaintiff's selection of Hahn Loeser & Parks LLP and Labaton Sucharow LLP, then known as Goodkind, Labaton, Rudoff & Sucharow LLP, to serve as Co-Lead Counsel.

36.     On April 19, 2005, Lead Plaintiff filed a 224-page Consolidated Amended Class Action Complaint ("First Amended Complaint"), that named a total of 12 defendants – including PwC – and asserted eight causes of action under the Securities Act and Exchange Act.  The First Amended Complaint included allegations relating to both the Market Division Fraud, as well as AIG's then-recently disclosed Accounting Frauds.

37.     On September 27, 2005, Lead Plaintiff filed a 485-page Consolidated Second Amended Class Action Complaint ("Second Amended Complaint"), that asserted 13 causes of action based on AIG's and other Defendants' violations of the Securities Act and Securities Exchange Act.  The Second Amended Complaint named a total of 23 defendants and significantly expanded the allegations contained in the First Amended Complaint.

38.     After the Court denied all but one of Defendants' motions to dismiss in April and May 2006, (discussed in greater detail below), the remaining Defendants filed answers to the Second Amended Complaint on June 16, 2006.

39.     On December 15, 2006, Lead Plaintiff filed a 486-page Consolidated Third Amended Complaint ("Third Amended Complaint"), that was virtually identical to the Second Amended Complaint except that it made certain ministerial changes and expanded the last day of the Class Period from March 30, 2005 to April 1, 2005.

40.     On January 16, 2007, Defendants filed answers to the Third Amended Complaint.

**B.     Defendants' Motions to Dismiss**

41.     On November 30, 2005, AIG, along with Richmond, moved to dismiss the Second Amended Complaint.  On December 14 and 19, 2005, all the other Defendants moved to dismiss as well.  The Defendants' briefing totaled almost two hundred pages.  Hundreds of pages of supporting exhibits were also filed.  Many of the defendants argued that, *inter alia*, the Second Amended Complaint failed to properly allege scienter and loss causation; that Lead Plaintiff lacked standing to pursue Section 11 claims; and that certain claims were barred by the statute of limitations.  PwC argued that, *inter alia*, the Second Amended Complaint failed to adequately allege scienter.  On February 1 and 6, 2006, Lead Plaintiff filed its briefs in opposition to all Defendants' motions.  On April 20, 2006, the Court heard oral argument on Defendants' motions.

42.     By Orders dated April 27, 2006 and May 25, 2006, the Court denied all but one of Defendants' motions to dismiss.

**C.     Class Certification**

**1.     Class Discovery**

43.     In anticipation of Lead Plaintiff's motion for class certification,  Defendants commenced extensive discovery by serving document requests and interrogatories on Lead Plaintiff in August 2006.  Defendants' discovery requests were broad and all encompassing, including 30 separate requests for documents and 12 interrogatory requests.  AIG later served class certification-related requests for admission and interrogatories in January 2008.  Defendants deposed 23 witnesses related to Lead Plaintiff, including 13 representatives of the Ohio State Funds and 10 outside money managers who traded in AIG securities on behalf of the Ohio State Funds.

44.     In response to Defendants' discovery requests, the Ohio State Funds produced more than 260,000 of pages of documents, including account statements, investment guidelines and investment manager reports.  Co-Lead Counsel worked closely with representatives of the Funds – including each Fund's general counsel and investment and other personnel – to respond to discovery requests over the

span of 20 months.   In addition, Co-Lead Counsel sought documents from 12 of the Funds' external investment advisers.

(a)     <u>**Depositions of OPERS**</u>

45.     Defendants deposed six witnesses from OPERS.

46.     On October 31, 2007, Defendants deposed Alan J. Davidson, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding OPERS' document productions, as well as the Funds' retention policies and procedures with respect to hard-copy documents.  In preparation for the deposition, Co-Lead Counsel met with Mr. Davidson in Columbus, Ohio and held other conferences by telephone.

47.     On October 31, 2007, Defendants deposed Peggy Trump, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding OPERS' document productions, as well as the Funds' retention policies and procedures with respect to electronic documents.  In preparation for the deposition, Co-Lead Counsel met with Ms. Trump in Columbus, Ohio and held other conferences by telephone.

48.     On April 14, 2008, Defendants again deposed Alan Davidson, who testified as a Fed. R. Civ. P. 30(b)(6) witnesses regarding, *inter alia*, (i) OPERS' investment decisions to buy and sell AIG securities; (ii) OPERS' investment policies, practices and procedures; (iii) OPERS' decision to commence the lawsuit; (iv) OPERS' knowledge of the allegations set forth in the Amended Complaint; (v) OPERS' damages; and (vi) OPERS' choice of counsel.  In preparation for the deposition, Co-Lead Counsel met with Mr. Davidson in Columbus, Ohio and held other conferences by telephone.

49.     On April 15, 2008, Defendants deposed Robert Ball, who testified as a fact witness regarding OPERS' investments in AIG common stock.  In preparation for the deposition, Co-Lead Counsel met with Mr. Ball  in Columbus, Ohio and held other conferences by telephone.

50.     On April 24, 2008, Defendants deposed Timothy Steitz, who testified as a fact witness regarding OPERS' investments in AIG common stock.  In preparation for the deposition, Co-Lead Counsel met with Mr. Steitz  in Columbus, Ohio and held other conferences by telephone.

51.     On May 6, 2008, Defendants deposed John Blue, who testified as a fact witness regarding OPERS' investments in AIG bonds.  In preparation for the deposition, Co-Lead Counsel met with Mr. Blue in Columbus, Ohio and held other conferences by telephone.

52.     On May 7, 2008, Defendants deposed Anthony Enderle, who testified as a fact witness regarding OPERS' investments in AIG bonds.  In preparation for the deposition, Co-Lead Counsel met with Mr. Enderle in Columbus, Ohio and held other conferences by telephone.

(b)     <u>Depositions of STRS Ohio</u>

53.     Defendants deposed three witnesses from STRS Ohio.

54.     On November 7, 2007, Defendants deposed Greg Taylor, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding STRS Ohio's document productions, as well as the Fund's retention policies and procedures with respect to hard-copy and electronic documents.  In preparation for the deposition, Co-Lead Counsel met with Mr. Taylor in Columbus, Ohio and held other conferences by telephone.

55.     On April 8, 2008, Defendants deposed Alan Warner, who testified as a fact witness regarding STRS Ohio's investments in AIG common stock.  Mr. Warner also testified as a Fed. R. Civ. P. 30(b)(6) witnesses regarding, *inter alia*, (i) STRS Ohio's investment decisions to buy and sell AIG securities; (ii) STRS Ohio's investment policies, practices and procedures; (iii) STRS Ohio's decision to commence the lawsuit; (iv) STRS Ohio's knowledge of the allegations set forth in the Amended Complaint; (v) STRS Ohio's damages; and (vi) STRS Ohio's choice of counsel.  In preparation for the deposition, Co-Lead Counsel met with Mr. Warner in Columbus, Ohio and held other conferences by telephone.

56.     On April 9, 2008, Defendants deposed Bill Cottrell, who testified as a fact witness regarding STRS Ohio's investments in AIG common stock.  In preparation for the deposition, Co-Lead Counsel met with Mr. Cottrell in Columbus, Ohio and held other conferences by telephone.

(c)     <u>Depositions of OP&F</u>

57.     Defendants deposed four witnesses from OP&F.

58.      On October 16, 2007, Defendants deposed Ellen Eichhorn, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding OP&F's document productions, as well as the Fund's retention policies and procedures with respect to hard-copy and electronic documents.  In preparation for the deposition, Co-Lead Counsel met with Ms. Eichhorn in Columbus, Ohio and held other conferences by telephone.

59.      On October 16, 2007, Defendants deposed Yvonne Harris, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding OP&F's document productions, as well as the Fund's retention policies and procedures with respect to hard-copy and electronic documents.  In preparation for the deposition, Co-Lead Counsel met with Ms. Harris in Columbus, Ohio and held other conferences by telephone.

60.      On April 22, 2008, Defendants deposed Robert Cheuvront, who testified as a fact witnesses regarding OP&F's investments in AIG common stock.  In preparation for the deposition, Co-Lead Counsel met with Mr. Cheuvront in Columbus, Ohio and held other conferences by telephone.

61.      On  May 5, 2008, Defendants deposed Theodore Hall, who testified as a Fed. R. Civ. P. 30(b)(6) witnesses regarding, *inter alia*, (i) OP&F's investment policies, practices and procedures; (ii) OP&F's decision to commence the lawsuit; (iv) OP&F's knowledge of the allegations set forth in the Third Amended Complaint; (iii) OP&F's damages; and (iv) OP&F's choice of counsel.  In preparation for the deposition, Co-Lead Counsel met with Mr. Hall in Columbus, Ohio and held other conferences by telephone.

### (d)      Discovery of Outside Investment Managers

62.      Defendants also sought discovery from the external investment advisers that purchased AIG common stock on the Funds' behalf during the Class Period.  It is common for public pension funds to diversify their investment strategy by apportioning their capital among a number of investment managers, who usually specialize in different asset classes – *i.e.*, equity, fixed income, emerging markets, etc.

63.      In April 2008, Defendants served *subpoenas duces* tecum on Barclay's Global Investors, Wellington Management Company LLP, AllianceBernstein, Goldman Sachs Asset Management,

INTECH, Jacobs Levy Equity Mangement,  Robeco Boston Partners Asset Management, Oak Associates,

Ltd., American Express, and Waddell & Reed, Inc.

64.     Thereafter, at depositions held throughout the country, they deposed the following

advisors to the Ohio State Funds:

(a)     Barclay's provided Rhonda Vitanye as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OPERS and STRS Ohio;

(b)     Wellington provided Theodore Shasta as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OPERS;

(c)     Alliance Bernstein provided David Handke as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OPERS and OP&F;

(d)     Goldman Sachs provided Gary Chropuvka as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OPERS and STRS Ohio;

(e)     INTECH provided David Hurley as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F and STRS Ohio;

(f)     Jacobs Levy provided Kenneth Levy as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of STRS Ohio;

(g)     Boston Partners provided David Hinton as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F;

(h)     Oak Associates provided Mark Oelschlager as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F;

(i)     AMEX/Riversource provided Joan Kampmeyer as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F; and

(j)     Waddell provided Philip Sanders as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F.

65.     In all, the parties, including PwC, undertook a substantial effort to complete class

discovery.  They spent more than 27 months negotiating and conducting class discovery, through

numerous letters, conference calls and in-person meetings.

### 2.   Class Certification Briefing

66.   On February 20, 2008, Lead Plaintiff moved to certify the Class and for the Ohio State Funds to be appointed class representatives.   The moving brief was accompanied by numerous exhibits, including an expert report on market efficiency and loss causation by John D. Finnerty, Ph.D., a professor of finance at the Graduate School of Business Administration at Fordham University.  Professor Finnerty conducted detailed event studies and found statistically significant results indicative of the fact that six of AIG's price drops can be attributed to disclosures of the alleged frauds.  He based his opinion on an analysis of all information about AIG's stock and bonds available to the market and screened out unrelated factors, such as general market movement and industry-specific news.

67.   Defendants (other than PwC) are opposing Lead Plaintiff's motion.  On August 20, 2008, AIG filed a 25-page opposition brief.  On September 23, 2008:  (i) Defendants Maurice R. "Hank" Greenberg, C.V. Starr & Co., Inc. and Starr International Company, Inc. filed a 25-page opposition brief; (ii) the Gen Re Defendants filed a 25-page opposition brief; (iii) the Underwriter Defendants filed a 4-page opposition brief; and (iv) Defendant Michael Murphy filed a brief that joined in the other Defendants' arguments.

68.   On November 7, 2008, Lead Plaintiff filed its 25-page reply brief, along with a rebuttal declaration by its expert on the issues of market efficiency and loss causation.

69.   Lead Plaintiff's motion is currently pending, and oral argument has been scheduled for February 10, 2009.

## V.   FACT DISCOVERY

70.   Prior to the start of formal fact discovery, Co-Lead Counsel conducted an extensive investigation of the claims in the Action.  This investigation included, *inter alia,* review and analysis of: (1) public documents concerning Defendants and the insurance industry; (2) AIG's filings with the SEC; (3) pleadings and other documents relating to various criminal, civil and administrative investigations and

proceedings involving AIG and its subsidiaries, as well as other defendants named in the case; (4) analyst reports; and (5) news releases and media reports of AIG and its subsidiaries.

71.     In addition, counsel conducted an extensive investigation over the span of two years to, among other things, locate and interview numerous former AIG employees and knowledgeable persons within the insurance industry. Numerous potential witnesses were located and contacted.

72.     On April 19, 2005, Lead Plaintiff moved by order to show cause to, *inter alia*:  (1) partially lift the automatic discovery stay under the PSLRA to obtain from AIG the same documents the Company had produced to government regulators; (2) for limited discovery into the reported destruction of evidence at AIG's Bermuda offices; and (3) for an order enjoining AIG from destroying documents relevant to this case.  After a hearing on Lead Plaintiff's application on June 16, 2005, the Court denied the motion.

73.     By Order dated May 22, 2008, the Court ordered that fact discovery shall end on December 1, 2009; expert discovery shall end on February 1, 2010; and a pre-trial conference shall be held on February 9, 2010.

74.     To date, Lead Plaintiff has served more than 25 documents requests on Defendants, including 2 requests on PwC.  In addition, Lead Plaintiff has served more than 5 sets of interrogatories on Defendants.

75.     In addition, Lead Plaintiff has been gathering evidence from numerous non-parties and has served subpoenas *duces tecum* to more than 56 non-parties, such as Marsh McLennan, Zurich and others in the insurance industry, financial analysts and former AIG and Marsh employees.

76.     In response to Lead Plaintiff's document requests and subpoenas, Defendants and non-parties have produced more than 45 million pages of documents in response to Lead Plaintiff's discovery requests, including more than 29,037,918 pages produced by PwC.

77.     To date, Lead Plaintiff has reviewed and analyzed nearly all of the documents produced.

1.      **Document Review and Analysis**

78.      To review, organize and analyze this vast amount of information, Lead Plaintiff dedicated extensive resources and technology.  In the summer of 2006, the parties negotiated an agreement concerning the format for producing and electronically storing documents produced in the case.  On August 29, 2006, the Court So Ordered the parties' Stipulation and Order Establishing a Joint Document Depository.

79.      Pursuant to that Order, the documents produced by all parties and non-parties were placed in an electronic document depository that allowed counsel to search the documents through "Boolean" type searches (as in the Westlaw and Lexis-Nexis databases), as well as by multiple other categories, such as by author and/or recipients, type of document (*e.g.*, emails, memoranda, SEC filings), date, bates number, etc.  The electronic database was accessible through the internet, allowing attorneys under the direction of Co-Lead Counsel to review documents and coordinate discovery remotely.  For example, when attorneys in one location identified "hot" documents, they were placed in an electronic folder and attorneys in other locations could immediately open the folder and review these documents. In addition, Co-Lead Counsel retained the services of insurance experts and forensic accountants, who assisted in identifying and analyzing complex accounting documents, including many that were produced by PwC.

80.      To host this large electronic document repository, the parties hired Merrill Legal Computer Solutions, Inc. ("Merrill"), one of the leading litigation technology support companies. Merrill's search engine is considered to be one of the best in the field and provides some of the most advanced features for searching electronic databases.

81.      Co-Lead Counsel achieved substantial savings working primarily electronically and saving hundreds of thousands (if not millions) of dollars in copying costs, and by sharing the costs of data storage with Defendants.

82.      To review this enormous document production, a team of more than 45 attorneys was assembled and thorough document review guidelines and protocols were prepared.  These attorneys

worked full-time to complete the document review and analysis.  They conducted their review with direct guidance from the same accounting firm used by the plaintiffs in the *Enron* litigation.  The review was structured to limit overall cost, with the bulk of the initial review being conducted by more junior attorneys hired by Labaton Sucharow.

83.     All aspects of the review have been carefully supervised by Co-Lead Counsel to eliminate any inefficiencies.   This supervision was carried out by multiple in-person training sessions that included providing a detailed "coding manual," power point presentation and in-person instruction with respect to the issues in the case and the procedures for analyzing and coding the documents.   The training sessions were supplemented by weekly conferences with senior Labaton Sucharow attorneys and the accounting experts who worked on the document review.  Moreover, the "hot" and "semi-hot" documents identified were subject to quality control assessments by more senior attorneys conducted on an on-going basis.   In addition, samplings of documents coded as "relevant" and "non-relevant" were reviewed by those same senior attorneys to determine whether the more junior attorneys' assessments were accurate.

84.     There are a number of core attorneys on the case who have devoted large amounts of their time to the litigation in order to insure continuity and proper allocation of resources. Document review was structured to limit overall cost, with the bulk of the initial review being conducted by junior attorneys.

        **2.**    **Other Discovery**

85.     To date, in addition to depositions related to class discovery, Lead Plaintiff has taken 18 merits depositions.

86.     Lead Plaintiff has also undertaken extensive effort to analyze the complex accounting issues that are integral to the PwC claims, as well as issues related to proving loss causation and the damages caused by PwC.  Co-Lead Counsel devoted thousands of hours to learning and analyzing the applicable accounting rules, analyzing AIG's accounting transactions and policies, piecing together the decision-making and documentation for the allegedly improper transactions, reviewing and analyzing

PwC's work papers related to these transactions and determining PwC's involvement and knowledge of the alleged fraud.

## VI.   SETTLEMENT PROCESS

87.   The $97.5 million Settlement with PwC is the result of two full-day mediation sessions with former federal judge Layn R. Phillips as mediator, as well as several additional in-person and telephonic negotiations (often including Judge Phillips) that took place over two months in August and September 2008.  These negotiations were informed by the more than two years of fact discovery discussed above.

88.   On September 13, 2008, the parties executed a Memorandum of Understanding.  The formal Stipulation and exhibits were then negotiated over the following several weeks.

89.   When the formal agreement was finalized, on September 25, 2008, the Stipulation was executed by the parties thereto and submitted to the Court for preliminary approval, which was granted by order dated October 14, 2008.  *See* Exhibit 1.

## VII.   ASSESSMENT OF STRENGTHS AND WEAKNESSES

90.   The investigation and discovery, described above, on both liability and damages issues enabled Lead Plaintiff and Co-Lead Counsel to thoroughly evaluate the strengths and weaknesses of the claims and the risks of continued litigation with PwC, and accordingly to enter into the Settlement on a fully informed basis.

91.   Lead Plaintiff and Counsel considered, among other things: (i) the substantial cash benefit to Settlement Class Members under the terms of the Stipulation; (ii) the risks and expense of additional fact discovery and completion of fact and expert depositions; (iii) the probability that PwC would move for summary judgment at the close of discovery, leading to a legal challenge and/or a battle of the experts with respect to reliance, materiality, damages and loss causation issues; (iv) the risk of not prevailing through summary judgment; (v) the difficulties and risks involved in proving the claims at trial, given the auditor standards for scienter, the ever-developing law on loss causation and the nature of

PwC's participation in the alleged frauds here; (vi) the delays inherent in such litigation, including appeals; (vii) the uncertainty in being able to prove PwC's comparative fault and contribution to damages; and (viii) the risks of presenting an exceedingly complex and fact-intensive case to a jury.

92.     The claims against PwC presented significant risks given, among other things, the highly complex nature of the fraud here at issue and PwC's involvement as AIG's independent outside auditor. Unlike in many other high profile cases involving a restatement, PwC was **not** fired after AIG's massive restatement of earnings.  In fact, PwC was retained by AIG pursuant to a request for proposal process overseen by former SEC Chairman Arthur Levitt, Jr.   Moreover, the government did not bring any criminal or civil charges against PwC.

93.     Issues of proof in such a case are complicated by the fact that the fraud alleged is, at its crux, a violation of complex accounting rules, which might not be understood by a jury.   For example, many of AIG's accounting frauds arose out of complicated reinsurance transactions typically involving off-shore reinsurance companies and actuarial calculations in analyzing the risk or lack of risk in those transactions.  The large number of relevant accounting issues would also have been a significant hurdle to overcome.  AIG's restatement affected more than two-dozen different types of transactions.

94.     There were also significant challenges to tying PwC to the contingent commission and bid-rigging allegations, as AIG's accounting related to those activities was not restated.

95.     Proving PwC's scienter to the jury would also have been challenging for the Settlement Class, whether under the standards of intentional or reckless conduct.  An auditor's recklessness can be demonstrated by a showing that it, *inter alia*, ignored red flags during the course of its audit. *See Teachers' Ret. Sys. of Louisiana v. A.C.L.N.*, No. 01 Civ. 11814, 2003 WL 21058090, at *11 (S.D.N.Y. May 15, 2003) (Pollack, J.) ("Allegations that multiple red-flags were ignored in performing the audits can reasonably support an inference of intent.").   Lead Plaintiff believes it has persuasive evidence of PwC's knowledge of the alleged fraud and numerous "red flags" showing the deficiencies of its audits. However PwC likely would have argued that, at most, the evidence showed negligence, which is not actionable under the securities laws.  The jury likely would have been confronted with contrary testimony

20

from both fact and expert witnesses about the meaning of the documentary evidence, the accounting rules and the role of an outside auditor. PwC would also have pointed to AIG's Form 10-K for the year 2004 and argued that former senior management of AIG concealed material facts not only from investors, but from PwC itself. Thus, it was far from clear that the jury would find PwC liable.

96.     The Non-Settling Defendants' expert declarations produced as part of class certification discovery are illustrative of the challenges that the Settlement Class would have had to overcome to recover from PwC. Defendants' experts are prepared to testify that AIG's stock drops following disclosures of the alleged fraud cannot be used to show loss causation.

97.     Lead Plaintiff and Co-Lead Counsel strongly believe that loss causation and resulting damages can be established with respect to the PwC claims (and all other claims as well). *See* "Declaration of John D. Finnerty, Ph.D. in Support of Lead Plaintiff's Motion for Class Certification" and "Rebuttal Declaration of John D. Finnerty." Ph.D. *See* D.E. #356 at Ex. 2; #446 at Ex. 26. However, Lead Plaintiff recognizes that at summary judgment or trial the finder of fact could credit PwC's experts over those of the Settlement Class and determine that the Class suffered no (or only modest) recoverable damages.

## VIII.    <u>REACTION OF THE CLASS</u>

98.     Despite the dissemination of more than two million notice packets, only four "objections" by putative Settlement Class members to the Settlement and/or the proposed award of attorneys' fees and expenses have been filed or received. *See* Exhibits 7 to 10 hereto. Each of these "objections" are responded to in Lead Plaintiff's Memorandum of Law in Response to Objections Concerning the Proposed Settlement With Defendant PricewaterhouseCoopers LLP, filed herewith.

99.     The Settling Parties have not received even one objection to the Settlement or attorneys' fee request by an institutional investor and no one has objected to the Plan of Allocation or Lead Plaintiff's request for reimbursement of expenses.

100.     Of the four "objections," letters by Shana De Caro and Peter Lilly are more properly characterized as general criticism of securities class actions as a whole and they do not raise any issues

specific to this Settlement.  Mr. Lilly does not actually object to the Settlement at all.  *See* Exhibits 7 and 8.

101.    Karen Michaels, an attorney in Texas who is represented by one of her colleagues, Jeffrey Weinstein, filed an objection to the Settlement and the attorneys' fee request.  *See* Exhibits 9 and 11 (true and correct copies of excerpts from the website of the Weinstein Law Firm).  Mr. Weinstein has filed objections in at least 4 other class actions within the last two years, all of which have been overruled. *See* Exhibit 12 (Table of Prior Objections Filed by Counsel for Rothsteins and Michaels).  Michaels does not have standing to object, because she did not purchase or acquire any eligible AIG securities during the Class Period.  Her objections are without merit.

102.    Michaels nevertheless raises nine different issues in a "kitchen sink" approach.  She challenges that: notice was not timely disseminated; class members should not have to be burdened by filing claim forms and having to establish ownership of AIG securities; the class definition is impermissibly vague, because it contains the phrase "damaged thereby;" attorneys' fees should not be paid when ordered by the Court; that review by the Court should not be the method for class members to appeal the Administrator's decisions on their individual distributions; new notice should be sent if the Court adjusts the plan of allocation; while the Court can adjust an individual distribution on equitable grounds, the notice does not explain what "equitable" means; the parties have failed to prove that the Settlement is fair, reasonable and adequate (without any explanation of the failure); and she did not have enough time to evaluate the fee request, but that the $6 million expense cap "appears to be excessive."

103.    All of Michaels' objections are without merit.  The Settlement Class received extensive notice complying with all aspects of the PSLRA, due process and the Preliminary Approval Order. The administration procedures will be carried out by a well experienced Administrator, under Court supervision and according to industry standards.  The merits of the Settlement and attorneys' fee request are well substantiated in the Notice and submissions filed herewith.

104.    Six relatives, represented by attorney Paul Kerson and referred by attorneys Paul S. Rothstein, N. Albert Bacharach, Jr. and Frank H. Tomlinson, are objecting to the 9% attorney fee cap set

forth in the Notice as well as certain aspects of the Notice. *See* Exhibit 10. Of note, attorney Rothstein has represented objectors in at least 11 class actions, 7 of which were also with attorneys Bacharach and Tomlinson. Exhibit 12. Attorney Bacharach has represented objectors in at least 3 additional class actions and attorney Tomlinson has represented objectors in at least 2 additional class actions. A portion of their objections were entertained in only 3 of the cases, however in 2 of those situations, the court noted that the objections related to issues that were already known to the parties. In all three cases, the settlements were approved. *Id*.

105.    The Rothsteins argue that the Notice did not provide enough information about the fee and that 9% is excessive because the Court awarded 3% in *In Re Nortel Networks Corp. Sec. Litig. See* Exhibit 13. However, *Nortel* is readily distinguishable because it was a settlement valued at $1.14 billion and the requested multiplier was 5.8. Here, Co-Lead Counsel's multiplier is only **0.54**. These objectors also offhandedly argue that the Notice was deficient, because it does not state what the potential damages were and what the insurance limits were. However, the PSLRA does not require such disclosures.

106.    Maurice ("Hank") R. Greenberg and certain related defendants also object to limited portions of the "bar order" in the proposed Judgment. D.E. # 458. However, the bar order complies with the PSLRA and Second Circuit case law.

## IX.    PLAN OF ALLOCATION

107.    Pursuant to the Preliminary Approval Order, and as explained in the Notice, all Class Members wishing to participate in the Settlement must file a valid Proof of Claim on or before January 28, 2009.

108.    As set forth in the Notice, all Class Members who timely file valid Proof of Claim forms that show a Recognized Loss will receive a distribution of the net settlement proceeds, after deduction of fees and expenses approved by the Court and taxes incurred on interest income earned by the Settlement Fund. The distribution will be made in accordance with the Plan of Allocation set forth and described in detail in the Notice. *See* Exhibit 2-A at 4, 8-14. The Plan of Allocation was developed by the Settlement

Class's non-testifying damages experts, Dr. Scott D. Hakala and Frank C. Torchio, both of whom have considerable experience in developing plans of allocation for settlements in securities class actions.

109.    As explained in the Notice, the Plan of Allocation apportions the recovery among Class Members who purchased or acquired AIG's publicly traded securities during the Class Period, specifically AIG common stock, options, Zero Coupon Convertible Senior Debentures, 0.5% Cash Exchangeable Equity-Linked Senior Notes, 2.85% Medium-Term Notes, Series F, 2.875% Notes (144A securities) that were exchanged into registered like coupon bonds and 4.25% Notes (144A securities) that were exchanged into registered like coupon bonds.

110.    The Plan distributes the recovery according to the type of security purchased and when Class Members acquired or sold their AIG Securities.  Those who purchased common stock and options will recover a larger portion of the Settlement than those who purchased the bonds, in recognition of the particular risks involved in establishing loss causation and market efficiency for the bonds.   Authorized Claimants with respect to the bonds will share in up to 5% of the amount that will be distributed to all Settlement Class members.  The Plan also distributes the recovery according to when Settlement Class members acquired or sold their AIG Securities—taking into account the relative strength of potential claims relevant to these time periods.

111.    The Plan limits Class Members' recovery to their out-of-pocket loss, pursuant to the Exchange Act.

112.    There have been no objections to the Plan of Allocation.  Lead Plaintiff and Class Counsel respectfully submit that the Plan is fair and reasonable and should be approved by the Court.

## X.    MISCELLANEOUS EXHIBITS

113.    Annexed hereto as Exhibit 14  is a true and correct copy of Laura E. Simmons & Ellen M. Ryan, *Securities Class Action Settlements: 2007 Review and Analysis* (Cornerstone Research 2008), showing, *inter alia*, that the median of all securities class action settlements in 2007 was $9 million.

114.    Annexed hereto as Exhibit 15 is a true and correct copy of Stephanie Plancich, Brian Saxton & Svetlana Starykh, *Recent Trends in Shareholder Class Actions: Filings Return to 2005 Levels*

*as Subprime Cases Take Off; Average Settlements Hit New High* (NERA Dec. 2007), showing that, *inter alia*, between 2002 and 2007 the median settlement amount in securities fraud class actions was $6.8 million and the median in 2007 was $9.6 million.

115.     Annexed hereto as Exhibit 16 is a true and correct copy of Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27 (2004), showing, *inter alia*, that for settlements between $79 million and $190 million, the mean fee percentage is 17.6% and the median fee percentage is 15% with a standard deviation of 9.2%.

116.     Annexed hereto as Exhibit 17 is a table of billing rates for defense firms compiled by Co-Lead Counsel from fee applications submitted by such firms in bankruptcy matters.

117.     Annexed hereto as Exhibit 18 is the Declaration of Thomas A. Dubbs on Behalf of Labaton Sucharow LLP in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, with annexed exhibits, dated January 13, 2008.

118.     Annexed hereto as Exhibit 19 is the firm resume of Labaton Sucharow LLP.

119.     Annexed hereto as Exhibit 20 is the Declaration of Alan S. Kopit on Behalf of Hahn Loeser & Parks LLP in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, with annexed exhibits, dated January 13, 2008.

120.     Annexed hereto as Exhibit 21 is a true and correct copy of the order in *In re General Motors Corp. Sec. & Deriv. Litig.,* MDL No. 1749 (E.D. Mich. Jan. 6, 2009), approving attorneys' fees, expenses and Lead Plaintiff costs.

121.     Annexed hereto as Exhibit 22 is a true and correct copy of the order in *In re Bristol-Myers Squibb Sec. Litig.,* No. 00-1990 (D. N.J. May 11, 2006), approving attorneys' fees, expenses and Lead Plaintiff costs.

122.     Annexed hereto as Exhibit 23 is a true and correct copy of an excerpt from http://www.sec.gov/investor/pubs/varannty.htm#wvar, last accessed January 13, 2008.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 13, 2009.

                                                    /s/ Thomas A. Dubbs
                                                    Thomas A. Dubbs