# Exhibit 14

# CORNERSTONE RESEARCH

www.cornerstone.com
securities.cornerstone.com

## Securities Class Action Settlements

# 2007 Review and Analysis

© 2008 by Cornerstone Research.  All Rights Reserved·

CORNERSTONE RESEARCH

## SECURITIES CLASS ACTION SETTLEMENTS:  2007 REVIEW AND ANALYSIS

The year 2007 was an active one for securities class action settlements, with 111 cases settled. The year saw the approval of the third largest securities case settlement in history: the $3.2 billion settlement in the Tyco International matter (exceeded by the the WorldCom settlement totaling $6.2 billion and the Enron settlement totaling $7.2 billion as of year-end 2007).[1] The Tyco settlement alone accounted for about 45% of settlement dollars in 2007. The value of cases settled in 2007 was lower than the unprecedented total in 2006. Still, excluding the four top settlements identified in the figure below, 2007 exceeded all prior years except 2006.

**1**



Figure 1

This report discusses these and other findings in further detail, updating our prior reports on settlements of cases filed since passage of the Private Securities Litigation Reform Act (Reform Act) in late 1995. Our sample includes 933 class actions settled from 1996 through 2007.[2] Generally the charts in this report present data for the entire period studied, 1996–2007, though some, like Figure 1 above, are focused on the past ten years. Cases in our sample are limited to those involving allegations of fraudulent inflation in the price of a corporation's common stock. These cases are identified by Institutional Shareholder Services' Securities Class Action Services (SCAS). For purposes of our research, the designated settlement year corresponds to the year when the hearing to approve the settlement was held. Cases involving multiple settlements are reflected in the year of the most recent partial settlement, provided certain conditions are met.[3]

© 2008 by Cornerstone Research.  All Rights Reserved.

CORNERSTONE RESEARCH

The median settlement amount reached a high of $9 million in 2007, surpassing all prior median amounts for cases settled in a given year. This is partly due to the fact that the percentage of cases settling for $10–20 million increased substantially from prior years.

In contrast, the average settlement fell from the $105 million in 2006 ($179 million if the Enron settlement is included) described in our prior year report to $62.7 million in 2007. This decline is partly due to the fact that in 2006 there were four settlements for more than $1 billion (excluding Enron), while in 2007 Tyco was the only settlement for more than $1 billion.[4] Despite the year over year decline, the 2007 average settlement value was higher than that for cases settled from 1996–2006.

**2**

| | **SETTLEMENT SUMMARY STATISTICS** | |
|---|---|---|
| | 2007 | Settlements Through 2006 |
| Minimum | $0.4 million | $0.1 million |
| Median | $9.0 million | $6.9 million |
| Average | $62.7 million | $54.7 million |
| Maximum | $3.2 billion | $7.4 billion |
| Total Amount | $7.0 billion | $45.0 billion |

Settlement dollars adjusted for inflation; 2007 dollar equivalent figures shown. Excluding the top four settlements detailed in Figure 1, the average and total values are: $34.2 million and $3.8 billion for 2007 and $33.2 million and $27.2 billion for all settlements through 2006.

Figure 2

© 2008 by Cornerstone Research.  All Rights Reserved.

In 2007 over half of settlements were for less than $10 million. This is a slight drop from 1996–2006, when about 65% of settlements were for less than $10 million. But as noted, the percentage of settlements for $10–20 million increased from prior years, with almost one-quarter settling in that range.

**3**



Figure 3

For purposes of our research, we use a highly simplified approach to estimate damages, adopted with certain modifications from a methodology historically used by plaintiffs.[5] In particular, our method makes no attempt to link shareholder losses to allegations included in the complaint. Accordingly, the "estimated damages" presented and referred to in this report are not intended to be indicative of actual damages borne by shareholders. But applying a consistent method in our calculations of estimated damages allows us to examine trends in these amounts.

Following the exceptionally high estimated damages observed in 2006, in 2007 average estimated damages returned to levels close to those in 2003–05. As described in our report covering 2006, the unusually high estimated damages that year were driven by eighteen settlements with estimated damages of more than $5 billion—with half of those in excess of $10 billion. In 2007 there were just ten settlements with estimated damages of more than $5 billion.

**4**



Figure 4

© 2008 by Cornerstone Research.  All Rights Reserved.

The percentage of cases involving mega-damages, that is estimated damages in excess of $1 billion, had increased every year since 1998, peaking in 2006 at 35% of settlements. But in 2007 that share fell to 24% (twenty-seven cases)—the lowest percentage since 2003.

In 2007 almost 90% of the total value of settlements involved the twenty-seven cases with estimated damages over $1 billion.

**5**



Figure 5

© 2008 by Cornerstone Research.  All Rights Reserved.

As we have described in previous reports, settlements as a percentage of estimated damages generally decrease as estimated damages increase. Accordingly, following the dramatic escalation in estimated damages that began in 2002, in recent years we have generally observed lower median settlements relative to estimated damages. This pattern continued in 2007, with settlements accounting for 2.9% of estimated damages, compared with a median of 3.6% in 1996–2006.

Using regression analysis to control for other factors affecting settlement amounts, we find a statistically significant difference in the relation between settlements and estimated damages for cases with estimated damages of more than $1 billion (that is, a dollar increase in estimated damages for these large cases is associated with a smaller increase in settlement amounts, relative to other cases; for a list of control variables considered see page 16).

**6**



Figure 6

© 2008 by Cornerstone Research.  All Rights Reserved.

The figure below shows median settlements as a percentage of Disclosure Dollar Losses (DDL). DDL is calculated as the decline in the market capitalization of the defendant firm from the trading day immediately preceding the end of the class period to the trading day immediately following the end of the class period. This measure is not intended to represent an estimate of damages, as it makes no attempt to isolate movements in the defendant's stock price that are unrelated to case allegations. Nor does this measure capture additional stock price declines during the alleged class period that may affect certain purchasers' potential damage claims. Further, this measure does not apply a trading model to estimate the number of shares damaged.[6]

Settlements as a percentage of DDL generally decline as DDL increases, similar to the trend observed with estimated damages.

**7**



Figure 7

© 2008 by Cornerstone Research.  All Rights Reserved.

Accounting issues continued to be included in the allegations of more than 55% of cases settled through 2007. Furthermore, these cases continued to settle for a significantly higher percentage of estimated damages relative to cases not involving accounting allegations.

At about 30% of settlements in 2007, the proportion of cases involving restatement of financial statements fell for the second year in a row. More than 75% of settlements in 2007 were for cases filed in 2003 or later—thus the majority of settlements involved cases filed after the Sarbanes-Oxley Act was passed in 2002. These data are consistent with the conjecture that improvements in corporate governance are contributing to the reduced frequency of allegations involving financial statement restatements in settled securities litigation matters. Still, it is too early to conclude with any certainty the cause of the decline in the past two years, or whether this decline will persist.

Although accountants were named in less than 20% of post-Reform Act settlements through 2007, cases where an accountant was a named defendant continued to settle for the highest percentage of estimated damages among cases with accounting allegations.

**8**



Figure 8

© 2008 by Cornerstone Research.  All Rights Reserved.

About 20% of post-Reform Act settlements involve Section 11 and/or 12(a)(2) claims, with the inclusion of cases settled in 2007 causing a slight increase from prior years. Median settlements as a percentage of estimated damages continue to be higher for these cases than for cases without these allegations. In cases involving an underwriter as a named defendant, settlements as a percentage of estimated damages are even higher.

Although there is considerable overlap between the inclusion of an underwriter as a named defendant and the presence of Section 11 and/or 12(a)(2) claims, underwriters are named in less than 15% of cases. Multiple regression analysis shows that, after controlling for the presence of an underwriter defendant and other factors, Section 11 and/or 12(a)(2) claims are not associated with a statistically significant increase in settlement amounts.

Only thirty-six cases in our sample did not involve Rule 10b-5 claims (that is, involved only Section 11 and/or 12(a)(2) claims). Median settlements are generally lower for this group of cases ($3.5 million) relative to cases involving Rule 10b-5 claims, while median settlements as a percentage of estimated damages are higher (6.6%).[7]

9



Figure 9

© 2008 by Cornerstone Research.  All Rights Reserved.

In earlier years there were claims that institutions rarely served as lead plaintiffs, despite the intent of Congress to increase their participation with passage of the Reform Act. But in recent years there has been a marked increase in the percentage of cases with institutional investors serving as lead plaintiffs. In fact, institutions served as lead plaintiffs in almost 60% of settlements in 2007.

Cases involving institutional investors as lead plaintiffs are associated with significantly higher settlements. Closer analysis reveals that these higher settlements are associated with public pension plans, as opposed to other types of institutional investors.

Public pension plan involvement does not necessarily indicate a causal effect on settlement outcomes, as it is possible that these sophisticated investors choose to participate in stronger cases. In addition, part of the cause for higher settlements in these cases is due to the fact that public pension plans tend to participate in larger cases. However, even controlling for estimated damages (that is, case size) and other factors that affect settlement amounts (such as the nature of the allegations), the presence of a public pension plan as lead plaintiff is associated with a statistically significant increase in settlement size. (For a list of control variables considered when testing the effect of public pension plans serving as lead plaintiffs see page 16.)

**10**



Figure 10

© 2008 by Cornerstone Research.  All Rights Reserved.

The number of cases involving companion derivative actions has been increasing in recent years.[8] More than 55% of cases settled in 2007 were accompanied by the filing of a derivative action, compared with 45% in 2006 and 35% in 2005.[9] Derivative cases are often resolved with changes to the issuer's corporate governance practices and little or no cash payment; this continues to be true despite the increase in corporate controls introduced after passage of the Sarbanes-Oxley Act in 2002. While settlement of a derivative action does not necessarily result in a cash payment, settlement amounts for class actions accompanied by derivative cases are significantly higher than for cases without companion derivative actions.

**11**

Derivative actions tend to be associated with larger class action cases (as measured by estimated damages and the assets of the issuer defendant) as well as class actions involving accounting allegations, actions by the Securities and Exchange Commission (SEC), and public pension plans as lead plaintiffs. These circumstances are likely to attract accompanying derivative actions, leading to the higher settlements observed in the class actions. Settlements as a percentage of estimated damages are slightly lower than for cases without accompanying derivative actions, which may reflect the larger estimated damages associated with the latter group of cases.



Figure 11

The prevalence of derivative actions varies by jurisdiction. To examine the possibility that more substantive derivative cases are typically filed in Delaware, we investigated whether the association between accompanying derivative cases and higher class action settlements is driven by cases filed in Delaware. Using a regression analysis to control for other determinants of class action settlements, we find that derivative cases filed in states other than Delaware are also associated with statistically significant higher settlements.

© 2008 by Cornerstone Research.  All Rights Reserved.

CORNERSTONE RESEARCH

The figure below shows settlements classified by whether the case was accompanied by a corresponding SEC filing of a litigation release or administrative proceeding. More than 20% of post-Reform Act settlements have involved such SEC actions. As shown, these cases are associated with significantly higher settlements, as well as higher settlements as a percentage of estimated damages.

**12**



Figure 12

© 2008 by Cornerstone Research.  All Rights Reserved.

The percentage of settlements involving non-cash components (such as stock or warrants) has declined since 1999. In 2007, 5% of cases involved non-cash components—the same as in 2006. Non-cash components represented 40% of settlement amounts for the few cases involving them in 2007.

The inclusion of non-cash components in settlements is associated with a statistically significant increase in settlement value, even when controlling for other factors such as estimated damages and the nature of the allegations.

**13**



Figure 13

© 2008 by Cornerstone Research.  All Rights Reserved.

In prior years we reported that the law firm of Milberg Weiss Bershad Hynes & Lerach was involved as lead or co-lead plaintiff counsel in roughly half of post-Reform Act settlements. In 2004 the firm split into Milberg Weiss Bershad & Schulman (the firm has since changed its name to Milberg) and Lerach Coughlin Stoia & Robbins (since changed to Coughlin Stoia Geller Rudman & Robbins).

In 2007 William Lerach and other former lead partners of the original Milberg firm pleaded guilty to conspiracy for their role in an alleged scheme to bribe individuals to serve as plaintiffs in securities class actions. In March 2008 Melvyn Weiss also pleaded guilty to a federal racketeering charge and entered into a plea agreement that included a forfeiture and criminal fine of nearly $10 million. At the time this report was published, the Milberg firm remained a defendant in the case, which is scheduled to go to trial in August 2008.[10]

During 2007 Milberg's role as lead or co-lead plaintiff in securities class action settlements declined substantially relative to that of Coughlin Stoia. Even when considered together, the dominance of the two firms, as lead or co-lead plaintiff counsel, weakened in 2007 to less than half of settled cases.

Meanwhile, law firms Schiffrin Barroway Topaz & Kessler and Bernstein Litowitz Berger & Grossman have have been steadily increasing their participation as lead or co-lead plaintiff counsel in securities case settlements. Aggregated through 2007, the firms represented 10% and 7% respectively of all settled cases in our sample.[11]

**14**

### SETTLEMENTS BY PLAINTIFF ATTORNEY

| Plaintiff Law Firm | 2007 | | Through 2006 | |
| --- | --- | --- | --- | --- |
| | % of Settled Cases | Median Settlement as a % of Estimated Damages | % of Settled Cases | Median Settlement as a % of Estimated Damages |
| Coughlin Stoia | 37% | 3.5% | 10% | 4.4% |
| Milberg | 9% | 1.9% | 8% | 3.6% |
| *Predecessor Firm:* Milberg Weiss Bershad Hynes & Lerach | | | 34% | 4.3% |
| | 46% | | 52% | |
| Schiffrin & Barroway | 14% | 1.3% | 9% | 1.9% |
| Bernstein Litowitz | 7% | 2.5% | 7% | 4.2% |
| Cohen Milstein Hausfeld & Toll | 6% | 2.5% | 2% | 4.6% |
| Bernstein Liebhard & Lifshitz | 5% | 1.5% | 5% | 3.3% |
| Weiss & Lurie | 5% | 3.7% | 1% | 2.1% |
| *Predecessor Firm:* Weiss & Yourman | | | 5% | 3.4% |
| Labaton Sucharow | 5% | 3.7% | 2% | 7.3% |
| Berger & Montague | 4% | 2.6% | 8% | 3.5% |

Figure 14

© 2008 by Cornerstone Research.  All Rights Reserved.

CORNERSTONE RESEARCH

As we have observed in previous reports, the Ninth Circuit (which includes California) continues to lead in the number of settled cases, handling 22% in 2007. Following close behind was the Second Circuit—reflecting the active Southern District of New York—with 21% of settlements. Although court circuits are generally not statistically significant in explaining settlement size, settlements are higher in the Second Circuit when controlling for the effects of estimated damages and other determinants of settlement amounts.

**15**

### SETTLEMENTS BY COURT CIRCUIT

*Dollars in Millions*

| | No. of Cases | | Median Settlement | |
|---|---|---|---|---|
| Court Circuit | 2007 | Through 2006 | 2007 | Through 2006 |
| 1 | 9 | 49 | $5.5 | $5.7 |
| 2 | 23 | 129 | $13.7 | $7.0 |
| 3 | 11 | 76 | $7.0 | $5.8 |
| 4 | 5 | 25 | $10.0 | $7.5 |
| 5 | 8 | 66 | $3.5 | $5.8 |
| 6 | 5 | 40 | $38.3 | $11.0 |
| 7 | 5 | 42 | $17.5 | $7.3 |
| 8 | 3 | 28 | $18.7 | $8.5 |
| 9 | 24 | 206 | $5.0 | $6.6 |
| 10 | 6 | 34 | $12.0 | $6.5 |
| 11 | 11 | 83 | $3.0 | $4.5 |
| DC | - | 2 | - | $18.5 |
| State | 1 | 32 | $1.3 | $4.0 |
| **Total** | **111** | **812** | **$9.0** | **$6.0** |

Figure 15

© 2008 by Cornerstone Research.  All Rights Reserved.

**16**

## CORNERSTONE RESEARCH SETTLEMENT PREDICTION MODEL

Features of securities cases that may affect settlement outcomes are often correlated, as noted in the discussion and charts in this report. Regression analysis makes it possible to examine the effects of these factors simultaneously. Accordingly, as part of our ongoing research on securities class action settlements, we applied regression analysis to study the determinants of settlement outcomes. Analysis performed on our sample of post-Reform Act cases settled through December 2007 reveals that variables that are important determinants of settlement amounts, either independently or in combination, include:[12, 13]

- Simplified plaintiff-style estimated damages
- Disclosure dollar losses (DDL)
- Most recently reported total assets of the defendant firm
- Number of entries on the lead case docket
- Indicator of whether a restatement of financial statements, announced during or at the end of the class period, is involved (or, alternatively, whether GAAP violations are alleged)
- Indicator of whether intentional misstatements or omissions in financial statements were reported by the issuer
- Indicator of whether a corresponding SEC action against the issuer or other defendants is involved
- Indicator of whether an accountant is a named co-defendant
- Indicator of whether an underwriter is a named co-defendant
- Indicator of whether a corresponding derivative action is filed
- Indicator of whether estimated damages are greater than $1 billion
- Indicator of the year when the settlement occurred
- Indicator of whether a public pension plan is a lead or co-lead plaintiff
- Indicator of whether non-cash components, such as stock or warrants, make up a portion of the settlement fund
- Indicator of whether securities other than common stock are alleged to be damaged
- Indicator of whether the case was filed in the Second Circuit

Settlements are higher when estimated damages, decline in market capitalization, defendant asset size, or number of docket entries are higher. Settlements are also higher in the presence of a restatement of financials or GAAP violation, intentional misstatements or omissions in financials reported by issuer, a corresponding SEC action, an accountant named as co-defendant, an underwriter named as co-defendant, a corresponding derivative action, a public pension plan involved as lead plaintiff, a non-cash component to the settlement, case filed in the Second Circuit, or securities other than common stock alleged to be damaged. Settlements are lower if the settlement occurred in 2002 or later or if estimated damages exceed $1 billion.

About 70% of the variation in settlement amounts can be explained by the variables applied in our settlement estimation model.

Cornerstone Research's clients are often interested in obtaining estimates of expected settlements in securities cases. Accordingly, using the regression analysis described above, we have developed a prediction model that can be used to estimate expected settlements for post-Reform Act cases. Settlement estimates based on our model are available to Cornerstone Research clients.

© 2008 by Cornerstone Research.  All Rights Reserved.

CORNERSTONE RESEARCH

## CONCLUSION

In 2007 average estimated damages returned to the escalated levels experienced in 2003–05 but declined from the extraordinarily high amounts of 2006. Following the trend in estimated damages, average settlements and the total value of settled cases in 2007 fell relative to 2006, but remained higher than all post-Reform Act years prior to 2006.

In recent years the dramatic increases in average and total settlements have been driven by a small number of extremely large cases. But 2007 saw an increase in middle range settlements (those of $10–20 million), contributing to an increase in the median settlement to $9 million—the highest amount to date.

Other interesting findings from our study of cases settled in 2007 include the facts that the proportion of settlements involving a restatement of financial statements declined for the second year in a row, the plaintiff law firms of Milberg and Coughlin Stoia were less dominant in their involvement in settled cases, and institutional investor involvement as lead or co-lead plaintiffs continued to increase, reaching 60% of settlements.

## SAMPLE AND DATA SOURCES

The sample of cases discussed in this report is from Institutional Shareholder Services' Securities Class Action Services (SCAS). Our database is limited to cases alleging fraudulent inflation in the price of a corporation's common stock (that is, excluding cases filed only by bondholders, preferred stockholders, and the like, as well as cases alleging fraudulent depression in price). Our sample is also limited to cases alleging Rule 10b-5, Section 11, and/or Section 12(a)(2) claims brought by purchasers of a corporation's common stock. These criteria are imposed to ensure data availability and to provide a relatively homogeneous set of cases in terms of the nature of the allegations.

In addition to SCAS, data sources include Factiva, Bloomberg, the University of Chicago's Center for Research in Security Prices (CRSP), Standard & Poor's Compustat, court filings and dockets, SEC registrant filings, SEC litigation releases and administrative proceedings, LEXIS-NEXIS, and the public press.

**17**

© 2008 by Cornerstone Research.  All Rights Reserved.

**ENDNOTES**

**18**

1   Although the WorldCom and Enron settlements were composed of a number of partial settlements, we categorize WorldCom as a 2005 settlement and Enron as a 2006 settlement. In 2000 the Cendant matter settled for slightly less than the Tyco settlement, coming in fourth for cases settled to date, with $3.1 billion awarded to common stockholders.

2   For all figures involving "estimated damages," nine settlements are excluded for lack of available stock price data, and the WorldCom settlement is excluded because most of the amounts settled in the case relate to liability associated with bond offerings (and our research does not compute damages related to securities other than common stock).

3   Movements of partial settlements between years can cause differences in amounts reported for prior years from those presented in earlier reports. For a settlement to be moved from inclusion in an earlier to a more recent year, the subsequent partial settlement must be at least half of the then-current settlement total.

4   Overall there were fourteen settlements in 2006 that settled for more than $100 million but only nine in 2007.

5   Our simplified plaintiff-style model is applied to common stock only. For all cases involving Rule 10b-5 claims, damages are determined from a market-adjusted backward value line. For cases involving only Section 11 and/or 12(a)(2) claims, damages are determined from a model that caps per share damages at the offering price. A volume reduction of 50% for shares traded on NASDAQ and 20% for shares listed on NYSE or AMEX is used. Finally, no adjustments for institutions, insiders, or short sellers are made to the float.

6   DDL information is presented in Figure 7 to provide a benchmark for the convenience of readers, since the measure is simple to compute and does not require application of a trading model.

7   In 2007 there were five settlements with only Section 11 and/or 12(a)(2) claims. The median settlement for those cases was $4.4 million and the median settlement as a percentage of estimated damages was 13.5%.

8   For the purposes of this report, a derivative action—generally a case filed against officers and directors on behalf of the issuer corporation—must have allegations similar to the class action in nature and time period to be considered an accompanying action.

9   Data for 2005 and 2006 are presented in prior reports.

10   See http://www.usdoj.gov/usao/cac/pressroom/pr2008/030.html.

11   In cases with co-lead counsel, cases are tallied for all law firms involved and may result in some settlements being counted more than once.

12   Our settlements database includes publicly available and measurable information about settled cases. Nonpublic or nonmeasurable factors such as case merits or the limits of available insurance are not reflected in the model to the extent that such factors are not correlated with the variables that are accessible to us (that is, publicly available and measurable factors).

13   Due to the presence of extreme observations in the data, logarithmic transformations are applied to settlement amounts, estimated damages, decline in market capitalization, the defendant's total assets, and the number of docket entries.

© 2008 by Cornerstone Research.  All Rights Reserved·

CORNERSTONE RESEARCH

**Contact**

Please direct any questions or requests for additional information to:

*Laura E. Simmons*
lsimmons@cornerstone.com
*Ellen M. Ryan*
eryan@cornerstone.com

**Cornerstone Research
Offices**

**Boston**
699 Boylston Street, 5th Floor
Boston, Massachusetts 02116-2836
617.927.3000

**Los Angeles**
633 West Fifth Street, 31st Floor
Los Angeles, California 90071-3509
213.553.2500

**Menlo Park**
1000 El Camino Real, Suite 250
Menlo Park, California 94025-4327
650.853.1660

**New York**
599 Lexington Avenue, 43rd Floor
New York, New York 10022-7642
212.605.5000

**San Francisco**
353 Sacramento Street, 23rd Floor
San Francisco, California 94111-3656
415.229.8100

**Washington**
1919 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C. 20006-3420
202.912.8900

www.cornerstone.com
securities.cornerstone.com

© 2008 by Cornerstone Research.  All Rights Reserved.
Cornerstone Research is a registered service make of
Cornerstone Research, Inc. C and design is a registered
trademark of Cornerstone Research, Inc.