# Exhibit 16

*Journal of Empirical Legal Studies*
Volume 1, Issue 1, 27–78, March 2004

# Attorney Fees in Class Action Settlements: An Empirical Study

*Theodore Eisenberg and Geoffrey P. Miller*\*

Study of two comprehensive class action case data sets covering 1993–2002 shows that the amount of client recovery is overwhelmingly the most important determinant of the attorney fee award. Even in cases in which the courts engage in the lodestar calculation (the product of reasonable hours and a reasonable hourly rate), the client's recovery generally explains the pattern of awards better than the lodestar. Thus, the time and expense of a lodestar calculation may be wasteful. We also find no robust evidence that either recoveries for plaintiffs or fees of their attorneys increased over time. The mean fee award in common fund cases is well below the widely quoted one-third figure, constituting 21.9 percent of the recovery across all cases for a comprehensive data set of published cases. A scaling effect exists: fees constitute a lower percent of the client's recovery as the client's recovery increases. Fees are also correlated with risk: the presence of high risk is associated with a higher fee, while low-risk cases generate lower fees. Fees as a percent of class recovery were found to be higher in federal court. The presence of "soft" relief (such as injunctive relief or coupons) has no material effect on the fee, regardless of whether the soft relief was included in the quantified benefit for the class used as the basis for computing the attorney fee. The study also addresses costs and expenses. Like fees, these display significant scale effects. The article proposes a simple methodology by which courts can evaluate the reasonableness of fee requests.

Of all the tasks facing trial court judges in class action litigation, one of the most difficult is determining an appropriate fee. Even in settled cases, the courts must determine that the fee is reasonable as part of their mandate to

---

\*Eisenberg is Henry Allen Mark Professor of Law, Cornell Law School; Miller is Stuyvesant P. and William T. III Comfort Professor of Law, New York University Law School. Address correspondence to Theodore Eisenberg, Cornell Law School, Myron Taylor Hall, Ithaca, NY 14853; e-mail theodore-eisenberg@postoffice.law.cornell.edu.

We thank Kevin Clermont and Charles Silver for comments and Thomas P. Eisenberg, Nicolas Germain, Preetpal Grewal, and Erica Miller for research assistance.

protect the interests of absent class members. Courts employ different methodologies in performing this task. To date, however, they have rarely looked to empirical research for guidance as to the reasonableness of the fee. In part, the courts' failure to utilize empirical research is due to the relative paucity of available information. Existing empirical studies of attorney fees in class action cases are limited in scope and generally do not control for important variables.

This article provides a more comprehensive and analytically detailed study of attorney fees in class action cases. It uses two new databases. First, we compiled data on all state and federal class actions with reported fee decisions between 1993 and 2002, inclusive, in which the fee and class recovery could be determined with reasonable confidence. Second, we used information on class actions reported in the March–April 2003 edition of *Class Action Reports* (*CAR*), which contains more than 600 common fund cases from 1993 to 2002.[1] The data allow us to assess the determinants of court-awarded attorney fees and expenses in class action and shareholders derivative cases. The analysis should assist courts in evaluating requests by class counsel for awards of attorney fees and expenses.

We find that the level of client recovery is by far the most important determinant of the attorney fee amount. A scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases. The relation between fees and recovery is remarkably linear on a log scale, and is similar between cases in which no fee-shifting statute applies and cases in which the plaintiff had a right to seek reimbursement under a fee-shifting statute. The presence of high risk is associated with a higher fee, as is the presence of the case in federal rather than state court. Contrary to popular belief, we find no robust evidence that either recoveries for plaintiffs or fees of their attorneys as a percentage of the class recovery increased during the time period studied. Nor does the presence or absence of objectors to settlement have a discernable effect on fees. The presence of a settlement class—a class certified before the fee decision—is associated with lower fees but the effect is not statistically significant. The presence of "soft" relief (such as injunctive relief or coupons) has no material effect on the fee.

The dominance of the client's recovery as a determinant of the fee is nearly complete. Even in cases in which the courts engage in a lodestar

---

[1]Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep. 169 (2003).

calculation (the product of reasonable hours and a reasonable hourly rate), the client's recovery explains the pattern of awards better than (in non-fee-shifting cases) or as about as well as (in fee-shifting cases) the lodestar calculation. Indeed, the lodestar multiplier (fee award divided by the product of reasonable hours and reasonable hourly rate) is significantly negatively correlated with the percentage fee when only these two variables are analyzed, and is not significant in the overall regression analysis. These results cast doubt on whether the fees actually awarded by courts follow *the frequent case-law admonition that fees determined on the percen-tage method should be checked for reasonableness against the lodestar calculation.*

*The article is structured as follows:* Part I describes the problem courts face in assessing requests for fees and expenses and outlines the leading methodologies used to rule on such requests. Part II surveys prior empiri-cal studies on attorney fees in class action cases. Part III outlines hypotheses about fees and describes the data. Part IV presents the results of our study. We end with a brief conclusion.

## I. The Legal Background

All state and federal courts provide procedures for joinder of numerous plaintiffs (or defendants) into a class action in which parties not before *the court are represented by a named plaintiff and by class counsel who,* in the usual case, dominates and controls the litigation.[2] When a class action settles (or when, in rare cases, it results in a judgment for the class on the merits), class counsel is *generally entitled to a fee award, either* under a fee-shifting statute[3] or through application of the common fund

---

[2]The named plaintiff's minimal role is stressed in, e.g., John C. Coffee, Jr., The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, 54 U. Chi. L. Rev. 877 (1987); Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 U. Chi. L. Rev. 1 (1991). Securities fraud litigation under the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737 (codified in 15 U.S.C. §§ 77, 78) may present a different situation. See Parts III.A.11 and IV.C.

[3]Fee-shifting statutes provide that, in designated cases, defendants must pay the reasonable attorney fees of prevailing plaintiffs. E.g., 42 U.S.C. § 1988(b) (2000) (fees in civil rights cases).

doctrine.[4] All states and the federal courts also provide procedures under which a shareholder can, in appropriate circumstances, bring a derivative lawsuit in the name of the corporation. Here, too, the shareholder's attorney is generally entitled, if successful, to an award of fees under application of the "common benefit" rule.

The amount of fees and expenses paid to class counsel must ultimately be determined by the court. With respect to fee-shifting statutes and awards of fees under the common benefit rule in derivative cases, the fees will be paid by the defendant or by the corporation, neither of which have the ability to control the reasonableness of class counsel's fee demands. Without judicial supervision, counsel could make entirely unreasonable fee requests. In the case of fees from a common fund, counsel's request for compensation creates a direct conflict of interest with the class. Because class members are dispersed, disorganized, and typically have a relatively small stake in the outcome of the litigation, the class cannot protect itself against an unreasonable fee request. Again, court protection is required to prevent counsel from enriching themselves at the expense of the class.

Moreover, all class and derivative actions present the specter that counsel will "sell out" the class or the shareholders by agreeing to a low recovery in exchange for a generous fee. In common fund cases, the inappropriate bargain can take the form of a below-par settlement for the class coupled with a "clear sailing" agreement under which the defendant agrees not to object to (or even to pay directly) fees and expenses up to a certain amount. In fee-shifting and common benefit cases, similarly, the defendant can agree to pay class counsel's fees and expenses in an excessive amount coupled with inadequate relief for the class or the corporation. The risk of collusion with the defendant also necessitates judicial control over fees in all class action cases.

Determining proper fees and expenses, however, is problematic. As to expenses, courts review statements provided by counsel to assure that the items listed are properly compensable separately from the fee and to assess whether the amounts requested are reasonable. As to fees, ordinarily a much larger item than expenses, courts use different methodologies. At one time the most common method was to consider multiple factors, including the time and labor required, the customary fee, whether the fee is fixed or

---

[4]See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 259 (1975) (describing history and function of the doctrine that plaintiffs' attorneys in class cases may be awarded fees from a common fund generated for the benefit of the class).

contingent, the amount involved and the results obtained, the experience, reputation, and ability of the attorneys, awards in similar cases, the nature and length of the professional relationship with the client, the time limitations imposed by the client or the circumstances, the preclusion of other employment by the attorney due to acceptance of the case, the novelty and difficulty of the questions, the skill needed to perform the legal services, and the "undesirability" of the case.[5]

The multifactor approach has the benefit of appearing to cover most of the important considerations. But, like most factor tests, it is difficult to apply in a consistent and coherent fashion. Some factors appear to be subjective, for example, the attorney's reputation or the undesirability of the case. Others seem duplicative—the list includes both "the customary fee" and "awards in similar cases." Further, the courts provide virtually no guidance as to how to weigh these factors or how to assess their impact if they cut in different directions. In practice, the multifactor approach approximates a discretionary grant of authority to the trial judge to set a reasonable fee based on his or her overall judgment about the case.

More recently, many courts, without necessarily repudiating the multifactor approach, have adopted two methodologies for determining fees that appear more objective and quantifiable: the lodestar and percentage methods. Under the lodestar method, as noted above, courts multiply the reasonable number of hours expended by counsel by a reasonable hourly rate and then adjust the product for various factors.[6] The lodestar method has numerous flaws, however: courts cannot easily determine either the reasonable hours or the reasonable hourly rate; there are few protections against counsel exaggerating either or both; the calculation involves the courts in time-consuming and mind-numbing bean counting and risks transforming the fee determination into a collateral lawsuit; standards for determining any multiplier for the lodestar are unclear and potentially arbitrary; and the method creates a perverse incentive to counsel to waste time in order to run up the bill once a victory of some sort appears reasonably certain.

---

[5]The leading precedent outlining this multifactor approach is Johnson v. Georgia Highway Express, 488 F.2d 714, 717–19 (5th Cir. 1974).

[6]E.g., Gisbrecht v. Barnhart, 535 U.S. 789 (2002). For discussion, and a critique of the lodestar approach, see Charles Silver, Unloading the Lodestar: Toward a New Fee Award Procedure, 70 Texas L. Rev. 856 (1992); Charles Silver, Due Process and the Lodestar Method: You Can't Get There from Here, 74 Tulane L. Rev. 1809 (2000).

The percentage fee fares better along these dimensions. Under this method, which resembles the contingency fee in individual tort cases, the court multiplies the amount recovered on behalf of the class by a percentage factor. The percentage method is easy to calculate, does not involve the court in fee audits, and does not create incentives to waste time. Although generally preferable to the lodestar method in cases where it can be used, the percentage method is also imperfect. In some cases (e.g., actions for injunctive relief or cases involving nonpecuniary relief such as hard-to-value coupons), the amount recovered may be difficult or impossible to quantify. Determining the proper percentage may be difficult, especially when the case is unusual in dimension (very large or very small) or especially difficult or risky. The percentage method provides an incentive for counsel to settle early in order to avoid expending low-return hours. And, unless adjusted for risk, the percentage method tends to overcompensate counsel in easy cases where the probability of recovery is high.

Perhaps in recognition that both the lodestar and percentage methods imperfectly estimate a reasonable fee, some courts adopt a blended approach that checks the percentage method for reasonableness against a lodestar calculation. This mixed approach may have value in correcting extreme cases in which the percentage approach alone would generate a windfall for class counsel, but it too is imperfect. Usually, when courts discuss a lodestar check, they do so with a view toward adjusting downward if the percentage approach alone results in an excessive fee. Thus, while it may correct for cases in which counsel would receive an exceptionally high hourly rate under the percentage method alone, the lodestar check does not usually adjust for cases in which counsel would receive an unusually low hourly rate. Thus, it may result in counsel being undercompensated on an aggregate basis. Further, because the lodestar check requires the lodestar calculation, it does not eliminate the burden on courts, the perverse incentive to run up hours, and the dangers of mini-trials.

Regardless of the methodology used, courts could benefit from reviewing empirical evidence on the amounts awarded in analogous cases. Courts in this setting engage in a process of appraisal, and any appraisal can properly take account of comparable transactions. In fact, courts frequently cite prior court precedents in which fees have been awarded. But courts almost never examine empirical research that could potentially provide more systematic and statistically controlled information about the determinants of awards. The following section surveys the existing literature and situates the current study against this backdrop.

## II. PRIOR STUDIES

Several prior empirical studies shed light on attorney fees. Herbert Kritzer's work undermines myths about contingency fees in individual cases, including beliefs that their use involves little risk and that "contingency fee lawyers and their clients are routinely in conflict."[7] Empirical analysis of adoption of the British Rule on fee shifting, under which the losing litigant pays the winner's fees, also promotes understanding of what might be achieved through fee reform.[8]

A few studies examine attorney fees in the class action setting. Studies by the National Economic Research Associates (NERA), an economic consulting firm, trace fees in securities class actions over the years. The most comprehensive NERA study, published in 1996, provides information on fee awards in settled securities class actions between 1991 and 1996, including mean and median awards of fees, and fees plus expenses as a percentage of settlement and as a function of increasing settlement amount.[9] The 1996 NERA study also breaks fee awards down by federal circuit, finding a remarkable uniformity in such awards between roughly 30 to 33 percent of the settlement amount. A 1999 update of the NERA study increases the sample size to 733 cases, with similar empirical findings.[10]

---

[7]Herbert M. Kritzer, Seven Dogged Myths Concerning Contingency Fees, 80 Wash. U. L.Q. 739, 741 (2002) [hereinafter Seven Dogged Myths]. See also Herbert M. Kritzer, Lawyer Fees and Lawyer Behavior in Litigation: What Does the Empirical Literature Really Say?, 80 Tex. L. Rev. 1943, 1949–57 (2002); Herbert M. Kritzer, Fee Arrangements and Fee Shifting: Lessons from the Experience in Ontario, 47, Law & Contemp. Probs 125 (1984). For a classic treatment of fees, see Kevin M. Clermont & John D. Currivan, Improving on the Contingent Fee, 63 Cornell L. Rev. 529 (1978).

[8]Susanne Di Pietro et al., Alaska Judicial Council, Alaska's English Rule Attorney's Fee Shifting in Civil Cases (1995); Gary M. Fournier & Thomas W. Zuehlke, Litigation and Settlement: An Empirical Approach, 71 Rev. Econ. & Stat. 189, 191 & n.5 (1989); James W. Hughes & Edward A. Snyder, Litigation and Settlement Under the English and American Rules: Theory and Evidence, 38 J.L. & Econ. 225 (1995); Edward A. Snyder & James W. Hughes, The English Rule for Allocating Legal Costs: Evidence Confronts Theory, 6 J.L. Econ. & Org. 345 (1990).

[9]Denise N. Martin, Vinita M. Juneja, Todd S. Foster & Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? (NERA, Nov. 1996).

[10]Todd S. Foster, Denise N. Martin, Vinita M. Juneja & Frederick C. Dunbar, Trends in Securities Litigation and the Impact of PSLRA (NERA, June 1999). NERA's most recent iteration of the study does not provide information on fee or expense awards. Elaine Buckberg, Todd S. Foster, Ronald I. Miller & Adam Werner, Recent Trends in Securities Class Action Litigation: Will Enron and Sarbanes-Oxley Change the Tides? (NERA, June 2003).

A 1996 Federal Judicial Center study examines all class actions terminated between July 1, 1992, and June 30, 1994, in four federal district courts.[11] This study reports mean and median fee awards of between 24 and 30 percent of the net monetary distribution to the class.

The March–April 2003 *CAR* provides information on 1,120 common fund cases extending back to 1974.[12] These data are discussed below.

Finally, William J. Lynk analyzed 332 securities cases reported in a 1990 edition of *CAR*.[13] Lynk found that mean fees and costs were 26.2 percent of the class recovery.

The present study differs from prior studies in several respects. Unlike the NERA and Lynk studies, which focus on securities class actions, or the Federal Judicial Center study, which examined class actions in four federal district courts, this study examines a full range of class action cases in all state and federal courts, using two independent data sets and comparing the results of these separate studies as a cross-check. The present sample covers 1993 to 2000; the Lynk study ends in 1990. Further, unlike prior studies other than Lynk's, the present study employs regression analysis to analyze the simultaneous effect of several variables on fees. The factors include some (such as risk) that have not previously been examined.

## III. HYPOTHESES AND DATA DESCRIPTION

This part first describes the hypotheses we test and then describes the data sets used to test them.

### A. *Hypotheses*

We started with several hypotheses about the determinants of fees and expenses in class action and shareholders' derivative cases and sought to design a study that tests those hypotheses against the two data sets. The factors that we believed shape fee awards are levels of client recovery, attorney time and effort, the category of case (e.g., securities, civil rights,

---

[11] Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 4 (1996).

[12] Logan, et al., *supra* note 1.

[13] William J. Lynk, The Courts and the Plaintiffs' Bar: Awarding the Attorney's Fee in Class-Action Litigation, 23 J. Legal Stud. 185 (1994).

antitrust), the legal regime regulating fees applicable to the case (percentage of recovery, lodestar, and the presence of a fee-shifting statute), the riskiness of the case, the case's complexity, the presence of objectors to the fee, whether the recovery includes "soft" value to clients (such as coupons), whether a class was certified before the settlement, and whether the case was decided in federal or state court.

### 1. Case Size: The One-Third Fee

Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases.[14] But evidence also suggests that the one-third fee is not as dominant as is widely believed.[15] Some regard one-third as a floor as well as a standard, with contingency fees often exceeding this percentage.[16] Kritzer, however, found that ex post downward adjustments from a one-third fee are also common.[17] Taken as a whole, the evidence suggests that one-third is the benchmark for privately negotiated contingent fees, but that significant variation up and occasional variation down exist as well.

Given this evidence, what fee levels should one expect to observe in court-approved class action settlements? One factor that might push fee percentages down as compared with individual contingent fee arrangements is

---

[14]See Herbert M. Kritzer, The Wages of Risk: The Returns of Contingency Fee Legal Practice, 47 DePaul L. Rev. 267, 285 (1998) ("[o]ne-third is the 'standard' contingency fee figure"). The one-third rule of thumb finds empirical support in James S. Kakalik, Patricia A. Ebener, William L.F. Felstiner, Gus W. Haggstrom & Michael G. Shanley, Variation in Asbestos Litigation and Compensation Expenses 84 tbl. 1 (RAND ICJ 1984).

[15]Kritzer's empirical study of contingency fees in Wisconsin found that only 53 percent of cases in which the parties were free to specify a fee employed a one-third contingency fee. Kritzer, supra note 14, at 285. Kritzer also notes that federal or state statutes dictate or limit fees in several classes of cases, including Social Security disability cases, workers' compensation cases, and medical malpractice cases. Id. See also Kritzer, Seven Dogged Myths, supra note 7, at 759.

[16]For example, Lester Brickman states: "Standard contingency fees are typically at least one-third, forty and even fifty percent in cases settled before trial and often more than fifty percent [of the net recovery] in cases which go to trial." Lester Brickman, ABA Regulation of Contingency Fees: Money Talks, Ethics Walks, 65 Fordham L. Rev. 247, 268 (1996). Kritzer's analysis of RAND's data from its study of the federal Civil Justice Reform Act also reveals substantial variation. In fixed percentage cases, the one-third fee again dominated, but there was more evidence of cases involving higher percentage fees, supporting Brickman's observation. Kritzer, Seven Dogged Myths, supra note 7, at 760.

[17]Kritzer, Seven Dogged Myths, supra note 7, at 761.

the larger size of class actions. The aggregate nature of class action cases should lead to larger awards to the class, which could well translate into lower percentage fee awards to attorneys as a result of economies of scale. But other factors might tend to increase fee awards. Because aggregating claims increases the litigation stakes, the parties can be expected to expend more resources to litigate a class action than an individual case. These increased expenditures may justify a higher fee. Class actions are also by their nature more complex than individual actions. Among other matters, the class certification question is added to the plaintiffs' attorneys' tasks. Internal class management, possible competition from other lawyers for class representation, and coordination of legal teams in large cases could require lawyer effort and expertise not required in the typical contingency fee cases. Theory does not predict whether class action fees will be higher or lower than the norm in individual litigation. As a working hypothesis, we predicted that average fees are approximately the same as in nonclass cases—approximately one-third of the recovery.

We also hypothesized, however, that the one-third guide would not hold constant across case types. For example, this percentage likely breaks down for cases with substantial nonmonetary relief. Injunctive relief in civil rights cases, for example, does not translate easily into a dollar amount on which to base a fee. As nonmonetary relief increases, the fee as a percent of dollars recovered should be expected to increase. Further, we predict that the fee as a percentage of the class recovery will decrease as recovery increases due to economy-of-scale effects.

## 2. Lodestar Effects

Two different lodestar questions are worth separating. First, given the predicted relation between client recovery and fee award, does the lodestar calculation better explain fee awards than the client recovery? If the lodestar does not do a better job than client recovery at predicting fees, its efficacy could be challenged on efficiency grounds in light of the work that goes into the lodestar calculation as well as the requirement that the lodestar method imposes on counsel of keeping detailed time records. Second, does use of the lodestar method raise or lower the fee award over the percentage method at a given level of client recovery? There is virtually no inherent limit on the fee based on the size of class recovery in lodestar cases: in theory the only considerations are the reasonable hours and the reasonable hourly rate. It is true that cases with larger recoveries will tend, other things equal, to require greater attorney effort, so some correlation between case size and

lodestar fee can be expected, and also true that the lodestar fee could be below as well as above the percentage fee in a given case. But in the absence of the built-in limitation of the percentage fee, counsel in lodestar cases have an incentive to run up hours and to refuse settlement offers in order to continue earning fees. Thus we hypothesize that, other things equal, fees in lodestar cases will be larger than fees in percentage cases of similar magnitude.

### 3. Effort; Complexity

Some cases are more complex than others, either because the proof required is technical or difficult to obtain, because the procedural context or applicable legal rules are convoluted or unique, or because the dynamics of litigation between the parties generates difficulties such as motions to compel discovery, motions for protective orders, motions for sanctions, and appellate proceedings such as petitions for writs of mandamus and appeals. We hypothesize that the fee will increase with case complexity, and that this effect will be observed even when we control for attorney hours and for ex ante risk: that is, for any given level of expenditure of hours and any given level of risk, courts are likely to award a higher fee if they observe that the litigation is highly convoluted and complex.

The length of time a case has been pending (its age) is a reasonable, though admittedly imperfect, proxy for complexity, especially needed when no lodestar fee is reported. As a further indication of the effort needed in a case, we include in our analysis whether the opinion is that of an appellate or trial court. Cases pressed through appeal introduce an additional stage to the proceedings and can signal enhanced complexity. When attorney hours are not reported, a case's age can also serve as a rough measure of effort.

### 4. Risk

Plaintiffs' attorneys in class and derivative cases nearly always litigate the case on a contingent basis: they will be responsible for all litigation costs, including both the opportunity costs of their time and the expenses of the litigation, if the case fails.[18] Because attorneys, like other economic actors, are

---

[18]The ethics rules of some states might be interpreted to make the representative plaintiff ultimately liable for litigation expenses, but in practice named plaintiffs do not assume this responsibility. See Geoffrey P. Miller, Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Rev. of Litig. 557 (2003).

expected to be risk averse, they demand compensation for the risk of nonsuccess in cases they take. That fees are adjusted for risk is widely accepted in the literature.[19] Courts often discuss risk when assessing fees in class action settlements.[20] Consistent with theory and practice, we expect that risk increases fees: other things equal, as the ex ante risk of a case increases, the percentage fee awarded will also increase.

## 5. Payment by Defendant

In some cases, by statute or settlement, the defendant will pay the fee in addition to the agreed settlement amount. The influence of payment by the defendant on fees is ambiguous. If the court accepts that the defendant's fee payment is truly in addition to the client's recovery, the court may feel less need to scrutinize the fee. The additional fee is not coming out of the clients' pockets and less need exists for the court to protect the class. On this view, the defendant paying the fee could lead to increased fees because judicial scrutiny would be lower and because class counsel has a self-interest in obtaining the largest possible fee. On the other hand, paying the fee enhances the defendant's incentive to bargain vigorously over the fee in a settled case or to present strong arguments to reduce the fee in a litigated case. When the defendant truly separately negotiates the fee level, it has the obvious incentive to keep the fee as low as possible. Under this view, defendants' paying fees should be associated with lower fees to plaintiffs' counsel.

## 6. Objectors

Objections to fee awards could signal different things. The objectors' economic calculus suggests that they should tend to find it worthwhile to object in larger cases. Expending resources to undermine a class action settlement signals that someone, objecting counsel or their clients, believes the stakes large enough to voice concerns. They are more likely to so believe in larger cases than in smaller cases, because the objector has a chance for receiving

---

[19] E.g., Kritzer, Seven Dogged Myths, supra note 7, at 256, 265.

[20] E.g., High-risk cases: In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 886 F. Supp. 445 (E.D. Pa. 1995); McLendon v. Continental Group, Inc., 872 F. Supp. 142 (D.N.J. 1994); In re Shell Oil Refinery, 155 F.R.D. 552 (E.D. La. 1993). Low-risk cases: Hanlon v. Chrysler Corp., 150 F.2d 1011, 1017, 1018 n.2 (9th Cir. 1998); In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283 (3d Cir. 1998); Conley v. Sears, Roebuck & Co., 222 Bankr. Rep. 181, 183–86 (D. Mass. 1998).

a larger commission from the class counsel to drop the objection. Objector presence could also signal that the award to counsel is too high. Objectors presumably value having some prospect of succeeding in their objection. They are more likely to succeed when a fee award they challenge is too high relative to an objectively proper fee than when the fee award is too low. Thus we hypothesize that the existence of an objector will correlate with lower fees, other things equal, and also that objectors will tend to appear in larger cases.

### 7. Interaction Between Lodestar Multiplier and Percentage

As noted above, many courts check the attorney fees determined by the percentage method against the lodestar award. The idea is that if the percentage fee grossly exceeds the lodestar amount, the attorney would be receiving a windfall, and the courts should adjust the fee downward to a more reasonable range. Courts may also use an informal lodestar check, even in cases where the check is not explicitly conducted, by granting a higher fee percentage in cases where they observe counsel expending unusually great efforts in the case. We predict, therefore, that there will be a strong negative correlation between the lodestar multiplier (fee award divided by the lodestar) and the percentage fee awarded, and that this interaction will hold even when other factors are held constant.

### 8. Soft Relief

Some believe that class action settlements systematically constitute better deals for the lawyers than for the clients. This fear is perhaps most often present in cases in which clients' recoveries consist in large part of non-monetary relief such as coupons for defendants' products.[21] Conflicts of interest between class clients and class counsel have led critics to question counsels' loyalty and ability to achieve fair awards for class members.[22] It is

---

[21]See Severin Borenstein, Settling for Coupons: Discount Contracts as Compensation and Punishment in Antitrust Lawsuits, 39 J.L. & Econ. 379 (1996); Christopher R. Leslie, A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation, 49 UCLA L. Rev. 991 (2002); Geoffrey P. Miller & Lori S. Singer, Nonpecuniary Class Action Settlements, 60 Law & Contemp. Probs. 97 (1997); Martha Neil, New Route for Class Actions, 89 A.B.A.J. 48 (2003); Note, In-Kind Class Action Settlements, 109 Harv. L. Rev. 810 (1996).

[22]Elliott J. Weiss & John S. Beckerman, Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions, 104 Yale L.J. 2053, 2065 (1995).

thus worth exploring the degree to which "soft" relief influences the amount of fees awarded to counsel in cases where soft relief is significant.

Soft relief may influence fees in two ways. In some cases, the court assigns a value to the soft relief and includes that value in the measure of the class recovery against which a percentage fee is assessed. These are the cases where class attorneys are often criticized for artificially inflating the assessed value of the case by including questionable coupons or other unwanted items in order to enhance their fees.[23] Our hypothesis is that such "included" soft relief will be negatively correlated with the fee percentage. The idea is that the court will perceive that the soft relief does not have the full economic value attributed to it, and accordingly will award a somewhat lower fee percentage to protect the class against a potentially excessive fee; or alternatively that counsel will pump up the assessed value of the class recovery with soft relief, then provide comfort to the court approving the fee by seeking a below-average percentage of the relief so obtained.

In other cases, the settlement includes items of soft relief that are not explicitly valued by the court and included in the class recovery against which fees are assessed under the percentage method. For example, the case may include defendant's commitment to refrain from engaging in the challenged conduct, thus benefiting class members and others in the future. If the court does not value this commitment, it will not be included in the quantified relief obtained by the class and will not be explicitly accounted for in the attorney fees. Our hypothesis is that "nonincluded" soft relief will be positively correlated with the percentage fee. Courts, in this hypothesis, will award a more generous fee because they want to account, at least roughly, for the added value that counsel has provided to the class and others by the nonincluded relief.

## 9. Federal Versus State Courts

We hypothesized that attorney fees as a percentage of the class recovery would tend to be higher in state court class actions than in federal class

---

[23] E.g., Lloyd Milliken, Jr., *Fixing the Broken Class Action Lawsuit System,* 47 Res Gestae 19 (2003) (proposed federal legislation "provides additional consumer protections to prevent egregious settlements that give lawyers millions of dollars while leaving the plaintiffs with worthless coupons"); Kendra S. Langlois, Note, *Putting the Plaintiff Class' Needs in the Lead: Reforming Class Action Litigation by Extending the Lead Plaintiff Provision of the Private Securities Litigation Reform Act,* 44 Wm. & Mary L. Rev. 855 (2002). Professor Leslie proposed that when coupon relief is awarded, counsel should also receive coupons as part of their fee. Leslie, supra note 21. The Texas legislature recently adopted a variant of his proposal. 2003 Tex. Sess. Law Serv. Ch. 204 (H.B. 4) (Vernon's).

actions, for two reasons.[24] One reason is the potential for "reverse auctions" in state courts.[25] The multidistrict litigation process often results in consolidating overlapping federal court class actions in a single jurisdiction, with the forum being chosen by a neutral panel of judges rather than the litigants. Overlapping state court class actions, however, are not consolidated in a single state.[26] With multiple actions to choose from as a settlement vehicle, defendants are potentially able to negotiate settlements that sell out the class in exchange for a generous fee for class counsel. If such reverse auctions occur, their effect might be observed in the form of a higher average percentage fee. Because reverse auctions are more likely in state court than in federal court class actions, we hypothesize a higher average percentage fee in state court actions.

In addition, fees may be higher in state courts because counsel may be able to file in remote jurisdictions with few judges and significant potential home-court advantage.[27] These attorneys likely select state court jurisdictions that they believe will be generous with fee awards.[28]

## 10. Settlement Classes

Some courts and commentators are suspicious of "settlement classes," in which a case may be certified for settlement purposes even if it does not

---

[24]We initially assumed that state court class action recoveries are smaller than federal recoveries. In nonclass action litigation, federal cases tend to be larger than state cases. E.g., Theodore Eisenberg, Jeffrey J. Rachlinski & Martin T. Wells, Reconciling Experimental Incoherence with Real World Coherence in Punitive Damages, 54 Stan. L. Rev. 1239, 1266 (2002). If the fee percent decreases as recoveries increase, then the average fee percent observed in federal court would tend to be lower than the percent observed in state courts. But our data reveal no statistically significant difference in the distributions of federal and state class action recoveries in non-fee-shifting cases.

[25]On reverse auctions, see John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Columbia L. Rev. 1343, 1350 (1995); Bruce Hay & David Rosenberg, "Sweetheart" and "Blackmail" Settlements in Class Actions: Reality and Remedy, 75 Notre Dame L. Rev. 1377, 1389–91 (2000).

[26]See Geoffrey P. Miller, Overlapping Class Actions, 71 N.Y.U.L. Rev. 514 (1996).

[27]See Interstate Class Action Jurisdiction Act of 1999: Hearings on H.R. 1875 Before the House Comm. on the Judiciary, 106th Cong. 81 (1999) (evidencing concerns about class counsel cherry-picking judges in state court class actions by filing in remote locations).

[28]Cf. Lynn M. LoPucki & Joseph W. Doherty, Why Are Delaware and New York Bankruptcy Reorganizations Failing?, 55 Vand. L. Rev. 1933 (2002) (suggesting relation between professional fees and forum in bankruptcy reorganizations).

meet all the criteria for certification of a litigation class.[29] In particular, settlement classes do not need to satisfy the manageability requirement of Rule 23(b)(3) because the proposal is that no trial will occur.[30] One concern about settlement classes is that they may be a vehicle for counsel to present an inadequate or collusive settlement to the court. If this concern is justified, we might expect to observe higher-than-average fees being awarded in such cases. On the other hand, the effect of settlement classes is ambiguous. Because such settlements often occur early in the litigation at a time when class counsel have not expended a large number of hours on the case, counsel could obtain a very large hourly rate even while accepting an average percentage of the recovery. Further, some courts have indicated that they will exercise enhanced scrutiny over settlements presented in the settlement class context.[31] If courts do exercise effective enhanced scrutiny, this might check the tendency of counsel to reward themselves with excessive fees in the settlement class context.

## 11. Securities Versus Other Types of Litigation

The structure of settlements and fees may differ in securities litigation compared to other class action litigation. The Private Securities Litigation Reform Act of 1995 (PSLRA)[32] applies only to securities class actions. In such actions, the PSLRA requires that the lead plaintiff choose the counsel for the class, subject to court review.[33] The choice for lead plaintiff is presumptively the member of the class who volunteers for the job and who has the largest financial stake.[34] This presumption is rebuttable only by evidence that such plaintiff "will not fairly and adequately protect the interests of the class"

---

[29]For particularly virulent condemnation of one settlement class, see Susan P. Koniak & George M. Cohen, Under Cloak of Settlement, 82 Virginia L. Rev. 1051 (1996).

[30]See Amchem Prods. Inc. v. Windsor, 521 U.S. 591 (1997).

[31]E.g., General Motors Corp. Pick-Up Truck Fuel Tanks Prod. Liab. Litig., 55 F.3d 768, 805 (3d Cir. 1995); Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982).

[32]15 U.S.C. § 78u-4(a)(3) (2000).

[33]15 U.S.C. § 78u-4(a)(3)(B)(v) (2000).

[34]15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (2000).

or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."[35]

The PSLRA's requirements generate conflicting predictions with respect to the expected level of fees in securities litigation. On the one hand, the Act's assurance that a large-stakes plaintiff will control the choice of counsel should promote selection of class counsel that is more accountable to the class than class counsel selected by other methods. This greater client control, if realized in practice, ought to reduce the fees in securities litigation because the client, not class counsel, would be in charge. On the other hand, greater client control of securities litigation may lead to selection of superior class counsel. When class counsel select themselves, counsel may be skilled at obtaining securities cases but less skilled at prosecuting them. When plaintiffs with a large financial stake select counsel, there may be an increased tendency to shop for the highest-quality counsel rather than to accept the counsel who happened to trigger the case filing. Greater counsel quality may warrant a higher percentage fee award than in other categories of cases.[36] The time period encompassed by our data allow exploring effects specific to securities litigation. The PSLRA does not apply to private actions commenced before and pending on December 22, 1995.[37] Since our data include cases commenced before and after the PSLRA's effective date, we can observe whether the PSLRA materially changed the pattern of fee awards in securities cases.

## 12. Expenses

We also started with certain hypotheses regarding costs and expenses of litigation—those amounts often paid to reimburse counsel for funds expended in the course of the litigation. Costs and expenses, as used here, do not include the value of attorneys' time. We predict that costs and expenses will be positively correlated with gross class recovery, age of case, presence of an appeal, the lodestar amount, and the amount of the counsel fee. We predict that costs and expenses will be negatively correlated with the presence of a settlement class (because if the case settles prior to certifica-

---

[35] 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa), (bb) (2000).

[36] There may be grounds to question this hypothesis, however, if the mix of class counsel is roughly the same post-PSLRA as pre-PSLRA.

[37] Private Securities Litigation Reform Act of 1995, Pub. L. 104–67, § 202 (1995).

tion, counsel will not have to expend resources on proving manageability and also will conserve on notice expenses).

## B. Data and Coding Conventions

To test these hypotheses we assembled a comprehensive database of published cases. We searched in the WESTLAW™ "AllCases" database using the search "settlement & 'class action' & attorney! w/2 fee! & date(= [1993–2002])." This search's results were checked against a search of the LEXIS™ "Mega" database using the same search terms. We also compiled lists of citations in the cases found by these search requests and included any additional cases meeting the basic search criteria. We further checked the list against the CCH™ Federal Securities and Trade Regulation Reporters. Once cases had been identified by this method, we sometimes gathered additional information about case characteristics from other sources, for example, information on the Internet or docket entries in the U.S. Courts PACER system. These searches yielded an initial list of 449 cases.

Two of the most important variables for our purposes are the fee and the client recovery. The fee was ascertainable in 417 class action cases.[38] Where expenses are identifiable, we separated them out and did not include them in the fee. The client recovery was usually available from the opinion and a usable amount was coded in 370 cases. If the court stated a range of value, we used the midpoint. If there was no better estimate available but a maximum recovery value could be ascertained, we used the maximum possible recovery. If the court estimated the relief at "over" a sum, the sum that was the minimum was used. Where the settlement amount included post- or prejudgment interest, we included that in the amount of the settlement.

To code the court's fee calculation method, we tracked whether the court engaged in a lodestar calculation and, if so, the purity of the lodestar approach. This generated three fee method categories: (1) percent method cases in which no lodestar calculation exists, (2) cases in which a lodestar calculation exists but as a check on the percent or in combination with the percent, and (3) pure lodestar cases in which the lodestar method was the exclusive method used. If the lodestar amount was not specified, but could be estimated with reasonable accuracy, we included it. We used plaintiffs' own estimates of their lodestar only when these estimates were not contested by the court. We also noted when the lodestar amount could not be

---

[38]If the litigation had the characteristics of a class action, even if not certified, we included it. This occurred only for certain employment discrimination cases.

calculated from the opinion. Where there was a range reported for multipliers, we used the midpoint.

For many other variables, coding was reasonably straightforward. The presence of an objector to the settlement, whether the case was in federal or state court, whether the defendant paid the fee, and whether soft relief constituted part of the recovery were all reasonably ascertainable from the opinions. We were often able to detect the presence of a settlement class by statements in the judicial opinion. It is possible, however, that in some cases the court may have approved a settlement involving a settlement class without announcing this fact and without providing other indicia in the opinion that the class had not previously been certified. Where nothing was said or could be inferred about the presence of a settlement class, we coded the case as a litigation class, keeping in mind the possibility that some of these cases may in fact have been undetectable settlement classes and that some degree of error is thus inevitable with respect to this variable.

In employment discrimination and civil rights cases, two prominent categories of fee-shifting statute cases, the amount of the relief to the class, as expected, often was difficult to quantify because a primary element of relief in such cases was often injunctive. For civil rights cases involving only injunctive relief, the cost to the defendant was used when this was available. In some fee-shifting cases, the court awarded attorney fees but it was impossible to estimate the amount of class damages. These fee and recovery coding conventions led to usable values for the fee amount and the client recovery, our two core variables, in 362 cases.

We coded the age of the case based on the opinion date and the date of filing, as reported in the opinion. We were able to calculate the age for 350 of the 362 cases.

Risk was not discussed in each opinion. Therefore, coding it depends on assuming that it was not prominent in cases in which courts did not mention it. We divided the cases into three risk categories. If nothing was said about risk or if the court's discussion suggested a normal degree of risk, the case was coded as being medium risk. If the court affirmatively indicated the existence of substantial risk, or if exceptional risk was evident from the facts or procedural history of the case, we coded the case as having high risk. If the court indicated or the facts otherwise indicated that the case was very likely to generate a substantial recovery for the class at the time it was brought, we coded the case as low risk.

One qualification about using published opinions is in order. This data set looks only to opinions that, for whatever reason, were published in some readily available form. The data set omits opinions that were not published.

Obviously, therefore, we have not included the full universe of cases in our data set. Although published opinions are not necessarily representative of the universe of all cases, they can lead to important insights. Our quantitative statements are, of course, estimates, but they represent substantially more informed estimates than those made without comprehensive knowledge of the opinions. In one important respect, opinions are representative: for judges seeking to inform their fee decisions with knowledge of other cases, published opinions are the prime source of data.[39] Further, as discussed immediately below, we checked the results of the published opinion data set against the results of the *CAR* data, which do include nonpublished opinions (but are less representative than the published opinion data set in other respects, e.g., by including only common fund cases).

*CAR* describes its data[40] and we leave the detailed description to that publication. The *CAR* data, updated in 2003 after an initial 1990 study, include 1,120 common fund cases, of which 630 are in the period 1993–2002. The *CAR* data emphasize securities cases, which are likely oversampled in relation to nonsecurities cases.[41] For the period 1993 to 2002, securities cases comprise 77 percent of the *CAR* cases compared to 39 percent of the published opinion data we assembled. The opinion data contain 276 nonsecurities cases (before reduction for missing data) compared to 147 nonsecurities cases in the *CAR* data. So the *CAR* editors gather more securities cases than are available through standard legal research databases. For nonsecurities cases, however, the *CAR* data do not contain all class action cases that are available in standard research databases. In addition, the *CAR* data exclude selected cases, including those in which class members received coupons.[42] Another difference is that the *CAR* data do not contain certain variables, such as risk, that often are ascertainable in the published opinion data.

---

[39]Cf. Theodore Eisenberg & Sheri Lynn Johnson, The Effects of Intent: Do We Know How Legal Standards Work?, 76 Cornell L. Rev. 1151, 1195 (1991).

[40]24 Class Action Rep. at 167–68, 194–97.

[41]To account for the possible imbalance in either or both data sets, we have run, but do not report here, our principal regression models with weighting schemes designed to reflect the overweighting of securities cases in the *CAR* data and the possible underweighting of securities cases in our data. No material change in our principal results emerged.

[42]24 Class Action Rep. at 194.

## IV. EMPIRICAL RESULTS

Because fees so commonly represent a percent of the client's recovery, a natural starting point for studying fees is describing client recovery levels. For example, if client recoveries have increased over time, attorney fees should also be expected to increase in absolute amount even if not as a percent of the client recovery.

### A. *Client Recovery Levels*

For the 370 cases for which we have client recovery data in the published opinion database, the mean gross recovery was $100 million in inflation-adjusted 2002 dollars, and the median gross recovery was $11.6 million. Figure 1 shows the mean and median client gross recovery for the years 1993 through 2002 in inflation-adjusted 2002 dollars. To complement our data, we report the mean and median recoveries from the *CAR* cases for this period, which show a mean gross recovery of $35.4 million in inflation-adjusted 2002 dollars and a median gross recovery of $7.6 million. The figure suggests that the mean client recovery has not noticeably increased over the last decade. A few large awards led to unusual peaks at over $200 million in the mean for the reported opinion data in 1994 and 2000. But the time trend in the mean is not noticeably upward over time.

The median recovery in our data shows more upward growth. But a relatively high period from 1999 to 2002 ends with the median award at $15 million, below where it was in 1994 and about where it was in 1996. Also, there is no statistically significant time trend in the median award. Even the ad-hoc approach of basing a time-trend inquiry on the observed peak in 1999, and post-1999 recovery levels, yields no significant result. If one divides recoveries into those received prior to 1999 and those received in 1999 and later, one cannot reject the hypothesis that the median recovery is the same for the two periods ($p = 0.161$). The *CAR* data show no upward movement in the median recovery over time. Thus, neither the mean nor the median recovery support popular and professional perception that recoveries in large class action cases are ever-increasing.[43]

---

[43]Cf. Ellen Kelleher, AIG Intensifies Efforts on Tort, Financial Times 16, 2003 WL 62023040 (Sept. 4, 2003) (referring to "a sudden rise in jury awards as well as increased risks of class action and corporate governance issues"). But there is a sense in which perceptions about class action recoveries are correct. The amounts plaintiffs recover in class action cases far exceed, on average, recoveries in other cases, even those that reach trial. For example, the median

48     *Attorney Fees in Class Action Settlements*

Figure 1:   Time trends in recoveries, 1993–2002.



SOURCES:  Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

*B. Fee Awards*

We first discuss fee-award levels separately in relation to four major influences: legal regime (fee shifting or not), case category, client recovery level, and time. We then assess the influence of these and other factors in regression models.

award in state-court tried tort cases in 1996 was $31,000. Bureau of Justice Statistics, U.S. Dep't of Justice, Bulletin No. NCJ-179769, Tort Trials and Verdicts in Large Counties, 1996, at 6 (Aug. 2000). Comparing recoveries per plaintiff could be done using the number of class members.

*Eisenberg and Miller*    49

Figure 2:   Distribution of attorney fee awards, 1993–2002, by fee-shifting status.



NOTE: Kernel density estimates.
SOURCE: Reported class action settlements with fee awards.

1. Legal Regime, Case Category, and Fee Method

Preliminary examination of fee awards shows substantial heterogeneity in the fee award based on whether the case involved a fee-shifting statute. Figure 2, which shows the distributions of fee-award percents, shows that the two kinds of fee awards differ. Non-fee-shifting cases result in a relative paucity of awards above 35 percent of the client recovery. Fee-shifting cases have a much wider distribution of awards. Two factors explain this difference. First, because fees in common fund cases are often awarded under the percentage-of-recovery method, the highest permissible percentage award sets a ceiling. In fee-shifting cases, fees are usually calculated under the lodestar method, which is not dependent in any formal sense on the amount of class recovery.[44] Thus one would expect a wider range of fees in fee-

---

[44]The lodestar method of computing fees has been the dominant method in federal statutory fee-shifting cases since 1984. See Gisbrecht v. Barnhart, 535 U.S. 789, 801 (2002).

shifting than in percentage cases.[45] Second, recoveries tend to be lower in
fee-shifting cases than in percentage cases, thus justifying a higher fee as a
percent of the recovery in light of scale dis-economies.

Table 1 summarizes fees as a percent of recoveries by fee-shifting status
and case category for our published opinion data in Panel A and by case
category for the *CAR* data in Panel B.[46] Panel A's "Total" row confirms the
substantial differences between *fee-shifting* and *non-fee-shifting* cases and
the greater dispersion of fees in fee-shifting cases shown in Figure 2. The
table also breaks down the case categories in which counsel fees are awarded
in class action and derivative cases. Securities law class actions tend to dom-
inate, comprising over 40 percent of the non-fee-shifting cases and 39
percent of all cases, and an even greater proportion of the *CAR* data. But
other categories, including antitrust and consumer cases, contribute a sub-
stantial number of cases. Securities cases also tend to have higher fee-award
percents, though not the highest. The median securities case fee percent is
25.0 percent in our data compared to 20.0 percent for nonsecurities, non-
fee-shifting cases, a highly statistically significant difference ($p = 0.0002$). We
defer trying to interpret this difference until controlling for other factors in
the regression models below. For now, it is worth noting that in non-fee-
shifting cases, the axiomatic one-third fee is inaccurate; a fee of 20 to 25
percent of the recovery better describes reality.

Descriptive statistics about the fee percent awarded, now broken down
by the court's method of computing fees, appear in Table 2. Consistent with
Table 1, Table 2 shows higher percentage awards in fee-shifting cases. It also
shows that the lodestar method differs in its effect depending on the degree
to which it dominates. In non-fee-shifting cases, the pure percent method
and the mixed method, in which both percent and lodestar play a role, yield
quite similar fee percents. This pattern holds for both the published opinion
data and for the *CAR* data, which do not differentiate between pure lodestar

[45]This is not a complete explanation: fees in some common fund cases are awarded on a pure
lodestar basis, which would not be subject to any theoretical percentage ceiling, while fees in
some fee-shifting cases are determined under the percentage method when counsel seeks an
award from the common fund rather than under the fee-shifting rule. The distinction holds
true, however, in the vast majority of cases.

[46]We included in the category of "Consumer" cases brought under the Fair Debt Collection
Practices Act. Products liability cases are included in the Tort category. Shareholder derivative
actions are included in the Corporate category.

*Eisenberg and Miller*   **51**

Table 1:   Fee-Award Percent Summary by Legal Regime and Case Category

| Category | Non-Fee-Shifting Cases | | | | Fee-Shifting Cases | | | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | SD | N | Mean | Median | SD | N |
| **A. Published Opinion Data, 1993–2002** | | | | | | | | |
| Antitrust | 21.4 | 23.3 | 9.9 | 36 | — | — | — | — |
| Civil rights | 37.0 | 37.0 | 1.4 | 2 | 26.1 | 31.3 | 17.3 | 7 |
| Consumer | 16.2 | 13.0 | 10.6 | 52 | 55.2 | 51.8 | 20.2 | 18 |
| Corporate | 20.4 | 20.0 | 11.5 | 15 | — | — | — | — |
| Employment | 25.3 | 23.4 | 9.6 | 7 | 37.5 | 31.8 | 21.7 | 16 |
| ERISA/pension | 22.0 | 24.0 | 7.8 | 7 | 24.4 | 16.2 | 26.4 | 15 |
| Mass tort | 18.3 | 18.7 | 7.0 | 7 | — | — | — | — |
| Securities | 24.1 | 25.0 | 8.9 | 142 | — | — | — | — |
| Tax refund | 13.1 | 11.5 | 9.7 | 6 | — | — | — | — |
| Tort | 17.9 | 19.6 | 9.2 | 10 | — | — | — | — |
| Other | 24.8 | 27.5 | 8.1 | 19 | 22.5 | 23.0 | 20.4 | 3 |
| Total | 21.9 | 23.2 | 9.9 | 303 | 37.5 | 33.0 | 25.9 | 59 |
| **B. Class Action Reports Data (*CAR*), 1993–2002** | | | | | | | | |
| Antitrust | 26.8 | 28.4 | 7.1 | 31 | — | — | — | — |
| Consumer | 24.3 | 25.0 | 8.5 | 48 | — | — | — | — |
| Civil rights | 23.5 | 25.5 | 11.0 | 4 | — | — | — | — |
| Derivative | 33.3 | 33.3 | — | 1 | — | — | — | — |
| Employment | 25.5 | 25.7 | 7.6 | 17 | — | — | — | — |
| Environmental | 30.5 | 30.5 | 7.8 | 2 | — | — | — | — |
| Government regulation | 29.7 | 29.7 | — | 1 | — | — | — | — |
| Labor/wage/pension | 22.9 | 26.4 | 10.6 | 30 | — | — | — | — |
| Mass tort | 17.6 | 17.0 | 6.9 | 8 | — | — | — | — |
| Securities | 27.9 | 30.0 | 7.4 | 483 | — | — | — | — |
| Taxpayer | 3.5 | 3.5 | — | 1 | — | — | — | — |
| Utilities | 20.3 | 20.3 | 1.7 | 2 | — | — | — | — |
| Social welfare/entitlements | 16.9 | 16.9 | 4.4 | 2 | — | — | — | — |
| Total | 27.0 | 30.0 | 7.9 | 630 | — | — | — | — |

NOTE: Fee shifting and non-fee-shifting are the two legal regimes for the published opinion data. The *CAR* data include only common fund cases. The first column identifies the case categories, which differ between the two data sets.

SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

cases and mixed cases. But the more finely tuned coding in the published opinion data indicate that the pure lodestar method tends to reduce the fee percent. The pattern shifts in fee-shifting cases. Now the pure lodestar method tends to increase awards compared to the other methods (which may be employed in the settlement context). We again defer reaching conclusions until we control for other factors in the regression models.

Table 2:   Fee-Award Percent Summary by Fee Method and Legal Regime

| | Non-Fee-Shifting Cases | | | | Fee-Shifting Cases | | | |
|---|---|---|---|---|---|---|---|---|
| Fee Method | Mean | Median | SD | N | Mean | Median | SD | N |
| **A. Published Opinion Data, 1993–2002** | | | | | | | | |
| Percent | 22.3 | 24.0 | 9.9 | 197 | 26.7 | 30.0 | 14.1 | 17 |
| Mixed percent/lodestar | 22.9 | 25.0 | 9.0 | 68 | 24.3 | 23.0 | 10.8 | 9 |
| Pure lodestar | 17.2 | 16.5 | 10.5 | 38 | 46.6 | 50.1 | 28.4 | 33 |
| **B. Class Action Reports Data (*CAR*), 1993–2002** | | | | | | | | |
| Percent | 27.5 | 30.0 | 7.5 | 370 | — | — | — | — |
| Lodestar | 26.3 | 29.6 | 8.4 | 260 | — | — | — | — |

NOTE: Fee shifting and non-fee-shifting are the two legal regimes for the published opinion data. The *CAR* data include only common fund cases and do not include a variable distinguishing fee-shifting from non-fee-shifting cases. The first column identifies the fee methods. The *CAR* data do not contain a separate "Mixed percent/lodestar" method category. Their *percent* method cases are likely dominated by what we code as percent cases in the opinion data. Panel A shows the numerical dominance of this category over the mixed category in the published opinion data.

SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

## 2.  Client Recovery Level and Fee Award

*Figure 3* shows the strong correlation between the fee amount and the client recovery. Each small circle represents a case's fee amount and client recovery in the published opinion data.[47] As the client recovery increases, so does the fee. This is not in itself particularly noteworthy. The surprising feature of the pattern is how tight the relation is. To the extent cases depart from the pattern, they tend to do so by having low fee amounts. That is, the data points most distant from the central pattern tend to lie below, not above, the pattern.

In addition to the scatter plot of individual award-recovery points, Figure 3 contains three lines. Each line represents the best-fitting regression line for a set of data. The solid line represents the best-fitting regression line for non-fee-shifting cases in our reported cases data. The line represented by long dashes represents the best-fitting regression line for fee-shifting cases in our reported cases data. The line represented by the short dashes represents the best-fitting regression line for the *CAR* data. These one-variable regression models are impressive for all three data sets. The model explains 89 percent of the variance in non-fee-shifting reported cases and 90 percent

---

[47]A scatter plot of the *CAR* data looks virtually identical in pattern to Figure 3.

*Eisenberg and Miller*    *53*

Figure 3:   Fee amount versus recovery, 1993–2002.



Legend

| | |
|---|---|
| ○ | Fee award, reported cases |
| —— | *Fitted values non-fee-shifting, reported cases* |
| – – – | Fitted values fee-shifting, reported cases |
| ···· | Fitted values, *CAR* data |

SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

of the variance in fee-shifting reported cases.[48] For the *CAR* data, the model explains 94 percent of the variance. Also *reasonably impressive is the similarity of the* fee-shifting and non-fee-shifting regression lines (slopes of 0.83 for non-fee-shifting cases and 0.74 for fee-shifting cases) and the *CAR* data line (slope of 0.90). No obvious theoretical reason exists to predict this close fit between the results in the fee-shifting and non-fee-shifting regimes. The fact that fees across the two regimes (and the *CAR* data) vary so similarly with recovery suggests that courts may be engaging in an intuitive approach that awards fees in log-linear *relation to class recovery regardless* of the formal methodology being used to calculate the fee.[49]

---

[48]Although the figure's lines are similar, they do differ at statistically significant levels. A Chow test of whether the coefficient on the client recovery variable is the same in the two samples yields $p = 0.0049$. The fee-shifting cases start with a higher intercept but then have a relatively flatter slope than the non-fee-shifting cases.

[49]The different distributions of the fee percents in fee-shifting and non-fee-shifting cases shown in Figure 2, and their similarity in relation to awards in Figure 3, raise the question of where the Figure 2 differences arise. The differences are largest for the smaller client recoveries that

Figure 4:   Fee percent versus recovery, 1993–2002.



SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

The relation between the fee percent (in contrast to the fee amount) and client recovery is also of interest. Figure 4 explores this relation. Like Figure 3, the figure combines a scatter plot of individual reported opinion cases with separate best-fitting regression lines for fee-shifting and non-fee-shifting reported cases, and the *CAR* data. In addition, the figure separately identifies fee-shifting reported cases, designated with an "f," and non-fee-shifting reported cases, designated with an "n."

Two major points emerge from the figure. First, all three data sets reveal a scale effect. As client recovery increases, the fee percent decreases. The regression lines, which differ in slope and intercept ($p < 0.0001$), nevertheless share a substantially negative correlation with the size of the client's recovery. The simple regression models explain substantially less of the fee percent than they did of the fee level. In non-fee-shifting cases, the model

are more common in fee-shifting cases, which generate the high percentage fees. If one limits the fee-shifting cases to those with recoveries in excess of $2 million, the slope on the fee-shifting regression line is 0.82, just about the same as the slope for the non-fee-shifting reported cases.

explains 25 percent of the variance, in fee-shifting cases, it explains 57 percent of the variance, and in the *CAR* data it explains 15 percent of the variance.[50] Second, fee-shifting cases dominate in the upper-left quadrant of the figure—corresponding to low-recovery, high-fee percent cases. They are scarce in the high-client-recovery range of cases.

### 3. Fee Percentage and Lodestar Multiplier

As noted above, judges frequently use the lodestar amount as a check for reasonableness even when they set the fee by the percentage method. Courts may be unwilling to award high percentage fees when doing so would result in attorney compensation far exceeding the lodestar amount, and conversely may be willing to award higher-than-normal percentage fees when the fee calculated by the percentage method would fall significantly below the lodestar. Thus, if the lodestar check is effective, we would expect to see a strong negative correlation between the lodestar multiplier (fee award divided by lodestar amount) and the fee as a percentage of the recovery.

Figure 5 shows a scatter plot of the relation between lodestar multipliers and percentage fees in the reported opinion data set, as well as the best-fitting regression lines. We limit these cases to those in which the multiplier is present and not equal to one. As can be seen, the prediction of a negative correlation is confirmed. Using only the multiplier (log) to explain the fee percent explains 10 percent of the variance in non-fee-shifting cases, 34 percent of the variance in fee-shifting cases, and 4 percent of the variance in the *CAR* data.

### 4. Time Trends for Fees

The hypothesis that attorney fees are increasing over time finds little support in our data. Figure 6 shows the essential facts. Neither the mean nor the median level of fee awards has increased over time, either for non-fee-shifting, fee-shifting, or *CAR* cases—a result largely confirmed by the regressions reported below. In one sense, this should come as no surprise. The fee level is fundamentally linked to the client's recovery. Since client recoveries have not increased over time, fee awards should not have been expected to increase. In another sense the result is intriguing. No real-dollar increase in the level of fee awards in major cases over the course of a decade is not

---

[50]The simple regression models used here for pictorial purposes are not entirely appropriate, given the skewed nature of the dependent variable. We report more appropriate models below.

56     *Attorney Fees in Class Action Settlements*

Figure 5:   Fee percent versus multiplier, 1993–2002.



Legend

f = fee-shifting reported case;   n = non-fee-shifting reported case
——— Fitted values non-fee-shifting, reported cases
– – – Fitted values fee-shifting, reported cases
········ Fitted values, *CAR* data

SOURCES:  Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

the sort of fact we are accustomed to hearing. Impressions of fees as ever-increasing need greater empirical support than has been offered to date.

The figure does reveal an occasional peak, such as the one in the mean non-fee-shifting awards in 2000. As one might expect, most of the spike is the product of a few awards—in this case two very large fee awards, over $200 million, on recoveries of about $3.6 billion and $700 million. But the pattern of mean fee awards quickly returned to historical levels in 2001 and 2002. In fee-shifting cases, conclusions in any direction should be more tentative. As Table 2 shows, the data include only about six awards per year, on average, so both the mean and median are based on thin data. Indeed, we exclude 1993 from the fee-shifting lines in the graph because only one (high) award is in the database.

In the interest of complete reporting, we do find bits of evidence, reported in Figure 7, suggesting that fee awards as a percentage of recovery increased over time. Figure 7 shows a slight upward slope over time for the median fee percent in fee-shifting cases and a similar upward trend for the mean fee percent in non-fee-shifting cases. But the model of fee percent for fee-shifting cases in Table 4 shows no such time effect. A median regression

Figure 6:    Class action attorney fee awards over time.



SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

model for the fee-shifting cases also failed to detect an increasing time trend. And the *CAR* data on fee percents, also reported in Figure 7, show no such time trend.

### 5. Regression Models; Other Factors

We explore the relation to fee awards of the above and other factors in regression models. Table 3 contains descriptive statistics for each factor in the published opinion data. Dollar amounts are in inflation-adjusted 2002 dollars. We then combine the factors discussed so far and the other variables motivated by Part III's hypotheses to model the fee level and fee percent.

*58     Attorney Fees in Class Action Settlements*

Figure 7:   Fee percents over time.



SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

Table 4 reports the results of models of the fee as a percent of client recovery and of the fee amount itself. Given the differences in the award distributions of fee-shifting and non-fee-shifting cases, we report separate models for the two legal regimes, supplemented by models for the *CAR* data.

*Client Recovery; Lodestar.* Regression analysis generates several interesting results. The most salient observation, confirming Figure 3, is that the overwhelming determinant of fee is the amount of the recovery for the class. In all models with "Gross recovery" as an explanatory variable, this variable is highly statistically significant in explaining either the fee amount or the fee as a percent of the client's recovery.

Table 3:   Descriptive Statistics by Legal Regime and Relation to Fee Award

| Variable | Mean | Median | SD | Mean Fee Percent With/Without Characteristic | Correlation with Fee Percent/Fee Level | Significance of Relation to Fee Percent | Significance of Relation to Fee Level | N |
|---|---|---|---|---|---|---|---|---|
| A. Fee-Shifting Cases | | | | | | | | |
| Gross recovery (thousands) | 22,958.99 | 1305.89 | 72,051.55 | — | -0.374/0.577 | 0.004 | 0.000 | 59 |
| Gross recovery (log) | 6.13 | 6.12 | 1.15 | — | -0.770/0.947 | 0.000 | 0.000 | 59 |
| Lodestar (log) | 5.56 | 5.41 | 0.70 | — | -0.517/0.951 | 0.000 | 0.000 | 42 |
| Multiplier (log) | 0.00 | 0.00 | 0.51 | — | -0.462/0.667 | 0.002 | 0.000 | 43 |
| Age of case (log years) | 1.21 | 1.39 | 0.79 | — | -0.432/0.493 | 0.001 | 0.000 | 57 |
| Year | 1999.58 | 2000.00 | 2.50 | — | 0.187/-0.337 | 0.156 | 0.004 | 59 |
| Appellate case | 0.12 | 0.00 | 0.33 | 33.2/37.9 | — | 0.663 | 0.013 | 59 |
| Defendant paid | 0.70 | 1.00 | 0.46 | 43.4/27.5 | — | 0.036 | 0.089 | 59 |
| Federal case | 0.89 | 1.00 | 0.31 | 37.9/51.7 | — | 0.673 | 0.139 | 59 |
| High-risk case | 0.16 | 0.00 | 0.37 | 27.9/39.4 | — | 0.258 | 0.023 | 59 |
| Low-risk case | 0.07 | 0.00 | 0.25 | 53.1/36.0 | — | 0.165 | 0.069 | 59 |
| Objector | 0.20 | 0.00 | 0.40 | 16.3/42.3 | — | 0.001 | 0.001 | 59 |
| Mixed percent/lodestar | 0.12 | 0.00 | 0.33 | 24.3/39.9 | — | 0.119 | 0.158 | 59 |
| Pure lodestar approach | 0.59 | 1.00 | 0.49 | 46.6/25.9 | — | 0.008 | 0.046 | 59 |
| No multiplier | 0.29 | 0.00 | 0.46 | 29.8/40.3 | — | 0.268 | 0.644 | 59 |
| Noninculded soft relief | 0.01 | 0.00 | 0.11 | 3.5/38.1 | — | 0.127 | 0.301 | 39 |
| Included soft relief | 0.17 | 0.00 | 0.38 | 33.6/38.5 | — | 0.778 | 0.460 | 59 |
| Settlement class | 0.24 | 0.00 | 0.43 | 34.0/39.2 | — | 0.559 | 0.231 | 58 |

60        *Attorney Fees in Class Action Settlements*

Table 3:   Continued

| Variable | Mean | Median | SD | Mean Fee Percent With/Without Characteristic | Correlation with Fee Percent/Fee Level | Significance of Relation to Fee Percent | Significance of Relation to Fee Level | N |
|---|---|---|---|---|---|---|---|---|
| **B. Non-Fee-Shifting Cases** | | | | | | | | |
| Gross recovery (thousands) | 115,469.44 | 15,000.00 | 444,929.26 | — | -0.324/0.497 | 0.000 | 0.000 | 303 |
| Gross recovery (log) | 7.20 | 7.18 | 0.82 | — | -0.510/0.943 | 0.000 | 0.000 | 303 |
| Lodestar (log) | 6.27 | 6.32 | 0.61 | — | -0.030/0.921 | 0.690 | 0.000 | 179 |
| Multiplier (log) | 0.42 | 0.41 | 0.61 | — | -0.293/0.477 | 0.000 | 0.000 | 179 |
| Age of case (log years) | 1.05 | 1.10 | 0.63 | — | 0.146/0.135 | 0.012 | 0.016 | 293 |
| Year | 1997.79 | 1998.00 | 2.99 | — | -0.018/0.073 | 0.761 | 0.176 | 303 |
| Appellate case | 0.16 | 0.00 | 0.37 | 21.2/21.9 | — | 0.304 | 0.704 | 303 |
| Defendant paid | 0.18 | 0.00 | 0.39 | 11.8/23.5 | — | 0.000 | 0.502 | 303 |
| Federal case | 0.77 | 1.00 | 0.42 | 22.4/18.8 | — | 0.024 | 0.027 | 303 |
| High-risk case | 0.19 | 0.00 | 0.39 | 25.0/20.9 | — | 0.001 | 0.000 | 303 |
| Low-risk case | 0.13 | 0.00 | 0.34 | 15.2/23.0 | — | 0.000 | 0.336 | 303 |
| Objector | 0.36 | 0.00 | 0.48 | 19.4/23.4 | — | 0.000 | 0.000 | 303 |
| Mixed lodestar/percent | 0.18 | 0.00 | 0.39 | 22.9/21.5 | — | 0.201 | 0.043 | 303 |
| Pure lodestar approach | 0.13 | 0.00 | 0.33 | 17.5/22.4 | — | 0.004 | 0.055 | 303 |
| No multiplier | 0.48 | 0.00 | 0.50 | 22.3/21.5 | — | 0.341 | 0.163 | 303 |
| Beneficial soft relief | 0.12 | 0.00 | 0.33 | 17.2/22.6 | — | 0.001 | 0.065 | 303 |
| Questionable soft relief | 0.07 | 0.00 | 0.26 | 20.7/21.9 | — | 0.719 | 0.505 | 303 |
| Settlement class | 0.34 | 0.00 | 0.48 | 20.4/22.6 | — | 0.053 | 0.831 | 294 |

SOURCE: Reported class actions with fee awards, 1993–2002. Significance levels are *p*-values.

Table 4:  Regression Models of Fee Percent and Fee Amount

| | Published Opinions, No-Fee Shifting Dependent Variable = | | | | Published Opinions, Fee Shifting Dependent Variable = | | | | Class Action Reports Dependent Variable = | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fee Amount | | Fee Percent | | Fee Amount | | | Fee Percent | Fee Percent | Fee Amount | | Fee Percent |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| Gross recovery (log) | 0.839** (49.33) | 0.859** (38.38) | -0.711** (10.70) | | 0.763** (11.29) | | 0.751** (9.04) | -1.400** (3.87) | | 0.895** (73.06) | 0.898** (53.54) | -0.530** (9.99) |
| Lodestar amount (log) | | 1.050** (29.47) | | | | 0.997** (10.61) | | | | 1.194** (26.67) | | |
| Lodestar dummy | -0.038 (1.43) | | | -0.160 (1.48) | 0.023 (0.25) | | | 0.426 (0.77) | -0.050** (3.67) | | | -0.222** (3.40) |
| Defendant pays | -0.226** (4.13) | 0.067 (0.88) | -0.233** (2.99) | -0.805** (4.60) | 0.009 (0.12) | 0.087 (0.88) | 0.076 (0.81) | 0.266 (0.63) | | | | |
| Age (log years) | 0.051* (2.10) | -0.080* (1.99) | 0.022 (0.55) | 0.208* (2.16) | -0.064 (1.42) | -0.051 (0.79) | -0.084* (1.83) | -0.562+ (1.83) | 0.046** (3.58) | | | 0.254** (4.09) |
| Appellate opinion | -0.023 (0.44) | 0.017 (0.26) | -0.090 (1.13) | 0.009 (0.05) | 0.333* (2.55) | 0.159 (1.23) | 0.380* (2.19) | 2.158* (2.42) | | -0.142** (2.97) | 0.050 (1.41) | |
| Federal case dummy | 0.120* (2.28) | 0.071 (1.01) | 0.078 (0.87) | 0.539* (2.33) | 0.063 (0.47) | -0.033 (0.31) | -0.001 (0.01) | 0.446 (0.52) | | | | |
| High-risk case dummy | 0.113** (3.58) | 0.081 (1.55) | 0.082* (2.13) | 0.529** (3.80) | 0.172+ (1.91) | 0.221 (1.67) | 0.192 (1.61) | 0.814+ (1.69) | | | | |
| Low-risk case dummy | -0.134** (3.46) | -0.066 (1.21) | -0.109* (2.18) | -0.616** (4.06) | -0.009 (0.10) | -0.077 (0.58) | -0.059 (0.30) | -0.364 (0.54) | | | | |

Table 4:  Continued

| | Published Opinions, No Fee Shifting Dependent Variable = | | | | Published Opinions, Fee Shifting Dependent Variable = | | | | Class Action Reports Dependent Variable = | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fee Amount | | Fee Percent | | Fee Amount | | | Fee Percent | Fee Amount | | | Fee Percent |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| Objector dummy | -0.031 (0.91) | 0.032 (0.73) | 0.010 (0.20) | -0.132 (0.94) | 0.053 (0.38) | 0.408* (2.47) | 0.053 (0.31) | 0.577 (0.72) | | | | |
| Nonincluded soft relief | 0.009 (0.21) | 0.021 (0.40) | -0.033 (0.51) | -0.079 (0.47) | -0.238 (1.17) | 0.173 (0.94) | -0.216 (0.80) | -0.639 (0.66) | | | | |
| Included soft relief | -0.022 (0.37) | 0.072 (0.94) | 0.063 (0.83) | 0.077 (0.34) | 0.060 (0.89) | -0.021 (0.19) | 0.073 (0.95) | 0.042 (0.10) | | | | |
| Settlement class | -0.005 (0.15) | 0.016 (0.35) | 0.024 (0.57) | -0.044 (0.33) | -0.148 (1.63) | -0.140 (0.94) | -0.171 (1.35) | -0.618 (1.14) | | | | |
| Year | 0.008 (0.70) | -0.008 (0.93) | 0.013* (2.36) | 0.019 (0.98) | -0.009 (0.67) | -0.010 (0.67) | -0.015 (0.71) | -0.032 (0.41) | 0.002 (1.21) | 0.006 (0.70) | 0.005 (0.74) | 0.014 (1.39) |
| Constant | -6,211 (0.67) | 15,035 (0.92) | 25.905* (2.34) | -28.514 (0.74) | 18.618 (0.71) | 20.933 (0.67) | 30.028 (0.73) | 77.321 (0.56) | -4.837 (1.18) | -13.089 (0.75) | -10.119 (0.74) | -19.159 (0.95) |
| Observations | 288 | 175 | 175 | 288 | 56 | 41 | 41 | 56 | 626 | 130 | 130 | 626 |
| Adj. $R^2$ | 0.92 | 0.87 | 0.91 | 0.49 | 0.95 | 0.95 | 0.94 | 0.65 | 0.94 | 0.86 | 0.93 | 0.25 |
| Root MSE | 0.20 | 0.24 | 0.21 | 0.85 | 0.21 | 0.21 | 0.22 | 1.24 | 0.15 | 0.26 | 0.19 | 0.73 |

Robust $t$ statistics in parentheses.

+ significant at 10%; *significant at 5%; **significant at 1%.

NOTE: Dependent variables are fee percent, fee amount, transformed to square roots, and fee amount, transformed to logs. For the published opinion data, the sample is divided into fee-shifting and nonfee-shifting cases, dummy variables for case categories are in the models but are not reported. A joint test of their significance in the published opinion data fails to reject the null hypothesis. They are highly significant in the CAR data. Variables not in the CAR models are not readily available in the CAR data. Root MSE is root mean squared error.

SOURCES: Reported class actions with fee awards, 1993–2002; 24 Class Action Rep. 169.

This is not a surprising result for common fund cases, given that fees in many such cases are determined as a percent of the class recovery. Gross recovery for the class is also highly significant, however, for fee-shifting cases, notwithstanding the fact that, in theory at least, court-awarded fees in such cases are not a function of the amount of class recovery. As Figure 3 shows, log scales reveal a positive linear relationship between fees and recovery in our data set of decided cases for both common fund and fee-shifting cases, as well as for the *CAR* data.

Focusing on a subset of the data—those cases with a computable lodestar amount reported—suggests that, in comparison to the client recovery, the lodestar fares poorly as a cost-effective way of calculating the fee, especially in non-fee-shifting cases. This conclusion emerges from comparing the second and third models for each of the three data sets—Models 2 and 3, 6 and 7, and 10 and 11. These models, by necessity, are limited to the subset of cases in which a lodestar award can be calculated[51] because we cannot test the lodestar calculation without information to compute the lodestar. We compare the ability of the client recovery variable to explain the fee with the ability of the lodestar calculation variable to explain the fee.

Consider first Models 2 and 3, those for non-fee-shifting cases. Table 3 shows that the lodestar-based Model 2 explains 87 percent of the variance in the fee award whereas the client-recovery-based Model 3 explains 91 percent of the variance. The client recovery model also has a lower root mean squared error. On both grounds it is preferable to the lodestar model. Yet it requires less effort to produce a client-recovery-based fee than a lodestar fee since the lodestar requires judicial scrutiny of hours and determination of hourly rates. The pattern is similar in the subset of the *CAR* data that allows computation of the lodestar. The client recovery Model 11 explains more variance with lower error than the lodestar Model 10. Only in the fee-shifting case data does the lodestar enjoy an advantage, but the advantage in both the percent of variance explained and the error seems trivial compared to the cost of computing the lodestar. And in the models that use fee percent as the dependent variable, client recovery models far outperform lodestar models. So whatever minor difference in fee the lodestar may yield in fee-shifting cases, it is hard to justify its time and expense in non-fee-shifting cases.

----

[51]For the *CAR* data, the lodestar amount is calculated by multiplying the hours awarded times the lodestar hourly rate.

In the models of fee percent, Models 4, 8, and 12, the negative, significant coefficient on gross recovery[52] is worth highlighting. This scale effect—fee percent decreases as client recovery increases—provides empirical support for the normative justification underlying class actions. By aggregating smaller claims into a single larger action, economies of scale in legal services are achieved, which can be passed onto class members in the form of enhanced recoveries. Reform efforts that might undermine class actions should consider this efficiency.

The results for the lodestar dummy variable confirm the story suggested by Table 2. The lodestar method is associated with lower fees in non-fee-shifting cases and with higher fees in fee-shifting cases. The size of the coefficient is similar in the non-fee-shifting opinion models and the *CAR* data models. It is likely more significant in the *CAR* data because of that sample's larger number of cases. In addition, when we refine the samples down to a more common set of cases—securities cases in Table 5—the lodestar dummy variable behaves similarly in our data and in the *CAR* data.

At the same time, in models not reported here, we found no significance in the lodestar multiplier as an explanatory variable when added to the client-recovery-based model. We added this variable to Models 1, 4, 5, 8, 9, and 12, and one cannot reject the hypothesis that its coefficient is zero.[53] This is despite frequent judicial statements that the lodestar should be used to check the reasonableness of the fee awarded by the percentage method. The principal determinant of the fees awarded in class actions is the size of the class recovery, not the lodestar or lodestar multiplier.

*Complexity.* We expected a case's age to serve as a proxy for case complexity or attorney effort. In either case, it should be associated with increased fee awards. Table 3 presents mixed evidence about this hypothesis. Most of the nine models that use the client recovery as explanatory

---

[52]We constructed the same models using net recovery rather than gross recovery as the key explanatory variable. No material change in results was observed.

[53]In models that limit the sample to cases reporting a lodestar and a multiplier, and that use the lodestar as an explanatory variable, the multiplier is significant. But these cases are in fact calculating the award by multiplying the lodestar. Since the multiplier is an after-the-fact adjustment to settle on a fee, the explanatory power of models using the lodestar and multiplier in lodestar cases is tautologous. These models have $R^2$ in excess of 0.99. Our question is whether one can explain the fee award *without* use of the after-the-fact multiplier.

In general, due to the smaller number of fee-shifting cases, results for these cases should be regarded as more tentative than results for non-fee-shifting cases.

variables show a significant association between case age and both fee amount and fee percent. But the association is positive in the non-fee-shifting and *CAR* common fund cases and negative in the fee-shifting cases.

The non-fee-shifting and *CAR* results square well with intuition. The fee-shifting result, even though only marginally significant, is somewhat mysterious, indicating that courts award lower fees in fee-shifting cases as the cases age. One possible explanation is that older fee-shifting cases may tend to be larger cases that cannot be settled quickly. If so, the client recovery effect may swamp the expected increase in the lodestar fee award due to the greater number of hours required of counsel as cases age. In fact, age and client recovery are substantially correlated in fee-shifting cases (rho = 0.481; $p = 0.0001$) but not in non-fee-shifting cases (rho = 0.064; $p = 0.270$). The coefficient for the age variable is positive if one omits client recovery from the model.

The non-fee-shifting and *CAR* models, Models 2 and 9, that use the lodestar as an explanatory variable also require explanation because the age variable changes sign and is significantly negatively related to the fee recovery. This may be because the lodestar fee is based on hours and already captures the time component of the case. If, as is likely, hours increase with case age, the lodestar amount should be more highly correlated with age than the client recovery. This turns out to be true, to a modest extent. The correlation between lodestar amount and age (rho = 0.272; $p = 0.0002$) in non-fee-shifting cases is stronger than the correlation between client recovery and age (rho = 0.064; $p = 0.270$). This stronger relation between lodestar amount and age persists in the *CAR* data (rho = 0.363; $p < 0.0001$). The coefficient for the age variable is positive if one omits the lodestar amount from the model.

Another proxy for complexity is the presence of an appellate opinion. This was not significant in the published opinion data set for non-fee-shifting cases, but was significant for fee-shifting cases. It is difficult to interpret why the results vary between these two.

*Risk.* Risk influences fee awards in the expected manner. When courts mention risk in a way that we interpret as reflecting high risk, or when we could otherwise confidently code risk as high, there is a significant association with both the fee level and the fee percent. The sign on the high-risk variable coefficient is uniformly positive. Cases we interpret as being low risk, on the other hand, are associated with lower fees. The low-risk variable coefficient is always negative in both fee-shifting and non-fee-shifting cases. The

significance of the risk effects varies in non-fee-shifting and fee-shifting cases. In all non-fee-shifting models, a test of the hypothesis that the high- and low-risk variable coefficients are equal can be rejected at or beyond the 0.03 level. In the fee-shifting cases, the magnitude of the high-risk case effect is larger, as evidenced by the larger coefficients, but the test of the hypothesis that the two risk variables have equal coefficients can be rejected only at the 0.10 to 0.16 levels, depending on the particular model. The smaller fee-shifting sample may explain the less significant results.[54]

*Defendant Pays.* In non-fee-shifting cases, payment by defendant is associated with lower fee levels and percents, except in the seemingly inferior model using the lodestar as an explanatory variable. This result is consistent with the view that defendants exercise care to keep the fee low when they are paying it in addition to the client recovery. The absence of an effect in fee-shifting cases may be due to the fact that the defendant pays the fee in a substantial majority of fee-shifting cases.

*Objectors.* With the exception of one model, we cannot reject the hypothesis of no significant relation between the presence of an objector and the fee award. To alleviate the concern that the presence of an objector is not exogenous, we explored a simultaneous equation model in which the existence of an objection is modeled along with the fee award. The objection model included the fee award as an explanatory variable. Higher client recoveries and fee awards are significantly associated with the presence of an objector. For example, the median recovery in a case with an objector is $35 million; the median recovery in a case without an objector is $6.7 million. But the core objector-related result in Table 4 survived. We could not reject the hypothesis of no change in fee award in the presence of an objector.

---

[54]This high-risk result should be reconciled with Table 3's descriptive statistics. The table indicates that, in fee-shifting cases, high risk is present in 16 percent of 59 cases. The presence of high risk is significantly associated with a lower fee percent, an initially strange result. The mean fee percent is 27.9 in high-risk cases compared to 39.4 in other cases. But this is an artifact of high-risk cases tending to have greater stakes. As the stakes increase, the scaling effect kicks in and drives the fee percent down. The median inflation-adjusted gross recovery in high-risk, fee-shifting cases is $4.6 million compared to a median of $492,000 in non-high-risk cases. As Table 4 shows, once one controls for size of recovery, high risk is associated with a higher percent fee, even in fee-shifting cases. A risk variable is not available in the *CAR* data.

*Settlement Classes.* We could not reject the null hypothesis as to the presence of a settlement class in non-fee-shifting cases. This result casts some doubt on the common perception that settlement classes are suspect because they can be vehicles for collusion between defendant and class counsel. It remains possible, however, that counsel do receive above-normal returns for their efforts in settlement classes because such classes tend to settle early and therefore may represent above-average hourly remuneration for counsel even if the fee as a percentage of the recovery is within ordinary limits. But the Table 4 models using the lodestar as explanatory variables also fail to reveal a settlement class effect.

*Soft Relief.* The presence of "soft" relief (such as coupons) when this was valued as part of the common fund is not statistically significant. Even though we distinguished between included and nonincluded soft relief, we find no robust soft relief effects.

*Federal Versus State Courts.* We predicted that fees as a percent of the recovery would be higher in state court class actions than in federal courts. This prediction is not confirmed by the evidence. If anything, the opposite is true. In two of the non-fee-shifting case models, being in federal court is significantly associated with higher fee levels and percents than is being in state court. In the other two models, the coefficient on the federal court dummy variable is also positive, although not significant. It might be supposed that this result is due to the impact of securities cases, almost all of which are in federal court and tend to generate fee percents above the norms for fee percentages across the universe of cases. In fact, however, the fee percents in nonsecurities cases are also higher in federal court than in state court (about 20 percent compared to 19 percent in nonsecurities, non-fee-shifting cases and 38 percent compared to 32 percent in fee-shifting cases).

*Time Trend.* The coefficient on the "Year" variable in Table 4 indicates that, in most models, we cannot reject the hypothesis of no linear time trend in either fee levels or fee percents. This result holds for both the published opinion data and the *CAR* data and is consistent with Figure 1. Model 3 is the only model with a significant and positive year effect. But this is for the subset of the data consisting of cases with a computable lodestar. A model using the subset of the data consisting of cases without a computable lodestar produces a negative coefficient for the year variable. We thus find no robust evidence of an increasing time trend in fees.

*C. Securities Cases*

Table 4's regression models provide ambiguous guidance with respect to the relation between fees and case categories. As the note accompanying the table reports, a set of case category dummy variables is not significant in the published opinion data but is highly significant in the *CAR* data. To further explore fees in homogeneous categories, we separately analyze the published opinion non-fee-shifting cases by dividing the sample into securities cases and nonsecurities cases. The *CAR* data include only common fund cases and therefore have no fee-shifting cases. A further benefit of exploring securities cases separately is that it allows us to test the effect of the PSLRA on attorney fees.

A few adjustments to Table 4's models are necessary. First, for securities cases, we eliminated the federal case dummy variable. Over 98 percent of securities class actions we found were in federal court, so the federal case dummy would provide no information of value. Second, we introduced a post-PSLRA dummy variable to divide the sample into cases subject to the PSLRA and cases that preceded it. We treated a case as subject to the PSLRA if it was decided after the PSLRA and had an age in years that assured it commenced after the PSLRA's effective date. We treated a case as not subject to the PSLRA if (1) it was decided before 1996, or (2) it was decided after 1995 and had an age in years that indicated it commenced before the PSLRA's effective date. Cases that could not be unambiguously determined to be subject to or not subject to the PSLRA were dropped. Table 5 reports the results.

Table 5 suggests that the key results in Table 3 are not a consequence of combining the large group of securities cases with other class action cases. The key relations between fee size and client recovery, and fee percent and client recovery, remain intact. The effects of the defendant paying the fee and risk and the higher fees in federal court are also consistent with Table 4's results.

The new variable introduced in Table 5, the PSLRA dummy variable, provides ambiguous guidance. It is positive and significant in the published opinion securities case data, suggesting that fees in securities cases after the PSLRA increased both in level and percent—a result that was probably not intended by the drafters of the PSLRA, which is widely viewed as a statute intended to rein in the activities and profitability of securities class action attorneys. But the same variable is negative and insignificant in the *CAR* data models. The one unambiguous result is the absence of significant evidence that the PSLRA reduced fee awards in securities cases.

Table 5: Analysis of Securities Cases and Nonsecurities Non-Fee-Shifting Cases

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| | *Securities Cases* | | *Nonsecurities Cases* | | *CAR Securities Cases* | |
| | Fee Amount | Fee Percent | Fee Amount | Fee Percent | Fee Amount | Fee Percent |
| Gross recovery (log) | 0.854** (26.00) | −0.661** (4.76) | 0.832** (37.61) | −0.757** (8.85) | 0.916** (53.43) | −0.444** (5.31) |
| Lodestar dummy | −0.064+ (1.80) | −0.353* (2.21) | −0.005 (0.10) | −0.032 (0.20) | −0.048** (3.16) | −0.227** (3.04) |
| Post-PSLRA dummy | 0.089* (2.60) | 0.465** (2.81) | −0.000 (0.01) | | −0.011 (0.72) | −0.066 (0.93) |
| Defendant pays | −0.581** (4.69) | −2.308** (4.35) | −0.196** (2.87) | −0.718** (3.33) | | |
| Age (log years) | 0.029 (0.78) | 0.132 (0.87) | 0.077* (2.05) | 0.325* (2.35) | 0.039* (2.35) | 0.233** (2.91) |
| Appellate opinion | −0.063 (0.67) | −0.120 (0.27) | −0.012 (0.20) | −0.115 (0.52) | | |
| Multiplier (log) | 0.045 (1.26) | 0.112 (0.73) | −0.059 (1.51) | −0.172 (1.22) | −0.030 (0.79) | −0.107 (0.58) |
| High-risk case dummy | 0.100** (2.76) | 0.476** (2.91) | 0.103+ (1.90) | 0.521* (2.47) | | |
| Low-risk case dummy | −0.182** (3.26) | −0.768** (3.39) | −0.095 (1.53) | −0.411+ (1.79) | | |
| Objector dummy | −0.045 (1.07) | −0.106 (0.52) | −0.013 (0.27) | −0.053 (0.29) | | |
| Nonincluded soft relief | 0.021 (0.42) | 0.044 (0.19) | −0.000 (0.00) | −0.234 (1.16) | | |
| Included soft relief | −0.150 (0.71) | −0.213 (0.31) | 0.011 (0.17) | 0.054 (0.21) | | |
| Settlement class | −0.073* (2.07) | −0.337+ (1.89) | 0.014 (0.28) | 0.035 (0.19) | | |
| Federal case dummy | | | 0.153* (2.38) | 0.599** (2.90) | | |
| Constant | 0.387+ (1.71) | 9.530** (9.88) | 0.312* (2.04) | 9.283** (15.77) | −0.013 (0.11) | 8.168** (14.57) |
| Observations | 119 | 119 | 139 | 154 | 436 | 436 |
| Adj. $R^2$ | 0.94 | 0.46 | 0.91 | 0.49 | 0.94 | 0.16 |

Robust $t$ statistics in parentheses.

+ significant at 10%; *significant at 5%; **significant at 1%.

NOTE: Dependent variables are fee percent, transformed to square roots, and fee amount, transformed to logs. For the published opinion data, the sample includes only non-fee-shifting cases. Variables not in the *CAR* models are not readily available in the *CAR* data.

SOURCES: Reported class actions with fee awards, 1993–2002; 24 *Class Action Rep.* 169.

Another difference between the published opinion data and the *CAR* data is worth noting. The sign of the gross recovery coefficient is negative in fee percent Models 2 and 6. But the *CAR* data show significantly less of a scale effect. Although fee percent decreases with increasing size of class recovery in both, the rate of decrease is lower in the *CAR* data. The principal difference between the *CAR* data and the published opinion data is that the *CAR* data include substantial numbers of unpublished opinions. Courts may be discounting percentage fees to account for size of recoveries more in published opinions than in nonpublished ones. We offer two possible reasons for this result. First, when courts give an extremely generous fee (a high percentage for a large recovery), they may not want to advertise this fact for fear of being criticized, or out of concern that the decision might stand as an undesirable precedent for future cases where generous fees are not warranted. Second, the sources that yield the *CAR* data may tend to over-report high percentage awards relative to low percentage awards. Although *CAR* does not filter data,[55] it does solicit submissions of case information.[56] Attorneys might naturally tend to submit information about their highest percentage awards. In the context of jury verdict reports, such solicitation methodology has led to upwardly biased estimates of award amounts.[57]

### D. Costs and Expenses

We also examined costs and expenses of litigation. For non-fee-shifting cases, we had usable costs and expenses and recovery data for 232 cases. For fee-shifting cases, we had usable data for 43 cases. Costs and expenses for the sample as a whole were, on average, 4 percent of the relief for the class and 16 percent of the fee. Table 6, Panels A and B, break these figures down by legal regime and case category. Table 6, Panel C shows similar figures for the *CAR* data. The median values were, respectively, 2.3 percent and 10.5 percent in our opinion data and 3.1 percent and 11.3 percent, respectively, in the *CAR* data. Costs and expenses also varied across case type and legal regime, as shown in Table 6, Panel A. The highest median costs in a case category with at least 10 cases were 5.9 percent in consumer fee-shifting

---

[55]24 Class Action Rep. at 168.

[56]Id. at first page, unnumbered.

[57]Theodore Eisenberg, Neil LaFountain, Brian Ostrom, David Rottman & Martin T. Wells, Juries, Judges, and Punitive Damages: An Empirical Study, 87 Cornell L. Rev. 743, 747 (2002).

Table 6:    Costs and Expenses by Legal Regime and Case Category

| Category | Non-Fee-Shifting Cases | | | | Fee-Shifting Cases | | | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | SD | N | Mean | Median | SD | N |
| **A. Costs as Percent of Recovery** | | | | | | | | |
| Antitrust | 2.7 | 2.1 | 2.6 | 30 | — | — | — | — |
| Civil rights | 8.4 | 8.4 | 7.2 | 2 | 4.9 | 4.3 | 4.0 | 4 |
| Consumer | 4.6 | 0.7 | 9.6 | 35 | 8.0 | 5.9 | 6.6 | 14 |
| Corporate | 2.2 | 1.4 | 2.2 | 8 | — | — | — | — |
| Employment | 2.9 | 2.8 | 3.0 | 4 | 5.3 | 2.8 | 7.4 | 12 |
| ERISA | 3.9 | 4.0 | 2.5 | 3 | 3.1 | 2.4 | 2.7 | 11 |
| Mass tort | 3.7 | 2.1 | 3.9 | 3 | — | — | — | — |
| Securities | 3.9 | 3.0 | 3.5 | 125 | — | — | — | — |
| Tax refund | 0.0 | 0.0 | — | 1 | — | — | — | — |
| Tort | 2.9 | 1.6 | 3.6 | 10 | — | — | — | — |
| Other | 2.1 | 2.2 | 1.3 | 11 | 1.6 | 1.6 | 0.3 | 2 |
| Total | 3.7 | 2.2 | 4.8 | 232 | 5.4 | 3.0 | 5.9 | 43 |
| **B. Costs as Percent of Fee Award** | | | | | | | | |
| Antitrust | 15.9 | 10.0 | 20.8 | 31 | — | — | — | — |
| Civil rights | 19.6 | 12.7 | 15.6 | 3 | 22.2 | 21.5 | 19.4 | 8 |
| Consumer | 26.8 | 4.7 | 53.8 | 38 | 16.8 | 9.1 | 19.3 | 15 |
| Corporate | 7.5 | 7.5 | 4.8 | 11 | — | — | — | — |
| Employment | 11.6 | 10.4 | 11.3 | 4 | 14.7 | 6.8 | 14.8 | 12 |
| ERISA | 14.4 | 16.6 | 6.1 | 4 | 12.1 | 6.8 | 10.6 | 11 |
| Mass tort | 23.3 | 20.0 | 18.7 | 3 | — | — | — | — |
| Securities | 15.9 | 13.0 | 12.5 | 136 | — | — | — | — |
| Tax refund | 1.1 | 1.1 | — | 1 | — | — | — | — |
| Tort | 14.2 | 15.0 | 11.4 | 11 | — | — | — | — |
| Other | 7.0 | 7.0 | 4.0 | 12 | 5.9 | 5.8 | 2.9 | 4 |
| Total | 16.7 | 10.7 | 24.5 | 254 | 15.3 | 8.0 | 15.8 | 50 |

C. Class Action Reports Data (*CAR*), 1993–2002

| | Costs as Percent of Recovery | | | | Costs as Percent of Fee | | | |
|---|---|---|---|---|---|---|---|---|
| Antitrust | 2.8 | 2.0 | 2.8 | 28 | 10.3 | 7.7 | 10.1 | 28 |
| Consumer | 2.9 | 1.0 | 5.0 | 36 | 14.3 | 4.1 | 26.3 | 36 |
| Civil rights | 4.2 | 2.4 | 4.4 | 4 | 18.2 | 17.6 | 12.6 | 4 |
| Derivative | — | — | — | — | — | — | — | — |
| Employment | 3.3 | 1.5 | 4.0 | 8 | 11.9 | 6.5 | 11.3 | 8 |
| Environmental | 6.8 | 6.8 | 8.0 | 2 | 19.4 | 19.4 | 21.2 | 2 |
| Government regulation | 5.7 | 5.7 | — | 1 | 19.3 | 19.3 | — | 1 |
| Labor/wage/pension | 1.7 | 0.9 | 1.7 | 28 | 7.8 | 5.3 | 6.8 | 28 |
| Mass tort | 3.9 | 3.4 | 3.4 | 8 | 21.2 | 15.0 | 17.6 | 8 |
| Securities | 4.8 | 3.6 | 4.3 | 461 | 17.9 | 12.4 | 28.0 | 461 |
| Taxpayer | 0.0 | 0.0 | — | 1 | 1.1 | 1.1 | — | 1 |
| Utilities | 1.1 | 1.1 | 0.4 | 2 | 5.4 | 5.4 | 2.5 | 2 |
| Social welfare/ entitlements | 0.4 | 0.4 | — | 1 | 2.9 | 2.9 | — | 1 |
| Total | 4.4 | 3.1 | 4.3 | 580 | 16.7 | 11.3 | 26.2 | 580 |

SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

cases. For case categories with data available for more than 10 cases, Panel B shows that securities cases had the highest median costs as a percent of the fee, 13.0 percent.

A regression model, not reported here, of costs as a percent of recovery controls for case category and other factors used in Table 4. The model shows that costs, like fees, have a scale effect: their percent of recovery significantly declines as the size of the recovery increases, a result confirmed in the *CAR* data. The cost percent significantly increases with a case's age, also confirmed by the *CAR* data, and tends to be significantly higher in fee-shifting cases than in non-fee-shifting cases. We find no evidence in our data or the *CAR* data that the cost percent is increasing over time.

## V. A Practical Application—A Lookup Table to Check on Fee Awards

Our study provides information that may be useful to courts in evaluating requests for attorney fees, costs, and expenses in class action cases. Most simply, because our study finds an overwhelming correlation between class recovery and attorney fees, the court can conduct a simple initial inquiry that looks only at these two variables in any case where the size of class recovery can be estimated. The court need only compare the request in a given case with average awards in cases of similar magnitude. If the request is relatively close to average awards in cases with similar characteristics, the court may feel a degree of confidence in approving the award. If the request is significantly higher than amounts awarded in past cases, the court should inquire further. The methodology is more appropriate for non-fee-shifting cases in which, as Table 1 shows, the range of fee-award percents is less variable than in fee-shifting cases. Accordingly, we use only non-fee-shifting cases in the following analysis.

To provide numerical guidance, we divide the client recoveries in our published opinion data by decile, thus assigning approximately ten percent of the cases to one of ten ordered groups. For each client recovery decile, we compute the mean and median fee percents, and the standard deviation, for the published opinion data set. Since the deciles each contain an approximately equal number of cases, each fee percent computation is based on similarly sized samples. Table 7, Panel A, reports the results.

The table's first column identifies each decile. The second column shows the range of client recovery for the decile—for example, less than $1.4

Table 7:   Fee Percent at Deciles of Client Recoveries

| Client Recovery Decile | Recovery Range in Decile ($ Millions) | Mean Recovery in Decile ($ Millions) | Mean Fee Percent | Median Fee Percent | SD Fee Percent |
|---|---|---|---|---|---|
| A. Published Opinion Data | | | | | |
| Less than 10% | <1.4 | 0.8 | 29.5 | 30.0 | 5.9 |
| 10 to 20% | 1.4 to 3.1 | 2.3 | 26.5 | 25.0 | 10.9 |
| 20 to 30% | 3.1 to 5.2 | 4.3 | 25.0 | 29.4 | 7.9 |
| 30 to 40% | 5.2 to 9.7 | 7.2 | 25.6 | 26.0 | 7.0 |
| 40 to 50% | 9.7 to 15 | 12.0 | 22.7 | 22.4 | 8.4 |
| 50 to 60% | 15 to 22 | 18.8 | 22.0 | 24.5 | 8.6 |
| 60 to 70% | 22 to 38 | 30.4 | 19.0 | 19.0 | 9.9 |
| 70 to 80% | 38 to 79 | 53.7 | 16.9 | 15.5 | 10.2 |
| 80 to 90% | 79 to 190 | 122.2 | 17.6 | 15.0 | 9.2 |
| Greater than 90% | >190 | 929.1 | 12.0 | 10.1 | 8.1 |

B. Class Action Reports Data (*CAR*)

| Client Recovery Decile | Recovery Range in Decile ($ Millions) | Mean Recovery in Decile ($ Millions) | All Cases | | | Nonsecurities Cases | | |
|---|---|---|---|---|---|---|---|---|
| | | | Mean Fee Percent | Median Fee Percent | SD Fee Percent | Mean Fee Percent | Median Fee Percent | SD Fee Percent |
| Less than 10% | <1.4 | 0.8 | 30.0 | 30.0 | 9.9 | 30.9 | 33.2 | 8.2 |
| 10 to 20% | 1.4 to 3.1 | 2.3 | 29.2 | 30.0 | 5.4 | 25.6 | 25.0 | 6.9 |
| 20 to 30% | 3.1 to 5.2 | 4.3 | 28.9 | 30.0 | 6.1 | 26.5 | 26.4 | 7.9 |
| 30 to 40% | 5.2 to 9.7 | 7.2 | 28.7 | 30.0 | 5.3 | 28.9 | 29.6 | 5.1 |
| 40 to 50% | 9.7 to 15 | 12.0 | 28.0 | 30.0 | 6.1 | 27.3 | 25.0 | 5.2 |
| 50 to 60% | 15 to 22 | 18.8 | 26.7 | 28.0 | 7.8 | 26.6 | 30.0 | 7.9 |
| 60 to 70% | 22 to 38 | 30.4 | 24.8 | 25.0 | 9.7 | 22.1 | 23.4 | 10.1 |
| 70 to 80% | 38 to 79 | 53.7 | 24.3 | 25.4 | 8.5 | 23.9 | 25.5 | 9.0 |
| 80 to 90% | 79 to 190 | 122.2 | 20.3 | 20.8 | 7.5 | 19.5 | 20.2 | 8.3 |
| Greater than 90% | <190 | 929.1 | 16.4 | 17.6 | 9.6 | 17.6 | 16.4 | 10.6 |

NOTE: Client recovery amounts are in millions of inflation-adjusted $ 2002. Client recovery ranges and deciles in the second and third columns of both panels are computed using the published opinion data. The *CAR* data show the median fee percent award in the *CAR* data for the recovery range shown in the second column.

SOURCES: Reported class action settlements with fee awards, 24 *Class Action Rep.* 169.

million in the first decile. The next column shows the mean client recovery within the decile. For example, in the 30 to 40 percent decile, the mean client recovery was $7.2 million (with a range of $5.2 to $9.7 million). In Panel A, the next three columns show the summary statistics for the fee

percent within each decile. Panel B shows the summary statistics for the *CAR* data in the same range of client recovery. Because the *CAR* data are so dominated by securities cases, we report separately the fee percent for all *CAR* cases and for *CAR* nonsecurities cases alone.

With respect to fee percents, Table 7 shows, for example, that the mean fee percent in the lowest decile in the decided cases data was 29.5, the median was 30.0, and the standard deviation was 5.9. In that same range of client recovery, the median fee award in the *CAR* data was 30.0 percent for all cases and 33.2 percent for nonsecurities cases. In the highest decile of recovery, the mean client recovery was $929,100,000 in the decided cases data. The mean fee percent was 12.0 percent, with a median of 10.1 percent, and a standard deviation of 8.1 percent. In that range of client recovery, the median fee award in the *CAR* data was 17.6 percent for all cases and 16.4 percent for nonsecurities cases. Clearly, a substantial scaling effect is at work but, as discussed above, it is less strong in the *CAR* data than in the published opinion data.

Figure 8 illustrates the effect graphically. It differs from Table 7 in that we allow the *CAR* data to "speak for itself" by using the client recovery deciles as generated by its data. Both portions of Figure 8 show a scaling effect but it is less extreme in the *CAR* data.

Approximately 68 percent of the cases in each decile range are predicted to fall within one standard deviation of the predicted fee, and 95 percent of the cases are predicted to fall within two standard deviations of the predicted fee. The standard deviations are reported in Table 7, and illustrated in Figure 8.

Our suggestion is that fee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee. Fee requests falling within one and two standard deviations above or below the mean should be viewed as potentially reasonable but in need of affirmative justification. Fee requests falling more than two standard deviations above or below the mean should be viewed as presumptively unreasonable; attorneys seeking fees above this amount should be required to come forward with compelling reasons to support their request. This methodology assumes that judges render, on average across many cases, reasonably fair and efficient awards. If judges have not achieved these normative goals in existing awards, then their use as guidelines should be further tempered.

To illustrate how a court could use this information, suppose class counsel requests a fee of $7.5 million, equal to 25 percent of a recovery of

Figure 8:   Fee percent range (one standard deviation) at levels of client recovery.



$30 million. At $30 million for the class, the mean fee in the published cases data set is 19.0 percent or $5.7 million. The question is whether the requested fee would be in the range of reason. At the $30 million recovery level, the one-standard-deviation range of fee percents is 9.9 percent, yielding a high end fee of 28.9 percent. The 28.9 percent figure corresponds to $8.67 million of a $30 million recovery. So a $7.5 million fee, equal to 25 percent of the recovery, is within one standard deviation of the mean fee at this client-recovery level. Thus the requested fee falls within the range of reasonableness and the court should approve it unless the court has information leading it to question such an award. On the other hand, suppose

counsel requests a fee of $10 million or 33.3 percent of a $30 million award. This request is more than one standard deviation above the mean of $5.7 million and therefore should not be approved unless further evidence justifies the award. But neither should the court automatically disapprove such a fee, because it is well within two standard deviations of the mean at this recovery level (38.8 percent or $11.64 million). Finally, suppose counsel requested a fee of 40 percent, or $12 million. Because this is more than two standard deviations above the mean award at this recovery level, the court should presumptively disapprove the request unless powerful reasons justify approval.

In evaluating the fee according to this methodology, the court could appropriately take into account factors identified in this study as influencing the amount of the fee other than the gross recovery for the class. For example, case type might be considered. Table 1 shows that consumer class actions tend to generate lower fee percents than securities class actions. But case type should not receive too prominent a role. Table 4's reported opinion regression models do not permit rejection of the hypothesis that case categories, as a group, have no significant effect on fee recovery. If the case presents a higher-than-average risk profile, the court might well consider this a factor that could justify a higher-than-normal fee. Conversely, if the case is deemed low risk, this could be a factor yielding a reduced fee. Since, as Table 4 shows, the lodestar multiplier has no observable effect on fees in the published opinion data when one controls for client recovery and other variables, courts may appropriately give this factor less importance than the rhetoric of many cases suggests. In light of the substantial practical problems with calculating the lodestar, courts may even elect to dispense with this analysis altogether.

## VI. Conclusion

This study provides information about attorney fees and expenses awarded in both common fund and fee-shifting class action cases as well as in shareholders derivative cases in which the amount of the recovery for the corporation can be calculated. The single most important factor determining the fee is the size of the client's recovery. Non-fee-shifting and fee-shifting cases have such distinct fee characteristics that analyzing them together is inappropriate for many purposes. As theory would predict, given the incentives facing attorneys in fee-shifting cases, fees in these cases are significantly

higher as a percent of class recovery than fees in non-fee-shifting common fund cases.[58]

Fee size also increases as cases are found in federal rather than state court. The fee as a percent of client recovery is noticeably below the widely quoted one-third level, ranging from about 30 percent in the smallest cases down to about 10 percent in the largest cases in the published opinion data set. Fee as a percent of recovery in the *CAR* data was also below the one-third level, but was higher than in the published opinion data.

As theory also predicts, fees in fee-shifting cases display a markedly wider variance, as a percent of recovery, than fees in common fund cases (standard deviation of 25.0 percent for fee-shifting cases as compared with 9.9 percent for non-fee-shifting cases).

We find no robust evidence that attorney fees in common fund cases have been increasing or decreasing over the 10-year period studied. Upward time trend effects are not robust in models that include key variables. Nor do we find evidence that the presence of an objector has an impact on the fee, either up or down. Settlement classes were not robustly significantly associated with fee levels. We find some evidence that complexity is correlated with higher fees: age of the case was significant and positive for some non-fee-shifting case models and the presence of an appellate opinion was significant and positive for non-fee-shifting cases. However, the results on complexity were ambiguous both because we used inexact proxies for this variable (which is in itself poorly defined) and because we found no significance for appellate opinions in non-fee-shifting cases and a negative and significant result for age in fee-shifting cases.

We find evidence that fees tend to be higher in federal court than in state court in non-fee-shifting cases, and that, also in non-fee-shifting cases, fees tend to be lower when the defendant pays the fee rather than when the fee is taken out of the class recovery. The fact that the defendant pays the fees in a non-fee-shifting case was highly significant in most models (beyond the 0.01 level) and negative, suggesting that even when the money in some sense comes out of the same "pot" (the defendant's bank account), the defendant's commitment to pay the fees had a moderating effect on their amount.

Risk is also usually significant: fees as a percentage of the recovery tend to be higher in high-risk cases than in other cases, and lower in low-risk cases.

---

[58]Regression models not reported here strongly confirm this.

*78      Attorney Fees in Class Action Settlements*

As to soft relief, we find no evidence that either soft relief included in the estimated benefit for the class, or soft relief that is not included in the estimated benefit, affects the fee award, either up or down.

We find robust evidence of a scaling effect. The percent of the recovery that goes to attorneys decreases as the size of the recovery increases, in both the reported opinions and in the *CAR* data. This effect can be interpreted as supporting the underlying theory for class actions. As similar cases are aggregated, the efficiency gains yield an increased net return to clients. This economy of scale carries over to costs and expenses. Costs absorb a lower percent of the recovery as the recovery increases. Costs also increase with case complexity and are higher in fee-shifting cases.

Finally, we present a table that can guide courts in assessing the size of the fees in class action cases. Given a level of client recovery, the table provides evidence of the presumptively valid range of fees.