**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                                      :
                                                      :       **ECF CASE**
                                                      :
IN RE AMERICAN INTERNATIONAL              :
GROUP, INC. SECURITIES LITIGATION         :       Master File No. 04 Civ. 8141 (DAB) (AJP)
                                                      :
This Document Relates To:  All Actions        :       Oral Argument Requested
                                                      :
———————————————————— x


**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION FOR APPROVAL OF PROPOSED SETTLEMENT WITH DEFENDANT**
**AMERICAN INTERNATIONAL GROUP, INC.**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

PRELIMINARY STATEMENT ........................................................................................1

     A.    Preliminary Approval and the Pre-Hearing Notice Program............................4

ARGUMENT.....................................................................................................................5

I.    THE PROPOSED SETTLEMENT IS FAIR, ADEQUATE AND
    REASONABLE, AND SHOULD THEREFORE BE APPROVED.................................5

     A.    The Settlement Is Entitled to a Presumption of Fairness ...............................7

     B.    The Settlement Satisfies the *Grinnell* Factors ............................................10

          1.    Ongoing Litigation Would Be Complex, Expensive and
               Lengthy......................................................................................10

          2.    The Reaction of the Class to Date ............................................11

          3.    There Was a Solid Foundation Underlying the Decision to
               Settle with the Company............................................................12

          4.    There Were Significant Risks in Establishing AIG's Liability.........13

          5.    The Settlement Class Faced Risks in Establishing Damages...........16

          6.    Ability of AIG to Withstand a Greater Judgment ............................17

          7.    The Settlement Amount Is More Than Reasonable .........................19

II.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS.......................................20

III.    THE PLAN OF ALLOCATION SHOULD BE APPROVED ...............................................20

CONCLUSION....................................................................................................................23

## TABLE OF AUTHORITIES

### CASES

*In re America Bank Note Holographics, Inc., Securities Litigation,*
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) ............................................................................. 16, 21

*AUSA Life Insurance Co. v. Ernst & Young,*
  39 F.App'x 667 (2d Cir. 2002) ........................................................................................... 15

*Becher v. Long Island Lighting Co.,*
  64 F. Supp. 2d 174 (E.D.N.Y. 1999) ................................................................................... 9

*Carson v. America Brands, Inc.,*
  450 U.S. 79 (1981) ............................................................................................................... 7

*Cinelli v. MCS Claim Services, Inc.,*
  236 F.R.D. 118 (E.D.N.Y. 2006) ....................................................................................... 14

*City of Detroit v. Grinnell Corp.,*
  495 F.2d 448 (2d Cir. 1974) ............................................................................................ 6, 13

*D'Amato v. Deutsche Bank,*
  236 F.3d 78 (2d Cir. 2001) ................................................................................................. 12

*In re Delphi Corp. Securities, Derivative & "ERISA" Litigation,*
  248 F.R.D. 483 (E.D. Mich. 2008) ....................................................................................... 9

*Gordon Partners v. Blumenthal,*
  No. 02 Civ. 7377 (LAK), 2007 WL 1438753 (S.D.N.Y. May 16, 2007) ........................... 17

*In re Global Crossing Securities & ERISA Litigation,*
  225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................................*passim*

*In re Initial Public Offering Securities Litigation,*
  226 F.R.D. 186 (S.D.N.Y. 2005) .......................................................................................... 9

*Joel A. v. Giuliani,*
  218 F.3d 132 (2d Cir. 2000) ................................................................................................. 5

*Klein ex rel. IRA v. PDG Remediation, Inc.,*
  No. 95 Civ. 4954 (DAB), 1999 WL 38179 (S.D.N.Y. Jan. 28, 1999) ................................ 11

*Maley v. Del Global Technologies Corp.,*
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) ...................................................................... 7, 15, 18

*Marisol A. ex rel. Forbes v. Giuliani,*
  185 F.R.D. 152 (S.D.N.Y. 1999) ....................................................................................... 12

*In re Marsh & McLennan Cos., Inc. Securities Litigation,*
 No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .........................................9, 18

*In re Omnicom Group., Inc. Securities Litigation,*
 541 F. Supp. 2d 546 (S.D.N.Y. 2008) ...................................................................................................17

*In re PaineWebber Ltd. Partnerships Litigation,*
 171 F.R.D. 104 (S.D.N.Y. 1997) ...........................................................................................................16

*People v. Gilman,*
 No. 4800-2009, 2010 WL 3036983 (N.Y. Sup. Ct. July 2, 2010) .........................................................11

*In re Prudential Insurance Co. America Sales Practices Litigation Agent Actions,*
 148 F.3d 283 (3d Cir. 1998) ..................................................................................................................10

*In re Sony SXRD Rear Projection Television Class Action Litigation,*
 No. 06 Civ. 5173 (RPP), 2008 WL 1956267 (S.D.N.Y. May 1, 2008) ..................................................12

*U.S. v. Ferguson,*
 653 F.3d 61 (2d Cir. 2011) .............................................................................................................. 11, 15

*U.S. v. New York City Board of Education,*
 85 F. Supp. 2d 130 (E.D.N.Y. 2000) ......................................................................................................7

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
 396 F.3d 96 (2d Cir. 2005) ...........................................................................................................*passim*

*Winkler v. NRD Mining, Ltd.,*
 198 F.R.D. 355 (E.D.N.Y. 2000) ..........................................................................................................15

**DOCKETED CASE**

*In re Merrill Lynch & Co., Inc. Securities, Derivative, & ERISA Litigation,*
 No. 07-cv-09633 (S.D.N.Y Oct. 27, 2006) .............................................................................................9

**FEDERAL STATUTE**

Fed. R. Civ. P. 23 ......................................................................................................................................5

# PRELIMINARY STATEMENT

Pursuant to Rules 23(a), (b)(3) and (e) of the Federal Rules of Civil Procedure, the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio and the Ohio Police & Fire Pension Fund (collectively, "Lead Plaintiff" or the "Ohio State Funds"), as Court-appointed Lead Plaintiff in this case, respectfully submit this memorandum of law in support of:

> (1) final approval of the proposed settlement (the "Settlement") of claims against Defendant American International Group, Inc. ("AIG" or the "Company") and related defendants[1] in this class action (the "Action") for $725 million in cash, as set forth in the Agreement of Compromise and Settlement, dated November 30, 2010 (the "Agreement");[2]

> (2) certification of a settlement class (the "Settlement Class") of all persons who purchased or otherwise acquired AIG Securities during the period from Oct. 28, 1999 through April 1, 2005, inclusive (the "Class Period"), as well as all persons and entities who held the common stock of HSB Group, Inc. ("HSB") at the time HSB was acquired by AIG in a stock for stock transaction, and all persons and entities who held the common stock of American General Corporation ("AGC") at the time AGC was acquired by AIG in a stock for stock transaction, and were damaged thereby; and

> (3) approval of the proposed Plan of Allocation for the proceeds of the Settlement.

The $725 million proposed cash Settlement is an outstanding result for the Class and would be the ***second largest*** private securities class action settlement since the fall of 2007, *i.e.* the onset of the financial crisis, and the ***only*** private securities class action settlement with a company that was essentially controlled by the Government.  Since the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), it is the ***13th largest*** private securities class action settlement according to the latest

---

[1]  The other released defendants are former AIG officers and directors: Eli Broad, John A. Graf, Martin J. Sullivan, Thomas R. Tizzio; and Underwriter Defendants Wachovia Securities, Inc., and Merrill Lynch & Co. Herein, Lead Plaintiff and the settling defendants are collectively referred to as the "Settling Parties."

[2]  Pursuant to the terms of the Agreement,  AIG shall fund the entire $725 million settlement in cash (as opposed to funding a portion in AIG stock) if the Company consummates a "Qualified Offering."  *See* Agreement § I.A.2.  A Qualified Offering is "an offering of its common stock . . . in which [AIG] raises net proceeds of at least $550 million."  *Id.*  After the Settlement was submitted to the Court, AIG consummated a Qualified Offering in which it raised approximately $2.9 billion.  Therefore, AIG will pay the entire Settlement Amount in cash.

quarterly report of the Securities Class Action Services.[3]  When combined with Lead Plaintiff's $97.5 million settlement with PricewaterhouseCoopers LLP ("PwC" and the "PwC Settlement") and the $115 million contingent settlement with Maurice R. Greenberg and related defendants (the "Greenberg Settlement"), it would be the ***10th largest*** securities class action settlement.

If approved, the proposed Settlement will resolve all claims in the Action against AIG and the other related Defendants, and release all related claims.  Lead Plaintiff has now reached settlements or contingent settlements with all defendants in the Action.

Generally, the Action arises from material misstatements and omissions allegedly made by defendants in connection with disclosures: (1) on October 14 and 15, 2004 of AIG's alleged involvement in a market division scheme that included AIG's payment of improper "steering" contingent commissions to, and alleged illegal rigging of certain insurance bids with, Marsh & McLennan Companies, Inc. ("Marsh") and others in the insurance industry (the "Market Division Fraud"); and (2) in March and April of 2005 of an alleged accounting fraud at AIG that resulted in the Company restating nearly four years of earnings and adjusting earnings for a fifth year, which, *inter alia*, slashed net income by $3.9 billion and shareholders' equity by $2.7 billion (the "Accounting Fraud"). Lead Plaintiff also asserted claims against AIG and Defendant Greenberg arising from the alleged manipulation of the market in which AIG common stock trades through the purchase of millions of shares of the Company's stock in order to inflate its price (the "Market Manipulation Fraud").  *See generally* Consolidated Third Amended Complaint ("Complaint"), D.E. # 308.

---

[3] *See* Declaration of Thomas A. Dubbs in Support of Proposed Class Settlement, Plan of Allocation and Award of Attorneys' Fees and Expenses, dated December 2, 2011 (the "Dubbs Decl."), Exhibit 1.  All exhibits referenced in Lead Plaintiff's submissions in connection with approval of the Settlement are annexed to the Dubbs Decl.  For clarity, citations to exhibits that themselves have attached exhibits, will be referenced as "Ex. ___ - ___."  The first numerical reference refers to the designation of the entire exhibit attached to the Dubbs Decl. and the second reference refers to the exhibit designation within the exhibit itself.

Since its appointment as Lead Plaintiff on February 7, 2005, the Ohio State Funds have tirelessly pursued the claims against AIG and the other settling defendants, reaching the Settlement after nearly seven years of litigation that included:

- Fully-briefed motion practice, on two separate occasions, to determine the lead plaintiff;

- Motions to dismiss filed by 23 defendants, all of which (except one) the Court denied in April and May 2006;

- Fact and expert discovery related to class certification, followed by a contested motion for class certification involving four days of legal argument and hearings;

- The review and analysis of more than 53.3 million pages of documents by defendants and non-parties, including more than 12 million pages produced by AIG; and

- 97 depositions of fact and expert witnesses.[4]

The Settlement was reached after years of extensive arm's-length negotiations by experienced counsel who possessed a comprehensive understanding of the Settling Parties' respective claims and defenses informed by years of contentious litigation, including the completion of all fact discovery. Importantly, the Settlement was negotiated with considerable creativity and under difficult and changing circumstances over the course of numerous informal and formal discussions, face-to-face meetings, and mediations over the course of nearly six years, with three different mediators, including the Hon. Layn R. Phillips (Ret.).

In view of the very substantial recovery achieved, and the risks that Lead Plaintiff would face in trying to obtain a greater recovery for the Settlement Class through continued litigation and trial, this Settlement constitutes an excellent result that should readily be approved by the Court as fair, reasonable and adequate.

---

[4] For a full recitation of the procedural and litigation history of the Action, the Court is respectfully referred to the accompanying Dubbs Decl., which is incorporated herein by reference.

### A.      Preliminary Approval and the Pre-Hearing Notice Program

In its Preliminary Approval Order, entered October 5, 2011, in addition to preliminarily

approving the Settlement, the Court also approved the Notice of Proposed Settlement, Motion for

Attorneys' Fees and Expenses Award and Fairness Hearing ("Notice"), Proof of Claim form ("Proof of

Claim"), Release Form and the Summary Notice of Pendency and Proposed Class Action with

Defendant AIG ("Summary Notice") for dissemination to the Settlement Class.  A copy of the

Preliminary Approval Order is attached as Exhibit 2 to the accompanying Dubbs Declaration.  Copies

of the notices, the Proof of Claim form and Release Form, are attached as Exs. A-F to the Affidavit of

Eric J. Miller, dated November 30, 2011 ("Rust Aff.").  Dubbs Decl. Ex. 3.  The Court also approved

Rust Consulting, Inc. ("Rust") as the Administrator of the Settlement and set a hearing for January 31,

2012 (the "Fairness Hearing") to consider the fairness, reasonableness and adequacy of the proposed

Settlement and the Plan of Allocation.

In compliance with the Preliminary Approval Order, under the supervision of Lead Counsel, the

Administrator mailed copies of the Notice, Proof of Claim and Release Form (when applicable) to all

potential members of the Settlement Class who could be reasonably identified by: (i) using record holder

data that was produced by the transfer agent for AIG in the PwC Settlement; (ii) mailing to all claim

filers in the PwC Settlement; (iii) using name and address data gathered in the PwC Settlement; and (iv)

by fulfilling requests made by nominees such as broker-dealers who made purchases on behalf of

beneficial owners.  Rust Aff. ¶ 4.  To date, the Administrator has mailed more than 2.1 million notice

packets containing the Notice and Proof of Claim forms to potential Settlement Class Members and

brokers/nominees and mailed 139,364 Release Forms.  *Id.* ¶¶ 10-17.

In addition, the Summary Notice was published in *The Wall Street Journal*, transmitted over *PR

Newswire*, and referenced on Bloomberg News Services within 14 days of October 14, 2011.  *Id.* ¶¶ 18-

19.  The Notice, Proof of Claim and Release Form were also made available on the website created by

Rust specifically for purposes of this Settlement and Labaton Sucharow's website for easy downloading by interested investors.  Dubbs Decl. ¶ 18.

The Notice described, *inter alia*, the claims asserted in this Action, the contentions of the Settling Parties, the course of the litigation, the terms of the Settlement with AIG, the proposed Plan of Allocation, the right to object to the Settlement, and the right to seek to be excluded from the Settlement Class.  The Notice also advised potential Settlement Class Members of the scheduled Fairness Hearing, and of Lead Counsel's intention to seek an award of attorneys' fees that would not exceed 13.25% of the gross Settlement Amount (the "Escrow Account") and reimbursement of expenses not to exceed $9.75 million.[5]  In addition, the Notice informed Settlement Class Members that Lead Plaintiff could seek up to $150,000 for its reasonable costs and expenses, pursuant to the PSLRA.

In light of the outstanding result and the opportunity for an immediate cash recovery for hundreds of thousands of Settlement Class Members, Lead Plaintiff respectfully asks this Court to: (1) enter the proposed Order and Final Judgment as to AIG ("Judgment"); (2) finally certify the proposed Settlement Class; and (3) enter the proposed Order Approving Plan of Allocation.[6]

## ARGUMENT

### I.    THE PROPOSED SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE, AND SHOULD THEREFORE BE APPROVED

A settlement of claims brought by a class is subject to approval by the Court after reasonable notice and a hearing.  Fed. R. Civ. P. 23(e).  A settlement will be approved if it is "fair, adequate, and reasonable, and not a product of collusion."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).  This determination falls within a court's sound discretion.  *See Joel A. v. Giuliani*, 218 F.3d

---

[5]  In fact, as set forth in the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses and Lead Plaintiff's Request for Reimbursement of Expenses, Lead Counsel are requesting 13.25% of the **Net** Settlement (*i.e.*, after deduction for reimbursement of expenses) as attorneys' fees and only approximately $8.26 million in reimbursement of expenses.

[6]  Proposed orders will be submitted to the Court with Lead Plaintiff's reply submissions, after the deadline for objections and exclusion requests has passed.

132, 139 (2d Cir. 2000).  In exercising such discretion, a court should be mindful of the "strong judicial

policy in favor of settlements, particularly in the class action context."  *Wal-Mart*, 396 F.3d at 116

(quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)); *In re Global Crossing Sec. &*

*ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) (Lynch, J.) ("[F]ederal courts favor settlement,

especially in complex and large-scale disputes, so as to encourage compromise and conserve judicial and

private resources.  Accordingly, this Court will take into consideration such public policy concerns in

exercising its discretion.").

A court determines the fairness of a settlement by looking at both its terms and the negotiation

process leading up to it.  *See Wal-Mart*, 396 F.3d at 116.  With respect to process, a class action

settlement enjoys a strong "presumption of fairness" where it is the product of arm's-length

negotiations conducted by experienced, capable counsel after meaningful discovery.  *Id.*; *see also Global*

*Crossing*, 225 F.R.D. at 461.  With respect to the substantive terms of a settlement, the standards

governing approval are well-established.  Courts in this Circuit examine the fairness, adequacy and

reasonableness of a class action settlement utilizing the "*Grinnell* factors," to the extent they are

applicable:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the
> class to the settlement; (3) the stage of the proceedings and the amount of discovery
> completed; (4) the risks of establishing liability; (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial; (7) the ability of the
> defendants to withstand a greater judgment; (8) the range of reasonableness of the
> settlement fund in light of the best possible recovery; [and] (9) the range of
> reasonableness of the settlement fund to a possible recovery in light of all the attendant
> risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).  To

support a finding that a settlement is fair, not every factor must weigh in favor of the settlement, but

"rather the court should consider the totality of these factors in light of the particular circumstances."

*Global Crossing*, 225 F.R.D. at 456.

Moreover, in applying the *Grinnell* factors, a court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a "mini-trial" of the merits of the action. *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) ("Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement . . . . They do not decide the merits of the case or resolve unsettled legal questions."). "[T]he essence of a settlement agreement is compromise . . . a yielding of absolutes and an abandoning of highest hopes." *U.S. v. New York City Bd. of Educ.*, 85 F. Supp. 2d 130, 157 (E.D.N.Y. 2000), *vacated on other grounds*, *Brennan v. New York City Bd. of Educ.*, 260 F.3d 123 (2d Cir. 2001). As such, a court must assess the settlement as presented, without modifying its terms and without substituting its "business judgment for that of counsel, absent evidence of fraud or overreaching." *Global Crossing*, 225 F.R.D. at 455.

As discussed below, Lead Plaintiff submits that the proposed Settlement with AIG is eminently fair, reasonable and adequate. The Settling Parties have thoroughly weighed the strengths and weaknesses of the claims and defenses over the past seven years and, after rigorous litigation efforts and negotiations facilitated by three mediators, including two former federal judges, have reached an informed and carefully crafted compromise.

### A.     The Settlement Is Entitled to a Presumption of Fairness

As noted above, a strong presumption of fairness attaches to a class action settlement reached in arm's-length negotiations among able counsel after meaningful discovery. *See Wal-Mart*, 396 F.3d at 116. "'[G]reat weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 366 (S.D.N.Y. 2002) (McMahon, J.).

A presumption of fairness is certainly appropriate here. As discussed in detail in the Dubbs Declaration, by the time the Settling Parties reached the Settlement, Lead Plaintiff had: (i) opposed

motions to dismiss by 23 defendants, including AIG; (ii) completed class discovery, involving more than two dozen depositions, including the depositions of three experts; (iii) moved for class certification, which involved a contested motion for class certification, expert declarations and four days of hearings concerning market efficiency and loss causation; and (iv) completed all fact discovery, including the review and analysis of more than 53.3 million pages of documents (more than 12 million of which were produced by AIG alone). *See generally* Dubbs Decl. ¶¶ 71-139. Lead Counsel also spent considerable time consulting with insurance experts, accounting experts, damages experts and finance experts in formulating its litigation and mediation strategies.

After briefing the dispositive motions, and through the course of the discovery described above, the Settling Parties participated in numerous formal and informal discussions and mediation sessions before three independent mediators, culminating in a mediation session with Judge Phillips in June of 2010 that resulted in this Settlement.

Lead Plaintiff's first formal mediations with AIG occurred in February and March of 2006, with former Judge Nicholas H. Politan as the mediator. That mediation was not successful. *Id.* ¶ 141.

In late 2007 and early 2008, the parties met with Kenneth R. Feinberg (who was also the settlement master for the administration of the SEC Fair Fund settlement with AIG). These mediations did not result in a settlement. *Id.*

In September 2008, Lead Plaintiff entered into another formal mediation with AIG, this time with Judge Phillips as the mediator. Shortly thereafter, AIG faced a financial crisis and the Government began its bailout of the Company. Although the parties were not able to reach agreement at that time, talks continued intermittently and formal mediation sessions were held in May 2009 and in April 2010. Again, these mediations did not result in a settlement. *Id.* ¶ 142.

Finally, in June 2010, at the request of Lead Counsel, the parties – *i.e.* Lead Plaintiff, represented by Ohio Attorney General Richard Cordray, and AIG, represented by a corporate officer and a senior

official of the U.S. Treasury – entered into face-to-face negotiations in Columbus, Ohio.[7]  That

mediation resulted in an agreement in principle for the $725 million AIG Settlement.  Thus, at the time

the agreement in principle was reached, there can be no doubt that Lead Plaintiff and Lead Counsel

were fully aware of the strengths and weaknesses of the claims against AIG.  *Id.* ¶ 153; *see also*

Declaration of Dennis P. Smith, Assistant Attorney General in the Office of the Ohio Attorney General,

dated Nov. 30, 2011, ¶ 5, submitted herewith as Dubbs Decl. Ex. 7.

 The active supervision and facilitation of the parties' negotiations by three highly experienced,

neutral mediators strongly supports a presumption that the Settlement is fair.  *See In re Delphi Corp. Sec.,*

*Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 498 (E.D. Mich. 2008) (speaking of Judge Phillips, "the

Court and the parties have had the added benefit of the insight and considerable talents of a former

federal judge who is one of the most prominent and highly skilled mediators of complex actions, who

acted as Special Master in the settlement negotiations."); *see generally*, *In re Initial Pub. Offering Sec. Litig.*,

226 F.R.D. 186, 194 & n.42 (S.D.N.Y. 2005) (Scheindlin, J.) (where negotiations were facilitated by

former judge, settlement was "clearly the result of arm's length bargaining"); *Becher v. Long Island Lighting*

*Co.*, 64 F. Supp. 2d 174, 181 (E.D.N.Y. 1999) (approving settlement facilitated by an "arms-length

negotiations before a respected neutral mediator").

 Indeed, there can be no suggestion that collusion played any part in reaching this Settlement.  To

the contrary, given the number of mediation efforts over nearly six years, it is clear that counsel for both

sides were determined and zealous in their representation of their clients.  *See Global Crossing*, 225 F.R.D.

at 461 (approving a settlement upon finding that "[b]oth sides have been represented well [by

---

[7] As the Court is aware, the Ohio Attorney General is an experienced lead plaintiff and has negotiated a
number of multimillion-dollar agreements in complex securities litigations.  *See, e.g., In re Marsh & McLennan Cos.,
Inc. Sec. Litig.*, No. 04 Civ. 8144, 2009 WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) (McMahon, J.) (approving
$400 million settlement); *In re Merrill Lynch & Co., Inc. Sec., Driv., & ERISA Litig.*, No. 07-cv-09633, slip op.
(S.D.N.Y Oct. 27, 2006) (Rakoff, J.) (approving $475 million settlement) (slip ops. are submitted herewith as part
of a compendium of unreported cases, Dubbs Decl. Ex. 21).

counsel]").  The Settlement was not entered into lightly.  Therefore, the Court should accord a

presumption of fairness to the Settlement in considering the substantive *Grinnell* factors discussed

below.

      **B.**     **The Settlement Satisfies the *Grinnell* Factors**

          **1.**     **Ongoing Litigation Would Be Complex, Expensive and Lengthy**

As the Court is aware, this litigation has been incredibly challenging and complex, involving, *inter*

*alia,* the analysis of (i) thousands of insurance contracts and (ii) dozens of different areas of insurance

and reinsurance accounting under changing GAAP provisions, statutory accounting, and also under

accounting rules affecting non-U.S. companies.  *See, e.g.*, Dubbs Decl. ¶¶ 40-44, 139, 155-61.  Without

the Settlement, years of litigation would remain ahead.  The prosecution of the claims against AIG

would require additional expert discovery, hotly contested *Daubert* motions (and likely *Daubert* hearings),

summary judgment briefing on numerous issues, including loss causation and, of course, trial

preparation and a trial, which would likely last for months.  These efforts would require additional large

expenditures over an extended period, after which the Settlement Class might obtain a result far less

beneficial than the one provided by the Settlement.  *See In re Prudential Ins. Co. Am. Sales Practices Litig.*

*Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (settlement favored where "trial of this class action would

be a long, arduous process requiring great expenditures of time and money on behalf of both the parties

and the court").  If this case were to proceed to trial, the jury would have to assimilate intricate facts,

learn numerous insurance company practices and procedures, and comprehend complex accounting

rules in order to fully understand the nexus between AIG's conduct, the alleged violations of the

securities laws and the Settlement Class's alleged injury.  Accordingly, a favorable outcome for the

Settlement Class was far from assured.

Moreover, in light of the highly contested nature and the complexity of the Market Division

Fraud and Accounting Fraud issues in this case, a judgment favorable to the Settlement Class would

undoubtedly have been the subject of post-trial motions and appeals.[8]  By contrast, the Settlement offers

the certainty of a prompt and substantial payout from the Escrow Account.  *See Klein ex rel. IRA v. PDG*

*Remediation, Inc.*, No. 95 Civ. 4954 (DAB), 1999 WL 38179, at *2 (S.D.N.Y. Jan. 28, 1999) (Batts, J.)

(considering complexity, expense and duration of litigation, settlement that "offer[ed] Class members

the benefit of immediate recovery as opposed to an uncertain award several years from now" was

preferred outcome).  Accordingly, the first *Grinnell* factor strongly favors approval.

### 2.  The Reaction of the Class to Date

Both the Notice and Summary Notice advised members of the Settlement Class of their right to

object to the Settlement and the procedures for doing so.  To date, no Settlement Class Member has

filed any objection despite the dissemination of more than *2 million* Notice Packets.  Rust Aff. ¶ 17.

Both the Notice and Summary Notice advised members of the Settlement Class of their right to

request exclusion from the Settlement Class and the procedures for doing so.  To date, only 41 requests

for exclusion have been received.  However, 30 of the requests did not satisfy the requirements in the

Notice or Preliminary Approval Order and are therefore invalid.  Accordingly, to date just *11* valid

requests for exclusion have been received, representing a mere *1,260* shares of stock, Dubbs Decl. ¶ 203,

which represent approximately 0.000048% of the almost *2.6 billion* shares of AIG common stock

---

[8]  We note that a criminal trial related solely to the Gen Re Transaction took five weeks, and the convictions were later vacated by the Second Circuit.  *See U.S. v. Ferguson*, 653 F.3d 61, 95 (2d Cir. 2011);  *see also*  Dubbs Decl. ¶¶ 47-50.

Further, a 2007-08 non-jury trial of two former Marsh employees accused of engaging in bid-rigging with AIG and other insurance companies lasted more than 10 months, and resulted in felony convictions on two counts.  A second trial of three more Marsh employees resulted in a not-guilty verdict after an 11 month trial. Two and a half years after the first trial was completed, the trial judge vacated those judgments.  *People v. Gilman*, No. 4800-2009, 2010 WL 3036983, at *20 (N.Y. Sup. Ct. July 2, 2010).  In addition, the trial judge vacated the judgments against all of the former AIG and Marsh employees who had confessed to bid rigging in 2004.  *See* Karen Freifeld, *Marsh Executives' Convictions Tossed in Bid-Rig Case*, Bloomberg.com (July 7, 210 4:41 PM), available at http://www.bloomberg.com/news/2010-07-07/ex-marsh-executives-convictions-in-bid-rigging-trial-tossed-by-n-y-judge.html; Dubbs Decl. ¶¶ 51-57.

outstanding as of March 31, 2005, *see* AIG Form 10-Q for the quarterly period ended March 31, 2005, dated June 28, 2005.

"[A] small number of opt-outs and objections relative to the size of the class . . . supports approval of the Settlement." *In re Sony SXRD Rear Projection Television Class Action Litig.,* No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *6 (S.D.N.Y. May 1, 2008) (Patterson, J.) (approving settlement where there were 22 opt-outs and 45 objectors out of approximately 175,000 class members); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (holding that the district court properly concluded that 72 requests for exclusion and 18 objections from a class of 27,883 weighed in favor of settlement).

The deadline for objections and exclusions is December 30, 2011.  Lead Plaintiff will address the substance of all objections and report on all exclusions in its reply submissions, which must be filed with the Court on January 13, 2012.

### 3.   There Was a Solid Foundation Underlying the Decision to Settle with the Company

Courts consider the stage of the proceedings and the amount of discovery completed to assess whether the Settling Parties had sufficient information to make informed decisions with respect to settlement.  *See Marisol A. ex rel. Forbes v. Giuliani*, 185 F.R.D. 152, 163 (S.D.N.Y. 1999) (Ward, J.), *aff'd sub nom. Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000).  Here, there can be absolutely no question that Lead Plaintiff and Lead Counsel conducted negotiations, and later entered into the Settlement, only after developing a thorough understanding of both the potential favorable outcomes and the significant challenges involved in continuing with the Action.

Here, Lead Plaintiff served at least five document requests on AIG (and an additional twenty-one document requests on other Defendants) and served more than 50 document subpoenas on non-parties, including Marsh and other insurance brokers, insurance companies and their employees.  Dubbs Decl. ¶¶ 122-23.  Overall, by the time the Settlement was reached, more than 53 million pages of

documents were produced by parties and non-parties, and all of those documents were reviewed and analyzed by Lead Counsel and its experts.

Lead Plaintiff also served five sets of interrogatories on AIG and other Defendants and responded to at least 12 interrogatory requests served by AIG and other defendants.  *Id.* ¶¶ 82, 122.

Further, as noted above, Lead Plaintiff took or defended 97 depositions of fact and expert witnesses in this case.  *Id.* ¶¶ 12, 83, 85-101, 104, 106, 109-10, 136-39.

In addition, even aside from the voluminous formal discovery, Lead Counsel conducted an extensive investigation over the span of six years to, among other things, (1) review and analyze AIG's public filings with the New York State Insurance Department and other state insurance departments and (2) locate and interview former AIG employees and other knowledgeable persons within the insurance industry.  Dozens of potential fact or expert witnesses were located and contacted and thousands of pages of documents were obtained and analyzed.  *Id.* ¶ 119.

Lead Plaintiff's and Lead Counsel's understanding of the claims against AIG was further informed by hundreds of pages of briefing on the Defendants' motions to dismiss and on Lead Plaintiff's motion for class certification, as well as mediation preparation and the mediations themselves. *Id.* ¶¶ 80-81, 111-14, 140-43.  Accordingly, Lead Plaintiff and Lead Counsel had a very well-founded understanding of the merits of the claims, which warrants approval of the Settlement.

### 4.    There Were Significant Risks in Establishing AIG's Liability

*Grinnell* holds that, in assessing the fairness, reasonableness and adequacy of a settlement, courts should consider such factors as the "risks of establishing liability . . . the risks of establishing damages [and] the risks of maintaining the class action[9] through the trial."  495 F.2d at 463.  While Lead Plaintiff

---

[9]    Lead Plaintiff's motion for certification of the litigation class was hotly contested.  By order filed February 22, 2010, the Court certified the Action for litigation purposes.  D.E. #534.  Both Lead Plaintiff and AIG requested that the United States Court of Appeals for the Second Circuit review the Court's certification

*(continued . . . )*

and Lead Counsel believe that the claims asserted against the settling defendants are very strong, they also recognize that there were considerable risks involved in pursuing the Action that could have led to a substantially smaller recovery or to no recovery at all for Lead Plaintiff and the Settlement Class.

In analyzing the risks concerning liability, the Court need not "decide the merits of the case or resolve unsettled legal questions." *Cinelli v. MCS Claim Servs., Inc.*, 236 F.R.D. 118, 121 (E.D.N.Y. 2006). Rather, the Court weighs the likelihood of success on the merits against the relief brought by the Settlement. *Id.* at 122. Courts regularly approve settlements where, as here, plaintiffs would have faced significant legal and factual obstacles to establishing liability. *See Global Crossing*, 225 F.R.D. at 459.

Here, the claims against AIG presented significant risks. Issues of proof in this case are complicated by the fact that the alleged Market Division Fraud involved hundreds of separate insurance transactions. Proof of wrongdoing would have to be established for each allegedly improper transaction separately. Moreover, the Accounting Fraud alleged is, at its crux, based on violations of very complex accounting rules, which might not be easily understood by a jury. The vast number of different accounting issues related to the Accounting Fraud would also have been a significant hurdle to be overcome with the jury. AIG's restatement affected **two-dozen different types** of accounting transactions, including (i) inflating claims reserves through allegedly sham reinsurance contracts that did not have sufficient risk to be accounted for as insurance; (ii) inflating earnings by means of allegedly improper "top side" adjustments of claims reserves without sufficient documentary evidence to support those adjustments and (iii) mischaracterization of millions of dollars in underwriting losses as investing losses through the acquisition and subsequent winding down of an off-shore reinsurance company. Dubbs Decl. ¶ 158-161.

---

*( . . . continued)*
order. AIG's request for review was granted, and Lead Plaintiff's request was denied. If the Action were to continue, issues related to class certification would have continued to be litigated.

Proving AIG's scienter to the jury would also have been challenging for the Settlement Class. For example, as noted above, all claims in the two Market Division cases brought by the New York Attorney General (against a total of five defendants) were either dismissed or the judgments were vacated. Indeed, even the 2004 misdemeanor and felony convictions of a dozen AIG and Marsh employees based on plea bargains related to bid-rigging were later reduced or vacated. *Id.* ¶¶ 51-57, 155-57, 161. Likewise, the criminal convictions a former AIG officer and four former Gen Re officers related to the Gen Re transaction were all vacated. *See U.S. v. Ferguson*, 653 F.3d 61, 95 (2d Cir. 2011). Further, many of the accounting entries that were later restated by AIG involved the exercise of professional judgment. *Id.* ¶ 161.

Thus, it was far from assured that a jury would have found AIG liable of securities fraud in this case. There was also a further risk that any finding against AIG could have been overturned on appeal. Numerous cases continue to demonstrate the enormous risks associated with prosecuting securities class actions.[10]

Given the uncertain prospects of success at trial and on any appeal as to the claims against AIG, settlement at this time is highly beneficial to the Settlement Class. The Settlement will provide tangible and certain relief to the Settlement Class Members now, and "without subjecting them to the risks, complexity, duration, and expense of continuing litigation." *Global Crossing*, 225 F.R.D. at 456-57; *see also Maley*, 186 F. Supp. 2d at 362 ("Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. These factors weigh in favor of the proposed Settlement.").

---

[10] *See, e.g.*, *AUSA Life Ins. Co. v. Ernst & Young*, 39 F.App'x 667, 674 (2d Cir. 2002) (affirming district court's dismissal after a full bench trial); *Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355, 374 (E.D.N.Y. 2000) (granting defendants' motion for judgment as a matter of law after jury verdict for plaintiffs).

5.      **The Settlement Class Faced Risks in Establishing Damages**

Damages issues in securities litigation are often reduced to a "battle of the experts," which could lead the jury in this Action to minimize the Settlement Class's proffered losses caused by AIG's participation in the alleged fraud.  *See In re Am. Bank Note Holographics, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) (McMahon, J.) ("In such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses."); *In re PaineWebber Ltd. P'Ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) (Stein, J.) (reasoning that "damages are a matter for the jury, whose determinations can never be predicted with certainty"), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  The issues raised in the report by AIG's expert on loss causation issues, Charles Cox, Ph.D. (produced as part of class certification discovery), and the questioning by counsel for AIG and other defendants' counsel at the deposition of Lead Plaintiff's loss causation expert, Professor John D. Finnerty, Ph.D., illustrate at least some of the challenges that the Settlement Class would have had to overcome to recover damages.  Dubbs Decl. ¶¶ 162-63.

For example, Defendants challenge the validity of Professor Finnerty's determination of loss causation with respect to *each* of the six disclosure dates at issue and with respect to the efficiency of the market for AIG bonds.  *Id.* ¶¶ 114, 162.  Among other things, they challenge his use of different methodologies to show the statistical significance of the stock drops related to the Market Division Fraud and the Accounting Fraud.  *See* Declaration of Charles C. Cox, dated Aug. 19, 2008, (D.E. #409, Ex. 1), ¶¶ 42-46.  Moreover, AIG would also likely argue at summary judgment and at trial that loss causation cannot be established unless Lead Plaintiff could show precisely how much of any decline was caused by each new disclosure related to the alleged fraud (and to specific defendants' role in the fraud) as opposed to other AIG or industry-related news that was made public on the disclosure dates.

Lead Plaintiff and Lead Counsel strongly believe that loss causation and resulting damages can be established with respect to the claims against AIG.  *See* Declaration of John D. Finnerty, Ph.D. in Support of Lead Plaintiff's Motion for Class Certification, D.E. #356 at Ex. 2, and Rebuttal Declaration of John D. Finnerty, Ph.D., D.E. #446 at Ex. 26.  However, Lead Plaintiff recognizes that at summary judgment or trial the Court or a jury could credit AIG's arguments and experts over those of the Settlement Class and determine that the class suffered no (or significantly smaller) recoverable damages. *See, e.g.*, *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK), 2007 WL 1438753, at *3 (S.D.N.Y. May 16, 2007) (Kaplan J.) (granting motion for summary judgment for, *inter alia*, failure to demonstrate loss causation), *aff'd* 2008 WL 4376259 (2d Cir. 2008); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008) (Pauley, J.) (same), *aff'd* 597 F.3d 501 (2d Cir. 2010).  Therefore, this *Grinnell* factor strongly favors approval of the Settlement.

### 6.     Ability of AIG to Withstand a Greater Judgment

AIG's financial condition has changed considerably during the course of the Action, and its condition years from now (at the point of enforcing a judgment) is far from certain.

At the beginning of the case, AIG was generally recognized as one of the strongest financial institutions in the world.  Indeed, it had a AAA rating by both Standard & Poor's and Moody's.  *See See* AIG Annual Report for 2005, filed with the SEC on Form 10-K filed Mar. 16, 2006, at 14 (AIG was rated AAA by all three of the major credit rating agencies—Standard & Poor's, Moody's Investors Service and Fitch Ratings—until March 2005).

 However, by September 2008, the Company was teetering on the brink of insolvency, and there was a distinct possibility that AIG would end up in bankruptcy.  Dubbs Decl. ¶¶ 58-69.

Moreover, AIG's risk of bankruptcy did not disappear as a result of the Government's bailout of the Company beginning in September 2008.  Based on the interest rates on AIG debt, it is clear that,

from September 2008 through 2010, investors believed that, notwithstanding the Government bailout of the Company, there was still a significant risk that it would have to file for bankruptcy. *Id.* ¶¶ 69-70.

Indeed, AIG admitted to its shareholders in its annual report for 2008 that there was a continuing risk that the Company would become insolvent:

> Borrowings available to AIG under the [Federal Reserve Board of New York Credit Facility and drawdowns under the Department of the Treasury Commitment] may not be sufficient to meet AIG's funding needs and additional financing may not be available or could be prohibitively expensive. . . . **If AIG is unable to obtain sufficient financing to meet its capital needs, AIG could become insolvent.**

AIG Form 10-K filed Mar. 2, 2009, at 25; *see also id.* at 21 ("Without additional support from the U.S. government, in the future there could exist substantial doubt about AIG's ability to continue as a going concern."); *id.* at 39 (In assessing AIG's ability to continue as a going concern, management considered, *inter alia*, "The commitment of the NY Fed and the United States Department of the Treasury to the orderly restructuring of AIG and their commitment to continuing to work with AIG to maintain its ability to meet its obligations as they come due . . . ."); AIG Form 10-K filed Feb. 26, 2010, at 17-18, 43 (same).

While AIG's financial outlook has improved greatly since then, no one can say with certainty what its ability to pay a settlement or judgment in this case will be in the future (*i.e.*, after trial and an appeal).

Given these circumstances, the seventh *Grinnell* factor also supports approval. *See, e.g., In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *7 (S.D.N.Y. Dec. 23, 2009) ("There exists the legitimate concern that Defendants might not be able to pay an award higher than the Settlement, even if Lead Plaintiffs were to prevail at trial. Accordingly, this factor supports approval of the Settlement."); *Maley*, 186 F. Supp. 2d at 365 (settlement warranted where "obtaining a greater recovery than provided by the Settlement would have been difficult" in light of defendant company's financial condition).

### 7.    The Settlement Amount Is More Than Reasonable

The eighth and ninth *Grinnell* factors concerning the reasonableness of the recovery also strongly weigh in favor of approving the Settlement.  The $725 million Settlement is a **very significant recovery** that falls well within the range of reasonableness both in absolute terms and when weighing potential recoveries and all the risks of proceeding with the claims against AIG.  *See Wal-Mart*, 396 F.3d at 119 (reasoning that "there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion") (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

Based on a comprehensive review of settlements in securities cases, the proposed Settlement would be the **second largest** private securities class action settlement since the fall of 2007, *i.e.* the onset of the financial crisis, and the **only** private securities class action settlement that we are aware of with a company that was essentially controlled by the Government.  Since the passage of the PSLRA, it is the **13th largest** private securities class action settlement according to Securities Class Action Services.  When combined with Lead Plaintiff's $97.5 million PwC Settlement and the $115 million Greenberg Settlement, it would be the **10th largest** securities class action settlement.

As noted by Professor Coffee, the $725 million settlement amount is an outstanding result, representing a recovery of 13.18% of the $5.5 billion in "maximum recoverable damages" in the case. *See* Coffee Decl. ¶ 22.  Moreover, when considered together with Lead Plaintiff's $115 million settlement with PwC and $97.5 million settlement with the Starr Defendants, the combined recovery for the Class represents more than 17% of maximum obtainable damages.  Dubbs Decl. ¶ 7.

Viewed in light of the significant risks discussed above, and compared to other securities class action settlements, the Settlement clearly represents an excellent result for the Settlement Class.  In sum, Lead Plaintiff and Lead Counsel submit that the Settlement is eminently fair, adequate and reasonable in

light of the best possible recovery and all of the risks of litigation, and should be approved.  The last two *Grinnell* factors clearly weigh in favor of approval.

## II.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

The Settlement Class here is the same as that authorized by the Court as part of the PwC Settlement.  It is also substantially similar to the settlement class that Judge Sprizzo certified in *In re AIG ERISA Litig.*, No. 04 Civ. 9387 (S.D.N.Y.), a related litigation with nearly identical underlying facts (*i.e.*, the class members' injuries stemmed from the Market Division Fraud and the Accounting Fraud) as in this Action.[11]  In presenting the proposed Settlement to the Court for preliminary approval, Lead Plaintiff requested that the Court preliminarily certify the Settlement Class so that Notice could be issued of the proposed Settlement, the Fairness Hearing, and the rights of Settlement Class Members to request exclusion, object or submit Proofs of Claim or Release Forms.  In its Preliminary Approval Order, the Court granted Lead Plaintiff's request and certified the Settlement Class.  Nothing has changed to alter the propriety of the Court's certification and, for the reasons stated in Lead Plaintiff's Memorandum of Law in Support of its Motion for Preliminary Approval of Class Settlement with American International Group, Inc., D.E. #566 (incorporated herein by reference), Lead Plaintiff requests that the Court: (i) finally certify the Settlement Class for Settlement pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (ii) appoint Lead Plaintiff as Settlement Class Representative; and (iii) appoint Lead Counsel as Settlement Class Counsel.

## III.    THE PLAN OF ALLOCATION SHOULD BE APPROVED

"When formulated by competent and experienced class counsel," a plan for allocation of net settlement proceeds "need have only a reasonable, rational basis."  *Global Crossing*, 225 F.R.D. at 462.  A reasonable plan may consider the relative strength and values of different categories of claims.  *Id.*

---

[11] Judge Sprizzo granted final approval of the related ERISA settlement on October 8, 2008.  *In re AIG ERISA Litig.*, No. 04-9387 (S.D.N.Y. Oct. 8, 2008).

"Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim." *Am. Bank Note*, 127 F. Supp. 2d at 429.

Lead Plaintiff respectfully submits that the Plan of Allocation, fully described in the Notice, should be approved as it provides a fair and equitable method of dividing the Settlement proceeds among Settlement Class Members who submit timely and valid Proof of Claim forms or Release Forms ("Authorized Claimants"), consistent with governing law.  The Settlement Class was informed that they had an opportunity to object to the Plan of Allocation by no later than December 30, 2011 and, to date, Lead Plaintiff and Lead Counsel are aware of no such objections.  Dubbs Decl. ¶ 170; Ex. 3-A.  The Plan of Allocation is predicated on: (i) the Supreme Court's decision in *Dura Pharmaceuticals* and its progeny; (ii) the timing of the alleged corrective disclosures during the Class Period; and (iii) the type of security purchased.  It was developed by the Settlement Class's non-testifying damages experts, Dr. Scott D. Hakala and Frank C. Torchio, both of whom have extensive experience in developing plans of allocation for settlements in securities class actions and who worked on the plan of allocation for the PwC Settlement.  *Id.* ¶ 165.[12]

As explained in the Notice, the Plan of Allocation apportions the recovery among Settlement Class Members who purchased or acquired AIG's publicly traded common stock, call options, put options and bonds during the Class Period.  Those who purchased common stock and options will recover a larger portion of the Settlement than those who purchased the bonds, in recognition of the particular risks involved in establishing loss causation and market efficiency for the bonds.  Specifically, Authorized Claimants with respect to the bonds only will share in up to 5% of the amount that will be distributed to all Settlement Class Members.  *Id.* ¶ 168.  The Plan distributes the recovery according to

---

[12] Dr. Hakala was the expert used by the SEC for its plan of allocation in the AIG Fair Fund settlement.

when Settlement Class Members acquired or sold their AIG Securities, taking into account the strength

of potential claims relevant to these time periods.  The Plan also limits Settlement Class Members'

recoveries to their out-of-pocket loss.  *Id.*  In recognition of some Class Members' recovery from the

Fair Fund created in *SEC v. American International Group, Inc.*, 06 Civ. 1000 (S.D.N.Y.) (LAP) ("Fair Fund

Distribution"), a claimant's Recognized Loss under the Plan of Allocation will also be reduced by seven-

eighths (7/8) of their Fair Fund Distribution.  This will ensure that Authorized Claimants do not

recover more than their alleged damages.

Under the Plan of Allocation, each Authorized Claimant is entitled to recover her Recognized

Loss to the extent that the Distribution Amount is sufficient.  If there are not sufficient funds,

Authorized Claimants will be entitled to receive their *pro rata* share of the Distribution Amount, *i.e.* the

percentage of their Recognized Loss determined by the ratio of the total Recognized Losses of all

Authorized Claimants to the Distribution Amount.  The Plan of Allocation therefore represents a fair

and equitable method for allocating the Distribution Amount among Authorized Claimants and should

be approved by the Court.

## CONCLUSION

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court (1) enter the proposed Judgment; (2) certify the Settlement Class and (2) enter the proposed Order Approving Plan of Allocation.

Dated:  New York, New York
        December 2, 2011

 

**MICHAEL DEWINE,**
**ATTORNEY GENERAL OF OHIO**

**LABATON SUCHAROW LLP**

By    /s/ Thomas A. Dubbs
     Thomas A. Dubbs (TD 9658)

Alan S. Kopit, Esq. (Ohio Bar #0031965)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114-2301
(216) 621-0150
(216) 274-2478 (Fax)

     Louis Gottlieb (LG 9169)
     Nicole M. Zeiss (NZ 3894)
     Thomas G. Hoffman, Jr. (TG 0330)
140 Broadway
New York, New York  10005
(212) 907-0700
(212) 818-0477 (Fax)

*Special Counsel to the Attorney General of Ohio and the*
*Ohio State Funds and Lead Counsel for the Class*

*Lead Counsel for Lead Plaintiff Ohio State Funds and*
*Lead Counsel for the Class*