**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x
                                                  :
                                                  :    ECF CASE
IN RE AMERICAN INTERNATIONAL GROUP,   :
INC. SECURITIES LITIGATION                :    Master File No. 04 Civ. 8141 (DAB) (AJP)
                                                  :
This Document Relates To:  All Actions    :    <u>Oral Argument Requested</u>
                                                  :
                                                  :
———————————————————————— x

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES AND <u>LEAD PLAINTIFF'S REQUEST FOR REIMBURSEMENT OF EXPENSES</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ..............................................................................................1

ARGUMENT ...........................................................................................................................3

I.     LEAD COUNSEL IS ENTITLED TO THE REASONABLE ATTORNEYS'
       FEE REQUESTED HEREIN ......................................................................................3

       A.     A Fee of 13.25% Is Fair, Reasonable, and Comparable to Fees Awarded
              in Similar Cases ...............................................................................................4

       B.     The Lodestar "Cross-Check" Supports the Reasonableness of the
              Requested Fee ..................................................................................................6

              1.     Plaintiffs' Counsel's Lodestar Multiplier Is Very Low .......................7

       C.     The Requested Fee Was Negotiated with Lead Plaintiff Is Entitled to
              Great Weight ....................................................................................................8

       D.     The Requested 13.25% Fee Is Appropriate Under the *Goldberger* Factors ....................8

              1.     The Time and Labor Expended by Plaintiffs' Counsel .......................9

              2.     The Magnitude and Complexities of the Litigation ...........................11

              3.     The Risks of the Litigation ................................................................12

              4.     The Quality of Representation ...........................................................16

              5.     The Requested Fee in Relation to the Results Achieved ...................18

              6.     Public Policy Considerations Support the Requested Fee ................19

       E.     The Class's Reaction to the Fee Request to Date .........................................20

II.    LEAD COUNSEL SHOULD BE REIMBURSED FOR LITIGATION
       EXPENSES REASONABLY INCURRED IN CONNECTION WITH THIS
       ACTION ....................................................................................................................21

III.   THE OHIO STATE FUNDS ARE ENTITLED TO REIMBURSEMENT OF
       REASONABLE COSTS AND EXPENSES, INCLUDING LOST WAGES ...................23

CONCLUSION ......................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Adelphia Commc'ns Corp. Sec.& Deriv. Litig.*
No. 03 MDL 1529, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006),
*aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008) ....................................................... 5, 8, 17

*In re Am. Bank Note Holographics, Inc. Sec. Litig.,*
127 F. Supp. 2d 418 (S.D.N.Y. 2001) ................................................................14

*In re Arakis Energy,*
No. 95 Civ. 3431, 2001 WL 1590512 (E.D.N.Y. October 31, 2001)................................21

*In re Bisys Sec. Litig.,*
No. 04-3840, 2007 WL 2049726 (S.D.N.Y. July 16, 2007) ....................................4

*In re Blech Sec. Litig.,*
No. 94 Civ. 7696, 2002 WL 31720381(S.D.N.Y. Dec. 4, 2002) .........................4

*Blum v. Stenson,*
465 U.S. 886 (1984) ................................................................................4, 6

*Boeing Co. v. Van Gemert,*
444 U.S. 472 (1980) ....................................................................................3

*In re Cardinal Health Inc. Sec. Litig.,*
528 F. Supp. 2d 752 (S.D. Ohio 2007) ............................................................5

*Carlson v. Xerox Corp.,*
596 F. Supp. 2d 400 (D.Conn. 2009)................................................................5

*In re Cavanaugh,*
306 F.3d 726 (9th Cir. 2002) ........................................................................24

*In re Charter Commc'ns, Inc. Sec. Litig., No. MDL 1506,*
No. 02-cv-1186, 2005 WL 4045741 (E.D. Mo. June 30, 2005) ........................24

*In re Cont'l Ill. Sec. Litig.,*
962 F.2d 566 (7th Cir. 1992) ........................................................................13

*In re Comverse Tech., Inc. Sec. Litig.,*
No. 06-cv-1825, 2010 WL 2653354 (E.D.N.Y. June 24, 2010)........................5,7

*City of Detroit v. Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974) ..........................................................................8

*In re Enron Corp. Sec., Deriv. & ERISA Litig.,*
　　586 F. Supp. 2d 732 (S.D. Tex. 2008) .................................................... 8, 21, 22

*In re EVCI Career Colls. Holding Corp. Sec. Litig.,*
　　No. 05-cv-10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ...................... 7

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
　　No. 02-cv-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ...................... 14,18

*Fogarazzo v. Lehman Bros., Inc.,*
　　No. 03-cv-5194, 2011 WL 671745 (S.D.N.Y. Feb. 23, 2011) ......................... 11

*In re Global Crossing Sec. & ERISA Litig.,*
　　225 F.R.D.436 (S.D.N.Y. 2004) .......................................................... 5, 6, 12, 22

*Goldberger v. Integrated Res., Inc.,*
　　209 F.3d 43 (2d Cir. 2000) .............................................................................. passim

*Hicks v. Morgan Stanley,*
　　No. 01-10071, 2005 WL 2757792 (S.D.N.Y. 2005) ................................ 4, 14,19

*In re Indep. Energy Holdings PLC Sec. Litig.,*
　　302 F. Supp. 2d 180 (S.D.N.Y. 2003) .............................................................. 21

*In re Initial Pub. Offering Sec. Litig.,*
　　671 F. Supp. 2d 467 (S.D.N.Y. 2009) .............................................................. 15

*LeBlanc-Sternberg v. Fletcher,*
　　143 F.3d 748 (2d Cir. 1998) ............................................................................ 10

*Luciano v. Olsten Corp.,*
　　109 F.3d 111 (2d Cir. 1997) .............................................................................. 6

*Maley v. Del Global Techs. Corp.,*
　　186 F. Supp. 2d 358 (S.D.N.Y. 2002) ...................................................... 5, 19, 20

*In re Marsh & McLennan Co., Inc. Sec. Litig.*
　　No. 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .................................. 14, 21, 23

*In re Merrill Lynch & Co.,Inc. Research Reports Sec. Litig.,*
　　246 F.R.D. 156 (S.D.N.Y. 2007) ...................................................................... 11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
　　No. 02 MDL 1484 , 2007 WL 313474 (S.D.N.Y. 2007) ............................... 10,11

*Missouri v. Jenkins,*
　　491 U.S. 274 (1989) ......................................................................................... 4, 6

*In re Nortel Networks Corp. Securities Litig.*
   539 F.3d 129 (2d Cir. 2008) ........................................................................................7

*In re Omnicom Group Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ......................................................................................14

*In re Oxford Health Plans, Inc. Sec. Litig.,*
   No. MDL 1222, 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003) ........................5

*In re Philip Servs. Corp. Sec. Litig.*,
   No. 98 Civ. 835, 2007 WL 959299 (S.D.N.Y. Mar. 28, 2007) ............................................15

*In re Prudential Sec. Inc. Ltd. P'ship Litig.*,
   985 F. Supp. 410 (S.D.N.Y. 1997) ..............................................................................20

*In re Salomon Analyst Metromedia Litig.*,
   544 F.3d 474 (2d Cir. 2008) ......................................................................................14

*Silverberg v. People's Bank,*
   No. 00-9548, 2001 WL 1268149 (2d Cir. Oct. 16, 2001) ....................................................4

*Stoneridge Investment Partners LLC v. Scientific-Atlanta Inc.*,
   552 U.S. 148 (2008) ................................................................................................14

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999) ..........................................................................13

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   No. 01 Civ. 11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) .....................................12

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ........................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................19

*In re Tyco Intern., Ltd. Multidistrict Litig.*,
   535 F. Supp. 2d 249 (D.N.H. 2007) ........................................................................8, 21

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
   724 F. Supp. 160 (S.D.N.Y. 1989) ..............................................................................20

*United States v. Ferguson,*
   653 F.3d 61 (2d Cir. 2011) ........................................................................................14

*In re Veeco Instruments Inc., Sec. Litig.,*
   No. 05 MDL 01695, 2007 WL. 4115808 (S.D.N.Y. Nov. 7, 2007) ....................................6

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
   396 F.3d 96 (2d Cir. 2005), *cert. denied sub nom. Leonardo's
   Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.,* 544 U.S. 1044 (2005) .............................................. 3, 4, 7

*In re Warnaco Group, Inc. Sec. Litig.,*
   No. 00 Civ. 6266, 2004 WL 1574690 (S.D.N.Y. July 13, 2004) ........................................................ 4

*In re WorldCom Sec. Inc. Litig.,,*
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ........................................................................ 8, 18, 19

*In Re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.,*
   364 F. Supp. 2d 980 (D. Minn. 2005) ........................................................................ 24


## STATE CASES

*Hersch v. DeWitt Stern Group, Inc.,*
   841 N.Y.S.2d 516 (2007) ...................................................................................... 13, 14


## DOCKETED CASES

*In re Bristol-Myers Squibb Sec. Litig.,*
   No. 00-1990 (D.N.J. May 11, 2006) ........................................................................ 23

*Cornwell v. Credit Suisse Group,*
   No. 08-cv-03758 (S.D.N.Y. July 18, 2011) ................................................................ 7

*In re HealthSouth Corp. Sec. Litig.,*
   No. 03-1500-S (N.D. Ala. July 26, 2010) .................................................................. 5

*Ohio Pub. Employees Ret. Sys. v. Freddie Mac,*
   No. 03-cv-4261 (S.D.N.Y. Oct. 27, 2006) .................................................................. 5

*In re Satyam Computer Services Ltd. Sec. Litig., Slip Op.,*
   No 09-2027 (S.D.N.Y Sept. 13, 2011) ...................................................................... 23


## STATUTES

Fed. R. Civ. P. 23 ........................................................................................................ 1

Fed. R. Civ. P. 54 ........................................................................................................ 1

Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4 (a)(4) ................................. 1, 23

## PRELIMINARY STATEMENT

Labaton Sucharow LLP and Hahn Loeser & Parks LLP, Court-appointed Lead Counsel for the Ohio Public Employees Retirement System ("OPERS"), State Teachers Retirement System of Ohio ("STRS Ohio") and the Ohio Police & Fire Pension Fund ("OP&F") (collectively, "Lead Plaintiff" or the "Ohio State Funds") and the Settlement Class,[1] respectfully submit this memorandum of law in support of, *inter alia*: (1) their motion, pursuant to Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure, on behalf of all plaintiffs' counsel who contributed to the prosecution of this Action ("Plaintiffs' Counsel"), for an award of attorneys' fees and reimbursement of litigation expenses to be paid out of the gross Settlement Amount  ("Escrow Account"), and (2) Lead Plaintiff's application for reimbursement of its reasonable costs and expenses (including lost wages) directly relating to the representation of the Settlement Class, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4 (a)(4).

Lead Plaintiff has reached a proposed settlement of the claims alleged against defendant American International Group, Inc. ("AIG") and certain related defendants in the above-captioned Action for $725 million in cash (the "Settlement") under the terms set forth in the Agreement.[2] This Settlement, if approved by the Court, would be the **second largest** private securities class action settlement since the onset of the financial crisis in the fall of 2007, and the **only**  private securities class action settlement with a company that was essentially controlled by the Government. Since the passage of the PSLRA, it is the **13th largest** private securities class action settlement

---

[1] All capitalized terms not otherwise defined herein have the same meaning as that defined in the Agreement of Compromise and Settlement (the "Agreement"), executed November 30, 2010.

[2] Pursuant to the terms of the Agreement, AIG shall fund the entire $725 million settlement in cash (as opposed to funding a portion in AIG stock) if the Company consummates a "Qualified Offering." *See* Agreement §I.A.2.  A Qualified Offering is "an offering of its common stock . . . in which [AIG] raises net proceeds of at least $550 million." *Id.* After the Settlement was submitted to the Court, AIG consummated a Qualified Offering in which it raised approximately $2.9 billion. Therefore, AIG will pay the entire Settlement Amount in cash.

according to the latest quarterly report of the Securities Class Action Services.[3]  When combined

with Lead Plaintiff's $97.5 million settlement with Defendant PricewaterhouseCoopers LLP ("PwC"

and the "PwC Settlement") and the $115 million contingent settlement with Defendant Maurice R.

"Hank" Greenberg and related defendants (the "Greenberg Settlement"), it would be the ***10th***

***largest*** securities class action settlement.  This is an exceptional result achieved through Lead

Plaintiff and Lead Counsel's persistent and creative efforts.  Lead Plaintiff has now reached

settlements or contingent settlements with all defendants in the Action.

Lead Counsel respectfully seeks an award of attorneys' fees in the amount of 13.25% of the

"Net Settlement" (approximately $716.74 million)[4] and reimbursement of $8,257,111.29 in expenses

reasonably incurred in the course of pursuing the claims against AIG.  This request is supported by

the Declarations of Dennis P. Smith, Esq., Assistant Attorney General in the Office of the Ohio

Attorney General, and Professor John C. Coffee, Esq.  *See* Dubbs Decl. Ex. 7 and 8.  Further, Lead

Plaintiff, supported by the Declarations of Julie E. Becker, Esq. and William J. Neville, Esq., seeks

reimbursement of $71,910.00 in costs as a result of the time expended by OPERS and STRS Ohio in

representing the Settlement Class.  *Id.* Ex. 4 and 5.

The attorneys' fees request is very fair and reasonable when one considers: (i) the

outstanding result for the Settlement Class; (ii) the amount of work done by Lead Counsel over the

past seven years; (iii) the risk involved in this litigation; and (iv) the amount of fees awarded by

courts within this Circuit and in other circuits in comparable cases.  The reasonableness of the

requested fee also is amply supported by comparing it to Lead Counsel's AIG-related lodestar of

---

[3] *See* Declaration of Thomas A. Dubbs in Support of Proposed Class Settlement, Plan of Allocation and Award of Attorneys' Fees and Expenses, dated December 2, 2011 ("Dubbs Decl."), Ex. 1.  All exhibits referenced herein and in Lead Plaintiff's submissions in connection with approval of the Settlement are annexed to the Dubbs Decl.  For clarity, citations to exhibits that themselves have attached exhibits, will be referenced as "Ex. ___ - ___."  The first numerical reference refers to the designation of the entire exhibit attached to the Dubbs Decl. and the second reference refers to the exhibit designation within the exhibit itself.

[4] "Net Settlement" is the $725 million Settlement Amount minus Court-awarded litigation expenses.

nearly $96.76 million, resulting in a negative lodestar multiplier of 0.98.  The requested expenses are also reasonable, as they are the type that are regularly reimbursed by courts within this Circuit and they were necessary for the thorough prosecution of the Action.  To date, no Settlement Class Members have filed objections to Counsel's fee and expense request.[5]

It is respectfully submitted that without the tenacity and creativity of Lead Counsel, the Settlement would not have been reached.  Accordingly Lead Counsel's fee and expense request should be granted.

## ARGUMENT

## I.     LEAD COUNSEL IS ENTITLED TO THE REASONABLE ATTORNEYS' FEE REQUESTED HEREIN

It is well-settled that attorneys who represent a class and achieve a benefit for class members are entitled to a reasonable fee as compensation for their services.  The Supreme Court has recognized that "a lawyer who recovers a common fund for the benefit of persons other than . . . his client is entitled to a reasonable attorneys' fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  The Second Circuit, similarly, has confirmed that attorneys who create a "common fund" are entitled to "a reasonable fee—set by the court—to be taken from the fund." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

Although recognizing that the trend within the Second Circuit is toward the percentage method, the Second Circuit stated in the *Wal-Mart* case that "[c]ourts may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method.  The lodestar method multiplies hours reasonably expended against a reasonable hourly rate.  Courts in their discretion may increase the lodestar by applying a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys . . . .  Irrespective of which method is used,

---

[5] The time for Settlement Class Members to object to the application for attorneys' fees and reimbursement of litigation expenses will expire on December 30, 2011.  Any objections received will be addressed in Lead Plaintiff's reply papers, which will be filed with the Court on January 13, 2012.

the '*Goldberger* factors' ultimately determine the reasonableness of a common fund fee." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005), *cert. denied sub nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005); *see also Goldberger*, 209 F.3d at 50 ("Both the lodestar and the percentage of the fund methods are available to district judges in calculating attorneys' fees in common fund cases.").[6]

Here, regardless of which method is used, the requested fee is fair and reasonable and should be awarded by the Court.

**A.**      **A Fee of 13.25% Is Fair, Reasonable, and Comparable to Fees Awarded in Similar Cases**

A reasonable percentage fee award generally should emulate what counsel would receive had they bargained in the marketplace.  *See Missouri v. Jenkins*, 491 U.S. 274, 285 (1989).  The attorneys' fee requested here is fully consistent with the fee agreement negotiated with a very sophisticated Lead Plaintiff.  If this action were a non-representative litigation, the customary fee arrangement likely would be contingent, on a percentage basis, and in the range of 30% to 33% of the recovery, ***a much higher percentage than the 13.25% requested in this Action***.[7]  *See Blum v. Stenson*, 465 U.S. 886, 904 (1984) ("In tort suits, an attorney might receive one third of whatever amount the plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery.")

---

[6] *See also In re Bisys Securities Litigation,* No. 04-3840, 2007 WL 2049726, at *2 (S.D.N.Y. July 16, 2007) (Rakoff, J.) ("The percentage method, 'though not without flaws, is often preferable to the lodestar method to determine attorneys' fees in class actions because it reduces the incentive for counsel to drag the case out [and] fewer judicial resources will be spent in evaluating the fairness of the fee petition.' . . .  The lodestar method remains highly useful, however, as a 'cross-check' to further ensure reasonableness.").

[7] Many courts presiding over securities class actions within the Second Circuit have awarded fees of 30% or more. *See, e.g., Silverberg v. People's Bank*, No. 00-9548, 2001 WL 1268149, at *1 (2d Cir. Oct. 16, 2001) (affirming district court order awarding attorney's fees and expenses of nearly 33-1/3% of settlement fund); *Bisys*, 2007 WL 2049726, at *3 (awarding 30% fee on $65 million settlement); *Hicks v. Morgan Stanley*, No. 01-10071, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (Holwell, J.) (reasoning that "the 30% fee is consistent with fees awarded in comparable class action settlements in the Second Circuit."); *In re Warnaco Group, Inc. Sec. Litig.*, 00 Civ. 6266, 2004 WL 1574690, at *2 (S.D.N.Y. July 13, 2004) (McKenna, J.) (awarding 30% of the settlement fund in fees); *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (Sweet, J.) (awarding one-third of the settlement fund in fees).

A 13.25% attorneys' fee falls well within the range of fees awarded by courts in common-fund cases in this Circuit since *Goldberger*. *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (McMahon, J.) ("Courts in this Circuit have awarded fees ranging from 15% to 50% of the settlement fund.") (awarding 33-1/3% fee). In securities class actions and other common fund cases within this Circuit that have settled for hundreds of millions of dollars, courts have often awarded fees ranging from 13.5% to 28% of the settlement fund. *See, e.g.*, *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-cv-1825, 2010 WL 2653354, at *4 (E.D.N.Y. June 24, 2010) (Garaufis, J.) (awarding attorney fee of 25% of $225 million settlement); *In re Marsh & McLennan Co. Inc. Sec. Litig.*, No. 04-cv-08144, 2009 WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) (McMahon, J.) (awarding 13.5% of $400 million settlement); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03 MDL 1529, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (McKenna, J.) (awarding 21.4% of the almost $455 million settlement), *aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008); *Ohio Pub. Employees Ret. Sys. v. Freddie Mac*, No. 03-cv-4261, slip op. (S.D.N.Y. Oct. 27, 2006) (Sprizzo, J.) (awarding 20% of $410 million settlement) (submitted herewith as part of compendium of unreported cases, Dubbs Decl. Ex. 21); *Global Crossing*, 225 F.R.D. at 464-68 (awarding 15.7% of $245 million settlement); *In re Oxford Health Plans, Inc. Sec. Litig.*, No. MDL 1222, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (Brieant, J.) (awarding 28% of $300 million settlement).

An examination of fee decisions in securities class actions with comparable settlements of between $600 and $800 million in other federal jurisdictions also shows that an award of 13.25% would be reasonable *See In re HealthSouth Corp. Sec. Litig.*, No. 03-1500-S, slip op. (N.D. Ala.) (Dubbs Decl. Ex. 1 and 21) (awarding an average of 15.3% of $804,500,000 total settlement amount); *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400 (D.Conn. 2009) (awarding 16% of $750,000,000 settlement); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) (awarding 18% of $600,000,000 settlement); *see also* Coffee Decl. ¶¶ 18-20 (listing fee awards in cases that settled for $400 million to

$1 billion and concluding that the proposed fee is "well within the mainstream of fee awards in recent comparable securities class actions.")  Accordingly, the attorneys' fee requested here is within the range of other fees awarded by courts across the country.

**B.      The Lodestar "Cross-Check" Supports
          the Reasonableness of the Requested Fee**

The Second Circuit encourages the practice of performing a lodestar "cross-check" on the reasonableness of a fee award.  *See Goldberger*, 209 F.3d at 50.  The lodestar is calculated by multiplying the number of hours expended on the litigation by a particular timekeeper by his or her current hourly rate.  The hourly billing rate to be applied is the attorney's normal hourly billing rate, so long as that rate conforms to the billing rate charged by attorneys with similar experience in the community where the counsel practices, *i.e.*, the "market rate."  *See Blum*, 465 U.S. at 895;  *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'") (quoting *Blum*, 465 U.S. at 896 n.11).  As discussed below, the current rates of Plaintiffs' Counsel here are in accord with the competitive market hourly rates in their legal community for cases of this sort.  Dubbs Decl. Ex. 18; 19; Coffee Decl. ¶ 39.[8]

"Under the lodestar method of fee computation, a multiplier is typically applied to the lodestar."  *Global Crossing*, 225 F.R.D. at 468.  An appropriate multiplier represents the "litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."  *Id.* (citing *Goldberger*, 209 F.3d at 47; *Savoie*, 166 F.3d at 460).  As Professor Coffee notes, "Here, [the] cross-check is extraordinarily simple to compute.  Because Lead Counsel

---

[8] The Supreme Court and other courts have held that the use of current rates is proper because such rates more adequately compensate for inflation and loss of use of funds.  *See Jenkins*, 491 U.S. at 283-84;  I*n re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695, 2007 WL 4115808, at *9 (S.D.N.Y. Nov. 7, 2007) (McMahon, J.) (reasoning that "use of current rates to calculate the lodestar figure has been repeatedly endorsed by courts as a means of accounting for the delay in payment inherent in class actions and for inflation").

is only seeking their lodestar, the lodestar multiplier is by definition, one.  This modest request contrasts sharply with the practice in other class actions."  Coffee Decl. ¶¶ 33-34.

### 1. Plaintiffs' Counsel's Lodestar Multiplier Is Very Low

The total lodestar of Plaintiffs' Counsel related to prosecuting the claims against AIG is nearly $96.76 million.  Dubbs Decl. Ex. 20.  This represents 259,926.5 hours spent by attorneys, paralegals, investigators and professional analysts furthering the prosecution of the AIG claims. Dubbs Decl. Exs. 10-A to 17-A; 20.  Plaintiffs' Counsel compiled the hours from contemporaneous time records maintained by each individual who participated in the prosecution of the Action.  *Id.*

Plaintiffs' Counsel's lodestar of $96.76 million actually represents a ***negative*** "multiplier" of 0.98, which is **very** low.   In *In re Nortel Networks Corp. Securities Litigation*, the Second Circuit recently ruled that a $34 million fee, representing a 2.04 multiplier was "***toward the lower end of reasonable fee awards***."  539 F.3d 129, 134 (2d Cir. 2008) (emphasis added).  Likewise, in *Bisys*, the court found that the reasonableness of the 30% fee on the $65 million settlement was confirmed by the multiplier of 2.99, noting that "[s]uch a multiplier falls well within the parameters set in this district and elsewhere."  2007 WL 2049726, at *3.

In complex contingent litigation, lodestar multiples between 2 and 5 are commonly awarded. *See, e.g., Wal-Mart*, 396 F.3d at 123 (upholding a multiplier of 3.5 as reasonable on appeal); *Cornwell v. Credit Suisse Group*, No. 08-cv-03758, slip op. (S.D.N.Y. July 18, 2011) (Marrero, J.) (awarding 27.5% fee on $70 million settlement, representing a multiplier of 4.7) (Dubbs Decl. Ex. 21); *Comverse*, 2010 WL 2653354, at *5 (awarding 2.78 times lodestar, and noting that "[w]here . . . counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar"); *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05-cv-10240, 2007 WL 2230177, at *17 (S.D.N.Y. July 27, 2007) (McMahon, J.) (lodestar multiplier of 2.48 was "found to be reasonable

by courts that have used lodestar cross checks in complex class actions"); *Adelphia*, 2006 WL

3378705, at *3 (awarding fee representing a 2.89 multiplier).[9]

In short, the reasonableness of the requested attorneys' fee is readily confirmed by such a

low lodestar multiplier.  Lead Counsel submits that the requested fee should be awarded.

### C.     The Requested Fee Was Negotiated with Lead Plaintiff and Is Entitled to Great Weight

The amount of the requested fee was the subject of informed negotiation between Lead

Counsel and the Office of the Ohio Attorney General on behalf of Lead Plaintiff.  Dubbs Decl. ¶

38.  The Ohio Attorney's General's Office has noted the "extraordinary circumstances confronted in

this case, the creative and aggressive resolution of the issues as reflected in the Settlements, and the

excellent result obtained by Lead Counsel for all members of the Settlement Class, who will benefit

by the recovery made under these settlements.   Moreover, the Ohio AG believes that [the fee

requested is] fully consistent with the Contract . . . ."   *See* Smith Decl. ¶ 22.  This support by the

Ohio Attorney General's Office strongly favors approval of the requested fee.  *See WorldCom,* 388

F. Supp. 2d 319 at 356  ("When class counsel in a securities lawsuit have negotiated an arm's-length

agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that

lead plaintiff endorses the application following close supervision of the litigation, the court should

give the terms of that agreement great weight.").

### D.     The Requested 13.25% Fee Is Appropriate Under the *Goldberger* Factors

In determining a reasonable attorneys' fee, district courts are guided by the factors first

articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974).  As

summarized more recently in *Goldberger*, these factors include:

---

[9] It should also be noted that outside the Second Circuit, in cases as large as *Enron* and *Tyco*, courts have approved multipliers greater than 2.  *See, e.g., In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) (awarding 9.52% fee representing a 5.2 multiplier in a $7.2 billion settlement); *In re Tyco Intern., Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 270 (D.N.H. 2007) (awarding 14.5% fee representing a 2.697 multiplier in a $3.2 billion settlement).

> (1) the time and labor expended by counsel; (2) the magnitude and
> complexities of the litigation; (3) the risk of the litigation . . . ; (4) the
> quality of representation; (5) the requested fee in relation to the
> settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50.  As discussed below and in the Dubbs Declaration, application of these

criteria to the facts now before this Court shows that Lead Counsel's fee request is clearly reasonable

and warranted.

### 1.  The Time and Labor Expended by Plaintiffs' Counsel

As detailed in the declarations submitted by Lead Counsel and other Plaintiffs' Counsel who

contributed to the prosecution of the Action, submitted herewith, Plaintiffs' Counsel have devoted

substantial time and effort to the prosecution of the claims against AIG and related defendants in

this Action and to the settlement of the claims on terms very favorable to the Settlement Class.

Dubbs Decl. Ex. 10-A to 17-A; 20.  The Settlement follows nearly seven years of litigation that

included:

- Fully-briefed motion practice, on two separate occasions, to
  determine the lead plaintiff;

- Motions to dismiss filed by 23 defendants, all of which
  (except one) the Court denied in April and May 2006;

- Fact and expert discovery related to class certification,
  followed by a contested motion for class certification
  involving four days of legal argument and hearings;

- The review and analysis of more than 53.3 million pages of
  documents by defendants and non-parties, including more
  than 12 million pages produced by AIG; and

- 97 depositions of fact and expert witnesses.[10]

Plaintiffs' Counsel collectively devoted nearly 260,000 hours to prosecution of the claims

against AIG, resulting in a combined "lodestar" amount of $96.76 million at Counsel's regular and

---

[10] For a full recitation of the procedural and litigation history of the Action, the Court is respectfully referred to the
Dubbs Decl. ¶¶ 24-139.

current billing rates.  *See* Dubbs Decl. Exs. 10-A to 17-A; 20.  (As explained by the Second Circuit in *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998), "current rates, rather than historical rates, should be applied in order to compensate for the delay in payment.").  If the Court approves the Settlement, Lead Counsel will also devote additional hours to the settlement administration and distribution process, without any additional compensation.

With respect to billing rates, Lead Counsel submits that the rates billed, averaging $384 per hour for attorneys, and $372 for all professionals, are comparable to those of peer plaintiffs' and defense-side law firms litigating matters of similar magnitude in this District.  Dubbs Decl. Ex. 18; 19.  Similar or higher billing rates have been approved by other courts in this District.  *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 , 2007 WL 313474, at *22 (S.D.N.Y. Feb. 1, 2007) (Keenan, J.) (approving billing rates up to $850 per hour and observing that "[t]he rates charged by counsel, though high, are not inordinate for top-caliber New York law firms").[11]

With respect to the hours worked, Lead Counsel submits that the substantial time devoted to litigating the claims against AIG reflects the tremendous effort needed to prosecute those claims and to bring them to a favorable resolution.  There are a number of core attorneys on the case who have devoted large amounts of their time to the litigation in order to insure continuity and to build on their knowledge base.  Document review was structured to limit overall cost, with the bulk of the initial review being conducted by junior attorneys hired by Labaton Sucharow.  Dubbs Decl. ¶¶ 126, 133-135.  These junior attorneys were trained and supervised by more senior Labaton attorneys and worked closely with accounting experts and insurance experts in order to insure the quality of their work.

---

[11]  The hourly billing rates of Plaintiffs' Counsel here ranged from $305 to $895 for partners, $575 to $665 for Of Counsels, and $195 to $540 for associates.  *See* Dubbs Decl. Ex. 10-A to 17-A.  Sample defense firm billing rates, gathered by Labaton Sucharow from bankruptcy court filings between 2007 and 2010, in many cases exceeded these rates.  Specifically, 2010 hourly billing rates for the law firms that represented certain defendants in this Action, *e.g.*, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Sidley Austin LLP, and Skadden, Arps, Slate, Meagher & Flom LLP, ranged from $590 to $995 for partners, $625 to $810 for Of Counsels, and $250 to $680 for associates.  Dubbs Decl. Ex. 19.

In addition, substantial effort went into investigating the claims against AIG; drafting the amended complaints; responding to AIG's motion to dismiss; reviewing and analyzing the 53.3 million page document production, including more than 12 million pages produced by AIG; class discovery, including the deposition of AIG's loss causation expert; preparation for the fact depositions; extensive analysis of loss causation issues, damages issues and complex accounting issues; and the taking of 97 depositions of fact and expert witnesses, most of which were AIG employees or former employees. Dubbs Decl. ¶ 71-81, 118-139.

As further supported by the lodestar cross-check, Lead Counsel submits that the first *Goldberger* factor weighs strongly in favor of the requested attorneys' fee.

### 2. The Magnitude and Complexities of the Litigation

Courts have long recognized that shareholder class actions are notoriously complex and difficult to prosecute. *See*, *e.g.*, *Fogarazzo v. Lehman Bros., Inc.*, No. 03-cv-5194, 2011 WL 671745, at *3 (S.D.N.Y. Feb. 23, 2011) (Scheindlin, J.) ("securities actions are highly complex"); *Merrill Lynch Research Reports*, 246 F.R.D. at 172 ("Securities class litigation " 'is notably difficult and notoriously uncertain.' ").

Here, in addition to the complex issues of law and fact associated with securities class actions generally, this case presented a *sui generis* fraud involving (i) the payment of undisclosed contingent commissions and alleged bid-rigging (the "Market Division Fraud") and (ii) extraordinarily complex sets of accounting issues that led to AIG's $3.9 billion Restatement with respect to approximately ***two dozen separate types*** of accounting issues (the "Accounting Fraud"). Dubbs Decl. ¶ 40. Lead Counsel, with the assistance of insurance and accounting experts, devoted thousands of hours to (i) analyzing hundreds of AIG insurance transactions that may have been part of the Market Division Fraud; (ii) learning the applicable accounting rules (which, in some cases, changed during the Class Period); (iii) analyzing thousands of AIG's accounting transactions and

memoranda and PwC workpapers in order to piece together the documentation and understand the decision-making processes for hundred of allegedly improper accounting entries and (iv) determining AIG's knowledge (through the knowledge of its top executives) of the alleged Market Manipulation and Accounting Frauds.  Dubbs Decl. ¶ 139, 177.  This effort, and the breadth of Lead Counsel's investigation, are noted by Professor Coffee as compelling factors that support the reasonableness of the fee request.  Coffee Decl. ¶¶ 24-29.

Moreover, efforts to resolve the Action, including the direct negotiations between the Ohio Attorney General and AIG (along with a senior representative of the U.S. Treasury) that ultimately led to this Settlement, were unusually sensitive and complex and required a tremendous amount of skill, tenacity and creativity on the part of Lead Counsel.[12]  *See* Smith Decl. ¶¶ 5, 33, 39-46.  Even after a memorandum of understanding was reached in July 2010, four months of negotiation and additional mediation were required to achieve the Settlement.  At every juncture, Lead Counsel rose to newly presented challenges and was fully prepared to litigate this case to judgment.  Considering the magnitude and complexity of this Action, the 13.25% fee request is entirely warranted.

### 3. The Risks of the Litigation

The Second Circuit has identified 'the risk of success as "perhaps the foremost" factor to be considered in determining' a reasonable award of attorneys' fees.  *Global Crossing,* 225 F.R.D. at 467 (quoting *Goldberger*, 209 F.3d at 54); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008) (McMahon, J.) ("Courts have repeatedly recognized that 'the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award to plaintiffs' counsel in class actions.").  Courts continue to recognize that "[l]ittle about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01 Civ. 11814, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) (Pollack, J.).

---

[12] As noted by Professor Coffee, "This tactic would have been beyond the capacity of most plaintiff's law firms, which simply lack the skill set for such negotiations."  Coffee Decl. ¶ 31.

The contingency risk here was very significant and fully supports the requested fee. Lead Counsel undertook this action on a strictly contingent-fee basis, and prosecuted the claims with no guarantee of compensation or recovery of any litigation expenses. *See In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (Pollack, J.) (class counsel not only undertook risks of litigation, but advanced its own funds and financed the litigation). Lead Counsel's risk encompasses not just the risk of non-payment, but also the risk of underpayment. *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 569-70 (7th Cir. 1992) (reversing district court's fee award where court failed to account for, among other things, risk of underpayment to counsel).

As discussed in the Dubbs Declaration, this case had significant risk from the beginning, when it was based solely on the Market Division Fraud, which had never before been the basis for a securities class action. Indeed, the New York Appellate Division subsequently ruled that the payment of contingent commissions – an integrated part of the scheme – was not *per se* illegal. *See Hersch v. DeWitt Stern Group, Inc.*, 841 N.Y.S.2d 516, 518 (2007) ("Contingent commission agreements between brokers and insurers are not illegal . . . , and, in the absence of a special relationship between the parties, defendant had no duty to disclose the existence of the contingent commission agreement . . . ."). Further, five Marsh employees accused of bid rigging were tried in two cases in New York State Court. After lengthy bench trials, the defendants in one case were found not guilty and the defendants in the other case had their convictions vacated. *See* Dubbs Decl. ¶¶ 51-55. Even those AIG and Marsh employees who pled guilty to bid rigging in 2004 had their convictions reduced or vacated. *Id.* ¶ 56.

Moreover, Lead Counsel's opposition to Defendants' numerous motions to dismiss, Lead Plaintiff's vigorously contested motion for class certification, and the very broad fact and expert discovery in this case have revealed that potential barriers to recovery lie ahead. For example, the complexity of the accounting and insurance issues may make it difficult to prove that AIG officers

acted with scienter.  We note that even with respect to the Gen Re Transaction, arguably Lead

Plaintiff's strongest Accounting Fraud claim, there are potential problems.  A criminal case against a

former AIG officer and four former Gen Re officers resulted in convictions after a five week trial.

However, all of those convictions were recently vacated by the Second Circuit,  *see United States v.*

*Ferguson*, 653 F.3d 61 (2d Cir. 2011), and it is uncertain whether the Government will seek a retrial.

Dubbs Decl. ¶¶ 47-50, 158-161.

The risks related to establishing loss causation also support the requested fee.  In its class

certification briefing and in Court hearings, AIG has tenaciously challenged Lead Plaintiff's ability to

establish loss causation for each of the alleged disclosure dates.  Likewise, it has challenged Lead

Plaintiff's calculation of damages.  At summary judgment and at trial, AIG would likely have argued

that Lead Plaintiff was unable to prove that any drops in AIG's stock price were caused by

disclosures of new information regarding the alleged fraud (as opposed to being reactions to other

market factors or non-fraud-related news pertaining to AIG.)[13]  *See* Dubbs Decl. ¶¶ 162-163.

Further, any resolution of damages issues necessarily would involve a "battle of the experts,"

with the concomitant risk that the jury could credit the Defendants' experts over those of Lead

Plaintiffs.  *See Hicks*, 2005 WL 2757792, at *6 (reasoning that "a 'battle of the experts' . . . creates a

significant obstacle to plaintiffs in establishing liability"); *In re Am. Bank Note Holographics, Inc. Sec.*

*Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) (McMahon, J.) ("In such a battle, Plaintiffs'

---

[13] During the course of the Action, there were also significant changes in law with respect to class certification and loss causation that should be considered during the evaluation of the attorneys' fees request. *See Flag Telecom*, 2010 WL 4537550, at *27-28 (noting that "the risk of this case for Lead Counsel increased as a result of developments in the law during the course of this litigation, especially in the areas of loss causation and class certification"); *see also Marsh*, 2009 WL 5178546, at *18 (noting that "[w]hile risk is measured as of when the case is filed . . . changes in the law during the course of litigation can increase those risks considerably"). Here, the litigation risk increased due to several rulings. For example, the Supreme Court made rulings in *Stoneridge Investment Partners LLC v. Scientific-Atlanta Inc.*, 552 U.S. 148 (2008), concerning liability with respect to claims under 10b-5 (a) and (c) of the Exchange Act.  In *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2d Cir. 2008), the Second Circuit vacated a grant of class certification and ruled that a district court must give defendants an opportunity to rebut the fraud-on-the-market presumption at the class certification stage, and in *In re Omnicom Group Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010), the Circuit affirmed summary judgment in favor of defendants for failure to establish loss causation as a matter of law.  Also, as noted above, the Appellate Division ruled that the payment of contingent commissions was not *per se* illegal.  *Hersch*, 841 N.Y.S.2d at 518.

Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses").

Finally, during the course of the litigation, a serious and completely unanticipated risk arose that AIG would not be able to pay a substantial judgment or settlement amount.  *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 509 (S.D.N.Y. 2009) (awarding lead counsel more than $170 million in attorney fees, one-third of the net settlement fund for a $586 million settlement, where the risk of the litigation "dramatically increased" after the outset of the case); *see also In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 835 (AKH), 2007 WL 959299, at *2 (S.D.N.Y. Mar. 28, 2007).  The parties could not have predicted that this risk would arise at the outset of the litigation, because, at that time, AIG was one of the strongest financial companies in the world – an AAA rated company.  *See* AIG Annual Report for 2005, filed with the SEC on Form 10-K, at 14 (Mar. 16, 2006) (AIG was rated AAA by all three of the major credit rating agencies—Standard & Poor's, Moody's Investors Service and Fitch Ratings—until March 2005).  Nevertheless, by September 2008, the Company was teetering on the brink of insolvency, and there was a distinct possibility that AIG would end up in bankruptcy.  *See* Dubbs Decl. ¶ 68.

Moreover, AIG's risk of bankruptcy did not disappear as a result of the Government's bailout of the Company beginning in September 2008.  Based on the interest rates on AIG debt, it is clear that, from September 2008 through 2010, investors believed that, notwithstanding the Government bailout of the Company, there was still a significant risk that it would have to file for bankruptcy.  *Id.* ¶¶ 68-70.

Indeed, AIG admitted to its shareholders in its annual report for 2009 that there was a continuing risk that the Company would become insolvent:

> Borrowings available to AIG under the [Federal Reserve Board of New York] FRBNY Credit Facility and drawdowns under the Department of the Treasury Commitment may not be sufficient to meet AIG's funding needs and additional financing may not be

> available or could be prohibitively expensive. . . . **If AIG is unable to obtain sufficient financing to meet its capital needs, AIG could become insolvent.**

AIG Form 10-K dated March 2, 2009, at 21; *see also id.* ("Without additional support from the U.S. government, in the future there could exist substantial doubt about AIG's ability to continue as a going concern."); *id.* at 39 (In assessing AIG's ability to continue as a going concern, management considered, *inter alia*, "The commitment of the NY Fed and the United States Department of the Treasury to the orderly restructuring of AIG and their commitment to continuing to work with AIG to maintain its ability to meet its obligations as they come due . . . ."); AIG Form 10-K dated Feb. 26, 2010, at 17, 43 (same).  The navigation of these risks took considerable skill which, in Professor Coffee's opinion, supports the fee request.  Coffee Decl. ¶¶ 28-32.

Accordingly, Lead Counsel submits that an analysis of the risks faced by the Settlement Class strongly supports the requested fee award.

### 4.    The Quality of Representation

Lead Counsel also respectfully submits that the quality of its representation supports the reasonableness of the requested fee.

Given the factual intricacies of the claims, the presence of numerous contested issues, the resources possessed by AIG, and the evolving issues concerning AIG's financial condition, this case required the expertise and capacity of Lead Counsel and its proven ability to prosecute cases over an extended period and through trial.  As the Court is aware, Labaton Sucharow has many years of experience in complex federal civil litigation, particularly the litigation of securities and other class actions.  Dubbs Decl. Ex. 10-C.  Likewise, Hahn Loeser, one of Ohio's largest and most respected law firms, has served as lead counsel in, and has defended, many class actions in the securities area, as well as in the areas of banking law, privacy, real estate, and antitrust law.  Dubbs Decl. Ex. 11-C.  This Settlement represents a highly favorable result for the Settlement Class in the face of uniquely

difficult legal, financial and  political circumstances, and is attributable to the diligence, determination, creativity, and hard work of Lead Counsel.

Moreover, Lead Counsel's contacts and reputation were key to hiring top-shelf financial analysts and investment bankers (professionals who generally do not work for plaintiffs' firms), to provide the Ohio Attorney General with important advice regarding how much AIG could afford to pay, and how to craft a settlement package that included cash and securities in a way that would maximize the dollar value of the total payment.  Dubbs Decl. ¶ 145.

For example, Lead Counsel retained Hugh Lamle, the president of MD Sass Investors Services Inc., a registered investment advisor, to prepare a number of financial analyses of AIG. Dubbs Decl. ¶ 146.  Based upon those analyses, Lead Counsel concluded that the Company could afford to pay a settlement in this case within the range that the Settling Parties eventually agreed to, with the proviso that a substantial portion of the settlement initially would have to consist of securities.  *Id.*

In order to put into effect Lead Counsel's strategy for attempting to resolve the case by face-to-face negotiation between the parties, Lead Counsel also retained the services of a restructuring expert, Robert Kost, the former Managing Director and Co-Head of Gleacher & Company's Restructuring Group.  Dubbs Decl. ¶ 148.  Not only was Mr. Kost eminently qualified to advise Lead Counsel and Lead Plaintiff on substantive issues relating to the AIG Settlement, he was the ideal person to assist in Lead Plaintiff's direct, face-to-face negotiations with Treasury, because he previously had worked with the senior Treasury official who represented AIG in those negotiations. *Id.*

The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work.  *See Adelphia*, 2006 WL 3378705, at *3 ("The fact that the settlements were obtained from defendants represented by formidable opposing counsel from some of the best defense firms in the

country also evidences the high quality of lead counsels' work."). The skill, tenacity, experience and resources of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for AIG, are well known. *See, e.g.*, *WorldCom,* 388 F.Supp.2d at 358 (stating defense counsel, including Paul, Weiss, acted as "formidable opposing counsel" and were "some of the best defense firms in the country.")

### 5.   The Requested Fee in Relation to the Results Achieved

The fifth *Goldberger* factor, the relation of the requested fee to the Settlement, also supports the requested attorneys' fee.

As discussed above, this Settlement provides the Class with an all-cash recovery of $725 million that was achieved despite many complexities and risks. The proposed Settlement is one of the largest in the history of class action securities litigation. Lead Plaintiff's consulting damages expert Frank C. Torchio, President of Forensic Economics, computed maximum alleged damages of approximately $5.5 billion using a traditional 2-trader model. Accordingly, this Settlement alone recovers more than *13%* of those damages. Moreover, when considering the $97.5 million recovery in the PwC Settlement and the $115 million recovery in the Greenberg Settlement, the total recovery is more than 17% of estimated damages. Dubbs Decl. ¶¶ 6-7. This result is much greater than the average recoveries for cases with damages of this size and is therefore very compelling. *See* Coffee Decl. ¶¶ 20-22.

As also discussed above, fees in the amount of 13.25% of a settlement of this size are well within the range of those that have regularly been awarded by courts. Moreover, the fee would provide a negative lodestar multiplier of 0.98. Lead Counsel submits that given these factors, the results achieved amply support the requested fee.

### 6.    **Public Policy Considerations Support the Requested Fee**

Courts in the Second Circuit have held that "[p]ublic policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-cv-3400, 2010 WL 4537550, at *29 (S.D.N.Y. Nov. 8, 2010) (McMahon, J.).

Specifically, "[i]n order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives." *WorldCom*, 388 F. Supp. 2d at 359.  Moreover, attorneys' fees must be sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the Securities and Exchange Commission and help deter future wrongdoing.  *See Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered.").  As Judge Holwell explained in *Hicks*:

> Private actions to redress real injuries further the objectives of the federal securities laws by protecting investors and consumers against fraud and other deceptive practices. . . .To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding. **The concept of a private attorney acting as a private attorney general is vital to the continued enforcement and effectiveness of the Securities Acts**.

2005 WL 2757792, at *9.  Indeed, the Supreme Court has repeatedly emphasized the importance of private securities class actions.  *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission.").

As a practical matter, lawsuits such as this one can be maintained only if competent counsel can be retained to prosecute them.  This will occur if courts award reasonable and adequate compensation for such services where successful results are achieved, often after years of litigation.  As Judge Brieant has noted:

> A large segment of the public might be denied a remedy for
> violations of the securities laws if contingent fees awarded by the
> courts did not fairly compensate counsel for the services provided
> and the risks undertaken.

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 169 (S.D.N.Y. 1989)

(Brieant, J.).

Lead Counsel's willingness to assume the risks of this litigation resulted in a substantial

benefit to the Settlement Class.  Public policy supports awarding Lead Counsel's reasonable

attorneys' fees and expenses.

### E.    The Class's Reaction to the Fee Request to Date

"The reaction of the Class," while not one of the formal *Goldberger* factors, "is entitled to

great weight by the Court."  *Maley*, 186 F. Supp. 2d at 374; *see also In re Prudential Sec. Inc. Ltd. P'ship*

*Litig.,* 985 F. Supp. 410, 416 (S.D.N.Y. 1997) (Pollack, J.) ("In determining the reasonableness of a

requested fee, numerous courts have recognized that 'the lack of objections from members of the

class is one of the most important reasons.'").

Pursuant to this Court's Preliminary Approval Order, Lead Counsel caused more than 2.1

million copies of the Notice of Proposed Settlement, Motion for Attorneys' Fees and Expenses

Award and Fairness Hearing ("Notice") and Proof of Claim forms ("Proof of Claims"), and 139,364

copies of the Release Forms (when applicable), to be disseminated to potential Settlement Class

Members.  *See* Affidavit of Eric J. Miller of Rust Consulting, Inc., Exhibit 3 to Dubbs Decl. at  ¶¶ 3-

17.  A Summary Notice of Pendency and Proposed Class Action with Defendant AIG ("Summary

Notice") regarding the Settlement and the Fairness Hearing was published in *The Wall Street Journal*

and transmitted over *PR Newswire* and referenced on Bloomberg News Services within 14 days of

October 14, 2011.  *Id.* ¶¶ 18-19.  The Notice and Proof of Claim and Release Form were also posted

on Labaton Sucharow's website and the website dedicated to the Settlement (which included a link

to the website for the PwC Settlement) created by the Administrator, for easy downloading by

potential claimants.  Dubbs Decl. ¶ 18.   The Notice advised Settlement Class Members of the procedures and deadlines for objecting to any aspect of the Settlement.  It specifically advised that Counsel intended to seek an award of attorneys' fees that would not exceed 13.25% of the Escrow Account and reimbursement of expenses not to exceed $9.75 million.  In addition, the Notice informed Settlement Class Members that Lead Plaintiff could seek up to $150,000 for reimbursement of its time and expenses.  *See generally* Rust Aff. Ex. A.

Although the deadline to object to the fee request is not until December 30, 2011, to date there have no objections by putative Settlement Class Members to the request for fees and expenses. After the objection deadline has passed, Lead Counsel will address the substance of any objections in its reply papers, which will be filed with the Court on January 13, 2012.

## II.   LEAD COUNSEL SHOULD BE REIMBURSED FOR LITIGATION EXPENSES REASONABLY INCURRED IN CONNECTION WITH THIS ACTION

In addition to a reasonable attorneys' fee, Lead Counsel respectfully seeks reimbursement in the amount of $8,257,111.29 for litigation expenses reasonably incurred in connection with prosecuting the AIG claims.  Dubbs Ex. 20.  Lead Counsel has submitted declarations attesting to the accuracy of Plaintiffs' Counsel's expenses and it is well-established that such expenses are properly recovered by counsel.  *See, e.g., In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (Scheindlin, J.) (court may compensate class counsel for reasonable litigation expenses necessary to representation of class); *Arakis Energy*, 2001 WL 1590512, at *17 n.12 ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course."); *see also In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 769 (S.D. Tex. 2008) (noting that the court had previously approved six expense reimbursement motions and awarded a total of $39 million to plaintiffs' counsel and that an additional $6 million may be the subject of future reimbursement requests); *In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249, 274 (D.N.H. 2007) (No. 02-1335) (awarding $28,938,412.74 in expenses); *In re Marsh & McLennan Cos., Inc. Sec.*

*Litig.*, 2009 WL 5178546, at *18 (awarding $7,848,411.84 in expenses to lead counsel and $214,657.14 in expenses to lead plaintiffs).

Plaintiffs' Counsel's declarations, annexed as Exhibits 10 to 12 and 14 to 15 of the Dubbs Declaration, itemize the various categories of expenses incurred.  Lead Counsel submits that these expenses were reasonably and necessarily incurred in prosecuting the AIG claims and achieving the proposed Settlement.  Lead Counsel further submits that these expenses, which include costs such as expert and consultant fees, the costs of establishing and using an electronic database to conduct discovery, and the costs related to taking depositions are the type for which "the paying, arms' length market" reimburses attorneys and should therefore be reimbursed from the Settlement Fund. *Global Crossing*,   F.R.D. at 468; *see also* Dubbs Decl. ¶¶ 189-195; Exs. 10-B to 12-B; 14-B to 15-B.

Indeed, certain of these costs actually saved the Settlement Class considerable expense.  For example, using an electronic document repository for which Defendants paid half of the hosting costs, saved millions of dollars in copying costs.  One set of copies of the 53.3 million-page document production at the rate of just 10 cents per page would have cost $5.3 million.  At a minimum, two sets of documents are required in litigation in order to maintain the integrity of the "master" set.  Thus, the copying of Defendants' document production alone would have cost at least $10.6 million.  Instead, Lead Counsel's costs related to the electronic document depository are less than $684,000.  Dubbs Decl. ¶¶ 128-132, 192; Ex. 10-B.

The most significant expense was the cost of consulting and testifying experts who provided critical assistance in the areas of accounting, insurance, loss causation, damages, and investment banking.[14]  As discussed above, securities cases involving accounting issues require extensive and costly expert analysis.  Expert expenses totaled approximately $6.17 million, and represented nearly 74% of total expenses.  Dubbs Decl. ¶191; Ex. 10-B.  Lead Counsel received crucial advice and

---

[14] The accounting expert Lead Plaintiff used to assist with analyzing defendants' accounting documents and prepare for depositions on accounting issues served in the same capacity in the *Enron* litigation.

assistance from these experts throughout the course of the litigation.  Their expertise enabled counsel to fully frame the issues, gather relevant evidence, make a realistic assessment of provable damages, and structure a resolution of the claims.

The Notice advised potential Settlement Class Members that Lead Counsel would seek reimbursement of expenses of up to $9.75 million.  Dubbs Decl. Ex. 3-A.  The expenses sought here are well below this "cap."

## III.   THE OHIO STATE FUNDS ARE ENTITLED TO REIMBURSEMENT OF REASONABLE COSTS AND EXPENSES, INCLUDING LOST WAGES

The PSLRA, 15 U.S.C. §78u-4(a)(4), limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  Here, as explained in the Declarations of Julie E. Becker, Esq. and William J. Neville, Esq., submitted herewith, OPERS and STRS Ohio are seeking reimbursement of $71,910.00 in lost wages related to their active participation in this Action.  Dubbs Decl. Exs. 4 and 5.  This amount is below the $150,000 cap reported in the Notice and, to date, there have been no objections to the request.

Many cases have approved reasonable payments to compensate class representatives for the time and effort devoted by them on behalf of a class.  *See, e.g., In re Satyam Computer Services Ltd. Sec. Litig.,* Slip Op., No 09-2027 (S.D.N.Y.) (Jones, J.) (awarding $193,111 to four institutional lead plaintiffs) (Dubbs Decl. Ex. 21); *Marsh,* 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009) (awarding $144,657 to NJ Attorney General's Office and $70,000 to Ohio Funds); *In re General Motors Corp. Sec. & Derivative Litig.,* Slip Op., No. MDL 1749 (E.D. Mich. Jan. 6, 2009) (awarding $184,205 to two institutional class representatives and $1,000 to each of the named plaintiffs)

(Dubbs Decl. Ex. 21); ; *In re Bristol-Myers Squibb Sec. Litig.*, Slip Op., No. 00-1990 (D.N.J. May 11, 2006) (awarding $58,948.64 to institutional class representative) (*Id.*).

Indeed, given that the central objective of the PSLRA was to "protect[] investors who join class actions against lawyer-driven lawsuits by . . . increas[ing] the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel,'" (*In re Cavanaugh*, 306 F.3d 726, 737 (9th Cir. 2002)), it would be unreasonable to penalize institutional class plaintiffs, like the Ohio State Funds here, for devoting time to the litigation by denying them reimbursement. *See also In Re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (recognizing the important public policy role of lead plaintiffs, "if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted.")

Here, OPERS and STRS Ohio have devoted at least 710 hours to the litigation, including meetings with counsel, time devoted to responding to extensive document requests and interrogatories and producing more than 260,000 pages of documents, preparation for and attendance at ten class discovery depositions, many of which lasted an entire day, review of court filings and correspondence and telephone conversations with counsel.  Dubbs Decl. Ex. 4 ¶¶ 6-12; Ex. 5 ¶¶ 4, 6-10.  While assisting with the prosecution of this Action, OPERS and STRS Ohio employees were unable to perform their regular responsibilities on behalf of their Funds, which lost those services. *Id.*

Lead Plaintiff is seeking reimbursement for that portion of their time related to the AIG claims.  As explained in counsels' declarations, the hourly rates utilized are based on fund employees' annual salaries with benefits and related administrative overhead (*e.g.*, $175 per hour for general counsel of the Funds).  *See In re Charter Commc'ns, Inc. Sec. Litig.*, No. MDL 1506, 2005 WL 4045741,

at *24-25 (E.D. Mo. June 30, 2005) (Shaw, J.) (awarding institutional lead plaintiff $26,625 based on managing director's estimated hourly rate of $300, and noting that "Courts in this District have routinely approved such reimbursements").

Lead Counsel and the Ohio State Funds respectfully submit that the $71,910.00 sought, based on Lead Plaintiff's extensive involvement in the Action from inception to settlement, is eminently reasonable and should be granted.

## CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that this Court award attorneys' fees of 13.25% of the Net Settlement of $725 million minus litigation expenses; reimbursement of litigation expenses in the amount of $8,257,111.29; and reimbursement of Lead Plaintiff's expenses in the amount of $71,910.00.  A proposed order will be submitted with Lead Counsel's reply papers.

Dated:  New York, New York
       December 2, 2011

MICHAEL DEWINE,
**ATTORNEY GENERAL OF OHIO**

**LABATON SUCHAROW LLP**

By  /s/ Thomas A. Dubbs
    Thomas A. Dubbs (TD 9658)
    Louis Gottlieb (LG 9169)
    Nicole M. Zeiss (NZ 3894)
    Thomas G. Hoffman, Jr. (TG 0330)

Alan S. Kopit, Esq. (Ohio Bar #0031965)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114-2301
(216) 621-0150
(216) 274-2478 (Fax)

*Special Counsel to the Attorney General of Ohio and the Ohio State Funds and Lead Counsel for the Class*

140 Broadway
New York, New York  10005
(212) 907-0700
(212) 818-0477 (Fax)

*Lead Counsel for Lead Plaintiff Ohio State Funds and Lead Counsel for the Class*