**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                                     :
IN RE AMERICAN INTERNATIONAL          :      <u>ECF CASE</u>
GROUP, INC. SECURITIES LITIGATION     :
                                                     :      Master File No. 04 Civ. 8141 (DAB) (AJP)
This Document Relates To:  All Actions      :
                                                     :
                                                     :
———————————————————— x

### DECLARATION OF THOMAS A. DUBBS IN SUPPORT OF PROPOSED CLASS SETTLEMENT, PLAN OF ALLOCATION <u>AND AWARD OF ATTORNEYS' FEES AND EXPENSES</u>

THOMAS A. DUBBS declares as follows pursuant to 28 U.S.C. §1746:

1.      I am a Senior Partner of the law firm of Labaton Sucharow LLP ("Labaton Sucharow"), Court-appointed Lead Counsel for the Ohio Public Employees Retirement System ("OPERS"), State Teachers Retirement System of Ohio ("STRS Ohio"), and Ohio Police & Fire Pension Fund ("OP&F") (collectively, "Lead Plaintiff" or the "Ohio State Funds"), and the Settlement Class in the above-titled action (the "Action").  I am admitted to practice before this Court.

2.      I have been actively involved in the prosecution of this case, am intimately familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision and active participation in the Action.

3.      I respectfully submit this declaration in support of Lead Plaintiff's motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the Settlement of this class action with respect to Defendant American International Group, Inc. ("AIG" or the "Company"), and certain related defendants, and the proposed Plan of Allocation.[1]  I also submit

———————————

[1] All capitalized terms herein are defined in the Agreement of Compromise and Settlement, dated November 30, 2010 (the "Agreement"), and have the same meaning as that set forth in the Agreement.

this declaration in support of Lead Counsel's motion for an award of attorneys' fees and reimbursement of counsel's expenses incurred during the prosecution of this Action and Lead Plaintiff's application for reimbursement of its reasonable costs and expenses directly relating to the representation of the Settlement Class, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4 (a)(4).

## I.      BENEFITS OF THE SETTLEMENT TO THE CLASS

4.      The Settlement, which was preliminarily approved by the Court by Order entered on October 5, 2011, provides for the gross payment of $725 million in cash (the "Settlement Amount") by AIG to the Settlement Class in exchange for a release of the Released Persons from the Released Claims—a dismissal of all claims in the Action against AIG.

5.      Pursuant to the terms of Agreement,  AIG shall fund the entire $725 million settlement in cash (as opposed to funding $550 million in AIG stock) if the Company consummates a "Qualified Offering."  *See* Agreement § I.A.2.  A Qualified Offering is "an offering of its common stock . . . in which [AIG] raises net proceeds of at least $550 million."  *Id.*  After the Settlement was submitted to the Court, AIG consummated a Qualified Offering on or about May 27, 2011, in which it raised approximately $2.9 billion.  Therefore, AIG will pay the entire Settlement Amount in cash.[2]

6.      The $725 million proposed Settlement is an outstanding result for the proposed Settlement Class and would bring to a close nearly seven years of contentious litigation between Lead Plaintiff and AIG.  Indeed, standing alone the Settlement would be the *13th largest* securities class action settlement since the passage of the PSLRA, according to the latest quarterly report of

---

[2] A June 27, 2011 letter submitted to the Court by AIG's counsel Daniel J. Kramer of Paul, Weiss, Rifkind, Wharton & Garrison (submitted jointly with counsel for Defendants Greenberg, C.V. Starr & Co. and Starr International Co.) confirmed that "on May 27, 2011, AIG closed its public offering, thereby effectively eliminating the funding contingency related to its settlement of this action with Lead Plaintiff."

the Securities Class Action Services.  *See* Exhibit 1 hereto.  Lead Plaintiff's consulting damages

expert Frank C. Torchio, President of Forensic Economics, computed maximum recoverable

damages of approximately $5.5 billion using a traditional 2-trader model.  Accordingly, this

Settlement alone recovers more than 13% of those damages.

7.      When combined with Lead Plaintiff's $97.5 million settlement with

PricewaterhouseCoopers LLP ("PwC" and the "PwC Settlement") and the $115 million contingent

settlement with Defendant Maurice R. "Hank" Greenberg and related defendants (the "Greenberg

Defendants"), it would be the ***10th largest*** securities class action settlement, and would reflect a

recovery of more than 17% of "maximum recoverable damages."

8.      In addition, the $725 million proposed Settlement would be the second

largest private securities class action settlement since the onset of the financial crisis in the fall of

2007.

9.      The Settlement Amount, plus all income earned thereon and after the deduction of

(i) any Attorneys' Fees and Expenses Award, (ii) Notice and Administrative Expenses, (iii) award to

the Lead Plaintiff of reasonable costs, and (iv) expenses approved by the Court, or any Tax

Expenses (the "Distribution Amount"), will be distributed to Authorized Claimants, *i.e.*, Settlement

Class Members who submit timely and valid Proofs of Claim or Release forms, in accordance with

the Plan of Allocation.

10.     The Plan of Allocation utilized in this Settlement is substantially similar to that

approved by the Court in connection with the PwC Settlement.

11.     Because of the stage of the administration of the PwC Settlement, Lead Counsel was

able to recommend a claim program whereby claims submitted in the PwC Settlement will be used

in conjunction with "Release Forms" to enable claimants to participate in this Settlement without

having to complete a second claim form.  This is not only more convenient for claimants, but more efficient and cost effective for the claims administration process.

12.    The Settlement was reached after more than six years of extensive and hard-fought litigation, which included a broad factual investigation; two lead plaintiff motions; the drafting of three amended complaints; successfully opposing motions to dismiss by nearly two dozen defendants; taking fact, class, and expert discovery involving the review of more than 53.3 million pages of documents and the taking or defending 97 depositions; and successfully moving for class certification.

13.    Further, the Settlement was reached only after dozens of informal and formal discussions, face-to-face meetings, and mediations (with three different, well-respected mediators) over a four-year period.

14.    Importantly, the Settlement was negotiated with great creativity and under very difficult circumstances, especially in view of the U.S. Government bailout and control of AIG beginning in September 2008.  Indeed, we believe that this is the only private securities class action settlement to date with a defendant that was essentially taken over by the Government as a result of the financial crisis.

15.    The proposed resolution meets all of the requirements for final approval and is eminently fair, reasonable and adequate.

## II.    THE COURT'S PRELIMINARY APPROVAL ORDER AND DISSEMINATION OF PRE-HEARING NOTICES

16.    Lead Plaintiff moved for preliminary approval of the Settlement on November 30, 2010.  On October 5, 2011, the Court issued the Preliminary Approval Order.  *See* Exhibit 2 hereto.[3]

---

[3] All exhibits referenced in the submissions in connection with approval of the Settlement and the request for attorneys' fees are annexed hereto.  For clarity, citations to exhibits that themselves have attached exhibits, will be referenced as "Ex. ___ - ___."  The first numerical reference refers to the designation of the entire exhibit attached here and the second reference refers to the designation within the exhibit itself.

17.     In the Preliminary Approval Order, the Court made the following findings, determinations and directives, among others:

(a)     certifying the Settlement Class for the purposes of Settlement only;

(b)     appointing Lead Plaintiff class representative for the Settlement Class and Lead Counsel as Settlement Class Counsel;

(c)     granting preliminary approval to the Settlement as sufficiently fair, reasonable and adequate to warrant dissemination of notice to the Settlement Class and a hearing on the fairness of the Settlement;

(d)     scheduling a hearing (the "Fairness Hearing") for January 31, 2012 at 11:00 a.m. to consider, among other things, whether: the proposed Settlement is fair, reasonable and adequate and should be finally approved; the Order and Final Judgment as provided under the Agreement should be entered; the Settlement Class should be finally certified; the proposed Plan of Allocation is reasonable and should be approved; Lead Counsel's application for an Attorneys' Fees and Expenses Award should be granted; and Lead Plaintiff's application for reimbursement of costs and expenses should be approved;

(e)     approving the form, substance and requirements of the Notice of Proposed Settlement, Motion for Attorneys' Fees and Expenses Award and Fairness Hearing  ("Notice"), the Summary Notice of Pendency and Proposed Class Action with Defendant AIG ("Summary Notice"), the Proof of Claim form ("Proof of Claim") and the Release Form;

(f)     appointing Rust Consulting, Inc. ("Rust") to administer the notice program and Settlement, under the supervision of Lead Counsel, and directing that the notices be disseminated; and

(g)     establishing procedures and deadlines for Settlement Class Members to exclude themselves from the Settlement or object to the Settlement, Plan of Allocation, the

Attorneys' Fees and Expenses Award requested by Lead Counsel and the reimbursement of costs and expenses requested by Lead Plaintiff.

18.     Annexed hereto as Exhibit 3 is the Affidavit of Eric J. Miller, dated November 30, 2011, of Rust ("Rust Aff."). The Rust Affidavit attests to, among other things, the efforts made to disseminate the Notice, Proof of Claim and Release Form; the web-posting of the Notice, Proof of Claim, Release Form, and other relevant documents; the creation of a dedicated website for the Settlement (including a link to the website for the PwC Settlement); and publication of the Summary Notice. Rust Aff. ¶¶ 2-21. The Notice, Proof of Claim, and Release Form were also posted on Labaton Sucharow's website.

19.     Rust (which was also the claims administrator for the PwC Settlement) was selected through a competitive bidding process with other experienced claims administrators, and after a careful review of its proposed fees, its track-record in administering the PwC Settlement, and its experience with other large class action settlement administrations.

20.     Lead Counsel has actively monitored the progress of the notice program and administration of the Settlement and has had frequent telephone conferences and email communications with Rust.

21.     Rust has sent Lead Counsel status reports summarizing specific data to chart the progress of the claims administration process. Accordingly, Lead Counsel has been able to monitor the number of: (1) notice packets mailed; (2) notice packets requested by brokers/nominees; (3) notice packets requested directly by potential class members; (4) notice packets re-mailed to an updated address; (5) calls from potential Settlement Class Members; (6) notice packets returned as undeliverable; (7) exclusion requests; (8) Release Forms mailed and submitted by prior filers; and (9) claims filed. *See also id.* ¶ 22.

22.     In order to assure thorough dissemination of the Notice, Rust worked diligently to reach every potential class member who received notice of the PwC Settlement.  As discussed in the Rust Affidavit, this was accomplished principally by using record holder data that was already produced by the transfer agent for AIG in the PwC Settlement to identify potential class members, by mailing Notice packets to all claim filers in the PwC Settlement, using name and address data gathered in the PwC Settlement, and by fulfilling requests made by nominees such as broker-dealers who made purchases on behalf of beneficial owners.  *Id.* ¶¶ 3-17.

23.     To date, 2,177,792 notice packets have been disseminated to potential Settlement Class Members and 139,364 Release Forms were mailed to claimants and electronic omnibus filers who submitted claims in the PwC Settlement.  *Id.* ¶¶ 11-17.

## III.   <u>SUMMARY OF ALLEGATIONS AND CLAIMS</u>

24.     This securities fraud class action was brought under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") against AIG, several of its former senior executives, and other related defendants concerning, *inter alia*, the Defendants' alleged false and misleading statements, deceptive conduct and direct market manipulation between October 28, 1999 and April 1, 2005.

### A.     <u>Relevant Parties</u>

#### 1.     <u>Settling Defendant</u>

25.     AIG is a Delaware corporation, with its principal place of business located in New York, New York.  AIG is a holding company that, through its subsidiaries, is engaged in a broad range of insurance and insurance-related activities in the United States and abroad.  AIG's securities are registered pursuant to Section 12(b) of the Exchange Act, and are listed on the New York Stock Exchange, as well as stock exchanges in London, Paris, Switzerland, Tokyo, Frankfurt, Australia, and Mexico.

##### 2.    **Released Parties (Additional Settling Defendants in the Action)**

26.     Defendant Eli Broad ("Broad") was a director of AIG until May 2003.  He served as a member of the AIG Finance Committee from 1999 to 2002, and at all relevant times was Chairman of AIG SunAmerica Inc., a wholly-owned subsidiary of AIG.

27.     Defendant John A. Graf ("Graf") was Executive Vice President of AIG from August 2001 until approximately September 2004.  Graf was Vice Chairman, Asset Accumulation at American General when that company was acquired by AIG in August 2001.  After the acquisition, Graf was named Vice Chairman and a member of the board of AIG SunAmerica Inc. in 2001 and was elected AIG Executive Vice President, Retirement Savings in 2002, a position he served in until leaving the Company in September 2004.

28.     Defendant Martin J. Sullivan ("Sullivan") was, at all relevant times, AIG's Vice Chairman and Co-Chief Operating officer.  He became a director of AIG in May 2002.  On March 14, 2005, Sullivan was elected CEO to replace Defendant Greenberg.  In 1998, Sullivan was elected Executive Vice President, Foreign General Insurance of AIG.  Prior to that, he had been Senior Vice President, Foreign General Insurance and President of American International Underwriters, AIG's international property-casualty organization.

29.     Defendant Thomas R. Tizzio ("Tizzio") was, at all relevant times, Senior Vice Chairman of AIG's General Insurance business segment and was a director of AIG until May 2003. In addition, Tizzio was, at all relevant times, a director of Defendants Starr International and C.V. Starr & Co., Inc.

30.     Defendant Wachovia Securities, Inc. was an underwriter with respect to $500 million in 2.85% Medium-Term Notes, Series F, issued by AIG on or about December 2, 2002.

31.     Defendant Merrill Lynch & Co. was an underwriter with respect to $500 million in 2.85% Medium-Term Notes, Series F, issued by AIG on or about December 2, 2002.

### 3.   **Lead Plaintiff**

32.   OPERS  is an instrumentality of the State of Ohio that operates pursuant to Chapter 145 of the Ohio Revised Code and had assets of more than $76 billion as of year-end 2010, making it the largest state pension fund in Ohio and the sixteenth largest state pension fund in the United States.  *See* Declaration of Julie E. Becker, Esq., dated November 29, 2011, ¶ 1, Exhibit 4 hereto.  As of 2010, OPERS has a total membership of nearly 954,000 members and beneficiaries, of whom 356,229 are active, 416,548 are inactive, and 171,955 are retired or beneficiaries.  *Id.*  OPERS purchased shares of AIG common stock, as well as AIG bonds, during the class period and is alleged to have suffered damages as a result of the alleged fraud.

33.   STRS Ohio is an instrumentality of the State of Ohio that operates pursuant to Chapter 3307 of the Ohio Revised Code and had assets of more than $66 billion as of June 30, 2011.  STRS Ohio serves more than 498,000 active, inactive and retired Ohio public educators.  *See* Declaration of William J. Neville, Esq., dated December 1, 2011, ¶ 1, Exhibit 5 hereto.  STRS Ohio purchased shares of AIG common stock during the class period and is alleged to have suffered damages as a result of the alleged fraud.

34.   OP&F is an instrumentality of the State of Ohio that operates pursuant to Chapter 742 of the Ohio Revised Code and had assets of approximately $11.8 billion as of year-end 2010.  *See* true and correct copy of excerpt of 2010 OP&F Annual Report, Exhibit 6 hereto.  OP&F serves nearly 57,000 active police officers and firefighters, retirees, and beneficiaries and survivors.  OP&F purchased shares of AIG common stock during the class period and is alleged to have suffered damages as a result of the alleged fraud.

35.   All three Ohio State Funds are represented by the Office of the Ohio Attorney General.  The Honorable Michael DeWine is the Ohio Attorney General.

36.     The three Ohio State Funds and the Ohio Attorney General's Office have played a central role in monitoring and participating in this litigation, including reviewing pleadings, motions and other court filings, participating in the discovery process, attending significant hearings and mediations, and participating in frequent conference calls and in-person meetings with Lead Counsel.  In particular, former Ohio Attorney General Richard Cordray played a direct role in the negotiation of the AIG Settlement with AIG and a senior representative of the U.S. Treasury.

37.     As set forth in the attached declaration of Assistant Attorney General Dennis P. Smith, the Attorney General and the general counsels of the three Ohio State Funds strongly endorse the Settlement.  *See* Declaration of Dennis P. Smith, Assistant Attorney General in the Office of the Ohio Attorney General, dated November 30, 2011, ("Smith Decl.") ¶¶ 9-11, Exhibit 7 hereto.  Further, the Boards of all three Ohio State Funds have reviewed and approved the Settlement.

38.     The requested attorney's fee is 13.25% of the Net Settlement, *i.e.*, the $725 million Settlement minus counsel's litigation expenses of approximately $8.3 million.  Based on the amount of work done by Lead Counsel, and the outstanding result achieved under very difficult circumstances, the Attorney General finds that the fee request is consistent with the terms of the fee agreement between the Ohio Attorney General's Office and Lead Counsel and does not object to the request.  *See Id.* ¶¶ 12-38 [4]

39.     The requested fee is also supported by the Declaration of Professor John C. Coffee, Jr., dated November 30, 2011, ("Coffee Decl."), a recognized expert in the field.  Exhibit 8.  Among other things, Professor Coffee notes that the complexity and risks in this case were enormous (Coffee Decl. ¶¶ 28-32); the breadth of Lead Counsel's investigation was far greater than the

---

[4] The agreement between the Ohio Attorney General's Office and Lead Counsel is attached as Exhibit 9 hereto.

allegations made by the New York Attorney General or the SEC (*id.* at ¶¶ 24-27), the recovery for

the Class was outstanding (*id.* at ¶¶ 20-22); the percentage fee request is in line with awards in

settlements of a similar size (*id.* ¶¶ 18-20); and the lodestar multiplier of less than 1 is very modest

(*id.* at ¶¶ 33-34).

        **B.**     **The Alleged Frauds**

       40.     The operative complaint (the "Third Amended Complaint" or the "Complaint")

alleges, *inter alia*, that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder by issuing false and misleading statements, including periodic reports,

which were filed with the Securities and Exchange Commission ("SEC") during the period from

October 28, 1999 through April 1, 2005, inclusive (the "Class Period").  These statements allegedly

contained false and misleading information concerning AIG's financial results and operations.

Specifically, AIG is alleged to have: (1) been involved in a market division scheme that involved its

paying allegedly improper contingent commissions to, and rigging bids with, the insurance broker

Marsh & McLennan Companies, Inc. ("Marsh") and others in the insurance industry ("Market

Division Fraud"), and (2) engaged in a massive accounting fraud scheme ("Accounting Fraud")

resulting in a $3.9 billion Restatement (the "Restatement").  The Restatement involved

approximately **two dozen different types of accounting issues,** and literally thousands of

individual insurance transactions and accounting entries.  In addition, AIG and Defendant

Greenberg, AIG's former longtime Chairman and Chief Executive Officer, are alleged to have

inflated the price of AIG common stock by using the Company's share buyback program to directly

inflate the price for AIG's stock (the "Market Manipulation Fraud").

       41.     The material misstatements and fraudulent acts by AIG and other related

Defendants, as set forth in the Complaint, are alleged to have caused AIG's securities to trade at

artificially inflated prices during the Class Period.  Plaintiffs allege that this ultimately caused

damages to those who purchased AIG securities at artificially inflated prices when the truth was disclosed in October 2004 and in March and April 2005.

42.  AIG has denied all of Lead Plaintiff's allegations and does not admit, as part of this Settlement, to any wrongdoing.

## C.  **The Corrective Disclosures**

43.  The inflation caused by AIG's Market Division Fraud was allegedly fully removed on October 14 and 15, 2004, when the New York Attorney General's Office ("NYAG") implicated AIG in a scheme to pay improper contingent commissions to, and illegally rig bids with, Marsh and others in the insurance industry.  (The NYAG filed a complaint against Marsh, but did not name AIG as a defendant.)

44.   The inflation caused by AIG's Accounting Fraud was allegedly removed through a series of partial disclosures made by AIG and through news reports and press releases in March and April of 2005.

## D.  **Post-Class Period Events**

### 1.  **AIG's 2005 Restatement**

45.  On May 31, 2005, AIG released its 2004 Form 10-K, the Restatement, which restated the Company's financial statements for the years ended December 31, 2000, 2001, 2002, 2003, and the first three quarters of 2004.  The Restatement slashed AIG's net income by $3.9 billion and reduced shareholder's equity by $2.26 billion.

### 2.  **AIG Settlements with the SEC and New York Attorney General**

46.  On February 9, 2006, AIG announced that it had settled the various lawsuits and investigations brought by the NYAG, SEC, U.S. Department of Justice ("DOJ"), and the New York Department of Insurance ("NYDOI"), pursuant to which AIG agreed to pay more than $1.6 billion as follows:

(a)     $700 million in disgorgement and $100 million in fines to be distributed to defrauded investors in connection with AIG's Accounting Fraud (the "SEC Settlement");

(b)     $375 million to the NYAG for AIG customers who purchased insurance policies at prices inflated by the Company's Market Manipulation Fraud;

(c)     $343 million to the NYAG to be distributed to all fifty states in connection with AIG's underpayment of workers compensation premium taxes;

(d)     $100 million in fines to the NYAG; and

(e)     $25 million in fines to the DOJ.

### 3.     Criminal Convictions of Gen Re Defendants Are Vacated

47.     On June 9 and 10, 2006 respectively, Defendants John Houldsworth and Richard Napier pled guilty to conspiracy to commit securities fraud in connection with their role in carrying out the allegedly fraudulent $500 million AIG-General Reinsurance Corporation ("Gen Re") reinsurance transaction (the "Gen Re Transaction").

48.     In short, the Complaint alleges that the purpose of the Gen Re Transaction was to allow AIG to inflate its claims reserves by $500 million through a sham, risk-free reinsurance transaction with a subsidiary of Gen Re.

49.     On February 25, 2008, a jury found Defendant Christian M. Milton (AIG's former Vice President of Reinsurance), Defendant Ronald E. Ferguson (Gen Re's former Chief Executive Officer), as well as three additional former Gen Re executives, guilty of 16 counts each of securities fraud and other charges in connection with their involvement in the Gen Re Transaction. Defendant Greenberg was not indicted.[5]

50.     However, on August 1, 2011, the Second Circuit issued a decision in *U.S. v. Ferguson*, 653 F.3d 61 (2d Cir. 2011), in which it reversed the convictions of all five defendants based on

---

[5] Herein, Defendants Gen Re, Ferguson, John B. Houldsworth and Richard Napier are referred to collectively as the "Gen Re Defendants."

defective jury instructions and remanded for a new trial.  To date, no announcement has been made regarding whether the Department of Justice will try the case again.

        **4.**      <u>**Criminal Convictions of Bid Riggers Are Vacated**</u>

51.     Beginning in mid-October 2004, approximately a dozen AIG employees, Marsh employees, and employees of other insurance companies and insurance brokers pled guilty to bid-rigging with respect to the pricing of certain commercial insurance contracts.  Lead Plaintiff included allegations regarding these guilty pleas in its Complaints.

52.     In February 2008, after a 10-month bench trial before Judge Yates in New York State Court, two Marsh McClennan executives were found guilty of violating New York anti-trust law, a class E felony.

53.     In October 2009, after an eleven-month bench trial before Judge Yates, three additional Marsh employees were found not guilty on all counts related to bid-rigging.

54.     In November 2009, Judge Yates dismissed all charges against three additional insurance broker executives in conjunction with bid-rigging allegations.

55.     On July 2, 2010, Judge Yates vacated the sentences of the two executives convicted of the anti-trust violations in February 2008, after finding that certain potentially exculpatory evidence had been improperly withheld from defendants' counsel.

56.     Further, Judge Yates vacated or reduced the sentences of all of the persons who had pled guilty to misdemeanor and felony violations related to bid-rigging in 2004.

57.     This development with respect to the confessed bid-riggers was unforeseen at the beginning of the case, and would have affected the manner in which Lead Plaintiff would present the bid-rigging claims against AIG at trial.

5.    **Government Bailout of AIG**

58.    Because of concerns about the potential systemic effects of an AIG failure on financial markets, beginning in September 2008, the U.S. Federal Reserve System and the U.S. Treasury Department ("Treasury") agreed to make more than $180 billion available to bail out the Company.  *See* GAO, "Financial Crisis: Review of Federal Reserve System Financial Assistance to American International Group, Inc.," at 7 (September 30, 2011) at http://www.gao.gov/products/GAO-11-616 [hereinafter "*GAO Review*"].

59.    On September 16, 2008, the Federal Reserve Board, with the support of Treasury, authorized the Federal Reserve Bank of New York ("FRBNY") to lend AIG up to $85 billion through a secured revolving credit facility (the "FRBNY Credit Facility").  *Id.*  In exchange for this loan, preferred shares equaling a 79.9% voting and dividend interest in AIG were issued to a trust for the benefit of Treasury.  Steven M. Davidoff & David Zaring, *Regulation by Deal: The Government's Response to the Financial Crisis*, 61 ADMIN. L. REV. 463 (2009) [hereinafter "*Davidoff & Zaring*"].

60.    In October 2008, the Federal Reserve Board authorized FRBNY to borrow up to $37.8 billion in investment-grade, fixed-income securities from certain AIG domestic insurance subsidiaries in return for cash collateral (the "Securities Borrowing Facility").  *GAO Review* at 7-8.

61.    In November 2008, in order to help AIG maintain its credit ratings, the Federal Reserve Board and Treasury announced the restructuring of AIG's debt.  *Id.*  Under the restructured terms, Treasury purchased $40 billion in shares of AIG cumulative preferred stock.  The cash from the sale was used to pay down a portion of AIG's outstanding balance from the FRBNY Credit Facility.  *Id.*

62.    FRBNY also announced plans to terminate the $37.8 billion Securities Borrowing Facility, and create two new credit facilities:  (1) a $22.5 billion residential mortgage-backed securities ("RMBS") facility, Maiden Lane II ("ML II"), to purchase assets relating to RMBS from AIG, and

(2) $30 billion facility, Maiden Lane III ("ML III"), to purchase multi-sector CDOs on which AIGFP had written CDS contracts. *Id.* at 8-9.

63.     In December 2008, FRBNY extended a $19.5 billion loan to ML II.

64.     In April 2009, Treasury agreed to exchange its $40 billion in AIG cumulative preferred stock for $41.6 billion in fixed-rate non-cumulative preferred stock. *Id.* at 10. In addition, the Company issued to Treasury fixed-rate non-cumulative perpetual preferred stock and a warrant to purchase AIG common stock in exchange for a new $29.835 billion facility. *Id.* at 11.

65.     In sum, as of April 2009, the total commitment of the U.S. Government to AIG totaled more than $180 billion. *See Davidoff & Zaring* at 499 (as of March 1, 2009, the government's aggregate commitments to AIG totaled $182.5 billion).

66.     When, in early 2011, the government swapped its AIG preferred shares for AIG common stock, its stake in AIG increased from 79.9% to 92%. Mary Williams Walsh, A.I.G. Reached Deal to Repay Treasury and Fed for Bailout, THE NEW YORK TIMES (Sept. 30, 2010).

67.     Subsequent to September 16, 2008, there was a distinct possibility that AIG would end up in bankruptcy. Indeed, AIG itself admitted that the Company likely could not have continued as a going concern without government support.[6] AIG warned investors that a wide variety of events, many of which were beyond its control, could result in the Company being unable to meet the financing/capital needs of certain of its subsidiaries, which could lead to AIG becoming insolvent. AIG's 2009 10-K stated as follows:

> Borrowings available to AIG under the [Federal Reserve Board of New York]
> FRBNY Credit Facility and drawdowns under the Department of the Treasury
> Commitment may not be sufficient to meet AIG's funding needs and additional

---

[6] *See, e.g.*, AIG Form 10-K dated March 2, 2009, at 21 ("Without additional support from the U.S. government, in the future there could exist substantial doubt about AIG's ability to continue as a going concern."), 39 (In assessing AIG's ability to continue as a going concern, management considered, *inter alia*, "The commitment of the NY Fed and the United States Department of the Treasury to the orderly restructuring of AIG and their commitment to continuing to work with AIG to maintain its ability to meet its obligations as they come due . . . ."); AIG Form 10-K dated Feb. 26, 2010, at 17, 43 (same).

financing may not be available or could be prohibitively expensive.  The inability of AGF or ILFC to raise sufficient liquidity to meet their obligations without support from AIG, additional collateral calls, deterioration in investment portfolios affecting statutory surplus, high surrenders of annuity and other policies, further downgrades in AIG's credit ratings, catastrophe losses or reserve strengthening, or a further deterioration in AIGFP's remaining super senior credit default swap portfolio could cause AIG to require additional funding in excess of the borrowings available under the FRBNY Credit Facility and available drawdowns on the Department of the Treasury Commitment.  In that event, AIG would be required to find additional financing and new financing sources.  Such financing could be difficult, if not impossible, to obtain and, if available, very expensive, and additional funding from the FRBNY, the Department of the Treasury or other government sources may not be available.  **If AIG is unable to obtain sufficient financing to meet its capital needs, AIG could become insolvent.**[7]

68.     The significant risk of an AIG bankruptcy, beginning in September 2008, was also evident from the extremely high interest rates on AIG medium-term notes ("MTNs").[8]  In September 2008, the average yield to maturity for the MTNs skyrocketed to 14.35%, with the high point being 26.3%.  At the same time, the average yield to maturity for the Insurer Index remained virtually unchanged at 6.8%.

69.     As discussed above, AIG's risk of bankruptcy did not disappear as a result of the Government's bailout of the Company in mid-September 2008.  To the contrary, in October 2008, the average yield to maturity for the MTN was 20.26%, and the yield exceeded 20% in March, April, and May of 2009.  Thus, even after the Government bailout of AIG, investors viewed the once investment grade, AA rated senior AIG bonds **as riskier than the worst junk bonds**.[9]

70.     Thus, it is clear that from September 2008 through 2010, despite the Government bailout, there was a significant chance that AIG would have to file for bankruptcy.

---

[7] *Id.* at 21.

[8] In May 2007, AIG issued $850 million of 10-year senior unsecured notes with a fixed interest rate of 5.45%.  The MTNs' CUSIP is 02687QBW7, and the maturity date is May 18, 2017.

[9] Junk bonds reached record high yields of 20 percent in November 2008.  *See* Gabrielle Coppola & Caroline Salas, *Junk Bond Yields Reach 20% as Economy Declines*, Bloomberg.com (Nov. 19, 2008, 6:37 PM), available at http://www.google.com/#sclient=psy&hl=en&source=hp&q=high +yeild+junk+status+yield+notes+bonds+what+yield+&aq=f&aqi=&aql=&oq=&pbx=1&bav=on.2,or.r_gc .r_pw.&fp=7e74ed319f8060e1&biw=1419&bih=699.

## IV.   PROCEDURAL HISTORY OF THE ACTION

### A.   Pleadings and Case Management

71.     Between October 15, 2004 and December 7, 2004, 10 class action complaints were filed against AIG, Defendant Greenberg and several other defendants.

72.     By Order dated February 7, 2005, Judge Laura Taylor Swain appointed the Ohio State Funds to serve as Lead Plaintiff and approved Lead Plaintiff's selection of Hahn Loeser & Parks LLP and Labaton Sucharow LLP, then known as Goodkind, Labaton, Rudoff & Sucharow LLP, to serve as Lead Counsel.  D.E.# 51

73.     On April 19, 2005, Lead Plaintiff filed a 224-page Consolidated Amended Class Action Complaint ("First Amended Complaint"), that named a total of 12 defendants – including AIG –  and asserted eight causes of action under the Securities Act and the Securities Exchange Act. The First Amended Complaint included allegations relating to both the Market Division Fraud, as well as AIG's then-recently disclosed Accounting Fraud.  D.E.# 61.

74.     On May 16, 2005, the San Francisco Employees' Retirement System filed a separate, purportedly "new" securities class action complaint against AIG and others that alleged causes of action based solely on the Accounting Fraud disclosed in March and April of 2005.  At a June 16, 2005 pre-motion conference, Judge Sprizzo asked for briefing on the issue of appointing a lead plaintiff with respect to the claims relating to the Accounting Fraud.  After the issue was fully briefed, the Court held a hearing on July 18, 2005, wherein the Court found that the Ohio State Funds would serve as the Lead Plaintiff for all the claims at issue – *i.e.*, the Market Division Fraud disclosed in October 2004, the Accounting Fraud disclosed in March and April of 2005 and the Market Manipulation claims.

75.     On September 27, 2005, Lead Plaintiff filed a 485-page Consolidated Second Amended Class Action Complaint ("Second Amended Complaint"), that asserted 13 causes of

action based on AIG's and other Defendants' violations of the Securities Act and Securities

Exchange Act.  D.E.# 132.  The Second Amended Complaint named a total of 23 defendants and

significantly expanded the allegations contained in the First Amended Complaint.

76.     All of the 23 defendants (represented by nearly two dozen law firms) moved to

dismiss the Second Amended Complaint, and Lead Counsel responded to all of their motions.

77.     The Court denied all but one of Defendants' motions to dismiss in April and May

2006,  and the remaining Defendants filed answers to the Second Amended Complaint on June 16,

2006.  D.E.# 273.

78.     On December 15, 2006, Lead Plaintiff filed a 486-page Third Amended Complaint,

that was substantially identical to the Second Amended Complaint except that it made certain

ministerial changes and expanded the last day of the Class Period from March 30, 2005 to April 1,

2005.  D.E.# 308.

79.     On January 16, 2007, Defendants filed answers to the Third Amended Complaint.

**B.     Defendants' Motions to Dismiss**

80.     On November 30, 2005, AIG moved to dismiss the Second Amended Complaint.

On December 14 and 19, 2005, all the other Defendants moved to dismiss as well.  The Defendants'

briefing totaled almost two hundred pages.  Hundreds of pages of supporting exhibits were also

filed.  AIG (and other defendants) argued, *inter alia*, that the Second Amended Complaint failed to

properly allege scienter and loss causation; that Lead Plaintiff lacked standing to pursue Section 11

claims; and that certain claims were barred by the statute of limitations.  On February 1, 2006, Lead

Plaintiff filed its brief in opposition to AIG's motion to dismiss, and on February 6, 2006, Lead

Plaintiff filed its briefs in opposition to all of the other defendants' motions to dismiss.  On April 20,

2006, the Court heard oral argument on Defendants' motions.

81.     By Orders dated April 27, 2006 and May 25, 2006, the Court denied all but one of Defendants' motions to dismiss.  D.E.# 252, 258.

**C.     Class Certification**

**1.      Class Discovery**

82.     In anticipation of Lead Plaintiff's motion for class certification,  AIG and other Defendants commenced extensive discovery by serving document requests and interrogatories on Lead Plaintiff in August 2006.  Defendants' discovery requests were broad and all encompassing, including 30 separate requests for documents and 12 interrogatory requests.  AIG later served class certification-related requests for admission and interrogatories in January 2008.

83.     Defendants deposed 23 fact witnesses and Rule 30(b)(6) witnesses related to Lead Plaintiff: 13 representatives of the Ohio State Funds and 10 outside money managers who traded in AIG securities on behalf of the Ohio State Funds.  Lead Counsel defended or helped to defend each of these depositions.  (The depositions of the 13 Ohio State Funds representatives took place in Columbus, Ohio  The depositions of the 10 outside money managers took place at their offices in various cities throughout the United States, including San Francisco, Kansas City, Morristown, Cleveland, Akron, Minneapolis and Boston.)

84.     In response to Defendants' discovery requests, the Ohio State Funds produced more than 260,000 of pages of documents, including account statements, investment guidelines and investment manager reports.  Lead Counsel reviewed all of these documents for relevance and privilege.  Lead Counsel worked closely with representatives of the Funds – including each Fund's general counsel and investment and other personnel – to respond to discovery requests over the span of 20 months.  In addition, Lead Counsel sought and reviewed documents from 12 of the Funds' external investment advisers.

(a)        **Depositions of OPERS**

85.        Defendants deposed six witnesses from OPERS.  All six depositions took place in Columbus, Ohio.

86.        On October 31, 2007, Defendants deposed Alan J. Davidson, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding OPERS' document productions, as well as the Funds' retention policies and procedures with respect to hard-copy documents.  In preparation for the deposition, Lead Counsel met with Mr. Davidson in Columbus, Ohio and held other conferences with Mr. Davidson and with OPER General Counsel by telephone.

87.        On October 31, 2007, Defendants deposed Peggy Trump, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding OPERS' document productions, as well as the Funds' retention policies and procedures with respect to electronic documents.  In preparation for the deposition, Lead Counsel met with Ms. Trump in Columbus, Ohio and held other conferences with Ms. Trump and with OPERS General Counsel by telephone.

88.        On April 14, 2008, Defendants again deposed Alan Davidson, who testified as a Fed. R. Civ. P. 30(b)(6) witnesses regarding, *inter alia*, (i) OPERS' investment decisions to buy and sell AIG securities; (ii) OPERS' investment policies, practices and procedures; (iii) OPERS' decision to commence the lawsuit; (iv) OPERS' knowledge of the allegations set forth in the Amended Complaint; (v) OPERS' damages; and (vi) OPERS' choice of counsel.  In preparation for the deposition, Lead Counsel met with Mr. Davidson in Columbus, Ohio and held other conferences with Mr. Davidson and with OPERS General Counsel by telephone.

89.        On April 15, 2008, Defendants deposed Robert Ball, who testified as a fact witness regarding OPERS' investments in AIG common stock.  In preparation for the deposition, Lead Counsel met with Mr. Ball in Columbus, Ohio and held other conferences with Mr. Ball and with OPERS General Counsel by telephone.

90.     On April 24, 2008, Defendants deposed Timothy Steitz, who testified as a fact witness regarding OPERS' investments in AIG common stock.  In preparation for the deposition, Lead Counsel met with Mr. Steitz  in Columbus, Ohio and held other conferences with Mr. Steitz and with OPERS General Counsel by telephone.

91.     On May 6, 2008, Defendants deposed John Blue, who testified as a fact witness regarding OPERS' investments in AIG bonds.  In preparation for the deposition, Lead Counsel met with Mr. Blue in Columbus, Ohio and held other conferences with Mr. Blue and with OPERS General Counsel by telephone.

92.     On May 7, 2008, Defendants deposed Anthony Enderle, who testified as a fact witness regarding OPERS' investments in AIG bonds.  In preparation for the deposition, Lead Counsel met with Mr. Enderle in Columbus, Ohio and held other conferences with Mr. Enderle and with OPERS General Counsel by telephone.

### (b)     Depositions of STRS Ohio

93.     Defendants deposed three witnesses from STRS Ohio.  All three depositions took place in Columbus, Ohio.

94.     On November 7, 2007, Defendants deposed Greg Taylor, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding STRS Ohio's document productions, as well as the Fund's retention policies and procedures with respect to hard-copy and electronic documents.  In preparation for the deposition, Lead Counsel met with Mr. Taylor in Columbus, Ohio and held other conferences with Mr. Taylor and STRS General Counsel by telephone.

95.     On April 8, 2008, Defendants deposed Alan Warner, who testified as a fact witnesses regarding STRS Ohio's investments in AIG common stock.  Mr. Warner also testified as a Fed. R. Civ. P. 30(b)(6) witnesses regarding, *inter alia*, (i) STRS Ohio's investment decisions to buy and sell AIG securities; (ii) STRS Ohio's investment policies, practices and procedures; (iii) STRS Ohio's

decision to commence the lawsuit; (iv) STRS Ohio's knowledge of the allegations set forth in the Complaint; (v) STRS Ohio's damages; and (vi) STRS Ohio's choice of counsel.  In preparation for the deposition, Lead Counsel met with Mr. Warner in Columbus, Ohio and held other conferences with Mr. Warner and with STRS General Counsel by telephone.

96.     On April 9, 2008, Defendants deposed Bill Cottrell, who testified as a fact witness regarding STRS Ohio's investments in AIG common stock.  In preparation for the deposition, Lead Counsel met with Mr. Cottrell in Columbus, Ohio and held other conferences with Mr. Cottrell and with STRS General Counsel by telephone.

### (c)     Depositions of OP&F

97.     Defendants deposed four witnesses from OP&F.  All four depositions took place in Columbus, Ohio.

98.     On October 16, 2007, Defendants deposed Ellen Eichhorn, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding OP&F's document productions, as well as the Fund's retention policies and procedures with respect to hard-copy and electronic documents.  In preparation for the deposition, Lead Counsel met with Ms. Eichhorn in Columbus, Ohio and held other conferences with Ms. Eichhorn and with OP&F General Counsel by telephone.

99.     On October 16, 2007, Defendants deposed Yvonne Harris, who testified as a Fed. R. Civ. P. 30(b)(6) witness regarding OP&F's document productions, as well as the Fund's retention policies and procedures with respect to hard-copy and electronic documents.  In preparation for the deposition, Lead Counsel met with Ms. Harris in Columbus, Ohio and held other conferences with Ms. Harris and with OP&F General Counsel by telephone.

100.     On April 22, 2008, Defendants deposed Robert Cheuvront, who testified as a fact witnesses regarding OP&F's investments in AIG common stock.  In preparation for the deposition,

Lead Counsel met with Mr. Cheuvront in Columbus, Ohio and held other conferences with Mr. Cheuvront and with OP&F General Counsel by telephone.

101.    On  May 5, 2008, Defendants deposed Theodore Hall, who testified as a Fed. R. Civ. P. 30(b)(6) witnesses regarding, *inter alia*, (i) OP&F's investment policies, practices and procedures; (ii) OP&F's decision to commence the lawsuit; (iv) OP&F's knowledge of the allegations set forth in the Complaint; (iii) OP&F's damages; and (iv) OP&F's choice of counsel.  In preparation for the deposition, Lead Counsel met with Mr. Hall in Columbus, Ohio and held other conferences with Mr. Hall and with OP&F General Counsel by telephone.

### (d)    Discovery of Outside Investment Managers

102.    Defendants also sought discovery from the external investment advisers that purchased AIG common stock on the Funds' behalf during the Class Period.  It is common for public pension funds to diversify their investment strategy by apportioning their capital among a number of investment managers, who usually specialize in different asset classes – *e.g.*, equity, fixed income, emerging markets, etc.

103.    In April 2008, Defendants served *subpoenas duces* tecum on Barclay's Global Investors, Wellington Management Company LLP, AllianceBernstein, Goldman Sachs Asset Management, INTECH, Jacobs Levy Equity Management,  Robeco Boston Partners Asset Management, Oak Associates, Ltd., American Express, and Waddell & Reed, Inc.

104.    Thereafter, at depositions held throughout the country, they deposed the following advisors to the Ohio State Funds:

     (a)    Barclay's provided Rhonda Vitanye as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OPERS and STRS Ohio;

     (b)    Wellington provided Theodore Shasta as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OPERS;

(c)      Alliance Bernstein provided David Handke as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OPERS and OP&F;

(d)      Goldman Sachs provided Gary Chropuvka as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OPERS and STRS Ohio;

(e)      INTECH provided David Hurley as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F and STRS Ohio;

(f)      Jacobs Levy provided Kenneth Levy as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of STRS Ohio;

(g)      Boston Partners provided David Hinton as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F;

(h)      Oak Associates provided Mark Oelschlager as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F;

(i)      AMEX/Riversource provided Joan Kampmeyer as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F; and

(j)      Waddell provided Philip Sanders as a 30(b)(6) witnesses regarding its investment policies and procedures, as well as its transactions in AIG common stock on behalf of OP&F.

**(e)     Expert Reports and Depositions<br>of Experts Related to Class Certification**

105.      On or about February 20, 2008, Lead Counsel provided defendants with the expert report on loss causation and market efficiency by Lead Plaintiff's expert, Professor John D. Finnerty, Ph.D, a professor of finance at the Graduate School of Business Administration at Fordham University.

106.      On May 15, 2008, Lead Counsel defended the deposition of Professor Finnerty.

107.      On or about November 7, 2008, Lead Counsel provided defendants with Professor Finnerty's rebuttal expert report.

108.     On or about August 21, 2008 and September 23, 2008, Lead Counsel received the expert reports by defendants' experts on class certification issues, Charles Cox, Ph.D and David Tabak, Ph.D.

109.     On October 16, 2008, Lead Counsel deposed Dr. Cox, AIG's expert on class certification issues.

110.     On October 31, 2008, Lead Counsel deposed Dr. Tabak, another expert for defendants on class certification issues.

### 2.     Class Certification Briefing

111.     On February 20, 2008, Lead Plaintiff moved to certify the Settlement Class and for the Ohio State Funds to be appointed class representatives.  The moving brief was accompanied by numerous exhibits, including an expert report on market efficiency and loss causation by Dr. Finnerty, who conducted detailed event studies concerning AIG's stock price drops.

112.     Defendants, including AIG, opposed Lead Plaintiff's motion.  On August 25, 2008, AIG filed a 25-page opposition brief.

113.     On September 23, 2008:  (i) Defendants Greenberg, C.V. Starr & Co., Inc. and Starr International Company, Inc. filed a 25-page opposition brief; (ii) the Gen Re Defendants filed a 25-page opposition brief; (iii) the Underwriter Defendants filed a 4-page opposition brief; and (iv) Defendant Michael Murphy filed a brief that joined in the other Defendants' arguments.

114.     AIG challenged class certification on numerous grounds, including the definition of the class, the adequacy of Lead Plaintiff, the efficiency of the market for AIG bonds, and loss causation with respect to various disclosures.

### 3.     Class Certification Order

115.     On November 7, 2008, Lead Plaintiff filed its 25-page reply brief, along with a rebuttal declaration by its expert on the issues of market efficiency and loss causation.

116.    After four days of legal argument, testimony and hearings, by Order filed February 22, 2010, the Court certified the Action for litigation purposes as a class action ("Class Certification Order").  D.E.# 534.

117.    Both Lead Plaintiff and AIG requested that the United States Court of Appeals for the Second Circuit review the Class Certification Order.  Only AIG's request for review was granted. At the time this Settlement was reached, no briefing was filed on the appeal, and on September 1, 2010 the parties filed a stipulation withdrawing the appeal until March 1, 2011 pursuant to Local Rule 42.1, without prejudice to AIG's right to reinstate the appeal.  *In re AIG Sec. Litig.*, No. 10-2549 (2d Cir.), D.E. #34 [hereinafter "2d Cir. D.E # __"].  That stipulation was renewed several times (2d Cir. D.E. # 41, 50, 57); thus the appeal is withdrawn until March 1, 2012.  If the Court grants final approval to the Settlement, the appeal will not be reinstated.

**D.    Fact Discovery**

118.    Prior to the start of formal fact discovery, Lead Counsel conducted an extensive investigation of the claims in the Action.  This investigation included, *inter alia,* review and analysis of: (1) public documents concerning Defendants and the insurance industry, including AIG's statutory filings with the New York Department of Insurance; (2) AIG's filings with the SEC; (3) pleadings and other documents relating to various criminal, civil and administrative investigations and proceedings involving the claims in the Complaint against AIG and its subsidiaries, as well as other defendants named in the case; (4) analyst reports regarding AIG; and (5) press releases and media reports of AIG and its subsidiaries.

119.    In addition, counsel conducted an extensive and ongoing investigation over the span of six years to, among other things, locate and interview former AIG employees and knowledgeable persons within the insurance industry.  Dozens of potential witnesses were identified and contacted.

120.    On April 19, 2005, Lead Plaintiff moved by order to show cause to, *inter alia*:  (1) partially lift the automatic discovery stay under the PSLRA to obtain from AIG the same documents the Company had produced to government regulators; (2) for limited discovery into the reported destruction of evidence at AIG's Bermuda offices; and (3) for an order enjoining AIG from destroying documents relevant to this case.  After a hearing on Lead Plaintiff's application on June 16, 2005, the Court denied the motion.

121.    Before Defendants' motions to dismiss were decided, Lead Counsel undertook a factual investigation involving (1) the review and analysis of thousands of pages of documents that AIG had publicly filed with the New York State Insurance Department and (2) interviews with dozens of former employees of AIG, Marsh and other companies on the insurance industry.  The information obtained pursuant to this investigation assisted Lead Counsel in drafting the First Amended Complaint and the Second Amended Complaint.

122.    After the motions to dismiss were decided in mid-2006, formal fact discovery began in earnest.  Since that time, Lead Plaintiff served more than 25 documents requests on Defendants. In addition, Lead Plaintiff served 5 sets of interrogatories on Defendants.

123.    Further, Lead Plaintiff gathered evidence from numerous non-parties and served subpoenas *duces tecum* to more than 56 non-parties, including Marsh, Zurich Insurance Services, Inc., Ace Group and others in the insurance industry.

124.    By Order dated May 23, 2008, the Court ordered that fact discovery shall end on December 1, 2009.  D.E. #366.  By subsequent Orders, this date was extended to April 30, 2010. D.E. # 527, 531, 533.

125.    In response to Lead Plaintiff's document requests and subpoenas, Defendants and non-parties produced more than 53.3 million pages of documents in response to Lead Plaintiff's discovery requests, including more than 12 million pages produced by AIG.

28

126.     Document review was structured to limit overall cost, with the bulk of the initial review being conducted by junior attorneys.

127.     Lead Plaintiff has reviewed and analyzed all of the documents produced in the case.

**1.     Document Review and Analysis**

128.     Lead Counsel dedicated extensive resources and used cutting-edge technology to review, organize and analyze the vast amount of information that were produced by parties and non-parties.

129.     In the Summer of 2006, the parties negotiated an agreement concerning the format for producing and electronically storing the documents.  On August 29, 2006, the Court So Ordered the parties' Stipulation and Order Establishing a Joint Document Depository.

130.     Pursuant to that Order, the documents produced by all parties and non-parties were placed in an electronic document depository that allowed Lead Counsel to search the documents through "Boolean" type searches (*i.e.*, the type of searches used in the Westlaw and Lexis-Nexis databases), as well as by multiple categories, such as by author and/or recipients, type of document (*e.g.*, emails, memoranda, SEC filings), date, bates number, etc.  The electronic database was accessible through the internet, allowing attorneys under the direction and supervision of Lead Counsel to review documents and coordinate discovery remotely.  For example, when attorneys in one location identified "hot" documents, they were placed in an electronic folder and attorneys and experts in other locations could immediately open the folder and review the documents.  In fact, Lead Counsel retained the services of insurance experts and forensic accountants, who assisted in identifying and analyzing complex insurance documents and accounting documents, including many that were produced by AIG.

131.     To host this large electronic document repository, the parties hired Merrill Legal Computer Solutions, Inc. ("Merrill"), one of the leading litigation technology support companies.

Merrill's search engine is considered to be one of the best in the field and provides some of the most advanced features for searching electronic databases.

132.    Lead Counsel achieved substantial savings by working primarily electronically (saving hundreds of thousands, if not millions of dollars in copying costs), and by sharing the costs of electronic data storage with Defendants, who paid half of those storage costs.  This cost sharing agreement alone resulted in savings of more than $600,000 to the Class.

133.    To review Defendants' enormous document production, a team of more than 55 attorneys was assembled and thorough document review guidelines and protocols were prepared. These attorneys worked full-time on this project to complete the document review and analysis as quickly and efficiently as possible.  The attorneys conducted their review with direct guidance on accounting issues from the same accounting firm used by the plaintiffs in the *Enron* litigation.  Our insurance expert also worked closely with the document review attorneys to ensure the accuracy and efficiency of the review.  The review was structured to limit overall cost, with the bulk of the initial review being conducted by more junior attorneys hired by Labaton Sucharow.

134.    All aspects of the review were carefully supervised by Lead Counsel to eliminate inefficiencies and to insure a high-quality product.  This supervision included multiple in-person training sessions, the drafting of a detailed "document review manual," presentations regarding the key legal and factual issues in the case, and in-person instruction from senior attorneys and experts with respect to the insurance and accounting issues.  The training sessions were supplemented by weekly conferences with senior Labaton Sucharow attorneys and daily meetings with the insurance and accounting experts who also worked on the document review.

135.    Moreover, the "hot" and "semi-hot" documents identified were all subject to further analysis assessments conducted by senior attorneys (again with the assistance of accounting and insurance experts) on an on-going basis.  In addition, samplings of documents coded as "relevant"

and "non-relevant" were reviewed by those same senior attorneys to provide quality control, *i.e.*, to make certain that the more junior attorneys' assessments were accurate.

        **2.**    **Fact Depositions**

136.    In addition to taking and defending depositions related to class discovery, as described above, Lead Plaintiff took more than 70 depositions of fact witnesses and 30(b)(6) witnesses, several of which were two-day depositions.

137.    These depositions include:

    (a)    Defendant Maurice R. Greenberg, AIG's former CEO;

    (b)    Defendant Howard I. Smith, AIG's former CFO;

    (c)    Defendant Thomas Tizzio, former AIG Senior Vice Chairman and President;

    (d)    Defendant Martin Sullivan, former AIG COO, Director, and, after Defendant Greenberg resigned, CEO;

    (e)    Defendant Michael Castelli, former AIG Vice President and Comptroller, Chief Accounting Officer;

    (f)    Defendant Michael Murphy, former AIG Executive Vice President;

    (g)    Defendant Frank Hoenemeyer, former member of the AIG Board of Directors;

    (h)    Vincent Cantwell, former AIG Vice President and deputy comptroller;

    (i)    Steven Bensinger, former AIG CFO;

    (j)    Frank Douglas, former AIG Senior Vice President and chief actuary;

    (k)    Jay Morrow, AIG's chief actuary for reinsurance of the Domestic Brokerage Group, the division of AIG where the Gen Re Transaction was recorded;

    (l)    Arnold Spier, former AIG Director of Financial Planning and Analysis;

    (m)    Ernest Patrikis, former AIG General Counsel;

    (n)    Kathleen Shannon, AIG Senior Vice President and Deputy General Counsel;

    (o)    Carol McFate, AIG Vice President and Treasurer;

    (p)    Barry Winograd, PwC Engagement Partner;

(q)     Richard Mayock; PwC Engagement Partner;

(r)     Robert Sands, PwC Partner on AIG audit;

(s)     Jeffrey Allen, PwC Director of Capital Markets Group on AIG audit;

(t)     John McCann, PwC Manager in Forensic Services on AIG audit;

(u)     Matthew Britten, manager of the corporate audit team on the AIG audit;

(v)     Matthew Wojcik, an AIG equity trader, regarding the Market Manipulation Fraud; and

(w)     Keith Duffy, AIG equity trader, regarding the Market Manipulation Fraud.

More than 20 AIG and Marsh McClennan employees and former employees with knowledge of the

Market Division Fraud, including:

(x)     John Keogh, former Co-head of AIG Domestic Brokerage Group;

(y)     John Doyle, President and CEO of American Home division of AIG;

(z)     Carlos Coello, AIG underwriter;

(aa)    Jean-Baptist Tateossian, former head of the national accounts unit of American Home, a division of AIG;

(bb)    John Mohs, Assistant Vice President at the American Home Division of AIG;

(cc)    Karen Jacobson, A Vice President of the American Home Division of AIG;

(dd)    Nicole Michaels, a Marsh McClennan broker;

(ee)    William Gilman, Managing Director and Executive Director of Marketing at Marsh McClennan;

(ff)    Susan Rivera, COO of the American Home division of AIG; and

(gg)    Kristian Moor, AIG Executive Vice President of Domestic General Insurance.

138.    More than 70 of the depositions in this case were taken or defended by Labaton

Sucharow partners; and 9 additional depositions were taken by senior attorneys who were Of

Counsel to Labaton Sucharow.

139.    In preparing for these depositions (and for possible trial) Lead Counsel undertook extensive efforts to analyze the complex accounting issues that are integral to the AIG claims, as well as issues related to proving loss causation and the damages caused by AIG.  Lead Counsel and their experts devoted thousands of hours to learning and analyzing (i) hundreds of AIG transactions that were potentially part of the Market Division Fraud; (ii) the applicable accounting rules (*e.g.*, special rules, which changed over time, related to accounting for reinsurance transactions where there was little or no risk of loss in the transaction); (iii) AIG's accounting transactions and policies in the two dozen separate areas where the Company restated its financial statements, and piecing together the decision-making and documentation for the allegedly improper accounting transactions; (iv) AIG memoranda and PwC work papers related to these accounting transactions and determining AIG's involvement (*i.e.*, the involvement of senior AIG officers and managers) and knowledge of the alleged accounting fraud; (v) the alleged Market Manipulation on dozens of dates throughout the Class Period where AIG purchased hundreds of thousands of shares of its own stock (including review and analysis of recorded phone records by Defendant Greenberg directing those purchases).

## V.    <u>SETTLEMENT PROCESS</u>

140.    As noted above, the $725 million Settlement with AIG is the result of dozens of formal and informal discussions and formal mediation sessions over more than five years.  At different points in time, three well-respected and highly experienced mediators, including Hon. Layn R. Phillips (Ret.),[10] served as mediators in an effort to resolve the claims against AIG.  Lead Plaintiff

---

[10] Judge Phillips is a former Assistant United States Attorney in the Central District of California and a former United States Attorney for the Northern District of Oklahoma.  He was appointed and served as a United States District Judge in the Western District of Oklahoma.  After he resigned from the federal bench, he joined Irell & Manella LLP, where he specializes in complex civil litigation and mediations.  Judge Phillips is one of the most experienced and respected mediators in the United States in securities class actions. Among the securities class action settlements that he mediated are the following:  *In re Cendant Corporation Securities Litigation* (NJ);  *UnitedHealth Group Inc. PSLRA Litigation* (MN);  *In re Healthsouth Corp. Securities*

and AIG (the "Settling Parties") were able to reach the proposed Settlement in the most recent series of mediation sessions with Judge Phillips during the summer of 2010. These negotiations were well-informed by the years of litigation and discovery discussed above.

141.     Lead Plaintiff's first formal mediations with AIG occurred in February and March of 2006, with former Judge Nicholas H. Politan as the mediator. That mediation was not successful. In late 2007 and early 2008, the parties met with Kenneth R. Feinberg (who was also the settlement master for the administration of the SEC settlement with AIG). These mediations did also not result in a settlement.

142.     In September 2008, Lead Plaintiff entered into another formal mediation with AIG, this time with Judge Phillips as the mediator. Shortly thereafter, AIG faced a financial crisis and the Government began its bailout of the Company. Although the parties were not able to reach agreement at that time, talks continued intermittently and formal mediation sessions were held in May 2009 and in April 2010. Again, these mediations did not result in a settlement.

143.     Finally, in June 2010, at the request of Lead Counsel, the parties – *i.e.*, Lead Plaintiff, represented by Ohio Attorney General Richard Cordray and AIG and a senior official of the U.S. Treasury – entered into direct, face-to-face negotiations in Columbus, Ohio. This mediation resulted in an agreement in principle for the $725 million AIG Settlement.

144.     One of the challenges for Lead Counsel at the mediation was to obtain the maximum possible recovery for the Settlement Class in view of the financial and political constraints under which AIG was operating. Due to Lead Counsel's behind-the-scenes efforts, the size and

---

*Litigation* (AL);  *In re Qwest Communications International, Inc. Securities Litigation* (CO);  *In re Williams Securities Litigation* (OK);  *In re General Motors Corp. Securities Litigation* (EDMI); *In re El Paso Corp. Securities Litigation* (SDTX);  *Brocade Communications Systems, Inc. Securities Litigation* (NDCA); *In re Refco, Inc. Securities Litigation* (SDNY); *Carpenters Health & Welfare Fund v. The Coca-Cola Company* (GA); and *In re KLA-Tencor Corp. Securities Litigation* (NDCA).

structure of the $725 million AIG Settlement (in particular, the initial division between $175 million in cash and $550 million in AIG securities) were financially doable and politically palatable.

145.    Lead Counsel's contacts and reputation were key to hiring top-shelf financial analysts and investment bankers (professionals who generally do not work for plaintiffs' firms), to provide the Ohio Attorney General with important advice regarding how much AIG could afford to pay, and how to craft a settlement package that included cash and securities in a way that would maximize the dollar value of the total payment.

146.    For example, we retained Hugh Lamle, the president of MD Sass Investors Services Inc., a registered investment advisor.  Mr. Lamle is also president of MD Sass-Macquarie Financial Strategies Management LLC, which invests in new investment management company start-ups and buy-outs.  In 2009 and 2010, Mr. Lamle prepared a number of financial analyses of AIG, concluding that the Company could afford to pay a settlement in this case within the range that the Settling Parties eventually agreed to, with the proviso that a substantial portion of the settlement initially would have to consist of securities.  Therefore, Lead Counsel sought a large cash component to the settlement, but understood that, in order to maximize the overall size of a settlement, it would have to accept AIG securities as the larger part of the overall package.

147.    As such, the proposed settlement was structured to include a combination of cash and AIG securities.  By raising these cash and securities proposals, we believe we changed the atmospherics of the negotiations, which eventually led to successful negotiations.

148.    Most importantly, I was also able to leverage my contacts as a former Senior Vice President & Senior Litigation Counsel at Kidder, Peabody & Co. Incorporated to find an investment banking professional who had the appropriate expertise, stature and background to assist in negotiating the Settlement.  In short, we were able to retain the services of a restructuring expert, Robert Kost, the former Managing Director and Co-Head of Gleacher & Company's Restructuring

Group. Not only was Mr. Kost eminently qualified to advise us and General Cordray on substantive issues relating to the AIG Settlement, but Mr. Kost was the ideal person to assist in negotiations with Treasury, because he previously had worked with the senior Treasury official who participated in direct, face-to-face negotiations with General Cordray.

149. In this manner, Lead Counsel was able to obtain a total settlement amount of $725 million – $175 million in cash plus $550 million in AIG stock – that was outstanding under the circumstances. Further, by negotiating terms under which the stock portion of the Settlement would convert to a cash payment if AIG made a "Qualified Offering," (which Lead Counsel, based on the advice of its financial experts, believed was likely to occur within months), Lead Counsel was able to obtain a settlement for the Settlement Class that – following the May 27, 2011 Qualified Offering – became a $725 million all-cash settlement.

150. As noted by Professor Coffee, the $725 million settlement amount is an outstanding result, representing a recovery of 13.18% of the $5.5 billion in "maximum recoverable damages" in the case. *See* Coffee Decl. ¶ 22. Moreover, when considered together with Lead Plaintiff's $115 million settlement with PwC and $97.5 million settlement with the Starr Defendants, the combined recovery for the Class represents 17.05% of maximum obtainable damages.

151. On July 1, 2010, the Settling Parties executed a Memorandum of Understanding. The formal Settlement Agreement and exhibits were then drafted over the following months, following numerous negotiating sessions, both by phone and in person, regarding the precise settlement terms. Judge Phillips participated in several of these sessions, and ultimately (after receiving mediation briefs from the parties) made rulings on a number of points on which the parties were unable to reach agreement.

152. The Settlement Agreement was executed by the Settling Parties on November 30, 2010 and immediately submitted to the Court for preliminary approval.

## VI.    ASSESSMENT OF STRENGTHS AND WEAKNESSES

153.    The investigation and discovery, described above, on both liability and damages issues enabled Lead Plaintiff and Lead Counsel to thoroughly understand and evaluate the strengths and weaknesses of the claims and the risks of continued litigation with AIG, and accordingly to enter into the Settlement on a fully informed basis.

154.    Lead Plaintiff and Lead Counsel considered, among other things: (i) the substantial cash benefit to Settlement Class Members under the terms of the Agreement; (ii) the risks and expense of additional expert reports and expert discovery, including additional expert depositions; (iii) the probability that AIG would move for summary judgment at the close of discovery, leading to a legal challenge and/or a battle of the experts with respect to reliance, materiality, damages and loss causation issues; (iv) the risk of not prevailing through summary judgment on some or all claims; (v) the difficulties and risks involved in proving the claims at trial, including the difficulties of proving (a) materiality with respect to certain allegedly fraudulent transactions (especially considering the size of AIG, which entered into tens of thousands of insurance contracts each year); (b) scienter with respect to the Company and the Individual Defendants, and (c) loss causation where, as here, the disclosures regarding the Accounting Fraud occurred over an extended period of time; (vi) the delays inherent in such litigation, including appeals; and (vii) the risks of presenting an exceedingly complex and fact-intensive case to a jury.

### A.    Risks of Establishing Liability

155.    The claims against AIG presented significant risks given, among other things, the highly complex nature of the alleged Market Division and Accounting Frauds here at issue.  As noted above, two criminal bench trials in New York State Court against Marsh employees regarding the Market Division allegations took 10 months and 11 months respectively.  The first trial resulted

in a guilty verdict based on New York State anti-trust law that was later vacated, and the second trial resulted in a not guilty verdict.

156.    Issues of proof in this case would be complicated by the fact that both the Market Division Fraud and the Accounting Fraud alleged are, at their crux, alleged violations of complex accounting rules and insurance practices, which might not be understood by a jury.

157.    For example, the Complaint alleges that AIG paid Marsh for its help in bid-rigging by paying to Marsh hundreds of millions of dollars in undisclosed contingent commissions. However, although the NYAG had characterized such contingent commissions as "illegal," Complaint ¶¶ 11 and 79, *State v. Marsh & McLennan Cos.*, No. 04403342 (N.Y. Sup. Ct. Oct. 14, 2004), the Appellate Division of the New York Supreme Court subsequently held that "[c]ontingent commission agreements between brokers and insurers are not illegal." *Hersch v. DeWitt Stern Group, Inc.*, 841 N.Y.S.2d 516, 518 (2007) ("[I]n the absence of a special relationship between the parties, defendant had no duty to disclose the existence of the contingent commission agreement . . . .").

158.    Further, certain of AIG's alleged accounting frauds arose out of complicated reinsurance transactions such as the Gen Re Transaction, which involved, *inter alia*, a foreign reinsurance company, at least six different AIG subsidiaries, the identification of claims reserves that could be reinsured, special accounting rules for "retroactive reinsurance," an understanding of the differences between deposit accounting and insurance transaction accounting used by two different companies to record the same transactions in different ways, the analysis of the statutory filings by four AIG subsidiaries, and the analysis of supposedly separate transactions between subsidiaries of AG and Gen Re that were allegedly designed to allow AIG pay Gen Re a secret fee for providing AIG with $500 million in claims reserves over two quarters through two risk-free reinsurance transactions.  Indeed, the issues were so complicated that the criminal trial relating to the Gen Re Transaction took five weeks to complete.

159.     Another allegedly fraudulent accounting transaction involved AIG's release of insurance reserves through top side adjustments for which there may not have been sufficient documentation to support the release.  Yet another involved the acquisition and capitalization of an off-shore re-insurance company, in part by providing non-recourse loans to foreign investors, for the sole purpose of allowing AIG to characterize underwriting losses as investment losses (the "Capco fraud") and another involved AIG's use over many years (and in hundreds of reinsurance transactions) of off-shore "captive" reinsurance companies such as Union Excess and Richmond that were allegedly controlled by AIG, but were not reported as such on AIG's financial statements.

160.     The large number of relevant, but complex accounting issues – including significant changes to the accounting rules during the Class Period on issues related to determining acceptable risk in retroactive insurance transactions (FAS 113) and determining control of supposedly independent companies (Fin 46-R) – would have been another significant hurdle to overcome at trial.  As noted above, AIG's Restatement affected two-dozen different *types* of transactions and dozens of GAAP rules and interpretations.  Moreover, many of the items that AIG restated, such as top side adjustments and the mischaracterization of risk-free transactions as insurance (rather than as deposits), involved hundreds of separate transactions from different AIG subsidiaries and business units over a period of five years or more.  Trial of these issues would have been very complex, very time-consuming, and very risky.[11]

161.     Proving AIG's scienter to the jury would also have been challenging for the Settlement Class, whether under the standards of intentional or reckless conduct.  We note that in the two related New York State bid-rigging trials (*see supra* at ¶¶ 52-56), one trial ended with a

---

[11] As a means of comparison, we note that in *In re Vivendi Securities Litigation*, No. 02 Civ. 5571 (RJH) (S.D.N.Y.), a much simpler case, with fewer allegedly fraudulent acts, the trial nevertheless lasted 3 months. Closing arguments lasted 5 days, jury deliberations lasted 14 days, and the jury eventually reached a "compromise verdict" in which the company was found to be liable although the individual defendants were not.  The case is currently on appeal.

conviction that was later vacated and the other trial resulted in a finding for the defendants.

Likewise, we note that the criminal convictions of the Gen Re Defendants have been vacated.  *See*

*supra*, at ¶ 50.  Perhaps most importantly, the accounting for many of the transactions that AIG

restated required the exercise of professional judgment.  Thus, establishing scienter would have been

difficult.

### B.       Challenges of Establishing Loss Causation and Damages

162.     AIG's and other Defendants' expert declarations, produced as part of class

certification discovery, and Defendants' deposition questioning of Lead Plaintiff's loss causation

expert, Professor Finnerty, illustrate the challenges that the Settlement Class would have had to

overcome to recover from AIG.  Defendants' experts were prepared to testify that AIG's stock

drops following disclosures of the alleged fraud could not be used to show loss causation, either

because (i) they were not statistically significant using the methodology and standards that

Defendants' experts deemed appropriate; (ii) certain information regarding the alleged frauds had

already been made public prior to the alleged Accounting Fraud disclosures, so there was "truth on

the market"; or (iii) non-fraud related information (*e.g.*, information about losses due to hurricane

damage or items that AIG restated its financial statements for non-fraudulent reasons) was disclosed

at or about the same time as the fraud-related information was disclosed.

163.     Lead Plaintiff and Lead Counsel strongly believe that loss causation and resulting

damages could be established with respect to all claims asserted against AIG.  *See* "Declaration of

John D. Finnerty, Ph.D. in Support of Lead Plaintiff's Motion for Class Certification" and "Rebuttal

Declaration of John D. Finnerty, Ph.D."  D.E. #356 at Ex. 2; D.E. #446 at Ex. 26.  However, Lead

Plaintiff recognizes that at summary judgment or trial the finder of fact could credit AIG's experts

over Lead Plaintiff's experts and determine that the Settlement Class suffered no (or only modest)

recoverable damages.

VII.   **PLAN OF ALLOCATION**

164.    Pursuant to the Preliminary Approval Order, and as explained in the Notice, all Settlement Class Members wishing to participate in the Settlement must file a valid Proof of Claim or Release Form by January 23, 2012.  As also set forth in the Notice, all Settlement Class Members who timely file a valid Release or Proof of Claim that shows a Recognized Loss under the proposed Plan of Allocation will receive a distribution from the Distribution Amount (the Settlement Amount less a deduction of fees and expenses approved by the Court and taxes incurred on interest income earned by the Settlement Amount) if their distribution totals at least $10.00.  *See* Exhibit 3-A at 9-10. Distributions to Class Members will be made only after a motion to distribute has been approved by the Court.

165.    The proposed Plan of Allocation was set forth in full in the Notice and was developed by the Settlement Class's non-testifying damages experts, Dr. Scott D. Hakala and Frank C. Torchio, both of whom have broad experience in developing plans of allocation for settlements in securities class actions.

166.    The Plan of Allocation is substantially similar to the Court-approved plan used in the PwC Settlement, apportioning the Settlement among common stock purchasers, option purchasers, and debt securities purchasers.[12]  The main differences between the Plan of Allocation and the plan used in the PwC Settlement are that (1) although the Plan uses essentially the same eleven inflation periods that were used in the PwC plan of allocation, the inflation per share for each of the eleven periods has been adjusted to take into account the particular allegations against AIG (as opposed to the distinct allegations against PwC), and (2) a claimant's total Recognized Loss will be reduced by

---

[12] The AIG Debt Securities eligible to participate are the same as those in the PwC Settlement.

7/8th of the claimant's distribution from the Fair Fund established in *SEC v. American International Group, Inc.*, 06 Civ. 1000 (S.D.N.Y.) (LAP).[13]

167.    As explained in the Notice, the Plan of Allocation apportions the recovery among Settlement Class Members who purchased or acquired AIG's publicly traded securities during the Class Period, specifically AIG common stock, options, Zero Coupon Convertible Senior Debentures, 0.5% Cash Exchangeable Equity-Linked Senior Notes, 2.85% Medium-Term Notes, Series F, 2.875% Notes (144A securities) that were exchanged into registered like coupon bonds and 4.25% Notes (144A securities) that were exchanged into registered like coupon bonds.

168.    The Plan distributes the recovery according to the type of security purchased and when Settlement Class Members acquired or sold their AIG Securities.  As in the PwC plan of allocation, those who purchased common stock and options will recover at least 95% of the amount that will be distributed to all Settlement Class Members; those who purchased the bonds, in recognition of the particular risks involved in establishing loss causation and market efficiency for the bonds, will share in up to 5% of the amount that will be distributed to all Settlement Class Members.  Like in the PwC plan of allocation, the Plan also varies the recognized loss per share according to when Settlement Class Members acquired or sold their AIG Securities—taking into account the relative strength of potential claims relevant to these time periods.

169.    As in the PwC Plan of Allocation, the Plan limits Settlement Class Members' recovery to their out-of-pocket loss, pursuant to the Exchange Act.

170.    To date, although the deadline for the filing of objections is not until December 30, 2011, there have been no objections to the Plan of Allocation.  Lead Plaintiff and Lead Counsel respectfully submit that the Plan is fair and reasonable and should be approved by the Court.

---

[13] The Fair Fund was funded entirely by AIG.  AIG paid $700 million in disgorgement and $100 million as a fine.  As set forth in its settlement with the SEC, AIG would not be entitled to judgment reduction for the amount of the fine.  Therefore, AIG is entitled to a reduction of recognized loss equal to 7/8 of any amount that Class Members received from the Fair Fund.

## VIII.   **THE FEE APPLICATION**

171.    Lead Counsel is making an application for a fee award of 13.25% of the Settlement Fund *after* the deduction of Lead Counsel's reimbursed expenses as approved by the Court and not including any accumulated interest earned on the Settlement (the "Net Settlement").  This amount is less than the maximum amount of 13.25% of the Settlement Fund (*i.e.*, of the full $725 million) reported to the Settlement Class in the Notice.

172.    This request is also fully consistent with the Fee Agreement between Lead Counsel and the Ohio Attorney General's Office.  *See* Smith Decl. ¶ 22; *see also* Exhibit 9.  Moreover, in his Declaration, Assistant Attorney General Dennis P. Smith notes that Lead Counsel were confronted with "extraordinary circumstances" in this case; that "the creative and aggressive resolution of the issues as reflected in the Settlement[], [led to] the excellent result obtain[ed] by Lead Counsel for all members of the Settlement Class"; and that the requested award is "fully consistent with the Contract [between Lead Counsel and the Ohio Attorney General]." *Id.*

173.    Lead Counsel also requests reimbursement of expenses incurred in connection with the prosecution of the Action from the Escrow Account in the amount of $8,257,111.29. *See* Exhibit 20 hereto.  This amount is less than the maximum amount of $9.75 million reported to the Settlement Class in the Notice.

174.    Lead Counsel further requests reimbursement of lost wages and expenses for the Ohio State Funds, pursuant to 15 U.S.C. § 78u-4(a)(4) directly related to their representation of the Settlement Class, in the total amount of $71,910 (as detailed in ¶¶ 196 to 198, below).  These amounts are below the maximum request of $150,000 reported to the Settlement Class in the Notice.  The legal authorities supporting the requested fees and expenses are set forth in Lead Counsel's separate memorandum of law in support of the application.  Below is a summary of the primary factual bases for Lead Counsel's requested fees and expenses.

A.      **The Risks and Unique Complexities of the Action**

175.    This Action presented exceedingly novel legal challenges from the outset of the case.

176.    From the outset, Lead Counsel understood that it was embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  Although AIG would later issue a Restatement, and the SEC and New York Attorney General would later launch investigations into certain of the Accounting Frauds, none of that had happened at the outset of the litigation.  The First Amended Complaint was solely based on the Market Division Fraud.  Moreover, the facts that contingent commissions were not *per se* illegal under New York law, *see* ¶ 157, *supra*, (citing *Hersch*, 841 N.Y.S.2d at 518), and that all of the criminal convictions relating to that Fraud were ultimately vacated, *see* Section III(D)(4), *supra*, shows that it was far from certain at the outset of the case that Lead Counsel would be successful in prosecuting claims based on the Market Division Fraud on behalf of the Class.

177.    As discussed above, Lead Counsel was required to contend with very complex class certification issues, unique factual challenges (*e.g.*, Lead Counsel reviewed and analyzed numerous AIG insurance contracts and identified more than 630 separate AIG insurance contracts that may have been affected by the Market Manipulation Fraud), and unusually complex financial issues related to AIG's Restatement (the Company restated two dozen separate *types* of transactions, each of which involved innumerable individual entries that had to be reviewed and analyzed separately) that required significant effort, creativity, and skill on the part of Lead Counsel, as well as significant out-of-pocket costs.  It took a great deal of hard work and diligence by skilled counsel to develop the facts and theories that were needed to sustain the Complaint and prepare for trial, and to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.  The novel risks faced as a result of the Government bailout of AIG were in addition to the more typical

risks accompanying these types of cases, such as the risk of non-payment stemming from the fact that this prosecution was undertaken by Lead Counsel entirely on a contingent-fee basis.

178.    In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With an average lag time of several years for securities class actions to conclude, the financial burden on contingent-fee counsel is far greater than on law firms that are paid on an ongoing basis.

179.    Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  For example, completely unforeseeable changes in the financial strength and independence of AIG and multiple Supreme Court, Second Circuit, and New York State Court decisions have been rendered since the outset of this litigation that impacted the course of the litigation.  *See, e.g.*, *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2d Cir. 2008) (regarding loss causation); *Stoneridge Investment Partners LLC v. Scientific-Atlanta Inc.,* 552 U.S. 148 (2008) (regarding scheme liability); *People v. Gilman*, No. 4800–2009, 28 Misc. 3d 1217(A) (N.Y. Sup. Ct. July 2, 2010) (regarding bid-rigging).  An ever-changing landscape in which to litigate is a substantial risk to contingent-fee law firms.

180.    Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws pertaining to the duties of officers and directors of public companies.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, can hire skilled and experienced counsel on a fully contingent basis to take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, fees must adequately compensate plaintiffs' counsel, taking into account all of the risks undertaken in prosecuting a securities class action.

181.     Lead Counsel's persistent efforts over nearly seven years have resulted in a very significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of Lead Counsel's hard work and the extraordinary result achieved, the requested fee of 13.25% of the Net Settlement and reimbursement of approximately $8.3 million in expenses is reasonable and should be approved.

### B.     The Work and Experience of Lead Counsel

182.     Attached hereto as Exhibits 10 to 17 are declarations from Lead Counsel and other plaintiffs' counsel who contributed to the prosecution of the Action submitted in support of the request for an award of attorneys' fees and reimbursement of litigation expenses.  Included with these declarations are schedules that summarize the lodestar of each firm, as well as the expenses incurred by category (the "Fee and Expense Schedules").[14]  The attached declarations and the Fee and Expense Schedules indicate the amount of time spent by each attorney and professional support staff employed by the firms, and the lodestar calculations based on their current billing rates.  As set forth in each declaration, the declarations were prepared from contemporaneous daily time records maintained by the respective firms, which are available at the request of the Court.  The hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary.  *See* Exhibit 18 hereto, a table summarizing these rates and Exhibit 19 hereto, a table compiled by Labaton Sucharow showing the billing rates for defense firms that represented defendants in this case based on fee applications submitted by those firms in bankruptcy proceedings in 2010.  For attorneys or paraprofessionals who are no longer employed by the firms, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment.

---

[14] Exhibit 20, hereto, is a summary table of the lodestars and expenses of all of the firms.

183.   Lead Counsel has expended nearly 260,000 hours in the prosecution and investigation of the claims against the settling defendants.[15]  The resulting collective lodestar from this monumental effort is approximately $96.76 million.  Exhibit 20 hereto.  The requested fee of 13.25% of the Net Settlement ($716.74 million, if Lead Counsel's request for reimbursement of expenses is granted), results in a negative lodestar multiplier of approximately 0.98, which does not include any time that will necessarily be spent from this date forward administering the Settlement.

184.   Lead Counsel is experienced in prosecuting securities class actions, and worked diligently and efficiently in prosecuting the Action, as demonstrated by the firms' resumes attached to their respective declarations.

185.   Labaton Sucharow is among the nation's preeminent law firms in class action securities litigation and has successfully litigated and tried numerous class actions on behalf of major institutional investors.  *See, e.g., In re HealthSouth Corp. Sec. Litig.*, No. CV-03-1501 (N.D. Ala.) (representing New Mexico State Investment Council, the New Mexico Educational Retirement Board and the State of Michigan Retirement System and achieving settlements valued at approximately $804.5 million); *In re Countrywide Sec. Litig.*, No. C 07-5295 (C.D. Cal.) (representing the State of New York and New York City Pension Funds and achieving a settlement of more than $600 million); *In re General Motors Corp. Sec. and Deriv. Litig.*, MDL No. 1749 (E.D. Mich.) (representing Deka Investment GmbH and Deka International S.A., Luxembourg and achieving a settlement of $303 million).

186.   Hahn Loeser is one of Ohio's largest and most respected law firms.  Hahn Loeser has served as lead counsel in, and has defended, many class actions in the securities area, as well as in the areas of banking law, privacy, real estate, and antitrust law.

---

[15] The time spent litigating the claims against settled defendant PricewaterhouseCoopers LLP, the Greenberg Defendants, and the Gen Re Defendants has not been included in this figure or the reported lodestars.

### C.   Standing and Caliber of Defense Counsel

187.   The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  AIG has been represented by two of the country's most prestigious law firms: Paul, Weiss, Rifkind, Wharton & Garrison LLP and Skadden, Arps, Slate, Meagher & Flom LLP.  Other counsel for the settling defendants include Wachtell, Lipton, Rosen & Katz; Sidley Austin LLP; Mayer Brown LLP; Morrison & Foerster LLP and Kobre & Kim LLP.  Defense Counsel zealously represented the interests of their clients.  In the face of this experienced, formidable, and well-financed opposition, Lead Counsel was nonetheless able to persuade AIG to settle the case at a very difficult time, on terms highly favorable to the Settlement Class.

### D.   Reimbursement of the Requested Litigation Expenses Is Fair and Reasonable

188.   Lead Counsel seeks reimbursement from the Escrow Account of $8,257,111.29 in litigation expenses reasonably and actually incurred in connection with commencing and prosecuting the claims against the settling defendants.

189.   From the beginning of the case, Lead Counsel was aware that it might not recover any of these expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

190.   As set forth in the Fee and Expense Schedules (included as Exhibits 10-B to 12-B and Exhibit 14-B to 15-B hereto), Lead Counsel has incurred a total of $8,257,111.29 in unreimbursed litigation expenses in connection with the prosecution of the Action against AIG.  *See also* Exhibit 20.  As attested to, these expenses are reflected on the books and records maintained by plaintiffs' counsel.  These books and records are prepared from expense vouchers, check records

and other source materials, and are an accurate record of the expenses incurred.  These expenses are set forth in detail in each firm's declaration, each of which identifies the specific category of expense, *e.g.*, experts' fees, out-of-town travel costs, online research, the costs of taking depositions, the costs of hosting electronic discovery, photocopying, telephone, fax and postage expenses, and other costs actually incurred for which Lead Counsel seeks reimbursement.  These expense items are billed separately and such charges are not duplicated in the respective firms' billing rates.

191.   Of the total amount of expenses, more than $6.1 million, or approximately 74%, was expended on expert assistance.  As noted above, Lead Counsel retained damages/loss causation experts to assist in the prosecution of the Action, to assist in mediation, and to help develop a fair and reasonable Plan of Allocation.  Lead Counsel also retained accounting experts, insurance experts, and experts in retrieving and using electronic documents in order to effectively conduct discovery and to prepare for mediation and/or trial.  Following the Government bailout of AIG beginning in September 2008,  Lead Counsel retained two investment bankers to assist the Ohio Attorney General's Office in the mediation process: (i) Robert Kost, former Managing Director and Co-Head of Gleacher & Company's Restructuring Group, and (ii) Hugh Lamle, President of MD Sass Investors Services, Inc., a registered investment adviser.  Indeed, one of the investment bankers, Mr. Kost, played a direct role in assisting Ohio Attorney General Richard Cordray in the negotiation of the AIG Settlement.  In addition, Lead Counsel engaged bankruptcy counsel to provide advice concerning the implications relating to the possibility of AIG seeking bankruptcy protection, including the steps that could be taken by Lead Counsel to protect the Class, to the extent possible, if a bankruptcy filing (or "restructuring" pursuant to the Dodd – Frank Act) was made before or after a proposed settlement was reached.

192.   As mentioned above, although the costs of the document depository were shared with Defendants, they were still considerable and totaled more than $683,000.  Another large

component of the litigation expenses was for online legal and factual research.  In addition to researching the law pertaining to such complex areas as scienter and causation, Lead Counsel necessarily spent considerable time and expense performing factual research.  Lead Counsel's factual research included investigatory costs associated with identifying and locating witnesses and former employees of AIG using a variety of online databases and service providers.  These research expenses amounted to more than $280,000.

193.    Additionally, Lead Counsel paid $178,662.85, for mediation fees assessed by the three mediators used in this matter.  As discussed above, these impartial "referees" were instrumental in enabling the Settling Parties to define and eventually narrow the areas of dispute so that a resolution could be reached.

194.    The other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, costs of out-of-town travel, copying costs (limited to $0.15 per page), long distance telephone and facsimile charges, postage and delivery expenses.

195.    All of the litigation expenses incurred, which total $8,257,111.29, were necessary to the successful prosecution and resolution of the claims against the settling defendants.  These expenses have been approved by Lead Plaintiff.

**E.    Reimbursement of the Costs and Expenses of Lead Plaintiff**

196.    Additionally, the Ohio State Funds seek reimbursement of their reasonable lost wages and expenses, pursuant to the PSLRA, 15 U.S.C. §78u-4(a)(4), that they directly incurred in connection with their representation of the Settlement Class in the total amount of $71,910.  The amount of time and effort devoted to this Action by Lead Plaintiff is detailed in the accompanying separate declarations of their respective representatives: Julie E. Becker, General Counsel of OPERS; and William J. Neville, General Counsel of STRS Ohio.

197.    OPERS hereby requests $36,551.00 as reimbursement for its lost wages and expenses to represent the Settlement Class.  *See* Exhibit 4 hereto, ¶¶ 6-16.

198.    STRS Ohio hereby requests $35,359.00 as reimbursement for its lost wages and expenses to represent the Settlement Class.  *See* Exhibit 5 hereto, ¶¶ 6-14.

199.    To date no objection has been raised as to the request for reimbursement of litigation expense by Lead Plaintiff.

200.    Lead Counsel respectfully submits that these awards, which will be paid directly to the Ohio State Funds, are fully consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type.

## IX.    REACTION OF THE CLASS

201.    Consistent with the Preliminary Approval Order, more than 2.1 million Notice packets have been mailed to potential Class Members advising them of the terms of the Settlement, the proposed Plan of Allocation, that Lead Counsel would seek an award of attorneys' fees not to exceed 13.25% of the Escrow Account and reimbursement of expenses in an amount not greater than $9.75 million, and the processes and deadlines associated with submitting objections and exclusion requests.  *See* Rust Aff. ¶¶ 2-17, Ex. A.  Additionally, on October 27, 2011, the Summary Notice was published in *The Wall Street Journal* and transmitted over *PR Newswire* on October 25, 2011.  *Id.* ¶ 18.  Although Bloomberg News Service chose not to run the Summary Notice in full, information about the Settlement was posted on Bloomberg News Service on October 25, 2011.  *Id.* ¶ 19.  The Notice and Stipulations for the Settlement have also been available on the settlement website maintained by Rust.  *Id.* ¶ 20.

202.    While the deadline set by the Court for Class Members to object to any aspect of the Settlement, the Plan of Allocation, and/or the requested fees and expenses has not yet passed, to

date the Settling Parties have not received even one objection to the Settlement or attorneys' fee request by an institutional investor or public pension fund.

203.     Moreover, to date, only 41 requests for exclusion have been received in response to more than 2.1 million Notice Packets that were sent by Rust.  However, 30 of the requests did not satisfy the requirements in the Notice or Preliminary Approval Order and are therefore invalid.  Rust Aff. ¶25.  Accordingly, to date only 11 valid requests for exclusion have been  received, representing just *1,260 shares* of stock, which is approximately 0.000048% of the almost *2.6 billion shares* of AIG common stock outstanding as of March 31, 2005.  *See* AIG Form 10-Q for the quarterly period ended March 31, 2005, dated June 28, 2005.

204.     Lead Plaintiff will address each of the objections received in its reply submission, which must be filed with the Court by January 13, 2012.

## X.     MISCELLANEOUS EXHIBITS

205.     Annexed hereto as Exhibit 21 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses and Lead Plaintiff's Request for Reimbursement of Expenses; and Lead Plaintiff's Memorandum of Law in Support of its Motion For Approval of Proposed Settlement With Defendant American International Group, Inc.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on December 2, 2011.

                              _____
                                   /s/ Thomas A. Dubbs
                                 Thomas A. Dubbs

# Appendix A

## APPENDIX A

Exhibit 1         Securities Class Actions Services Report for Third Quarter 2011

Exhibit 2         Preliminary Approval Order, filed October 5, 2011

Exhibit 3         Affidavit of Eric J. Miller of Rust Consulting, Inc., dated November 30, 2011

Exhibit 4         Declaration of Julie E. Becker, Esq., dated November 29, 2011

Exhibit 5         Declaration of William J. Neville, Esq., dated December 1, 2011

Exhibit 6         Ohio Police & Fire Pension Fund Annual Report for 2010

Exhibit 7         Declaration of Dennis P. Smith, Assistant Attorney General in the Office of the Ohio Attorney General, dated November 30, 2011

Exhibit 8         Declaration of Professor John C. Coffee, Jr., dated November 30, 2011

Exhibit 9         Retention Agreement for AIG Securities Litigation

Exhibit 10        Declaration of Thomas A. Dubbs on Behalf of Labaton Sucharow LLP, dated December 2, 2011

Exhibit 11        Declaration of Alan S. Kopit on Behalf of Hahn Loeser & Parks LLP, dated November 18, 2011

Exhibit 12        Declaration of Brian P. Murray on Behalf of Murray Frank LLP, dated November 18, 2011

Exhibit 13        Declaration of Jeffrey S. Abraham on Behalf of Abraham, Fruchter & Twersky LLP, dated November 22, 2011

Exhibit 14        Declaration of Laurence D. Paskowitz on Behalf of Paskowitz & Associates, dated November 11, 2011

Exhibit 15        Declaration of Mark S. Goldman on Behalf of Goldman Scarlato Karon & Penny, P.C., dated November 11, 2011

Exhibit 16        Declaration of Gretchen M. Nelson on Behalf of Kreindler & Kreindler LLP, dated November 10, 2011

Exhibit 17        Declaration of Leigh R. Lasky on Behalf of Lasky & Rifkind, Ltd., dated November 21, 2011

Exhibit 18        Blended Rates Table

Exhibit 19       Table of Rates from Bankruptcy Filings 2007-2010

Exhibit 20       Table of Lodestars and Expenses

Exhibit 21       Compendium of Unreported Orders