# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

IN RE AMERICAN INTERNATIONAL            :
GROUP, INC. SECURITIES LITIGATION
                                        :
--------------------------------------------------------
                                        :

This Document Relates to:
ALL ACTIONS                             :

-------------------------------------------------------- x

<u>**ECF CASE**</u>

Master File No. 04 Civ. 8141


# **DECLARATION OF JOHN C. COFFEE, JR.**

JOHN C. COFFEE, JR., under penalty of perjury, declares as follows:

## I. <u>INTRODUCTION</u>

1.       I submit this Declaration in support of the motion of Labaton Sucharow LLP and Hahn Loeser & Parks LLP (collectively, "Lead Counsel") for an award of attorneys' fees and reimbursement of expenses out of the $725 settlement fund recovered from American International Group, Inc. ("AIG") in the above captioned class action that will come to $94,870,000 (or slightly less than its full "lodestar" – i.e., its time expended on the action times its normal hourly rates). At the outset, I should acknowledge that my writings over nearly thirty years have frequently been skeptical of the performance of plaintiff's attorneys in class actions, and especially in securities class actions. See, e.g., John C. Coffee Jr., <u>Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation</u>, 106 Colum. L. Rev. 1534 (2006). But even a critic must recognize that there are exceptions to any generalization, and this case stands out as an exemplary exception. As this declaration will discuss, the benefit to the class – viewed from a variety of perspectives – is extraordinary, while the fee request – which comes to 13.25% of the recovery and is somewhat less than its full lodestar – is well below the norm, whether we assess that request on a percentage of the recovery basis or in terms of a lodestar methodology.

2.       In overview, this settlement is distinguished by two unique features:  (1) it appears to have recovered a much higher percentage of the maximum estimated damages than characteristically occurs in securities class actions; and (2) Lead Counsel is seeking to recover slightly less than its lodestar (while most class counsel in securities class actions usually seek a fee award equal to a healthy multiple of their lodestar). This

combination of a very high recovery (apparently the 13th largest in the securities class action field) and a modest fee award request (in terms of the time and effort expended) is unique in my experience. Nor, as explained below, did class counsel ride on the "coattails" of a public enforcement action; instead, this settlement was negotiated in the uniquely high risk and unsettled environment that arose after the 2008 collapse of AIG. Not only was the very solvency of the defendant regularly in doubt, but the political issues in reaching a settlement, based at least in part on taxpayer funds, arguably overshadowed the legal ones. Nonetheless, despite these risks, Lead Counsel made an extraordinary investment of its time and money (as its lodestar of $97 million clearly reflects) to obtain a very favorable settlement for the class. Very few law firms could make a similar investment, and, as proposed, Lead Counsel will not even receive full reimbursement of its lodestar.

3.      This declaration will focus on (i) the empirical evidence on fee awards in similar class actions, (ii) the level of success in this case, (iii) the factor of risk, and (iv) Lead Counsel's lodestar and the absence of any risk multiplier. At the outset, I acknowledge that an empirical understanding of what the average or median fee award has been does not resolve the normative issue of what the optimal or appropriate fee award should be in any specific case. Empirical data seldom resolves normative issues. But such information does provide a starting point and a baseline. Thus, Part III of this declaration will cover the recent studies of class action settlements and fee awards in securities class actions, with particular emphasis on comparably large class actions. Part IV will then turn to the relative success of plaintiff's counsel by examining the contemporary evidence on the ratio between settlement size and recoverable investor

losses. Part V will then turn to the issue of risk and assess the actual risks in this case. Part VI will focus on Lead Counsel's lodestar and then contrast this case with the typical risk multiplier sought in other securities class actions. Part VII will set forth my conclusions.

## II. BACKGROUND AND QUALIFICATIONS

4.      I am the Adolf A. Berle Professor of Law at Columbia University Law School, where I have taught since 1980, and am a member of the Bars of the State of New York and the District of Columbia. I am also a Fellow of the American Academy of Arts and Sciences, a Life Fellow of the American Bar Foundation, and a member of, and former Reporter for, the American Law Institute. I have also been a Visiting Professor of Law at Harvard Law School, Stanford Law School, the University of Virginia Law School, and the University of Michigan Law School. I began my academic career teaching at Georgetown University Law School from 1976 to 1980. Prior to that, I practiced law with the firm of Cravath, Swaine & Moore in New York City from 1970 to 1976. I am a 1969 graduate of Yale Law School.

5.      As a law professor, one of my principal academic interests has been class action litigation (with a special focus on the management of the large class action and the incentive structure that the law creates to reward the successful plaintiff's attorney). Although my academic interest in class actions does not make me more able than any other competent attorney to cite relevant precedent to this Court, my research has placed me in a position to call to this Court's attention recent empirical evidence concerning class action litigation and attorney fee awards. This data has relevance because it supplies a frame of reference enabling this Court to compare the requested fee against

relevant benchmarks and an appropriate sample of related cases. Thus, rather than duplicating class counsel's legal memorandum, I will focus instead on recent empirical studies regarding the typical recovery and fee award in class action litigation.

6.      I have on a number of occasions testified before Congressional committees with regard to the federal securities laws and class actions, have appeared as a witness before the Advisory Committee on the Civil Rules of the United States Judicial Conference, and regularly appear as a panelist at symposia and institutes on the topics of securities law and class actions. For the past fifteen years, I have been the opening lecturer at the annual ABA National Institute on Class Actions, and my annual survey of class action developments for this Institute is regularly published by the Bureau of National Affairs ("BNA"). During 1995, I served as an adviser to the White House's Office of General Counsel with regard to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which chiefly seeks to regulate securities class actions. More recently, I advised the staff of the Senate Banking Committee with respect to the drafting of both the Sarbanes-Oxley Act in 2002 and the Dodd-Frank Act in 2010.

7.      In addition, I have authored the following articles on class actions (which I cite in part to indicate that I am not contradicting prior positions or inventing a novel argument that I would not endorse apart from the facts of this case): John C. Coffee Jr., Litigation Governance:  Taking Accountability Seriously, 110 Colum. L. Rev. 288 (2010); John C. Coffee Jr., Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534 (2006); John C. Coffee Jr., Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter Is Not Working, 42 Md. L. Rev. 215 (1983); John C. Coffee Jr., The Unfaithful

Champion: The Plaintiff as Monitor in Shareholder Litigation, 48 Law & Contemp. Probs. 5 (Summer 1985); John C. Coffee Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 Colum. L. Rev. 669 (1986); John C. Coffee Jr., The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, 54 U. Chi. L. Rev. 877 (1987), John C. Coffee Jr., and Donald E. Schwartz, The Survival of the Derivative Suit: An Evaluation and a Proposed Legislative Reform, 81 Colum. L. Rev. 261 (1981); John C. Coffee Jr., Rethinking the Class Action: A Policy Primer on Reform, 62 Ind. L. Rev. 625 (1987); John C. Coffee Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343 (1995), John C. Coffee Jr., The Future of the Private Securities Litigation Reform Act: or Why the Fat Lady Has Not Yet Sung, 51 Bus. Law. 975 (1996); John C. Coffee Jr., Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation, 100 Colum. L. Rev. 370 (2000). Some of these articles have been cited and relied upon by other federal courts, including the U.S. Supreme Court, in well-known decisions dealing with class actions and attorney fee awards.  See, e.g., Ortiz v. Fibreboard Corp., 119 S. Ct. 2295, 2317 n.28  (1999); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 621 (1997).

        8.      My work in the area of class actions and representative litigation also includes service (for over a dozen years) as a Reporter for the American Law Institute in connection with its effort to codify the common law rules of corporate law and fiduciary duties in a Restatement-like volume.  See A.L.I., PRINCIPLES OF CORPORATE GOVERNANCE: Analysis and Recommendations (1992).  I served as the Reporter for Litigation Remedies, and this project specifically recommended standards for plaintiff's

attorney fee awards in direct and derivative shareholder actions.  In connection with serving as Reporter for the American Law Institute, I have studied fee award procedures, met with many of the leading attorneys in the class and derivative action field, and have participated in numerous seminars, panels, and informal conferences with judges who have faced similar issues to those involved in this case.

9.	I have also served as an expert witness in a number of the largest class actions, including Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997); In re Enron Corp. Securities, Derivative & "ERISA" Litig., 586 F. Supp. 2d 732 (S.D. Tex. 2008); In re Visa Check/MasterMoney Antitrust Litig., 297 F. Supp. 2d 503 (E.D.N.Y. 2003); In re AOL Time Warner Inc. Sec. & "ERISA" Litig., No. 02 Civ. 5575, 2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28, 2006); In re Royal Ahold Sec. & "ERISA" Litig., 461 F. Supp. 2d 383 (D. Md. 2006); In re NASDAQ Market-Makers Antitrust Litigation, 187 F.R.D. 465 (S.D.N.Y. 1998); In re Sumitomo Copper Litig., 74 F.Supp. 2d 393 (S.D.N.Y. 1999); In re Cendant Corp. Sec. Litig., 182 F.R.D. 144 (D.N.J. 1998); In re Cendant Corp. Sec. Litig., 109 F.Supp. 2d 235 (D.N.J. 2000), aff'd 264 F.3d 201 (3d Cir. 2001); In re Lucent Tech. Inc. Sec. Litig., 327 F. Supp. 2d 426 (D.N.J. 2004); In re Waste Management, Inc. Sec. Litig., No. 97C7709 (N.D. Ill. 1999); In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403 (S.D. Tex. 1999); Shaw v. Toshiba America Info. Sys., 91 F.Supp. 2d 942 (E.D. Tex. 2000); and In re Diet Drugs Products Liability Litigation, MDL Docket No. 1203 (E.D. Pa. 2000).

## III.  THE EMPIRICAL DATA

10.    Two legitimate perspectives can be taken on any proposed fee award: one views the fee award from an "ex ante" perspective; the other from an "ex post" perspective.

11.    First, from the "ex ante" perspective, if there was a fee agreement between the lead plaintiff or plaintiffs and class counsel, one can examine the reasonableness of that agreement at the time the deal was struck. One can ask whether the lead plaintiffs were sophisticated and independent of class counsel and whether the deal, as struck, was consistent with the then prevailing standards for a contingent fee representation in a securities class action, as shown by the fee arrangements struck by other sophisticated institutional investors with their counsel. Some Circuits (most notably the Seventh Circuit) prefer this "ex ante" perspective. See In the Matter of Synthroid Marketing Litigation, 264 F.3d 712, 719-720 (7th Cir. 2001) (favoring a "market-based approach" that looks to the prevailing rates and fees in class actions agreed to by sophisticated institutional investors). Here, the Ohio State Funds[1] serving as Lead Plaintiff were not only experienced and sophisticated institutional investors, but they were advised by the Ohio Attorney General's Office throughout the litigation. When the case began in 2004, Ohio Attorney General Jim Petro supervised the litigation. Subsequently, the case has been overseen by Ohio Attorney Generals Mark Dann, Nancy Rogers, Richard Cordray, and Michael DeWine. It is my understanding that the Ohio State Funds and Lead Counsel agree that the Litigation Retention Agreement, dated September 27, 2011, entered into by Lead Counsel and Attorney General DeWine (the "LRA"), is the effective agreement governing this fee request. In my judgment, the LRA, although relatively parsimonious,

_____

[1] The Ohio State Funds are the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, and the Ohio Police & Fire Pension Fund.

is fully protective of class members. In this regard, I have also reviewed the Declaration of Dennis P. Smith, an Assistant Attorney General in the Office of the Ohio Attorney General, which agrees that the proposed fee award is consistent with the LRA. In my judgment, the LRA eliminated any meaningful possibility that Lead Counsel could receive an excessive fee award in this case. More specifically, Lead Counsel is requesting a fee award of 13.25% of the Net Settlement (i.e., $725 million minus approximately $9 million in expenses), which amount comes to $94,870,000 and is below Lead Counsel's full lodestar of approximately $96,760,000. Because this fee request is consistent with the LRA, I am advised that Lead Plaintiff has no objection to this request. Such a resolution, which awards no risk multiplier and somewhat less than the full lodestar, means that the class has received an exemplary recovery at a very modest cost. Accordingly, if sophisticated parties, assisted by counsel, have struck an arm's length and well-informed bargain, I see little reason for a court to substitute its judgment for theirs.

12. Second, the alternative perspective views the proposed fee award "ex post": how does the proposed fee award look in comparison to the fee awards in other comparable cases? In this declaration, I will give greater attention to this second or "ex post" perspective, but I believe that both perspectives deserve attentive judicial consideration.

13. To gain an overall sense of fee awards from an "ex post" perspective, it is useful to start with some historical data. According to the National Economic Research Associates ("NERA"), a well-known and respected economics consulting firm, attorney fee awards in securities class actions for a considerable period averaged around 32% of the settlement. See Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja, Denise N.

Martin, <u>Recent Trends III: What Explains Settlements in Shareholder Class Actions?</u>

(NERA, June 1995) (hereinafter "NERA Study"). Using data from 656 shareholder class

actions that were settled, dismissed or resolved by a jury verdict between January 1991

and December 1994, the NERA Study specifically found:

> "Regardless of case size, fees average approximately
> 32 percent of the settlement."  (NERA Study at 7).

14.     Given the relevance of this conclusion, a closer look at their data seems

warranted, and an abbreviated version of Table 5 from this study is thus set forth below:

### **Table 1**

#### **Plaintiff's Attorney Fees**

| Settlement Range | Number of Settlements | Average Attorneys Fee as a Percentage | Median Attorney Fee as a Percentage |
|---|---|---|---|
| $0.00-$0.99 Mil | 27 | 30.31% | 30.00% |
| $1.00-$1.99 Mil | 45 | 31.99% | 33.33% |
| $2.00-$9.99 Mil | 162 | 31.99% | 33.33% |
| $10.00-$49.99 Mil | 53 | 31.36% | 32.00% |
| $50 + Million | <u>2</u> | <u>31.67%</u> | <u>31.67%</u> |
| **Total or Average:** | **<u>289</u>** | **<u>31.71%</u>** | **<u>33.33%</u>** |

15.     Although still accurate for a range of cases, the foregoing data has in my

judgment become dated and cannot be relied upon with respect to fee awards in very

large class actions. Fee awards as a percentage of the recovery have declined over the last

decade for two distinct reasons:  (1) the PSLRA gave effective control over the securities

class action to those institutional investors willing to serve as lead plaintiffs, and public

pension funds in particular have exercised a restraining oversight over fee awards, and (2) fee awards have long been a declining percentage of the recovery, and the magnitude of securities class action settlements has soared over the last decade, with the result that the nine largest securities class action settlements are today all in excess of one billion dollars.[2]

16.    Today, attorney fee awards remain in the vicinity of 25% of the recovery (as they were in earlier decades), until the recovery approaches approximately $500 million. Once into this vicinity, fee awards begin to decline on a percentage basis. This is shown by a 2011 NERA Study, which finds fee awards in securities class actions to amount to 27.3% in cases where the settlement is between $25 million and $100 million, 22.2% in cases where the settlement is between $100 million and $500 million, and 8.3% in cases where the settlement is above $500 million.[3]

17.    The problem with such a statistical overview is that it ignores exactly the context of this case. This is because the class recovery in the instant case ($725 million) falls on the seam between the last two categories discussed above: i.e., the $100 to $500 million category (where the median fee award is 22.2%); and the above $500 million category (where the median fee award is 8.3%). That last category extends from $500 million to the $7.2 billion settlement in the Enron case and the $6.15 billion settlement in WorldCom class action. Any category that extends from $500 million to $7.2 billion inherently overaggregates, and thus the median fee award for such an overbroad category can be misleading.

---

[2] See Institutional Shareholder Services, Securities Class Action Services, "The SCAS 100 for Q3 2011" (2011).
[3] See Dr. Jordan Miley, Robert Patton and Syetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2011 Mid-Year Review" (NERA 2011) at p. 27 (Figure 29).

18.     Thus, in my opinion, it is more useful (and certainly more informative) to look at the fee awards in cases that straddle the $725 million recovery in this case. In the instant case Lead Counsel are requesting a fee award of $94,870,000, which is actually below their lodestar. Given that this award is below their lodestar, the only remaining question that need be asked in my judgment is how such a proposed fee award, expressed on a percentage basis, compares with the fee awards in comparable cases. The following table sets forth the settlement and fee award in securities class actions since 2000 in which the settlement ranged from $400 million to $1 billion:[4]

| Case Name | Settlement Amount | Fee Award | Fee Award As A Percentage of the Settlement |
|---|---|---|---|
| 1. In re United Health Group Inc. PSLRA Litig., 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009) | $925.5 million | $64.7 million | 7% |
| 2. Carlson v. Xerox Corp., 596 F. Supp. 2d 400 (D. Conn. 2009) | $750 million | $120 million | 16% |
| 3. In re Countrywide Fin. Corp. Sec. Litig., No. 07-cv-05295 (C.D. Cal. March 4, 2011) | $601.5 million | $46.50 million | 7.7% |
| 4. In re Cardinal Health, Inc. Sec. Litig., 528 F. Supp. 2d 752, 2007 U.S. Dist. LEXIS 95127 (S.D. Ohio Dec. 31, 2007) | $600 million | $108 million | 18% |
| 5. In re Initial Pub. Offering Sec. Litig., 671 F. Supp. 2d 467, 516 (S.D.N.Y. Oct. 5, 2009) | $586 million | $170.1 million | 33.30% |
| 6. In re Health South Corp. Shareholder Litig., No. 03-cv-1500, Dkt. No. 1112 (N.D. Ala. Feb. 12, 2008) | $537.5 million | $97.50 million | 18.1% |
| 7. In re Lucent Techs. Inc. Sec. Litig., 327 F. Supp. 2d 426, No. 00-cv-621 (D.N.J. Jul. 19, 2004) | $517 million | $87.90 million | 17% |
| 8. In re Bank America Corp. Sec. Litig., 228 F. Supp. 2d 1061 (E.D. Mo. 2002) | $490 million | $86.40 million | 18% |

---

[4] This more focused table has been updated from that in Carlson v. Xerox Corp., 596 F. Supp. 2d 400, at 405-06 (D. Conn. 2009).

| | | | |
|---|---|---|---|
| 9. In re Merrill Lynch & Co. Inc. Sec., Derivative & ERISA Litig., No. 07-cv-9633, 2009 WL 2407551 at *1 (S.D.N.Y. Aug. 4, 2009) | $475 million | $37.12 million | 7.82% |
| 10. In re Dynegy, Inc. Sec. Litig., Master File No. H-02-1571, Dkt. No. 686, slip. op. at 1 (S.D. Tex. July 7, 2005) | $474 million | $41.3 million | 8.73% |
| 11. In re Raytheon Co. Sec. Litig., No. 99-12142 Dkt. No. 645, slip. op. at 9 (Mass. Dec. 6, 2004) | $460 million | $41.4 million | 9% |
| 12. In re Waste Management Sec. Litig., No. 99-2183, Dkt. No. 248, slip. op. at 14 (S.D. Tex. April 29, 2002) (Waste Management II) | $457 million | $36.24 million | 7.93% |
| 13. In re Adelphia Communs. Corp. Sec. and Derivative Litig., 2006 U.S. Dist. LEXIS 84621 (S.D.N.Y. Nov. 16, 2006 | $460 million | $97 million | 21.4% |
| 14. In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 469 (S.D.N.Y. 2004) (multiple settlements) | $448 million | $72,470,000 | 16.04% |
| 15. In re Qwest Communication Int'l Inc. Sec. Litig., No. 01-cv-1451, 2006 U.S. Dist. LEXIS 71267 at *31 (D. Colo. Sept. 29, 2006), 625 F. Supp. 2d 1143, 1154 (D. Colo. May 27, 2009) | $445 million | $60 million | 15% |
| 16. Ohio Pub. Employees Ret. Sys. v. Freddie Mac, 2006 U.S. Dist. LEXIS 98380 at *4 (S.D.N.Y. Oct. 26, 2006) | $410 million | $82 million | 20% |
| 17. In re Marsh & McLennan Cos. Inc. Sec. Litig., 2009 WL 5178546 at *19 (S.D.N.Y. Dec. 23, 2009) | $408 million | $55 million | 13.5% |

19.     In the above seventeen cases that are comparable to this settlement, a higher or similar fee award than that here requested was awarded in eleven cases (or a clear majority of them). On this basis, I would conclude that the proposed 13.25% fee award is at least consistent with the recent practice in comparable cases. Immediately, I must emphasize that this consistency does not prove that the proposed fee is necessarily the appropriate fee award for this case. That is a normative question. Empirically,

however, the proposed fee award seems well within the mainstream of fee awards in recent comparable securities class actions.

## IV.  RELATIVE SUCCESS: Measuring Class Counsel's Contribution

20.     As earlier noted, this settlement appears to be the 13th largest settlement in a securities class action. Indeed, when combined with the $97.5 million settlement with PricewaterhouseCoopers LLP, and the pending $115 million settlement with the Starr Defendants (i.e., Maurice Greenberg, Howard I. Smith, Christian M. Milton, Michael J. Castelli, Starr International Company, and C.V. Starr & Co.), the total settlement would amount to $937.5 million. Others have ranked this settlement as the 10th largest securities class action settlement,[5] and it was obtained in a time of acute economic distress when the principal defendant was on the doorstep of insolvency. Put simply, that is not an easy combination to achieve. Still, it can be argued that a large recovery does not, of itself, prove that class counsel has been particularly successful. Conceivably, class counsel could have settled for a trivial recovery in terms of the potential damages. Although true in theory, this possibility diminishes when we recognize that, when very large damages are sought, defendants become subject to inevitable solvency constraints. Indeed, defendants often might prefer to file for bankruptcy (or at least threaten to do so) than to pay astronomic damages. Still, given even the possibility that a larger settlement might have been achieved, the best relative measure of class counsel's success lies in comparing the percentage of the maximum recoverable damages that the instant settlement obtained versus that percentage in other cases. Even here, it must also be recognized that, as the level of damages increases, the percentage that the settlement will bear to those damages

---

[5] For this conclusion, see Miley, Patton and Starykh, supra note 3, at Table 2. As so computed, this settlement ranks only slightly behind the 9th highest settlement (which was the McKesson HBOC, Inc. settlement in 2008 for $1,043,000,000.

will likely decline because of the solvency constraints on the defendant and the threat of bankruptcy. In short, settlement size as a percentage of investor losses tends to decline as investor losses increase.

21.     This pattern is clearly shown in the diagram set forth below from the NERA 2011 Mid-Year Review of securities class actions:[6]

<u>Settlement Value as a Percentage of Investor Losses,</u>
<u>by Level of Investor Losses (January 1996 to June 2011)</u>



As this study shows, when investor losses are between $1 billion and $5 billion, the average settlement is approximately 2.0% of investor losses and the median settlement is 1.2%. If investor losses are even higher and exceed $5 billion, then the median settlement declines to 1% (and to 0.7% if the damages exceed $10 billion).

22.     Against this backdrop, the actual settlement in this case was extremely favorable to the investor class. I have reviewed the analysis of Frank C. Torchio,

---

[6] See Miley, Patton and Starykh, supra note 3, at 29 (Figure 32).

President of Forensic Economics, Inc., who has computed the maximum recoverable damages in this case during the class period from October 28, 1999 through April 1, 2005. Using his own firm's "51-trader" model, he computes the "maximum obtainable damages to be approximately $7.8 billion." Using the more traditional 2-trader model, he estimates the same maximum damages to be $5.5 billion. Although I lack the specialized competence to vouch for his analysis under either method, I am familiar with the 2-trader model and consider it to be the more generally accepted model. On the assumption that the maximum recoverable damages was $5.5 billion, Lead Counsel here succeeded in recovering 13.18% of that amount in this settlement alone (that is, without considering the payments by the other defendants in this litigation). If we instead use $7.8 billion as the maximum recoverable damages, Lead Counsel have instead recovered 9.29%. Either way, this recovery is between more than 9 and more than 13 times the average percentage of maximum damages recovered in securities class actions in the above-discussed NERA study (where the average recovery was 1% when the maximum damages fell between $5 and $10 billion). Such a multiple speaks for itself. There is no need to "gild the lily" with adjectives, as counsel's relative success here stands out as virtually unparalleled.

## V. THE RELATIONSHIP OF THIS SETTLEMENT TO PRIOR PUBLIC ENFORCEMENT PROCEEDINGS

23.     A common critique of securities class actions is that the plaintiff's attorneys "free ride" on the prior efforts of public enforcers (such as the Department of Justice or the SEC). Even if such a critique is often valid, it does not apply well to the facts of this case. To be sure, it is true that the New York Attorney General ("NYAG") did bring an action against AIG under the Martin Act (and other New York statutes and New York common law) in May, 2005, which action followed an earlier action brought

-16-

by the NYAG against Marsh & McLennan Companies, and it essentially alleged that AIG was implicated in the Gen Re Transaction and other allegedly fraudulent accounting transactions. AIG settled this action in January, 2006, and a similar SEC action was brought and settled in February 2006.

24.     But none of these facts begin to show that Lead Counsel "free rode" on the efforts of public enforcers. Lead Counsel actually filed its initial complaint in 2004, well before the New York Attorney General ("NYAG") and the SEC filed their complaints. Even Lead Counsel's First Amended Complaint ("FAC"), filed on April 19, 2005, preceded the actions of the NYAG and the SEC (the SEC did not file its action until February, 2006). More importantly, the FAC was far broader, covering both a more extensive accounting fraud and a significantly wider bid rigging conspiracy that either the NYAG or the SEC alleged. From the time of their appointment as Lead Counsel on February 7, 2005 (again before the NYAG action in May), Lead Counsel did the following:

1.   filed the 224 page FAC on April 19, 2005;

2.   filed a 485 page Second Amended Complaint on September 27, 2005, which was upheld against multiple motions to dismiss made by the 23 defendants named in it;

3.   conducted elaborate factual discovery and took extensive depositions (which neither public enforcer did), as discussed below.

25.     In contrast, the SEC complaint against AIG (filed on February 9, 2006) was only 29 pages and alleged a particularized accounting fraud only with respect to a limited number of transactions (basically the Gen Re transactions, the Capco transaction,

and the Union Excess transaction). Although the NYAG complaint was somewhat longer (37 pages), it largely discussed the same allegations as the SEC complaint and did not discuss bid rigging on the part of AIG.[7] Further, Lead Counsel engaged in more intensive fact discovery than either the NYAG or the SEC, as AIG produced approximately 2 million pages to the SEC, but more than 12 million pages to Lead Plaintiff (an approximately 6 to 1 ratio). The SEC appears to have taken only one deposition with respect to the accounting issues (a deposition of Maurice Greenberg in which he asserted the Fifth Amendment and thus produced no substantive evidence), whereas Lead Counsel took at least 47 fact and expert depositions of AIG and PricewaterhouseCoopers witnesses with respect to the accounting fraud.

26.     Lead Counsel also pursued the bid-rigging allegations more thoroughly than did the public enforcers. Even if the NYAG should be given credit for initially uncovering bid-rigging by Marsh & McLennan, that was only one episode, whereas Lead Counsel's Second Amended Complaint described in some detail eight different bid-rigging transactions involving AIG. Further, I am advised that (i) after reviewing extensive factual discovery, Lead Counsel was able to identify 634 separate AIG transactions in which it concluded that bid-rigging may have occurred, and (ii) Lead Counsel conducted at least 16 depositions of AIG and Marsh and McLennan employees who were allegedly involved in the bid-rigging conspiracy.

27.     Finally, Lead Counsel investigated and pursued market manipulation charges against Maurice Greenberg and AIG, which charges were largely ignored by the

---

[7] I recognize that the NYAG did file a complaint against Marsh & McLennan Companies in October 2004 that covered bid-rigging, but AIG was only briefly and tangentially mentioned in this complaint as one of several insurance companies with whom Marsh & McLennan conspired.

public enforcers. In short, Lead Counsel both pursued a broader investigation and a more intensive one.

28.     Whatever the risk level was for this action when it was filed in 2004, that risk level rose significantly after 2008, as (1) new legal risks appeared, (2) the persons controlling AIG changed, (3) the risk of AIG's insolvency became a constant danger, and (4) enormous obstacles arose to crafting a settlement with a defendant who had been bailed out with taxpayers' funds. As a result, Lead Counsel was compelled to engage simultaneously in a traditional legal battle (in which the Paul Weiss firm litigated intensely, as it always does) and an entirely novel political and diplomatic battle in order to convince the U.S. Treasury Department that it was better to settle than to go to trial or place AIG into bankruptcy (which would have effectively stayed and ended this action). To fight such a two-front war and emerge with a near record settlement is a notable achievement. That achievement takes on added stature when one recognizes that the recovery exceeded that paid by any other TARP recipient.

29.     Legally, this case faced lead Counsel with a variety of difficult challenges. The five and one half year class period (October 28, 1999 to April 1, 2005) is unusually long, and this makes it more difficult for plaintiffs to show loss causation (as is their burden in a Rule 10b-5 case). Compounding this problem was the fact that AIG had made numerous "corrective" disclosures. AIG also vigorously asserted that the statute of limitations had run. Clearly, AIG and Paul Weiss litigated relentlessly, as shown by the fact that some 97 depositions were conducted and 53 million pages of documents were reviewed in this case. Because the settlement was not reached until the completion of fact discovery, Lead Counsel had to bear an enormous economic burden in litigating this case

on a contingency fee basis. Lead Counsel's $97 million lodestar implies that it was making a major investment in a case that could be decided against it on any number of legal grounds. Ultimately, Lead Counsel's risky gamble paid off for the class in the form of a $725 million settlement, but, unless Lead Counsel receives its fee request, this case will have been a losing gamble for them.

30.     The negotiating effort undertaken by Lead Counsel to reach a settlement required it to pursue an even more uncharted path through the thickets of Washington politics. Following the forced departure of Maurice Greenberg, AIG experienced a period of institutional paralysis in which it could not reach any major strategic decision. Then, with the 2008 financial crisis and the September 2008 bailout of AIG, the uncertainties grew exponentially. For an extended period after 2008, it was uncertain whether AIG could avoid insolvency, and AIG's Annual Report on Form 10-K frankly warned its investors that "AIG could become insolvent."[8] Indeed, the possible insolvency of AIG remained a very real possibility even after the Treasury's bailout, as AIG's bonds traded at levels exceeding a 20% yield, suggesting that they were riskier than the lowest grade junk bonds. Moreover, it was equally uncertain whether the Treasury Department, as the controlling shareholder of AIG, would accept the idea of taxpayer funds being used to fund a class action settlement. Thus, an issue of political acceptability hovered over the case that was wholly independent of both the legal issues and the solvency of AIG.

31.     In my judgment, Lead Counsel resolved these issues skillfully by following a two-pronged strategy:  (1) they isolated AIG by settling first with both the Starr Defendants and PricewaterhouseCoopers; and (2) they elevated the level of the negotiations by directly engaging the Treasury Department, thereby outflanking the

---

[8] See AIG Form 10-K, dated February 26, 2010, at 21.

paralysis at AIG and the impasse in the negotiations between counsel. To engage the

Treasury Department, Lead Counsel retained its own investment bankers: (1) Robert

Kost, Managing Director and Co-Head of Gleacher & Company's Restructuring Group,

and (2) Hugh Lamle, President of MD Sass Investors Services, Inc., a registered

investment adviser. This tactic would have been well beyond the capacity of most

plaintiff's law firms, which simply lack the skill set for such negotiations. Further, by

insisting that the final negotiations be conducted between Attorney General Cordray and

a senior representative of the Treasury, Lead Counsel was able to break out of the

negotiating impasse that had developed among the law firms.

32. In overview, it is hard to imagine many similar occasions in which the

risks surrounding a litigation rose as significantly after the commencement of the action

as they did in this case. The 2008 financial debacle was both unexpected and made the

political acceptability of a settlement paying taxpayer funds to AIG's investors highly

questionable. In my judgment, the only remotely similar securities class action that

experienced a similarly significant increase in risk in the wake of its filing was In re

Initial Pub. Offering Sec. Litig., 2011 WL 2732563 (S.D.N.Y. July 8, 2011), and there

United States District Judge Shira Scheindlin reasoned that this enhanced risk justified a

2.5 multiplier. Here, Lead Counsel seeks slightly less than its lodestar.

## VI.  THE LODESTAR

33. The Second Circuit recommends the use of a lodestar cross-check. See,

e.g., Goldberger v. Integrated Resources, 209 F.3d 43, 50 (2d Cir. 2000). The purpose of

this cross check is to assure that plaintiff's counsel is not receiving a windfall under the

percentage of the recovery method. Here, that cross-check is extraordinarily simple to

compute. Because Lead Counsel is only seeking their lodestar, the lodestar multiplier is, by definition, one.

34.     This modest request contrasts sharply with the practice in other class actions. A study by Logan, Moshman, and Moore found that in cases in which the recovery exceeded $100 million, the average multiplier was 4.50.[9] The following table shows that multipliers above 4 have become relatively common over the last two decades:

## Recent Multipliers

| Case | Multiplier |
|---|---|
| Weiss v. Mercedes-Benz of North America, Inc., 899 F. Supp. 1297 (D.N.J. 1995), aff'd, 1995 U.S. App. LEXIS (3d Cir. 1995) | **9.3** |
| Perera v. Chiron Corp., No. 95-20725-SW (N.D. Cal. 1996) | **9.14** |
| Cosgrove v. Sullivan, 759 F. Supp. 166 (S.D.N.Y. 1991) | **8.84** |
| In re Buspirone Antitrust Litig., No. 01-CV-7951 (JGK), MDL Docket No. 1413 (S.D.N.Y. Apr. 17, 2003) | **8.46** |
| Newman v. Carabiner Int'l, Inc., No. 99 Civ. 2271 (S.D.N.Y. Oct 19, 2001) | **7.7** |
| In re Rite-Aid Corp. Sec. Litig. ("Rite Aid II"), 362 F. Supp. 2d 587 (E.D. Pa. 2005) | **6.96** |
| In re Cendant Corp. Litig., 243 F. Supp. 2d 166 (D.N.J. 2003) | **6.875** |
| In re 3COM Corp. Sec. Litig., No. C-97-21083 (N.D. Cal. Mar. 9, 1999) | **6.67** |
| In re Triangle Industries Sec. Litig., No. 10466, 1991 Del. Ch. LEXIS 203 (Del. Ch. Dec. 19, 1991) | **6.6** |
| In re RJR Nabisco, Inc. Sec. Litig., MDL No. 818, 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) | **6.0** |
| In re Cardinal Health, Inc. Sec. Litig., 528 F. Supp. 2d 752 (S.D. Ohio 2007) | **5.9** |

---

[9] See Logan, Moshman & Moore, Jr., "Attorney Fee Awards in Common Fund Class Actions," 24 Class Action Reports 169 (2003).

| | |
|---|---|
| Roberts v. Texaco, 979 F. Supp. 185 (S.D.N.Y. 1997) | **5.5** |
| Lemmer v. Golden Books, No. 98 Civ. 5748 (S.D.N.Y. Oct. 12, 1999) | **5.38** |
| In re Waste Management Sec. Litig., No. 99-2183, Dkt. No. 248 (S.D. Tex. April 29, 2002) | **5.296** |
| In re Enron Corp. Sec., Deriv. & ERISA Litig., 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) | **5.2** |
| Feerer v. Amoco Production Co., No. 95-0012, 1998 U.S. Dist. LEXIS 22248 (D.N.M. May 28, 1998) | **4-5** |
| In re Nortel Networks Corp. Sec. Litig., No. 05-MD-1659 (LAP), Dkt. No. 77 (S.D.N.Y. Dec. 26, 2006) | **4.773** |
| Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358 (S.D.N.Y. 2002) | **4.65** |
| Willson v. New York Life. Ins. Co., No. 94-127804, 1995 N.Y. Misc. LEXIS 652 (N.Y. Sup. Ct. Nov. 8, 1995) | **4.6** |
| In re Rite-Aid Corp. Sec. Litig. ("Rite Aid I"), 146 F. Supp. 2d 706 (E.D. Pa. 2001) | **"4.5 to 8.5"** |
| Rabin v. Concord Assets Group, Inc., No. 89 Civ. 6130 (LBS) 1991 U.S. Dist. LEXIS 18273, [1991-92 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,471 (S.D.N.Y. Dec. 19, 1991) | **4.4** |
| In re Lucent Techs. Inc. Sec. Litig., 327 F. Supp. 2d 426 (D. N.J. 2004) | **4.343** |
| In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109 (D.N.J. 2002) | **4.3** |
| In re Dynegy Inc. Sec. Litig., Master File A-02-1571, Dkt. No. 686 (S.D. Tex. July 7, 2005) | **4.07** |
| In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | **4.04** |
| In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465 (S.D.N.Y. 1998) | **3.97** |
| In re AOL Time Warner, Inc., SEC & ERISA Litig., No. 02-Civ. 5575 (SWK), 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) | **3.69** |

35.     Beyond the above cases, there has been a recurrent recognition in the Southern District that multipliers in the range of 3 to 4.5 have become relatively

"common." See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 123 (2d Cir. 2005); In re NASDAQ Market-Makers Anti-Trust Litig., 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding a 3.97 multiplier and finding fee multipliers of 3 to 4.5 to be "common"); In re Sumitomo Copper Litig., 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (awarding a 27.5% fee on a $134.6 million commodities fraud settlement and similarly finding a 3 to 4.5 multiplier to be common); Maley v. Del Global Technologies Corp., 186 F. Supp. 2d 358, 368-69 (S.D.N.Y. 2002) (finding a multiplier of 4.65 to be within the standard range in the Second Circuit); Johnson v. Brennan, 2011 U.S. Dist. LEXIS 105775, at *58-*59 (S.D.N.Y. Sept. 16, 2011) (finding that "courts regularly award lodestar multipliers from two to six times lodestar").

36.     To avoid an unbalanced presentation, I should note that several Southern District courts have expressed the view that lodestar multipliers have declined since the time of the Second Circuit's decision in Goldberger v. Integrated Resources, 209 F.3d 43 (2d Cir. 2000). The decision that most clearly articulates this view is Hall v. Children's Place Retail Stores, Inc., 669 F. Supp. 2d 399 (S.D.N.Y. 2009), which states:

> "A review of other, more recent cases reveals a trend toward awarding more modest fees. Courts appear to be finding that an award of one-third of the settlement fund is not always justified where that percentage amounts to a lodestar multiplier of substantially more than 2.0." Id. at 403 (citing cases).

It is possible that the Hall court overstates in its generalization and contrary precedents exist.[10] Nonetheless, this debate is irrelevant for purposes of this case. Whether the

---

[10] See, e.g., In re Adelphia Commc'ns Corp. Sec. & Der. Litig., No. 03-MDL 1529, 2006 U.S. Dist. LEXIS 84621 (S.D.N.Y. Nov. 16, 2006) (21.4% fee award on a $455 million settlement accompanied by a 2.89 multiplier); In re Converse Tech. Inc. Sec. Litig., No. 06-1825 (E.D.N.Y. June 25, 2010) (21% fee award on $255 million settlement accompanied by a 2.78 multiplier); In re Bisys Sec. Litig., 2007 U.S. Dist. LEXIS 51087 (S.D.N.Y. July 4, 2007) (30% fee award accompanied by a 2.99 multiplier).

normal multiplier is as high as 4.5 or as low as 2, either figure is well above the multiplier sought here: namely, slightly less than 1.

37.     In this light, the only possible issue is whether Lead Counsel's lodestar might be inflated in some way. As noted earlier, Lead Counsel reviewed 53 million pages of documents and conducted 97 depositions in this case. But perhaps the best way to evaluate the reasonableness of its lodestar is to compare it with those in other recent cases in which the lodestar was equivalent or higher. Set forth below are some recent examples:

Recent Lodestars

| | Case | Settlement Amount | Lodestar |
|---|---|---|---|
| 1. | In re Initial Public Offering Sec. Litig.[11] | $586 million | $276 million |
| 2. | In re Tyco Intern. Ltd. Multidistrict Litig.[12] | $3.2 billion | $172 million |
| 3. | In re Enron Corp. Sec., Deriv. & ERISA Litig.[13] | $7.242 billion | $131,971,583.20 |
| 4. | In re Marsh & McLennan Co. Inc. Sec. Litig.[14] | $400 million | $119,556,484.25 |
| 5. | Carlson v. Xerox Corp.[15] | $750 million | $95,942,272.25 |

38.     Some of these cases had larger recoveries and some, smaller. But, all had higher lodestars (except for Carlson, which was virtually equivalent). My point is only that nothing appears irregular about this lodestar, given that the case has stretched on for over seven years.

39.     In considering whether the lodestar in this case is reasonable, this Court may wish to consider whether the blended hourly rate charged by Lead Counsel is

---

[11] 671 F. Supp. 2d 467, 474 (S.D.N.Y. 2009).
[12] 535 F. Supp. 2d 249, 268 (D.N.H. 2007).
[13] 586 F. Supp. 2d 732, 740 (S.D.N.Y. 2008).
[14] 2009 WL 5178546 at *16 (S.D.N.Y. 2009).
[15] 596 F. Supp. 2d 400, 410 (D. Conn. 2009).

reasonable. Here, I am advised by counsel that the blended hourly rate for all time expended in this case is only $372 per hour. If one looks instead simply at the time expended by attorneys, I am advised that the blended hourly rate becomes $384. I note that this rate is well below the $605 per hour blended hourly rate recently approved by United States District Judge Richard Sullivan in <u>Chin v. RCN Corporation</u>, 2010 U.S. Dist. LEXIS 96302 at *15 (S.D.N.Y., September 8, 2010). In my judgment, a blended hourly rate in the range of $372 to $384 is reasonable at a time when many attorneys on the defense side of the aisle are charging rates of $900 to $1,000 per hour. If plaintiff's attorneys cannot charge at roughly comparable rates to defense counsel, a fundamental inequality results, which would force much work to be pushed down to paralegals and contract attorneys and which would ultimately deny class members the ability to secure counsel as experienced and skilled as those on the defense side. That would preclude a level playing field in securities litigation and would produce only an illusory saving for the class.

## VII. <u>CONCLUSION</u>

40.    I recognize that an expert's role is limited and that the ultimate decision necessarily remains with the Court. Nonetheless, the issue in this case is remarkably simple:  did Lead Counsel earn its lodestar or should it be penalized by using a "negative multiplier" to reduce its fee award? In fact, Lead Counsel is actually applied for slightly less than its full lodestar (i.e., $94,870,000 rather than $97,000,000) in order to fulfill its responsibilities under the LRA. Given this discount, the conclusion is unavoidable to my mind that Lead Counsel has easily earned its fee. Even viewed in percentage of the recovery terms, a fee award of 13.25% is entirely reasonable, both because it is consistent

with recent practice in large cases in the $400 million to $1 billion recovery range and, more importantly, because the extraordinary success obtained in this case more than justifies the requested fee award. Ultimately, the "proof is in the pudding," and an exemplary recovery justifies a fee that is at least comparable with the normal recovery rate.

I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.

John C. Coffee, Jr.

November 30, 2011