**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————— x
                                                        :
                                                        :        **ECF CASE**
                                                        :
IN RE AMERICAN INTERNATIONAL            :
GROUP, INC. SECURITIES LITIGATION      :        Master File No. 04 Civ. 8141 (DAB) (AJP)
                                                        :
This Document Relates To:  All Actions     :        <u>Oral Argument Requested</u>
                                                        :
————————————————————— x

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION FOR FINAL APPROVAL OF PROPOSED CLASS SETTLEMENT**
<u>**WITH THE STARR DEFENDANTS**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................1

    A.    Overview of the Litigation History ..............................................................2

    B.    Preliminary Approval and the Pre-Hearing Notice Program .........................4

ARGUMENT .................................................................................................................5

I.    THE PROPOSED SETTLEMENT IS FAIR, ADEQUATE AND
    REASONABLE, AND SHOULD THEREFORE BE APPROVED ....................................5

    A.    The Settlement Is Entitled to a Presumption of Fairness ............................7

    B.    The Settlement Satisfies the *Grinnell* Factors ..........................................9

        1.    Ongoing Litigation Would Be Complex, Expensive and Lengthy ...............9

        2.    The Reaction of the Class to Date .................................................10

        3.    There Was a Solid Foundation Underlying the Decision to Settle with
            the Starr Defendants ...................................................................12

        4.    There Were Significant Risks in Establishing the Starr Defendants'
            Liability ......................................................................................14

        5.    The Settlement Class Faced Risks in Establishing Damages ................16

        6.    Ability of the Starr Defendants to Withstand a Greater Judgment ..........19

        7.    The Settlement Amount Is Very Reasonable .....................................21

II.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ..................................22

III.    THE PLAN OF ALLOCATION SHOULD BE APPROVED ........................................23

CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re America Bank Note Holographics, Inc., Sec. Litigation,*
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) ................................................................................ 16, 23

*AUSA Life Ins. Co. v. Ernst & Young,*
  39 F.App'x 667 (2d Cir. 2002) ............................................................................................16

*Becher v. Long Island Lighting Co.,*
  64 F. Supp. 2d 174 (E.D.N.Y 1999) ......................................................................................8

*Carson v. America Brands, Inc.,*
  450 U.S. 79 (1981) .................................................................................................................7

*Cinelli v. MCS Claim Services, Inc.,*
  236 F.R.D. 118 (E.D.N.Y. 2006) .........................................................................................14

*City of Detroit v. Grinnell Corp.,*
  495 F.2d 448, 463 (2d Cir. 1974) .........................................................................................13

*D'Amato v. Deutsche Bank,*
  236 F.3d 78 (2d Cir. 2001) ...................................................................................................11

*In re Delphi Corp. Sec., Derivative & "ERISA" Litigation,*
  248 F.R.D. 483 (E.D. Mich. 2008) .........................................................................................8

*Gordon Partners v. Blumenthal,*
  No. 02 Civ. 7377 (LAK), 2007 WL 1438753 (S.D.N.Y. May 16, 2007),
  *aff'd* 293 F'Appx. 815 (2d Cir. 2008) ..................................................................................18

*In re Global Crossing Sec. & ERISA Litigation,*
  225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................................*passim*

*In re Initial Public Offering Sec. Litigation,*
  226 F.R.D. 186 (S.D.N.Y. 2005) ............................................................................................8

*Joel A. v. Giuliani,*
  218 F.3d 132 (2d Cir. 2000) ...................................................................................................6

*Klein ex rel. IRA v. PDG Remediation, Inc.,*
  No. 95 Civ. 4954 (DAB), 1999 WL 38179 (S.D.N.Y. Jan. 28, 1999)..................................10

*Maley v. Del Global Techs. Corp.,*
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) .........................................................................7, 16, 20

*In re Marsh & McLennan Cos., Inc. Sec. Litigation,*
   No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 21, 2009) ............................................20

*Marisol A. ex rel. Forbes v. Giuliani,*
   185 F.R.D. 152 (S.D.N.Y. 1999),
   *aff'd sub nom. Joel A. v. Giuliani,*
   218 F.3d 132 (2d Cir. 2000) ....................................................................................................12

*In re Omnicom Grp., Inc. Sec. Litigation,*
   541 F. Supp. 2d 546 (S.D.N.Y. 2008),
   *aff'd* 597 F.3d 501 (2d Cir. 2010)...........................................................................................19

*In re PaineWebber Ltd. P'Ships Litigation,*
   71 F.R.D. 104 (S.D.N.Y. 1997),
   *aff'd,* 117 F.3d 721 (2d Cir. 1997)..........................................................................................16

*People v. Gilman,*
   No. 4800-2009, 2010 WL 3036983 (N.Y. Sup. Ct. July 2, 2010)......................................10

*In re Prudential Insurance Co. America Sales Practices*
   *Litigation Agent Actions,*
   48 F.3d 283 (3d Cir. 1998) .......................................................................................................9

*In re Sony SXRD Rear Projection Television Class Action Litig.,*
   No. 06 Civ. 5173 (RPP), 2008 WL 1956267 (S.D.N.Y. May 1, 2008) ...............................11

*In re UnitedHealth Group Inc. PSLRA Litigation,*
   643 F. Supp. 2d 1094 (D. Minn. 2009)..................................................................................21

*U.S. v. Ferguson,*
   No. 08-6211, 2011 WL 6351862 (2d Cir. Dec. 19, 2011) ..........................................10, 15

*U.S. v. New York City Board of Education,*
   85 F. Supp. 2d 130 (E.D.N.Y. 2000),
   *vacated on other grounds, Brennan v. New York City Bd. of Educ.,*
   260 F.3d 123 (2d Cir. 2001) .....................................................................................................7

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
   396 F.3d 96 (2d Cir. 2005),
   *cert. denied, Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.,*
   544 U.S. 1044 (2005) .......................................................................................................6, 7, 20

*Winkler v. NRD Mining, Ltd.,*
   198 F.R.D. 355 (E.D.N.Y. 2000) ..........................................................................................16

*In re WorldCom, Inc. Sec. Litigation,*
   388 F. Supp. 2d 319 (S.D.N.Y. 2005).....................................................................................21

**DOCKETED CASE**

*In re Vesta Ins. Group Inc. Sec. Litig.*,
   CV-98-BE-1407 (N.D. Ala. Dec. 12, 2008)...........................................................................................21

**FEDERAL STATUTE**

Fed. R. Civ. P. 23 (e)..............................................................................................................................5

# PRELIMINARY STATEMENT

Pursuant to Rules 23(a), (b)(3) and (e) of the Federal Rules of Civil Procedure, the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio and the Ohio Police & Fire Pension Fund (collectively, "Lead Plaintiff" or the "Ohio State Funds"),[1] as Court-appointed Lead Plaintiff in this case, respectfully submits this memorandum of law in support of:

(1) final approval of the proposed Settlement of claims against Maurice R. Greenberg, Howard I. Smith, Christian M. Milton, Michael J. Castelli, C.V. Starr & Co., Inc. ("C.V. Starr") and Starr International Company, Inc. ("SICO") (collectively, the "Starr Defendants" and, collectively with Lead Plaintiff, the "Settling Parties") in the Action for $115 million in cash, as set forth in the Contingent Agreement of Compromise and Settlement, dated August 10, 2009 (the "Agreement");[2]

(2) certification of a settlement class (the "Settlement Class") of all persons or entities who purchased or otherwise acquired the publicly traded securities of American International Group, Inc. ("AIG") during the period from October 28, 1999 through April 1, 2005 (the "Class Period"), inclusive, as well as all persons and entities who held the common stock of HSB Group, Inc. ("HSB") at the time HSB was acquired by AIG in a stock for stock transaction, and all persons and entities who held the common stock of American General Corporation ("AGC") at the time AGC was acquired by AIG in a stock for stock transaction, and were damaged thereby;[3] and

(3) approval of the proposed Plan of Allocation for the proceeds of the Settlement.

The $115 million proposed Settlement with the Starr Defendants is an outstanding result for the proposed Settlement Class and would bring to a close five years of hard-fought litigation between Lead Plaintiff and the Starr Defendants.  Even after the Settlement was reached, during the following three

---

[1] All capitalized terms that are not defined herein are defined in the Agreement.  [ECF 576-3.]

[2] On October 2, 2009, as a result of the Settlement and at the request of the Settling Parties, the Court so-ordered a stipulation providing for the voluntary dismissal, without prejudice, of the Starr Defendants.  [ECF 521.]  With entry of the Judgment approving the Company Settlement on February 3, 2012, the contingencies have been satisfied and the proposed Settlement is no longer contingent.  The Settling Parties have now stipulated to bringing the Starr Defendants back into the case for the purpose of finalizing the Settlement.

[3] Excluded from the class are the Defendants, members of the immediate families of the Individual Defendants, any parent, subsidiary, affiliate, officer, or director of defendant AIG, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person and any person who makes a valid and timely request for exclusion from the Settlement Class and does not thereafter rescind such a request.  This is the same Settlement Class that the Court certified in the settlement with PricewaterhouseCoopers LLP (the "PwC Settlement") and the Company Settlement.  [ECF 569 & 622.]

years Lead Plaintiff continued to engage with the Starr Defendants on a variety of issues that arose in the ongoing litigation, including taking the depositions of Defendants Greenberg, Smith, and Castelli. Indeed, when combined with the $725 million Company Settlement and the $97.5 million PwC Settlement with PricewaterhouseCoopers LLP, the Starr Settlement would be part of the **10th largest** securities class action settlement, according to the most recent report of Securities Class Action Services.[4]   Importantly, when viewed primarily as a private settlement with individual defendants it is one of the largest such settlements in the history of securities litigation, and when viewed as a settlement of control person claims (*i.e.*, those against SICO and C.V. Starr), it appears to be the largest of its kind.

A.   **Overview of the Litigation History**

As the Court is well aware, the Action arises from, *inter alia*, material misstatements and omissions allegedly made by Defendants in connection with: (1) disclosures on October 14 and 15, 2004 of the Starr Defendants' alleged involvement in a market division scheme that included the payment of improper "steering" contingent commissions to, and alleged illegal rigging of bids with, Marsh & McLennan Companies ("Marsh") and others in the insurance industry ("Market Division Fraud"); and (2) disclosures in March and April 2005 of an alleged accounting fraud at AIG that resulted in the Company restating nearly four years of earnings and adjusting earnings for a fifth year, which, *inter alia*, slashed AIG's net income by $3.9 billion and shareholders' equity by $2.7 billion ("Accounting Fraud"). Lead Plaintiff also asserted claims against Defendant Greenberg (and AIG) arising from the alleged manipulation of the market in which AIG common stock trades by purchasing millions of shares of the Company's stock in order to inflate its stock price ("Market Manipulation Fraud").  Lead Plaintiff alleges

---

[4] *See* Declaration of Thomas A Dubbs in Support of Proposed Class Settlement, Plan of Allocation and Award of Attorneys' Fees and Expenses ("Dubbs Declaration" or "Dubbs Decl."), dated April 27, 2012, Ex. 1. All exhibits referenced herein are annexed to the Dubbs Declaration.  For clarity, citations to exhibits that themselves have attached exhibits, will be referenced as "Ex. ___ - ___."  The first numerical reference refers to the designation of the entire exhibit attached to the Dubbs Declaration and the second reference refers to the exhibit designation within the exhibit itself.

that the price of AIG's stock fell at various times during the Class Period when these alleged frauds were disclosed to the market, resulting in significant damages to the Settlement Class.

Since its appointment as Lead Plaintiff on February 7, 2005, the Ohio State Funds have tirelessly pursued the claims against the Starr Defendants, reaching the Settlement in August 2009, after nearly five years of litigation that included:

- Fully-briefed motion practice, on two separate occasions, to determine the lead plaintiff;

- Motions to dismiss filed by 23 Defendants, including five separate motions by the Starr Defendants, all of which (except one) the Court denied in April and May 2006;

- Fact and expert discovery related to class certification, followed by a contested motion for class certification involving four days of legal argument and hearings (the Settlement was reached before the hearings were completed);

- The review and analysis of more than 53.3 million pages of documents by Defendants and non-parties, including nearly 835,000 pages of documents produced by the Starr Defendants; and

- More than 50 depositions of fact and expert witnesses (approximately 45 additional depositions were taken after reaching the proposed Settlement, including those of Starr Defendants Greenberg, Smith and Castelli).[5]

The Settlement was reached through years of extensive arm's-length negotiations by experienced counsel who possessed a comprehensive understanding of the Settling Parties' respective claims and defenses informed by years of contentious litigation and discovery.  Importantly, the Settlement was negotiated with considerable creativity and under difficult and changing circumstances over the course of numerous informal and formal discussions, face-to-face meetings, and two mediation sessions, one each in the Spring and Summer of 2009  with the Honorable Layn R. Phillips, a former federal district court judge, serving as mediator.

---

[5] For a full recitation of the procedural and litigation history of the Action, the Court is respectfully referred to the accompanying Dubbs Declaration, which is incorporated herein by reference.

In view of the very substantial recovery achieved and the risks that Lead Plaintiff would face in trying to obtain a greater recovery for the Settlement Class through continued litigation and trial, this Settlement constitutes an excellent result that should readily be approved by the Court as fair, reasonable and adequate.

      **B.**      **Preliminary Approval and the Pre-Hearing Notice Program**

In its Preliminary Approval Order, entered February 3, 2012, in addition to preliminarily approving the Settlement, the Court also approved the Notice of Proposed Settlement, Motion for Attorneys' Fees and Expenses Award and Fairness Hearing  ("Notice"), Proof of Claim form ("Proof of Claim"), Release Form and the Summary Notice of Pendency and Proposed Class Action with ("Summary Notice") for dissemination to the Settlement Class.  A copy of the Preliminary Approval Order is attached as Exhibit 2 to the Dubbs Declaration.  Copies of the notices, Proof of Claim form, and Release Form are attached as Exhibits A and B to the Affidavit of Eric J. Miller, dated April 24, 2012 ("Rust Aff.").  Ex. 3.  The Court also approved Rust Consulting, Inc. ("Rust") as the Administrator of the Settlement and set a final hearing for June 28, 2012 (the "Fairness Hearing") to consider the fairness, reasonableness and adequacy of the proposed Settlement and the Plan of Allocation.

In compliance with the Preliminary Approval Order, under the supervision of Lead Counsel, the Administrator mailed copies of the Notice, Proof of Claim and Release Form (when applicable) to all potential members of the Settlement Class who could be reasonably identified by: (i) using record holder data that was produced by the transfer agent for AIG in the PwC Settlement; (ii) mailing to all claim filers in the PwC and Company Settlements; (iii) using name and address data gathered in the PwC and Company Settlements; and (iv) by fulfilling requests made by nominees such as broker-dealers who made purchases on behalf of beneficial owners.  Rust Aff. ¶¶ 3-9.  To date, the Administrator has mailed more than 2 million notice packets containing the Notice and Proof of Claim forms to potential

4

Settlement Class Members and brokers/nominees and mailed 187,060 Release Forms.  *Id.* ¶¶ 11-12, 16.

In addition, the Summary Notice was published in *The Wall Street Journal*, transmitted over *PR Newswire*, and referenced on Bloomberg News Services.  *Id.* ¶¶ 17-18.  The Notice, Proof of Claim and Release Form were also made available on the website created by Rust specifically for purposes of this Settlement and Labaton Sucharow's website for easy downloading by interested investors.  Dubbs Decl. ¶ 15.

The Notice described, *inter alia*, the claims asserted in this Action, the contentions of the Settling Parties, the course of the litigation, the terms and consequences of the Settlement with the Starr Defendants, the proposed Plan of Allocation, the right to object to the Settlement, and the right to seek to be excluded from the Settlement Class.  The Notice also advised potential Settlement Class Members of the scheduled Fairness Hearing, and of Lead Counsel's intention to seek an award of attorneys' fees that would not exceed 13.25% of the Cash Settlement Account and reimbursement of expenses not to exceed $1 million.  In addition, the Notice informed Settlement Class Members that Lead Plaintiff could seek up to $50,000 for its reasonable costs and expenses, pursuant to the PSLRA.

In light of the outstanding result and the opportunity for an immediate cash recovery for hundreds of thousands of Settlement Class Members, Lead Plaintiff respectfully asks this Court to: (1) enter the proposed Order and Final Judgment as to Starr Defendants ("Judgment"); (2) finally certify the proposed Settlement Class; and (3) enter the proposed Order Approving Plan of Allocation.[6]

## ARGUMENT

## I.   THE PROPOSED SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE, AND SHOULD THEREFORE BE APPROVED

A settlement of claims brought by a class is subject to approval by the Court after reasonable notice and a hearing.  Fed. R. Civ. P. 23(e).  A settlement will be approved if it is "fair, adequate, and

---

[6] Proposed orders will be submitted to the Court with Lead Plaintiff's reply submissions, after the deadline for objections and exclusion requests has passed.

reasonable, and not a product of collusion." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116

(2d Cir. 2005), *cert. denied, Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005).

This determination falls within a court's sound discretion. *See Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d

Cir. 2000). In exercising such discretion, a court should be mindful of the "strong judicial policy in

favor of settlements, particularly in the class action context." *Wal-Mart*, 396 F.3d at 116 (quoting *In re*

*PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)); *In re Global Crossing Sec. & ERISA Litig.*,

225 F.R.D. 436, 455 (S.D.N.Y. 2004) (Lynch, J.) ("[F]ederal courts favor settlement, especially in

complex and large-scale disputes, so as to encourage compromise and conserve judicial and private

resources. Accordingly, this Court will take into consideration such public policy concerns in exercising

its discretion.").

A court determines the fairness of a settlement by looking at both its terms and the negotiation

process leading up to it. *See Wal-Mart*, 396 F.3d at 116. With respect to process, a class action

settlement enjoys a strong "presumption of fairness" where it is the product of arm's-length

negotiations conducted by experienced, capable counsel after meaningful discovery. *Id.*; *see also Global*

*Crossing*, 225 F.R.D. at 461. With respect to the substantive terms of a settlement, the standards

governing approval are well-established. Courts in this Circuit examine the fairness, adequacy and

reasonableness of a class action settlement utilizing the "*Grinnell* factors," to the extent they are

applicable:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the
> class to the settlement; (3) the stage of the proceedings and the amount of discovery
> completed; (4) the risks of establishing liability; (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial; (7) the ability of the
> defendants to withstand a greater judgment; (8) the range of reasonableness of the
> settlement fund in light of the best possible recovery; [and] (9) the range of
> reasonableness of the settlement fund to a possible recovery in light of all the attendant
> risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). To

support a finding that a settlement is fair, not every factor must weigh in favor of the settlement, but

"rather the court should consider the totality of these factors in light of the particular circumstances." *Global Crossing*, 225 F.R.D. at 456.

Moreover, in applying the *Grinnell* factors, a court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a "mini-trial" of the merits of the action. *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) ("Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement . . . . They do not decide the merits of the case or resolve unsettled legal questions."). "[T]he essence of a settlement agreement is compromise. . . . a yielding of absolutes and an abandoning of highest hopes." *U.S. v. New York City Bd. of Educ.*, 85 F. Supp. 2d 130, 157 (E.D.N.Y. 2000), *vacated on other grounds*, *Brennan v. New York City Bd. of Educ.*, 260 F.3d 123 (2d Cir. 2001). As such, a court must assess the settlement as presented, without modifying its terms and without substituting its "business judgment for that of counsel, absent evidence of fraud or overreaching." *Global Crossing*, 225 F.R.D. at 455.

As discussed below, Lead Plaintiff submits that the proposed Settlement with the Starr Defendants is eminently fair, reasonable and adequate. The Settling Parties have thoroughly weighed the strengths and weaknesses of the claims and defenses over five years and, after rigorous litigation efforts and negotiations and two mediations facilitated by a former federal judge, have reached an informed and carefully crafted compromise.

## A.    The Settlement Is Entitled to a Presumption of Fairness

As noted above, a strong presumption of fairness attaches to a class action settlement reached after arm's-length negotiations among able counsel after meaningful discovery. *See Wal-Mart*, 396 F.3d at 116. "'[G]reat weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 366 (S.D.N.Y. 2002) (McMahon, J.).

A presumption of fairness is certainly appropriate here.  As discussed in detail in the Dubbs Declaration, by the time the Settling Parties reached the Settlement, Lead Plaintiff had: (i) successfully opposed motions to dismiss by more than 20 Defendants, including five such motions by the Starr Defendants; (ii) completed class discovery, involving more than two dozen depositions, including the depositions of three experts; (iii) moved for class certification, which involved a contested motion for class certification, expert declarations and hearings concerning market efficiency and loss causation; and (iv) conducted extensive fact discovery, including more than 50 depositions and the review and analysis of more than 53 million pages of documents (including nearly 835,000 pages of documents produced by the Starr Defendants alone).  Lead Counsel also spent considerable time consulting with insurance experts, accounting experts, damages experts and finance experts in formulating its litigation and mediation strategies.  *See generally* Dubbs Decl. ¶¶ 64-133.

After briefing the dispositive motions, and through the course of the discovery described above, the Settling Parties participated in numerous formal and informal discussions and two full-day mediation sessions during the Spring and Summer of 2009 before former U.S. District Court Judge Layn Phillips that resulted in this Settlement.  The active supervision and facilitation of the parties' negotiations by a highly experienced, neutral mediator strongly supports a presumption that the Settlement is fair.  *See In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 498 (E.D. Mich. 2008) (speaking of Judge Phillips, "the Court and the parties have had the added benefit of the insight and considerable talents of a former federal judge who is one of the most prominent and highly skilled mediators of complex actions, who acted as Special Master in the settlement negotiations."); *see generally In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 194 & n.42 (S.D.N.Y. 2005) (Scheindlin, J.) (where negotiations were facilitated by former judge, settlement was "clearly the result of arm's length bargaining"); *Becher v. Long Island Lighting Co.*, 64 F. Supp. 2d 174, 181 (E.D.N.Y. 1999) (approving settlement facilitated by an "arms-length negotiations before a respected neutral mediator").

Indeed, there can be no suggestion that collusion played any part in reaching this Settlement. To the contrary, given the vigorous negotiation and mediation efforts that occurred between the Settling Parties, it is clear that counsel for both sides were determined and zealous in their representation of their clients. *See Global Crossing*, 225 F.R.D. at 461 (approving a settlement upon finding that "[b]oth sides have been represented well [by counsel]"). The Settlement was not entered into lightly. Therefore, the Court should accord a presumption of fairness to the Settlement in considering the substantive *Grinnell* factors discussed below.

### B.      The Settlement Satisfies the *Grinnell* Factors

#### 1.      Ongoing Litigation Would Be Complex, Expensive and Lengthy

As the Court is aware, this litigation has been incredibly challenging and complex, involving, *inter alia,* the analysis of (i) thousands of insurance contracts and (ii) dozens of different areas of insurance and reinsurance accounting under changing GAAP provisions, statutory accounting, and also under accounting rules affecting non-U.S. companies. *See, e.g.*, Dubbs Decl. ¶¶ 143-150, 168-169. Without the Settlement, years of litigation against the Starr Defendants would remain ahead.[7] The prosecution of the claims would also require additional fact and expert discovery, hotly contested *Daubert* motions (and likely *Daubert* hearings), summary judgment briefing on numerous issues, including loss causation and, of course, trial preparation and a trial, which would likely last for months. These efforts would require additional large expenditures over an extended period, after which the Settlement Class might obtain a result far less beneficial than the one provided by the Settlement. *See In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (settlement favored where "trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of

---

[7] We note that an action brought by the New York Attorney General ("NYAG") against Settling Defendants Hank Greenberg and Howard Smith, with respect to only two of the accounting claims that are part of the Acton, has been ongoing since May 2005 and has been stayed pending the resolution of an appeal to the New York State Supreme Court, Appellate Division, First Department, initiated by Greenberg and Smith in November 2010. *See* Dubbs Decl. ¶ 52-55.

both the parties and the court").  If this case were to proceed to trial, the jury would have to assimilate intricate facts, learn numerous insurance company practices and procedures, and comprehend complex accounting rules in order to fully understand the nexus between the Starr Defendants' conduct, the alleged violations of the securities laws and the Settlement Class's alleged injury.  Accordingly, a favorable outcome for the Settlement Class was far from assured.

Moreover, in light of the highly contested nature and the complexity of the issues in this case, a judgment favorable to the Settlement Class would undoubtedly have been the subject of post-trial motions and appeals.[8]  By contrast, the Settlement offers the certainty of a prompt and substantial payout from the Cash Settlement Account.  *See Klein ex rel. IRA v. PDG Remediation, Inc.*, No. 95 Civ. 4954 (DAB), 1999 WL 38179, at *2 (S.D.N.Y. Jan. 28, 1999) (Batts, J.) (considering complexity, expense and duration of litigation, settlement that "offer[ed] Class members the benefit of immediate recovery as opposed to an uncertain award several years from now" was preferred outcome).  Accordingly, the first *Grinnell* factor strongly favors approval.

### 2.     The Reaction of the Class to Date

Both the Notice and Summary Notice advised members of the Settlement Class of their right to object to the Settlement and the procedures for doing so.  To date, no Settlement Class Member has filed any objection despite the dissemination of more than *2 million* Notice Packets.  Rust Aff. ¶ 16.

---

[8]  We note that a criminal trial related solely to the Gen Re Transaction took five weeks, and the convictions were later vacated by the Second Circuit.  *See U.S. v. Ferguson*, No. 08-6211, 2011 WL 6351862 (2d Cir. Dec. 19, 2011); *see also*  Dubbs Decl. ¶¶ 41-44.

Further, a 2007-08 non-jury trial of two former Marsh employees accused of engaging in bid-rigging with AIG and other insurance companies lasted more than 10 months, and resulted in felony convictions on two counts.  A second trial of three more Marsh employees resulted in a not-guilty verdict after an 11 month non-jury trial.  Two and a half years after the first trial was completed, the trial judge vacated the judgments in that case. *People v. Gilman*, No. 4800-2009, 2010 WL 3036983, at *20 (N.Y. Sup. Ct. July 2, 2010).  In addition, the trial judge vacated the judgments against all of the former AIG and Marsh employees who had confessed to bid rigging in 2004.  *See* Karen Freifeld, *Marsh Executives' Convictions Tossed in Bid-Rig Case*, Bloomberg.com (July 7, 2010 4:41 PM), *available at* http://www.bloomberg.com/news/2010-07-07/ex-marsh-executives-convictions-in-bid-rigging-trial-tossed-by-n-y-judge.html; Dubbs Decl. ¶¶ 45-50.

However, we anticipate that the NYAG  will be filing an objection to the Settlement and/or the Notice, solely because of his pending case against Greenberg and Smith with respect to the Gen Re and CAPCO Transactions.  (Any objection to the Notice by the NYAG should be considered untimely because, *inter* alia, Lead Plaintiff twice invited the NYAG to provide written proposals to address any concerns he had regarding the Notice, and he failed to do so.  *See* March 4, 2011 letter from Thomas Dubbs to the Court at p. 4, Ex. 27 ("We are also willing to consider any specific suggestions for the Amended Notice proposed in writing by the NYAG"); March 28, 2011 letter from Thomas Dubbs to the Court at p.1, Ex. 28 ("We again invite the NYAG to propose in writing any specific suggestions for the Amended Notice that it believes would be informative to Class members.").  All such objections will be responded to in Lead Plaintiff's reply submission, which must be filed with the Court by June 13, 2012.

Both the Notice and Summary Notice advised members of the Settlement Class of their right to request exclusion from the Settlement Class and the procedures for doing so.  To date, 58 requests for exclusion have been received to date.  However, 51 of the requests did not satisfy the requirements in the Notice or Preliminary Approval Order and are therefore invalid.  Accordingly, to date just 7 valid requests for exclusion have been received, representing only 400 shares of stock, which is approximately .000015% of the almost *2.6 billion* shares of AIG common stock outstanding as of March 31, 2005.  *See* AIG Quarterly Report for the period ended March 31, 2005, filed with the SEC on Form 10-Q on June 28, 2005.  Ex. 3 ¶ 23.

"[A] small number of opt-outs and objections relative to the size of the class . . . supports approval of the Settlement."  *In re Sony SXRD Rear Projection Television Class Action Litig.,* No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *6 (S.D.N.Y. May 1, 2008) (Patterson, J.) (approving settlement where there were 22 opt-outs and 45 objectors out of approximately 175,000 class members); *see also D'Amato*

*v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (holding that the district court properly concluded that 72 requests for exclusion and 18 objections from a class of 27,883 weighed in favor of settlement).

The deadline for objections and exclusions is May 25, 2012.  Lead Plaintiff will address the substance of all objections and report on all exclusions in its reply submissions.

### 3. There Was a Solid Foundation Underlying the Decision to Settle with the Starr Defendants

Courts consider the stage of the proceedings and the amount of discovery completed to assess whether the Settling Parties had sufficient information to make informed decisions with respect to settlement.  *See Marisol A. ex rel. Forbes v. Giuliani*, 185 F.R.D. 152, 163 (S.D.N.Y. 1999) (Ward, J.), *aff'd sub nom. Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000).  Here, there can be absolutely no question that Lead Plaintiff and Lead Counsel conducted negotiations, and later entered into the Settlement, only after developing a thorough understanding of both the potential favorable outcomes and the significant challenges involved in continuing with the Action.

Lead Plaintiff served two document requests on Greenberg and one each on Smith, Castelli, C.V. Starr and SICO (and at least an additional twenty document requests on other Defendants, including AIG) and served more than 50 document subpoenas on non-parties, including Marsh and other insurance brokers, various insurance companies and their employees.  Overall, by the time the Settlement was reached, more than 53 million pages of documents were produced by parties and non-parties, and all of those documents were reviewed and analyzed by Lead Counsel and its experts.  Lead Plaintiff also served more than five sets of interrogatories on AIG and other Defendants and responded to at least 12 interrogatory requests served by AIG and other Defendants.  Dubbs Decl. ¶¶ 73, 116-121.

Further, as noted above, Lead Plaintiff took more than 50 depositions of fact and expert witnesses by the time the Settling Parties reached the proposed Settlement, including several focused on the Market Manipulation Fraud, and others focused on the scienter of the individual Settling Defendants, and C.V. Starr's document retention practices.  *Id.* ¶¶ 99-105, 130-133.

In addition, even aside from the voluminous formal discovery, Lead Counsel conducted an extensive investigation to, among other things, (1) review and analyze AIG and C.V. Starr's public filings with the New York State Insurance Department and other state insurance departments and (2) locate and interview former AIG and C.V. Starr employees and other knowledgeable persons within the insurance industry. Dozens of potential fact or expert witnesses were located and contacted and thousands of pages of documents were obtained and analyzed. *Id.* ¶ 113-114.

Lead Plaintiff's and Lead Counsel's understanding of the claims against the Starr Defendants was further informed by additional discovery relating to Lead Plaintiff's motion for certification of a litigation class on February 20, 2008. The Ohio State Funds produced more than 267,000 pages of documents. More than 20 witnesses from the Funds and their external investment advisers were deposed. Both the Starr Defendants and AIG put forth expert witnesses on the issue of loss causation and damages to counter the expert report submitted by Lead Plaintiff's loss causation expert, Dr. John D. Finnerty. Specifically, Greenberg, SICO, C.V. Starr and Smith put forward David Tabak, Ph.D. of the National Economic Research Associates ("NERA") and Greenberg and Smith also put forward Mark Zmijewski, Ph.D. of the University of Chicago Booth School of Business. In addition, AIG put forward Charles Cox, Ph.D. of Compass Lexecon, a former commissioner of the SEC. All of these experts were deposed by the parties prior to the Settlement. Dubbs Decl. ¶ 73-105.

In February 2009, the Court heard extensive oral argument on class certification over two days, including argument on issues of adequacy, typicality, and loss causation. In August 2009, just days after the Settlement was reached, the Court heard two more days of testimony and legal argument relating to class certification, including argument on issues of loss causation, statistical significance and market efficiency, which led, on February 22, 2010, to the Court certifying a litigation class in the Action.

Accordingly, Lead Plaintiff and Lead Counsel had a very well-founded understanding of the merits of the claims, which warrants approval of the Settlement.

### 4.   There Were Significant Risks in Establishing the Starr Defendants' Liability

*Grinnell* holds that, in assessing the fairness, reasonableness and adequacy of a settlement, courts should consider such factors as the "risks of establishing liability . . . the risks of establishing damages [and] the risks of maintaining the class action through the trial."  495 F.2d at 463.  While Lead Plaintiff and Lead Counsel believe that certain of the claims asserted against the Starr Defendants are very strong, they also recognize that there were considerable risks involved in further pursuing the Action that could have led to a substantially smaller recovery or to no recovery at all for Lead Plaintiff and the Settlement Class.

In analyzing the risks concerning liability, the Court need not "decide the merits of the case or resolve unsettled legal questions."  *Cinelli v. MCS Claim Servs., Inc.*, 236 F.R.D. 118, 121 (E.D.N.Y. 2006). Rather, the Court weighs the likelihood of success on the merits against the relief brought by the Settlement.  *Id.* at 122.  Courts regularly approve settlements where, as here, plaintiffs would have faced significant legal and factual obstacles to establishing liability.  *See Global Crossing*, 225 F.R.D. at 459.

Here, the claims against the Starr Defendants presented significant risks.  Issues of proof in this case are complicated by the fact that the alleged Market Division Fraud involved hundreds of separate insurance transactions.  Proof of wrongdoing likely would have to be established for each allegedly improper transaction separately.  Moreover, the Accounting Fraud alleged is, at its crux, based on violations of very complex accounting rules, which might not be easily understood by a jury.  The vast number of different accounting issues related to the Accounting Fraud would also have been a significant hurdle to be overcome with the jury.  AIG's 2005 restatement affected **two-dozen different types** of accounting transactions, including: (i) inflating claims reserves through allegedly sham reinsurance contracts that did not have sufficient risk to be accounted for as insurance; (ii) inflating earnings by means of allegedly improper "top side" adjustments of claims reserves without sufficient documentary evidence to support those adjustments and (iii) mischaracterization of millions of dollars in

underwriting losses as investing losses through the acquisition and subsequent winding down of an off-shore reinsurance company.  Dubbs Decl. ¶ 149.   Proving C.V. Starr and SICO's liability would have hinged on proving their "control" over AIG management based upon their funding of deferred compensation plans and establishing "culpable participation" on their part.  We also note that the Market Manipulation Fraud was conducted pursuant to publicly announced stock buy-back programs, and that establishing the stock price inflation caused by the alleged scheme, including the length of time the price of AIG stock was inflated by the scheme, would have been difficult.  We are not aware of any other securities fraud case that has been brought on similar grounds.  Indeed, although the Department of Justice issued subpoenas related to this alleged wrongdoing, no charges were ever brought.

Proving the individual Starr Defendants' scienter to the jury would also have been challenging for the Settlement Class.  For example, as noted above, with respect to the two market division cases brought by the New York Attorney General (against a total of five defendants), all claims were either dismissed or the judgments were vacated.  Indeed, even the 2004 misdemeanor and felony convictions of a dozen AIG and Marsh employees based on plea bargains related to bid-rigging were later reduced or vacated.   No Starr Defendant was indicted in connection with these charges, and no witness testified about communicating with the Starr Defendants about the alleged bid-rigging at the time it occurred.  *Id.* ¶¶ 145-150.

Indeed, the SEC brought no securities claims based on the Market Division Fraud.   Likewise, the criminal convictions of a former AIG officer and four former Gen Re officers related to the Gen Re transaction were all vacated, and neither Greenberg nor Smith were indicted.  *See U.S. v. Ferguson*, 2011 WL 6351862; Dubbs Decl. ¶¶ 43-44, 168.[9]   Further, many of the accounting entries that were later restated by AIG involved the exercise of professional judgment, and the individual Starr Defendants all

---

[9] A retrial has been scheduled for January 2013.  Dubbs Decl. ¶ 44.

testified at their depositions that they relied upon the advice of highly experienced lawyers, accountants, actuaries, and other professionals who also knew about the accounting transactions at issue and signed off on them. *Id.* ¶ 148.[10]

Thus, it was far from assured that a jury would have found the Starr Defendants liable of securities fraud in this case. There was also a further risk that any finding against the Starr Defendants could have been overturned on appeal. Numerous cases continue to demonstrate the enormous risks associated with prosecuting securities class actions. *See, e.g.*, *AUSA Life Ins. Co. v. Ernst & Young*, 39 F.App'x 667, 674 (2d Cir. 2002) (affirming district court's dismissal after a full bench trial); *Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355, 374 (E.D.N.Y. 2000) (granting defendants' motion for judgment as a matter of law after jury verdict for plaintiffs).

Given the uncertain prospects of success at trial and on any appeal as to the claims against the Starr Defendants, settlement at this time is highly beneficial to the Settlement Class. The Settlement will provide tangible and certain relief to the Settlement Class Members now, and "without subjecting them to the risks, complexity, duration, and expense of continuing litigation." *Global Crossing*, 225 F.R.D. at 456-57; *see also Maley*, 186 F. Supp. 2d at 362 ("Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. These factors weigh in favor of the proposed Settlement.").

### 5. The Settlement Class Faced Risks in Establishing Damages

Damages issues in securities litigation are often reduced to a "battle of the experts," which could lead the jury in this Action to minimize the Settlement Class's proffered losses caused by the Starr Defendants' participation in the alleged fraud. *See In re Am. Bank Note Holographics, Inc., Sec. Litig.*, 127 F.

---

[10] Moreover, AIG's 2005 restatement was filed after Settling Defendants Greenberg and Smith left AIG, and Greenberg took the position that it was unnecessary and, in certain aspects, simply wrong. *See, e.g.*, Jesse Westbrook, *AIG's Ex-boss Disputes Audit*, SunSentinel.com (Aug. 5, 2005), http://articles.sun-sentinel.com/2005-08-05/business/0508041404_1_mr-greenberg-maurice-hank-greenberg-pricewaterhousecoopers-llp (last visited April 12, 2012).

Supp. 2d 418, 426-27 (S.D.N.Y. 2001) (McMahon, J.) ("In such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses."); *In re PaineWebber Ltd. P'Ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) (Stein, J.) (reasoning that "damages are a matter for the jury, whose determinations can never be predicted with certainty"), *aff'd*, 117 F.3d 721 (2d Cir. 1997). The issues raised in the reports by the Starr Defendants' experts on loss causation and damages issues, David Tabak, Ph.D. and Mark Zmijewski, Ph.D., the report by AIG's expert, Charles Cox, Ph.D., (produced as part of class certification discovery), and the questioning by counsel for the Starr Defendants and other Defendants' counsel at the deposition of Lead Plaintiff's loss causation expert, Professor John D. Finnerty, Ph.D., illustrate at least some of the challenges that the Settlement Class would have had to overcome to recover damages. Dubbs Decl. ¶¶ 151-155.

For example, the Defendants challenge the validity of Professor Finnerty's determination of loss causation with respect to *each* of the six disclosure dates at issue and with respect to the efficiency of the market for AIG bonds. For instance, Dr. Tabak opined that AIG's stock price drops allegedly resulting from corrective disclosures on March 30 and 31, 2005 concerning the alleged accounting fraud were not statistically significant at the 95% level and therefore Lead Plaintiff could not allege a claim with respect to these dates.[11] Dr. Tabak also opined that Lead Plaintiff's expert's methodology for analyzing the stock price drop on March 17, 2005 was unreliable, because it did not factor in that multiple dates were being analyzed. Using what he believed was the more appropriate methodology, Dr. Tabak concluded that the March 17, 2005 stock price drop was also not statistically significant, and therefore could not be attributed to news about AIG and the alleged accounting fraud. With respect to the October 14 and 15, 2004 alleged corrective disclosures concerning the Market Division Fraud, he believed that Lead

---

[11] This Court agreed with Defendants on this point. *See* Order filed February 22, 2010 [ECF 534] (certifying the Action as a class action for litigation purposes).

Plaintiff's expert had not presented reliable evidence of loss causation, because there was confounding news that was not properly analyzed. He also opined that AIG's April 1, 2005 stock price drop following *The Wall Street Journal* and *New York Times'* reports of additional improprieties at the Company was not statistically significant once it is corrected for alleged "misinformation" and paired with a positive related disclosure on April 4, 2005 that purportedly acted as a partial correction of this "misinformation." Dubbs Decl. ¶ 153, Ex. 11.

Dr. Zmijewski analyzed the amount of Lead Plaintiff's and the proposed class's "in-and-out" transactions that occurred between alleged corrective disclosures. He stated that these transactions were not damaged by the alleged fraud. By sampling data subpoenaed from various brokers, he opined that large portions of their Class Period trades were "in-and-out" because they were conducted between the alleged corrective disclosures. Dubbs Decl. ¶ 154, Ex. 12.

Like Dr. Tabak, Dr. Cox opined that AIG's stock price drops on March 30 and 31, 2005, following the alleged disclosures of improper accounting, were not statistically significant at the 95% confidence level and therefore they could not be used to show loss causation. Dr. Cox also challenged Lead Plaintiff's expert's methodology for analyzing AIG's stock price drops in October 2004 concerning the alleged Market Division Fraud (as compared to the methodology he used to analyze the stock price drops relating to the Accounting Fraud) and opined that if the same methodology were used, the results would show that the October 2004 stock price drops were also not statistically significant. Dubbs Decl. ¶ 152, Ex. 10.

The Starr Defendants would likely argue at summary judgment and at trial that loss causation cannot be established unless Lead Plaintiff could show precisely how much of any decline was caused by each new disclosure related to the alleged fraud (and how much of any decline was caused by a specific Defendants' role in the fraud) as opposed to other AIG or industry-related news that was made public on the alleged disclosure dates.

Lead Plaintiff and Lead Counsel strongly believe that loss causation and resulting damages can be established with respect to the claims against the Starr Defendants.  *See* Ex. 13 (Declaration of John D. Finnerty, Ph.D. in Support of Lead Plaintiff's Motion for Class Certification [ECF 356-3]; *see also* Ex. 14 (Rebuttal Declaration of John D. Finnerty, Ph.D. [ECF 446-27]).  However, Lead Plaintiff recognizes that at summary judgment or trial the Court or a jury could credit the Starr Defendants' arguments and experts over those of the Settlement Class and determine that the class suffered no (or significantly smaller) recoverable damages.  *See, e.g.*, *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK), 2007 WL 1438753, at *3 (S.D.N.Y. May 16, 2007) (Kaplan J.) (granting motion for summary judgment for, *inter alia*, failure to demonstrate loss causation), *aff'd* 293 F'Appx. 815 (2d Cir. 2008); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008) (Pauley, J.) (same), *aff'd* 597 F.3d 501 (2d Cir. 2010).  Therefore, this *Grinnell* factor strongly favors approval of the Settlement.

### 6.    Ability of the Starr Defendants to Withstand a Greater Judgment

It is clear that the wealth and assets of Settling Defendants Greenberg, Smith, Milton, Castelli, SICO, and C.V. Starr were greatly diminished as AIG's stock price plummeted in 2008, culminating in the September 2008 bailout of the Company.  Accordingly, at the time of the Settlement in August 2009, their ability to fund a larger settlement or withstand a greater judgment was significantly reduced.

For example, at the end of the Class Period, Greenberg owned approximately 45 million shares of AIG common stock.  *See* Third Amended Complaint ¶ 48.  [ECF 308.]  At that time, AIG's common stock was trading at slightly above $50 per share, yielding $2.25 billion in assets.  *See* Notice at 12, Ex. 3-A.  At the time of the bailout, however, AIG's common stock was trading closer to $3 per share, yielding only $135 million in assets for the same shares.[12]  At the end of June 2009, shortly before the

---

[12] *See* Historical pricing *available at*, http://finance.yahoo.com/q/hp?s=AIG&a=08&b=7&c=2008&d=08&e=30&f= 2008&g=w (last visited April 17, 2012.).

Settlement was reached and before a 1:20 stock split, AIG's stock was trading below $2.00 per share.[13] Dubbs Decl. ¶¶ 59-60.

C.V. Starr and SICO's assets were almost entirely made up of AIG stock.  At the end of the Class Period, they owned approximately 47 million and 311 million shares, respectively, valued at $2.35 billion and $15.5 billion.  [ECF 308 ¶¶ 46-47.]  According to records filed with the SEC, between the end of the Class Period and the AIG bailout in September 2008, SICO sold approximately 62,000,000 shares at prices ranging from $72.81 to $3.06, such that as of September 30, 2008, shortly after the bailout and in the year prior to the Settlement, SICO held approximately 210,000,000 shares valued at less than $700,000,000.  With respect to C.V. Starr, between the end of the Class Period and the AIG bailout, C.V. Starr sold approximately 8,000,000 shares at prices ranging from $72.81 to $66, such that as of September 30, 2008, shortly after the bailout and in the year prior to the Settlement, C.V. Starr held approximately 26,500,000 shares valued at just $88,000,000.  Dubbs Decl. ¶ 61.  It is clear that both companies suffered huge losses as a result of AIG's plummeting stock price.

Given these circumstances, the seventh *Grinnell* factor also supports approval.  *See, e.g.*, *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *7 (S.D.N.Y. Dec. 23, 2009) ("There exists the legitimate concern that Defendants might not be able to pay an award higher than the Settlement, even if Lead Plaintiffs were to prevail at trial.  Accordingly, this factor supports approval of the Settlement."); *Maley*, 186 F. Supp. 2d at 365 (settlement warranted where "obtaining a greater recovery than provided by the Settlement would have been difficult" in light of defendant company's financial condition).  Moreover, this steep decrease in fortune shows that payment of the Settlement Amount was much more significant to the Settling Defendants after 2008.

---

[13] *See* Historical pricing *available at* http://finance.yahoo.com/q/hp?s= AIG&a=05&b=7&c=2009&d= 07&e=31&f=2009&g=w (last visited April 17, 2012).

### 7.    The Settlement Amount Is Very Reasonable

The eighth and ninth *Grinnell* factors concerning the reasonableness of the recovery also strongly weigh in favor of approving the Settlement.  The $115 million Settlement is a **very significant recovery** that falls well within the range of reasonableness both in absolute terms and when weighing potential recoveries and all the risks of proceeding with the claims against the Starr Defendants.  *See Wal-Mart*, 396 F.3d at 119 (reasoning that "[t]here is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion") (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

Four of the six Starr Defendants were senior officers of AIG.  From the perspective that the $115 million settlement with the Starr Defendants is primarily a settlement with these four persons, it is one of the largest ever paid by individual defendants, who typically do not settle securities claims for significant amounts.[14]  Likewise, from the perspective that the Settlement is primarily with Defendants SICO and C.V. Starr, against whom Lead Plaintiff asserted only "control person" claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act (largely based upon compensation plans created by those Defendants for the benefit of AIG executives) the recovery appears to be unprecedented.  In virtually all securities cases, control person claims are asserted (and settled) only in conjunction with other Exchange Act or Securities Act claims (such as claims under Section 10(b) or

---

[14] Indeed, our understanding is that the highest such private settlement with a single individual defendant was approximately $35 million (by Bernard Ebbers in the *WorldCom* case, *see In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005)(settlement ranging from $23.6 million to $33.6 million depending on sale of assets), and the next highest was $30 million (by Gary Winnick in the *Global Crossing* case, *see In re Global Crossing*, 225 F.R.D. at 447; and by William McGuire in the *UnitedHealth* case, *see In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094 (D. Minn. 2009)).

In 2005, a group of 18 outside directors and one inside director reached a $168 million settlement in the *Enron* securities case, however the damages alleged in *Enron* were significantly larger than those alleged here, and on a *pro rata* basis the instant Settlement is much larger. *See* University of California, *UC Reaches $168-Million Settlement with Enron Directors in Securities Case*, TheEnronFraud.com (Jan. 7, 2005), http://www.enronfraud.com/enr-cgi-bin/mil?templ=news/articles/uc_168M_ settlement_050107.html (last visited April 16, 2012)

Section 11, respectively).  "Control person only" settlements are so rare, organizations that track class action settlements, like Securities Class Action Services, do not report information about them.  To our knowledge, there has been no other control person only settlement that comes close to the amount recovered here.  *Cf., In re Vesta Ins. Group Inc. Sec. Litig.*, CV-98-BE-1407 (N.D. Ala. Dec. 12, 2008) (approving $1,950,000 settlement with alleged control person Torchmark Corp.).

Importantly, the settlement between the U.S. Securities and Exchange Commission ("SEC") and Greenberg and Smith, reached in August 2009 concerning their involvement in improper accounting transactions between 2000 and 2005, amounted to payments of $15 million by Greenberg and $1.5 million by Smith.  The $115 Settlement here is an excellent result for the Settlement Class.

Furthermore, when combined with the $725 million Company Settlement and the $97.5 million PwC Settlement, the Starr Settlement would be part of the ***10th largest*** securities class action settlement.  As noted in the declaration of Professor John C. Coffee, Esq., submitted in support of approval of the Company Settlement [ECF 603-8], the $725 million settlement amount represented a recovery of 13.18% of the $5.5 billion in "maximum recoverable damages" in the case.  *See* Coffee Decl. ¶ 22.  Thus, the combined recovery for all three settlements (*i.e.*, the PwC Settlement, the Company Settlement, and the Starr Settlement) for the Settlement Class represents more than 17% of maximum obtainable damages.

Viewed in light of the significant risks discussed above, and compared to other securities class action settlements, the Settlement clearly represents an excellent result for the Settlement Class.  In sum, Lead Plaintiff and Lead Counsel submit that the Settlement is eminently fair, adequate and reasonable in light of the best possible recovery and all of the risks of litigation, and should be approved.  The last two *Grinnell* factors clearly weigh in favor of approval.

## II.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

The Settlement Class here is the same as that authorized by the Court as part of the PwC

Settlement and the Company Settlement.  It is also substantially similar to the settlement class that Judge Sprizzo certified in *In re AIG ERISA Litig.*, No. 04 Civ. 9387 (S.D.N.Y.), a related litigation with nearly identical underlying facts (*i.e.*, the class members' injuries stemmed from the Market Division Fraud and the Accounting Fraud) as in this Action.[15]  In presenting the proposed Settlement to the Court for preliminary approval, Lead Plaintiff requested that the Court preliminarily certify the Settlement Class so that Notice could be issued of the proposed Settlement, the Fairness Hearing, and the rights of Settlement Class Members to request exclusion, object or submit Proofs of Claim or Release Forms.  In its Preliminary Approval Order, the Court granted Lead Plaintiff's request and certified the Settlement Class.  Nothing has changed to alter the propriety of the Court's certification, and so, for all the same reasons stated in Lead Plaintiff's Memorandum of Law in Support of its Motion for Preliminary Approval of Class Settlement with Maurice R. Greenberg, Howard I Smith, Christian M. Milton, Michael J. Castelli, C.V. Starr & Co., Inc. and Starr International Company, Inc. [ECF 575], incorporated herein by reference, Lead Plaintiff requests that the Court: (i) finally certify the Settlement Class for Settlement pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (ii) appoint Lead Plaintiff as Class Representative; and (iii) appoint Lead Counsel as Class Counsel.

## III.   THE PLAN OF ALLOCATION SHOULD BE APPROVED

"When formulated by competent and experienced class counsel," a plan for allocation of net settlement proceeds "need have only a reasonable, rational basis." *Global Crossing*, 225 F.R.D. at 462.  A reasonable plan may consider the relative strength and values of different categories of claims. *Id.* "Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim." *Am. Bank Note*, 127 F. Supp. 2d at 429.

---

[15] Judge Sprizzo granted final approval of the related ERISA settlement on October 8, 2008.  *In re AIG ERISA Litig.*, No. 04-9387 (S.D.N.Y. Oct. 8, 2008).

Lead Plaintiff respectfully submits that the Plan of Allocation, fully described in the Notice, should be approved as it provides a fair and equitable method of dividing the Settlement proceeds among Settlement Class Members who submit timely and valid Proof of Claim forms or Release Forms ("Authorized Claimants"), consistent with governing law. The Settlement Class was informed that they had an opportunity to object to the Plan of Allocation by no later than May 25, 2012 and, to date, Lead Plaintiff and Lead Counsel are aware of no such objections. Dubbs Decl. ¶ 162, Ex. 3-A. The Plan of Allocation is predicated on: (i) the Supreme Court's decision in *Dura Pharmaceuticals* and its progeny; (ii) the timing of the alleged corrective disclosures during the Class Period; and (iii) the type of security purchased. It is essentially identical to the plan approved by the Court in connection with the Company Settlement, which was developed by the Settlement Class's non-testifying damages experts, Dr. Scott D. Hakala and Frank C. Torchio, both of whom have extensive experience in developing plans of allocation for settlements in securities class actions and who worked on the plan of allocation for the PwC Settlement. *Id.* ¶ 157-161.[16] Unlike the plan of allocation in the Company Settlement, it does not involve any reduction based on a Class Members' recovery from the Fair Fund created in *SEC v. American International Group, Inc.*, 06 Civ. 1000 (S.D.N.Y.) (LAP).

As explained in the Notice, the Plan of Allocation apportions the recovery among Settlement Class Members who purchased or acquired AIG's publicly traded common stock, call options, put options and bonds during the Class Period. Those who purchased common stock and options will recover a larger portion of the Settlement than those who purchased the bonds, in recognition of the particular risks involved in establishing loss causation and market efficiency for the bonds. Specifically, Authorized Claimants with respect to the bonds only will share in up to 5% of the amount that will be distributed to all Settlement Class Members. *Id.* ¶ 160. The Plan distributes the recovery according to

---

[16] Dr. Hakala was the expert used by the SEC for its plan of allocation in the AIG Fair Fund settlement.

when Settlement Class Members acquired or sold their AIG Securities, taking into account the strength of potential claims relevant to these time periods.  The Plan also limits Settlement Class Members' recoveries to their out-of-pocket loss.  *Id.*

Under the Plan of Allocation, each Authorized Claimant is entitled to recover her Recognized Loss to the extent that the Distribution Amount is sufficient.  If there are not sufficient funds, Authorized Claimants will be entitled to receive their *pro rata* share of the Distribution Amount (*i.e.*, the percentage of their Recognized Loss determined by the ratio of the total Recognized Losses of all Authorized Claimants to the Distribution Amount).  The Plan of Allocation therefore represents a fair and equitable method for allocating the Distribution Amount among Authorized Claimants and should be approved by the Court.

## CONCLUSION

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court (1) enter the proposed Judgment; (2) certify the Settlement Class and (2) enter the proposed Order Approving Plan of Allocation.

Dated:  New York, New York
April 27, 2012

**MICHAEL DEWINE,
OHIO ATTORNEY GENERAL**

**LABATON SUCHAROW LLP**

Alan S. Kopit, Esq. (Ohio Bar #0031965)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114-2301
(216) 621-0150
(216) 274-2478 (Fax)

By   /s/ Thomas A. Dubbs
Thomas A. Dubbs (TD 9658)
Louis Gottlieb (LG 9169)
Nicole M. Zeiss (NZ 3894)
Thomas G. Hoffman, Jr. (TG 0330)
140 Broadway
New York, New York  10005
(212) 907-0700
(212) 818-0477 (Fax)

*Special Counsel to the Ohio Attorney General and the Ohio State Funds and Lead Counsel for the Class*

*Lead Counsel for Lead Plaintiff Ohio State Funds and Lead Counsel for the Class*