```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
In Re AMERICAN INTERNATIONAL
GROUP, INC. SECURITIES LITIGATION
                                          04 Civ. 8141(DAB)
                                          MEMORANDUM AND ORDER

------------------------------------X
```

DEBORAH A. BATTS, United States District Judge.

Before the Court is a Motion to Direct Rust Consulting (the "Claims Administrator") to Approve the Settlement Claims of the American International Group, Inc. Incentive Savings Plan, American General Agents' and Managers' Thrift Plan, the American International Group, Inc. Retirement Plan, and the Chartis Insurance Co. Puerto Rico Capital Growth Plan (collectively the "Plans"). For the reasons set forth below, the Plans' Motion is DENIED.

I. BACKGROUND

Over the course of almost a decade, the Court presided over the litigation, and ultimately the settlements, in the class action securities cases at issue here. A detailed background can be found on the docket in the various submissions of the Parties and Court Orders, including the Orders and Final Judgments as to PriceWaterhouseCoopers ("PwC") and American International Group,

Inc. ("AIG"). (ECF Nos. 569, 622.)[1]  Therefore, the Court provides facts only to the extent necessary to resolve the instant Motion.

On October 14, 2008, the Court signed an Order to Preliminarily Approve the Settlement and Certified the Class as to PwC, which also instructed that the Notices and Proof of Claim forms to be mailed by October 20, 2008. (ECF No. 444.)  Likewise, the Court preliminarily approved the Settlement and certified the class as to AIG in a October 5, 2011 Order, which provided for the mailing of the Notices and Proof of Claim forms by October 14, 2011. (ECF No. 598.)  Potential members of the Settlement Class were instructed to return their claim forms within 100 days of the dates of mailing. (ECF No. 444, 598.)  It is undisputed that the Plans sent in claim forms to be considered by the Claims Administrator. (Plans' Br. at 3; Opp'n. Br. at 4-7.)  On December

---

[1] Also under this caption is the litigation as to Maurice R. Greenberg, Howard I. Smith, Christian M. Milton, Michael J. Castelli, C.V. Starr & Co., Inc., and Starr International Co., Inc. (collectively "Starr Defendants") and General Reinsurance Corp. ("Gen Re"), which is premised on the same factual allegations.  The Settlements as to the Starr Defendants and Gen Re were approved by the Court on May 13, 2013 and September 11, 2013, respectively. (See Orders & Final J. as to Starr Defendants and Gen Re, ECF Nos. 688, 715.) When the Parties briefed the instant Motion, they noted that the Starr Defendants and Gen Re settlements were not directly at issue, but agreed that this Memorandum and Order is equally applicable to them to the extent that the Plans submit claims. (See Opp'n. Br. at 1, n.1; Reply Br. at 7, n. 16.)  After this Motion was briefed, Lead Plaintiff filed a Motion to Approve the Initial Settlement Distribution in the Connection with Gen Re and Starr Defendants (ECF. No. 736), and the Plans filed their Objection thereto based on the reasons set forth in the instant Motion. (ECF No. 740.)  Therefore, this Memorandum and Order applies to that Motion and the Objection.  Furthermore, as this Opinion resolves the "affiliate" question in favor of Lead Plaintiff, the Plans' Objection as to the size of the reserve is moot.

10, 2010, the Court approved the Settlement and certification of the class as to PwC, (ECF No. 568, 569), and on February 2, 2012, as to AIG. (ECF Nos. 617, 622.)

In February 2013, each of the Plans received two Notices of Ineligibility from the Claims Administrator,[2] one notice for each settlement, with identical wording. (See Rose Decl. ¶¶ 8-13, Exs. 6, 7, 8, 9, 10, 11.)  In relevant part, the Notices of Ineligibility read:

> **The claim you submitted appears to be on behalf of an 'affiliate' of Defendant AIG and therefore is considered ineligible. . . . Additionally, the claim filed was submitted on a 'participant level'. . . . Based on the data we have, it appears the participants did not directly purchase and sell 'AIG Securities.' . . . As a result, claims filed on a 'participant level' will not be considered for eligibility in this settlement.**

(Id.)  The Notices went on to explain the procedures to contest the determinations of the Claims Administrator, so that the recipients who disagreed with the conclusions could seek review. (Id.)  The Plans ostensibly complied with the instructions, as no Party has indicated otherwise.

The Parties, having submitted their papers in support and in opposition to the Motion, seek this Court's review of the Claims

---

[2] Mercer Trust Company, as trustee for the AIG Stock Fund, received two Notices of Ineligibility, one for each settlement. (Rose Decl. ¶¶ 8-9, Exs. 6, 7.)  The Notices were applicable to the claims of both the AIG Incentive Savings Plan and the American General Agents' and Managers' Thrift Plan. (Id.)

**Administrator's determination.**

**II. DISCUSSION**

**A. The Court has Jurisdiction Over the Instant Dispute**

From the outset, the Court has jurisdiction over this matter, as well as any dispute related to the distribution of the Settlements' funds.  While the Claims Administrator has initial authority to determine the eligibility of claimants, (PwC Agreement, ECF No. 718, Ex. 2 at ¶ 1.D.7-8; AIG Agreement, ECF No. 567, Ex. 3 at ¶ 1.D.7-8), the Settlements made clear that "this Court hereby retains continuing jurisdiction over (a) implementation of this Agreement and any award or distribution of the Cash Settlement Account, including interest earned thereon . . . and (d) all parties hereto for the purpose of construing, enforcing and administering the Agreement." (Order & Final J. as to PwC at ¶ 23, ECF No. 569; See also Order & Final J. as to AIG at ¶ 29, ECF No. 622; Opp'n. Br. at 1, n.4.)  Therefore, the instant Motion is properly before the Court.

**B. The Motion Requires the Court to Interpret the Agreement**

Settlements and consent decrees are "hybrid[s] in the sense that they are at once both contracts and orders." Berger v. Heckler, 771 F.2d 1556, 1567 (2d Cir. 1985).  Once executed, a

settlement or consent decree, as with any duly issued order, burdens the Court with "an affirmative duty to protect the integrity of its decree." Berger, 771 F.2d at 1568 (citation omitted).  A settlement simultaneously "represents a compromise between parties who have waived their right to litigation and, in the interest of avoiding the risk and expense of suit, have 'give[n] up something they might have won had they proceeded with the litigation." Id. (citing United States v. Armour & Co., 402 U.S. 673, 681 (1971)).  It is "[f]or these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." Id. (citing Armour & Co., 402 U.S. at 682). See Barcia v. Sitkin, 367 F.3d 87, 106 (2d Cir. 2004)(citing Perez v. Danbury Hosp., 347 F.3d 419, 424 (2d Cir. 2003)("[C]ourts must abide by the express terms of a consent decree and may not impose supplementary obligations on the parties even to fulfill the purposes of the decree more effectively.  A court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals.").

The Court looks to the text of the Settlements because "[w]here the contract is unambiguous, courts must effectuate its plain language." Seabury Constr. Corp. v. Jeffrey Chain Corp.,

289 F.3d 63, 68 (2d Cir. 2002)(citing Slamow v. Delcol, 79 N.Y.2d 1016, 594 N.E.2d 918, 919, 584 N.Y.S.2d 424 (N.Y. 1992); Union Carbide Corp. v. Affiliated FM Ins. Co., 16 N.Y.3d 419, 425 (N.Y. 2011)("where the meaning of a writing is clear from its text, extrinsic evidence will not be considered.")  The contested provisions, which are substantively the same in both Settlements, provide the scope of the certified class, which includes:

> all persons and entities who purchased or otherwise acquired AIG Securities during the period of time from October 28, 1999, through April 1, 2005, inclusive (the "Class Period"), as well as all persons and entities who held the common stock of HSB Group, Inc. ("HSB") at the time HSB was acquired by AIG in a stock for stock transaction, and all persons and entities who held the common stock of American General Corporation ("AGC") at the time AGC was acquired by AIG in a stock for stock transaction, and were damaged thereby (the "Settlement Class").  Excluded from the Settlement Class are (i) the Defendants, as named in the Consolidated Third Amended Class Action Complaint, dated December 15, 2006 (the "Complaint") in this Action; (ii) the immediate families of the Individual Defendants, as named in the Complaint; (iii) any parent, subsidiary, affiliate, officer, or director of AIG; (iv) persons who made requests for exclusion from the Settlement Class in the manner and within the time period provided by Section IV of the Agreement and/or by order of the Court and did not thereafter rescind such requests, such excluded persons being listed on Exhibit A hereto; (v) any entity in which any excluded person has a controlling interest; and (vi) the legal representatives, heirs, successors and assigns of any excluded person.

(Order & Final J. as to AIG at ¶ 4, ECF No. 622 (emphasis added); see Order & Final J. as to PwC at ¶ 4, ECF No. 569.)  Parties dispute whether the Plans fall within the class definition, but

6

they agree that the resolution of the question depends on the meaning of the word "affiliate." (See generally Plans' Br.; Opp'n. Br.)  The Court, therefore, must determine whether the Plans constitute "affiliates" of AIG, a term which Parties acknowledge is not defined in the Settlement.[3] (PwC Agreement, ECF No. 718, Ex. 2; AIG Agreement, ECF No. 567, Ex. 3; Opp'n. Br. at 10.)

In contract interpretation, "a term is ambiguous when it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Care Travel Co. v. Pan Am. World

---

[3] The Plans, in their initial submission, never mention that the word "affiliate" is omitted from the excluded members of the class as set forth an either Agreement.  In fact, the Plans open their argument not by contending that affiliates can be part of the Settlement Class, but by denying that they are affiliates, pointing to the Third Amended Complaint to show that affiliates are listed among the excluded. (Plans' Br. at 5.)  Then, curiously, they "note" the absence of "affiliates" from the persons and entities excluded from the Settlement Class. (Reply Rose Decl. ¶ 5 (referencing Ex. 1, PwC Agreement at 10, Ex. 2, AIG Agreement at 11 ).)  If the Plans are now implying that affiliates are eligible to be members of the Settlement Class, the Court rejects this suggestion outright.  Not only are affiliates explicitly excluded from the Settlement Class in most every document that identifies ineligible persons and entities, including those signed by the Court, (see, e.g., ECF Nos. 444, 569, 598, 622 ), but the very Agreements referenced by the Plans indicate that affiliates are excluded from the Class. (Reply Rose Decl. ¶ 5, Ex. 1 at 26, Ex. 2 at 36.)  Furthermore, under the reasoning implied by the Plans, if they held stocks, even the alleged wrongdoers and their families would be eligible to recover, because they are not listed in "Settlement Class" section of that document either. (Reply Rose Decl. ¶ 5, Ex. 1 at 10, Ex. 2 at 11.)  The Court itself defined the class specifically to exclude affiliates. (Order Certifying Class, ECF No. 534 at 89.)

Airways, 944 F.2d 983, 988 (2d Cir. 1991)(quoting Walk-In Med. Ctrs., Inc. v. Breuer Cap. Corp., 818 F.2d 260, 263 (2d Cir. 1987)).  In addition, while the terms of an agreement are typically construed against the drafter, "New York applies this rule 'only as a matter of last resort after all aids to construction have been employed without a satisfactory result.'" Albany Sav. Bank, FSB v. Halpin, 117 F.3d 669, 674 (2d Cir. 1997).  The "rationale for [this] doctrine is inapposite," furthermore, in a case like the instant one, where the agreement "involv[es] bargained-for contracts, negotiated by sophisticated parties." Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10 (2d Cir. 1983).  Ultimately, "[i]f the court determines the operative contract to be ambiguous, it may evaluate the extrinsic evidence as a matter of law." Bank of N.Y. Trust Co., N.A. v. Franklin Advisers, Inc., 726 F.3d 269, 275 (2d Cir. 2013).

     C. The Text of the Agreement is Unambiguous

     In resolving the instant Motion, the Court considers whether "affiliate" includes organization-sponsored pension plans, as Lead Plaintiff contends, (Opp'n. Br. at 5), or only related profit-making entities, as the Plans suggest. (Plans' Br. at 5.) Having reviewed the Agreements, and understanding that "'[p]articular words should be considered, not as if isolated

from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby,'" the Court finds that the use of the term "affiliate" presents no ambiguity. Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 13 N.Y.3d 398, 404 (N.Y. 2009)(citing William C. Atwater & Co. v. Panama R. Co., 246 N.Y. 519, 524 (N.Y. 1927)).  While the term may, in general, be somewhat vague, it is not in the context of this case; persons well-versed in securities litigation, and especially those familiar with the instant series of actions, will not possess divergent views as to the meaning of "affiliates."  Thus, there is no need to introduce extrinsic evidence to aid the Court here.

Looking to Black's Law Dictionary, an affiliate is defined as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Black's Law Dictionary (9th ed. 2009). Black's Law Dictionary offers yet a second meaning of affiliate, which is more relevant to the instant action: "[o]ne who controls, is controlled by, or is under common control with an issuer of a security." Id. (citing SEC Rule 10b-18(a)(1)). Control, furthermore, is defined as "[t]he direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by

9

contract, or otherwise; the power or authority to manage, direct, or oversee." Id.  Under this definition, AIG controls the Plans if, at a minimum, it possesses some indirect authority to determine their management and direct policies.

Accordingly, AIG possesses control over the Plans such that they can be deemed affiliates of the company for the purposes of the instant case.  The Plans are each sponsored by either AIG itself or a company subsidiary. (Opp'n. Br. at 4, Dubbs Decl. ¶ 3, Ex. 1, ISP Summary Plan Description at 19, 21; Exs. 3-5.) Likewise, the AIG Retirement Board, the Plans' Administrator, was not only appointed by AIG, but its members were all AIG employees, including officers and directors of the company. (Opp'n. Br. at 4-5 & nn. 9-18; Ex. 2.)  Indeed, the company could disband the Plans without reason. (See, e.g., Opp'n. Br. at 4 & n.12 (citing Ex. 1 at 17)("The Company expects to continue the Plan indefinitely.  However, the Company reserves the right to amend or discontinue the Plan in any manner or at any time.(emphasis added).)  Certainly nothing more is needed to demonstrate control.

Alternatively, where "[t]he parties [to a federal securities class action suit] agree that . . . the term 'affiliate' is not defined in the Settlement Agreement, it is appropriate to look to the definition provided in regulations promulgated under the 1933

10

and 1934 Acts." Waldman v. Riedinger, 423 F.3d 145, 151 (2d Cir. 2005). See also HNC Realty Co. v. Bay View Towers Apartments, Inc., 64 A.D.2d 417, 425 (N.Y. App. Div. 2d Dep't 1978)("words are to be given their plain and normal meaning and . . . technical words are to be given their generally accepted technical meaning.")  S.E.C. Rule 144, which was promulgated under the Securities Act of 1933, defines "an affiliate of an issuer [as] a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1).[4] Furthermore, "[w]hile Rule 144 fails to define 'control,' Rule 405 of Regulation C establishes a definition of 'affiliate' identical to that of Rule 144 and defines 'control' as 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise.'" SEC v. Kern, 425 F.3d 143, 149 (2d Cir. 2005)(citing 17 C.F.R.§ 230.405).[5]

---

[4] Rule 12b-2, which was promulgated under the Securities Exchange Act of 1934, similarly provides that an "'affiliate' of, or a person 'affiliated' with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified." 17 C.F.R. § 240.12b-2.

[5] Rule 12b-2 has an identical definition of "[t]he term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with')." 17 C.F.R. § 240.12b-2.

The analysis varies little, and the same outcome results, where the Court accepts Lead Plaintiff's argument that it should look to securities laws to clarify "affiliate" because, "[a]s a general rule, a class definition is interpreted according to the substantive law that provides the basis for the class action." (Reply Br. at 10)(quoting In re Motorola Sec. Litig., 644 F.3d 511, 517 (7th Cir. 2011)).  Here, the Plans were "created by [AIG] for the benefits of employees of [AIG] and its subsidiaries." In re Marsh & McLennan Co., Inc. Securities Litig., No. 04 Civ. 8144, at *1 (June 1, 2011), ECF No. 352.  Moreover, "[t]he administrators of the Plan[s] were all affiliated with or appointed by the Company; indeed the Plans provide[ ] that it must be administered by a [Plan Administrator] appointed by [AIG], which "alone causes the Plan to fit within the specialized definition of 'affiliate; under the federal securities laws." Id. (citing In re Motorola Sec. Litig., 644 F.3d 511, 513 (7th Cir. 2011)); Dubbs Decl. ¶ 3, Ex. 1, ISP Summary Plan Description at 16.  "The power to appoint and remove management is a hallmark of control, because the ability to select the managers gives [AIG] the power to cause the direction of the [Plans'] management." In re Marsh & McLennan Co., Inc. Securities Litig., No. 04 Civ. 8144, at *1 (June 1, 2011), ECF No. 352.

Nor does it matter that the Plans are "distinct legal entities," as "[s]ubsidiaries are distinct legal entities from their parents, but parent and subsidiary are affiliated companies . . . ." Id. at *2  "For the purposes of federal securities laws (and this action was brought to redress purported violations of federal securities laws), all that matters is that [AIG] is the party that created the Plans, set up its policies, put its management into place, and retains the power to remove management." Id.  On the facts in the record, Lead Plaintiff has demonstrated adequately that AIG has control over the Plans and, therefore, the Plans are affiliates.

Still, the Plans contend that "there is no other support for using securities law to define an ERISA plan's relationship to its sponsor," and then cites Int'l Bhd of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am. v. Daniel, 439 U.S. 551, 569 (1979), to support its claim that ERISA law should apply here. (Reply Br. at 2.)  In Int'l Bhd. of Teamsters, the U.S. Supreme Court had to determine "whether noncontributory, compulsory pension plan consitute[d] a "security" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934." 439 U.S. at 553.  An employee brought an action, claiming that the union's misrepresentation and omission of certain facts regarding the pension plan constituted a violation of the

aforementioned Acts. Id. at 555-56.  The Supreme Court reversed the Opinions of the District and Appeals Courts, not only holding the pension plan did not constitute a security and, therefore, there was no actionable claim, but also that the Acts were not even applicable. Id. at 566 ("As we have demonstrated above, the type of pension plan at issue in this case bears no resemblance to the kind of financial interest the Securities Acts were designed to regulate.").

Int'l Bhd of Teamsters, however, is completely irrelevant to the instant Motion.  The Court there simply held that the action could not be brought pursuant to the Acts due to minimal support in the plain text of the statutes, "the commonly held understanding" of "investment contract,"[6] 439 U.S. at 559, and legislative and regulatory histories. Id. at 558-59, 564, 569. Here, however, the Acts and their regulations clearly provide a definition for affiliate. (See 17 C.F.R. §§ 230.144(a)(1), 240.12b-2.)  And while the Court in Int'l Bhd of Teamsters did briefly mention ERISA, it did so only to explain that the then newly-enacted law, which "requires pension plans to disclose specified information to employees in a specified manner," supported the Court's conclusion that the action should not have

---

[6] An investment contract is "an instrument which is included in the statutory definitions of a security." Id. at 558.

been brought pursuant to the Securities Acts. Id. at 569. By no means does the case support the proposition that the Court should toggle between unrelated areas of law in search of a definition already established in the statutes and regulations that provide a basis for the claims.

The Plans also point to Kurzweil v. Philip Morris Cos., No. 94 Civ. 2373, 2001 U.S. Dist. LEXIS 83 (S.D.N.Y. Jan. 9, 2001), and urge the Court to follow its reasoning and to reach the same conclusion.[7] Similar to the instant case, Kurzweil involved pension plans, related to the settling corporate defendant, that sought to participate in the settlement of a securities action. Id. at *1-2. Ruling against Lead Plaintiff and the Settlement Administrator, the Court not only permitted employees –– investors in a number of defined contribution plans –– to receive shares of the Settlement proceeds, but it also concluded that they could receive the funds on either a "participant-level" or a "plan-level," "provided that no claim filed by the Fund may duplicate a claim filed by an individual investor." Id. at * 10. Still, while Kurzweil presents some similarities to the instant

---

[7] Because the Court concludes that the Plans are affiliates of AIG and, thus, cannot participate in the Settlement, the Court need not decide whether the Plans should receive funds on the "plan-level" or "participant-level." Therefore, the Court rejects the application of Kurzweil to the extent that the Plans rely on it in to urge the approval of participant-level claims. (See Plans' Br. at 21-25.)

15

Motion, there is a critical difference that sets them apart: the Kurzweil Opinion did not depend on the class definition and those excluded thereby. That case, therefore, is not on point.

Here, to resolve the instant Motion, the Court interpreted the class definition, finding that the Plans fit within the meaning of affiliate. (See supra.) Affiliates being mentioned explicitly for exclusion from the Settlement proceeds, the Plans are not entitled to partake in the distribution. (See Order & Final J. as to AIG at ¶ 4, ECF No. 622; Order & Final J. as to PwC at ¶ 4, ECF No. 569.) In Kurzweil, however, a class definition, including the mention of any excluded Parties, was notably absent. That Court, instead, determined that the Fund was a "purchaser" or "seller" of the company's stock within the meaning of the Securities Exchange Act of 1934. Kurzweil, 2001 U.S. Dist. LEXIS 83 at *3-4. Whether the Plans in the current action should be considered "purchasers" or "sellers" is not at issue before this Court and, therefore, need not be decided. So, unlike in Kurzweil, where the Court was "deal[ing] with a judicial oak which has grown from little more than a legislative acorn," id. at *6 (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737 (1975)), here, the Court acts only to ensure that the Settlement "is interpreted to give effect to the intent of the parties as expressed in the clear language of the

contract." Morgan Stanley Group, Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000)(citing Village of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995)). Suffice it to say, this is not a case where the Court is reading the Securities Exchange Act too narrowly, but interpreting the plain language of the agreement, which was executed by the Parties and approved by the Court.

D. The Equities do not Alter the Court's Decision

Finally, the Plans argue that the equities of the case tilt the case in their favor. The Court disagrees. The Circuit has made clear that under New York law, "[a] court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000); Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir. 1992)(same); see also Travelers Indem. Co. v. Statutory & Haw. Direct Action Settlement Counsel, 845 F. Supp. 2d 584, 596 (S.D.N.Y. 2012)(citing Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010))("New York law is clear that subjective notions of fairness or equity are not a permissible basis for a

17

court to rewrite a contract or to excuse compliance with conditions precedent."). The Plans' contentions, i.e. that the Settlement Administrator was slow to reject their claims, that they would have sought a Court determination earlier, and that they would not have wasted resources filing claims, do not alter the Court's conclusion. (See Plans' Br. at 18-19.) And while the Court is aware that "until the fund created by the settlement is actually distributed, [it] retains its traditional equity powers," Zients v. La Morte, 459 F.2d 628, 630 (2d Cir. 1972), this dispute does not involve settlement class members who did not receive notice or filers of a "few late claims." Id. at 630-31. Indeed, the dispute does not involve class members at all.

The Court, having found no ambiguity in the Settlement here, concludes that Plans' arguments from equity are without merit.

III. CONCLUSION

For the reasons stated above, the Plans' Motion to Direct the Settlement Administrator to Approve Claims is DENIED, the Plans' Objection to the Motion to Approve the Initial Settlement Distribution in Connection with Gen Re and Starr Defendants is OVERRULED, and Lead Plaintiff's Motions to Approve the Initial Settlement Distribution in Connection with PwC, AIG, Gen Re, and Starr Defendants are GRANTED.

SO ORDERED.

Dated: September 29, 2014
       New York, New York

_____
Deborah A. Batts
United States District Judge